No. 23-50746

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

GARY PEREZ AND MATILDE TORRES,

*Plaintiffs-Appellants,*

v.

CITY OF SAN ANTONIO,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Western District of Texas (Biery, J.)

## EMERGENCY MOTION OF APPELLANTS GARY PEREZ AND MATILDE TORRES FOR AN INJUNCTION PENDING APPEAL AND TO EXPEDITE APPEAL (OPPOSED MOTION)

Mark W. Rasmussen
Margaret I. Lyle
Jonathan D. Guynn
J. Benjamin Aguiñaga
Chance McCraw
Timothy M. Villari
JONES DAY
2727 North Harwood Street
Dallas, TX 75201.1515
Telephone: +1.214.220.3939
E-mail: mrasmussen@jonesday.com
E-mail: milyle@JonesDay.com
E-mail: jguynn@jonesday.com
E-mail: jbaguinaga@jonesday.com
E-mail: cmccraw@jonesday.com
E-mail: tvillari@jonesday.com

ATTORNEYS FOR PLAINTIFFS

John Greil
Steven T. Collis
Law & Religion Clinic
University of Texas School of Law
727 East Dean Keeton St.
Austin, TX 78705
Telephone: +1.512.471.5151
E-mail: john.greil@law.utexas.edu
E-mail: steve.collis@law.utexas.edu

ATTORNEYS FOR PLAINTIFFS

# CERTIFICATE OF INTERESTED PERSONS

*Perez, et al. v. City of San Antonio*, No. 23-50746

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Plaintiffs-Appellants Gary Perez and Matilde Torres

   Mark W. Rasmussen
   JONES DAY
   2727 N. Harwood St.
   Dallas, TX  75201

   Margaret I. Lyle
   JONES DAY
   2727 N. Harwood St.
   Dallas, TX  75201

   Jonathan D. Guynn
   JONES DAY
   2727 N. Harwood St.
   Dallas, TX  75201

   J. Benjamin Aguiñaga
   JONES DAY
   2727 N. Harwood St.
   Dallas, TX  75201

   Chance McCraw
   JONES DAY
   2727 N. Harwood St.
   Dallas, TX  75201

   Timothy M. Villari
   JONES DAY

2727 N. Harwood St.
Dallas, TX 75201

John Greil
Law and Religion Clinic
University of Texas School of Law
727 East Dean Keeton St.
Austin, TX 78705

Steven T. Collis
Law and Religion Clinic
University of Texas School of Law
727 East Dean Keeton St.
Austin, TX 78705

2.   Defendant-Appellee City of San Antonio

Fred R. Jones
Langley & Banack, Incorporated
745 East Mulberry Avenue
Suite 700
San Antonio, TX 78212
Tel: (210) 736-6600
Fax: (210) 735-6889
Email: fjones@langleybanack.com

Ian M. McLin
Langley & Banack, Incorporated
745 East Mulberry Avenue
Suite 700
San Antonio, TX 78212
Tel: (210) 736-6600
Fax: (210) 735-6889
Email: imclin@langleybanack.com

Lee Brinson Warren
Langley & Banack, Incorporated
745 East Mulberry Avenue
Suite 700
San Antonio, TX 78212
Tel: (210) 736-6600

Fax: (210) 735-6889
Email: warren@goodelaw.com

Natalie Friend Wilson
Langley & Banack, Incorporated
745 East Mulberry Avenue
Suite 700
San Antonio, TX 78212
Tel: (210) 736-6600
Fax: (210) 735-6889
Email: nwilson@langleybanack.com

*/s/ Mark W. Rasmussen*
Mark W. Rasmussen

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ...................................................... ii

INTRODUCTION ................................................................................................ 1

STATEMENT OF JURISDICTION ....................................................................4

STATEMENT OF THE CASE .............................................................................5

      A.     Factual Background .................................................................5

           1.    Plaintiffs' Religious Beliefs and the Sacred Area. ........................5

           2.    The City's Current and Intended Actions Within the Sacred Area ...................................................................................7

      B.     Procedural History ................................................................9

ARGUMENT .................................................................................................... 12

I.     Plaintiffs Established a Strong Likelihood of Success, or at Least a Substantial Case, on the Merits. ................................................................ 13

      A.     The City's Actions Violate TRFRA ..................................... 13

      B.     The City's Actions Violate Article I, Section 6-a of the Texas Constitution ....................................................................... 17

II.    The Remaining Factors Strongly Favor Plaintiffs. ...................................... 18

CONCLUSION .................................................................................................20

CERTIFICATE OF SERVICE .......................................................................... 22

CERTIFICATE OF COMPLIANCE ..................................................................24

# TABLE OF AUTHORITIES

**Page**

<span style="font-variant:small-caps">Cases</span>

*Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs,*
   217 F.3d 393 (5th Cir. 2000) ............................................................ 4

*Fulton v. City of Philadelphia,*
   141 S. Ct. 1868 (2021) ....................................................... 3, 16, 17

*Kennedy v. Bremerton Sch. Dist.,*
   142 S. Ct. 2407 (2022) ................................................................... 1

*Laurenzo ex rel. Laurenzo v. Miss. High Sch. Activities Ass'n, Inc.,*
   708 F.2d 1038 (5th Cir. 1983) ..................................................... 12

*McDonald v. Longley,*
   4 F.4th 229 (5th Cir. 2021) .......................................................... 19

*Merced v. Kasson,*
   577 F.3d 578 (5th Cir. 2009) ....................................................... 13

*Nken v. Holder,*
   556 U.S. 418 (2009) ..................................................................... 19

*Opulent Life Church v. City of Holly Springs,*
   697 F.3d 279 (5th Cir. 2012) .................................................. 18, 19

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
   141 S. Ct. 63 (2020) ..................................................................... 18

*Ruiz v. Estelle,*
   650 F.2d 555 (5th Cir. 1981) .................................................. 12, 18

*Tandon v. Newsom,*
   141 S. Ct. 1294 (2021) .................................................................. 17

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Watson v. City of Memphis,*
    373 U.S. 526 (1963) ........................................................................ 16, 20

*Whole Woman's Health v. Jackson,*
    13 F.4th 434 (5th Cir. 2021) ................................................................. 12

**STATUTES**

28 U.S.C.
    § 1292(a)(1) ........................................................................................... 4
    § 1331 .................................................................................................... 4
    § 1343 .................................................................................................... 4
    § 1367 .................................................................................................... 4
    § 1657(a) ................................................................................................ 1

42 U.S.C.
    § 1983 .................................................................................................... 4

Religious Land Use and Institutionalized Persons Act....................................... 9

Migratory Bird Treaty Act ............................................................................ 12

Texas Religious Freedom Restoration Act.................................................passim

**OTHER AUTHORITIES**

First Amendment ......................................................................................passim

Fifth Circuit Rule 27.3.................................................................................... 1

Fifth Circuit Rule 27.5.................................................................................... 1

Fifth Circuit Rule 34.5.................................................................................... 1

Fed. R. App. P. 8(a)(2)(A)(ii) ......................................................................... 1

Article I, § 6 of the Texas Constitution .....................................................9, 17

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Article I, § 6-a of the Texas Constitution .......................................................................9, 17

Pursuant to Federal Rule of Appellate Procedure 8(a)(2), 28 U.S.C. § 1657(a), and Fifth Circuit Rules 27.3, 27.5, and 34.5, Plaintiff-Appellants Gary Perez and Matilde Torres respectfully file this emergency motion requesting that the Court (a) enter an injunction pending appeal as detailed below, and (b) expedite this appeal. Given the exigencies, Plaintiffs requested an injunction pending appeal in the district court and sought a ruling by Friday, October 20. The district court has not yet issued its ruling, leaving Appellants with no option but to seek relief in this Court. *See* Fed. R. App. P. 8(a)(2)(A)(ii). Plaintiffs respectfully request a ruling on this emergency motion **by Thursday, October 26.** Plaintiffs have conferred with the City, which opposes this motion. Plaintiffs certify that the facts supporting this emergency motion are true and complete.

## INTRODUCTION

Religious liberty is central to our constitutional system. Indeed, in crafting the First Amendment, the Framers preserved "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022). And to secure that promise, Texas enacted the Texas Religious Freedom Restoration Act ("TRFRA"), which prohibits government-imposed, substantial burdens on religious exercise that fail strict scrutiny.

This case presents a classic violation of religious freedom that threatens devastating and irreparable consequences. Plaintiffs are members of the Lipan-Apache

Native American Church.  For centuries, they and their ancestors have gathered for worship at a bend in the San Antonio River located in San Antonio's Brackenridge Park (the "Sacred Area").  That riverbend is sacred to Plaintiffs because its shape tracks the constellation Eridanus, which is central to Plaintiffs' religion.  So too are the trees surrounding the riverbend, where double-crested cormorants—birds likewise central to Plaintiffs' religion—nest.  In other words, the Sacred Area is a living and breathing place of worship for Plaintiffs.

But the City of San Antonio is poised to destroy it.  In a two-acre tract of land that includes the Sacred Area (the "Project Area"), the City plans to repair retaining walls, drive away all cormorants, and leave only 14 of 83 trees standing. The City selected that plan without considering—and indeed, refusing to consider—Plaintiffs' religious exercise.  It also erected a fence that bars Plaintiffs from accessing the Sacred Area (even though no construction is planned for the Sacred Area).  <u>It plans to begin the project and utilize anti-nesting measures as early as October 26, and to remove the trees as early as December 1.</u>  All told, the City plans to destroy every aspect of what makes the Sacred Area sacred to Plaintiffs.

Plaintiffs sued the City under TRFRA and related laws and sought a preliminary injunction against these measures.  In the two orders now appealed to this Court, the district court found that Plaintiffs sincerely hold their religious beliefs and that the City's current and intended measures substantially burden Plaintiffs' religious exercise.  Given

that the court denied Plaintiffs complete relief, however, it appears that the district court thought the City satisfied strict scrutiny.

In particular, the district court expressly likened itself to King Solomon but, unlike Solomon, actually tried to split the baby. It ordered the City to give Plaintiffs access to the Sacred Area for two ceremonies on specific "astronomical dates," finding that Plaintiffs "met their burden to prove the four elements for injunctive relief." But the district court denied access for "individual worship," finding the issue waived (even though Plaintiffs expressly requested such access) and stating that Plaintiffs could simply pray and meditate in a Roman Catholic church or elsewhere in the Park. It also declined to enjoin the City's planned tree-removal and anti-nesting measures, even though the City admitted it never actually attempted to accommodate Plaintiffs' religious exercise.

The district court was wrong on each score, and Plaintiffs suffer irreparable harm every day they are barred from the Sacred Area and will suffer even more irreparable harm—in their words, "devastating" harm—if the City is permitted to carry out its irreversible tree-removal and anti-nesting operations. To be clear, Plaintiffs do not seek to prevent any legitimate construction projects. Their only claim is that the City must satisfy strict scrutiny to justify the substantial burdens on Plaintiffs' religious freedom—and the City never tried to accommodate Plaintiffs. The City thus flunks strict scrutiny. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021) ("[S]o long as

the government can achieve its interests in a manner that does not burden religion, it must do so.").

To ensure this Court's effective appellate review and to prevent further irreparable harm to Plaintiffs, Plaintiffs respectfully request that the Court expedite this appeal and enter an injunction pending appeal (1) preventing the City from barring Plaintiffs' entry into the Sacred Area for individual and group worship and prayer; (2) preventing the City from implementing Phase I of the construction project as currently designed with respect to tree removal in the Project Area; and (3) preventing the City from utilizing anti-nesting procedures to prevent cormorants from nesting in the project area. *Cf. Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs*, 217 F.3d 393, 399 (5th Cir. 2000) ("A plaintiff may [] seek a stay or injunction pending appeal to halt construction while the appeal is fully considered."). <u>Given the City's stated intent to proceed as early as Thursday, October 26, Plaintiffs request a ruling by that date.</u>

## STATEMENT OF JURISDICTION

The district court has jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 1983, and Plaintiffs' state-law claims under 28 U.S.C. § 1367. The district court entered orders granting in part and denying in part Plaintiffs' request for a preliminary injunctions on October 2 and October 11, 2023. Dist. Ct. Dkts. 47, 52. Plaintiffs filed a timely notice of appeal from both orders on October 16, 2023. Dist. Ct. Dkt. 53. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE CASE

**A.    Factual Background**

**1.    Plaintiffs' Religious Beliefs and the Sacred Area.**

Plaintiffs Gary Perez and Matilde Torres are Native Americans and practicing members of the Lipan-Apache Native American Church. Tr. 41:15–42:11, 121:4–9. Plaintiffs adhere to the teachings and religious practices of both Native American and Christian faith traditions. Tr. 42:12–19. Relevant here, the Sacred Area—the northernmost point on the southern bank of a unique riverbend in the San Antonio River which passes through Brackenridge Park—is a central part of Plaintiffs' religious practice. The shape of the riverbend is itself important because it tracks the shape of the Eridanus constellation. Tr. 94:21–95:2, 126:18–23, 769:7–11. The trees surrounding the riverbend likewise are critical because Plaintiffs believe that the trees are descendants of trees that previously stood in the Sacred Area, just as Plaintiffs' religious traditions have passed "from generation to generation." Tr. 77:21–78:3, 100:15–19. Finally, the trees provide nesting locations for double-crested cormorants. The cormorant is special for its role in the Yanaguana creation story, which teaches that life in the San Antonio River Valley began when a spirit in the form of a blue panther chased a spirit in the form of a cormorant from the Blue Hole—a spring located just north of Brackenridge Park. Tr. 43:24–44:4. In this Sacred Area, water, trees, and cormorants come together to reflect the sacred linkage between the lower, middle, and upper worlds. Tr. 110:12–15, 112:7–15.

5

One ceremony well illustrates this sacred connection: During this ceremony, Plaintiffs view a reflection of a cormorant in the river (the underworld), while standing both in the presence of nesting cormorants (the middle world) and beneath the Eridanus constellation (the upper world). Tr. 58:14–21, 66:2–13. In that holy moment, Plaintiffs' prayers transcend time and space, and as the cormorants ascend into the sky, they "take[] our prayers ... to the heavens." Tr. 127:23–25; *see also* Tr. 139:5–8.

For decades, Plaintiffs, like their ancestors, have worshipped in the Sacred Area, both individually and collectively. Tr. 89:12–20, 140:11–14, Tr. 43:17–18; Dist. Ct. Dkt. 52, Pls.' FoF ¶¶ 4, 6. They have assisted Native American pilgrims by "bring[ing] them to that very point along the river." Tr. 63:13–17. And, as ceremonial leaders, they have conducted Church ceremonies in the Sacred Area. Tr. 53:13–23. Plaintiffs view their service as "absolutely critical." Tr. 57:15–25, 63:18–64:1, 107:18–20, 121:10–16. And they view their worship in the Sacred Area in particular as "critical": "it's where the birds are," "[i]t's because of that bend in the river," "it's connected to [the Eridanus constellation]." Tr. 769:7–11. Their worship in the Sacred Area is a personal and spiritual obligation. Tr. 96:11–22. They cannot worship elsewhere because "[i]t's not religiously effective … I'm not standing where I need to stand to make my petitions to God almighty." Tr. 62:20–63:8. In short, the Sacred Area is truly sacred to Plaintiffs, and the district court had no trouble concluding that "Plaintiffs have a sincere religious belief." Dist. Ct. Dkt. 47 at 2.

**2.    The City's Current and Intended Actions Within the Sacred Area.**

The City, however, has halted Plaintiffs' access to the Sacred Area and plans to destroy the very aspects of the Sacred Area that make it sacred to Plaintiffs. In 2017, San Antonio voters approved a bond package for renovations to Brackenridge Park. Dkt. 52, Def.'s FoF ¶¶ 38–40. Years later, the City arrived at a plan to repair retaining walls along the San Antonio River, including near (but not in) the Sacred Area. Tr. 306:7–10. Phase I of the City's plan includes the removal of some 69 of 83 trees in the Project Area that cormorants use for nesting. Tr. 245:5–7. In addition, the City intends to deploy anti-nesting measures designed to keep migratory birds, including cormorants, from nesting in the Project Area. Tr. 412:17–413:2. Ultimately, the City intends to use a "cantilever" system to repair the retaining walls in the Project Area, which the City claims compels this dramatic degradation of the Sacred Area. Tr. 369:9–10.

Since early 2022, the City has been aware that these proposed actions would run roughshod over Plaintiffs' religious freedom. Plaintiffs testified at public meetings throughout 2022. Tr. 361:15–25; 137:3–8. In June 2022, Ms. Torres also emailed the City letters from multiple Native American tribes opposing the measures. Pls.' Ex. 16; Tr. at 135:15–136:24. The City refused to change its plans, complaining that "[i]t would take time and money." Tr. 344:10. Nor did the City attempt to accommodate Plaintiffs. *See, e.g.*, Tr. 78:20–23, 464:23–465:13.

The City rejected one alternative to the cantilever plan—a plan to "reconstruct the walls in place [to] … potentially save trees." Tr. 648:12–18. The City also rejected another alternative proposed by an engineer retained by a citizens' community group—the pier-and-spandrel system—which would preserve 59 more trees than would the City's selected cantilever design. Pls.' Ex. 28; Tr. 245:5–13. As to the pier-and-spandrel alternative, the City rejected it *even though* it would "take about the same" length of time to construct and is "at least as safe" as the cantilever system. Tr. 241:6–16; *see also* Tr. 342:2–10, Tr. 630:16–19. The City's expert conceded that the pier-and-spandrel system would "save more trees" than the cantilever approach. Tr. 627:18–24. But the City rejected it nonetheless under the belief that "our hands are basically tied by a series of legal issue[s] – or regulatory restrictions." Tr. 627:20–24. At the same time, the City acknowledged that it can "seek exemptions from the [San Antonio Historic Design and Review Commission] or ... USACE [(United States Army Corps of Engineers)] to deviate ... from various regulatory obligations." Tr. 20:1–7, 395:12–20. But it admitted that it has not "attempted to submit [a variance, or] notice of deviation on account of Plaintiffs' religious exercise." Tr. 395:12–20. (Contrast that with the fact that the City pursued, and received, a variance from a zoning ordinance that would have required the City to "preserve 80 percent of significant trees and 100 percent of heritage trees." Tr. 396:3–8.)

In February 2023, the City erected fencing around the Project Area, thereby barring Plaintiffs from worshipping in the Sacred Area. Tr. 61:5–14, 359:21–360:10.

The City repeatedly denied Plaintiffs' requests to worship in the Sacred Area.  Tr. 64:2–14.  At the same time, the City allowed other individuals inside the fence: a city councilwoman, a city arborist, and other city employees.  Tr. 482:4–483:2, 523:4–524:19, 525:1–5, 755:9–20.  But the City has no justification for the fence.  It principally claimed concern about a single hanging branch (which the district court ordered the City to remove and the City has now removed).  Tr. 819:9–18; Dist. Ct. Dkt. 48 at 1.  The City also claimed that the fencing aided its anti-nesting efforts—but the City now concedes that the Sacred Area does not "need to be fenced off for any bird reason."  Tr. 408:4–11.

To proceed with its plans, the City needs (but does not yet have) a USACE permit.  Tr. 673:18–24.  The USACE is in a consultation period, however, and the City has represented to Plaintiffs that it may proceed as early as Thursday, October 26, 2023.  Tr. 762:7–13.

### B.    Procedural History

Plaintiffs sued the City on August 9, 2023, asserting federal and state-law causes of action and seeking a temporary restraining and preliminary injunction against the City's actions detailed above.  Specifically, Plaintiffs asserted claims under the federal Free Exercise Clause (Count I), the federal Religious Land Use and Institutionalized Persons Act ("RLUIPA") (Count II), Article I, Section 6 of the Texas Constitution (Count III), Article I, Section 6-a of the Texas Constitution (Count IV), and TRFRA (Count V).  Dist. Ct. Dkt. 3.  Plaintiffs sought three forms of injunctive relief: (a) access

for religious worship in the Sacred Area; (b) preservation of the spiritual ecology of the Sacred Area by minimizing tree removal; and (c) preservation of the spiritual ecology of the Sacred Area by allowing cormorants to nest. Dist. Ct. Dkt. 52 at 1. To that end, "Plaintiffs ask[ed] the Court to 'order the City to grant access to the plaintiffs to the Sacred Area and reevaluate the Bond Project to develop alternative plans that will accommodate [their] religious beliefs.'" *Id.* at 2.

The district court held a four-day hearing on Plaintiffs' motion for a preliminary injunction, during which the court heard Plaintiffs' unequivocal testimony that the City's plans—without any effort to accommodate their religious exercise—would be devastating to their religion and the spiritual ecology of the Sacred Area. Tr. 71:14–72:11.

On October 2, 2023, the district court issued a partial order addressing Plaintiffs' time-sensitive request for access to the Sacred Area for ceremonies on November 17 and December 21, 2023. The district court recognized that Plaintiffs seek "to resume their historic access to a sacred site in Brackenridge Park which is presently fenced off." Dist. Ct. Dkt. 47 at 1. The court held that "Plaintiffs have a sincere religious belief and are entitled to be present at the site" on the requested dates. *Id.* The court also ordered the City to remove a broken tree limb (referenced above) and install a gate in the fence to facilitate Plaintiffs' access. *Id.* The court also, however, acquiesced in the City's "immediate desire … to resume bird deterrent operations"—"except for the dates on which Plaintiffs['] religious ceremonies occur." *Id.* The Court thought that "a serious

health risk [from bird excrement] exists which surpasses Plaintiffs' desire to have the double-crested cormorant present for their dropped feathers which no doubt Plaintiffs already have or can be found in other locations." *Id.* (The district court misunderstood the record: Plaintiffs' religious practice requires the presence and nesting of cormorants in the area, not the gathering of feathers. *See, e.g.*, Tr. 59:13–21, 129:9–15.) Finally, the district court invoked King Solomon in stating that its order "[f]ollow[ed] the example of another individual who had to make difficult decisions." Dist. Ct. Dkt. at 3 (citing 1 *Kings* 3:16–28).

Nine days later, the district court issued a second order granting Plaintiffs' motion in part and denying it in part. *First*, as to access for worship in the Sacred Area, the court found that "Plaintiffs have a sincere religious belief and have met their burden to prove the four elements for injunctive relief." Dist. Ct. Dkt. 52 at 2. The court thus granted Plaintiffs' request for access with respect to "'religious services' involving 15 to 20 people for no more than an hour on specified astronomical dates coinciding with Plaintiffs' spiritual beliefs." *Id.* The court, however, denied any "access for individual worship," deeming that request "waived" because "it was not in Plaintiffs' Closing Argument request" and holding that "individual access at any time Plaintiffs desire is impractical." *Id.* at 3. The court also "note[d] that both Plaintiffs also practice Roman Catholicism whose places of worship provide numerous locations for individual meditation and worship"—and they "still have access to over 300 acres of Brackenridge Park for meditation in nature." *Id.*

*Second*, as to tree removal and anti-nesting, the court found that "the City has met its burden of proving a compelling government interest for public health and safety, and the equities favor the City on those two items." *Id.* at 5. It summarily adopted the City's own findings of fact and conclusions of law as the court's own. *Id.* It also briefly suggested that hindering the City's tree removal would "exponentially extend Plaintiffs' and the public's presently fettered ability to enjoy the area," and hindering the anti-nesting efforts would put the City's project on hold indefinitely "given the different species' migration patterns and the Migratory Bird Treaty Act." *Id.* at 45.

Plaintiffs filed a notice of appeal from both orders and moved the district court for an injunction pending appeal, which the district court has not yet adjudicated.

## ARGUMENT

To obtain an injunction pending appeal, a party "must show (1) a strong likelihood of success on the merits; (2) irreparable injury in the absence of an injunction; (3) that the balance of hardships weighs in their favor if injunctive relief is granted; and (4) that the public interest favors such relief." *Whole Woman's Health v. Jackson*, 13 F.4th 434, 441 (5th Cir. 2021). However, a "movant need only present a *substantial case* on the merits when a *serious legal question* is involved and show that the balance of the equities weighs heavily in favor of granting the stay" or injunction pending appeal. *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981) (emphasis added); *see also Laurenzo ex rel. Laurenzo v. Miss. High Sch. Activities Ass'n, Inc.*, 708 F.2d 1038, 1042 (5th Cir. 1983) (*Ruiz* supplies the standard for a "stay or injunction pending appeal"). Here, Plaintiffs have

demonstrated both a strong likelihood of success on the merits and a substantial case on the merits of serious legal questions—and the equities heavily favor Plaintiffs.

## I.   PLAINTIFFS ESTABLISHED A STRONG LIKELIHOOD OF SUCCESS, OR AT LEAST A SUBSTANTIAL CASE, ON THE MERITS.

### A.   The City's Actions Violate TRFRA.

Plaintiffs have established both a strong likelihood of success and a substantial case on the merits of their TRFRA claim.  TRFRA deems unlawful a government regulation that substantially burdens a plaintiff's free exercise of religion unless the regulation satisfies strict scrutiny—*i.e.*, it furthers a compelling governmental interest and it is the least restrictive means of furthering that interest.  *Merced v. Kasson*, 577 F.3d 578, 588 (5th Cir. 2009).  Here, there is no serious dispute that the City's current and intended actions substantially burden Plaintiffs' religious exercise.  The City literally bars them from worshipping in the Sacred Area and proposes to destroy its sacred aspects altogether.  *See Merced*, 577 F.3d at 591 ("Merced cannot perform the ceremonies dictated by his religion. This is a burden, and it is substantial.").  And even the district court itself determined that Plaintiffs "have a sincere religious belief and have met their burden to prove the four elements of injunctive relief"—at least as to group worship "on specified astronomical dates." Dist. Ct. Dkt. 52 at 2.  The only question, therefore, is whether the City can satisfy strict scrutiny as to its remaining restrictions.  It cannot.

*Access to the Sacred Area.*  That is plainly true with respect to the City's fencing that currently bars Plaintiffs from entering the Sacred Area for individual

worship and prayer. The City not only has no compelling governmental interest—*it has no interest at all.* There is no ongoing or even planned construction at the Sacred Area, and the original rationales for the fence (a tree limb and bird deterrence) no longer apply, as the City admits. Tr. 408:4–11, 819:9–18; Dist. Ct. Dkt. 48 at 1. And even if the City could identify a compelling governmental interest, the fencing is not narrowly tailored to achieve that interest. For example, the record evidence shows that the City could easily install the fencing elsewhere to protect construction areas while leaving access to the Sacred Area where "no construction" is even planned. *See* Tr. 306:7–14, 640:1–11.

The district court's October 11 order permits Plaintiffs to enter the Sacred Area for group worship on significant astronomical dates only, reasoning that Plaintiffs had not requested access for individual worship and prayer. That distinction is mistaken: No court would uphold a rule prohibiting Christians from individually worshipping at their church while excepting group worship on Christmas Eve and Easter. Just so here. The district court also misapprehended the record. Plaintiffs' briefing expressly asked the Court to "enjoin[] the City from [] denying Plaintiffs general access to the Sacred Area, not just for scheduled religious ceremonies in November and December but also for ceremonies beyond December *and* for daily prayer and worship now and in the future." Dkt. 49 at 6 (emphasis in original). They emphasized that they seek to "perform scheduled and unscheduled ceremonies, *such as personal prayer.*" *Id.* at 8 (emphasis added). And they relied on the fact that Mr. Perez was "prevented [] from accessing the Sacred Area to pray following the tragic loss of his aunt and niece"—*i.e.*,

a time when he needed a personal moment of prayer and meditation. *Id.* at 9. The evidence and argument at the hearing likewise presented this request. Tr. 92:2–6, 777:19–21, 780:7–8, 781:19–82:6, 787:5–15, 824:19–22. The district court was thus simply mistaken in thinking Plaintiffs waived this issue.

The district court also suggested that it would be "impractical" to allow Plaintiffs individual access at any time. Dist. Ct. Dkt. 52 at 3. As just explained, however, no construction is happening or planned at the Sacred Area with which Plaintiffs' access would interfere. The district added that Plaintiffs "also practice Roman Catholicism" and could pray and meditate in a church or one of the other "over 300 acres of Brackenridge Park." *Id.* But Plaintiffs' religion requires worship in the Sacred Area because of its unique attributes, none of which are present in Roman Catholic churches or other areas of Brackenridge Park. *See, e.g.*, Tr. 111:3–17.

There is no good reason why Plaintiffs may not individually worship and pray in the Sacred Area. <u>At a minimum, therefore, Plaintiffs are entitled to an injunction pending appeal that prevents the City from barring Plaintiffs from the Sacred Area.</u>

*Tree Removal.* The same goes for the City's plan to remove dozens of trees. Plaintiffs do not dispute that the City generally has an interest in public safety (although the undisputed evidence is that the retaining walls in the Sacred Area do not need repair). Tr. 114:1–2, 134:16–19. The problem is that the City pursued a single plan—its cantilever idea—without ever attempting to accommodate Plaintiffs' religious exercise. That is fatal on strict-scrutiny review because "so long as the government can achieve

its interests in a manner that does not burden religion, *it must do so*." *Fulton*, 141 S. Ct. at 1881 (emphasis added). (The October 11 order does not mention the narrow-tailoring requirement.)

Here, moreover, the record is clear that the City can accommodate Plaintiffs. The City's own expert conceded that alternative designs would "save more trees." Tr. 627:18–20. The City, however, rejected those plans under the mistaken belief that its "hands are basically tied by a series of legal issue[s]—or regulatory restrictions." Tr. 627:23–24. But the City admitted that it never sought an exemption "on account of Plaintiffs' religious exercise," even though the City sought (and obtained) a variance from other restrictions. Tr. 395:18–20. Instead, the City stuck to the cantilever design, which "was chosen well before [the City] understood there was an issue" with religious freedom, Tr. 343:25–344:1, and—even after discovering the religious-liberty problem—stubbornly persisted while complaining that accommodating Plaintiffs "would take time and money." Tr. 344:10. But "constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." *Watson v. City of Memphis*, 373 U.S. 526, 537 (1963).

**Anti-Nesting Measures.** So too for the City's attempts to prevent cormorants from nesting in the Project Area. The district court's passing references to potential harm from feces are a red herring: The City's anti-nesting measures are about eliminating migratory birds that might otherwise stall construction. Tr. 413:22–23. The City provided zero evidence that "the particular practice at issue"—cormorants nesting

in the Project Area—causes health or safety problems.  *See Barr v. City of Sinton*, 295 S.W.3d 287, 307 (Tex. 2009); *compare* Tr. 414:8–9 (cormorants in Project Area "do not present a health risk").  And the City "never actually investigated whether it could" craft a bird-deterrence policy that would accommodate Plaintiffs' religious exercise.  Tr. 464:23–465:2.  Under *Fulton*, that is fatal.  141 S. Ct. at 1881.  Plaintiffs are likely to succeed, or at least have a substantial case, on the merits across the board.

Finally, for preservation purposes, Plaintiffs' claims under the Free Exercise Clause and Article I, Section 6 of the Texas Constitution generally rise and fall with their TRFRA claim.  In particular, strict scrutiny governs Free-Exercise claims because the City has openly favored secular activity over Plaintiffs' religious exercise.  *See Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021); *Fulton*, 141 S. Ct. at 1877.  Accordingly, for all the reasons they are likely to prevail on their TRFRA claim, they are likely to prevail on the other two claims as well.

## B.   The City's Actions Violate Article I, Section 6-a of the Texas Constitution.

Separately, Plaintiffs are likely to succeed (or at least have a substantial case) on the merits under Article I, Section 6-a of the Texas Constitution.  That provision prohibits a city from issuing a decision or rule "that prohibits or limits religious services."  Tex. Const. art. I, § 6-a.  And that is precisely what the City has done and proposes to do.  It has *prohibited* Plaintiffs from entering the Sacred Area for religious services and similar activities.  And it proposes to *limit* Plaintiffs' future religious services by

irreparably destroying the very aspects of the Sacred Area that make it a living place of worship for Plaintiffs. No one would say that a city that padlocked the doors to a local Baptist church would survive Article I, Section 6-a scrutiny. Much less would a city that ransacked a local Catholic church's mass materials, burned the church down, and then assured the congregation that it is free to have mass. All the same here. The plain text forbids the City from barring Plaintiffs' services.

## II.    THE REMAINING FACTORS STRONGLY FAVOR PLAINTIFFS.

The three remaining injunction factors weigh in Plaintiffs' favor—indeed, they "heavily tilt" in Plaintiffs' favor. *Ruiz*, 650 F.2d at 566.

*Irreparable Harm.* "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012). Such losses are irreparable even if they are "limited" or "temporary." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020). Two forms of textbook irreparable harm are at issue here.

*First*, undisputed evidence establishes that the City has prohibited Plaintiffs from worshipping and praying in the Sacred Area since the City erected the fence in February 2023. Tr. 54:4–11, 61:18–24, 62:4–11. Notwithstanding that no construction is ongoing, the City apparently intends to maintain its fencing—and its bar on Plaintiffs' presence in the Sacred Area—indefinitely. And that loss of First Amendment freedoms is textbook irreparable harm. To be sure, as noted above, the district court permitted Plaintiffs to enter the Sacred Area for scheduled ceremonies—but again, that partial

(and welcome) relief does not change the fact that Plaintiffs are otherwise barred from worshipping in the Sacred Area.

*Second*, the City's intended destruction of the Sacred Area—with construction beginning as soon as October 26 and tree removal starting December 1—quite literally will be irreparable. Indeed, coupled with anti-nesting measures, this destruction will irreversibly transform the Sacred Area. As Plaintiffs testified, the Sacred Area is sacred *because of* the spiritual ecology comprising the riverbend, the trees, and the cormorants. *E.g.*, Tr. 87:15–88:7, 409:20–24, 412:17–23. If the City proceeds, it will forever dissolve what Plaintiffs sincerely believe represents thousands of years of continuity. Tr. 83:11–19, 139:13–24 ("[I]t'd be gone forever. You can't replace that."). The district court was wrong to suggest that this is simply a "temporary" hardship until the Sacred Area reopens. Dist. Ct. Dkt. 52 at 5. If and when the Sacred Area reopens, the Sacred Area will have been desecrated. That is irreparable harm in spades.

**Equities and Public Interest.** The remaining "factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church*, 697 F.3d at 293 (citation omitted). And the City's inability to impinge on Plaintiffs' First Amendment freedoms "is really no harm at all." *McDonald v. Longley*, 4 F.4th 229, 255 (5th Cir. 2021). Neither does the City move the needle by complaining that "[i]t would take time and money" to not violate Plaintiff's First Amendment rights. Tr. 344:10. The "vindication of conceded constitutional rights

cannot be made dependent upon any theory that it is less expensive to deny than to afford them." *Watson*, 373 U.S. at 537.  The evidence showed, moreover, that an alternative pier-and-spandrel option would take about the same amount of time as the City's preferred cantilever system—and Plaintiffs seek an expedited appeal.  Tr. 241:6–16.  The equities favor Plaintiffs.

## CONCLUSION

For these reasons, the Court should expedite this appeal and enjoin (pending appeal) the City (1) from preventing Plaintiffs from accessing the Sacred Area for personal and group worship and related religious activities; (2) from implementing the bond project as currently designed with respect to tree removal; and (3) from engaging in anti-nesting measures that results in displacing cormorants from the Sacred Area.

October 23, 2023

Respectfully submitted,

/s/ Mark W. Rasmussen

/s/ John Greil

Mark W. Rasmussen
Margaret I. Lyle
Jonathan D. Guynn
J. Benjamin Aguiñaga
Chance McCraw
Timothy M. Villari
JONES DAY
2727 N. Harwood St.
Dallas, Texas 75201
214-220-3939
mrasmussen@jonesday.com
milyle@JonesDay.com
jguynn@jonesday.com
jbaguinaga@jonesday.com
cmccraw@jonesday.com
tvillari@jonesday.com

John Greil
Steven T. Collis
LAW AND RELIGION CLINIC
UNIVERSITY OF TEXAS SCHOOL OF LAW
727 East Dean Keeton St.
Austin, Texas 78705
(512)-471-5151
john.greil@law.utexas.edu
Steve.collis@law.utexas.edu

*Counsel for Plaintiffs*

*Counsel for Plaintiffs*

## CERTIFICATE OF CONFERENCE

I certify that on October 23, 2023, counsel for Plaintiffs-Appellants Gary Perez and Matilde Torres contacted counsel for Defendant-Appellee regarding this motion and the relief requested herein.  Counsel indicated they are opposed to this motion.

*/s/ Chance B. McCraw*
Chance B. McCraw
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on October 23, 2023, the foregoing motion was electronically filed with the United States Court of Appeals for the Fifth Circuit using the CM/ECF system, and that all parties required to be served have been served. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

/s/ Chance B. McCraw
Chance B. McCraw
*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

This motion complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5198 words, excluding parts exempted by Rule 27(a)(2)(B); and (2) the typeface and type style requirements of Rule 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface (14-point Garamond) using Microsoft Word (the program used for the word count).

Dated: October 23, 2023

/s/ *Chance B. McCraw*
Chance B. McCraw
*Counsel for Plaintiffs*