CASE NO. 23-50746
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

Gary Perez; Matilde Torres,

Plaintiffs – Appellants

v.

City of San Antonio,

Defendant – Appellee

---

APPELLEE CITY OF SAN ANTONIO'S RESPONSE IN OPPOSITION TO
APPELLANTS' EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

---

FRED R. JONES
fjones@langleybanack.com
State Bar No. 10886700
SARA MURRAY
smurray@langleybanack.com
State Bar No. 14729400
NATALIE F. WILSON
nwilson@langleybanack.com
State Bar No. 24076779
IAN M. MCLIN
imclin@langleybanack.com
State Bar No. 24005071
LEE WARREN
lwarren@langleybanack.com
State Bar No. 24099453
LANGLEY & BANACK, INC.
745 East Mulberry, Suite 700
San Antonio, TX 78212-3166

Telephone: (210) 736-6600
Facsimile:  (210) 735-6889


CITY OF SAN ANTONIO
DEBORAH KLEIN
Deputy City Attorney
State Bar No. 11556750
Deborah.Klein@sanantonio.gov
International Center
203 South St. Mary's Street,
Second Floor
San Antonio, TX 78205
Telephone: (210) 207-8949
Facsimile:  (210) 207-4004

COUNSEL FOR APPELLEE
CITY OF SAN ANTONIO

## CERTIFICATE OF INTERESTED PERSONS

*Perez, et al. v. City of San Antonio*, No. 23-50746

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1.     Plaintiffs — Appellants Gary Perez ("Perez") and Matilde Torres ("Torres")(collectively, "Appellants")

   Trial and Appellate Counsel for Plaintiffs — Appellants:

   Mark W. Rasmussen
   mrasmussen@jonesday.com
   Margaret I. Lyle
   milyle@jonesday.com
   Jonathan D. Guynn
   jguynn@jonesday.com
   J. Benjamin Aguiñaga
   jbaguinaga@jonesday.com
   Chance McCraw
   cmccraw@jonesday.com
   Timothy M. Villari
   tvillari@jonesday.com
   JONES DAY
   2727 N. Harwood Street
   Dallas, TX 75201.1515
   Telephone: (214) 220-3939

   John Greil
   john.greil@law.utexas.edu
   Steven T. Collis
   steve.collis@law.utexas.edu
   LAW AND RELIGION CLINIC
   UNIVERSITY OF TEXAS SCHOOL OF LAW

727 East Dean Keaton Street
Austin, TX  78705
Telephone:  (512) 471-5151

2.     Defendant — Appellee City of San Antonio ("City" or "San Antonio" or "Appellee")

Fred R. Jones
fjones@langleybanack.com
Ian McLin
imclin@langleybanack.com
Lee Brinson Warren
lwarren@langleybanack.com
Natalie Friend Wilson
nwilson@langleybanack.com
Sara Murray
smurray@langleybanack.com
LANGLEY & BANACK, INC.
745 East Mulberry, Suite 700
San Antonio, TX  78212
Telephone:  (210) 736-6600
Facsimile:   (210) 735-6889

City of San Antonio
Deborah Klein
Deputy City Attorney
Deborah.Klein@sanantonio.gov
International Center
203 South St. Mary's Street,
Second Floor
San Antonio, TX 78205
Telephone: (210) 207-8949
Facsimile:  (210) 207-4004

*Fred R. Jones*
FRED. R. JONES
Attorney of Record
for Appellee

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

TABLE OF CONTENTS ................................................................................ iii

TABLE OF AUTHORITIES............................................................................ iv

CITATIONS TO THE APPENDIX .................................................................... vi

INTRODUCTION AND RELIEF SOUGHT.......................................................... 1

STATEMENT REGARDING JURISDICTION ....................................................... 2

    I. RESPONSE TO APPELLANTS' STATEMENT OF THE CASE ........................ 3

    II. RESPONSE TO APPELLANTS' ARGUMENT ............................................. 9

        A. The City Did Not Violate TRFRA, and the District Court Has Already Granted Appellants Access to the Project Area for Their Religious Ceremonies. .................................................................. 9

        B. The City's Actions Did Not, and Do Not, Violate TEX. CONST. art. I, § 6-a, and Appellants Have Failed to Show Otherwise........... 14

    III. CONCLUSION ............................................................................. 25

CERTIFICATE OF COMPLIANCE ................................................................. 27

CERTIFICATE OF SERVICE ........................................................................ 28

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. City of San Antonio,*
 67 S.W.2d 1036 (Tex. 1934) ....................................................... 8

*Aquifer Guardians in Urban Areas v. Fed. Hwy. Admin.,*
 779 F. Supp. 2d 542 (W.D. Tex. 2011) ................................... 25

*City of Brookside Vill. v. Comeau,*
 633 S.W.2d 790 (Tex. 1982) ......................................................... 5

*City of Laredo v. Laredo Merchs. Ass'n,*
 550 S.W.3d 586 (Tex. 2018) ........................................................ 8

*Crow v. Gullet,*
 541 F. Supp. 785 (D. S.D. 1982) .............................................. 17

*Havasupai Tribe v. United States,*
 752 F. Supp. 1471 (D. Ariz. 1990) ........................................... 16

*Hunt v. City of San Antonio,*
 462 S.W.2d 536 (Tex. 1971) ......................................................... 5

*Lyng v. Northwest Indian Cemetery Protective Ass'n,*
 485 U.S. 439 (1988) ...................................................................... 15

*Manybeads v. United States,*
 730 F. Supp. 1515 (D. Ariz. 1989) ........................................... 16

*Navajo Nation v. U.S. Forest Serv.,*
 535 F.3d 1058 (9th Cir. 2008) ........................................... 12, 15

*Powell v. City of Houston,*
 628 S.W.3d 838 (Tex. 2021) ......................................................... 5

*Prater v. City of Burnside,*
 289 F.3d 417 (6th Cir. 2002) ..................................................... 15

*Satanic Temple v. City of Belle Plaine,*
 2021 WL 4199369 (D. Minn. Sept. 15, 2021) ....................... 14

*Taylor v. City of Gary,*
 233 F. App'x 561 (7th Cir. 2007) .............................................. 14

*Texas River Barges v. City of San Antonio,*
 21 S.W.3d 347 (Tex. App.—San Antonio 2000, pet. denied) ............. 8, 9

*United States v. Means,*
 858 F.2d 404 (8th Cir. 1988) ..................................................... 15

*Wilson v. Block,*
 708 F.2d 735 (D.C. Cir. 1983) ................................................... 16

## Statutes

16 U.S.C. § 703 ................................................................. 6

42 U.S.C. § 2000cc .......................................................... 9

TEX. CIV. PRAC. & REM. CODE § 110.003(a) ............................ 10

TEX. LOC. GOV'T CODE § 54.004 ......................................... 9

## Rules

FED. R. APP. P. 8 ............................................................. 1

FED. R. APP. P. 8(a)(2)(E) ................................................. 2

FED. R. APP. P. 27(a)(2)(B); and (2) ................................... 27

FED. R. APP. P. 27(d)(1)(E) ............................................... 27

FED. R. APP. P. 27(d)(2)(A) ............................................... 27

## Constitutions

TEX. CONST. art. I, § 6-a ....................................... iii, 10, 14

TEX. CONST. art. XI, § 5 .................................................. 8

## CITATIONS TO THE APPENDIX

The Appendix to this Response contains: (1) exhibits to this Response (**Ex.** ___); (2) exhibits introduced into evidence at the Preliminary Injunction Hearing (**DC Ex.** ___); and (3) excerpts from the testimony at the Preliminary Injunction Hearing (**Tr.**___).

To the Honorable United States Court of Appeals
for the Fifth Circuit:

Pursuant to Fed. R. App. P. 8, Appellee, the City of San Antonio ("City" or "Appellee"), files this Response in Opposition to the Emergency Motion of Appellants Gary Perez and Matilde Torres for an Injunction Pending Appeal and to Expedite Appeal (Opposed Motion) ["Motion," **COA Dkt. 6**].

## Introduction and Relief Sought

Appellants come into this Court seeking the very same relief the District Court correctly denied them after a four-day Preliminary Injunction Hearing ("PI Hearing") at which over 120 exhibits were entered, all without objection. *See generally* **Ex. 1** hereto ("Partial Order," **DC Dkt. 47**); **Ex. 2** hereto ("Opinion & Order," **DC Dkt. 52**). Appellants failed to prove they were entitled to such relief before the District Court, and they have similarly failed to meet their burden here. For the reasons set out below, the Court should not grant an injunction pending appeal, and should not stay or modify the District Court's preliminary injunction rulings pending trial on the merits of this case. In the alternative, if the Court is inclined to enjoin or somehow stay or modify the District Court's preliminary injunction rulings pending trial

on the merits, Appellants should be required to post a bond to protect the City from the substantial financial injury it will sustain if effectuation of Phase I of the Project is delayed due to the injunction Appellants seek in this litigation. *See, e.g.,* FED. R. APP. P. 8(a)(2)(E); *see also* **Ex. 3** ("City's Response to Injunction Pending Appeal Motion," **[DC Dkt. 56]**, which is adopted and incorporated by reference in its entirety herein). Presently, the City's Director/City Engineer of Public Works estimates that the City will incur delay costs and other damages of at least $17,000/month for the total number of months an injunction or stay, if any, remains in effect.

## STATEMENT REGARDING JURISDICTION

The City does not question this Court's jurisdiction to consider and rule on the Motion. However, the City does question Appellants' decision to wrest jurisdiction from the District Court by filing the Motion in this Court without permitting the District Court to finish ruling on the motion for injunction pending appeal that Appellants had already filed in that court. Contrary to what Appellants argue—there is no emergency here. Consistent with the City's October 24, 2023, Advisory to the Court, the City now respectfully further advises the Court that before commencing construction of the Project:

1.    The City must have a permit from the U.S. Army Corps of Engineers (USACE). A permit has not been received as of the date of this Response [10/25/23]. Representatives of the USACE recently asked the City additional questions, and the City responded. The City expects that it will take several weeks before it knows whether the USACE has additional questions, or when a permit will be issued.

2.    On August 3, 2023, the San Antonio City Council enacted an Ordinance authorizing Phase I work on the Project to begin. On November 2, 2023, City Council will be considering administrative changes affecting budgets for capital improvement projects, including this Project. This action will allow the City to move forward with engaging a contractor for the Project.

3.    Based on the above information, the City of San Antonio representatives familiar with this process estimate that it will be December 15, 2023, at the very earliest before any tree relocation or removal will begin.

The Appellants deprived the District Court of the opportunity to consider evidence of the proper amount of a bond as a condition of granting an injunction, leaving the record in this Court incomplete.

## I.    RESPONSE TO APPELLANTS' STATEMENT OF THE CASE

The District Court adopted, as its own, the historical background facts presented by Appellants and the City. **Ex. 2** at 2. The City presented the following background facts, which remain undisputed:

***Brackenridge Park.*** Brackenridge Park (the "Park") is an urban park spanning about 343 acres near the San Antonio River's headwaters.

*See, e.g.,* **Ex. 4** (City's "**(1)** Supplemental Response in Opposition to 'Appellants' Motion for Temporary Restraining Order and Preliminary Injunction' . . . and (2) Memorandum Brief in Support Thereof" [**DC Dkt. 34**] at ¶ 5 at 2-3); **Ex. 2** at 29-30 (City's Proposed Findings of Fact 5-15). An integral part of the City's history and culture, Brackenridge Park now includes the San Antonio Zoo, Sunken Garden Theater, Japanese Tea Garden, and Witte Natural History Museum. The Park belongs to, and is managed by, the City of San Antonio. **Ex. 4** at ¶ 5 at 2-3; **Ex. 2** at 29-30.

In May 2017, San Antonio voters approved a multi-million-dollar bond issue ("Bond Issue") for renovations and repairs to several areas of the City, including parts of the Park that: **(a)** have deteriorated or fallen into disrepair (**DC Ex.** D-4.1; D-4K); **(b)** threaten the Park's historical, natural, cultural, and recreational features; and **(c)** pose health and safety risks to the Park's many visitors. **DC Ex.** D-6; **Ex. 2** at 34-39 (City's Proposed Findings of Fact ¶¶ 38-68).

The City has been planning the necessary renovations of, and repairs to, the Park. **Ex. 4** at ¶ 6 at 3; **Ex. 2** at 34-39 (City's Proposed Findings of Fact ¶¶ 38-68). That process has involved expert studies,

public hearings, and multiple levels of approval to reach its current point, where work on Phase I of the Bond Project can begin. **Ex. 4** at ¶¶ 7-9 at 3-5; **Ex. 2** at 34-39 (City's Proposed Findings of Fact ¶¶ 38-68); *see also* **DC Ex.** 40 (Project Chronology). On August 3, 2023, the City Council enacted an Ordinance authorizing Phase I work to begin. **DC Ex.** D-57; **Ex. 4** ¶¶ 7-9 at 3-5 and the exhibits attached thereto and cited therein. This Ordinance says nothing about Appellants or their religion and, as a matter of law, is presumptively valid. *See Powell v. City of Houston*, 628 S.W.3d 838, 842 (Tex. 2021); *City of Brookside Vill. v. Comeau*, 633 S.W.2d 790, 792 (Tex. 1982)(quoting *Hunt v. City of San Antonio*, 462 S.W.2d 536, 539 (Tex. 1971). Appellants have not shown otherwise.

In preparing for the Phase I work, and to protect the public's health and safety, the City has temporarily fenced off an approximate two-acre area ("Project Area") where the work is scheduled to occur. *See, e.g.,* **Ex. 4** ¶ 8 at 4; **Ex. 1** at 1. The City has temporarily fenced off this area to everyone for safety reasons, and in order to implement Phase I of the 2017 Bond election project, which will remedy these safety problems by reinforcing, strengthening, and restoring the historic walls along the River. These improvements are vitally important to promote the safety

of visitors to the Park, including Appellants. This temporary closure is for public safety, and in the public interest.

"Phase I consists of the structural stabilization of the historic Pumphouse, rehabilitation and stabilization of historic river walls, retaining walls, and grand staircase in what is called the Lambert Beach area, including landscaping and irrigation improvements." **DC Ex.** D-1; **DC Ex.** D-2; **Ex. 4** ¶ 8 at 4. By way of example, the following four documents discuss some of the health and safety concerns at issue: **(a)** May 16, 2022, Tree Assessment Committee Report DC Ex. D-10); **(b)** April 19, 2023, City of San Antonio Office of Historic Preservation Certificate of Appropriateness (**DC Ex.** D-2); **(c)** February 3, 2023, City of San Antonio Parks & Recreation News Release: "Brackenridge Park Migratory Birds" (**DC Ex.** D-17); and **(d)** City of San Antonio Parks & Recreation, "Bird Mitigation FAQ (**DC Ex.** D-16)." In addition to needing to mitigate the health and safety concerns posed by the Park's migratory birds, the City must temporarily discourage the birds from nesting in the area where Phase I work will occur because the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703, forbids interference with actively nesting migratory birds and their nests.

While Phase I necessitates the removal of certain trees and the relocation of others, the City has: **(a)** listened to experts and others expressing concerns about the Park's trees and wildlife; and **(b)** adjusted its plans regarding the trees so that the number of trees now scheduled for removal has been reduced from 70 to 48, with another 20 trees scheduled for relocation. *See, e.g.,* **Ex. 4** ¶ 9 at 4-5 & Ex. 3(b) thereto (4-19-23: City of San Antonio Office of Historic Preservation Certificate of Appropriateness at 2-3 of 4)(**DC Ex.** D-2). The City's current design for the Project is the product of a thorough, comprehensive, and complex process involving experts in many disciplines, including arborists, civil engineers, architects, landscape architects, wildlife biologists, and scientists. The Project Area of Brackenridge Park is a designated State Antiquities Landmark and locally designated landmark, necessitating compliance with a myriad of federal, state, and local laws, rules, and regulations. (**DC Ex.** D-2).

The City has listened to the opinions and concerns of Appellants and others about various aspects of the Project. *See* **DC Ex.** D-1, D-2, D-24. In the end, though, San Antonio voters entrusted the City with the obligations and responsibilities for deciding how best to implement the

Project on the City's own property. *See*, *e.g.*, May 17, 2017, Ordinance 2017-05-17-0329, Canvassing the Results of the General Obligation Bond Election. **Ex. 6.**

*Defendant, the City of San Antonio.* The City is a home rule municipality and, as such, "derives its authority from the Texas Constitution and the City Charter ("Charter") adopted by its voters. *See* TEX. CONST. art. XI, § 5. The Charter is San Antonio's organic act— the fundamental law of the municipality, just as a constitution is the fundamental law of a state. *Texas River Barges v. City of San Antonio*, 21 S.W.3d 347, 354 (Tex. App.—San Antonio 2000, pet. denied). Under the Texas Constitution, a home-rule city may exercise all powers not denied to it by the Constitution or state law. *See* TEX. CONST. art. XI, § 5; *City of Laredo v. Laredo Merchs. Ass'n*, 550 S.W.3d 586, 592 (Tex. 2018). *Texas River Barges*, 21 S.W.3d at 354 (citing *inter alia Anderson v. City of San Antonio*, 67 S.W.2d 1036, 1037 (Tex. 1934)).

San Antonio's Charter authorizes the City to enact ordinances "as shall be needed for the government, interest, welfare and good order of the city and the interest, welfare, health, morals, comfort, safety and convenience of its inhabitants." *Id.* (quoting SAN ANTONIO, TX.,

8

CHARTER art. I, § 3, ¶ 1). This "provision incorporates the police power as a power of the City." *Texas River Barges*, 21 S.W.3d at 355. The police power has also been conferred on home rule cities by TEX. LOC. GOV'T CODE § 54.004 ("A home-rule municipality may enforce ordinances necessary to protect health, life, and property and to preserve the good government, order, and security of the municipality and its inhabitants."). Pursuant to its "police power, a municipality may enact *ordinances designed to promote the public safety and welfare.*" *Texas River Barges*, 21 S.W.3d at 355. The police power includes the "*power to anticipate and prevent dangers and to protect the inhabitants of a community, and, in so doing, to restrain individual tendencies.*" *Id.*

## II. RESPONSE TO APPELLANTS' ARGUMENT

### A. The City Did Not Violate TRFRA, and the District Court Has Already Granted Appellants Access to the Project Area for Their Religious Ceremonies.

At the outset of this litigation, Appellants alleged multiple religious rights violations—including ones pursuant to the First Amendment's Free Exercise Clause, the coextensive Free Exercise Clause of the Texas Constitution, and RLUIPA (42 U.S.C. § 2000cc, *et seq.*). In this Court, however, Appellants assert only two—one under TRFRA and one under

9

TEX. CONST. art. I, § 6-a. Appellants have failed to prevail on any of their other alleged claims and appear to have abandoned them.

In relevant part, TRFRA prohibits a government agency from "substantially burden[ing] a person's free exercise of religion." TEX. CIV. PRAC. & REM. CODE § 110.003(a). That provision "does not apply," though, "if the government agency demonstrates that the application of the burden to the person" is "in furtherance of a compelling governmental interest"; and is "the least restrictive means of furthering that interest." *Id.* § 110.003(b).

For reasons discussed extensively in **Ex. 4**, hereto, and during the PI Hearing, the City does not believe Appellants have demonstrated a substantial burden on their religious exercise. Even if one accepts, *arguendo*, that Appellants have sincerely held beliefs that: **(1)** the specific bend of the San Antonio River at issue in this litigation is sacred; and **(2)** Appellants' beliefs and ceremonies require the presence of: **(a)** large-canopy trees, the reflections of which can be viewed in the River; and **(b)** actively nesting double-crested cormorants—none of which the City concedes—Appellants still failed, as a matter of law, to demonstrate a substantial burden on their religious exercise, particularly with respect

to the removal or relocation of trees and the temporary deterrence of nesting activity by migratory birds (including double-crested cormorants) in the Project Area.

Nevertheless, the City has not appealed or cross-appealed the District Court's preliminary injunction rulings granting Appellants access to a particular spot in the Project Area for their religious ceremonies because the City believes it can accommodate the District Court's requirement to provide Appellants and a small number of their co-religionists limited, controlled access to that spot. *See, e.g.,* **Ex. 1** at 2; **Ex. 2** at 2-3.

The City does not, however, waive the "substantial burden" issue for trial, and anticipates showing that Appellants' claims fail due to the lack of a substantial burden upon their religious exercise. When a government action "decreases the spirituality, the fervor, or the satisfaction with which a believer practices his religion," but the government has not "coerced the Appellants to act contrary to their religious beliefs under the threat of sanctions, or conditioned a governmental benefit upon conduct that would violate [their] religious beliefs, there is no 'substantial burden' on the exercise of their religion."

*Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1063 (9th Cir. 2008).

The District Court correctly concluded that the City's plans for Phase I of the Bond Project satisfy strict scrutiny in that they: **(1)** serve a compelling government interest; **(2)** are narrowly tailored as they pertain to the removal or relocation of trees and temporary deterrence of nesting by migratory birds; even though they **(3)** could be more narrowly tailored by allowing Appellants to access the particular riverbend spot for religious ceremonies, under certain circumstances and conditions. *See, e.g.,* **Ex. 2** at 2, 5. With regard to Appellants' supposed claim for unrestricted access at any time to the particular riverbend spot in the Project Area, the District Court correctly found that Appellants waived such a claim. The District Court weighed all evidence and the equities and concluded that the fence should stay up, and that giving Appellant unfettered access to the Project Area was unworkable.[1] This Court should reject Appellants' request—on an extremely limited record and contrary to the reasoning of the District Court, after hearing a week of testimony—to force the City to allow Appellants unrestricted access to

---

[1] Of course, it is undisputed that when Phase I of the Bond Project is complete, Appellants, and all other citizens, will have access to the Project Area in accordance with normal Park rules and regulations.

the Project Area or any part thereof.

Moreover, consistent with the above rulings regarding what the District Court labeled Item 1 for relief (access to the Project Area for religious ceremonies), the District Court adopted as its own the proposed findings of fact and conclusions of law cited and submitted by Plaintiffs/Appellants "to support granting access for 'religious services' involving 15 to 20 people for no more than an hour on specified astronomical dates coinciding with [Plaintiffs'/Appellants'] spiritual beliefs." *See, e.g.,* **Ex. 2** at 2. Appellants cannot now complain in this Court regarding the District Court's adoption of Appellants' own proposed findings and conclusions on those specific issues.

Regarding Items 2 and 3 for relief, though, the District Court adopted the *City's* proposed findings of fact and conclusions of law as to "the removal or relocation of trees" and the "temporary deterrence of nesting by migratory birds" parts of the preliminary injunction rulings. *See, e.g.,* **Ex. 2** at 5 & at ¶¶ 38-92 at 34-41. The City's proposed findings and conclusions on Items 2 and 3 are comprehensive, and Appellants never addressed most, if any, of the matters included therein.

13

**B. The City's Actions Did Not, and Do Not, Violate TEX. CONST. art. I, § 6-a, and Appellants Have Failed to Show Otherwise.**

With regard to TEX. CONST. art. I, § 6-a, the District Court does not appear to have made any particular findings or conclusions. To the extent such claim could be construed to implicate Appellants' claim for Item 1 relief—which the City *denies*—the District Court adopted Appellants' own proposed findings of fact and conclusions of law, so Appellants can have no complaint. Moreover, to the extent such claim might be construed to implicate Appellants' claim for Item 1 relief, the District Court granted Appellants Item 1 relief, as discussed above.

On the other hand, to the extent Appellants' TEX. CONST. art. I, § 6-a claim may be construed to implicate Appellants' claim for Items 2 and 3 relief, the District Court adopted the *City's* proposed findings of fact and conclusions of law. *See, e.g.,* **Ex. 4** ¶¶ 150-61 at 57-60. Appellants have not addressed those findings and conclusions, nor have Appellants had any answer for the law cited by the City, providing that there is no "constitutional right to use public property as a place of worship." *Satanic Temple v. City of Belle Plaine*, 2021 WL 4199369, at *13 (D. Minn. Sept. 15, 2021); *Taylor v. City of Gary*, 233 F. App'x 561, 562 (7th

Cir. 2007)(no constitutional right "to demand that the City provide him with municipally-owned property as a place of worship"); *Prater v. City of Burnside*, 289 F.3d 417, 427-28 (6th Cir. 2002).

Appellants also have had no answer for the law cited by the City, providing that the government has the right to limit conduct on its own property, even if such limitation might also impose limits on the exercise of religion. *See, e.g., Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 447-49 (1988)(rejecting Indian tribes' Free Exercise challenge to the United States Forest Service's approval of plans to construct a logging road in the Chimney Rock area of the Six Rivers National Forest and finding that such conduct did not impose a burden "heavy enough" to violate the Free Exercise Clause); *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d at 1063 (rejecting the claim of multiple Indian-tribe Appellants that use of artificial snow made from reclaimed water in a government-owned park on what the Navajo Nation considered a sacred mountain desecrates the entire mountain, deprecates their religious ceremonies, and injures their religious sensibilities, in violation of several federal statutes); *United States v. Means*, 858 F.2d 404 (8th Cir. 1988)(rejecting, on the basis of government's ownership, the

Lakotas' claim that the United States Forest Service's denial of a permit for the use of an area in the Black Hills National Forest (federal property), as a religious, cultural, and educational community violated their free exercise rights); *Wilson v. Block*, 708 F.2d 735, 739-40 (D.C. Cir. 1983)(finding no impermissible burden on religious rights despite Navajo and Hopi Appellants' contentions that development of the Snow Bowl on the San Francisco Peaks (federal land) would be inconsistent with their First Amendment right to freely hold and practice their religious beliefs on the Peaks, which they believe to be sacred); *Havasupai Tribe v. United States*, 752 F. Supp. 1471, 1484-85 (D. Ariz. 1990), *aff'd sub nom. Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991)(rejecting, on the basis of government's ownership, a Havasupai free exercise violation claim involving the Forest Service's plan for a uranium mine in an Arizona national forest (federal property)); *Manybeads v. United States*, 730 F. Supp. 1515, 1517-18 (D. Ariz. 1989)(rejecting, on the basis of the government's ownership, a Navajo claim that relocation from the Hopi Reservation under the provisions of the Navajo-Hopi Land Settlement Act violated their free exercise rights).

The same sort of rule has been applied to park land owned by a state. *See, e.g., Crow v. Gullet,* 541 F. Supp. 785, 794 (D. S.D. 1982), *aff'd, Crow v. Gullet,* 706 F.2d 856, 858-59 (8th Cir. 1983)(per curiam)(Appellants did not show that defendants' development, construction, and regulatory actions burdened Appellants' religious exercises in the Bear Butte area, and Appellants "failed to establish any infringement of a constitutionally cognizable first amendment right." To the extent their right of access was temporarily restricted at the ceremonial grounds, Appellants' interests were "outweighed by compelling state interests in preserving the environment and the resource from further decay and erosion, in protecting the health, safety, and welfare of park visitors, and in improving public access to this unique geological and historical landmark"). No principled analysis would prevent the same sort of rule from also applying to land owned by, and under the management of, a home rule municipality such as the City.

**The Remaining Factors for Injunctive Relief Do Not**

**Strongly Favor Appellants/Appellants**.

In light of the previous arguments regarding the substance of the District Court's rulings, it is clear that Appellants have not prevailed—

and cannot prevail—on all four requirements for preliminary injunctive relief and, thus, also cannot prevail on all four elements for an injunction pending appeal.

The Project's Construction Plan/Tree Removal is narrowly tailored to achieve the City's compelling government interest of making the Project Area safe for visitors to the Park, including the Appellants. Appellants' expert arborist, Micah Pace, offered no opinion about whether trees in the Project Area could survive the construction planned under the 2017 Bond Project. **Tr.** 199:23–200:3. Appellants' engineering expert, however, admitted that the retaining walls in the Project Area are not structurally sound. **Tr.** 220:15-220:23. Appellants' engineering expert testified that he considered three or four alternatives to the City's proposed engineering solution regarding the retaining walls and concluded that the pier and spandrel system would be the "best" if the objective was "to save some of the trees[.]" **Tr.** 221:7-221:17. Appellants' engineering expert could not testify to the cost difference between the cantilever wall system proposed by the City and the pier and spandrel system he promoted. **Tr.** 280:10-280:15.

Noticeably absent from the testimony and opinions of Appellants' expert opinions, however, was any testimony regarding whether the additional trees that could allegedly be preserved in place would be close enough and large enough to be reflected in the River, as Appellants claim is necessary for their religious practices. **Tr.** at 215–287. The only detailed opinion provided by Appellants' engineering expert is that, in one section of the Project Area, a pier and spandrel system would permit the preservation in place of three additional trees. **Tr.** 241:19-242:6. The record, however, contains no evidence that the three additional trees that might be preserved in place using the pier and spandrel system are in an area where Appellants can see the trees' reflection in the River when performing their religious ceremonies.

The uncontested testimony, moreover, showed that the City did attempt to maximize the number of trees preserved in place in the Project Area. The City appointed a committee of highly qualified independent arborists to evaluate which trees in the Project Area needed to be removed because of construction restrictions imposed by the 2017 Bond Project constructions plans. (**DC Ex. 9**) (Arborists Qualifications); **DC Ex. 10** (Tree Assessment Committee Report). The Tree Assessment

Committee recommended that additional trees could be preserved in place, and the City amended its plans accordingly. **Tr.** 334:7-335:23 (testimony of Jamaal Moreno). The record shows that, as recently as this past March, the City carefully evaluated—and re-evaluated—the same alternative engineering solution proffered by Appellants' expert, Dr. Shafique. As Ms. Shanon Miller testified, "We were asked to really look at the alternatives and to figure out whether or not what was being proposed was the best solution moving forward—that we were saving as many trees as possible. The consensus in the meeting with the—with the arborists was that no additional trees would be saved because they would still be impacted by the construction regardless of the methodology." **Tr.** 603-04.

The pier and spandrel system advocated by Appellants was considered by the City but was rejected in part because it would cost two to three times as much as the cantilever wall engineering solution, exceeding the budget for the Bond Project. **Tr.** 368:21-369:5. Additionally, the pier and spandrel system was rejected because it required drilling through the face of the historic walls, in violation of applicable standards promulgated by the Secretary of the Interior. **Tr.**

621:7-622:3. The City determined that the pier and spandrel system would not have a significantly lower impact on the site—would not allow for the preservation of significantly more shade trees—to justify the expense, nor would it meaningfully address the desire of Appellants and other citizens to preserve additional trees in the Project Area. **Tr.** 372:9-374:17; 378:20-378:22 (Jamaal Moreno); **Tr.** 402:7-402:14 (testimony of Bill Pennell that Tree Assessment Committee was asked to evaluate alternative construction plans and concluded that additional trees could not be preserved in place); **Tr.** 602:19-604:6 (testimony of Shanon Miller describing City's analysis of pier and spandrel engineering solution); **Tr.** 629:5-630:15 (Shawn Franke testimony about the construction impact of a pier and spandrel system in contrast to cantilever wall system); **Tr.** 632:3-634:10 (Shawn Franke explaining why the demonstrative used by Appellants' engineering expert **[PX 53]** misrepresents the extent of excavation necessary for a pier and spandrel system); **Tr.** 729:23-730:17 (Ross Hosea testimony regarding conclusion that pier and spandrel system would not allow the City to preserve more trees). The City even considered moving the walls further into the River to distance them from the trees, but that solution was rejected because of the floodplain

mitigation project that would have been required. **Tr.** 368:18-369:3 (Jamaal Moreno); **Tr.** 588:12-588:23 (Shanon Miller).

Moreover, the City's wildlife management plan—and specifically, its deterrence of nesting by migratory birds in the Project Area—is narrowly tailored to achieve the City's compelling government interest in making the Project Area safe for all visitors to the Park. The undisputed testimony at the PI Hearing established that the Migratory Bird Treaty Act prohibits disruption of active nests of migratory birds—that is, nests containing eggs or chicks—such that construction in the Project Area could not proceed if migratory birds are actively nesting there. **Tr.** 338:6-338:13, 339:2-339:12 (Jamaal Moreno). The undisputed testimony at the PI Hearing also established that if migratory birds were not deterred from nesting in the Project Area, there would not be an uninterrupted period of six to eight months when the construction could be accomplished in compliance with the Migratory Bird Treaty Act. **Tr.** 553:11-555:4.

Further, the undisputed testimony at the Preliminary Injunction Hearing established that it is not feasible to deter only egrets and herons but not deter the double-crested cormorants that Appellants contend are

necessary to the exercise of their religious beliefs. Cattle egrets and double-crested cormorants migrate to San Antonio at the same time of year. **Tr.** 404:21-404:25 (Bill Pennell); **Tr.** 549:24-550:3 (Jessica Alderson).

Separate and apart from the need to deter nesting to facilitate the construction activities, the City established a compelling interest in deterring migratory birds in this highly urbanized area of the Park. (**DC Ex.** D-3) (letter from Wildlife Veterinarian – Texas Parks and Wildlife Department ("significant public health concerns . . . sheer magnitude of fecal contamination, high likelihood of human contact with fecal matter, and limited ability to perform effective environmental decontamination make rookery management action paramount to disease risk mitigation."); *see also,* **DC Ex.** D-18-G-4 (photo). The City has worked with the USDA and Texas Parks & Wildlife to carefully deter nesting. (**DC Ex.** D-19; **DC Ex.** D-20; **DC Ex.** D-21). There are no effective deterrence methods that affect herons and egrets, but not double-crested cormorants. **Tr.** 423:15-425:9 (Bill Pennell); **Tr.** 441:17-442:6 (Bill Pennell); **Tr.** 551:2-551:23 (Jessica Alderson); **Tr. 566:24-567:3** (Jessica Alderson). As the record confirms, the City did, in fact, consider the

alternatives promoted by Appellants; incorporated the aspects that were feasible—namely, preserving more trees in place; and rejected alternatives that were not feasible.

The City received and considered the input from Appellants regarding the 2017 Bond Project, just as it considered input from all participants in the public comment process. (DC Ex. D-24) **Tr.** 361:23-362:11 (testimony of Jamaal Moreno that the number of trees to be removed was modified based on public feedback, including that of Appellants); **Tr.** 397:11-398:7 (Bill Pennell); **Tr.** 449:20—450:11 (testimony of Bill Pennell that City considered all public comments and the religious basis of Appellants' concerns does not impact that scientific and technical information that informs the City's decisions with regard to the 2017 Bond Project); **Tr.** 533:1-533:9 (testimony of Shanon Miller that the City received feedback on the 2017 Bond Project from many stakeholders, which testimony was examined and resulted in changes to the Bond Project); **Tr.** 589:9-589:17 (Shanon Miller); **Tr.** 662:2-662:9 (Homer Garcia); **Tr.** 730:23-732:11 (Ross Hosea describing changes to tree plan based on public comment).

Appellants have not proven themselves entitled to any relief on their Items 2 and 3 claims. Further, as a matter of law, "simply alleging some possibility of irreparable injury does not support the issuance of a preliminary injunction." *Aquifer Guardians in Urban Areas v. Fed. Hwy. Admin.*, 779 F. Supp. 2d 542, 556 (W.D. Tex. 2011)(citation omitted).

## III.  CONCLUSION

For all these reasons, the City asks the Court to deny Appellants' request for injunction pending appeal.  Further, the City asks for all other legal and equitable relief to which it may be justly entitled.

Respectfully submitted,

LANGLEY & BANACK, INC.

BY: *Fred R. Jones*
FRED R. JONES
State Bar No. 10886700
fjones@langleybanack.com
NATALIE F. WILSON
State Bar No. 24076779
nwilson@langleybanack.com
IAN M. MCLIN
State Bar No. 24005071
imclin@langleybanack.com
LEE WARREN
State Bar No. 24099453
lwarren@langleybanack.com
SARA MURRAY
State Bar No. 14729400
smurray@langleybanack.com

745 East Mulberry, Suite 700
San Antonio, TX 78212-3166
Telephone: (210) 736-6600
Facsimile: (210) 736-6889

-and -

CITY OF SAN ANTONIO
DEBORAH KLEIN
Deputy City Attorney
State Bar No. 11556750
Deborah.Klein@sanantonio.gov
International Center
203 S. St. Mary's Street,
2nd Floor
San Antonio, TX 78205
Telephone: (210) 207-8949
Facsimile:    (210) 207-4004

**ATTORNEYS FOR DEFENDANT
CITY OF SAN ANTONIO**

## CERTIFICATE OF COMPLIANCE

This response in opposition to Appellants' Motion complies with (1) the type-volume limitation of FED. R. APP. P. 27(d)(2)(A) because it contains **4982** words, excluding the parts of the response exempted by FED. R. APP. P. 27(a)(2)(B); and (2) the typeface and type style requirements of FED. R. APP. P. 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface (Century Schoolbook, 14-point) using Microsoft Word (the program used to determine the response's word count).

October 25, 2023

*Fred R. Jones*
FRED R. JONES
**Counsel for Appellee**
**City of San Antonio**

## CERTIFICATE OF SERVICE

I certify that on October 25, 2023, the foregoing response was electronically filed with the United States Court of Appeals for the Fifth Circuit using the CM/ECF system, and that all parties required to be served have been served. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Fred R. Jones*
Fred R. Jones
*Counsel for Appellee*
*City of San Antonio*