# APPENDIX

CASE NO. 23-50746
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

Gary Perez; Matilde Torres,

> Plaintiffs – Appellants

v.

City of San Antonio,

> Defendant – Appellee

---

### DECLARATION OF FRED R. JONES IN SUPPORT OF APPELLEE THE CITY OF SAN ANTONIO'S RESPONSE IN OPPOSITION TO APPELLANTS' EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

---

I, Fred R. Jones, of full age, hereby declare as follows:

1. I am an attorney at law admitted to practice before the Courts of the State of Texas and this Court.

2. Attached hereto as Attachment A are copies of exhibits to the City's Response to Appellants' Motion for Injunction Pending Appeal.

3. Attached hereto as Attachment B are true and correct copies of excerpts from the rough transcript of the Preliminary Injunction

Hearing held before the District Court the week of September 25, 2023.

4. Attached hereto as Attachment C are true and correct copies of Defendant's Exhibit Nos. 1, 2, 3, 4.1, 4-K, 6, 9, 10, 15-E, 16, 17, 18-G4, 19, 20, 21, 24, 40, and 57, from the Preliminary Injunction Hearing held before the District Court the week of September 25, 2023.

I declare under perjury that the foregoing is true and correct.

Signed on the 25th day of October, 2023, in Bexar County, Texas, United States

*/s/ Fred R. Jones*

Fred. R. Jones

Declaration of Fred R. Jones

CASE NO. 23-50746
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

Gary Perez; Matilde Torres,

              Plaintiffs – Appellants

v.

City of San Antonio,

              Defendant – Appellee

_____

**APPENDIX TO APPELLEE'S RESPONSE IN OPPOSITION TO APPELLANTS'
EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL**

_____

FRED R. JONES
fjones@langleybanack.com
State Bar No. 10886700
SARA MURRAY
smurray@langleybanack.com
State Bar No. 14729400
NATALIE F. WILSON
nwilson@langleybanack.com
State Bar No. 24076779
IAN M. MCLIN
imclin@langleybanack.com
State Bar No. 24005071
LANGLEY & BANACK, INC.
745 East Mulberry, Suite 700
San Antonio, TX  78212-3166
Telephone: (210) 736-6600
Facsimile:  (210) 735-6889

CITY OF SAN ANTONIO
DEBORAH KLEIN
Deputy City Attorney
State Bar No. 11556750
Deborah.Klein@sanantonio.gov
International Center
203 South St. Mary's Street,
Second Floor
San Antonio, TX 78205
Telephone: (210) 207-8949
Facsimile:  (210) 207-4004

**COUNSEL FOR APPELLEE
CITY OF SAN ANTONIO**

## APPENDIX

| EXHIBIT NO. | DOCUMENT DESCRIPTION |
|---|---|
| Attachment A: | Copies of City's Response to Appellants' Motion for Injunction Pending Appeal |
| Exhibit 1 | "Partial Order," [DC Dkt. 47] |
| Exhibit 2 | "Opinion & Order," [DC Dkt 52] |
| Exhibit 3 | "City's Response to Injunction Pending Appeal Motion," [DC Dkt. 56] |
| Exhibit 4 | "City's Supplemental Response in Opposition to 'Appellants' Motion for Temporary Restraining Order and Preliminary Injunction' [DC Dkt 34] |
| | |
| Attachment B: | Excerpts from the rough transcript of the Preliminary Injunction Hearing |
| | |
| Attachment C: | Defendant's Exhibits from the Preliminary Injunction Hearing |
| DC Ex. D-1 | April 19, 2023, Historic Design Review Committee Presentation |
| DC Ex. D-2 | April 19, 2023, Office of Historic Preservation – Certificate of Appropriateness |
| DC Ex. D-3 | March 22, 2022, Dr. J. Hunter Reed DVM, MPH Letter |
| DC Ex. D-4 | March 2016 Color Photograph of Brackenridge Park |
| DC Ex. D-4-K | June 2017 Color Photograph of Brackenridge Park |
| DC Ex. D-6 | May 17, 2017, Canvassing of General Obligation Bond Election |
| DC Ex. D-9 | July 21, 2023, Arborists Qualification Summary |
| DC Ex. D-10 | May 16, 2022, Tree Assessment Committee |
| DC Ex. D-15-E | February 2022, Color Photograph of Park Walls |
| DC Ex. D-16 | Bird Mitigation FAQ |
| DC Ex. D-17 | Brackenridge Migratory Birds Fact Sheet 2022 |
| DC Ex. D-18-G4 | April 2022, Color Photographs of Brackenridge Park |
| DC Ex. D-19 | City of SA Parks 2022 Management Plan |
| DC Ex. D-20 | December 21, 2021, USDA-COSA Agreement signed |
| DC Ex. D-21 | August 23, 2023, J. Alderson Letter to Sen. Menendez |

| EXHIBIT NO. | DOCUMENT DESCRIPTION |
|---|---|
| DC Ex. D-24 | February 9, 2022, Town Hall Presentation |
| DC Ex. D-40 | August 31, 2023, Brackenridge Park 2017 Bond Project Chronology |
| DC Ex. D-57 | August 3, 2023, Brackenridge Park Project – Corrected |
| | |
| | |
| | |
| | |
| | |
| | |

# Attachment A

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **GARY PEREZ and MATILDE TORRES,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. SA-23-CV-977-FB** |
| | § | |
| **CITY OF SAN ANTONIO,** | § | |
| | § | |
| **Defendant.** | § | |

## <u>PARTIAL ORDER CONCERNING PRELIMINARY INJUNCTION ISSUES</u>

After a four-day preliminary injunction hearing, the Court finds two issues which need to be addressed now due to time constraints. There will follow a more thorough and detailed analysis, opinion and order.

This case involves competing interests of constitutionally protected religious exercise and compelling government responsibilities to protect public health and safety.

Plaintiffs want to resume their historic access to a sacred site in Brackenridge Park which is presently fenced off in anticipation of restorative construction to begin as soon as all permits are obtained. The site is depicted in Plaintiffs' Exhibit 58 attached hereto and comprises an approximate 20-foot-by-30-foot rectangular plot out of two acres of land located between two bald cypress trees. Defendant City contends that one of the trees, number 129, poses a risk of injury or death because of a large broken limb which the evidence showed can be removed quickly and must be done before the area can be reopened to the general public irrespective of the religious free exercise matter before the Court.

The immediate desire of the City is to resume bird deterrent operations to comply with the Migratory Bird Treaty Act and to prevent large amounts of foul fowl feces making the area unhealthy for humans, especially the Court notes for toddlers who put anything and everything in their mouths.

Concerning access for Plaintiffs' religious exercise, the Court finds that Plaintiffs have a sincere religious belief and are entitled to be present at the site on the dates of November 17 and December 21, 2023. Plaintiffs, through their counsel, shall keep the City and the Court informed of other proposed dates. The Court will address other issues during construction and as is suggested later in this Order.

To comply with the Court's Order, the City shall:

1. Immediately remove the broken limb on Tree 129.

2. Install a gate in the fence depicted in Plaintiffs' Exhibit 58. The gate may remain locked except in the designated Plaintiffs' access time and dates.

As the construction time approaches, the City shall explore whether the sacred site can be separately fenced off with fencing from the street on the exterior side of the trunks of the two trees to the riverbank, and if not, why not.

With regard to bird deterrence, the Court finds a serious public health risk exists which surpasses Plaintiffs' desire to have the double-crested cormorant present for their dropped feathers which no doubt Plaintiffs already have or can be found in other locations. Accordingly, the City may resume bird deterrent operations, except for the dates on which Plaintiffs religious ceremonies occur.

Finally, the Court makes this observation: Spiritual reflection and connection contemplate being done in the quiet of a forest or a traditional house of worship. Because of the publicity this matter has engendered, the Court predicts Plaintiffs' time in the sacred area will be disruptively accompanied by television camera crews, other members of the press and the general public who are

also protected by the First Amendment of our Bill of Rights.  Plaintiffs' religious experience may

not be as satisfactory as hoped for.

Following the example of another individual who had to make difficult decisions, it is so

ORDERED.  1 *Kings* 3:16-28.

SIGNED this 2nd day of October, 2023.

_____

FRED BIERY
UNITED STATES DISTRICT JUDGE



# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **GARY PEREZ and MATILDE TORRES,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. SA-23-CV-977-FB** |
| | § | |
| **CITY OF SAN ANTONIO,** | § | |
| | § | |
| **Defendant.** | § | |

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' REQUEST FOR PRELIMINARY INJUNCTION

"When asked by an anthropologist what the Indians called America
before the white men came, an Indian said simply, 'Ours.'"[1]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"You can please some of the people some of the time,
all of the people some of the time, some of the people all of the time,
but you can never please all of the people all of the time."[2]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiffs seek a preliminary injunction requesting three items of relief:

1.    Restore access for religious services in the Sacred Area, which is the northernmost
point on the south bank of the San Antonio River.

2.    Preserve the spiritual ecology of the Sacred Area by minimizing tree removal.

3.    Preserve the spiritual ecology of the Sacred Area by allowing cormorants to nest.

---

[1]  Quotation attributed to Vine Deloria, Jr.; *SEE* VINE DELORIA, JR., CUSTER DIED FOR YOUR SINS: AN INDIAN MANIFESTO (MacMillan, 1971).

[2]  Quotation often attributed to Abraham Lincoln, though there is no verifiable historical source to support such attribution.

To achieve the request, Plaintiffs ask the Court to "order the City to grant access to the plaintiffs to the Sacred Area and reevaluate the Bond Project to develop alternative plans that will accommodate our clients' religious beliefs."[3]

During and following a four-day preliminary injunction hearing, the Court thoroughly reviewed the testimony, exhibits, legal authorities and arguments of counsel.

Plaintiffs and Defendant have filed Proposed Findings of Fact and Conclusions of Law supporting their respective positions and the legal authorities and bases therefor. (Docket entries 31 and 32.) They are attached hereto and made a part hereof. *See also* <u>Partial Order Concerning Preliminary Injunction Issues</u> at Docket entry 47.

Concerning the historical background facts included in both submissions, the Court finds them to be accurate and adopts them as its own.

With reference to Item 1, "access for religious services in the Sacred Area," the Court finds that Plaintiffs have a sincere religious belief and have met their burden to prove the four elements for injunctive relief. The Court adopts as its own Plaintiffs' Proposed Findings of Fact and Conclusions of Law and the legal authorities cited to support granting access for "religious services" involving 15 to 20 people for no more than an hour on specified astronomical dates coinciding with Plaintiffs' spiritual beliefs. Plaintiffs shall provide those dates in advance to the City during the pre-construction and construction periods so that Plaintiffs may be accommodated for entry to the Sacred Area and appropriate security provided. Plaintiffs' request for access in Item 1 is GRANTED.

The testimony also evidenced that there are other indigenous people who share Plaintiffs' beliefs but reside far away from the Sacred Area. Nevertheless, they exercise the same religious

---

[3] Plaintiffs' Closing Argument, Realtime Unedited Transcript, September 29, 2023, at page 778, lines 4-7.

ceremonies. Those facts support the City's argument that Plaintiffs can temporarily be accommodated in other parts of Brackenridge Park. However, out of an abundance of legal caution and respect for Plaintiffs' beliefs, the Court reaffirms its granting of Plaintiffs' requested Item 1.

The Court also heard some testimony concerning all-night ceremonies involving consumption of peyote, which is a legal substance for indigenous people. The Court will defer ruling on that issue while awaiting further advice from counsel whether that type of event has been allowed or occurred before the fencing was erected, it being the Court's recollection that there is some restriction of the Park's nighttime use.

To the extent there was some mention of access for individual worship during the construction period, it was not in Plaintiffs' Closing Argument request, is deemed waived and the equities support the conclusion that individual access at any time Plaintiffs desire is impractical and is DENIED. The Court notes that both Plaintiffs also practice Roman Catholicism whose places of worship provide numerous locations for individual meditation and worship. Moreover, Plaintiffs and the general public still have access to over 300 acres of Brackenridge Park for meditation in nature.

For the safety of Plaintiffs and the security of the City's property during the construction period, the City may, if it chooses, erect additional fencing perpendicular to the existing fencing at the Sacred Area.

Item 2 and Item 3 have to do with the spiritual ecology of the Sacred Area. Clearly the area does not look the same as it did thousands of years ago in the cave painting exhibit. Nor does it look the same as 100 years ago when there really was a beach as depicted in various exhibits. Nor will it look the same 100 years from now.

Central to Plaintiffs' spiritual ecology is the San Antonio River, also referred to by Plaintiffs as Mother Waters. Many religions see water as the wellspring of life, as indeed it is, and incorporate water into their faith traditions: The Ganges River for Hindus, Roman Catholicism Holy Water, the mikveh bath in Judaism, water as a symbol of Allah paradise in Islam, baptismal immersion and sprinkling in Protestant ceremonies and water as symbols of purity and compassion in Buddhist thought.

The most important part of Plaintiffs' spiritual ecology is the confluence of the shape of the Mother Waters at the bend of the San Antonio River with the shape of the Eridanus constellation of stars.

Given the current extended drought, the lack of water flow from the Blue Hole Springs and other natural sources, there would be no San Antonio River/Mother Waters but for the City artificially assisting the river by pumping recycled waste water, presumably from the sewer reclamation system. It is not particularly holy water nor the purity of the spring water Plaintiffs would like, but better than a dry riverbed. This creates something of a secular/religious symbiotic relationship between Plaintiffs and Defendant until it rains, the springs come to life and until the reformation and resurrection of the Project Area is complete. Amen.

Regarding Plaintiffs' requested Item 3, the Court heard credible testimony of thousands of egrets, herons, and cormorants and their excrement nesting in the Project Area during their migrations at different times of the year. Once nested, the Migratory Bird Treaty Act precludes removal. The Court finds the bird deterrent operation is in the realm of public health and safety. To grant Plaintiffs' relief regarding Item 3 would effectively put the Project on hold ad infinitum, given the different species' migration patterns and the Migratory Bird Treaty Act. There could not be an eight month window of opportunity to accomplish the Project.

-4-

With reference to Item 2 and Item 3 of Plaintiffs' requested relief, the Court finds the City has met its burden of proving a compelling government interest for public health and safety, and the equities favor the City on those two items. The Court adopts as its own the City's Proposed Findings of Fact and Conclusions of Law and the legal authorities cited regarding Plaintiffs' requested Item 2 and Item 3. Accordingly, those requests by Plaintiffs are DENIED.

Moreover, Plaintiffs desire possibly to save trees by ordering the City to "reevaluate the Bond Project to develop alternative plans" would, given the lengthy redesign and re-permitting processes, exponentially extend Plaintiffs' and the public's presently fettered ability to enjoy the area. The temporary closing becomes semi-permanent. Instead of months, access would likely remain limited for years, as is the case of the faithful who find the Notre Dame Cathedral to be their sacred place and who for several years will have to use alternative places of worship. By its Order, it is the Court's intent to make the fettered unfettered as soon as reasonably possible. It will be up to the parties to decide how long they wish to delay the unfettered with continuing litigation.

Accordingly, IT IS HEREBY ORDERED that Plaintiffs' Motion for Preliminary Injunction (docket entry 5) is GRANTED IN PART and DENIED IN PART as set forth herein.

No bond shall be required.

It is so ORDERED.

SIGNED this 11th day of October, 2023.

_____
FRED BIERY
UNITED STATES DISTRICT JUDGE

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**I.**   **Proposed Findings of Fact**[1]

    **A.**   **The Parties**

    1.   Plaintiff Gary Perez ("Perez") is a descendant of the indigenous people of North America, resident of the City, and member of the Lipan-Apache Native American Church ("Native American Church").

    2.   Perez serves as the principal chief and cultural preservation officer for the Pakahua/Coahuiltecan Peoples of Mexico and Texas and for the Indigenous Governors' office for the State of Coahuila Mexico.

    3.   Perez is a published researcher who deciphered elements of the Native American Church's theology and archaeology.

    4.   Perez has worshipped and led religious ceremonies in Brackenridge Park ("Park") for at least 25 years.

---

[1] To the extent any of the following findings of fact constitute conclusions of law, they are adopted and treated as such.

5.      Plaintiff Matilde Torres ("Torres") (together with Perez, "Plaintiffs") is a descendant of the indigenous people of North America, resident of the City, and member of the Native American Church and the Pakahua Peoples of Mexico and Texas.

6.      Torres has worshipped and participated in religious ceremonies in the Park for at least 10 years. She is a respected leader in her religious community, and regularly organizes, leads, and serves as a water bearer for religious services.

7.      Defendant City of San Antonio (the "City") is a municipal government entity in Bexar County, Texas.

8.      The City is responsible for the policies developed and implemented through its officers, employees, agents, and departments, including the Department of Parks and Recreation, Public Works Department, Office of Historical Preservation, Development Services Department, and Historic Design and Review Commission.


**B.      The Park**

9.      The Park exists on land that has been inhabited and utilized by indigenous peoples for thousands of years.

10.      The Park officially was established and began to assume its current form in 1899 when George Brackenridge donated 199 acres of land to the City. The City bought or received bequests of additional acreage over the next two decades, which expanded the Park to its current size of approximately 343 acres.

11.      The San Antonio River flows through the Park.

12.      Approximately 83 trees currently exist in the Lambert Beach Area.

13.      The Park contains manmade structures, including retaining walls along the San Antonio River. The retaining walls along the San Antonio River were constructed to protect trees that existed and grew on the bank of the San Antonio River.

14.     An area within the Park is called Lambert Beach ("Lambert Beach Area"). The Lambert Beach Area is the location in dispute in this litigation. It is a place where Plaintiffs and other members of the Native American Church believe they must gather to worship and perform religious ceremonies. It is also the place where the City wishes to make extensive changes and renovations to the natural environment and manmade structures within the Park.

15.     The Park is listed on the National Register of Historic Places and is a Texas State Antiquities Landmark.

16.     The State of Texas and United States government provide a portion of the funding that is used to repair, enhance, maintain, and operate the Park.

17.     Travel to the Park and commercial activity within the Park affects commerce with foreign nations, among the several states, or with Indian tribes. Peyote pilgrims from around North and Central America visit the Park, as well as the nearby Blue Hole spring, to perform religious ceremonies on their way to the peyote gardens.

**C.     Wildlife Management in the Park**

18.     To deter migratory birds from feeding, roosting, nesting, or inhabiting the Lambert Beach Area, the City contracted with the U.S. Department of Agriculture ("USDA") and coordinated with the Texas Parks and Wildlife Department and U.S. Fish and Wildlife Service.

19.     The City and its agents have engaged in "habitat modification" within the Park, which included removing nests, clearing underbrush, and removing dead wood from the tree canopy to discourage nesting in the Lambert Beach Area.

20.     The City uses bird deterrent techniques in the Lambert Beach Area, including pyrotechnics, clappers, spotlights, lasers, distress calls, effigies, balloons, explosives, and drones.

21.     The USDA holds wildlife take permits, which authorize the use of lethal force to deter birds from nesting or inhabiting the Lambert Beach Area.

**D.    The 2017 Bond Project**

22.    In late 2016 and early 2017, the City engaged in public outreach regarding its desire to make changes to the Park, including the Lambert Beach Area. To that end, the City hosted several meetings with City residents and other stakeholders where the City tried to gain support to make certain changes in the Park.

23.    As part of its promotional efforts, the City did not identify public health or safety as a reason for making changes in the Park.

24.    On February 21, 2017, the City published the Brackenridge Park Master Plan, which synthesized the promotional messages and public feedback regarding the City's public outreach regarding the City's desire to make changes to the Park. The Brackenridge Park Master Plan does not identify public health or safety as a reason to make changes in the Park. Rather, the City distilled three "approved public strategies" as guideposts for the City's further efforts to secure funding and define a scope of work to achieve the City's desired changes within the Park: (1) restoration of natural park features; (2) restore, preserve, and articulate park cultural and historic features; and (3) increase visibility and pedestrian access to / within the park.

25.    In May 2017, the citizens of San Antonio voted in favor of a $850 million bond package for public improvements.

26.    Proposition 3 of the bond package was dedicated to "improvements to parks, recreation, and open spaces," including $7,750,000 for use at the Park to make "[g]eneral park improvements and rehabilitation which may include historic river walls, restrooms, trails and historic structures."

27.    Consistent with the Brackenridge Park Master Plan that was published earlier in 2017, the City did not promote Proposition 3 to San Antonio voters by identifying public health or safety as a purpose for voting for this portion of the bond package.

28.     After voters passed Proposition 3, the City began developing the Brackenridge Park 2017 Bond Project (the "Bond Project").

29.     The City requires a permit from the U.S. Army Corps of Engineers ("USACE") before it can begin repairing or reconstructing walls, or removing or relocating trees within the Lambert Beach Area. The City has not submitted a final "Treatment Plan" to USACE, which is needed before the City can obtain a permit from USACE.

30.     Once USACE approves the final Treatment Plan, which approval is not anticipated to be given until months after submission, a 30-day comment period will begin to solicit feedback from stakeholders, including local indigenous tribes.

31.     The City's plan for the Bond Project includes the repair or rebuilding of certain portions of retaining walls along the San Antonio River, including in the Lambert Beach Area.

32.     The City's plan for the Bond Project includes the removal or relocation of 69 trees that currently exist within the Lambert Beach Area.

33.     Of the 83 trees that currently exist in the Lambert Beach Area, only 14 trees will be preserved in place.

34.     Of the 69 trees that the City currently plans to remove or relocate from the Lambert Beach Area, the City's "primary purpose" for removing 31 of the trees is because the City has concluded that removal is needed to address the requirements for heavy construction related to the City's chosen engineering solution to repair or rebuild retaining walls along the San Antonio River.

35.     Of the 69 trees that the City currently plans to remove or relocate from the Lambert Beach Area, the City's "primary purpose" for removing 28 of the trees is because the City has concluded that removal is needed for trees (i) within a few feet of a historically significant structure

that requires rehabilitation, (ii) that are causing or have caused damage to resources, or (iii) that will cause future damage if left in place.

36.     Of the 69 trees that the City currently plans to remove or relocate from the Lambert Beach Area, the "primary purpose" for removing 4 of the trees is because the City has concluded that removal is needed because the trees are an invasive species.

37.     The City applied for, and received from the Development Services Department, a variance from a City Unified Development Code provision that requires 80% significant tree preservation and 100% heritage tree preservation for projects within the 100-yr floodplain.

38.     The Development Services Department granted that variance based on a discretionary, individualized assessment.

39.     The City's current plan for the Bond Project includes bird mitigation and wildlife management measures within the Lambert Beach Area intended to deter migratory birds from feeding, roosting, nesting, or inhabiting the Lambert Beach.

40.     Pursuant to the Migratory Bird Treaty Act, the removal or relocation of trees planned for the Lambert Beach Area cannot proceed if migratory birds, including cormorants, are nesting in the area.

**E.     Plaintiffs' Sincerely Held Religious Beliefs**

41.     Plaintiffs are practitioners of the Native American Church.

42.     Members of the Native American Church, including Plaintiffs, believe in the teachings and perform the religious ceremonies of indigenous and Christian faith traditions.

43.     Plaintiffs believe that life in the region of San Antonio began at a spring, now called Blue Hole, which is north of the Park and situated on the campus of the University of the Incarnate Word.

44.     Plaintiffs believe that a spirit in the form of a blue panther lived in the Blue Hole. Plaintiffs believe, a spirit in the form of a cormorant visited the Blue Hole. Plaintiffs believe that the blue panther scared the bird, and as it fled, water droplets from its tail scattered across the San Antonio River Valley, including the area that now comprises the Park, spurring life in the region.

45.     Plaintiffs believe that a riverbend located in the Park, specifically within the Lambert Beach Area, mirrors the celestial constellation Eridanus and is where a unique connection exists between the physical and spiritual worlds.

46.     Plaintiffs believe that this riverbend is sacred and that they are required to gather, worship, and conduct religiously important ceremonies there.

47.     Plaintiffs believe that certain of the religious ceremonies that they are required to perform can only be accomplished at this riverbend that is located within the Lambert Beach Area.

48.     Plaintiffs believe that a physical location's capacity to function as a holy place relies on the presence of trees, birds, and other natural features that are part of a "spiritual ecology" of the location, which enables people to commune with the spiritual world and orient themselves in reality when they are present at the location.

49.     Plaintiffs believe that cormorants tell the life-creation story through their presence and nesting in the area of the river bend. Accordingly, Plaintiffs believe that certain religious ceremonies that must be performed according to their religious beliefs cannot be properly administered without the presence of cormorant presence, nesting, and habitat.

50.     Plaintiffs believe that the Park is a significant site for "peyote pilgrims" and they regularly act as religious leaders and guides to individuals who have traveled to the Park, often unannounced.

**F.    The City's Bond Project Substantially Burdens Plaintiffs' Religious Exercise**

51.    Since at least February 2023, the City has prevented Plaintiffs, Native American Church members, and peyote pilgrims from entering the Lambert Beach Area.

52.    Because Plaintiffs have not been permitted to access the southern bank of the riverbend within the Lambert Beach Area, Plaintiffs have been unable to perform religious ceremonies that they believe are religiously necessary or Plaintiffs have been forced to perform religious ceremonies in a different location, which Plaintiffs believe is not religiously acceptable.

53.    Due to their inability to enter the southern portion of the Lambert Beach Area, Plaintiffs have also been unable to minister fully to peyote pilgrims and members of the Native American Church. Plaintiffs are also often presented with requests from local adherents, such as a birthday blessing, that they are unable to perform at the Lambert Beach Area.

54.    According to Plaintiffs' beliefs, the City's current plan to remove or relocate 69 trees from the Lambert Beach Area will permanently disrupt the "spiritual ecology" of the riverbend within the Lambert Beach Area and render the area spiritually inert, making it impossible for Plaintiffs to perform religious ceremonies that they believe are religiously necessary.

55.    According to Plaintiffs' beliefs, the City's current plan to deter migratory birds, especially cormorants, from feeding, roosting, nesting, or inhabiting the Lambert Beach Area will permanently disrupt the "spiritual ecology" of the riverbend within the Lambert Beach Area and render the area spiritually inert, making it impossible for Plaintiffs to perform religious ceremonies that they believe are religiously necessary.

**G.    The City's Design and Implementation of the Bond Project Are Not Neutral or Generally Applicable**

56.    The City will not remove or relocate trees that have migratory or endangered birds nesting in them, but does not provide similar protection for trees that have cormorants nesting in them or that are otherwise essential to Plaintiffs' religious practice.

57.    The City has fenced off the southern portion of the Lambert Beach Area, where Plaintiffs must perform religious ceremonies, because of purported public safety risks from dead or dying trees or due to forthcoming construction, yet the City has failed to fence off many portions of the Park that contain trees posing as great a public safety risk, or greater public safety risk, as compared to the trees inside the Lambert Beach Area.

58.    Homer Garcia, the City's head of Parks and Recreation, has sole discretion to allow or disallow access to the Lambert Beach Area.  There is no formal criteria that Mr. Garcia utilizes to adjudicate requests to enter the Lambert Beach Area.

59.    An examples of this discretion the City has permitted a San Antonio councilwoman to enter the fenced-in Lambert Beach Area without personal protective equipment for a thirty to sixty minute period during which the councilwoman and arborists walked on the south bank, but has refused to grant Plaintiffs the same access.

60.    The City has also permitted Shanon Miller to enter the fenced-in Lambert Beach Area without personal protective equipment, and she walked the area freely accompanied by an arborist.

61.    In contrast, the Plaintiffs offered to follow the same protocols in their requests to enter the Lambert Beach Area on August 12, 2023 and September 21, 2023. The City denied Plaintiffs's request to access the Lambert Beach Area on the same terms that the City permitted the councilwoman and Shanon Miller to enter the Lambert Beach Area.

62.     Plaintiffs have participated in many private and public meetings with the City's employees and agents related to the Bond Project, including a July 29, 2022 meeting with the Department of Parks and Recreation, an April 19, 2023 Historic Design and Review Commission hearing, and an August 3, 2023 City Council hearing, in which they have explained their religious beliefs and practices and how the Bond Project burdens their religious practice.

63.     On May 23, 2023, Plaintiffs sent the City a letter explaining their religious beliefs and practices and detailing how the current Bond Project proposal would prevent them from practicing their religion, and how the proposal violates their rights under federal and state law.

64.     After learning of Plaintiffs' religious objections to the City's current plan for the Bond Project, the City did not commission a study to determine if the Bond Project could be completed if the priority was ensuring that the cormorants could inhabit the Park after the Bond Project was completed.

65.     After learning of Plaintiffs' religious objections to the City's current plan for the Bond Project, the City did not commission a study to determine if the City could achieve its governmental purposes related to the Bond Project while also accommodating Plaintiffs' religious exercise.

66.     One of the City's departments is the Office of Historic Preservation. The mission of the Office of Historic Preservation "is to safeguard the cultural, economic, and environmental sustainability that preserves San Antonio's unique sense of place, economic competitiveness, and authenticity."

67.     To accomplish that mission, the Office of Historic Preservation investigates claims by San Antonio Residents regarding the historic or cultural significance of buildings or property within City limits. Yet, after learning of Plaintiffs' statements about the historic, cultural, and

religious significance of the Lambert Beach Area, the Office of Historic Preservation did not attempt to investigate or verify Plaintiffs statements.

68. The alleged risks present in the Lambert Beach area may also be present in other areas of Brackenridge Park that are not fenced off.

69. Going back to 2017, the City has made revisions to its plans for the Bond Project in response to comments received from the public. But the City has not made any changes to its plans for the Bond Project to accommodate Plaintiffs' religious exercise.

**H.     The City's Design and Implementation of the Bond Project Are Not Justified by a Compelling Governmental Interest**

70. The City's employees are unable to articulate a non-generalized public safety justification, if any at all, for the City's decision to deny Plaintiffs access to the southern bank of the Lambert Beach Area.

71. The City is not performing construction on the overwhelming majority of the walls on the southern bank of Lambert Beach Area because they are not a threat to public safety. The limited construction that the City is performing on the southern bank of the Lambert Beach area is planned to occur in a small area on the east side of the southern bank of the Lambert Beach Area.

72. The City is removing small species trees, such as crepe myrtles, from the southern bank of the river that do not require large equipment to remove and these trees do not pose a threat to public safety.

73. The City has been aware of a moderately-sized hanging branch from a bald cypress tree on the southern bank of the river since at least August 12, 2023, but has refused to remove the branch. Yet, the City has trimmed other areas of the Lambert Beach Area during this time.

74.     The City has not attempted to request permission from the Historic Design and Review Commission to conduct tree risk mitigation work in the Lambert Beach Area that would eliminate the purported tree risk in the area.

75.     The City erected fencing around the southern portion of the Lambert Beach Area in February 2023 to protect its bird deterrence equipment and staff, not to protect the public from any risk of zoonotic disease from birds or danger from trees or future construction.

76.     The City did not task its Tree Assessment Committee with evaluating individual tree risk based on present conditions.

77.     The City fenced off the southern portion of the Lambert Beach Area without any arborist conducting a risk assessment of any tree.

78.     The City did not task its Tree Assessment Committee with evaluating individual tree risk based on present conditions.

79.     The City has failed to demonstrate a substantial threat of zoonotic disease from cormorants in the Lambert Beach Area. The City did not demonstrate that histoplasmosis, salmonella, or psittacosis pose substantial risk to humans if contracted. The City failed to demonstrate that those any such dangers could not be easily prevented.

80.     The City relies solely on visual assessments to determine risk from bird feces on surfaces.

81.     The City's water quality information does not indicate the source of problematic contributions to bacteria levels. The data does not distinguish avian from non-avian sources, does not distinguish cormorant from other bird sources, and does not identify what amount of contribution wildlife from Brackenridge Park Zoo contributes.

82. The City's internal documents discuss issues relating to feces with respect to egrets and herons, not cormorants.

83. The City's urban rookery management plan identifies egrets and herons, and not cormorants, as problematic bird species. The City's public statements have stated that the largest issues are caused by cattle egrets and snowy egrets.

**I.      The City's Design and Implementation of the Bond Project Are Not Adequately Tailored to Achieve a Compelling Governmental Interest**

84. The City erected fencing around the entirety of the Lambert Beach Area, instead of around locations it deems hazardous. The enclosed project area includes areas that no qualified arborist or engineer has deemed dangerous.

85. The City was presented with at least three engineering solutions that it could use to repair or reconstruct retaining walls within the Lambert Beach Area.

86. The City rejected two engineering solutions without performing detailed studies or reviews due to cost considerations and because the City believed that it would be more difficult to obtain approval from regulatory agencies to implement those two engineering solutions.

87. The City selected a third engineering solution that requires extensive excavation and, according to the City, necessitates significant loss of tree and bird life within the Lambert Beach Area.

88. One of the engineering solutions that the City rejected involves the construction of concrete piers to support the retaining walls. This solution reduces the amount of excavation required and thus reduces the destruction of trees and the disruption to bird life in the Lambert Beach Area.

89. Once completed, both of the engineering solutions that the City rejected are equally safe or more safe for the public as compared to the City's chosen engineering solution.

90.     The City's chosen engineering solution causes the most damage to the largest number of trees and birds of the known available alternatives. It is the most damaging proposal to the Lambert Beach Area's spiritual ecology, and Plaintiffs' religious exercise, of all the options that have been proposed to the City.

91.     Alternative engineering solutions could preserve more trees and reduce the damage to birds at Lambert Beach.

92.     The City did not task its Tree Assessment Committee with determining whether alternative plans could preserve more trees.  Instead, it instructed the arborists to take the existing design plan for repairing or reconstructing retaining walls as a given.

93.     The City knows that egrets nest earlier than cormorants, but has not tried to tailor deterrence activities to minimize the presence of egrets while allowing cormorants in the area.

94.     The City acknowledges that a single nest does not present a health risk, but nonetheless has the bird deterrence goal of no nesting.

95.     The City has the ability to deviate from the Secretary of the Interior's guidelines if it needs to in order to accommodate Plaintiffs' religious exercise, but it has chosen not to do so.

96.     The City has been aware that the Bond Project would violate Plaintiffs' religious rights since at least July 29, 2022, when Perez made a presentation to the Department of Parks and Recreation regarding his religious beliefs and practices.

97.     The City has been aware that the Bond Project would prevent the religious exercise of members of the Native American Church since at least June 16, 2022, when City employees circulated a letter sent by the Comanche Nation objecting to Bond Project on religious grounds.

98.     On May 23, 2023, Plaintiffs sent a letter to the City outlining the harm that the current plan for the Bond Project would do to their religious exercise.

99.     The City has refused to accommodate Plaintiffs' religious exercise.

100.    The City made no changes to its bird deterrence measures or the Bond Project in response to the religious objection letter from the Comanche Nation.

101.    The City never requested that any arborist or engineer attempt to accomplish the City's goals with respect to bird deterrence, Bond Project construction, or safety fencing, while accommodating Plaintiffs' religious practice.

102.    The City never informed the United States Department of Agriculture, the Texas Parks and Wildlife department, or the Unites States Fish and Wildlife Service of Plaintiffs' religious beliefs and practices.

103.    The City never asked an employee arborist or independent arborist what safety measures could be taken to allow Plaintiffs' ceremonies on August 12, 2023 or September 21, 2023 to be performed safely.

104.    The City has made no changes to its bird deterrence, fencing, or Bond Project design in response to Plaintiffs' religious practice. .

## II.     Proposed Conclusions of Law[2]

### A.     Legal Standard for Granting A Preliminary Injunction

1.      A party seeking a preliminary injunction must establish four elements:  (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

---

[2] To the extent any of the following conclusions of law constitute findings of fact, they are adopted and treated as such.

2.      Plaintiffs are substantially likely to succeed on the merits.

3.      There is a substantial threat of irreparable injury to the plaintiffs if the injunction is not granted.

4.      The threatened injury to Plaintiffs religious exercise if the injunction is denied outweighs any harm that will result if the injunction is granted.

5.      Granting the injunction in Plaintiffs' favor will prevent the violation of constitutional rights and will serve the public interest.

**B.      Texas Constitution, Tex. Const. art. I, § 6-a & Tex. Civ. Prac. & Rem. Code § 110.0031**

6.      Plaintiffs have sincere religious beliefs and practices that originate and are related to the land on which the Park and Lambert Beach Area now sits. Plaintiffs' performance and compliance with these beliefs is a religious exercise.

7.      The Bond Project prevents, prohibits, and limits Plaintiffs' religious services.

8.      Plaintiffs are members of a religious organization, the Native American Church, that was established to support and serve the propagation of sincerely held religious beliefs.

9.      The southern portion of the Lambert Beach Area is the location on which Plaintiffs have and must gather to worship and conduct religious ceremonies.

10.     The City's fencing off of the southern portion of the Lambert Beach Area has the effect of closing Plaintiffs' place of worship.

**C.      Texas Religious Freedom Restoration Act ("TRFRA"), Tex. Civ. Prac. & Rem. Code § 110.003(a), (b)**

11.     Plaintiffs have sincere religious beliefs and practices that originate and are related to the river bend located in the Lambert Beach Area, and the presence and nesting of cormorants in that area.

12.     Plaintiffs perform ceremonies on the southern portion of the Lambert Beach Area that are motivated by sincere religious belief. Some of those ceremonies require the presence and nesting of cormorants for Plaintiffs to sufficiently perform their ceremonies.

13.     By fencing off the southern bank of the Lambert Beach Area, the City has substantially burdened Plaintiffs' religious exercise by prohibiting their exercise at risk of criminal and civil punishment for entering the area. By destroying the cormorants' habitat through excessive tree destruction and bird mitigation, the City has burdened Plaintiffs' religious exercise by forcing them to modify their religious ceremonies. Plaintiffs believe that the spiritual ecology of the Lambert Beach Area requires the presence and nesting of cormorants, and that without that presence and nesting, Plaintiffs must change their ceremonies and the meaning of their ceremonies to incorporate that degradation. The Bond Project as currently proposed and bird mitigation to eliminate cormorant presence and nesting would end the ability of Plaintiffs to perform religious ceremonies as they know them.

14.     The City has no compelling interest for designing or implementing the Bond Project as it is currently iterated, for conducting bird mitigation that would completely eliminate the presence and nesting of cormorants in the Lambert Beach Area, for preventing Plaintiffs from accessing the southern bank of the Lambert Beach Area, or for failing to accommodate Plaintiffs' religious exercise. The City's has vague and general conception of public safety focused on crumbling riverbank walls and falling trees that is the type of "broadly formulated interest" that is insufficient to satisfy strict scrutiny. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006). So too with the general interest in "public health" the City generally associates with migratory birds.

15. The proper interest to analyze is "the asserted harm of granting specific exemptions to particular religious claimants." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1881 (2021). Here, as to access, that means determining whether the City has a public safety interest in denying access to the southern bank of the Lambert Beach Area for 15 individuals for 15 minutes under the watch of a certified arborist. As to the bird mitigation, it means whether the City has demonstrated that its public health goals cannot be reached unless a zero-cormorant population is achieved in the Lambert Beach Area. As to the Bond Project, it means whether each tree that serves as a potential nesting location for cormorants poses an independent safety hazard or prevents a real safety hazard from being remedied.

16. TRFRA "places the burden of proving a compelling state interest on the government." *Barr v. City of Sinton*, 295 S.W.3d 287, 307 (Tex. 2009). But the City must support its asserted interest by providing evidence "with respect to 'the particular practice at issue.'" *Id.* "[S]peculation is insufficient to satisfy strict scrutiny." *Fulton*, 141 S.Ct. at 1882.

17. The City has not only failed to meet its evidentiary burden; it has affirmatively disclaimed its burden altogether. As to access, City witnesses conceded that there would not be a safety risk of allowing Plaintiffs to perform a 15–20 minute ceremony in the southern bank of the Lambert Beach Area. The City's own public documents identify egrets and herons—and not cormorants—as the potential health concerns (notwithstanding the City's failure to establish that birds pose any significant public health hazard in Brackenridge Park). As for the removal or relocation of trees pursuant to the Bond Project being necessary for public safety, the City did not assert that interest at any public point until this litigation commenced.

18. The Bond Project is not narrowly tailored to achieve any compelling interest that the City may have for implementing it. Furthermore, the City refused to consider or implement

alternatives that would accomplish the City's stated interest in the Bond Project while also preserving Plaintiffs' religious liberty rights. In fact, the City has never undertaken a study to see whether the Bond Project could proceed in a manner that accommodates Plaintiffs' religious exercise.

      **D.**    **First Amendment of the U.S. Constitution,** *see* **U.S. Const. amend. I**

19.    Plaintiffs have sincere religious beliefs and practices that originate and are related to the land on which the Park and Lambert Beach Area now sits. Plaintiffs' performance and compliance with these beliefs is a religious exercise.

20.    By fencing off the southern bank of the Lambert Beach Area, the City has substantially burdened Plaintiffs' religious exercise by prohibiting their exercise at risk of criminal and civil punishment for entering the Lambert Beach Area.

21.    By destroying the cormorants' habitat through excessive tree destruction and unnecessary bird mitigation, the City has burdened Plaintiffs' religious exercise by forcing them to modify their religious ceremonies.

22.    Plaintiffs believe that the spiritual ecology of this sacred area requires the presence and nesting of cormorants, and that without that presence and nesting, Plaintiffs must change their ceremonies and the meaning of their ceremonies to incorporate that degradation. The Bond Project as currently proposed and bird mitigation to eliminate cormorant presence and nesting would end the ability of Plaintiffs to perform religious ceremonies as they know them.

23.    The City's design and implementation of the Bond Project is not neutral or generally applicable.

24.    "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1877 (2021) (internal

quotation marks and alterations omitted). The City applied for, and received from the Development Services Department, a variance from a City Unified Development Code provision requiring 80% significant tree preservation and 100% heritage tree preservation for projects within the 100-yr floodplain, in a discretionary, individualized determination. That variance rendered the Bond Project and its implementation not generally applicable.

25.     The City has engaged in preferential treatment for secular values and activities that it has refused to Plaintiffs' religious exercise. Namely, the City permits citizens to enter the Lambert Beach Area for secular reasons but denies Plaintiffs entry into the Lambert Beach Area to engage in their religious exercise. The City seeks to preserve structures, such as retaining walls that it believes have historic and cultural significance, while destroying trees and driving away birds that are historic, culturally significant and sacred to Plaintiffs. The City is apathetic to the burdens it has and continues to inflict on Plaintiffs' religious exercise and has not investigated or treated Plaintiffs' claims of historic and cultural significance in the way that it treats the claims of other City residents. Likewise, the City has undertaken significant plan alterations to other projects to preserve animal presence when those animals were valued under secular statutes such as the Endangered Species Act or Migratory Bird Treaty Act.

26.     The City's implementation of the Bond Project is also not generally applicable because "the burden of the [implementation], in practical terms, falls on [Native American Church] adherents but almost no others." *Lukumi*, 508 U.S. at 536. Specifically, the City has fenced of the southern bank of the Lambert Beach Area, which contains Plaintiffs' sacred location necessary for performing religious ceremonies, despite that area posing little to no safety risk, and despite the City failing to fence off areas that present a similar or greater safety risk.

27.     The City has no compelling interest for designing or implementing the Bond Project as it is currently iterated, for preventing Plaintiffs from accessing the Park, or for failing to accommodate Plaintiffs' religious exercise. When pressed, the City has asserted a vague conception of public safety focused on crumbling riverbank walls and falling trees. But the City's purported interest in promoting public safety is a post hoc rationalization that appears nowhere in the volumes of printed and electronic materials the City used to promote the Bond Project with San Antonio residents or obtain permission for the Bond Project from relevant authorities.

28.     The Bond Project is not narrowly tailored to achieve any compelling interest that the City may have for implementing it. Furthermore, the City refused to consider or implement alternatives that would accomplish the City's stated interest in the Bond Project while also preserving Plaintiffs' religious liberty rights. In fact, the City has never undertaken a study to see whether the Bond Project could proceed in a manner that accommodates Plaintiffs' religious exercise.

**E.     Texas Constitution, *see* Tex. Const. art. I, § 6**

29.     Plaintiffs have sincere religious beliefs and practices that originate and are related to the land on which the Park and Lambert Beach Area now sits. Plaintiffs' performance and compliance with these beliefs is a religious exercise.

30.     Through its design and implementation of the Bond Project, the City is and will further substantially burden Plaintiffs' ability to practice their religion. By refusing Plaintiffs access to the Lambert Beach Area, the City makes it impossible for them to practice core aspects of their religion. And by destroying trees and driving away birds from the Lambert Beach Area, the City degrades and risks permanently destroying a sacred place for Plaintiffs, which would make core aspects of their religious practice impossible to perform.

31.     The City has no compelling interest for designing or implementing the Bond Project as it is currently iterated, for preventing Plaintiffs from accessing the Park, or for failing to accommodate Plaintiffs' religious exercise. When pressed, the City has asserted a vague conception of public safety focused on crumbling riverbank walls and falling trees. But the City's purported interest in promoting public safety is a post hoc rationalization that appears nowhere in the volumes of printed and electronic materials the City used to promote the Bond Project with San Antonio residents or obtain permission for the Bond Project from relevant authorities.

32.     The Bond Project is not narrowly tailored to achieve any compelling interest that the City may have for implementing it. Furthermore, the City refused to consider or implement alternatives that would accomplish the City's stated interest in the Bond Project while also preserving Plaintiffs' religious liberty rights. In fact, the City has never undertaken a study to see whether the Bond Project could proceed in a manner that accommodates Plaintiffs' religious exercise.

---

DEFENDANT CITY OF SAN ANTONIO'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION

---

On September 25, 2023, the Court commenced a hearing on the request for preliminary injunction filed by Plaintiffs Gary Perez ("**Perez**") and Matilda Torres ("**Torres**", and together with Perez, "**Plaintiffs**") in the above-captioned case. For the reasons set forth below in the Findings of Fact and Conclusions of Law, the Court **DENIES** Plaintiffs' Motion for Preliminary Injunction. The Findings of Fact and Conclusions of Law are related solely to the Motion for Preliminary Injunction and are not determinative of the final outcome of the above-captioned suit. To the extent any Finding of Fact should be deemed a Conclusion of Law, or vice versa, it shall be treated as such.

## FINDINGS OF FACT

### I. THE PARTIES

1.      Plaintiff Gary Perez ("**Perez**") is a resident of Bexar County, Texas.

2.      Plaintiff Matilda Torres ("**Torres**") is a resident of Bexar County, Texas.

3.      Perez and Torres are members of the Lipan-Apache "Hoosh Chetzel" Native American Church (the "**Native American Church**"). The Lipan Apache Tribe (of Texas)

recognized by the State of Texas and is admitted to the National Congress of American Indians, but it is not a federally recognized tribe.

4.      Defendant City of San Antonio (the "**City**") is a home-rule municipal government in Bexar County Texas.

## II.      THE HISTORY OF BRACKENRIDGE PARK

5.      Brackenridge Park (which may be referred to as the "**Park**") is a public park in San Antonio, Texas, consisting of approximately 343 acres. It is roughly bounded by Hildebrand Avenue, Broadway, Avenue B, Josephine Street, US Highway 281, River Road, Alpine Drive, and N. St. Mary's Street.

6.      The Park was initially established in 1899 when George Brackenridge donated 199 acres of land to the City.

7.      In the early 20th century, the City acquired additional land through purchases and donations, bringing the Park to its final area of approximately 343 acres.

8.      The San Antonio River flows through the northern portion of Brackenridge Park.

9.      Brackenridge Park contains various attractions including paths, sports fields, the San Antonio Zoo, the Japanese Tea Garden, the Sunken Garden Theater, and the Witte Natural History Museum.

10.      The Park contains other manmade structures, including without limitation, retaining walls in the Lambert Beach area.

11.      The Lambert Beach area of the Park was initially constructed in 1915 as a gravel-lined pool in the San Antonio River.  In 1925, concrete stairs and landings, and a stone bathhouse were added.  The Lambert Beach walls are historic structures that contribute to the Park's designation on the National Register of Historic Places as well as a State Antiquities Landmark

and a City of San Antonio Historic Landmark. Because of their historic designation, construction on the retaining walls is regulated by, *inter alia,* the Texas Historical Commission and the United States Army Corps of Engineers.

12.     The retaining walls were built between the 1920s and the 1940s, and have fallen into disrepair. The original retaining walls are a gravity wall system. In part, the damage to the retaining walls has been caused by the presence of trees and/or their root systems, which are too close to the walls.

13.     In their current state, the retaining walls present a safety hazard. Some portions of the walls have failed and others are at risk of failing. When a portion of the wall fails, it could cause the soil and/or trees to shift dangerously. These risks increase when there is substantial precipitation.

14.     The Park is also a habitat for various wildlife, including, pertinent to this case, migratory birds such as the heron, egret, and double-crested cormorant.

15.     The Park, and certain structures within the Park, are listed on the National Register of Historic Places and are also designated as having significant historical value by the applicable State and local government agencies.

### III.     PLAINTIFFS' ASSERTED RELIGIOUS BELIEFS

16.     Perez and Torres are practitioners and leaders in the Native American Church.

17.     Plaintiffs profess that according to their beliefs, life "in the region" began at a spring, now called Blue Hole, which is north of the Park, situated on the campus of the University of the Incarnate Word.

18.     Plaintiffs profess to believe that a spirit in the form of a blue panther lived in the Blue Hole.

19.     According to Plaintiffs' beliefs, a spirit in the form of a double crested cormorant visited the Blue Hole.

20.     Plaintiffs believe that the blue panther scared the bird, and as it fled, water droplets from its tail scattered across the San Antonio River Valley, including the area that now comprises the Park, spurring life "in the region."

21.     As a result, Plaintiffs claim that the Park, or a certain area thereof, is a sacred site and that their religious beliefs require them to conduct religious ceremonies in specific locations within the Park.

22.     Specifically, Plaintiffs claim that a specific area in the Park, in the approximate area known as Lambert Beach, is a particularly sacred area and the location at which they must conduct religious ceremonies.  This area is referred to in this litigation as the "Project Area" and is depicted in blue below.



23.     The northern part of the Project Area is the Lambert Beach swimming area and its attendant structures.  The southern portion of the Project Area is green space.  The Project Area

is generally bounded on the east by a vehicular bridge and on the west by a pedestrian bridge, as shown in the image below.



24.     Plaintiffs claim that the Project Area is the location where the spirit in the form of the blue panther scared off the spirit in the form of the anhinga in their creation story.

25.     Plaintiffs claim that when the constellation Eridanus aligns with the bend in the San Antonio River located in the Project Area, they are supposed to conduct a ceremony called "Midnight Waters."

26.     In the Midnight Waters ceremony, the participants dip the feathers of the double crested cormorant into the San Antonio River.

27.     According to Plaintiffs the participant views a reflection of the double-crested cormorant (represented by the feather) in the River, representing the underworld.  The participant is surrounded by the bird on land and in the trees, representing the middle world.  The Eridanus constellation reflects the River and the bird in the upperworld.  The Plaintiffs believe that the

simultaneous presence and connection of the three worlds creates a "spiritual ecology" that allows them to locate themselves in the physical world and commune with the spiritual world.

28.     Plaintiffs have not alleged that double-crested cormorants must be actively nesting in the Project Area in order for Plaintiffs to exercise their religious beliefs.

29.     Plaintiffs have not alleged that any particular number of double-crested cormorants must be present in the Project Area in order for Plaintiffs to exercise their religious beliefs.

30.     Plaintiffs have not alleged that any particular tree within the Project Area is necessary to the exercise of Plaintiffs' religious beliefs.

31.     Plaintiffs have not alleged that any particular number of trees within the Project Area is necessary to the exercise of their religious beliefs.

32.     The Plaintiffs have previously modified their religious practices or ceremonies due to temporary, exigent circumstances.  For example, during the COVID-19 pandemic, the Plaintiffs voluntarily limited the number of individuals who participated in a ceremony in person, and encouraged others to participate or worship remotely.

33.     According to Plaintiffs, the use of peyote is part of their religious exercise and the Park is also significant site for "peyote pilgrims."

34.     Plaintiffs claim that peyote pilgrims visit Barton Springs, San Marcos Springs, Comal Springs, and finally, San Antonio Springs, performing religious rites at each stop.  "San Antonio Springs" is not a single designated spot, but rather, a collection of springs in the general vicinity of the University of the Incarnate Word and the Park.  The San Antonio Springs include the Blue Hole.

35.     Peyote pilgrims may visit areas of the Park outside of the Project Area.

36.     Peyote pilgrims may or may not contact Plaintiffs during their peyote pilgrimage.

37.     Each peyote pilgrimage is unique to the pilgrim and does not require any particular observance in any particular location within the Park.

### IV.     THE 2017 BOND PROJECT

38.     In May 2016, the citizens of San Antonio voted overwhelmingly in favor of a $850 million bond package for public improvements.

39.     Proposition 3 of the bond package was dedicated to improvements related to Parks, Recreation, and Open Spaces, including $7,750,000 for improvements at the Park.

40.     The improvements and repairs include, pertinently, repairs to retaining walls along the San Antonio River, including in the Project Area.  The improvements planned for the Park that are the subject of this lawsuit are collectively referred to as the "2017 Bond Project."

41.     Within the Project Area, the City proposes to repair and rehabilitate the retaining walls along the River; repair and rehabilitate the historic Pump House; and construct a ramp to make the Lambert Beach area more easily accessible to visitors with physical disabilities or who use mobility aids.

42.     The City anticipates that the 2017 Bond Project improvements in the Project Area will commence in the fourth quarter of 2023 and take approximately eight months to complete.

43.     In connection with the 2017 Bond Project, including the construction with the Project Area, the City must comply with a number of local, state, and federal regulations.  These include, but are not necessarily limited to, the City's own design guidelines, State regulations related to the preservation of historic structures and cultural resources, the Secretary of the Interior's Design Guidelines, U.S. Army Corps of Engineer regulations, the Americans with Disabilities Act, and OSHA regulations, to name a few.

44.     The City evaluated and considered multiple different repair methodologies for the original retaining walls.  Land, regulatory, and agency limitations exist for the repair of the original retaining walls.

45.     The City utilized a team of design professionals, including architects, engineers, and historic preservation officials ("Design Team"), to determine the repair methodology to be utilized.

46.     The Design Team retained by COSA recommended utilization of a cantilevered wall system to effectuate repairs of the original retaining walls.

47.     The Design Team considered multiple factors in recommending a cantilevered wall system including, but not limited to:

        a.  Tree density
        b.  Tree location
        c.  Topography
        d.  Existing retaining wall stability
        e.  Existing wall height
        f.  Equipment accessibility
        g.  Construction feasibility
        h.  Legal compliance
        i.  Regulatory compliance

48.     The City held a number of public meetings to receive community input regarding repairs of the original walls.  Plaintiffs participated in some of these meetings and submitted public comments.  Plaintiffs, and other citizens, expressed their concerns that the City's initial proposal involved the removal and relocation of many trees in the Project Area.  The Plaintiffs, and other citizens, expressed their desire that the City consider whether more trees in the Project Area could be preserved in place.

49.     The City took these comments, including Plaintiffs' under consideration and evaluated whether more trees could be preserved in place in the Project Area.  The City revised

its plan for the work in the Project Area pursuant to the 2017 Bond Project in response to the public comments, including Plaintiffs' comments.  Plaintiffs have not identified any statute, regulation, policy, or other law that would require the City to s evaluate Plaintiffs' comments based on the asserted religious rights separately from other comments that expressed similar concerns regarding bird deterrence and tree removal and relocation based on secular concerns.

50.     After revising the initial proposal for the Bond Project to identify and save as many trees as possible, the City is unable to identify any additional trees that could be saved from removal in order to complete the 2017 Bond Project and prevent future degradation of the surrounding infrastructure in the Project Area.

51.     The City's current proposal for the work in the Project Area pursuant to the 2017 Bond Project was developed to comply with all applicable local, state, and federal regulations, statutes, and laws.

52.     The Plaintiffs do not dispute that the retaining walls and other historic structures in the Project Area need to be repaired or rehabilitated, or that, in and of itself, such construction would infringe on their religious rights.  Rather, Plaintiffs complain about the manner in which the City intends to pursue the construction in the Project Area.

53.     Specifically, the Plaintiffs claim that the City's plan to remove or relocate trees in the Project Area infringes on their religious rights.

54.     In particular, the Plaintiffs object to the City's plans to remove or relocate certain trees within the Project Area to facilitate construction and prevent future damage to the re-built walls.  The City has determined that the affected trees will interfere with the construction in the Project Area, will be irreparably damaged by the construction in the Project Area, or will damage

the repaired and rehabilitated retaining walls and historical structures in the future, leading to the exact same problem the 2017 Bond Project is intended to fix. .

55.     Under the City's current proposal for construction in the Project Area:

    a.    46 trees will be removed completely.  Of these trees, 4 are dead or dying.  Of the trees suggested to be removed, 4 are invasive species.  The Plaintiffs do not object to the removal of the dead or dying trees or of the invasive species.

    b.    21 trees will be relocated to other areas of the Park.

    c.    16 trees will be preserved in place.

    d.    At least 22 new trees will be planted in the Project Area, but in locations where they will not threaten the integrity of the retaining walls or other historic structures.  The Plaintiffs do not complain about new trees being planted in the Project Area.

56.     The removal and relocation of trees in the Project Area does not, on its face, discriminate against religion or religious practice.

57.     The removal and relocation of trees in the Project Area is not aimed at any religion or religious practice.

58.     The removal and relocation of trees in the Project Area does not treat religious practice different from secular activities.

59.     The removal and relocation of trees in the Project Area does not prohibit religious conduct while allowing similar secular conduct.

60.     There is no mechanism for individualized exemptions from the City's plan to remove and relocate trees in the Project Area.

61.     There is no dispute that failing retaining walls present a significant danger to any member of the public who is visiting the Park, including visitors to Lambert Beach and the Project Area.  Because of the hazardous conditions at the Lambert Beach Area, the City temporarily closed the northern portion of the Project Area in 2022.  Plaintiffs do not allege the temporary closure of the northern portion of the Project Area infringes on their religious rights.

62.     The City determined that dead and dying trees in the Project Area present a significant danger to the public. Accordingly, the City temporarily closed the southern portion of the Project Area in February 2023.

63.     The City's determination that dead and dying trees in the Project Area is underscored by two incidents.  First, On March 15, 2023, the limb from a cedar elm fell on to a sidewalk at the San Antonio Zoo, allegedly injuring 7 individuals.  Four of those individuals have filed a lawsuit claiming damages of $1 million.  Second, on or about September 9, 2023, a 20-30' Cedar Elm trunk in the Project Area failed during thunderstorms and a large portion of the tree fell into the River near the bend in the River where Plaintiffs claim they must conduct religious ceremonies.

64.     There is a known "hanger branch" located in the canopy of a Cypress tree in the Project Area, in the immediate vicinity of the area in which Plaintiffs claim they must conduct religious ceremonies.

65.     If the aforementioned hanger branch fell from the tree and struck a person, it could cause serious physical injury or even death to that person.

66.     The City also determined that it was in the interest of public safety to temporarily close the Project Area so that the bird deterrence program (as described below in Section V) could be safely conducted.  The bird deterrence efforts may present a risk to individuals who are

not wearing suitable personal protection equipment. For example, the bird deterrence efforts include techniques that utilize loud noises to dissuade the birds from actively nesting in the area, which could damage someone's hearing if they were close to the noise and not wearing hearing protection, Additionally, there were instances in which City contractors or employees were harassed by members of the public. Finally, when the construction commences, it will not be safe for the public to be in the Project Area among the construction equipment or close to the trenches necessary to shore up the retaining walls.

67.    When the 2017 Bond Project improvements are complete and the area is safe, the Project Area will be reopened to all visitors, including Plaintiffs and other members of the Native American Church.

68.    The City cannot accomplish its compelling government interest in making the Project Area safe for visitors, preserving historic structures, and making Park amenities accessible and available to the public by any less restrictive means than the removal and relocation of the designated trees in the Project Area, the bird deterrence program, and the temporary closure of the Project Area.

## V.    BIRD DETERRENCE AT THE PARK

69.    Various migratory bird species populate the Park, including herons and egrets.

70.    Double-crested cormorants are also migratory birds. They are attracted to the nesting sites of other colonial water birds, including those of egrets and herons.

71.    The large roosting colonies of egrets, in particular, adversely affected wildlife biodiversity, water quality, and park amenity access.

72.    Areas of the Park where egret rookeries exist become unusable for 10 months of the year due to increased bird density.

73.     Bird feces damage park amenities and equipment, including picnic tables, playground equipment, and sidewalks.

74.     Bird feces adversely affect the quality of the water in the San Antonio River, contributing to elevated levels of E. coli.

75.     Large populations of birds increase respiratory illnesses in humans resulting from avian diseases and uric acid in bird feces.

76.     The chemicals in bird feces may increase the nitrogen in water, killing off aquatic life.

77.     To address the adverse impacts of large rookeries and bird populations, the City contracted with the U.S. Department of Agriculture (**"USDA"**) and coordinated with the Texas Parks and Wildlife Department ("TPWD") and U.S. Fish and Wildlife Service (**"FWS"**) to modify the bird habitats and deter the birds from nesting in highly urbanized areas of the  Park, including the Project Area.

78.     Habitat modification includes removing old nests, clearing underbrush, and removing dead wood from the tree canopy to discourage nesting.

79.     The City uses only non-lethal deterrent techniques that may include, pyrotechnics, clappers, spotlights, lasers, distress calls, effigies, balloons, and drones.

80.     The City does not utilize any population control techniques on active nests or viable eggs.

81.     The bird deterrence activities are necessary to protect the health and safety of all members of the public who visit the Park, including visitors to Lambert Beach.

82.     The bird deterrence activities are also necessary so that the 2017 Bond Project improvements can proceed without undue delay.

83. Pursuant to the Migratory Bird Treaty act, the proposed construction and removal/relocation of trees planned for the Project Area cannot proceed if migratory birds, including the double crested cormorant, are nesting in the area.

84. The bird deterrence activities are aimed at preventing birds from nesting in the highly urbanized areas of the Park, and particularly, in the Project Area.

85. The bird deterrence activities do not prevent birds, including the double crested cormorant, from entering the Park, including the Project Area.

86. Since the implementation of the bird deterrence measures, double-crested cormorants are still observed to be present in the Park, including in the Project Area.

87. The City's bird deterrence program does not, on its face, discriminate against any religion or religious practices.

88. The City's bird deterrence program is not aimed at any religious practice.

89. The City's bird deterrence program does not treat religious activities differently from secular activies.

90. The City's bird deterrence program does not permit secular conduct while prohibiting similar religious conduct.

91. There is no scheme for individualized exemptions from the City's bird deterrence program.

92. The City cannot accomplish its compelling interest in public health and safety from the hazards posed by the large populations of egrets and herons by any least restrictive means that the current bird deterrence efforts.

## VI.    THE INSTANT SUIT

93.    Plaintiffs filed the instant suit, alleging that the following plans or activities on behalf of the City place a place a substantial burden on their sincerely held religious beliefs, in violation of the First Amendment of the United States Constitution, Texas Constitution, Religious Land Use and Institutionalized Persons Act ("**RLUIPA**"), and Texas Religious Freedom Restoration Act ("**TRFRA**"): (a) bird deterrence activities, (b) the temporary closure of Project Area, and (c) the proposed removal or relocation of trees in the Project area.

94.    Plaintiffs sought a Temporary Restraining Order to be allowed access to the Project Area on August 12, 2023 to perform the Midnight Water ceremony.

95.    The Court denied the request for Temporary Restraining Order.

96.    Plaintiffs now seek a Preliminary Injunction enjoining the City from:

    **a.**    "implementing the [2017] Bond Project or otherwise removing trees from the Park until Plaintiffs and the City agree on a specific plan that preserves the Park's spiritual ecology";

    **b.**    "implementing the [2017] Bond Project or otherwise engaging in 'bird deterrence' within the Park in a way that violates Plaintiffs' religious rights"; and

    **c.**    "preventing Plaintiffs from accessing and performing religious ceremonies in the Park".

97.    Based on the Court's findings above, and pursuant to the Conclusions of Law stated below, the Court finds that the Plaintiffs have not met their burden of showing they are entitled to preliminary injunctive relief.

# CONCLUSIONS OF LAW

## I. PRELIMINARY INJUNCTION STANDARD

98. To obtain a preliminary injunction,

> First, the movant must establish a substantial likelihood of success on the merits. Second, there must be a substantial threat of irreparable injury if the injunction is not granted. Third, the threatened injury to the plaintiff must outweigh the threatened injury to the defendant. Fourth, the granting of the preliminary injunction must not disserve the public interest.

*Allstars v. City of San Antonio*, TX, No. CIV.A. SA-03-CA-356-, 2003 WL 21204471, at *2 (W.D. Tex. May 19, 2003) (citations omitted). "The third and fourth factors merge when, as here, the government is a party." *Guajardo v. Kerry*, No. CV SA-13-CA-608-FB, 2014 WL 12538142, at *2 (W.D. Tex. May 2, 2014) (citing *Planned Parenthood v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013)). A preliminary injunction is an "extraordinary remedy," that "should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements, and is treated as the exception rather than the rule." *Malone v. CST Brands, Inc.*, No. SA-16-CA-0955-FB, 2016 WL 8258791, at *4 (W.D. Tex. Nov. 10, 2016) (quoting *Planned Parenthood v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005); *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997)) (internal quotation marks omitted); *see also 35 Bar & Grille, LLC v. City of San Antonio,* 943 F. Supp. 2d 706, 711 (W.D. Tex. 2013) (quoting *Canal Auth. v. Callaway,* 489 F.2d 567, 569 (5th Cir.1974) ("In order to prevail, Plaintiffs must carry the burden on all four elements.")). The Plaintiffs have not met their burden.

99. With respect to the first criterion of the preliminary injunction standard,

> When determining the likelihood of success on the merits, courts look to the standards of the substantive law. To prevail on a preliminary injunction, the Plaintiffs likelihood of success must be more than negligible, and the preliminary injunction should not be

> granted unless the question presented by the litigant is free from
> doubts.

*35 Bar & Grille*, 943 F. Supp. 2d at 722 (internal quotation marks and citations omitted).

100.     The second criterion of the preliminary injunction requires the Plaintiffs to show

they have sustained an irreparable injury, defined as an injury that

> cannot be remedied by an award of economic damages. It is well
> established that the loss of First Amendment freedoms for even
> minimal periods of time constitutes irreparable injury justifying the
> grant of a preliminary injunction.

*Id*. at 724 (internal quotation marks and citations omitted).  "As a matter of law, however, simply

alleging some possibility of irreparable injury does not support the issuance of a preliminary

injunction."  *Aquifer Guardians in Urban Areas v. Fed. Highway Admin.*, 779 F. Supp. 2d 542,

556 (W.D. Tex. 2011) (citation omitted).

101.     The third part of the preliminary injunction analysis requires the Plaintiffs to show

that the threatened injury to them outweighs the potential injury to the City if the injunction is

not granted.  While the Plaintiffs claim they have been and will be prevented from practicing

their religion, the issuance of the preliminary injunction would prevent the City from proceeding

with measures it has determined are necessary to protect the health and safety of its citizens and

its natural resources.  "The City has an interest in promoting the health, safety, morals and

general welfare of the citizens of the City."  *35 Bar & Grille*, 943 F. Supp. 2d at 725; *Houston

Chronicle Pub. Co. v. City of League City, Tex.*, 488 F.3d 613, 622 (5th Cir. 2007) (city

ordinance restricting the solicitation or distribution of any material to the occupant of a vehicle

stopped at a traffic light served government's compelling interest in public safety).

II.     **PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIM UNDER THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION:  FREE EXERCISE CLAUSE (28 U.S.C. § 1983)**

A.  **The Plaintiffs Lack Standing To Bring Claims On Behalf Of Unknown "Peyote Pilgrims"**

102.    To establish Article III standing sufficient "to pursue an alleged violation of the Free Exercise Clause, a plaintiff must allege that his or her own 'particular religious freedoms are infringed.'" *Patterson v. Def. POW/MIA Accounting Agency*, 343 F. Supp. 3d 637, 652 (W.D. Tex. 2018) (quoting *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 292 n.25 (5th Cir. 2001)).

103.    Plaintiffs allegations relating to peyote pilgrims or peyote pilgrimages do not meet this standard.

104.    First, the Plaintiffs have not alleged that their own peyote pilgrimages have been or are being infringed upon by any of the City's actions related to bird deterrence, the 2017 Bond Project, or the temporary closure of the Project Area.  Additionally, the Plaintiffs' presence (in their capacities as leaders of the Native American Church) is not a necessary component of any individual's peyote pilgrimage.

105.    Second, there is no allegation that a peyote pilgrimage requires the presence of a double-crested cormorant.  Thus, Plaintiffs have not asserted any injury to this aspect of their religious practice arising out of the bird deterrence program.

106.    Third, there is no allegation that the removal or relocation of trees will have any impact on the conduct of peyote pilgrimages.  Thus, Plaintiffs have not asserted any injury to this aspect of their religious practice arising out of the removal or relocation of trees in the Project Area.

107.     Finally, there is no allegation that the peyote pilgrims must access the Project Area as part of their pilgrimage.  Thus, Plaintiffs have not asserted any injury to this aspect of their religious practice arising out of the temporary closure of the Project Area.

108.     Based on the foregoing, to the extent that Plaintiffs assert claims that the City's actions infringe on the conduct of peyote pilgrimages, the Plaintiffs are not likely to succeed on the merits of those claims because they lack standing to bring them.

**B.  The Plaintiffs Have Not Established Municipal Liability For Purposes Of Section 1983**

109.     To prevail on their federal constitutional claim brough via 28 U.S.C. § 1983, the Plaintiffs must prove "(1) a policymaker, (2) an official policy, and (3) a violation of constitutional rights whose moving force is the policy or custom."  *Horvath v. City of Leander*, 946 F.3d 787, 793 (5th Cir. 2020), *as revised* (Jan. 13, 2020); *see also Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 694 (1978).

110.     Under *Monell*, as interpreted and applied by the Fifth Circuit, "municipal liability cannot be sustained under a theory of *respondeat superior*."  *Rivera v. Houston Indep. Sch. Dist.,* 349 F.3d 244, 247 (5th Cir. 2003).  Nevertheless, the Plaintiffs have not alleged—or proven—the three *Monell* factors and, therefore, have not established that the City can be liable for the claimed violations of Plaintiffs' First Amendment Rights under section 1983.

111.     Alternatively, and notwithstanding Plaintiffs' failure to satisfy *Monell*, Plaintiffs have not shown that they are likely to succeed on the merits of their claims because none of the City's actions **(a)** addresses Plaintiffs or their religion; or **(b)** violates the First Amendment Free Exercise Clause.  *See Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 877 (1990); *see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. ___, ___, 142 S. Ct. 2407, 2421 (2022)(*citing Smith*).

### C.  The Plaintiffs Have Not Shown A Likelihood Of Success On Their Claim That The City Violated Their Tights Under the Free Exercise Clause

112.    Even if the Plaintiffs could establish municipal liability under section 1983, they have not shown that they are likely to succeed on the merits of their claim under the Free Exercise Clause of the First Amendment.

113.    In *Smith*, the Supreme Court considered whether a law criminalizing the use of peyote interfered with the plaintiff's religious exercise in violation of the First Amendment.  The Court held that "if prohibiting the exercise of religion . . . is not the object of the [conduct] but merely the incidental effect of a generally applicable and otherwise valid provision, ***the First Amendment has not been offended***." *Smith*, 494 U.S. at 878 (emphasis added).

114.    The City's bird deterrence efforts are neutral policies.  The bird deterrence policy does not, on its face, discriminate against any religion or religious practice.  The bird deterrence program is not aimed at any religion or religious practice.  The bird deterrence program does not treat religious activities differently from secular activities.

115.    The City's bird deterrence policy is generally applicable.  The bird deterrence policy does not permit any secular conduct while prohibiting similar religious conduct.  There is no mechanism for individualized exemptions.

116.    The City's plan to remove and relocate trees in connection with the 2017 Bond Project is neutral.  It does not, on its face, discriminate against any religion or religious practice.  The plan to remove and relocate trees is not aimed at any religion or religious practice.  The City's plan to remove and relocate trees in connection with 2017 Bond Project does not treat secular and religious activities differently.

117.     The City's plan to remove and relocate trees in connection with the 2017 Bond Project is generally applicable.  The removal or relocation of trees does not permit any secular conduct while prohibiting similar religious conduct.  There is no mechanism for individualized exemptions.

118.     The City's decision to temporarily prohibit public access to the Project Area is neutral.  It does not, on its face, discriminate against any religion or religious practice.  The temporary prohibition of public access to the Project Area is not aimed at any religion or religious practice.  The temporary prohibition of public access to the Project Area does not treat secular and religious activities differently.

119.     The City's decision to temporarily prohibit public access to the Project Area is generally applicable.  The temporary prohibition of public access to the Project Area does not permit any secular conduct while prohibiting similar religious conduct.  There is no mechanism for individualized exemptions.  Indeed, to the extent that any exemption *could* be allowed, it would favor religious exercise over secular considerations.  The City thoroughly considered Plaintiffs' requests to access the Project Area on August 12, 2023 and September 21, 2023, so that Plaintiffs could conduct religious ceremonies in the Project Area.

120.     In this instance, the City's bird deterrence program, the removal and relocation of trees pursuant to the 2017 Bond Project, and the temporary closure of the Project Area are generally applicable laws.  The effect – if any – on Plaintiffs' religious exercise is merely incidental to these generally applicable and otherwise valid governmental decisions and actions.

121.     A different standard would apply if the City's bird deterrence program, the removal and relocation of trees pursuant to the 2017 Bond Project, and the temporary closure of the Project Area were deemed not to be neutral or generally applicable.  As the Supreme Court

recently explained. "a plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy*, __ U.S. at __, 142 S. Ct. at 2421–22 (citations omitted).  If the policy at issue is not "neutral" or "generally applicable", the "Court will find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* (citation omitted).

> 122.    The Court explained further,

> A government policy will not qualify as neutral if it is specifically directed at ... religious practice. A policy can fail this test if it discriminates on its face, or if a religious exercise is otherwise its object. A government policy will fail the general applicability requirement if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way, or if it provides a mechanism for individualized exemptions. Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny.

*Id.* (internal quotation marks, citations, and brackets omitted) (ellipses in original). Disparate treatment between secular and religious activities may indicate that a policy is not neutral.  *See Roman Catholic Diocese of Brooklyn v. Cuomo*, __ U.S. __. __ 141 S. Ct. 63, 66-67(2020) (occupancy restrictions related to COVID-19 emergency were not neutral because religious services were more strictly regulated than secular activities).

123.    Although strict scrutiny should not apply in this case, the City's bird deterrence policy, the removal and relocation of trees in connection with the 2017 Bond Project, and the temporary closure of the Project Area to the public all pass strict scrutiny.

124.    The City's bird deterrence policy serves its compelling interest in public health and safety.  Large populations of migratory birds in highly urbanized areas of the Park contribute

to unsanitary conditions in the Park, which can pose a risk of disease to humans and animals. Large populations of migratory birds in highly urbanized areas of the Park also have an adverse impact on the water quality in the San Antonio River.

125.    The City's bird deterrence policy is narrowly tailored to serve this compelling interest. The City's bird deterrence policy uses non-lethal methods to encourage the migratory birds to nest in less urbanized areas of the Park, where the birds' presence poses less risk of disease and contamination. The City's bird deterrence policy does not prohibit migratory birds from visiting, roosting, or foraging in the Project Area.

126.    The City's plan to remove or relocate trees in connection with the 2017 Bond Project serves the City's compelling interest in public health and safety. Removing dead and dying trees prevents them from failing and injuring visitors to the Park.

127.    Repairing the retaining walls in the Project Area also serves the City's compelling interest in public safety. Failing retaining walls pose a substantial risk to safety. The otherwise healthy trees that are scheduled to be removed or relocated from the Project Area would be damaged or compromised by the construction required to repair the retaining walls, rendering those trees a risk of failure in the future. The City has a compelling interest in removing or relocating trees that would become a risk to public safety because of the likelihood of future failure.

128.    Similarly, the relocation and removal of trees that are too close to the retaining walls serves the City's compelling interest in public safety. Trees that would compromise the integrity of the retaining walls present a serious risk of harm to the public.

129.    The City's plan to remove or relocate trees in the Project Area is narrowly tailored to serve this compelling interest. There is no reasonable alternative to removing dead or dying

trees.  The City has limited the removal or relocation of otherwise healthy trees to preserve in place many of the trees.  The City plans to plant at least 22 additional trees in the Project Area, in places where the trees do not pose the same risks to public safety as the currently-existing trees.

130.    The City's temporary prohibition on access to the Project Area serves the City's compelling interest in public safety.  The City's engineers and arborists, as well as independent engineers and arborists, have determined that unsafe conditions exist in the Project Area, including the potential for failing trees (trunks and limbs) and the potential for failing retaining walls.

131.    The City's temporary prohibition on access to the Project Area is narrowly tailored to the City's compelling interest in public safety.  The Project Area will be reopened to all members of the public, including Plaintiffs, when the construction is completed and the Project Area is once again safe for visitors.  The temporary closure of a small portion of the Park while unsafe conditions persist is narrowly tailored.

132.    Whether the Court applies a rational basis or strict scrutiny test, the Plaintiffs have failed to show that they are likely to prevail on their claim that the City has violated the Free Exercise Clause of the U.S. Constitution.

**D.    The Plaintiffs Have Not Shown That They Are Likely To Succeed On The Merits Of Their Claim Under the Religious Land Use and Institutionalized Persons Act ("RLUIPA")**

133.    Plaintiffs' alleged claim under the federal Religious Land Use and Institutionalized Persons Act ("RLUIPA"), *see* 42 U.S.C. § 2000cc, *et seq*, fails as a matter of law because RLUIPA applies only to land use regulations.  The statute defines "land use regulation" as

> ***a zoning or landmarking law, or the application of such a law***, that limits or restricts a claimant's use or development of land (including a structure affixed to land), ***if the claimant has an***

24

> *ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest.*

42 U.S.C. § 2000cc-5(5) (emphases added). The City's actions and decisions at issue in this lawsuit are not zoning or landmarking laws.

134. Plaintiffs' claims under RLUIPA also fail as a matter of law because RLUIPA applies to cases in which the plaintiff is complaining about a land use regulation as applied to the plaintiff's property, not a land use regulation as applied to the government's own property. *See*, *e.g.*, *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 447-49 (1988)(rejecting Indian tribes' Free Exercise challenge to the United States Forest Service's approval of plans to construct a logging road in the Chimney Rock area of the Six Rivers National Forest (federal property), and finding that such conduct did not impose a burden "heavy enough" to violate the Free Exercise Clause); *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1063 (9th Cir. 2008)(rejecting the claim of multiple Indian-tribe plaintiffs that use of artificial snow made from reclaimed water in a government-owned park on what the Navajo Nation considered a sacred mountain desecrates the entire mountain, deprecates their religious ceremonies, and injures their religious sensibilities, in violation of several federal statutes); *United States v. Means*, 858 F.2d 404 (8th Cir. 1988)(rejecting, on the basis of government's ownership, the Lakotas' claim that the United States Forest Service's denial of a permit for the use of an area in the Black Hills National Forest (federal property), as a religious, cultural, and educational community violated their free exercise rights); *Wilson v. Block*, 708 F.2d 735, 739-40 (D.C. Cir. 1983)(finding no impermissible burden on religious rights despite Navajo and Hopi plaintiffs' contentions that development of the Snow Bowl on the San Francisco Peaks (federal land) would be inconsistent with their First Amendment right to freely hold and practice their religious beliefs on the Peaks,

which they believe to be sacred; that such development would be a profane act and an affront to the deities; and that, as a consequence of such acts, the Peaks would lose their healing power and otherwise cease to benefit the tribes; would seriously impair their ability to pray and conduct ceremonies upon the Peaks, as well as to gather from the Peaks the sacred objects, such as fir boughs and eaglets, which are necessary to their religious practices); *Havasupai Tribe v. United States*, 752 F. Supp. 1471 (D. Ariz. 1990), *aff'd sub nom. Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991)(rejecting, on the basis of government's ownership, a Havasupai free exercise violation claim involving the Forest Service's plan for a uranium mine in an Arizona national forest (federal property)); *Manybeads v. United States*, 730 F. Supp. 1515 (D. Ariz. 1989)(rejecting, on the basis of the government's ownership, a Navajo claim that relocation from the Hopi Reservation under the provisions of the Navajo-Hopi Land Settlement Act violated their free exercise rights).

135.    The government's right to limit conduct on its own property is equally applicable to state park land. *See*, *e.g.*, *Crow v. Gullet,* 541 F. Supp. 785, 794 (D. S.D. 1982), *aff'd*, *Crow v. Gullet*, 706 F.2d 856, 858 (8th Cir. 1983)(per curiam)(plaintiffs did not show that defendants' development, construction, and regulatory actions burdened plaintiffs' religious exercises in the Bear Butte area, and plaintiffs "failed to establish any infringement of a constitutionally cognizable first amendment right. To the extent their right of access was temporarily restricted at the ceremonial grounds, plaintiffs' interests were "outweighed by compelling state interests in preserving the environment and the resource from further decay and erosion, in protecting the health, safety, and welfare of park visitors, and in improving public access to this unique geological and historical landmark").

136. Even if RLUIPA could apply to a land use regulation imposed by the government on its own property (which it dies not), it would not apply in this case. RLUIPA limits the definition of "land use regulation"—and, in the process, also limits who may be a claimant under RLUIPA—as follows:

> The term "land use regulation" means a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), *if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest*.

42 U.S.C. § 2000cc-5(5).

137. Plaintiffs have not shown any "*ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest*" in any property in the Park, as required by RLUIPA. Thus, Plaintiffs do not fall within the class of individuals granted cause of action under 42 U.S.C. § 2000cc-5(5).

138. Additionally, Plaintiffs' claims under RLUIPA fail as a matter of law because they cannot prove the "substantial burden" element of 42 U.S.C. § 2000cc-(a)(1).

139. The Fifth Circuit has explained that

> a government action or regulation creates a "substantial burden" on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs. And, in line with the foregoing teachings of the Supreme Court, the effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs.

*Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004); *see also Barr v. City of Sinton*, 295 S.W.3d 287, 302 (Tex. 2009)(following *Adkins* in declining to "craft a bright-line rule" or "one that will

apply in every context," and in finding that the inquiry as to whether a person's religious exercise has been **substantially burdened** under the TRFRA "requires a case-by-case, fact-specific inquiry.")

140.    Here, even assuming the City's bird deterrence program, 2017 Bond Project, and temporary closing of the Project Area are "land use regulations" for purposes of RLUIPA, they do not place a "substantial burden" on Plaintiffs' religious practices.

141.    There is no allegation—and thus, no proof—that any of the complained of actions force the Plaintiffs to choose between a benefit that is generally available and adhering to their religious beliefs and practices.

142.    The Plaintiffs also have not shown that the complained of actions force them to act in a way that violates their beliefs.

143.    As set forth above, Plaintiffs' religious beliefs do not require double-crested cormorants to be nesting in the Project Area. The City's bird deterrence program only aims to eliminate nesting. It does not prevent the double-crested cormorant from visiting, foraging in, or flying over the Project Area.

144.    Plaintiffs' religious beliefs also do not require any particular tree or any particular number of trees to be present in the Project Area. The City's planned removal and relocation of trees in the Project Area therefore does not substantially burden the Plaintiffs' religious beliefs or practices.

145.    Finally, the City's temporary closure of the Project Area does not rise to a "substantial burden" on Plaintiffs' religious exercise for purposes of RLUIPA because it prevents them only from "enjoying some benefit that is not otherwise generally available[.]" *Adkins*, 393 F.3d at 570; *see also Patterson*, 398 F. Supp. 3d at 122–23. Temporarily, access to the Project

Area is not "otherwise generally available" due to safety concerns.  The Plaintiffs have refused accommodations that would have allowed them to access certain areas of the Project Area that are less hazardous.

### E. Plaintiffs Have Not Shown That They Are Likely To Succeed On The Merits Of Their Claims Under The Texas Constitution

146.  TEX. CONST. art. I, § 6 provides:

> All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences. No man shall be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent.  No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion, and no preference shall ever be given by law to any religious society or mode of worship.  But it shall be the duty of the Legislature to pass such laws as may be necessary to protect equally every religious denomination in the peaceable enjoyment of its own mode of public worship.

147.  Texas courts treat section 6 as "coextensive with the First Amendment, unless the plaintiff argues that the application of each is different," which Plaintiffs have not done.  *Tilton v. Marshall,* 925 S.W.2d 672, 677 n. 6 (Tex. 1996).  Thus, for the same reasons that the Plaintiffs are unlikely to prevail on their claims under the Free Exercise Clause of the U.S. Constitution, they are unlikely to prevail on the merits of their claims under the Free Exercise Clause of the Texas Constitution. *See Smithback v. Texas*, No. 3-05-CV-0578-BD, 2007 WL 241376, at *3 (N.D. Tex. Jan. 29, 2007)(Texas courts have repeatedly refused to interpret the Texas Bill of Rights—including the free exercise clause—more broadly than the First Amendment), *aff'd sub nom Smithback v. Crain*, No. 07-10274, 2009 WL 552227 (5th Cir. 2009)(following *Adkins* and holding that "governmental regulation does not substantially burden religious exercise "if it merely prevents the adherent from either enjoying some benefit that it not otherwise generally available or acting in a way that is not otherwise generally allowed").

148.     Plaintiffs' failure to allege any viable violation of the First Amendment "Free Exercise Clause" means that they have also failed to allege any viable violation of the comparable provision of TEX. CONST. art. I, § 6. Similarly, to the extent that the conduct Plaintiffs advocate would violate the Establishment Clause of the First Amendment, such conduct would also violate the comparable language TEX. CONST. art. I, § 6 prohibiting the establishment of religion.

149.     In addition, there is no statutory or common law cause of action for damages resulting from alleged violations of the Texas Constitution. *Smithback*, 2007 WL 241376, at *3 (citing *Williams v. Kaufman Co.*, No. 3-97-CV-0875-L, 1998 WL 34190569 at *6 (N.D.Tex. Sept.18, 1998)); *see also City of Beaumont v. Bouillion*, 896 S.W.2d 143, 150 (Tex. 1995)).

150.     The Texas Constitution, however, was amended in November 2021 to provide broader protections to the exercise of religion than the U.S. Constitution. TEX. CONST. art. I, § 6-a provides:

> This state or a political subdivision of this state may not enact, adopt, or issue a statute, order, proclamation, decision, or rule that prohibits or limits religious services, including religious services conducted in churches, congregations, and places of worship, in this state by a religious organization established to support and serve the propagation of a sincerely held religious belief.

151.     The Texas Legislature did not define "places of worship" for purposes of this constitutional provision, nor have the Texas courts defined it.

152.     In the context of the Texas Constitution exemption "places of worship" from taxation, the phrase has been defined to mean

> a place where a number of persons meet together for the purpose of worshiping God. The Century Dictionary gives this definition: A building or part of a building set apart for any purpose—as a place of worship. The worship of God is not prohibited in any place, but we are of the opinion that the spirit of the Constitution would

include any place at which the worship might be indulged in so
continuously and in such a manner as to give it the character of a
place of worship.

*Kerrville Indep. Sch. Dist. v. Sw. Tex. Encampment Ass'n*, 673 S.W.2d 256, 259 (Tex. App.—San

Antonio 1984, writ ref'd n.r.e.) (internal quotation marks omitted) (emphasis omitted).  In that

case, the Court of Appeals held that vacant lots that were not "used in any capacity other than to

further the atmosphere of the rustic hill country" were not "an actual place of religious worship"

exempt from taxation.  *See id*. at 261.

153.    Again in the context of tax exemptions for "places of worship", the Supreme

Court held that while a property does not need to be used exclusively for worship in order to

qualify for the exemption, it will not qualify if "the greater part" of the property is "used for

purposes other than religious worship."  *Davies v. Meyer*, 541 S.W.2d 827, 830 (Tex. 1976)

(citation omitted) (facility that was used primarily for religious education was not "an actual

place of worship").

154.    The Park itself cannot be a "place of worship" under this definition.  Even if once

accepts, for the moment, that Project Area is sometimes used for worship activities, the vast

majority of the Park's 343 are not used for worship.   And even the Project Area is most

commonly used for activities other than worship.

155.    Moreover, the Project Area does not qualify as a "place of worship" as interpreted

by the Texas Courts.  It is not a building or part of a building set apart for the conduct of

worship.  It is not so continuously used for religious purpose that it has acquired a "character of a

place of worship." The Project Area retains its character as an urban park, even if Plaintiffs

occasionally conduct short ceremonies there.

156.    The City's bird deterrence program in the Project Area does not "prohibit[] or limit[] religious services" in violation of article I, section 6-a of the Texas Constitution.  The bird deterrence program prevents only active nesting by migratory birds in the Project Area.  It does not prohibit or prevent them from visiting, foraging in, or flying through the Project Area.  There is no evidence that Plaintiffs' religious ceremonies or beliefs require double-crested cormorants to be nesting in the Project Area.

157.    The City's plan to remove or relocate trees in the Project Area does not "prohibit[] or limit[] religious services" in violation of article I, section 6-a of the Texas Constitution.  The Plaintiffs assert that their religious beliefs or ceremonies recognize the trees as an element that connects the "middle world" to the "upper world".  There is no evidence that the City's plan to preserve in place 14 trees and plant at least 22 more trees in the Project Area will prohibit or limit this connection.

158.    The City's temporary closure of the Project Area also does not ""prohibit[] or limit[] religious services" in violation of article I, section 6-a of the Texas Constitution.  The 2021 amendment was passed in response to "restrictions put in place by state and local governments in response to the COVID-19 pandemic …."  Resolution Analysis, Committee Report (Unamended), S.J.R. 27.[1]  The COVD-related restrictions specifically prohibited worship services except by video and teleconference.  *See, e.g.*, City of Frisco, Ordinance No.: 2020-03-13 section 1.e.

159.    Here, the temporary closure of the Project Area is not related to COVID-19 and does not specifically mention any prohibition or limits on religious practice.

---

[1] Available at https://capitol.texas.gov/tlodocs/87R/analysis/html/SJ00027H.htm.

160.     For the foregoing reasons, Plaintiffs have not shown that the City's bird deterrence program, the removal and relocation of trees in the Project Area, or the temporary closure of the Project Area place a substantial burden on their religious exercise.

161.     Therefore, they have failed to demonstrate that they are likely to succeed on the merits of their claims under the Texas Constitution.

## G.     Plaintiffs Have Not Shown That They Are Likely To Succeed On The Merits Of Their Claim Under TRFRA

162.     A TRFRA claimant must establish that a government agency *substantially burdened* his free exercise of religion.  TEX. CIV. PRAC. & REMEDIES CODE § 110.003(a).  Thus, the previous discussion about "substantial burden" applies with equal force in the context of TRFRA, and Plaintiffs' failure to establish a substantial burden in the context of RLUIPA applies with equal force here.  As set forth above, Plaintiffs have not shown that the City's bird deterrence program, its decision to remove and relocate trees in the Project Area, or the temporary closure of the Project Area imposes a "substantial burden" on their religious exercise. In any event, subsection (a) does not apply if the government agency can demonstrate that the alleged burden was the "least restrictive means of furthering" a "compelling governmental interest."  *Id.* § 110.003(b)(1)-(2).  For all the reasons set forth above, the City has shown that its bird deterrence program, the current iteration of the 2017 Bond Project (*i.e.*, reducing the number of trees to be removed or relocated within the Project Area), and the temporary closure of the Project Area were the least restrictive means of furthering the compelling government interests in public safety and the preservation of the Park and its amenities.

### III. THE PLAINTIFFS HAVE NOT SHOWN THE LIKELIHOOD OF AN IRREPARABLE INJURY

163.    While any infringement on a constitutional right, even if it is *de minimis*, can constitute an irreparable injury for purposes of the Motion for Preliminary Injunction, Plaintiffs have not met their burden of showing such an injury.

164.    The City's bird deterrence program in the Project Area does not infringe on Plaintiffs' religious rights, because their beliefs do not require double-crested cormorants to be nesting in the Project Area.

165.    The City's plan to remove and relocate trees in the Project Area does not infringe on the Plaintiffs' religious rights, because their beliefs do not require the presence of any particular tree or a particular number of trees in the Project Area.

166.    The City's temporary closure of the Project Area does not infringe on Plaintiffs' religious rights because the right of free exercise does not relieve individuals like Plaintiffs of their obligations to comply with valid or neutral laws of general applicability on the grounds that the law proscribes, or requires, conduct which is contrary to his or her religious practice. *Smith*, 494 U.S. at 878.

### IV. THE THREATENED INJURY TO PLAINTIFFS DOES NOT OUTWEIGH THREATENED INJURY TO THE CITY AND A PRELIMINARY INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST.

167.    The third and fourth criteria for obtaining a preliminary injunction merge in this instance, because the City is a governmental agency.

168.    Even assuming that the Plaintiffs had shown that the City's bird deterrence program in the Project Area, the 2017 Bond Project, and the temporary closure of the Project Area constituted a threatened injury to Plaintiffs, such threatened injury does not outweigh the threatened injury to the City.

169.    If the City is enjoined from pursuing the bird deterrence program in the Project Area, the public will continue to be exposed to the numerous health hazards posed by the large population of migratory birds in the Project Area, including, but not limited to: failing tree limbs, contaminated water, zoonotic diseases, regurgitated food, deceased birds, and bird feces. The City will be exposed to legal liability if the City is enjoined from pursuing the bird deterrence program to mitigate these health hazards.

170.    Additionally, if the City is enjoined from pursuing the bird deterrence program in the Project Area, it will likely delay the 2017 Bond Project.  Absent the bird deterrence measures, it is virtually certain that migratory birds will nest in the Project Area.  The City will then be required to monitor those nests.  As long as there are active nests in the Project Area, the City cannot proceed with the construction proposed under the 2017 Bond Project.

171.    If the City is enjoined from completing the 2017 Bond Project then the public will continue to be endangered by the failing and collapsing walls and dead or dying trees within the Project Area. The City will be exposed to legal liability if the City is enjoined from making the necessary repairs in the Project Area or will have to keep the Project Area closed to the public to prevent serious injuries.

172.    If the City is not permitted to remove and relocate the trees as currently proposed in the 2017 Bond Project, visitors to the park may be exposed to unnecessarily hazardous conditions.  Additionally, the City would be required to expend additional funds to re-evaluate the proposed bond project to address the same concerns that have already been addressed following the public comment period, *e.g.*, the public comments **(a)** objecting to the bird deterrence program and **(b)** advocating for the preservation of more trees in the Project Area.  As the City has already evaluated alternative and adjusted its plans in response to those public

comments, re-evaluating the same concerns under the gloss of Plaintiffs' religious beliefs would be duplicative and futile.

173.     The injunctive relief that Plaintiffs seek would, paradoxically, enhance the injury that Plaintiffs allege.  Until the 2017 Bond Project is complete, the City must continue deterring migratory birds—including the double-crested cormorant—from nesting in the Project Area, and the Project Area must remain closed to the public due to safety concerns.

174.     Further, if Plaintiffs are permitted to access an area that the City has already deemed presents a safety hazard, the City (and ultimately, the taxpayers) are exposed unnecessarily to significant liability if Plaintiffs (or their co-religionists) were injured by, *e.g.*, falling trees or tree limbs.

175.     Finally, granting a preliminary injunction would disserve the public interest. Granting a preliminary injunction to halt the bird deterrence efforts disserves the public interest in public health and safety as well as environmental quality.  Granting a preliminary injunction to prohibit the City from performing the work pursuant to the 2017 Bond Project disserves the public interest in having safe and accessible public park spaces. Granting a preliminary injunction allowing the Plaintiffs to access the Project Area while unsafe conditions persist disserves the public interest in public safety.

# Exhibit 3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

GARY PEREZ AND MATILDE TORRES, §
          Plaintiffs, §
           §
v. §       CASE NO. 5:23-cv-00977-FB
           §
CITY OF SAN ANTONIO, §
          Defendant, §
           §

**DEFENDANT CITY OF SAN ANTONIO'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL
[DKT. 54]**

TO: FRED BIERY, UNITED STATES DISTRICT JUDGE:

Pursuant to FED. R. CIV. P. 62(d), Defendant City of San Antonio ("City") files this Response in Opposition to Plaintiffs' Emergency Motion for Injunction Pending Appeal ["Motion," **Dkt. 54**], and would respectfully show as follows:

## I. INTRODUCTION AND RELIEF SOUGHT

1. Pursuant to FED. R. CIV. P. 62(d)—and based on about eight pages of argument in their Motion [**Dkt. 54**]—Plaintiffs now seek, on an emergency basis, the same injunctive relief pending appeal that they failed to prove they were entitled to during the Preliminary Injunction Hearing ("PI Hearing"). Plaintiffs seek to further delay the City from proceeding with repairs and improvements to an approximately two-acre area of Brackenridge Park, and to leave the Project in limbo while they pursue a meritless appeal from this Court's rulings.

2. In relevant part, FED. R. CIV. P. 62(d) provides:

**(d) Injunction Pending an Appeal.** While an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court

may suspend, modify, restore, or ***grant an injunction on terms for bond or other terms that secure the opposing party's rights***.[1]

3.     For the reasons set out more fully below, the Court was correct in its decisions on Plaintiffs' Motion for Preliminary Injunction, and Plaintiffs have failed to carry their burden of showing sufficient grounds for granting the extraordinary remedy of an injunction pending appeal.  The record amply supports this Court's rulings.  Delay means the City and the public remain hostage to an injunction the Plaintiffs sought but could not support with legal authority and evidence.  Delay means continued public health and safety risks, the real danger of which cannot be ascertained with certainty.  Even Plaintiff Gary Perez admitted in his testimony that "Safety is Paramount."

4.     The Plaintiffs are bound by the entire record made at the injunction hearing. The record shows more than ample evidence that the City's current design for the project is the product of a thorough, comprehensive, and complex process involving experts in many disciplines, including arborists, civil engineers, architects, landscape architects, wildlife biologists, and scientists.   The record fully supports the Court's conclusions on Issues 2 (trees) and 3 (cormorants).    In their Motion, Plaintiffs point to snippets of testimony taken out of context, which mischaracterize the entirety of the evidence, including over 120 exhibits, to which no objection was made.

## II.  FACTUAL BACKGROUND

5.     As a preliminary matter, the City offers these observations:

---

[1]Unless otherwise indicated, all emphasis in quoted passages throughout this Response has been supplied and did not appear in the originals, and all internal citations have been omitted.

- There are places in Brackenridge that many people consider special. The specific area in question, the area along the San Antonio River approaching Lambert Beach, is one of those special places.

- This place has historic river walls for flood control and a variety of other good reasons, many of which are essential to public safety. The walls in this place need repair, but there is debate about how to accomplish those repairs.

- The City has temporarily fenced off this area for safety reasons, and in order to implement Phase I of the 2017 Bond election project, which will remedy these safety problems by reinforcing, strengthening, and restoring the historic walls along the river. These improvements are vitally important to promote the safety of visitors to the park, including Plaintiffs. This temporary closure is for public safety, and in the public interest.

- Aside from what they called the "Sacred Area" when they recently requested access, Plaintiffs want the current "viewshed" to be permanently maintained. They want this viewshed of the River in the entire Phase I project area to stay this way permanently, no matter the needs or wants of the public.

- This particular spot of the River also has significant other cultural and recreational features and uses, however, so there must be a balance. The Court found that balance.

- The City thoroughly evaluated and re-evaluated the issues involving the trees. The evidence established that although there are other designs or

4867-2950-6184, v. 1

engineering solutions that could be used to repair and reconstruct the river walls, no more trees can be preserved by any of these alternative methods.

- The record shows that as recently as this past March, the City carefully evaluated – and re-evaluated - the same alternative engineering solution proffered by Plaintiffs' expert, Dr. Shafique. As Ms. Shanon Miller testified, "we were asked to really look at the alternatives and to figure out whether or not what was being proposed was the best solution moving forward, that we were saving as many trees as possible. The consensus in the meeting with the -- with the arborists was that no additional trees would be saved because they would still be impacted by the construction regardless of the methodology." (See, Unofficial Transcript, pp. 603-04).

- As the Court correctly observed, this is a brief snapshot of time in the historic Brackenridge Park. In time, the new trees will have experienced years of growth to replace those trees that must be removed and/or relocated as part of the Project.

- The City has a governing body that has made decisions, and has delegated authority to Department Directors. These directors have had the benefit of recommendations and decisions of volunteer members of the Planning Commission, the Historic and Design Review Commission, and the Board of Adjustment. The City's Design Team is comprised of recognized experts in engineering, tree science, architecture, and planning, among others. The City must navigate a complex collection of regulatory controls.

4

- Plaintiffs want this court to "second guess" the expert engineers, arborists, architects, wildlife biologists, as well as the State Veterinarian. The Court correctly declined that invitation.

- Migratory birds including cormorants are being temporarily deterred from nesting in the Project Area, so that the project can be completed. However, these migratory birds are allowed to nest throughout the range of Brackenridge Park (340+ acres), or across Hildebrand, to the Blue Hole and property owned by the Sisters of Charity of the Incarnate Word, and into Olmos Basin.

- And, the migratory birds are still allowed to forage, feed and rest in the Project Area, and will be allowed in the Project Area even during construction. The deterrence measures are aimed at nesting, not merely being present, for reasons plainly and correctly explained by the Court.

- Any questions about bird deterrence after completion of construction involve hypothetical, advisory opinions, beyond the jurisdiction of the Court to resolve at this time.

- The evidence at the PI Hearing clearly established that this section of the park will be open to public access again after construction is complete in about eight months.

### III. <u>PROCEDURAL BACKGROUND</u>

6. On September 25 and 27-29, 2023, the Court conducted an evidentiary hearing on Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction [**Dkt. 5**].

5

7.      On October 2, 2023, after considering all the evidence presented by the parties, including all the exhibits that were admitted into evidence without objection, the Court entered its "Partial Order Concerning Preliminary Injunction Issues" ["Partial Order," **Dkt. 47**], finding *inter alia* that "Plaintiffs have a sincere religious belief and are entitled to be present" on two specific dates "at a sacred site in Brackenridge Park," as "depicted in Plaintiffs' Exhibit 58. The Partial Order describes the site as comprising "an approximate 20-foot-by-30-foot rectangular plot out of two acres of land located between two bald cypress trees." *Id*.

8.      On October 11, 2023, the Court entered its "Opinion and Order Granting in Part and Denying in Part Plaintiffs' Request for Preliminary Injunction" ["Injunction Order," **Dkt. 52**], identifying the following three items of relief sought by Plaintiffs: **(1)** "Restore access for religious services in the Sacred Area, <u>which is the northernmost point on the south bank of the San Antonio River</u>" ("Item 1") (emphasis added); **(2)** "Preserve the spiritual ecology of the Sacred Area by minimizing tree removal" ("Item 2"); and **(3)** "Preserve the spiritual ecology of the Sacred Area by allowing cormorants to nest" ("Item 3"). **Dkt. 52** at 1.

9.       Based on the extensive record, the Court decided Item 1 as follows:

> With reference to Item 1, "access for religious services in the Sacred Area," the Court finds that Plaintiffs have a sincere religious belief and have met their burden to prove the four elements for injunctive relief. The Court adopts as its own Plaintiffs' Proposed Findings of Fact and Conclusions of Law and the legal authorities cited to support granting access for "religious services" involving 15 to 20 people for no more than an hour on specified astronomical dates coinciding with Plaintiffs' spiritual beliefs. Plaintiffs shall provide those dates in advance to the City during the pre-construction and construction periods so that Plaintiffs may be accommodated for entry to the Sacred Area and appropriate security provided. Plaintiffs' request for access in Item 1 is GRANTED [**Dkt. 52** at 2].

10.     The City does not intend to appeal the Court's ruling on Item 1.

6

11.    Turning then to Item 2 and Item 3—concerning what Plaintiffs call the "spiritual ecology" of the "Sacred Area"—the Court correctly observed:

> Clearly the area does not look the same as it did thousands of years ago in the cave painting exhibit. Nor does it look the same as 100 years ago when there really was a beach as depicted in various exhibits. Nor will it look the same 100 years from now [**Dkt. 52** at 3].

12.    Regarding Item 3, in particular, the Court found as follows:

> . . . the Court heard credible testimony of thousands of egrets, herons, and cormorants and their excrement nesting in the Project Area during their migrations at different times of the year. Once nested, the Migratory Bird Treaty Act precludes removal. The Court finds the bird deterrent operation is in the realm of public health and safety. To grant Plaintiffs' relief regarding Item 3 would effectively put the Project on hold ad infinitum, given the different species' migration patterns and the Migratory Bird Treaty Act. There could not be an eight month window of opportunity to accomplish the Project [**Dkt. 52** at 4].

13.    With reference to Item 2 and Item 3 of Plaintiffs' requested relief, moreover, the Count found that the City "met its burden of proving a compelling government interest for public health and safety, and [that] the equities favor the City on those two items [**Dkt. 52** at 5]." In support of its findings regarding Items 2 and 3, the Court adopted "as its own the City's Proposed Findings of Fact and Conclusions of Law and the legal authorities cited regarding Plaintiffs' requested Item 2 and Item 3," and accordingly denied those requests [**Dkt. 52** at 5].

14.    The Phase I work to be done in the Park is intended to be—and will be—temporary, provided the City is able to begin such work without inordinate delays caused by protracted litigation. Fears, doubts, and speculation cannot support a preliminary injunction or a Rule 62(d) injunction pending appeal.

15.    Faced with these rulings, Plaintiffs filed their Notice of Appeal on October 16, 2023 [**Dkt. 53**], seeking the Fifth Circuit's review of the Court's: **(a)** October 2, 2023,

7

"Partial Order Concerning Preliminary Injunction Issues" [**Dkt. 47**]; and **(b)** October 11, 2023, "Opinion and Order Granting in Part and Denying in Part Plaintiffs' Request for Preliminary Injunction" [**Dkt. 52**] (collectively, "Orders").

## IV.  ARGUMENT

### A.  THE LAW GOVERNING FED. R. CIV. P. 62(D) INJUNCTIONS PENDING APPEAL

16.     A federal district court, in deciding whether to grant an injunction pending appeal in a federal case, considers: **(a)** whether it is likely that the party seeking such an injunction will prevail on the merits of its appeal; **(b)** whether the party seeking an injunction pending appeal will suffer irreparable harm or injury unless an injunction is granted; **(c)** whether the other parties interested in the proceeding will suffer substantial harm or injury if an injunction is granted; and **(d)** whether the public interest will be harmed or served by granting an injunction.   *See*, *e.g.*, *Dayton Christian Sch. v. Ohio Civ. Rights Comm'n*, 604 F. Supp. 101, 103 (S.D. Ohio 1984), *rev'd*, 766 F.2d 932 (6th Cir. 1985), *rev'd on other grounds*, 477 U.S. 619 (1986);  Wright et al., FEDERAL PRACTICE AND PROCEDURE § 2904.  The court in *Dayton Christian Schools* noted that  "[t]he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors." *Id. See also Mohammed v. Reno,* 309 F.3d 95, 101 (2d Cir.2002) ("The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay. Simply stated, more of one excuses less of the other").

17.     As the Supreme Court held in Winter v. Nat. Res. Def. Council, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008):

A preliminary injunction is an extraordinary remedy never awarded as of right. *Munaf*, 553 U.S., at 689 – 690, 128 S.Ct., at 2218–2219. In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co*., 480 U.S., at 542, 107 S.Ct. 1396. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Romero–Barcelo*, 456 U.S., at 312, 102 S.Ct. 1798; see also *Railroad Comm'n of Tex. v. Pullman Co*., 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

18.     Here, as to Items 2 and 3, the Plaintiffs' proof was lacking that they will suffer irreparable harm or injury by a temporary closure of the Project Area during construction, along with bird nesting deterrence measures that are necessary to mitigate significant public health risks.  The balance of equities and consideration of the overall public interest in this case tip strongly in favor of the City.

19.     As to the remaining factors relevant for deciding the injunction issue, it is clear that the citizens and residents of San Antonio will suffer substantial harm or injury by a delay in commencement of construction.  The public interest will be harmed by the continuation of the significant public health risks cited by the Court, as well as "fettered access" to the entire area.  Clearly the balance of the equities weighs in favor of denying an injunction on appeal.

20.     In their Motion, Plaintiffs continue with the ever-evolving use of the term "Sacred Area."  In the Partial Order [**Dkt. 47**], the Court described a "sacred site" as the area on the Southern Bank (20-foot-by-30-foot rectangular plot out of two acres of land located between two bald cypress trees).  In their Motion, however, Plaintiffs argue that essentially the entire Project Area is the area where the "spiritual ecology" must be preserved.  Thus, Plaintiffs argue, the entire north-shore project needs to be halted.  The Court correctly sorted through the Plaintiffs' various evolving claims, and found a proper

9

balance. Plaintiffs offered no credible evidence that an alternative design or engineering plan would actually save any trees. The City's findings of fact and conclusions of law that the Court adopted are more than amply supported by the evidence at the hearing.

21. Significantly—for purposes of adjudicating Plaintiffs' Motion [**Dkt. 54**] and assessing their alleged "likelihood of success of the merits" on appeal—the "City's Proposed Findings of Fact and Conclusions of Law and the legal authorities cited regarding Plaintiffs' requested Item 2 and Item 3"—adopted by the Court as its own—confirm the Court's conclusions that the City's conduct at issue in Plaintiffs' requested Item 2 and Item 3 does not offend the First Amendment Free Exercise Clause or the coextensive provision of the Texas Constitution. *See* **Dkt. 32;** *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878-79 (1990); *see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. ___, ___, 142 S. Ct. 2407, 2421 (2022)(*citing Smith*). The Findings and Conclusions were directly supported by the evidence, and they properly support the Court's rationale and ultimate decision on both Items.

22. The Free Exercise Clause of the First Amendment, moreover, is written in terms of what the government cannot do to the individual, *not* in terms of what the individual can exact from the governments. *Satanic Temple v. City of Belle Plaine*, 2021 WL 4199369, at *13 (D. Minn. Sept. 15, 2021)(also stating that the "First Amendment does not include a constitutional right to use public property as a place of worship"); *see also Taylor v. City of Gary*, 233 F. App'x 561, 562 (7th Cir. 2007)(observing that "the Free Exercise Clause does not give [plaintiff] the right to demand that the City provide him with municipally-owned property as a place of worship"); *Prater v. City of Burnside*, 289 F.3d 417, 427-28 (6th Cir. 2002).

23. Further, First Amendment law is clear that the government has the right to

10

limit conduct on its own property, even if such limitation might also impose limits on the exercise of religion. *See*, *e.g.*, *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 447-49 (1988)(rejecting Indian tribes' Free Exercise challenge to the United States Forest Service's approval of plans to construct a logging road in the Chimney Rock area of the Six Rivers National Forest and finding that such conduct did not impose a burden "heavy enough" to violate the Free Exercise Clause); *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1063 (9th Cir. 2008)(rejecting the claim of multiple Indian-tribe plaintiffs that use of artificial snow made from reclaimed water in a government-owned park on what the Navajo Nation considered a sacred mountain desecrates the entire mountain, deprecates their religious ceremonies, and injures their religious sensibilities, in violation of several federal statutes); *United States v. Means*, 858 F.2d 404 (8th Cir. 1988)(rejecting, on the basis of government's ownership, the Lakotas' claim that the United States Forest Service's denial of a permit for the use of an area in the Black Hills National Forest (federal property), as a religious, cultural, and educational community violated their free exercise rights); *Wilson v. Block*, 708 F.2d 735, 739-40 (D.C. Cir. 1983)(finding no impermissible burden on religious rights despite Navajo and Hopi plaintiffs' contentions that development of the Snow Bowl on the San Francisco Peaks (federal land) would be inconsistent with their First Amendment right to freely hold and practice their religious beliefs on the Peaks, which they believe to be sacred); *Havasupai Tribe v. United States*, 752 F. Supp. 1471, 1484-85 (D. Ariz. 1990), *aff'd sub nom*. *Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991)(rejecting, on the basis of government's ownership, a Havasupai free exercise violation claim involving the Forest Service's plan for a uranium mine in an Arizona national forest (federal property)); *Manybeads v. United States*, 730 F. Supp. 1515, 1517-18 (D. Ariz. 1989)(rejecting, on

11

the basis of the government's ownership, a Navajo claim that relocation from the Hopi Reservation under the provisions of the Navajo-Hopi Land Settlement Act violated their free exercise rights).

24.     The same sort of rule has been applied to park land owned by a state. *See*, *e.g.*, *Crow v. Gullet*, 541 F. Supp. 785, 794 (D. S.D. 1982), *aff'd*, *Crow v. Gullet*, 706 F.2d 856, 858-59 (8th Cir. 1983)(per curiam)(plaintiffs did not show that defendants' development, construction, and regulatory actions burdened plaintiffs' religious exercises in the Bear Butte area, and plaintiffs "failed to establish any infringement of a constitutionally cognizable first amendment right." To the extent their right of access was temporarily restricted at the ceremonial grounds, plaintiffs' interests were "outweighed by compelling state interests in preserving the environment and the resource from further decay and erosion, in protecting the health, safety, and welfare of park visitors, and in improving public access to this unique geological and historical landmark").  No principled analysis would prevent the same sort of rule from applying to land owned by, and under the management of, a home rule municipality such as the City.

25.     Indeed, even the Plaintiffs' expert engineer conceded that when presented with competing engineering methods, it is usually the Owner who gets to make the decision. See, Unofficial transcript, pp. 282-83:

> "THE COURT:  If two competing engineering companies came up with these plans and we're presenting it to the owner of a property and there are arguably pluses and minuses either method, who gets to make that decision.
>
> THE WITNESS: Usually the owner.
>
> THE COURT: The owner. All right. In this case it appears, at least part of it, that one side is asking the Court to tell the owner which methodology to use, which is neither here nor there as far as your testimony, but it's an issue."

26.     The City's Findings of Fact and Conclusions of Law that the Court adopted as its own also confirm that Plaintiffs' alleged claim under RLUIPA fails as a matter of law because Plaintiffs admit that they have no property interest in Brackenridge Park, and Plaintiffs' failure to even mention RLUIPA during the PI Hearing suggests that they have abandoned that claim. While Plaintiffs do not discuss RLUIPA in their Motion, either, they nevertheless rely upon RLUIPA cases in trying to support their argument for injunctive relief.  *See*, *e.g.*, **Dkt. 54** at 5, 7 (citing *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295, 298 (5th Cir. 2012).

27.     While the foregoing points are relevant in their own right, they are also relevant to the Motion because they confirm that Plaintiffs have not—and cannot—satisfy the "irreparable harm" element of a claim for injunction pending appeal by simply pointing to some alleged or feared—but never proven—Constitutional violation.

28.     Plaintiffs now ask the Court to disregard its prior correct rulings and grant Plaintiffs the very same injunctive relief—this time, pursuant to FED. R. CIV. P. 62(d)—to which Plaintiffs never proved themselves entitled during the PI Hearing.  The law does not support Plaintiffs' position, and even if it did—which the City *denies*—Plaintiffs are certainly not entitled to an injunction pending appeal without posting a significant supersedeas-type bond to protect the City from the significant harm it will incur as a result of any such injunction.  If the Court finds that Plaintiffs are entitled to injunction pending appeal they seek, the City respectfully requests a hearing to establish the amount of such bond.

## V. <u>CONCLUSION AND PRAYER</u>

For the foregoing reasons, Plaintiffs have not proven their entitlement to a FED. R. CIV. P. 62(d) injunction pending appeal, and the City respectfully asks that the Court deny

Plaintiffs' Motion and grant the City all other relief to which it may be justly entitled, at law or in equity.

Respectfully submitted,

LANGLEY & BANACK, INC.

BY: */s/ Fred R. Jones*
FRED R. JONES
State Bar No. 10886700
fjones@langleybanack.com
NATALIE F. WILSON
State Bar No. 24076779
nwilson@langleybanack.com
IAN M. MCLIN
State Bar No. 24005071
imclin@langleybanack.com
LEE WARREN
State Bar No. 24099453
lwarren@langleybanack.com
SARA MURRAY
State Bar No. 14729400
smurray@langleybanack.com
745 East Mulberry, Suite 700
San Antonio, TX 78212-3166
Telephone: (210) 736-6600
Facsimile: (210) 736-6889

-and -

CITY OF SAN ANTONIO
DEBORAH KLEIN
Deputy City Attorney
State Bar No. 11556750
Deborah.Klein@sanantonio.gov
International Center
203 S. St. Mary's Street, 2nd Floor
San Antonio, TX 78205
Telephone: (210) 207-8949
Facsimile: (210) 207-4004

**ATTORNEYS FOR DEFENDANT**
**CITY OF SAN ANTONIO**

## CERTIFICATE OF SERVICE

The undersigned counsel of record hereby certifies that on October 19, 2023, a true and correct copy of the "Defendant City of San Antonio's Response in Opposition to 'Plaintiffs' Emergency Motion for Injunction Pending Appeal [**Dkt. 54**]'" was served via the Court's electronic facilities to the following persons:

MARK W. RASMUSSEN
mrasmussen@jonesday.com
JONATHAN D. GUYNN
jguynn@jonesday.com
CHANCE MCCRAW
cmccraw@jonesday.com
JONES DAY
2727 North Harwood Street
Dallas, TX  75201-1515

**ATTORNEYS FOR PLAINTIFFS**

JOHN GREIL
john.greil@law.utexas.edu
STEVEN T. COLLIS
steve.collis@law.utexas.edu
Law & Religion Clinic
University of Texas School of Law
727 East Dean Keaton Street
Austin, TX 78705

**ATTORNEYS FOR PLAINTIFFS**

  /s/ Fred R. Jones
   FRED R. JONES

15

# Exhibit 4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| GARY PEREZ and MATILDE TORRES, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CASE NO. 5:23-cv-00977-FB |
| | § | |
| CITY OF SAN ANTONIO, | § | |
| Defendant, | § | |

**DEFENDANT CITY OF SAN ANTONIO'S (1) SUPPLEMENTAL RESPONSE IN OPPOSITION TO "PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION" [DKT. 5] AND (2) MEMORANDUM BRIEF IN SUPPORT THEREOF**

TO THE HONORABLE FRED BIERY, UNITED STATES DISTRICT COURT JUDGE:

Pursuant to FED. R. CIV. P. 65, Defendant City of San Antonio ("City") files this: **(1)** Supplemental Response in Opposition to "Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ['Motion,' **Dkt. 5**]" and **(2)** Memorandum Brief in Support Thereof, respectfully showing the Court:

**I. INTRODUCTION AND RELIEF SOUGHT**

1.      In their August 10, 2023, Motion, Plaintiffs sought a temporary restraining order and a preliminary injunction enjoining the City from: **(a)** "preventing Plaintiffs from holding a religious ceremony" on August 12, 2023, at what they call the "Sacred Area" and "from accessing the Sacred Area at other times for religious services"; **(b)** "engaging in activities to deter the double-crested cormorant bird from nesting within [Brackenridge] Park"; and **(c)** "removing trees and other habitat from the Park." [**Dkt. 5** at 1 of 3].

2.      On August 11, 2023, at about 3:28 p.m., the City filed its "Initial Response to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction," informing the Court *inter alia* that the City had first been notified of Plaintiffs' Motion at "approximately 8:30 p.m. on August 10." ["City's Initial Response," **Dkt. 7** at 1]. For the Court's convenience, a true

and correct copy of the City's Initial Response is attached hereto as **Ex. 1** (with its exhibits) and is incorporated by reference herein for all purposes. Later on August 11, 2023, the Court denied Plaintiffs' motion for temporary restraining order, finding *inter alia* that Plaintiffs had not "sufficiently shown immediate and irreparable harm in light of significant public safety issues raised by" the City. ["TRO Order," **Dkt. 9** at 3 of 3].

3.     Although Homer Garcia, III, the Director of the City of San Antonio's Parks and Recreation Department, offered Plaintiffs three alternative locations for their August 12, 2023, religious ceremony—all of which were in the immediate vicinity of the approximately two-acre area fenced off from public access for health and safety reasons—Plaintiffs rejected those options and did not hold the ceremony in the Park. *See generally* **Ex. 1** at **Dkt. 7-1** ("Declaration of Homer Garcia, III Subject to Penalty of Perjury).

4.     Plaintiffs' request for preliminary injunctive relief remains pending and is set for hearing beginning on September 25, 2023. In preparation for that hearing, the parties have engaged in some discovery, and the City now files this Supplemental Response/Memorandum Brief to more fully address Plaintiffs' Motion and the Memorandum of Law attached thereto. As stated below, Plaintiffs have not carried their burden for preliminary injunctive relief, and the City respectfully asks the Court to deny Plaintiffs' Motion.

## II. FACTUAL AND PROCEDURAL BACKGROUND

5.     ***Brackenridge Park***. At the heart of this litigation is Brackenridge Park ("Park"), an urban park spanning about 343 acres near the San Antonio River's headwaters, in the vicinity of what is now Alamo Heights. *See generally* **Ex. 1** [**Dkt. 7**, **Dkt. 7-1**, **Dkt. 7-2**]; *see also* Lewis F. Fisher, *Brackenridge: San Antonio's Acclaimed Urban Park* 1, 3 (Maverick Books/Trinity University Press 2022). The Park began in 1899, when George Brackenridge—who was, among other things, a San Antonio financier and owner of the Water Works Company located on what

2

is now Park land—donated nearly 200 acres of his own property to the City for a park.  *See*
Fisher at ix, 51, 53. 61-62.  Over time, Mr. Brackenridge and others donated additional parcels of
what is now Park land, eventually bringing the Park to its present size.  *See*, *e.g.*, *id.* 49-167.  An
integral part of the City's history and culture, Brackenridge Park now includes the San Antonio
Zoo, Sunken Garden Theater, Japanese Tea Garden, and Witte Natural History Museum.  The
Park belongs to, and is managed by, the City of San Antonio through its Parks and Recreation
Department, and the Brackenridge Park Conservancy serves as steward of the Park's "natural,
historic, educational, and recreational resources and an advocate for their preservation and
enhancement for the benefit of current and future generations."[1]

6.      In May 2017, San Antonio voters approved a multi-million-dollar bond issue
("Bond Issue") for renovations and repairs to several areas of the City, including parts of the
Park that: **(a)** have deteriorated or fallen into disrepair; **(b)** threaten the Park's historical, natural,
cultural, and recreational features; and **(c)** pose health and safety risks to the Park's many
visitors.  Since passage of the Bond Issue, the City has been planning the necessary renovations
of, and repairs to, the Park, and that process has involved expert studies, public hearings, and
multiple levels of approval to reach its current point, where work on Phase I of what Plaintiffs
call the "Bond Project" can begin.  *See*, *e.g.*, **Ex. 1** at **Dkt. 7-1** and **Dkt. 7-2**.

7.      On August 3, 2023, the City Council enacted Ordinance 2023-08-03-0497,
authorizing Phase I work to begin.  A true and correct copy of Ordinance 2023-08-03-0497 is
attached hereto as **Ex. 2**, and is incorporated by reference herein for all purposes.  Ordinance
2023-08-03-0497 says nothing about Plaintiffs or their religion and, as a matter of law, is
presumptively valid.  *See Powell v. City of Houston*, 628 S.W.3d 838, 842 (Tex. 2021); *City of*

---

[1] https://www.brackenridgepark.org/about-the-conservancy/mission-and-vision#:~:text
(last visited Sept. 20, 2023).

*Brookside Vill. v. Comeau*, 633 S.W.2d 790, 792 (Tex. 1982)(quoting *Hunt v. City of San Antonio*, 462 S.W.2d 536, 539 (Tex. 1971), as saying that a "city ordinance is presumed to be valid," and "the courts have no authority to interfere unless the ordinance is unreasonable and arbitrary—a clear abuse of municipal discretion."). Plaintiffs have not shown otherwise.

8.      In preparing for the Phase I work, and to protect the public's health and safety, the City has fenced off a small area (less than two acres) where the work is scheduled to occur. *See*, *e.g.*, **Dkt. 7** at **Dkt. 7-1** at 3 and Ex. 1. "Phase I consists of the structural stabilization of the historic Pumphouse, rehabilitation and stabilization of historic river walls, retaining walls, and grand staircase in the Lambert Beach area, including landscaping and irrigation improvements." **Ex. 2** at 1. The following four documents—attached hereto as **Ex. 3,** and incorporated by reference herein—discuss some of the health and safety concerns at issue: **(a)** May 16, 2022, Tree Assessment Committee Report [COSA0587-0588]; **(b)** April 19, 2023, City of San Antonio Office of Historic Preservation Certificate of Appropriateness [COSA0874-0877]; **(c)** February 3, 2023, City of San Antonio Parks & Recreation News Release: "Bird mitigation commences at Brackenridge Park" [COSA1315-1317]; and **(d)** City of San Antonio Parks & Recreation, "Bird Mitigation FAQ" [COSA1318-1319]). In addition to needing to mitigate the health and safety concerns posed by the Park's migratory birds—including the double-crested cormorants and egrets—the City must temporarily discourage the birds from nesting in the area where Phase I work will occur because the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703, forbids interference with actively nesting migratory birds and their nests.

9.      While Phase I necessitates the removal of certain trees and the relocation of others, the City has: **(a)** listened to experts and others expressing concerns about the Park's trees and wildlife; and **(b)** adjusted its plans regarding the trees so that the number of trees now scheduled for removal has been reduced from 70 to 48, with another 20 trees scheduled for

4

relocation. *See*, *e.g.*, **Ex. 3(b)**(April 19, 2023, City of San Antonio Office of Historic Preservation Certificate of Appropriateness at 2-3 of 4 [COSA0875-COSA0876]).

10.     ***Plaintiffs Perez and Torres***.  Plaintiffs allege that they are members of the Lipan-Apache "Hoosh Chetzel" Native American Church.  **Dkt. 5-1** at 6 of 26.  They believe that a portion of the Park's land "is a sacred site where life began in this region." *Id.* Although Plaintiffs complain about the Park's disrepair  [**Dkt. 3** at ¶¶ 45-47 at 12], they: **(a)** oppose the City's plans and efforts to remedy some of the same problems about which Plaintiffs complain; **(b)** refuse to tolerate even a temporary limitation on their access to the Lambert Beach area of the Park; and **(c)** have rejected the City's offers for alternative locations in the immediate vicinity of the area that has been temporarily fenced off *from all public access—not just from Plaintiffs' access*—for health and safety reasons.  *See generally* **Dkt. 3**; **Dkt. 5**; and **Ex. 1** at **Dkt. 7-1** ("Declaration of Homer Garcia, III Subject to Penalty of Perjury).

11.     The City has listened to the opinions and concerns of Plaintiffs and others about various aspects of the Bond Project.  *See generally* **Ex. 3** and the documents contained therein. In the end, though, San Antonio voters entrusted the City with the obligations and responsibilities for deciding how best to implement the Bond Project on the City's own property. *See*, *e.g.*, May 17, 2017, Ordinance 2017-05-17-0329, Canvassing the Results of the General Obligation Bond Election Held on Saturday, May 6, 2017, a true and correct copy of which Ordinance is attached hereto as **Ex. 4** and incorporated by reference herein for all purposes.

12.     Noticeably absent from Plaintiffs' Amended Complaint [**Dkt. 3**] and from the Motion [**Dkt. 5**] is any argument, evidence, or authority showing that Plaintiffs have a right to make any demands regarding the City's use of its own property.  To borrow language from the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), Plaintiffs have no "ownership, leasehold, easement, servitude, or other property interest in"—or even "a contract or

5

option to acquire such an interest"—in any Park property.  42 U.S.C. § 2000cc-5(5); *see also* Argument § III(B)(2), *infra*.

13.    ***Defendant, the City of San Antonio***.  The City is a home rule municipality and, as such, "derives its authority from the Texas Constitution and the City Charter ("Charter") adopted by its voters.  *See* TEX. CONST. art. XI, § 5.  The Charter is San Antonio's organic act— the fundamental law of the municipality, just as a constitution is the fundamental law of a state. *Texas River Barges v. City of San Antonio*, 21 S.W.3d 347, 354 (Tex. App.—San Antonio 2000, pet. denied).  Under the Texas Constitution, a home-rule city may exercise all powers not denied to it by the Constitution or state law.  *See* TEX. CONST. art. XI, § 5; *City of Laredo v. Laredo Merchs. Ass'n*, 550 S.W.3d 586, 592 (Tex. 2018).  A home-rule city, though, can exercise only such powers as are expressly granted by its charter, such powers as may be reasonably implied from the powers granted, and such powers as are incidental to the purpose for which the city was created. *Texas River Barges*, 21 S.W.3d at 354 (citing *inter alia Anderson v. City of San Antonio*, 67 S.W.2d 1036, 1037 (Tex. 1934)).

14.    San  Antonio's Charter authorizes the City to enact ordinances "as shall be needed for the government, interest, welfare and good order of the city and the interest, welfare, health, morals, comfort, safety and convenience of its inhabitants."  *See id.* (quoting SAN ANTONIO, TX., CHARTER art. I, § 3, ¶ 1).  This "provision incorporates the police power as a power of the City." *Texas River Barges*, 21 S.W.3d at 355 (citing 6A EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 24.43 (3d ed. 1984)).  The police power has also been conferred on home rule cities by TEX. LOC. GOV'T CODE § 54.004 ("A home-rule municipality may enforce ordinances necessary to protect health, life, and property and to preserve the good government, order, and security of the municipality and its inhabitants.").  Pursuant to its "police power, a municipality may enact *ordinances designed to promote the public safety and welfare*."  *Texas River Barges*,

6

21 S.W.3d at 355 (citing 6A McQuillin § 24.10). Defining the police power's exact parameters is impossible, but it certainly includes the "*power to anticipate and prevent dangers and to protect the inhabitants of a community, and, in so doing, to restrain individual tendencies*." *Id.*

### III. Argument

#### A. The Law Governing Preliminary Injunctive Relief

15.    Preliminary injunctive relief is an extraordinary remedy and is never awarded as a matter of right. *See, e.g., Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Granting preliminary injunctive relief is "to be treated as the exception rather than the rule." *Mississippi Power & Light Co. v. United Gas & Pipe Line Co.*, 760 F.2d 612, 621 (5th Cir. 1985). In seeking preliminary injunctive relief, Plaintiffs must prove that: **(a)** they are likely to succeed on the merits; **(b)** they are likely to suffer irreparable harm in the absence of preliminary injunctive relief; **(c)** the balance of equities tips in their favor; ***and*** **(d)** an injunction is in the public interest." *Winter*, 555 U.S. at 20. The Court should deny the Motion because Plaintiffs cannot carry their burden to prove all four of these requirements.

#### B. Plaintiffs Are Not Likely to Succeed on the Merits.

##### 1. Plaintiffs Are Not Likely to Succeed on their Alleged First Amendment Claim.

16.    Plaintiffs seek relief under 42 U.S.C. § 1983 for the City's alleged violation of the Free Exercise Clause of U.S. Const. amend. I, made applicable to the states pursuant to U.S. Const. amend. XIV. *See* Amended Complaint [**Dkt. 3**] ¶¶ 88-94 at 21-22. Plaintiffs, however, have not pled—and cannot prove—the factors set out in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978). Under *Monell* and its progeny, even a constitutional violation is ordinarily not enough to trigger municipal liability. Rather, municipal liability also requires proof of an official policy; a final policymaker; and the policymaker's knowledge of, or deliberate indifference to, a risk of constitutional violations. *See, e.g., Raymond*

*v. Ector Cnty.*, 507 Fed. Appx. 347, 349-50 (5th Cir. 2013)(discussing the *Monell* factors); *Kinnison v. City of San Antonio*, No. SA-08-CV-421-XR, 2013 WL 228022, at *4-5 (W.D. Tex. Jan. 22, 2013)(following *Raymond*).

17.     Plaintiffs' Amended Complaint [**Dkt. 3**] neither pleads nor proves the *Monell* factors.   To the contrary, Plaintiffs allege the very vicarious liability that *Monell* forbids: "Defendant City of San Antonio is a municipal government entity in Bexar County, Texas, ***that is responsible for the policies developed and implemented through its officers, employees, agents, and departments, including the Department of Parks and Recreation and the Historic Design and Review Commission***." **Dkt. 3** at ¶ **6** at 2-3.

18.     However, even if Plaintiffs had properly pled and proven the *Monell* factors—and they *have not*—Plaintiffs are still unlikely to succeed on their First Amendment "Free Exercise" claim because nothing in Ordinance 2023-08-03-0497 (**Ex. 2**) or the unspecified City policies about which Plaintiffs complain: **(a)** addresses Plaintiffs or their religion; or **(b)** violates the First Amendment Free Exercise Clause. *See Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 877 (1990); *see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. ___, ___, 142 S. Ct. 2407, 2421 (2022)(*citing Smith*).

19.     *Smith* required the Supreme Court to "decide whether the Free Exercise Clause of the First Amendment [permitted] the State of Oregon to include religiously inspired peyote use within the reach of its general criminal prohibition on use of that drug, and thus [permitted] the State to deny unemployment benefits to persons dismissed from their jobs because of such religiously inspired use."  494 U.S. at 874.  After the Oregon Supreme Court confirmed that Oregon law does prohibit the religious use of peyote, Supreme Court considered whether such law was consistent with the Free Exercise Clause, which in relevant part provides, "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof*

8

. . . ." *Id.* at 876-77 (quoting U.S. CONST. amend. I). As an initial matter, the Court noted that the "free exercise of religion" means "the right to believe and profess whatever religious doctrine one desires," so the Free Exercise Clause "excludes all 'governmental regulation of religious *beliefs* as such,'" and the government "may not compel affirmation of religious belief"; "punish the expression of religious doctrines it believes to be false"; "impose special disabilities on the basis of religious views or religious status"; "or lend its power to one or the other side in controversies over religious authority or dogma." *Id.* at 877 (citing numerous cases). The Court then noted that the "'exercise of religion' often involves not only belief and profession but the performance of (or abstention from) physical acts: assembling with others for a worship service, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation." *Id.* Thus, a State would also be "'prohibiting the free exercise [of religion]' if it sought to ban such acts or abstentions **only** when they are engaged in for religious reasons, or **only** because of the religious belief that they display." *Id.*

20.    Seeking to carry the meaning of "prohibiting the free exercise [of religion]" farther than it previously had been taken, however, the *Smith* Respondents contended that "their religious motivation for using peyote place[d] them beyond the reach of a criminal law that [was] not specifically directed at their religious practice, and that [was] concededly constitutional as applied to those who use the drug for other reasons." *Id.* at 878. Thus, to Respondents, "prohibiting the free exercise [of religion]" included "requiring any individual to observe a generally applicable law that requires (or forbids) the performance of an act that his religious beliefs forbid (or requires)." *Id.* In rejecting those arguments, the Court found that the Free Exercise Clause did not require such a reading, and that it is permissible to read the Clause "to say that if prohibiting the exercise of religion . . . is not the object of the [conduct] but merely the incidental effect of a generally applicable and otherwise valid provision, ***the First Amendment***

9

*has not been offended*." *Id.* The Court then added that laws "are made for the government of actions, and *while they cannot interfere with mere religious belief and opinions, they may with practices* . . . . Can a man excuse his practices to the contrary because of his religious belief? *To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself*." *Id.* at 879.

21.     The Court also rejected Respondents' urging that the Court "hold, quite simply, that when otherwise prohibitable conduct is accompanied by religious convictions, not only the convictions but the conduct itself must be free from governmental regulation"—finding that the Court had "never held that" and declining to do so in *Smith*. *Id.* at 882. Emphatically, the Court added, "'Our cases do not at their farthest reach support the proposition that a stance of conscientious opposition relieves an objection from any colliding duty fixed by a democratic government.'" *Id.* (quoting *Gillette v. United States*, 401 U.S. 437, 461 (1971)). Declining Respondent's other suggestions, too, the Court then declared, "To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is 'compelling'—permitting him, by virtue of his beliefs, 'to become a law unto himself,' . . . . contradicts both constitutional tradition and common sense." *Id.* at 885-86.

22.     Plaintiff's First Amendment Free Exercise claim also fails because Ordinance 2023-08-03-0497 (**Ex. 2**) and the unspecified City policies about which Plaintiffs complain do not impose a ***substantial burden*** upon Plaintiffs' free exercise of religion. For First Amendment purposes, a "***substantial burden***" is one that "truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004). A "government action or regulation does not rise to the level of a ***substantial burden*** on religious exercise," though, if it merely "prevents the adherent from either

10

enjoying some benefit that is **not otherwise generally available** or acting in a way that is **not otherwise generally allowed**." *Id.*; *see also Patterson v. Def. POW/MIA Acct. Agency*, 398 F. Supp. 3d 102, 122-23 (W.D. Tex. 2019).

23.    Applying the *Adkins* principles to the facts of the present case confirms that neither Ordinance 2023-08-03-0497 (**Ex. 2**) nor the unspecified City policies about which Plaintiffs complain impose a **substantial burden** upon Plaintiffs' free exercise of religion.

### 2. Plaintiffs' Alleged RLUIPA Claim Fails, As a Matter of Law.

24.    Plaintiffs' alleged claim under RLUIPA, 42 U.S.C. § 2000cc, *et seq*, fails as a matter of law because RLUIPA applies to cases in which the plaintiff is complaining about a land use regulation as applied to property in which plaintiff has a property interest, *not* a land use regulation as applied to the government's property.  *See* 42 U.S.C. § 2000cc-5(5); *Muslim Community Ass'n v. Pittsfield Charter Twp.*, No. 12-CV-10803, 2015 WL 1286813, at *7 (E.D. Mich. Mar. 20, 2015)(RLUIPA does not apply if the person or entity asserting protection under RLUIPA does not have a sufficient legal interest in the property at issue).  In fact, 42 U.S.C. § 2000cc-5(5) limits the definition of "land use regulation" to "a zoning or landmarking law, or the application of such law," and also limits who may be a claimant under RLUIPA, as follows:

> The term "land use regulation" means **a zoning or landmarking law, or the application of such a law**, that limits or restricts a claimant's use or development of land (including a structure affixed to land), **if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest**.

25.    The Amended Complaint does not point to any "zoning or landmarking law, or the application of such law" by the City, and missing from the Amended Complaint throughout is any sort of argument, evidence, or authority showing that Plaintiffs have any right to make demands regarding the City's use of the **City's property**, in which Plaintiffs have no ownership interest whatsoever.  Plaintiffs do not allege—and do not have—any "**ownership, leasehold,**

11

*easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest*" in any Park property.

26.     On facts similar to those in the present case, some courts have found that 42 U.S.C. § 2000cc-5(5) raises a **standing issue** and is, therefore, **jurisdictional**.  *See*, *e.g.*, *Congregation Etz Chaim v. City of Los Angeles*, No. CV 10-1587 CAS CFEX, 2012 WL 11826032, at \*3-4 (C.D. Cal. Apr. 17, 2012).  As the *Congregation Etz Chaim* explains:

> The Court concludes that the individual plaintiffs must be dismissed because they lack standing under Section 2 of RLUIPA. RLUIPA provides that "[n]o government shall impose or implement a land use regulation in a manner that imposes a **substantial burden** on . . . religious exercise . . . ." 42 U.S.C. § 2000cc(a)(1).  A "land use regulation" claimant is defined as one who "has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such interest." 42 U.S.C. § 2000cc–5(5).  In this case, the complaint avers that "Congregation Etz Chaim of Hancock Park is a religious non-profit California corporation, and owns the residence at 303 South Highland." Compl. ¶ 18.  *There are no allegations that any individual member holds an interest in the property.  Based on the plain language of RLUIPA—that a claimant must have "an ownership, leasehold, easement, servitude, or other property interest in the regulated land"—the individual members of the Congregation lack standing to assert any claim under RLUIPA*.

*Id.*  The *Congregation Etz Chaim* court also cites several other cases in which courts found 42 U.S.C. § 2000cc–5(5) to be a jurisdictional standing issue, but *Congregation Etz Chaim* does not appear to have considered 42 U.S.C. § 2000cc-2(a), which addresses Article III standing:

> **(a) Cause of action**
> A person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. *Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution*.

27.     In light of 42 U.S.C. § 2000cc-2(a), other courts have cast the issue as one of "statutory standing," holding that—even if a RLUIPA claimant has Article III standing—such claimant **may still not have a viable RLUIPA claim based upon the claimant's failure to comply with the requirements of 42 U.S.C. § 2000cc–5(5)**.  *See*, *e.g.*, *Omar Islamic Ctr. Inc. v.*

12

*City of Meriden*, 633 F. Supp. 3d 600, 613-15 (D. Conn. 2022)(comparing and contrasting Article III standing with "statutory standing" under RLUIPA). In distinguishing between Article III standing and "statutory standing," these courts' analyses give meaning to all parts of RLUIPA—including 42 U.S.C. § 2000cc-2(a)—and also comport with *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-29 (2014), in which the Supreme Court distinguishes between a claimant's lack of Article III standing, which is jurisdictional, and a claimant's failure to satisfy the statutory requirements established by Congress for a particular statutory claim. The *Lexmark* analysis asks whether the claimant "falls within the class of plaintiffs whom Congress has authorized to sue under" the statute at issue and whether the plaintiff has a cause of action under the relevant statute: here 42 U.S.C. § 2000cc-5(5). *Lexmark*, 572 U.S. at 128. That question then requires the Court "to determine the meaning of the congressionally enacted provision creating a cause of action, and in doing so, the Court must "apply traditional principles of statutory interpretation," asking *not* whether "Congress should have authorized" such a suit, but rather "whether Congress in fact did so." *Id.*

28.     In the present case, even if the Amended Complaint or Motion had referred to a zoning or landmarking law—which the City **denies**—Plaintiffs still do not qualify as claimants and still do not have a cause of action under 42 U.S.C. § 2000cc-5(5) because they do not have *"an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest*," as required by that statute.

29.     Plaintiffs' RLUIPA claim also fails because—as with their First Amendment "Free Exercise" claim—they cannot prove the "substantial burden" element of 42 U.S.C. § 2000cc-(a)(1). *See ¶¶ 22-23, supra*, and the authorities cited therein. Even if that were not true, which the City **denies**, the City has a compelling interest in protecting the health and safety of the public, and the City has undertaken to do so by the least restrictive means that would still be

13

effective—temporarily closing less than two acres of the approximately 343 acres of Park land to *all public access*, *not just to Plaintiffs' access*.

### 3. Plaintiffs Are Unlikely to Succeed on Their Alleged Texas Constitution Claims.

30.     Plaintiffs' Texas Constitution claims are based on TEX. CONST. art. I, §§ 6, 6-a. Section 6 has components analogous to both the Free Exercise Clause and the Establishment Clause of U.S. CONST. amend. I, as follows:

> All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences. No man shall be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent. No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion, and no preference shall ever be given by law to any religious society or mode of worship. But it shall be the duty of the Legislature to pass such laws as may be necessary to protect equally every religious denomination in the peaceable enjoyment of its own mode of public worship.

31.     The Supreme Court of Texas treats Section 6 as "coextensive with the First Amendment, unless the plaintiff argues that the application of each is different," which Plaintiffs here have not done. *See Tilton v. Marshall*, 925 S.W.2d 672, 677 n. 6 (Tex. 1996). Thus, the law governing the First Amendment religion clauses is also applicable to TEX. CONST. art. I, § 6. *See Smithback v. Texas*, No. 3-05-CV-0578-BD, 2007 WL 241376, at *3 (N.D. Tex. Jan. 29, 2007)(Texas courts have repeatedly refused to interpret the Texas Bill of Rights—including the free exercise clause—more broadly than the First Amendment), *aff'd sub nom. Smithback v. Crain*, No. 07-10274, 2009 WL 552227 (5th Cir. 2009)(following *Adkins* and holding that "governmental regulation does not substantially burden religious exercise "if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed"; and citing *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 150 (Tex. 1995), for the proposition that there is no statutory or common law cause of action for damages resulting from alleged violations of the Texas Constitution). In the present

14

case, Plaintiffs' failure to allege a viable First Amendment free exercise claim means they have also failed to allege a viable free exercise claim under TEX. CONST. art. I, § 6.

32.     As for Plaintiffs' alleged TEX. CONST. art. I, § 6-a claim, that provision says:

> This state or a political subdivision of this state may not enact, adopt, or issue a statute, order, proclamation, decision, or rule that prohibits or limits religious services, including religious services conducted in churches, congregations, and places of worship, in this state by a religious organization established to support and serve the propagation of a sincerely held religious belief.

33.     Section 6-a was adopted on November 2, 2021, and made effective on November 29, 2021, in response to the closure of churches that occurred during the COVID-19 pandemic. Section 6-a seems like another "free exercise" provision—in that it prevents the state or a political subdivision of the state from interfering with the right of churches, congregations, and other places of worship to conduct religious services. While Plaintiffs and other members of their church have historically worshiped in the Park, that does not make the Park—which is the City's property, in which Plaintiffs have no ownership interest whatsoever—a "place of worship" comparable to a church or congregation for purposes of the prohibitions of Section 6-a.

34.     In a speech before the University of Chicago Law School's Federalist Society chapter on February 8, 2022, moreover, Supreme Court of Texas Justice Jimmy Blacklock portrayed Section 6-a as an act of public defiance:

> Last fall, in November of 2021, the People of Texas decided to dictate to their government, rather than the other way around. They chose not to leave it up to scientists or judges to decide whether they can worship as they choose the next time the WHO or the CDC declares a pandemic. They took matters into their own hands by exercising their sovereign right to amend their state constitution. They've now added the following provision to their Bill of Rights:
>
>> Sec. 6-a. This state or a political subdivision of this state may not enact, adopt, or issue a statute, order, proclamation, decision, or rule that prohibits or limits religious services, including religious services conducted in churches, congregations, and places of worship, in this state by a religious organization established to

15

> support and serve the propagation of a sincerely held religious belief.[6]
>
> The adoption of this amendment—this direct rejection by the People of Texas of a pandemic measure they never want to see again—reflects something very healthy, which is that the people are still very much in charge, when they decide to be.

*The Constitution After COVID*, 2023 HARV. J.L. & PUB. POL'Y PER CURIAM 8, 4-5 (Spring 2023).

35.    The sort of restriction Justice Blacklock was addressing—and at which Section 6-a is directed—goes well beyond historical principles underlying the free exercise or establishment provisions of either the United States or Texas constitutions.  It has long been the law that "free exercise of religion is not absolute."  *See Cantwell v. Connecticut*, 310 U.S. 296, 304 (1940); *see also Smith*, 494 U.S. at 878-79 (As Justice Scalia wrote in *Smith*, "We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate. On the contrary, the record of more than a century of our free exercise jurisprudence contradicts that proposition. . . . the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'"

36.    Whether Section 6-a will ultimately pass constitutional muster under either the United States Constitution or the Texas Constitution is as yet unclear.  *See*, *e.g.*, Erwin Chemerinsky, Michele Goodwin, *Civil Liberties in A Pandemic: The Lessons of History*, 106 CORNELL L. REV. 815, 838-43 ("Religion")(2021).  What is clear, though, is that Section 6-a addresses a different problem from that alleged in the present case, in which the City is imposing neutral, generally applicable, temporary limits on use of a very small part (about 2 acres in the approximately 343-acre Park) of the City's own property, while such property is undergoing renovations and improvements necessary for the City to address—in the valid exercise of its

16

police powers—its compelling governmental interest in protecting the public's health and safety by the least restrictive means. The City is not telling Plaintiffs what to do or not do with *their* property, or in any way addressing Plaintiffs' religious beliefs. Plaintiffs have chosen to worship in the Park, but the Park's intended purpose/function is *not* as a place of worship, and the City's conduct at issue in the present case is *not* directed at Plaintiffs' free exercise of religion.

37.     The Free Exercise Clause of the First Amendment is written in terms of what the government cannot to do the individual, *not* in terms of what the individual can exact from the governments. *Satanic Temple v. City of Belle Plaine*, Case No. 19-cv-1122 (WMW/JFD), Case No. 21-cv-0336 (WMW/JFD), 2021 WL 4199369, at *13 (D. Minn. Sept. 15, 2021)(and also stating that the "First Amendment does not include a constitutional right to use public property as a place of worship"); *see also Taylor v. City of Gary*, 233 F. App'x 561, 562 (7th Cir. 2007)(observing that "the Free Exercise Clause does not give [plaintiff] the right to demand that the City provide him with municipally-owned property as a place of worship"); *Prater v. City of Burnside*, 289 F.3d 417, 427-28 (6th Cir. 2002).

38.     Further, First Amendment law is clear that the government has the right to limit conduct on its own property, even if such limitation might also pose limits on the exercise of religion. *See*, *e.g.*, *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 447-49 (1988)(rejecting Indian tribes' Free Exercise challenge to the United States Forest Service's approval of plans to construct a logging road in the Chimney Rock area of the Six Rivers National Forest (federal property) and finding that such conduct did not impose a burden "heavy enough" to violate the Free Exercise Clause); *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1063 (9th Cir. 2008)(rejecting the claim of multiple Indian-tribe plaintiffs that use of artificial snow made from reclaimed water in a government-owned park on what the Navajo Nation considered a sacred mountain desecrates the entire mountain, deprecates their religious

17

ceremonies, and injures their religious sensibilities, in violation of several federal statutes); *United States v. Means*, 858 F.2d 404 (8th Cir. 1988)(rejecting, on the basis of government's ownership, the Lakotas' claim that the United States Forest Service's denial of a permit for the use of an area in the Black Hills National Forest (federal property), as a religious, cultural, and educational community violated their free exercise rights); *Wilson v. Block*, 708 F.2d 735, 739-40 (D.C. Cir. 1983)(finding no impermissible burden on religious rights despite Navajo and Hopi plaintiffs' contentions that development of the Snow Bowl on the San Francisco Peaks (federal land) would be inconsistent with their First Amendment right to freely hold and practice their religious beliefs on the Peaks, which they believe to be sacred); *Havasupai Tribe v. United States*, 752 F. Supp. 1471, 1484-85 (D. Ariz. 1990), *aff'd sub nom. Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991)(rejecting, on the basis of government's ownership, a Havasupai free exercise violation claim involving the Forest Service's plan for a uranium mine in an Arizona national forest (federal property)); *Manybeads v. United States*, 730 F. Supp. 1515, 1517-18 (D. Ariz. 1989)(rejecting, on the basis of the government's ownership, a Navajo claim that relocation from the Hopi Reservation under the provisions of the Navajo-Hopi Land Settlement Act violated their free exercise rights).

39.    The same sort of rule has been applied to park land owned by a state.  *See*, *e.g.*, *Crow v. Gullet*, 541 F. Supp. 785, 794 (D. S.D. 1982), *aff'd*, *Crow v. Gullet*, 706 F.2d 856, 858-59 (8th Cir. 1983)(per curiam)(plaintiffs did not show that defendants' development, construction, and regulatory actions burdened plaintiffs' religious exercises in the Bear Butte area, and plaintiffs "failed to establish any infringement of a constitutionally cognizable [F]irst [A]mendment right. To the extent their right of access was temporarily restricted at the ceremonial grounds, plaintiffs' interests were "outweighed by compelling state interests in preserving the environment and the resource from further decay and erosion, in protecting the

18

health, safety, and welfare of park visitors, and in improving public access to this unique geological and historical landmark"). No principled analysis prevents the same rule from applying to land owned by, and under the management of, a home rule city like San Antonio.

### 4. Plaintiffs Are Unlikely to Succeed on Their Alleged TRFRA Claim.

40.     Like other "RFRA" laws throughout the nation, the Texas Religious Freedom Restoration Act ("TRFRA"), TEX. CIV. PRAC. & REM. CODE ch. 110, was enacted in the wake of *Smith*, 494 U.S. at 877-78, after the United States Supreme Court—in *City of Boerne v. Flores*, 521 U.S. 507, 511-36 (1997)—found the federal Religious Freedom Restoration Act to be unconstitutional as applied to the states. In seeking to return "strict scrutiny" to the legal analysis of religious rights cases, TRFRA makes clear that Texans have the same religious rights—and that Texas courts have the same power in adjudicating religious rights cases—as they had prior to April 17, 1990, the date *Smith* was decided. TEX. CIV. PRAC. & REM. CODE § 110.010; *Vallejo v. City of Del Rio*, Civil Action No. DR-10-DV-8-AM/CW, 2012 WL 13072121, at *5-7 (W.D. Tex. Sept. 29, 2012)(discussing the history and purposes of TRFRA).

41.     As with RLUIPA, a TRFRA claimant must establish that a government agency *substantially burdened* his free exercise of religion. *Id.* § 110.003(a). Thus, the previous discussions about "substantial burden" applies with equal force in the context of TRFRA, and Plaintiffs' failure to establish a substantial burden in the context of RLUIPA applies with equal force here. *See*, *e.g.*, ¶¶ 22-23, 29, *supra*. Subsection 110.003(a) does not apply, though, if the government agency can demonstrate that the alleged burden was the "least restrictive means of furthering" a "compelling governmental interest." *Id.* § 110.003(b)(1)-(2). Further, Since TRFRA law is substantially similar to First Amendment "Free Exercise Clause" law and RLUIPA law, it bears repeating that the right of free exercise does not relieve individuals like Plaintiffs of their obligations to comply with valid or neutral laws of general applicability on the

19

grounds that the law proscribes, or requires, conduct which is contrary to his or her religious practice. *Smith*, 494 U.S. at 878-79.

### C. PLAINTIFFS HAVE NOT PROVEN SUBSTANTIAL THREAT OF IRREPARABLE HARM.

42.     As discussed above, Plaintiffs have failed to establish that the City's plans would *substantially* burden their religious exercise.   While Plaintiffs claim a substantial threat of irreparable harm, any restriction about which they complain is limited and temporary, and is significantly outweighed by City's compelling government interest in protecting the health and safety of those who visit the Park, while at the same time moving forward with the much-needed repair and renovation work in the Park, which work San Antonio voters approved and agreed to fund when they passed the 2017 multi-million-dollar Bond Issue.   As the Court correctly found in the TRO Order [**Dkt. 9** at 3 of 3], Plaintiffs have not shown that they are substantially or imminently threatened with any irreparable harm.

### D. THE SUPPOSED "ONGOING AND THREATENED INJURY TO PLAINTIFFS"—IF ANY— DOES NOT OUTWEIGH THE HARM THE CITY WILL SUFFER IF AN INJUNCTION IS GRANTED AND GRANTING AN INJUNCTION WILL DISSERVE THE PUBLIC INTEREST.

43.     For the reasons stated in ¶ 42, *supra*, there is no "ongoing and threatened injury to Plaintiffs," so any injury about which Plaintiffs complain cannot outweigh the harm the City will suffer if—after years of effort and hard work—it is enjoined from moving forward with the Phase I work and with honoring the contractual and other obligations the City has incurred in preparing to begin the needed repairs and renovations in the Park.   The need to fix those problems will not go away, and undue delay will only worsen the problems that precipitated the 2017 Bond Issue in the first place.   Even if Plaintiffs faced some ongoing and threatened injury—which the City *denies*—when the government is a party, the final two factors for preliminary injunctive relief merge. *VanDerStok v. BlackHawk Mfg. Grp. Inc.*, 639 F. Supp. 3d

722, 730 (N.D. Tex. 2022)(citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  In that case, the Court weighs "the competing claims of injury" and considers what effect the granting or withholding of the requested relief would have on each party, while also considering the public consequences of granting injunctive relief.  *Winter*, 555 U.S. at 24.  Here, the equities weigh in the City's favor. and weighing the equities in that way best serves the public interest.

### III.  CONCLUSION AND PRAYER

For the foregoing reasons, Plaintiffs have failed to prove ***all*** of the required elements of their FED. R. CIV. P. 65 claim for preliminary injunctive relief.  Therefore, the City respectfully asks the Court deny Plaintiffs' Motion for Preliminary Injunction and grant the City all other relief to which it may be justly entitled, at law or in equity.

Respectfully submitted,

LANGLEY & BANACK, INC.

BY: *Fred R. Jones*
FRED R. JONES
State Bar No. 10886700
fjones@langleybanack.com
NATALIE F. WILSON
State Bar No. 24076779
nwilson@langleybanack.com
IAN M. MCLIN
State Bar No. 24005071
imclin@langleybanack.com
LEE WARREN
State Bar No. 24099453
lwarren@langleybanack.com
SARA MURRAY
State Bar No. 14729400
smurray@langleybanack.com
745 East Mulberry, Suite 700
San Antonio, TX  78212-3166
Telephone:  (210) 736-6600
Facsimile:   (210) 736-6889

-and -

21

CITY OF SAN ANTONIO
DEBORAH KLEIN
Deputy City Attorney
State Bar No. 11556750
Deborah.Klein@sanantonio.gov
International Center
203 S. St. Mary's Street, 2nd Floor
San Antonio, TX 78205
Telephone: (210) 207-8949
Facsimile: (210) 207-4004

**ATTORNEYS FOR DEFENDANT**
**CITY OF SAN ANTONIO**

## CERTIFICATE OF SERVICE

The undersigned counsel of record hereby certifies that on September 22, 2023, true and correct copies of the "Defendant City of San Antonio's **(1)** Supplemental Response in Opposition to 'Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction' [**Dkt. 5**] and **(2)** Memorandum Brief in Support Thereof" were served via the Court's electronic facilities to the following persons:

Mark W. Rasmussen
mrasmussen@jonesday.com
Jonathan D. Guynn
jguyon@jonesday.com
Chance McCraw
cmccraw@jonesday.com
JONES DAY
2727 North Harwood Street
Dallas, TX 75201-1515
ATTORNEYS FOR PLAINTIFFS

John Greil
john.greil@law.utexas.edu
Steven T. Collis
steve.collis@law.utexas.edu
Law & Religion Clinic
University of Texas School of Law
727 East Dean Keaton Street
Austin, TX 78705
ATTORNEYS FOR PLAINTIFFS

_/s/ Fred R. Jones_
FRED R. JONES

22

# Ex. 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Gary Perez and Matilde Torres<br>Plaintiffs | § § § | |
| vs. | § § § § | CIVIL ACTION NO. 23-cv-00977-FB |
| City of San Antonio<br>Defendant | § § | |

## CITY OF SAN ANTONIO'S INITIAL RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

TO THE HONORABLE FRED BIERY,
UNITED STATES DISTRICT JUDGE:

The CITY OF SAN ANTONIO (the "City") files this Initial Response to the Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (ECF 5), and would respectfully show as follows:

1. Initial Response.

The Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("the Motion") was served on counsel last night at approximately 8:30 p.m. The City files this Initial Response, but requests additional time to provide briefing and evidence in opposition to the Motion.   The City also requests a full hearing on the application for a Preliminary Injunction.

This Initial Response is supported by the Declarations of Homer Garcia, III (Director of the San Antonio Parks & Recreation Department) and Ross Hosea (Certified Arborist, Parks & Recreation Manager), attached hereto as Exhibits A and B.

2. <u>Status Quo</u>.

As demonstrated by the Motion, the status quo is 1) no trees have been removed or relocated; 2) bird mitigation activities began several months ago, and are continuing (although the City has agreed to "pause" these activities during the ceremony planned by Plaintiffs); and 3) the small (less than one acre) site planned for this ceremony is fenced off to public access for safety reasons.  As to points 2 and 3, Plaintiffs are seeking to change the status quo to require that the City cease the bird mitigation activities, and to require the City to remove the safety fencing for a very small area of Brackenridge Park in relation to the size of the park (in excess of 350 acres).  This is contrary to the purpose of a TRO, which is to preserve the status quo of the subject matter of the litigation and prevent irreparable harm pending a hearing on a preliminary injunction.  *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974).

3. <u>No need for an immediate restraining order in reference to two of the three actions the Plaintiff seeks to enjoin.</u>

There is no need for an emergency TRO as to the following issues, which would be better suited for consideration at a hearing on Plaintiffs' Application for Preliminary Injunction:

* <u>Tree Removal or relocation</u>: This part of the project is not imminent. Additional approvals from the U.S. Army Corps of Engineers are necessary before the City can proceed.  This process with the Corps of Engineers is expected to take several more weeks.

* <u>Wildlife Management/Bird Mitigation activities</u>: The bird mitigation activities have been ongoing for several months, but the City has agreed to "pause"

City of San Antonio's Initial Response – Page 2

those activities during the period of time requested by Plaintiffs on August

12, 2023.

These issues can certainly wait to be fully explored and developed during a

Preliminary Injunction hearing as contemplated by Rule 65, Fed. R. Civ. P.

4. <u>Improper Request for emergency TRO to order removal of safety fencing
deemed necessary by the City of San Antonio.</u>

The third issue in the Motion is Plaintiffs' request for a mandatory restraining order

to the City to remove safety fencing in a small area of Brackenridge Park. In the Motion,

Plaintiffs candidly say that they think they know better than the Certified Arborists and

other professionals about the safety of the area currently under temporary safety fencing.

They apparently want to "second guess" the opinions of tree experts, and subject

themselves and other attendees at the planned ceremony to risk of serious bodily harm.

Mr. Perez's affidavit does not describe any education, experience, or expertise that

qualifies him to opine on the safety of retaining walls or trees and his "opinion" about the

safety of the fenced-off area should be respectfully disregarded. *See* Fed. R. Evid. 701.

Even sacred sites may be closed to worshippers when they are fundamentally unsafe for

visitors. *See, e.g.,* Sara Duran "After Two Centuries, Mission Concepcion is Closed for

Historic         Restoration         Work,"         https://spectrumlocalnews.com/tx/san-

antonio/news/2020/01/22/after-two-centuries--mission-concepcion-is-closed-for-historic-

restoration-work (Jan. 23, 2020) (Mission Concepcion closed to public because dome

required stabilization and waterproofing). The Court may take judicial notice of the

closing of Mission Concepcion for repair work pursuant to Fed. R. Evid. 201.

On July 26, 2023 (at 4:19 p.m.), Counsel for Plaintiff requested access to an area

of Brackenridge Park for a religious ceremony. This was the first time this request was

made. Within 5 business days, the undersigned, after consultation with the City's Director of Parks & Recreation, advised Plaintiff's counsel that the request could be accommodated. *See,* Declaration of Jonathan Guynn, Ex.D , attached to the Motion. Three alternative sites in Brackenridge Park were offered, and the City agreed to "pause" the bird mitigation activities for a 24-hour period beginning August 11 at 8:00 a.m. and ending August 12 at 8:00 a.m. *Id.*

Plaintiffs' counsel clarified that the area his clients was seeking for a gathering of 15-20 people was the fenced area currently in controversy (on the south bank of the San Antonio River leading up to Lambert Beach.) Dialogue continued between the undersigned and Plaintiffs' counsel to try to resolve the issue, but in the end, the Parks Director concluded that safety considerations prevailed, and he could not authorize a removal of the safety fencing. This was after consultation with Ross Hosea, a Certified Arborist.

The area proposed for the ceremony on August 12 is <u>temporarily</u> under fence for safety reasons. The fences are still vitally important to protect the health, safety and welfare of park visitors. The area is potentially extremely hazardous, as determined by Certified Arborist, Ross Hosea. The City has a legitimate and compelling interest in protecting park visitors from the potential for falling walls and trees in the area at issue.

To remove the fences now would change the status quo as it has existed since early this year and would be contrary to the public interest.

5. <u>Issues relating to tree removal or relocation and Wildlife Management Plan are better suited for consideration at a hearing.</u>

The City's Wildlife Management Plan was developed, approved, and implemented with the assistance of wildlife biologists and other experts. The City's website for

Brackenridge Park has a large amount of information regarding this plan, and the reasons for its implementation. The City stands ready to present testimony and evidence on this subject from qualified experts.

In short, there is a compelling government interest in managing bird populations in a public park, especially in this highly-urbanized part of Brackenridge Park. The evidence will show that the plan is essential to the long-term health of the rookeries in Brackenridge Park. The existing rookeries (regardless of species) are simply too large, and can actually have a very harmful effect on the affected trees. The uric acidity of the birds' droppings and the weight of the nests can have adverse impacts on the trees.

The Wildlife Management Plan complies with both state and federal wildlife law. Well-documented and peer reviewed scientific research shows that these measures have a high likelihood of success in having a healthy and sustainable rookery for cormorants and other migratory birds as well.

San Antonio, acting through its Department leaders, as well as knowledgeable and qualified members of staff, scientists, wildlife biologists, consultants, and volunteers decided these serious concerns warranted the action the City took, and is taking. San Antonio's mitigation efforts are intended to balance the inherent conflict between people and the wildlife.

The City requests that the Court deny Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted,
LANGLEY & BANACK,
INCORPORATED

745 East Mulberry Avenue
Suite 700
San Antonio, Texas 78212
(210) 736-6600
(210) 735-6889 – Fax

By:     /s/ Fred R. Jones
        Fred R. Jones
        State Bar No. 10886700
        fjones@langleybanack.com

-and-

CITY OF SAN ANTONIO
Deborah Klein
Deputy City Attorney
State Bar No. 11556750
International Center
203 S. St. Mary's Street, 2nd Floor
San Antonio, Texas 78205
(210) 207-8949
(210) 207-4004 – Fax
Deborah.Klein@sanantonio.gov

ATTORNEYS FOR DEFENDANT
CITY OF SAN ANTONIO

## CERTIFICATE OF SERVICE

This is to certify that on the 11th day of August, 2023, a true and correct copy of the foregoing document has been forwarded via electronic service through the Court's CM/ECF system to all counsel of record.

                /s/ Fred R. Jones
                Fred R. Jones

City of San Antonio's Initial Response – Page 6

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Gary Perez and Matilde Torres<br>Plaintiffs | § <br> § <br> § | |
| vs. | § <br> § <br> § | CIVIL ACTION NO. 23-cv-00977-FB |
| City of San Antonio<br>Defendant | § <br> § <br> § | |

## DECLARATION OF HOMER GARCIA, III
## SUBJECT TO PENALTY OF PERJURY

COUNTY OF BEXAR        §

STATE OF TEXAS          §

My name is HOMER GARCIA, III and I am the Director of the City of San Antonio's

Parks and Recreation Department. I have been with the City of San Antonio organization

since 2001, and with Parks and Recreation since 2009. I was promoted to Assistant

Director in early 2017, and appointed Director in February 2020 after serving on an interim

basis since July 2019. I am over 18 years of age, of sound mind, and capable of making

this Declaration. The facts stated herein are within my personal knowledge and are true

and correct.

1. My educational background is as follows: Bachelor of Business Administration,

Texas State University and Master of Business Administration, Our Lady of the Lake

University. I am a Certified Public Manager in the State of Texas and the National Certified

Public Manager Consortium.

2.     I have personal knowledge of the facts stated in this Declaration, based on my involvement in numerous public meetings and several personal inspections of Brackenridge Park and the area included within the 2017 Bond issue, and specifically including the Lambert Beach, pumphouse, bathhouse, and other amenities.

3.     In my capacity as Director of the San Antonio Parks Department, I made the decision to fence specific areas off for safety reasons. This decision was made, in part to protect the health, safety and welfare of visitors to Brackenridge Park. This fencing is temporary, and will be removed once the improvements and repairs contemplated by the 2017 Bond Issue have been completed.

4.     The areas under fence (as shown on the aerial, attached as Exhibit 1) have been temporarily closed.    This is a small area (under 2 acres) relative to the entire approximately 350-acre Brackenridge Park. The fencing was installed by City employees for several reasons, but including public safety concerns, and it is still necessary.

5.     In late July, 2023, I was advised that Mr. Perez and Ms. Torres requested access to Brackenridge Park for a ceremony to occur on August 12, 2023 at 5:30 a.m. I authorized counsel for the City to advise Mr. Perez and Ms. Torres (through their lawyers) that:

a. the request would be accommodated;

b. the City will pause park wildlife management operations for a 24-hour period beginning August 11 at 8:00 a.m. and ending August 12 at 8:00 a.m., at which time wildlife management operations may resume; and

c. the City has developed three alternatives in the immediate vicinity of the fenced area:

Declaration of Homer Garcia, III – Page 2

First, on the north bank there is a pedestrian access path which serves as a maintenance route and is not open to public vehicular traffic. This space on the north bank is offered as one alternative; we would coordinate maintenance access and use so this does not occur during the ceremony and be available for pedestrian use only.

A second option for the ceremonial proceedings would be across the south bank at Joske Pavilion and the adjacent area in the plaza right next to it.

Additionally, as a third option, the area south of the pedestrian bridge is open on both sides of the river with direct access. This area is in direct adjacency immediately to the south of the fenced area.

6.     After I was informed that Mr. Perez and Ms. Torres did not accept any of the alternative areas, but were requesting access to the area secured by safety fences, I considered additional alternatives involving possible removal or modification of some of the fencing.

7.     However, Mr. Ross Hosea, a Certified Arborist inspected the site on August 9, 2023. After this inspection, Mr. Hosea determined that the safety fencing around the specific site being requested is still necessary to protect the health, safety and welfare of the public.

8.     Many of the retaining walls along the river at this location have collapsed and are in various stages of active decline as evidenced by stones falling as recently as several weeks ago including a fallen tree. This presents an unsafe condition for the public which is why the area of concern remains fenced off to prevent access.

Declaration of Homer Garcia, III -- Page 3

9.      Based on Mr. Hosea's findings and recommendations, I made the decision that the City cannot allow park visitors to access this requested "specific site" which is temporarily under fencing.  To remove or modify the fencing to allow access to the south bank in this area would place park visitors (and the participants in the planned ceremony) in danger of potential serious physical harm.

10.     The City has temporarily fenced off these areas in order to implement Phase I of the 2017 Bond election, which will remedy these safety problems by reinforcing, strengthening and restoring the historic walls along the river while also removing trees inclusive of those which are dead or dying.  In my opinion, these repairs and improvements are vitally important to promote the safety of visitors to the park.

My name is Homer Garcia, III and I am the Director of the City of San Antonio's Parks and Recreation Department.  My birthdate is ███████████████.

I hereby certify, under penalty of perjury, that the facts stated herein are true and correct.

Signed on the ⁣‍11 day of August, 2023.

_____

Homer Garcia, III

Declaration of Homer Garcia, III – Page 4

# EXHIBIT 1



# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Gary Perez and Matilde Torres | § | |
| Plaintiffs | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 23-cv-00977-FB |
| | § | |
| | § | |
| City of San Antonio | § | |
| Defendant | § | |

---

DECLARATION OF ROSS HOSEA
SUBJECT TO PENALTY OF PERJURY

---

| | |
|---|---|
| COUNTY OF BEXAR | § |
| STATE OF TEXAS | § |

My name is ROSS HOSEA and I am employed by the City of San Antonio. I am currently a Parks & Recreation Manager in the City's Parks and Recreation Department. I am over 18 years of age, of sound mind, and capable of making this Declaration. The facts stated herein are within my personal knowledge and are true and correct.

1. I am an ISA Certified Arborist. My education, professional training and experience are all set out in the document attached hereto as Exhibit 1. My education, training and experience qualify me to perform risk assessments on trees.

2. I have personal knowledge of the facts stated in this Declaration, based on my involvement in numerous public meetings and personal inspection of Brackenridge Park and the area included within the 2017 Bond issue, and specifically including the Lambert Beach, pumphouse, bathhouse, and other amenities. I inspected this area as recently as August 9, 2023.

3. I am familiar with the area along the south bank of the San Antonio River near a pedestrian bridge and leading up to Lambert Beach and the pumphouse. This area is temporarily fenced off to access by the public. The Parks Director requested that I inspect the area under fence, and I did that on August 9, 2023.

4.      The areas under fence along the south bank leading from a pedestrian bridge to Lambert Beach are currently closed to the public.

5.      Based on my visual inspection of the area under fence, I have concluded, in my professional opinion, that removal of the fencing to allow access would place Park visitors in danger of serious physical harm.  Among other things, there is risk of tree fall debris occurring in this area, and I personally observed a large broken and hanging branch of a large Cypress tree directly above the site.

6.      At least eight (8) other ISA Certified Arborists (including one (1) ASCA Registered Consulting Arborist) and one (1) ISA Board Certified Master Arborist have been consulted in the process of determining whether trees in the area should be removed or relocated.

7.      On or about April 21, 2023, a large Pecan tree on the north bank of the San Antonio River collapsed.  Photographs of this collapsed tree are attached to this Declaration as Exhibit 2.  These photographs accurately portray the condition of the tree after it had collapsed – a total failure of the tree.

My name is Ross Hosea, and my birthdate is ███████████.

I hereby certify, under penalty of perjury, that the facts stated herein are true and correct.

Signed on the  11th  day of August, 2023.

Ross Hosea

Declaration of Ross Hosea – Page 2

# EXHIBIT 1

5406 MISSOURI BEND • SAN ANTONIO TX 78247
210/912-4869 • ROSSHOSEA@HOTMAIL.COM

# ROSS HOSEA

## QUALIFICATIONS SUMMARY
- 30 years of experience in traditional and urban forest management and arboriculture
- 20 years of supervisory experience in a wide range of settings
- 15 years of experience managing and implementing operating budgets
- International Society of Arboriculture Certified Arborist TX-3811A
- Tree Risk Assessment Qualification (TRAQ)
- Texas Oak Wilt Certified TOWC-0203

## PROFESSIONAL EXPERIENCE

**August 2014–present • City of San Antonio • San Antonio, TX**

*Parks and Recreation Manager, July 2023–present*
- Manages and coordinates urban forestry projects, programs, and activities between various Parks and Recreation divisions, City departments, and public and private stakeholders.
- Prepares and delivers numerous formal and informal presentations annually to industry professionals, Parks leadership, City Council, and stakeholders.
- Creates, develops, and implements new program strategies to increase the city's tree canopy.
- Prepares, implements, and manages multimillion-dollar operating budget.
- Oversees a staff of 30 employees to maintain urban forestry operations and implement programs.

*Special Projects Manager, January 2019–July 2023*
- Obtains and evaluates tree data from multiple sources and provides specialized reports on quantification, qualification, and effectiveness as requested by leadership and City Council.
- Creates, develops, and implements new program strategies to increase the city's tree canopy.
- Prepares, implements, and manages multimillion-dollar operating budget.
- Maintains knowledge of current industry standards through continuing education.

*City Forester, August 2014–December 2018*
- Coordinates assigned urban forestry activities within the City of San Antonio with outside agencies and with the general public.
- Supervises a staff of 39 employees to complete tree planting, watering, and maintenance as well as management of greenway trails.
- Prepares, implements, and manages multimillion-dollar operating budget.
- Manages multifaceted special tree projects in parks across the city.
- Provides education and outreach programs to various stakeholder and volunteer groups.

**May 2004–July 2014 • ArborPro Tree Care • San Antonio, TX**

*Owner*
- Provided all aspects of urban tree care and planting to residential and commercial clients in the San Antonio area.
- Supervised and trained crew of 4-6 climbers/groundmen.
- Established and implemented forecasts and budgets to continually improve cost efficiencies in labor, equipment, and materials.
- Educated clients and community on proper tree care and planting practices.
- Maintained updated records and files for all business activities.

## PROFESSIONAL EXPERIENCE (CONTINUED)

### July 1999–May 2004 • Mississippi State University • Starkville, MS
*Teaching Assistant, January 2003–May 2004*
- Taught 3 field laboratory classes per semester for Forest Dendrology.
- Nominated for Teaching Assistant of the Year.

*Research Assistant, July 1999–December 2002*
- Collected and analyzed field, laboratory, and statistical data to evaluate effects of forestry practices on soil nitrogen mineralization.
- Supervised up to 10 student workers.

### Oct. 1996–June 1999 • Plum Creek Timber Company • Huttig, AR
*Forestry Superintendent*
- Responsible for planning, coordinating and implementing all resource management activities on approximately 268,000 acres of land.
- Responsible for maintaining and implementing approximately $1.5 million budget.
- Facilitated community outreach projects, such as Project Learning Tree, community tree planting, and speaking at local schools.
- Managed project for creating and implementing Habitat Conservation Agreement for endangered species, Red-cockaded Woodpecker
- Supervised up to 12 employees.

*Harvesting Forester*
- Responsible for supervising up to 12 logging contractors until promotion to Superintendent.

### May 1990–Sept. 1996 • Various forestry positions and internships for Brian Forestry Consultants and US Forest Service

## EDUCATION

### Dec. 1993 • Stephen F. Austin State University • Nacogdoches, TX
*Bachelor of Science in Forestry*
- 3.39 GPA
- Alpha Chi - National Collegiate Honor Society
- Phi Eta Sigma – Freshman Honor Society
- Xi Sigma Pi - National Forestry Honor Society

### July 1999–May 2004 • Mississippi State University • Starkville, MS
*Candidate for Master of Science in Forestry*
- 3.88 GPA
- Recognized for Excellence in Presentation at 2001 Soil Science Society of America Annual Meeting.

## PROFESSIONAL ASSOCIATIONS AND MEMBERSHIPS
- Vice Chairperson, Alamo Forest Partnership
- Member, International Society of Arboriculture
- Member, International Society of Arboriculture – Texas Chapter
- Member, San Antonio Arborist Association
- Member, Society of Municipal Arborists

# EXHIBIT 2





Case 5:23-cv-00977-FB Document 7-2 Filed 08/11/23 Page 9 of 11



Filed 08/11/23    Page 11 of 11



# Ex. 2

DAH
08/3/23
Item No. 8

ORDINANCE          2023-08-03-0497

**APPROVING A TASK ORDER TO A JOB ORDER CONTRACT WITH AMSTAR, INC. IN THE AMOUNT OF $3,467,639.00 FOR PHASE 1 OF THE BRACKENRIDGE PARK PROJECT; APPROVES AN AMENDMENT IN THE INCREASED AMOUNT OF $696,659.00 FOR A REVISED PROFESSIONAL SERVICES AGREEMENT VALUE OF $2,200,314.00 WITH SWA GROUP FOR ADDITIONAL ARCHITECTURAL AND ENGINEERING DESIGN SERVICES ASSOCIATED WITH THE DESIGN, CONSTRUCTION AND OTHER RELATED SERVICES REQUIRED FOR PHASES 1 AND 2 OF THE BRACKENRIDGE PARK PROJECT; AND, AMENDING THE FY 2023 – FY 2028 CAPITAL IMPROVEMENT PROGRAM WITH THE REAPPROPRIATION OF $526,751.00 FROM THE TREE PRESERVATION FUND AND ACCEPTANCE OF A CONTRIBUTION OF $90,000.00 FROM THE BRACKENRIDGE PARK CONSERVANCY TO THE BRACKENRIDGE PARK PROJECT, A 2017 GENERAL OBLIGATION BOND PROGRAM FUNDED PROJECT, LOCATED IN COUNCIL DISTRICTS 1 AND 2.**

\*     \*     \*     \*     \*

**WHEREAS,** on May 6, 2022, voters approved the 2017 Bond Program, which authorized $7,750,000.00 for improvements to Brackenridge Park, located in Council Districts 1 and 2; and

**WHEREAS,** voters also approved $2,500,000.00 as part of the 2022 Bond Program for the completion of the 2017 Bond project and further development of the adopted Park Master Plan in Brackenridge Park; and

**WHEREAS,** supplemental funding from the City of San Antonio, Bexar County, The San Antonio Conservation Society, and the Brackenridge Park Conservancy have totaled approximately $8,100,000.00, allowing additional scope of work to be added; and

**WHEREAS,** the Brackenridge Park project will be constructed in two phases. Phase 1 consists of the structural stabilization of the historic Pumphouse, rehabilitation and stabilization of historic river walls, retaining walls, and grand staircase in the Lambert Beach area, including landscaping and irrigation improvements. Phase 2 consists of the rehabilitation and construction of a small culture trail, recreational open spaces, rehabilitation and structural stabilization of the historic acequia, interior and exterior improvements to the historic Pumphouse, engineering improvements to the lily pond, removal of asphalt area between acequia and zoo back-of-house, construction of a hike and bike trail, excavation and rehabilitation of the historic Upper Labor Dam, interpretive and wayfinding signage, lighting, landscaping and irrigation improvements including Low Impact Design (LID) features and plant ecology restoration, installation and interpretation of the historic St. Mary's sluice, and underground conversion of existing overhead electrical utilities; and

1

DAH
08/3/23
Item No. 8

**WHEREAS**, Construction of Phase 1 is anticipated to begin in Summer 2023 and is estimated to be completed in Spring 2024. Construction of Phase 2 is anticipated to begin in Fall 2024 and is estimated to be completed in Spring 2026; and

**WHEREAS,** this task order utilizes the Job Order Contracting (JOC) approved through Ordinance 2022-02-17-0107 by City Council on February 17, 2022. The use of the JOC delivery method provides the City with on-call construction, renovation and maintenance services for City buildings and facilities. Assignment of JOC contractors to specific jobs is based on the contractor's current workload, overall capacity, familiarity with a specific facility, expertise in completing a specific task and/or managing a specific trade needed to carry out the requested repair or rehabilitation. Of the eight contractors approved as part of the JOC, Amstar, Inc. is the JOC that has been selected; and

**WHEREAS,** this contract will be awarded in compliance with the Small Business Economic Development Advocacy (SBEDA) Program, which requires contracts to be reviewed by a Goal Setting Committee to establish a requirement and/or incentive unique to the particular contract to maximize the amount of small, minority, and women-owned business participation on the contract. The Goal Setting Committee set a 24% Minority/Women Business Enterprise (M/WBE) subcontracting goal and a 3% African American Business Enterprise subcontracting goal. Amstar, Inc. has committed to meeting the subcontractor participation and goals; and

**WHEREAS,** on October 5, 2017 through Ordinance 2017-10-05-0742 City Council approved a design services agreement with SWA Group in the amount of $1,097,700.00, and previous amendments to modify and enhance the project have increased this contract by $405,955.00 to a total contract amount of $1,503,655.00. This proposed amendment will increase the contract in the amount of $696,659.00 for a revised agreement value of $2,200,314.00; and

The following table illustrates the previously authorized amendments since the execution of this agreement and the proposed amendment:

| Item | Amount |
|---|---|
| Original Contract Value | $1,097,700.00 |
| Previous Authorized Amendments | $ 405,955.00 |
| Proposed Amendment | $ 696,659.00 |
| Revised Contract Value | $2,200,314.00 |

This amendment will provide for additional design work by SWA Group to complete the additional proposed scope of work for general park rehabilitation and public infrastructure improvements in relation to Phases 1 and 2 of the Brackenridge Park Project; and

**WHEREAS,** this Ordinance reappropriates and transfers funds in the amount of $526,751.00 from the FY 2023 Tree Canopy Preservation and Mitigation Fund to the Brackenridge Park project to relocate and maintain trees, amending the FY 2023 – FY 2028 Capital Improvement Program; and

DAH
08/3/23
Item No. 8

**WHEREAS**, this Ordinance accepts a contribution in the amount of $90,000.00 from the Brackenridge Park Conservancy to complete Phase 1 of the Brackenridge Park project: **NOW THEREFORE:**

**BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF SAN ANTONIO**:

**SECTION 1.** The City Manager or designee, or the Director of the Public Works Department or designee, is authorized to execute task order to a Job Order Contract with Amstar, Inc. in the amount of $3,467,639.00 for construction of the Brackenridge Park Project.

**SECTION 2.** The City Manager or designee, or the Director of the Public Works Department or designee, is authorized to execute an amendment in the increased amount of $696,659.00 or a revised Professional Services Agreement value of $2,200,314.00 with SWA Group for additional architectural design and other related services required for the Brackenridge Park Project.

**SECTION 3.** Funds in the amount of $90,000.00 are authorized to be received from the Brackenridge Park Conservancy to and are authorized to be appropriated and transferred to Fund 45099000 GO Capital Projects, Project 23-01644 Brackenridge Park 2017.

**SECTION 4.** The budget in Project 23-01644 Brackenridge Park 2017 shall be revised by increasing WBS 23-01644-90-10-03 with GL 6101100 and WBS 23-01644-05-02-08 with GL 5201140 each by $90,000.00.

**SECTION 5.** Funds in the amount of $526,751.00 in Fund 29619000 Tree Preservation, Internal Order 39000002790, and General Ledger Account 6102100, Project 26-00705 are authorized to be reappropriated to Internal Order 3900000XXXX, and General Ledger Account 6102100 transfer to Fund 45099000, Project 23-01644.

**SECTION 6.** The budget in Project 26-00705 Tree Planting initiative FY23 shall be revised by decreasing WBS 26-00705-90-14-01 with GL 6101100 and WBS 26-00705-05-02-01 with GL 5201140 each by $526,751.00.

**SECTION 7.** The budget in Project 23-01644 Brackenridge Park 2017 shall be revised by increasing WBS 23-01644-90-10-02 with GL 6101100 and WBS 23-01644-05-02-02 with GL 5201140 each by $526,751.00.

**SECTION 8.** Payment is authorized to be encumbered and made payable to Amstar, Inc., in an amount not to exceed $3,467,639.00. Payment is in support of the Brackenridge Park 2017 Project using Fund 45099000, WBS Element 23-01644-05-02-01 and GL Account 5201140. Funding for this project is provided by General Obligation Bonds, the Tree Mitigation Fund, and contributions from the SA Conservation Society and the Brackenridge Park Conservancy and is included in the FY 2023 - FY 2028 Capital Improvement Program.

Payment is limited to the amounts budgeted in the Operating and/or Capital Budget funding sources identified. All expenditures will comply with approved operating and/or capital budgets for current and future fiscal years.

DAH
08/3/23
Item No. 8

**SECTION 9.** The financial allocations in this Ordinance are subject to approval by the Deputy Chief Financial Officer, City of San Antonio. The Deputy Chief Financial Officer may, subject to concurrence by the City Manager or the City Manager's designee, correct allocations to specific Fund Numbers, Project Definitions, WBS Elements, Internal Orders, Fund Centers, Cost Centers, Functional Areas, Funds Reservation Document Numbers, and GL Accounts as necessary to carry out the purpose of this Ordinance.

**PASSED AND APPROVED this 3ʳᵈ day of August, 2023.**

M A Y O R
Ron Nirenberg

**ATTEST:**

Debbie Racca-Sittre, City Clerk

**APPROVED AS TO FORM:**

Andrew Segovia, City Attorney

4



**City of San Antonio**

**City Council Meeting**
**August 3, 2023**

8.

2023-08-03-0497

Ordinance 1) approving a task order to a Job Order Contract with Amstar, Inc. in the amount of $3,467,639 for Phase 1 of the Brackenridge Park project; 2) amending the Professional Services Agreement with SWA Group for an increased amount of $696,659 for a revised value of $2,200,314 for additional architectural and engineering design services associated with the design, construction and other related services required for Phases 1 and 2 of the Brackenridge Park project; 3) amending the FY 2023 – FY 2028 Capital Improvement Program with the reappropriation of $526,751 from the Tree Preservation Fund; and 4) accepting a contribution of $90,000 from the Brackenridge Park Conservancy to the Brackenridge Park project, a 2017 General Obligation Bond Program funded project. [Roderick Sanchez, Assistant City Manager; Razi Hosseini, Director, Public Works]

Councilmember Courage moved to approve. Councilmember Pelaez seconded the motion. The motion carried by the following vote:

Aye:          Nirenberg, Pelaez, Courage, Whyte, Gavito, Kaur
No:           McKee-Rodriguez, Viagran, Castillo, Cabello Havrda
Absent:       Rocha Garcia

# Ex. 3

# Ex. 3(a)

Tree Assessment Committee

May 16, 2022

Committee members David Vaughan, Certified Arborist; Michael Nentwich, Certified Arborist; Mark Kroeze, Certified Arborist; and Mark Duff, Board Certified Master Arborist.

The committee's assignment was to evaluate trees scheduled for removal on the Brackenridge Park Project. The project is addressing historic stone walls at Lambert Beach and the restoration of the historic acequia and raceway. The group was tasked with evaluating trees scheduled for removal based on the current proposed construction procedures.

A briefing of the project was conducted by Ross Hosea COSA City Arborist, Bill Pennell Project Manager with COSA Public Works, and Jamaal Moreno COSA Landscape Architect, including a walking tour of the entire project. The arborist committee returned a few days later to independently evaluate trees scheduled for removal.

Trees are being removed to facilitate restoration of historic stone walls along the river at Lambert Beach, walls of the acequia, restoration of the raceway, and new walkways. The plan is to restore the acequia and raceway along with their historic function while allowing public viewing and access, and to stabilize the walls along the river.

Our assignment was to evaluate trees based on the current plan of construction. The arborist committee is in agreement with the removal of most of the trees shown on the provided Tree Removal Plan with the following exceptions that we recommended to be preserved: Tree 03, 17-inch Elm; Tree 156, 19-inch Elm; and Tree 104, 8-inch Pecan.

Tree 156, 19-inch Elm, is far enough away from the historic stone wall to allow restoration without causing significant harm to the tree. Tree 104, 8-inch Pecan is adequate distance from the proposed wall and shadow wall. Neither tree is expected to cause harm to the restored wall in the future.

Our assignment was to evaluate trees based on the current plan of construction. Preserving 03, 156, and 104 will not require changes to that plan. We recommend changing those plans to preserve Tree 01, 21-inch Elm, Tree 145, 32-inch Live Oak at the bridge, and Tree 101, 44-inch Live Oak.

Tree 101 has abundant structural roots and we feel it is unlikely that it will be destabilized or killed by removing roots close to the trunk on the river side to restore the wall and support feature. Unlike Tree 100, a 37-inch Live Oak which has few support roots and would likely become high risk if roots were removed on the river side for wall construction. We do not expect preserving #101 to cause damage to the restored wall in the future. If preserved, 101 will require weight reduction pruning.

Preserving Tree 145, 32-inch Live Oak at the bridge, will require significant changes to the construction plan. The stone block seating proposed for this area could simultaneously be designed as retaining walls to assist in the retention of this Live Oak. Significant alteration to the pedestrian bridge and to the grading plan around the pump house will be required.

1

COSA 0587

We understand these changes to the project will not be easy, but feel these 3 trees are worth the effort and expense. We also feel within the expected life of the restored walls that roots from these trees will not damage restored structures.

There are many small native trees in the area north of the bath house that are good candidates for transplanting to other areas in the park or city. We agree with the stated plan to transplant these trees as long as the removal includes transplanting as many as possible. These trees should not be considered mitigation for other removed trees on this site.

Although not part of our assignment, we feel the following trees will need to be removed and recommend the plan reflect their removal: #43, 149, 187,202-205, 280, 118, 215.

A special precaution. A limited visual assessment of Tree 209, a 19-inch Walnut, indicates that this tree is high risk and may fail at any time. Failure would likely cause damage to the historic building it is near with most of the tree's canopy over the building's roof. We recommend removal of this tree as soon as possible.

Our assignment was to evaluate all trees on this project according to the provided plans and the scope of planned construction. There are other trees besides the 3 already mentioned that could be preserved with some changes to the current plan, especially if the grading plan is adjusted along the acequia and raceway. Having walking access along the entire length of these features may not be as important as a nice shade tree. The public will use a shade tree much more than walking down to the acequia. We think you can provide drainage without grading all areas. Even the education sessions you envision are more likely to set up under a shade tree than spending time in the sun next to a feature. And the benefits of shade, cooling, erosion control, carbon capture, storm water retention seem more beneficial than a uniform grading of the landscape.


David M. Vaughan          Michael Nentwich          Mark Kroeze          Mark Duff
Certified Arborist        Certified Arborist        Certified Arborist   Board Certified Master Arborist

COSA 0588

# Ex. 3(b)



## CITY OF SAN ANTONIO
# OFFICE OF HISTORIC PRESERVATION

**HISTORIC AND DESIGN REVIEW COMMISSION**

CERTIFICATE OF APPROPRIATENESS

April 19, 2023

| | |
|---|---|
| **HDRC CASE NO:** | **2022-091** |
| **COMMON NAME:** | Brackenridge Park, Lambert Beach |
| **ADDRESS:** | 3700 N ST MARYS ST |
| **LEGAL DESCRIPTION:** | NCB A49 PART OF A-2, A-4, A-52 (208 AC) |
| **PUBLIC PROPERTY:** | No |
| **LANDMARK:** | Individual Landmark |
| **APPLICANT:** | Jamaal Moreno/City of San Antonio, PWD - 100 W Houston |
| **OWNER:** | City of San Antonio - 100 W Houston |
| **TYPE OF WORK:** | Park improvements |

**REQUEST:**

The applicant is requesting a Certificate of Appropriateness for approval to construct improvements to the Lambert Beach area in Brackenridge Park as Phase I of the FY17 Bond Project. Request items include:

1) Stabilization and restoration of the historic stone walls that have not yet failed?

2) Reconstruction of walls that have already failed to match existing?

3) Stabilization and reconstruction of the Grand Staircase to improve safety and accessibility?

4) Underpinning of the 1877 Pump House for foundation stabilization in preparation for Phase II improvements

5) Selective removal of trees located within the project area. In accordance with the UDC, HDRC approval is required for removal of mature trees located on the banks of the San Antonio River.

**FINDINGS:**

BACKGROUND – The proposed scopes for the Lambert Beach area are consistent with the publicly approved Brackenridge Park Master Plan strategy to restore, preserve, and articulate park cultural and historic features and were prioritized in the FY 17 Bond as approved by voters. In February 2022, the HDRC reviewed an item that considered removal of protected trees from the top of the river bank. The item was tabled in order to further develop design plans for the area and consider alternatives to tree removal. In this time, the City has conducted additional public outreach and design development and has begun coordination with the Texas Historic Commission regarding required approvals.

DESIGNATIONS – Brackenridge Park is a designated State Antiquities Landmark, National Register District, and locally designated landmark located within the River Improvement Overlay District (RIO-1). The 1877 Pump House and structures associated with the Lambert Beach recreational area are considered contributing and part of an important cultural landscape for the City of San Antonio.

ARCHAEOLOGY - Furthermore, the property is adjacent to the historical alignment of the San Antonio River, an area known to contain significant historic and prehistoric archaeological deposits. Therefore, an archaeological investigation is required. An Antiquities Permit is required prior to beginning construction. The project shall comply with all federal, state, and local laws, rules, and regulations regarding archaeology, as applicable.

PERIODS OF CONSTRUCTION - Lambert Beach was initially developed as a recreational area in 1915. A 1925 renovation resulted in many of the permanent features evident today including stone retaining walls, concrete walkway at the water level, and "grand

COSA 0874

staircase" with steps extending into the water. In 1940, additional work to the area, including raising of the stone walls, was completed through a WPA project to prevent further erosion of the river bank.??

PUBLIC PARTICIPATION - The City provided a robust community engagement process that included a walking tour detailing the proposed project scope, information on the cultural resources and proposed impact to trees; hosting a series of seven (7) public input meetings from March 2022 – August 2022; and meetings with the Brackenridge Park Stakeholder Advisory Committee comprised of local stakeholders.

TEXAS HISTORICAL COMMISSION – The Executive Committee of the Texas Historical Commission approved an Antiquities Permit for the project on April 10, 2023, as submitted.

DESIGN REVIEW COMMITTEE - A site visit of the Design Review Committee was held on April 12, 2023. The committee reviewed the current conditions of the site and gained a better understanding of the project scope and which trees would remain.

EXISTING WALLS - The existing walls are a combination of monolithic block and rubble stone construction. These walls have failed in several areas, making the area inaccessible to the public. Additional wall failure will occur without intervention.

WALL DESIGN - In order to stabilize the stone walls, a reinforced concrete shadow wall with footing will be introduced along the length of the Lambert Beach walls. The design requires an excavation width of a minimum of 48" from the back of the plumb line of the stone walls. This design will preserve the historic stone walls in place while providing structural support and adequate drainage to prevent future displacement. This treatment method prioritizes retention of original materials in place, consistent with the Secretary of the Interior's Standards and the UDC.

GRAND STAIR – The Grand Stair is in structural decline due to hydrological forces and lack of sufficient foundation. The design proposal will largely reconstruct this feature and include modifications to improve safety and accessibility. The existing stone steps were previously rebuilt with existing stone as part of a 2002 project. Based on feedback from the Texas Historical Commission, two original extant features, the historic bench and portions of the original historic steps will be preserved and repaired in place. The design of the reconstructed stair has also been redesigned to more closely match original conditions. This is consistent with the Secretary of the Interior's Standards and the UDC.

PUMP HOUSE – Restoration of the 1877 Pump House and raceway restoration are planned as part of the Phase II project improvements for the site. The proposed underpinning is necessary for the long term stabilization of the structure and will accompany the proposed work for the adjacent cheek walls which are of similar age.

EXISTING TREES - Based on a tree age study conducted in January 2023, the oldest oak trees located on the north bank date to approximately 1945.

TREES IN THE RIO – Generally, compliance with the City's tree preservation requirements is reviewed by the City Arborist and does not require additional review by the HDRC in most instances. Heritage trees and significant trees located at the top of the bank or along the River Walk are not allowed to be removed without HDRC approval per UDC 35-680. On a case-by-case basis, tree removal may be approved by the HDRC with a recommendation from the City Arborist (Development Services) and Forester (Parks Department) in instances of disease, age or physical condition, or if they must be removed for the safety reasons. Current conditions of the site present a safety concern and public access is currently restricted.

TREE REMOVAL – Due to the width of excavation required by the approved wall design, tree removal or relocation is needed. The City has worked with a tree relocation consultant to review relocation viability for all trees impacted by the project. In most cases, tree removal cannot be avoided due to a variety of factors.

TREE PRESERVATION - There is a total of 83 trees in the project area. The initial design removed 70 trees. The updated design reduces the number of trees to be removed down to 48 including:

4 invasive species trees

4 trees that are dead/dying

10 trees less than 6" in diameter

24 trees between 6" and 24" in diameter

6 heritage trees

COSA 0875

In response to public input, the project has been updated to preserve 35 additional trees:

The largest heritage oak in the area will be relocated and preserved (Tree 101, 44" Oak)

20 additional trees to be relocated and preserved

14 trees total will be preserved in place

TREES OF GREATEST CONCERN - The City has heard the public concerns, specifically regarding removal of the following:

| | | | |
|---|---|---|---|
| 95 | 32" Oak | 0" | 76 yrs |
| 97 | 22" Oak | 3" | unknown |
| 98 | 18" Oak | 18" | unknown |
| 99 | 16" Oak | < 5' | unknown |
| 100 | 37" Oak | 15" | 78 yrs. |

ALTERNATIVES & DUE DILIGENCE - The City has reviewed proposals for alternative wall designs intended to limit the width of required excavation behind the stone walls in an attempt to lessen the required tree removal, including:

Introduction of a pier and spandrel system that will require a minimum 16-18" of excavation width. Both drilled, reinforced concrete piers and helical piers have been proposed.

Full demolition of failing walls, construction of a reinforced concrete spandrel wall, and re-creation of the stone wall as a veneer.

Following review, the City and its consultants have noted the following factors which continue to restrict tree retention:

Many of the walls are currently out of plumb. For example, trees 95 and 97 are either touching or growing over the out-of-plumb wall and would need to be relocated or removed in order to accommodate wall correction regardless of excavation depth.

Remaining trees are located between 15" and 28" from the existing wall location and impacts to the roots cannot be avoided with the spandrel design.

The minimum excavation required by a spandrel system do not take into account OSHA standards.

The minimum excavation required by a spandrel system can only be achieved by anchoring th e stone walls through the front or reconstructing the stone as a veneer, contrary to the Secretary of the Interior's Standards.

The design of the piers themselves do not make a difference in terms of retaining trees.

The City's tree location consultant and multiple independent arborists have determined that impacts to trees 95, 97, 98, 99 & 100 cannot be avoided due to the positioning of these trees.

PROJECT LONGEVITY - Other concerns include the longevity of the project should trees remain in place. Due to proximity to the water, all trees in the area are fast growing and will continue to negatively impact the walls in the future. After carefully considering alternatives, likely outcomes, expense, and likelihood of future interventions needed, the City maintains that the proposed design will deliver a project that balances tree preservation with delivery of a lasting project that ensures future public access and recreational use and preserves historic features of the park consistent with the Secretary of the Interior Standards.

**RECOMMENDATION:**
Staff recommends approval of items 1-5 based on the findings. An archaeological investigation is required. The project shall comply with all federal, state, and local laws, rules, and regulations regarding archaeology, as applicable.

**COMMISSION ACTION:**
Approved with stipulations:

1) That no work will occur until the Section 106 process is complete;
2) That any additional tree removals will come back to the HDRC consistent with the UDC; and
3) That the City will monitor and maintain the heritage and significant trees during and after construction.

An archaeological investigation is required. The project shall comply with all federal, state, and local laws, rules, and regulations regarding archaeology, as applicable.

COSA 0876

_Shanon Shea Miller_

**Shanon Shea Miller**
**Historic Preservation Officer**

A Certificate of Appropriateness (COA) serves as a record of design approval and is valid for 180 days. Work that is not completed in accordance with this certificate may be subject to correction orders and other penalties.

A COA does not take the place of any required building permits nor does it authorize the use of a property beyond what is allowed by the Unified Development Code. Prior to beginning your construction project, please contact the Development Services Department at (210) 207-1111 to ensure that, all requirements have been met.

This Certificate must remain posted on the job site for the duration of your project. Modifications to an approved design or an expired approval will require a re-issue of your Certificate of Appropriateness by OHP staff. Please contact OHP Staff at (210) 207-0035 with

COSA 0877

# Ex. 3(c)

 

Home (https://www.sa.gov/Home)  /  Directory (https://www.sa.gov/Directory)  /  News
(https://www.sa.gov/Directory/News)  /  News Releases
(https://www.sa.gov/Directory/News/News-Releases)  /  **Bird mitigation commences at
Brackenridge Park**

# Bird mitigation commences at Brackenridge Park

Published on February 03, 2023



**Efforts aimed to improve wildlife biodiversity, water quality, and park amenity access**

**SAN ANTONIO (February 3, 2023)** – In an effort to reduce impacts caused by the large
colonies of migratory birds at parks, the City of San Antonio has contracted with the U.S.
Department of Agriculture and coordinated with the Texas Parks and Wildlife Department
and U.S. Fish and Wildlife Service to facilitate necessary habitat modification and
deterrent techniques at Brackenridge Park. By minimizing the impacts of large rookeries,

COSA 1315

these efforts are expected to improve wildlife biodiversity, water quality, and park amenity access.

Visitors to the park may observe habitat modification and deterrent activities beginning February 3 through the end of March 2023.
Habitat modification entails removing old nests, clearing underbrush, and dead wood removal to open the tree canopy which will discourage birds from roosting in these areas.

- Deterrent techniques are used to disperse birds and may include pyrotechnics, clappers, spotlights, lasers, distress calls, effigies, balloons and drones.
- These techniques are legal and in accordance with U.S. Fish & Wildlife guidelines, as well as Texas Parks and Wildlife Code.

**What are the impacts of birds to parks?**
The egret populations and rookery locations have increased and expanded to different areas of the city impacting public amenities at parks and impacting water quality due to bird feces. Amenities where rookeries exist become unusable for 10 months of the year due to increased bird density. Bird feces cause damage to park amenities including picnic tables, playground equipment, and sidewalks become inaccessible to the public.

**What are the impacts of bird feces to water quality and public health?**
High concentrations of bird fecal bacteria affect water quality and bird rookeries are significant contributors to that pollution. Bird feces may also carry diseases that cause respiratory problems in humans.

- The San Antonio River Authority (https://www.sariverauthority.org/be-river-proud/river-health) has measured elevated levels of E.coli detected in the San Antonio River at Brackenridge Park due to the high population of birds.
- Egrets have been linked to psittacosis-ornithosis agents in Texas populations which is a concern for human health, along with Histoplasma capsulatum fungus (https://www.cdc.gov/fungal/diseases/histoplasmosis/index.html) which can occur in fecal waste, especially around rivers and water systems.

COSA 1316

- Breathing problems can occur from these avian diseases in addition to the uric acid produced by bird feces.
- Fecal remains from the birds have the potential to increase the nitrogen in the water, which could kill off aquatic life.

For more information about wildlife management efforts at City parks, please visit the Wildlife Resources (https://www.sanantonio.gov/ParksAndRec/News-Events/Wildlife-Resources) page.

# Media Contact

Connie Swann
210-207-6122 (tel:2102076122)
Email Media Contact (https://us.openforms.com/Form/d015d9f1-dd7d-460c-931b-18206cce1515?type=Department%20media%20request&department=Parks%20%26%20Recreation&Parks%20%26%20Recreation%20Contact=Connie%20Swann)

**Related Information**

Parks & Recreation Youtube Channel (https://www.youtube.com/user/COSAParksandRec)
Parks & Recreation Website (https://www.sanantonio.gov/ParksAndRec/Home)

**Category:**  Animals, Pets & Wildlife

**Department:**  Parks & Recreation | Public Works

COSA 1317

# Ex. 3(d)



# Bird Mitigation FAQ

**Bird Mitigation - Frequently Asked Questions**
*Balancing the needs of people and wildlife in our urban areas*

*San Antonio is home to migratory bird rookeries. Rookeries are large colonies of breeding birds. Multiple species nest in San Antonio including cattle egrets, double-crested cormorants, snowy egrets, great egrets, and Yellow-crowned night-herons, among other species. Many thousands of birds arrive annually beginning in February until November.*

*For several years, San Antonio Parks and Recreation has maintained ongoing efforts to help minimize impacts caused by the large colonies of migratory birds at parks in the city. The City of San Antonio has contracted with the U.S. Department of Agriculture and coordinated with the Texas Parks and Wildlife Department and U.S. Fish and Wildlife Service to facilitate necessary habitat modification and deterrent techniques. These techniques come from years of experience, research, extensive field work and follows regulations placed on wildlife from local, state, and federal agencies.*

## What are the impacts of birds to parks?

The egret populations and rookery locations have increased and expanded to different areas of the city adversely impacting flight safety, public amenities at parks, and water quality due to bird feces. Amenities where rookeries exist become unusable for 10 months of the year due to the bird density. The bird's feces cause damage to park amenities including picnic tables and playground equipment, sidewalks become inaccessible to the public and more.

## What are the impacts of bird feces to water quality and public health?

High concentrations of bird fecal bacteria decrease water quality and the bird rookeries are significant contributors to this pollution. Bird feces may also carry diseases that cause respiratory problems in humans.

- The San Antonio River Authority has measured elevated levels of E.coli in the San Antonio River at Brackenridge Park due in part to the dense population of birds.

- Egrets have been linked to psittacosis-ornithosis agents in Texas populations which is a concern for human health, along with Histoplasma capsulatum fungus which can occur in fecal waste, especially around rivers and water systems.

- Breathing problems can occur from these avian diseases in addition to the uric acid produced by bird feces.

- Fecal contamination from birds has the potential to increase the nitrogen in the water, which could kill off aquatic life.

COSA 1318

## What techniques are used to relocate birds?

The best way to prevent the establishment of a rookery is through early detection. If detected early when the birds first arrive, they can be encouraged to relocate through habitat modification and various dispersal methods.

- Habitat modification entails removing old nests, clearing the underbrush, and dead wood removal to open up the tree canopy which will discourage birds from roosting in this area.

- Deterrent techniques are used to disperse birds and may include pyrotechnics, clappers, spotlights, lasers, distress calls, effigies, balloons and drones.

- These techniques are legal and in accordance with U.S. Fish & Wildlife guidelines, as well as Texas Parks and Wildlife Code.

## Where will the birds relocate?

Based on prior egret rookery and roost relocation projects, it is anticipated that many of these birds will move as a group. Initially, the birds will search out a location that affords them adequate and suitable roosting habitat. If the chosen location is agreeable from a flight safety and public health standpoint, there won't be an effort to move the birds.

## How will these efforts affect park and waterways, including other types of wildlife?

Bird dispersal is expected to improve wildlife biodiversity, natural habitat, water quality, and park amenity access by minimizing the impacts of large rookeries

## How are these efforts aligned with the Bird City, Texas program?

The program recognizes the need for wildlife management in cases that create understood conflicts with the public that relate to health, safety, property damage, etc. Humane and non-lethal dispersal methods are recommended.

## What agencies are involved with bird mitigation efforts

Lead agencies relied on data and information from top experts including wildlife biologists and water quality experts to inform mitigation efforts. The agencies include:

- U.S. Department of Agriculture Animal and Plant Health Inspection Service (USDA APHIS)

- Texas Parks and Wildlife Department (TPWD)

- United States Fish and Wildlife Service

- San Antonio River Authority

**Bird Mitigation FAQ**

COSA 1319

# Ex. 4

RKN
05/17/17
Item No. 1.B.

AN ORDINANCE   2017-05-17-0329

## CANVASSING THE RESULTS OF THE GENERAL OBLIGATION BOND ELECTION HELD ON SATURDAY, MAY 6, 2017.

\*       \*       \*       \*       \*

**WHEREAS**, on Thursday, February 9, 2017, the City Council of the City of San Antonio, Texas, ordered an election to be held on Saturday, May 6, 2017 ("Election"), to determine whether the qualified voters of the City would authorize the issuance of general obligation bonds by the City for the propositions summarized below, which are comprehensively described in Ordinance No. 2017-02-09-0067 incorporated herein for all purposes; and

**WHEREAS**, the bond propositions were submitted to the voters, the Election was held and conducted, all as required by the Texas Election Code, the City Charter, and the laws of the State of Texas; and

**WHEREAS,** all matters pertaining to the Election, including the ordering, notices, election officers, holding, and returns of the results of the Election have been reviewed and investigated, and it is now necessary to declare the official results of the canvass; **NOW THEREFORE:**

**BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF SAN ANTONIO:**

**SECTION 1.**  The City Council, having convened on this 17th day of May, 2017, to canvass the returns of the General Obligation Bond Election held on May 6, 2017, and after canvassing the returns of this Election, officially finds and determines that this Election was duly ordered; proper notice of this Election was given; proper Election officers were duly appointed prior to this Election; the Election was duly held; the City has complied with the Texas Election Code, the City Charter, and the laws of the State of Texas; and due returns of the result of this Election have been made and delivered, all in accordance with the law and the Ordinances calling the Election.

**SECTION 2.**  The City Council does officially find and declare the results of the Special Bond Election to be as follows:

### STREETS, BRIDGES, AND SIDEWALKS IMPROVEMENTS PROPOSITION
### PROPOSITION NO. 1

"Shall the City Council of the City of San Antonio, Texas, be authorized to issue bonds of the City in one or more series in the aggregate principal amount not to exceed $445,263,000 for the purpose of making permanent public improvements or other public purposes, to wit:  providing streets, bridges, and sidewalks improvements (as well as necessary improvements incidental thereto), relocating utilities, street lighting, technology

improvements, and signage, acquiring lands and rights-of-way necessary for streets, bridges, and sidewalks, landscaping, and acquiring and installing public art related to and being a part of some or all of the foregoing?"

| | | |
|---|---|---|
| **FOR** | 76,798 | 78% |
| **AGAINST** | 21,604 | 22% |

## DRAINAGE AND FLOOD CONTROL IMPROVEMENTS PROPOSITION
## PROPOSITION NO. 2

"Shall the City Council of the City of San Antonio, Texas, be authorized to issue bonds of the City in one or more series in the aggregate principal amount not to exceed $138,988,000 for the purpose of making permanent public improvements for public purposes, to wit: providing drainage and flood water improvements and facilities for the removal of, and protection from, harmful excesses of water, whether constant or periodic, any other drainage or storm water improvements, acquiring lands and rights-of-way necessary thereto, landscaping, and acquiring and installing public art related to and being a part of some or all of the foregoing?"

| | | |
|---|---|---|
| **FOR** | 76,896 | 79% |
| **AGAINST** | 20,065 | 21% |

## PARKS, RECREATION, AND OPEN SPACE IMPROVEMENTS PROPOSITION
## PROPOSITION NO. 3

"Shall the City Council of the City of San Antonio, Texas, be authorized to issue bonds of the City in one or more series in the aggregate principal amount not to exceed $187,313,000 for the purpose of making permanent public improvements for public purposes, to wit: acquiring, constructing, equipping, and renovating park, recreation, and open space improvements, making park, recreation, and open space additions, acquiring lands and rights-of-way necessary thereto, and acquiring and installing public art related to and being a part of some or all of the foregoing?"

RKN
05/17/17
Item No. 1.B.

**FOR**                   68,728         70%

**AGAINST**             29,147         30%

## LIBRARY AND CULTURAL FACILITIES IMPROVEMENTS PROPOSITION
## PROPOSITION NO. 4

"Shall the City Council of the City of San Antonio, Texas, be authorized to issue bonds of the City in one or more series in the aggregate principal amount not to exceed $24,025,000 for the purpose of making permanent public improvements for public purposes, to wit: acquiring, constructing, improving, renovating, and/or equipping library and cultural facilities, and/or other facilities to be utilized as libraries or cultural facilities to benefit or promote cultural and social enrichment and/or libraries, acquiring lands and rights-of-way necessary thereto, landscaping, and acquiring and installing public art related to and being a part of some or all of the foregoing?"

**FOR**                   70,636         73%

**AGAINST**             26,626         27%

## PUBLIC SAFETY FACILITIES IMPROVEMENTS
## PROPOSITION NO. 5

"Shall the City Council of the City of San Antonio, Texas, be authorized to issue bonds of the City in one or more series in the aggregate principal amount not to exceed $34,411,000 for the purpose of making permanent public improvements for public purposes, to wit: acquiring, constructing, improving, renovating, and equipping public safety facilities (to include fire, police, emergency medical service (EMS), animal control facilities, and other facilities to protect the safety, health and welfare of the residents of the City), acquiring lands and rights-of-way necessary thereto, landscaping, and acquiring and installing public art related to and being a part of some or all of the foregoing?"

RKN
05/17/17
Item No. 1.B.

| | | |
|---|---|---|
| **FOR** | 68,163 | 70% |
| **AGAINST** | 29,161 | 30% |

## NEIGHBORHOOD IMPROVEMENTS
### (2017 URBAN RENEWAL PLAN IMPLEMENTATION)
## PROPOSITION NO. 6

"Shall the City Council of the City of San Antonio, Texas, be authorized to issue bonds of the City in one or more series in the aggregate principal amount not to exceed $20,000,000 for the public purpose of funding the costs of and implementing the City's 2017 Urban Renewal Plan (to include aiding in the planning and carrying out of the City's urban renewal projects undertaken thereunder), formulated and adopted under Chapter 374, Texas Local Government Code, as amended, and adopted by the City Council of the City on February 2, 2017, for the purpose of eliminating slum or blight conditions or to prevent the spread of those conditions through permitted activities, to include acquisition, improvement for redevelopment, and disposition of property acquired in affected areas (being those areas identified in the City's 2017 Urban Renewal Plan); such bonds to mature serially or otherwise (not more than 40 years from their date) in accordance with law; and any issue or series of said bonds to bear interest at such rate or rates (fixed, floating, variable, or otherwise) as may be determined within the discretion of said City Council; provided, however, that such rate of interest shall not exceed the maximum rate per annum authorized by law at the time of the issuance of any issue or series of said bonds; and shall the City Council be authorized to levy and pledge, and cause to be assessed and collected, annual ad valorem taxes on all taxable property in said City sufficient to pay the annual interest and provide a sinking fund to pay the bonds at maturity and to pay the costs of any credit agreements executed in connection with the bonds?"

| | | |
|---|---|---|
| **FOR** | 65,736 | 68% |
| **AGAINST** | 31,398 | 32% |

**SECTION 3.** A <u>MAJORITY</u> of the resident, qualified voters of the City of San Antonio, Texas, voting in such Election, having voted <u>FOR</u> the authorization and issuance of $445,263,000 of general obligation bonds and the levy and pledge of the tax in payment thereof as provided in

Proposition No. 1, the City Council finds and determines that Proposition No. 1 carried at the Election, and that the City Council is accordingly authorized to issue the general obligation bonds and to levy the tax in accordance with the authority granted in Proposition No. 1 and with law.

**SECTION 4.** A <u>MAJORITY</u> of the resident, qualified voters of the City of San Antonio, Texas, voting in such Election, having voted <u>FOR</u> the authorization and issuance of $138,988,000 of general obligation bonds and the levy and pledge of the tax in payment thereof as provided in Proposition No. 2, the City Council finds and determines that Proposition No. 2 carried at the Election, and that the City Council is accordingly authorized to issue the general obligation bonds and to levy the tax in accordance with the authority granted in Proposition No. 2 and with law.

**SECTION 5.** A <u>MAJORITY</u> of the resident, qualified voters of the City of San Antonio, Texas, voting in such Election, having voted <u>FOR</u> the authorization and issuance of $187,313,000 of general obligation bonds and the levy and pledge of the tax in payment thereof as provided in Proposition No. 3, the City Council finds and determines that Proposition No. 3 carried at the Election, and that the City Council is accordingly authorized to issue the general obligation bonds and to levy the tax in accordance with the authority granted in Proposition No. 3 and with law.

**SECTION 6.** A <u>MAJORITY</u> of the resident, qualified voters of the City of San Antonio, Texas, voting in such Election, having voted <u>FOR</u> the authorization and issuance of $24,025,000 of general obligation bonds and the levy and pledge of the tax in payment thereof as provided in Proposition No. 4, the City Council finds and determines that Proposition No. 4 carried at the Election, and that the City Council is hereby accordingly authorized to issue the general obligation bonds and to levy the tax in accordance with the authority granted in Proposition No. 4 and with law.

**SECTION 7.** A <u>MAJORITY</u> of the resident, qualified voters of the City of San Antonio, Texas, voting in such Election, having voted <u>FOR</u> the authorization and issuance of $34,411,000 of general obligation bonds and the levy and pledge of the tax in payment thereof as provided in Proposition No. 5, the City Council finds and determines that Proposition No. 5 carried at the Election, and that the City Council is accordingly authorized to issue the general obligation bonds and to levy the tax in accordance with the authority granted in Proposition No. 5 and with law.

**SECTION 8.** A <u>MAJORITY</u> of the resident, qualified voters of the City of San Antonio, Texas, voting in such Election, having voted <u>FOR</u> the authorization and issuance of $20,000,000 of general obligation bonds and the levy and pledge of the tax in payment thereof as provided in Proposition No. 6, the City Council finds and determines that Proposition No. 6 carried at the Election, and that the City Council is accordingly authorized to issue the general obligation bonds and to levy the tax in accordance with the authority granted in Proposition No. 6 and with law.

**SECTION 9.** The recitals contained in the preamble hereof are hereby found to be true, and such recitals are hereby made a part of this Ordinance for all purposes and are adopted as a part of the judgment and findings of the City Council. All Ordinances and Resolutions, or parts thereof, which are in conflict or inconsistent with any provision of this Ordinance are hereby repealed to

RKN
05/17/17
Item No. 1.B.

the extent of such conflict, and the provisions of this Ordinance shall be and remain controlling as to the matters resolved herein.  This Ordinance shall be construed and enforced in accordance with the laws of the state of Texas and the United States of America.  If any provision of this Ordinance or the application thereof to any person or circumstance shall be held to be invalid, the remainder of this Ordinance and the application of such provision to other persons and circumstances shall nevertheless be valid, and the City Council hereby declares that this Ordinance would have been enacted without such invalid provision.

**SECTION 10.** It is officially found, determined, and declared that the meeting at which this Ordinance is adopted was open to the public and public notice of the time, place, and subject matter of the public business to be considered at such meeting, including this Ordinance, was given, all as required by Chapter 551, as amended, Texas Government Code.

**SECTION 11.** This Ordinance is effective immediately upon the receipt of eight affirmative votes; otherwise, it is effective ten days after passage.

**PASSED AND APPROVED** this ___17th___ day of ___May___, 2017.

**M A Y O R**
Ivy R. Taylor

ATTEST:

Leticia M. Vacek, City Clerk

APPROVED AS TO FORM:

Andrew Segovia, City Attorney

| Agenda Item: | 1B | | | | | | |
|---|---|---|---|---|---|---|---|
| Date: | 05/17/2017 | | | | | | |
| Time: | 01:50:45 PM | | | | | | |
| Vote Type: | Motion to Approve | | | | | | |
| Description: | An Ordinance canvassing the returns and declaring the results of a Bond Election and other matters in connection therewith. | | | | | | |
| Result: | Passed | | | | | | |

| Voter | Group | Not Present | Yea | Nay | Abstain | Motion | Second |
|---|---|---|---|---|---|---|---|
| Ivy R. Taylor | Mayor | | x | | | | |
| Roberto C. Treviño | District 1 | | x | | | | |
| Alan Warrick | District 2 | | x | | | | |
| Rebecca Viagran | District 3 | | x | | | x | |
| Rey Saldaña | District 4 | | x | | | | |
| Shirley Gonzales | District 5 | | x | | | | |
| Ray Lopez | District 6 | | x | | | | x |
| Cris Medina | District 7 | x | | | | | |
| Ron Nirenberg | District 8 | | x | | | | |
| Joe Krier | District 9 | | x | | | | |
| Michael Gallagher | District 10 | | x | | | | |

5/18/2017



**Canvassing Report**



- **Under Votes:** Represents electronic and paper voted ballots which were not marked.

- **Over Votes:** Represents more than one mark on a paper ballot.

1

1

## Canvassing Report

### MEMBER OF COUNCIL, Place 11 (MAYOR)

| | |
|---|---|
| Napoleon Madrid | 225 votes |
| Keven Roles | 1,557 votes |
| Felicio Hernandez Flores II | 429 votes |
| Michael "Commander" Idrogo | 366 votes |
| Ron Nirenberg | 36,887 votes |
| Provisional | 3 votes |
| Will McLeod | 545 votes |
| John Martin Velasquez | 383 votes |
| Manuel Medina | 15,049 votes |
| Mama Bexar (Julie Iris Oldham) | 270 votes |
| Stephen Lucke | 315 votes |

2

## Canvassing Report

### MEMBER OF COUNCIL, Place 11 (MAYOR)

| | |
|---|---|
| Rhett Smith | 321 votes |
| Ivy R. Taylor | 41,788 votes |
| Provisional | 6 votes |
| Gerard Xavier Ponce | 366 votes |
| Antonio "Tony" Diaz | 966 votes |
| **Place 11 (Mayor) Totals** | **99,476 votes** |

3



Canvassing Report

MEMBER OF COUNCIL, PLACE NO. 3:

| | |
|---|---|
| Jessica O. Guerrero | 1,062 votes |
| Jerome C. Durham | 213 votes |
| Rebecca J. Viagran | 4,509 votes |
| Nathan Carrizales | 802 votes |
| Provisional | 1 vote |
| Sylvia E. Don | 154 votes |
| Ismael Reyes | 369 votes |
| Ralph E. Gerber | 150 votes |
| **Place 3 Totals** | **7,260 votes** |

6



Canvassing Report

MEMBER OF COUNCIL, PLACE NO. 4:

| | |
|---|---|
| Johnny Arredondo | 638 votes |
| Rey Saldaña | 3,455 votes |
| Rey Guevara | 316 votes |
| **Place 4 Totals** | **4,409 votes** |

7

5/18/2017

## Canvassing Report

### MEMBER OF COUNCIL, PLACE NO. 5:

| | |
|---|---|
| Cynthia T. Cavazos | 234 votes |
| David C. Yañez | 309 votes |
| Dolores Sotomayor | 220 votes |
| Shirley Gonzales | 3,396 votes |
| Richard Montez | 834 votes |
| Daniel Lopez | 170 votes |
| **Place 5 Totals** | **5,163 votes** |

8

## Canvassing Report

### MEMBER OF COUNCIL, PLACE NO. 6:

| | |
|---|---|
| Greg Brockhouse | 3,064 votes |
| Melissa Cabello Havrda | 1,747 votes |
| Eric Gosset | 127 votes |
| Joseph Cortez | 1,514 votes |
| Ricardo "Rick" Treviño | 1,719 votes |
| Robert Castaneda | 138 votes |
| Ropal Anderson | 23 votes |
| Don Page | 159 votes |
| **Place 6 Totals** | **8,491 votes** |

9

5

5/18/2017



**Canvassing Report**

MEMBER OF COUNCIL, PLACE NO. 7:

| | |
|---|---|
| Cris Medina | 4,257 votes |
| Provisional | 2 votes |
| Marco Reyes | 153 votes |
| Alfredo Esparza Colunga | 84 votes |
| Ana Sandoval | 5,957 votes |
| Provisional | 1 vote |
| Michele Dalbis-Robledo | 1,278 votes |
| **Place 7 Totals** | **11,732 votes** |

10



**Canvassing Report**

MEMBER OF COUNCIL, PLACE NO. 8:

| | |
|---|---|
| Manny Pelaez | 3,034 votes |
| Shane A. Hinze | 204 votes |
| Paul Martin | 661 votes |
| Cynthia Brehm | 3,716 votes |
| Provisional | 1 vote |
| Pat Stout | 2,326 votes |
| Tony Valdivia | 1,190 votes |
| **Place 8 Totals** | **11,132 votes** |

11

## Canvassing Report

### MEMBER OF COUNCIL, PLACE NO. 9:

| | |
|---|---|
| Lynlie Wallace | 1,085 votes |
| Adam Goodman | 244 votes |
| Sandra Martinez-Deyarmond | 641 votes |
| Provisional | 1 vote |
| Patty Gibbons | 1,087 votes |
| Matt Pina | 274 votes |
| Marco Barros | 3,616 votes |
| Provisional | 1 vote |
| Bert T. Cecconi | 487 votes |
| Patrick Von Dohlen | 2,814 votes |
| Provisional | 1 vote |
| John Courage | 3,281 votes |
| David "Doc" Cohen | 1,121 votes |
| **Place 9 Totals** | **14,653 votes** |

12

## Canvassing Report

### MEMBER OF COUNCIL, PLACE NO. 10:

| | |
|---|---|
| Diana Kenny | 1,419 votes |
| Clayton Perry | 2,715 votes |
| John Alvarez | 1,209 votes |
| Celeste Montez-Tidwell | 384 votes |
| Reinette King | 1,486 votes |
| Andrew J. Padilla | 335 votes |
| Lon Jett, IV | 127 votes |
| Eric Robert Morse | 194 votes |
| Jonathan Delmer | 1,997 votes |
| Ezra A. Johnson | 2,733 votes |
| **Place 10 Totals** | **12,599 votes** |

13

5/18/2017







5/18/2017





5/18/2017

## Canvassing Report

It is hereby declared that as a result of said election, the following persons are elected for a two-year term of office commencing June 1, 2017:

Rebecca J. Viagran, Member of Council, Place No. 3

Rey Saldaña, Member of Council, Place No. 4

Shirley Gonzales, Member of Council, Place No. 5

Ana Sandoval, Member of Council, Place No. 7

20

## Canvassing Report

- Vote Tabulation
  - Total votes cast includes provisional and overseas ballots
    - 99,476
  - Registered voters for the City of San Antonio as of April 15, 2017
    - 751,679
  - Voter Turnout for the City of San Antonio General and Bond Election
    - 13.2%

21

## Run-Off Election Information

SAN ANTONIO

- The Run-Off Election is scheduled for Saturday, June 10, 2017 from 7am-7pm for the positions of Mayor and Council Districts 1, 2, 6, 8, 9, & 10.

- Anyone who registered to vote by May 11, 2017 is eligible to vote in the Run-Off Election.

- 26 Early Voting & 223 Election Day Polling Sites will be utilized in the Run-Off Election.

- The Run-Off Election will cost $858,198.42 and funding is allocated under the FY 2017 Municipal Elections Budget.

22

## Early Voting Sites for the Run-Off Election

SAN ANTONIO

- Tuesday, May 30 thru Tuesday, June 6, 2017
  26 Early Voting Sites (subject to change):

| | |
|---|---|
| Bexar County Elections Department | Las Palmas Library |
| Bexar County Justice Center | Lion's Field |
| Brookhollow Library | Maury Maverick, Jr. Library |
| Claude Black Center | McCreless Library |
| Cody Library | Memorial Library |
| Collins Garden Library | Mission Library |
| Copernicus Community Center | Parman Library @ Stone Oak |
| Encino Library | Schaefer Library |
| Great Northwest Library | South Park Mall |
| Henry A. Guerra, Jr. Library | Tobin Library @ Oakwell |
| John Igo Library | UTSA – University Center |
| Johnston Library | Windcrest Takas Park Civic Center |
| Julia Yates Semmes Library | Wonderland Mall of the Americas @ Crossroads |

23

## Next Steps



- **Wednesday, May 31, 2017**
  - 5:30 pm – Certificates of Election, Oaths of Office & Statements of Elected Officer presented to Council elected in the Main Election – Council Chambers
- **Wednesday, June 21, 2017**
  - 11:30 am – Canvass Run-Off Election; Certificates of Election, Oaths of Office & Statements of Elected Officer presented to Council elected in run-off. 2017-2019 Council take office. Drawing for Mayor Pro-Tem terms and official photo.
  - 3:00 pm – Blessing hosted by San Fernando Cathedral for the 2017-2019 Mayor and Council
  - 5:00 pm – Inauguration Ceremony of 2017-2019 Mayor and Council in the Council Chambers

24

## Recommendation



- Recommendation
  - Adoption of Ordinances for Items 1A and 1B accepting the Canvassing Reports and declaring the Official Election Results of the Saturday, May 6, 2017 City of San Antonio General and Bond Elections.

25

# Attachment B

1  that are adapted to these conditions and they're I would think

2  in their mind, it's not extreme.  They go through this every

3  year or so, high temperatures for months on end.  Extreme

4  whether in terms of the assessment I made is referring to high

5  winds or excessive, you know, flooding, things that could

6  dislodge or destablize the Anchorage system.

7        MR. JONES:  Some have you ever heard or reset the me

8  calf and Eddie report of 1920 on the flood of 1921.

9        THE WITNESS:  I don't believe so, no, sir.

10 Q.  Okay.  Can that -- are you aware that sometimes experts

11 make reports saying that a certain condition is like will I to

12 occur in the next 12 months like you have or in the next year?

13 A.  Sure.

14 Q.  Hundred year flood, 500-year flood?

15 A.  Of course.

16 Q.  Things of that nature, are there times when you as an

17 expert are wrong in your assessment as to whether these extreme

18 weather conditions can contribute to a tree falling?

19 A.  To be human, tozer to be human, yes, sir, we all make

20 mistakes.

21        THE COURT:  Yeah, well, --

22 BY MR. JONES:

23 Q.  And so your evaluation was done based solely on the tree

24 condition not based upon whether it -- whether any one of the

25 trees could survive the construction planned under the 2017

WitHeader       - Cross

1  bond issue?

2  A.  That is correct.  That's a separate assessment all

3  together.

4  Q.  And when you talk about targets, I believe we talked about

5  this earlier.  Or we talked about consequences.  What in your

6  lexicon or your terminology, what is a target?

7  A.  People or property that could be struck by a failing tree

8  or tree part.

9  Q.  Okay.  And so a target could be a human being or a child or

10  a dog?

11  A.  People or property, yes, sir.

12  Q.  And then the consequences means what kind of injuries you

13  can expect when a tree falls on a target?

14  A.  Personal injury or property damage, yes, sir.

15  Q.  Are you sometimes called upon to consult with people just

16  like the zoo that are getting sued for having dangerous tree

17  up?

18  A.  I've been an expert witness in accidental death case, yes,

19  sir.

20  Q.  On both sides of the docket, representing people who have

21  been injured and people who are getting sued?

22  A.  Yes.

23  Q.  Let's go then to your basic tree risk assessment form.  You

24  can skip over the part of your -- of your CV or actually your

25  report that has your CV and go directly to tree 95 which I

```
8:31AM    1           THE COURT:  You may be seated.

8:31AM    2       Good morning, ladies and gentlemen, for the plaintiff,

8:31AM    3   anything before we take the next witness.

8:31AM    4           MR. RASMUSSEN:  Good morning, Your Honor.  For the

8:31AM    5   record Mark Rasmussen, Jones Day, on behalf of the plaintiffs.

8:31AM    6       We have no preliminary matters.  We're ready to call our

8:31AM    7   next witness.

8:31AM    8           THE COURT:  All right.  Mr. Jones, anything?

8:31AM    9           MR. JONES:  Yes.  Good morning, Your Honor.  I did

8:31AM   10   want to just address the issue of the -- of these documents

8:31AM   11   that were received by the Court from some party that's not a

8:31AM   12   party to this lawsuit.  We have -- I've determined through my

8:31AM   13   sources that we did not have anything to do with that.

8:31AM   14           THE COURT:  Well, I haven't read them.  And I'm not

8:31AM   15   going to --

8:31AM   16           MR. JONES:  Okay.

8:32AM   17           THE COURT:  So it's a moot point.

8:32AM   18           MR. JONES:  All right.

8:32AM   19           THE COURT:  All right.  Very well.  Next witness.

8:32AM   20           MR. RASMUSSEN:  Yes, Your Honor.  Again Mark Rasmussen

8:32AM   21   for the plaintiffs.  The plaintiffs call Dr. Sazzad Shafique, a

8:32AM   22   professor at the University of Texas San Antonio in civil

8:32AM   23   engineering.  And my colleague chance McCraw will examine.

8:32AM   24           THE COURT:  All right.  Doctor, if you'll come up,

8:32AM   25   please.  And if you'll raise your right hand.
```

Sazzad Shafique – Direct

| | | |
|---|---|---|
| 8:32AM | 1 | *(The oath was administered)* |
| 8:32AM | 2 | THE COURT:  All right.  You may be seated.  And |
| 8:32AM | 3 | Mr. McCraw, you may proceed. |
| 8:32AM | 4 | MR. McCRAW:  Thank you, Your Honor. |
| 8:32AM | 5 | SAZZAD SHAFIQUE, PLAINTIFFS' WITNESS, SWORN |
| 8:33AM | 6 | DIRECT EXAMINATION |
| 8:33AM | 7 | BY MR. McCRAW: |
| 8:33AM | 8 | Q.  Doctor Shafique, do you mind introducing yourself to the |
| 8:33AM | 9 | Court? |
| 8:33AM | 10 | A.  Yeah.  My name is Sazzad beneficial.  I'm a professor at |
| 8:33AM | 11 | the Department of civil and environmental at University of |
| 8:33AM | 12 | Texas, San Antonio. |
| 8:33AM | 13 | Q.  And how long have you been a professor? |
| 8:33AM | 14 | A.  For 20 years. |
| 8:33AM | 15 | Q.  And what are your general responsibilities as a professor |
| 8:33AM | 16 | of civil engineering? |
| 8:33AM | 17 | A.  40 percent is teaching, undergraduate and graduate courses, |
| 8:33AM | 18 | 40 percent is research, try to attract external money for |
| 8:33AM | 19 | research and conduct research, and 20 percent is studies. |
| 8:33AM | 20 | Q.  And where did you go to school? |
| 8:33AM | 21 | A.  Well, I did my BS in civil engineering from engineering and |
| 8:33AM | 22 | technology, I have been working there for six, seven years, |
| 8:34AM | 23 | then I came to the United States as a graduate student.  I did |
| 8:34AM | 24 | my master's in civil engineering from University of Texas |
| 8:34AM | 25 | El Paso.  And then I did my Ph.D. in civil engineering from |

Sazzad Shafique - Direct

| | | |
|---|---|---|
| 8:34AM | 1 | University of Wisconsin Madison. |
| 8:34AM | 2 | Q.  And what year did you get each of those degrees? |
| 8:34AM | 3 | A.  I did my BS in 1987, my master's in 1996 and my Ph.D. in |
| 8:34AM | 4 | 2002. |
| 8:34AM | 5 | Q.  Just to correct something.  You got your BS in 1989, right? |
| 8:34AM | 6 | A.  Actually, '97, I made a little mistake there. |
| 8:34AM | 7 | Q.  Okay.  All right.  Did you have any professional |
| 8:34AM | 8 | certifications? |
| 8:34AM | 9 | A.  Yes.  I'm a professional engineer that is in Texas and was |
| 8:34AM | 10 | son kin. |
| 8:34AM | 11 | Q.  And have you written my scientific articles about wall |
| 8:34AM | 12 | structures? |
| 8:34AM | 13 | A.  Yeah.  I did. |
| 8:34AM | 14 | Q.  And can you tell me about a few of those? |
| 8:35AM | 15 | A.  Can you repeat that question? |
| 8:35AM | 16 | Q.  Can you tell me about a few of the articles that you've |
| 8:35AM | 17 | written about wall structures, you know, how many have you |
| 8:35AM | 18 | written and what do they generally relate to? |
| 8:35AM | 19 | A.  Oh, okay.  I did hundreds, maybe thousands, general |
| 8:35AM | 20 | articles, but I wrote myself I wrote around like 80 general |
| 8:35AM | 21 | papers and most of them are related with foundation |
| 8:35AM | 22 | engineering, soil mechanics and the interaction of foundation |
| 8:35AM | 23 | and soil. |
| 8:35AM | 24 | Q.  And have you published any of these articles in the |
| 8:35AM | 25 | engineering journals? |

Sazzad Shafique – Direct

| | | |
|---|---|---|
| 8:35AM | 1 | A.  Oh, obviously, yes. |
| 8:35AM | 2 | Q.  And what engineering journals have you been published in? |
| 8:35AM | 3 | A.  Most have been ASC journal of, you know, like different |
| 8:35AM | 4 | areas. |
| 8:35AM | 5 | Q.  And what's ASC? |
| 8:35AM | 6 | A.  AFC means American Society of civil engineers. |
| 8:35AM | 7 | Q.  And are you a member of any professional organizations? |
| 8:35AM | 8 | A.  Yeah.  I'm a member of the AFC, I'm also a member of |
| 8:36AM | 9 | American GEO physics society.  I'm also a member of |
| 8:36AM | 10 | professional engineers group and also in my University I also |
| 8:36AM | 11 | the charter member for the academia education excel is I. |
| 8:36AM | 12 | Q.  And have you received any awards? |
| 8:36AM | 13 | A.  Yes.  So many.  But the most notable one is the UT board of |
| 8:36AM | 14 | Legents outstanding teaching award which is actually award for |
| 8:36AM | 15 | all 13 you know like campuses under the UT system and I |
| 8:36AM | 16 | received that one in 2010, and which was $25,000 cash. |
| 8:36AM | 17 | Q.  And where did you work for UTSA? |
| 8:36AM | 18 | A.  I had been working for U.S. Army corps of engineers. |
| 8:37AM | 19 | Q.  And whether was your job at U SAC? |
| 8:37AM | 20 | A.  I was a civil design engineer. |
| 8:37AM | 21 | MR. McCRAW:  Your Honor, I tender Dr. Shafique as an |
| 8:37AM | 22 | expert in structural engineering. |
| 8:37AM | 23 | THE COURT:  Admitted. |
| 8:37AM | 24 | BY MR. McCRAW: |
| 8:37AM | 25 | Q.  And Dr. Shafique, have you been retained by counsel for |

Sazzad Shafique – Direct

| | | |
|---|---|---|
| 8:37AM | 1 | plaintiffs in connection with this proceeding? |
| 8:37AM | 2 | A.  Yes. |
| 8:37AM | 3 | Q.  And are you receiving compensation? |
| 8:37AM | 4 | A.  No.  But I'm going to get like if there is any extra |
| 8:37AM | 5 | expenses, that would be reimbursed. |
| 8:37AM | 6 | Q.  Okay.  And did plaintiffs' counsel is you to analyze three |
| 8:37AM | 7 | issues in relation to this case? |
| 8:37AM | 8 | A.  Yes. |
| 8:37AM | 9 | Q.  Okay.  And would you like me to bring you a copy of your |
| 8:37AM | 10 | expert report? |
| 8:37AM | 11 | A.  That would be great. |
| 8:37AM | 12 | Q.  Okay. |
| 8:37AM | 13 |     MR. McCRAW:  Your Honor, do you mind if I bring him a |
| 8:37AM | 14 | copy of his expert report? |
| 8:37AM | 15 |     THE COURT:  Go ahead. |
| 8:38AM | 16 |     THE WITNESS:  Thank you. |
| 8:38AM | 17 | BY MR. McCRAW: |
| 8:38AM | 18 | Q.  And so we asked you to analyze three particular issues. |
| 8:38AM | 19 | Was the first issue the condition of existing Lambert Beach |
| 8:38AM | 20 | retaining walls and the City's representations regarding public |
| 8:38AM | 21 | safety? |
| 8:38AM | 22 | A.  Yes. |
| 8:38AM | 23 | Q.  And then was the second issue the impact of nearby trees on |
| 8:38AM | 24 | the structural integrity of Lambert Beach retaining walls? |
| 8:38AM | 25 | A.  Yes. |

Sazzad Shafique - Direct

| | | |
|---|---|---|
| 8:38AM | 1 | Q.  And was the third alternatives to the City's proposed |
| 8:38AM | 2 | engineering solutions for the existing Lambert Beach retaining |
| 8:38AM | 3 | walls? |
| 8:38AM | 4 | A.  Yes. |
| 8:38AM | 5 | Q.  And did you form opinions to reasonable degree of |
| 8:38AM | 6 | acceptance of responsibility in the field of structural |
| 8:38AM | 7 | engineering on those topics? |
| 8:38AM | 8 | A.  Yes. |
| 8:38AM | 9 | Q.  And then was your analysis focused on why was your analysis |
| 8:38AM | 10 | focused on the Lambert Beach area of Brackenridge Park? |
| 8:38AM | 11 | A.  Because I was told to. |
| 8:38AM | 12 | Q.  And is that -- is it your understanding that that's where |
| 8:38AM | 13 | plaintiffs worship? |
| 8:38AM | 14 | A.  Yes. |
| 8:39AM | 15 | Q.  So at a summary level, what did you conclude with regard to |
| 8:39AM | 16 | the condition of existing Lambert Beach retaining walls and the |
| 8:39AM | 17 | City's representations regarding public safety? |
| 8:39AM | 18 | A.  Well, the existing retaining wall has very minimal |
| 8:39AM | 19 | foundation, honestly, most of all they didn't -- the |
| 8:39AM | 20 | engineering calculation to hold that one in place.  So some of |
| 8:39AM | 21 | them, especially which one is a little bit taller, some of them |
| 8:39AM | 22 | already failed, some of them has already tilted and some of |
| 8:39AM | 23 | them is expected to fail in future. |
| 8:39AM | 24 | Q.  And then at a summary level, what did you conclude with |
| 8:39AM | 25 | regard to the impact of nearby trees on the structural |

Sazzad Shafique - Direct

| | | |
|---|---|---|
| 8:39AM | 1 | integrity of Lambert Beach retaining walls? |
| 8:39AM | 2 | A.  I see that some of the trees are actually very close to the |
| 8:39AM | 3 | wall, sometimes it's just growing within the wall.  At the same |
| 8:40AM | 4 | time I saw there are a lot of trees which is actually area from |
| 8:40AM | 5 | the, you know, wall, four five feet area from the wall, but |
| 8:40AM | 6 | still, the City's asking to remove them. |
| 8:40AM | 7 | Q.  And then at a summary level what did you conclude with |
| 8:40AM | 8 | regard to the alternatives to the City's proposed engineering |
| 8:40AM | 9 | solution for the existing Lambert Beach retaining walls? |
| 8:40AM | 10 | A.  Actually, I was thinking like three, four different ways, |
| 8:40AM | 11 | because my engineering philosophy is just to, you know, like |
| 8:40AM | 12 | expose as many as options available to the stakeholders and |
| 8:40AM | 13 | they can pick the most, you know, sweet of the one best of the |
| 8:40AM | 14 | requirements.  So since my objective was, you know, like to |
| 8:40AM | 15 | save some of the trees, so I came up that the pier and the |
| 8:40AM | 16 | spandrel system would be like the best, you know, in that |
| 8:41AM | 17 | situation. |
| 8:41AM | 18 | Q.  Okay.  And so I want to talk about your first opinion, |
| 8:41AM | 19 | which was regarding the condition of existing walls.  But I |
| 8:41AM | 20 | think a visual will probably be helpful for all of us, so can |
| 8:41AM | 21 | you turn to -- so we'll be looking at tab 18 of the exhibit |
| 8:41AM | 22 | binder. |
| 8:41AM | 23 | MR. McCRAW:  Your Honor, do you mind if I bring him |
| 8:41AM | 24 | his copy that has his annotations? |
| 8:41AM | 25 | THE COURT:  Go ahead.  What tab was it? |

Sazzad Shafique - Direct

| 8:41AM | 1 | MR. McCRAW:  Tab 18. |
| 8:41AM | 2 | THE COURT:  All right. |
| 8:42AM | 3 | *(Discussion off the record)* |
| 8:42AM | 4 | BY MR. McCRAW: |
| 8:42AM | 5 | Q.  All right.  Dr. Shafique, do you recognize this document? |
| 8:42AM | 6 | A.  Yes. |
| 8:42AM | 7 | Q.  And what is this document? |
| 8:42AM | 8 | A.  That is the Brackenridge Park Lambert Beach drawing by the |
| 8:42AM | 9 | City. |
| 8:42AM | 10 | Q.  Okay.  And have you viewed this document online? |
| 8:42AM | 11 | A.  Yes. |
| 8:42AM | 12 | Q.  All right.  And do you see there's a stamp in the upper |
| 8:42AM | 13 | right-hand corner and do you recognize that as an official seal |
| 8:42AM | 14 | for the state of Texas? |
| 8:42AM | 15 | A.  Yes. |
| 8:42AM | 16 | Q.  Okay.  And were you able to do an examination of existing |
| 8:43AM | 17 | walls at Lambert Beach? |
| 8:43AM | 18 | A.  Yes. |
| 8:43AM | 19 | Q.  And was that done on September 8th of 2023? |
| 8:43AM | 20 | A.  Yes. |
| 8:43AM | 21 | Q.  And what kind of walls currently exist at Lambert Beach? |
| 8:43AM | 22 | A.  These are just old stone wall which doesn't have any |
| 8:43AM | 23 | foundation there, just started on top of the soil and some of |
| 8:43AM | 24 | them already failed and I see some of them has already some |
| 8:43AM | 25 | sort of sign of distress that it can fail any time. |

Sazzad Shafique - Direct

| | | |
|---|---|---|
| 8:43AM | 1 | Q.  And you mentioned earlier that there's an issue with the |
| 8:43AM | 2 | foundation.  How does horizontal force impact the type of |
| 8:43AM | 3 | foundation that's there? |
| 8:43AM | 4 | A.  Actually, like the horizontal threshold that's coming from |
| 8:44AM | 5 | the soil, that's trying to overturn the wall, and this |
| 8:44AM | 6 | horizontal pressure is usually increases with the height and it |
| 8:44AM | 7 | increases squarely, proportional to the height of the wall.  So |
| 8:44AM | 8 | if the wall height is small, we see that most of the wall is |
| 8:44AM | 9 | stable.  On the other hand, you know like there are some little |
| 8:44AM | 10 | taller walls, this one has failed. |
| 8:44AM | 11 | Q.  And so in your expert opinion why have the existing walls |
| 8:44AM | 12 | failed that have failed? |
| 8:44AM | 13 | A.  This one -- this one was not adequately designed. |
| 8:44AM | 14 | Q.  And so in your expert opinion, just looking at the south |
| 8:44AM | 15 | side here, what is your assessment of the walls on the south |
| 8:44AM | 16 | side of the river? |
| 8:45AM | 17 | A.  In what respect? |
| 8:45AM | 18 | Q.  Is there a safety risk posed by the walls on the south side |
| 8:45AM | 19 | of the river? |
| 8:45AM | 20 | A.  Yes, in some places. |
| 8:45AM | 21 | Q.  What kind of condition are the walls on the south side of |
| 8:45AM | 22 | the river in? |
| 8:45AM | 23 | A.  Some of them has already failed and there are some of them |
| 8:45AM | 24 | are little bit tilted, actually, that is kind of like subjected |
| 8:45AM | 25 | to no public risk. |

Sazzad Shafique - Direct

| | | |
|---|---|---|
| 8:45AM | 1 | Q. On the outside of the river? |
| 8:45AM | 2 | A. You were talking about south side? |
| 8:45AM | 3 | Q. Yes, the south side river? |
| 8:45AM | 4 | A. Okay. Sorry about that. |
| 8:45AM | 5 | Q. Okay. Talking just here on the south side of the river, |
| 8:45AM | 6 | we'll start that over. |
| 8:45AM | 7 | So what is your assessment of the walls on the south side |
| 8:45AM | 8 | of the river? |
| 8:45AM | 9 | A. Okay. From the civil engineering perspective, honestly I |
| 8:45AM | 10 | didn't see any of these on the south side. |
| 8:45AM | 11 | Q. And what's the risk to public safety on the south side of |
| 8:45AM | 12 | the river? |
| 8:46AM | 13 | A. None. |
| 8:46AM | 14 | Q. Okay. And that's -- so the walls on the south side of the |
| 8:46AM | 15 | river do not pose a risk to public safety? |
| 8:46AM | 16 | A. Yes. That's what I said. |
| 8:46AM | 17 | Q. Okay. All right. And then why do you think that there is |
| 8:46AM | 18 | no risk to the public safety on the outside of the river? |
| 8:46AM | 19 | A. From the civil engineering perspective, I see all the walls |
| 8:46AM | 20 | are, you know, very stable condition and I didn't -- also, the |
| 8:46AM | 21 | height of the walls are very low compared to the north side and |
| 8:46AM | 22 | there is no sign of distress that this one can fail |
| 8:46AM | 23 | immediately. |
| 8:46AM | 24 | Q. Okay. And then switching to the north side of the river? |
| 8:46AM | 25 | A. Uh-huh. |

Sazzad Shafique - Direct

8:46AM 1    Q. Okay. What is your assessment of the existing walls on the
8:46AM 2    north side of the river?
8:46AM 3    A. As I said earlier, that some of the walls in the north side
8:46AM 4    has already failed and some of the walls along with the brick
8:47AM 5    trees, you know, which is like leaning, I see that the wall is
8:47AM 6    also leaning a little bit there. So there is a chance that
8:47AM 7    people go there that the wall can fail at any time.
8:47AM 8    Q. And in your expert opinion, what is the risk to public
8:47AM 9    safety on the north side of the river with respect to the
8:47AM 10   walls?
8:47AM 11   A. There are some risk there.
8:47AM 12   Q. Okay. And so but are some areas safe?
8:47AM 13   A. Yeah. Some areas are safe, yes. The broken part.
8:47AM 14   Q. And are you generally familiar with the area on the south
8:47AM 15   side of the river where plaintiffs would like to hold their
8:47AM 16   religious ceremonies?
8:47AM 17   A. Yes.
8:47AM 18   Q. Okay. And so with respect to that area, what is the risk
8:47AM 19   to public safety to informs they were to hold a ceremony there
8:47AM 20   for 20 to 30 minutes?
8:47AM 21   A. Well, from the civil engineering perspective, I don't see
8:47AM 22   any risk, but yesterday I learned that there is, you know, like
8:48AM 23   branch hanging over there, but that's not my perspective.
8:48AM 24   Q. So with respect to the walls, there is no risk?
8:48AM 25   A. No.

Sazzad Shafique - Direct

| | | |
|---|---|---|
| 8:48AM | 1 | Q.   Okay.  So let's move onto your second opinion.  So how |
| 8:48AM | 2 | would you generally describe the landscape at Lambert Beach |
| 8:48AM | 3 | area? |
| 8:48AM | 4 | A.   That's a pretty good area.  You know like beautiful river |
| 8:48AM | 5 | with a lot of big trees that always attracted me even though I |
| 8:48AM | 6 | was not born here, but as soon as I went there, as soon as I |
| 8:48AM | 7 | came in San Antonio, with my kids.  So it's a beautiful area. |
| 8:48AM | 8 | Q.   Yeah.  But you said lots of big trees, pretty heavily |
| 8:48AM | 9 | treed? |
| 8:48AM | 10 | A.   Uh-huh. |
| 8:48AM | 11 | Q.   And so could you describe kind of the type and sizes of |
| 8:48AM | 12 | trees that you noticed there? |
| 8:48AM | 13 | A.   I see a lot of big trees, at the same time, you know, like |
| 8:48AM | 14 | each side there are some small trees there too.  And I also see |
| 8:48AM | 15 | some flora trees like crepe myrtle in the south side. |
| 8:49AM | 16 | Q.   And how close are the trees to the walls? |
| 8:49AM | 17 | A.   Some are pretty close.  Some are within the -- you know, |
| 8:49AM | 18 | like walls.  But many of them are like within like three to |
| 8:49AM | 19 | four feet and some of them are little bit area from there, like |
| 8:49AM | 20 | five to ten feet. |
| 8:49AM | 21 | Q.   And are the trees a threat to the walls at Lambert Beach? |
| 8:49AM | 22 | A.   Some of them, yes. |
| 8:49AM | 23 | Q.   And so what kind of threat are they to the walls at Lambert |
| 8:49AM | 24 | Beach? |
| 8:49AM | 25 | A.   Well, usually the tree, you know, tries to, you know, exert |

Sazzad Shafique - Direct

| | | |
|---|---|---|
| 8:49AM | 1 | some horizontal pressure on the wall and the current wall is |
| 8:49AM | 2 | not designed to take any horizontal pressure because of its |
| 8:49AM | 3 | lack of footing.  So basically if the pressure increases, then |
| 8:49AM | 4 | eventually the wall can fail. |
| 8:49AM | 5 | Q.  And are there areas of the walls that have failed where |
| 8:49AM | 6 | there aren't any trees present? |
| 8:50AM | 7 | A.  Yeah.  There are some places. |
| 8:50AM | 8 | Q.  So they failed without any horizontal pressure from trees? |
| 8:50AM | 9 | A.  No.  They are fail from the horizontal pressure from the |
| 8:50AM | 10 | soil itself. |
| 8:50AM | 11 | Q.  So not from the trees? |
| 8:50AM | 12 | A.  Not from the trees. |
| 8:50AM | 13 | Q.  Okay.  So let's go on to your third opinion regarding |
| 8:50AM | 14 | alternative solutions.  So are you generally familiar with the |
| 8:50AM | 15 | 2017 bond project as it relates to Brackenridge Park? |
| 8:50AM | 16 | A.  Yes. |
| 8:50AM | 17 | Q.  And so if I refer to that -- if I refer to that today as |
| 8:50AM | 18 | the -- as the bond project, will you understand what I'm |
| 8:50AM | 19 | referring to? |
| 8:50AM | 20 | A.  Yes. |
| 8:50AM | 21 | Q.  Okay.  And so could you explain at a high level what the |
| 8:50AM | 22 | City's design plan is for the bond project? |
| 8:50AM | 23 | A.  So the City's plan is like primarily in terms of like the |
| 8:50AM | 24 | walls, they want to make a shadow wall behind the existing |
| 8:50AM | 25 | wall, and that's a cantilever type walls and then they want to |

Sazzad Shafique - Direct

| 8:51AM | 1 | fasten the existing wall with the shadow wall. |
| 8:51AM | 2 | Q.  And is there an alternative design that you look at called |
| 8:51AM | 3 | the peer and spandrel system? |
| 8:51AM | 4 | A.  Yes. |
| 8:51AM | 5 | Q.  And did you prepare any diagrams first showing the |
| 8:51AM | 6 | difference between these two -- |
| 8:51AM | 7 | A.  Yes, I did. |
| 8:51AM | 8 | MR. McCRAW:  Your Honor, may I display some of his |
| 8:51AM | 9 | designs? |
| 8:51AM | 10 | THE COURT:  Yes. |
| 8:51AM | 11 | MR. McCRAW:  Your Honor, would you like a physical |
| 8:51AM | 12 | copy? |
| 8:51AM | 13 | THE COURT:  Sure.  That'd be great.  All right.  Thank |
| 8:51AM | 14 | you.  All right.  So, Dr. Shafique, we'll take this piece by |
| 8:51AM | 15 | piece as we go through this.  So is the top set of images the |
| 8:52AM | 16 | cantilever system. |
| 8:52AM | 17 | THE WITNESS:  Yes. |
| 8:52AM | 18 | Q.  Okay.  And what does the first image show? |
| 8:52AM | 19 | A.  The first image show the existing condition. |
| 8:52AM | 20 | Q.  And then what is the second image? |
| 8:52AM | 21 | A.  Second image shows like amount of excavation.  The amount |
| 8:52AM | 22 | at the height of the wall is less than ten feet, then you have |
| 8:52AM | 23 | to excavate at least 11 feet, little bit below the footing of |
| 8:52AM | 24 | the wall and then you have to extend that one of the back of |
| 8:52AM | 25 | the wall at least 70 percent of the height of the wall.  Once |

Sazzad Shafique - Direct

| | | |
|---|---|---|
| 8:52AM | 1 | you are done with that, then the third figure, you can see that |
| 8:52AM | 2 | you have to just past the concrete there and concrete footing |
| 8:52AM | 3 | and once this one is done, you can just, you know, pass the |
| 8:52AM | 4 | cantilever wall and then you can tie the existing wall with the |
| 8:53AM | 5 | cantilever wall and then basic how you fill that one with soil. |
| 8:53AM | 6 | But the big problem here is like you need to have a lot of soil |
| 8:53AM | 7 | from the back of the wall and that's why, let's say in the |
| 8:53AM | 8 | picture 1, where there is a tree, you must have to cut that |
| 8:53AM | 9 | tree to put your retaining wall there. |
| 8:53AM | 10 | Q.  So in the -- from the first picture to the last picture, |
| 8:53AM | 11 | the tree would have to go away? |
| 8:53AM | 12 | A.  Yes. |
| 8:53AM | 13 | Q.  Okay.  And then you mentioned a little bit higher walls are |
| 8:53AM | 14 | going to require taller walls are going to require a larger |
| 8:53AM | 15 | footer? |
| 8:53AM | 16 | A.  Yeah.  The City -- I see that the drawings.  This one is |
| 8:53AM | 17 | only done for 60 height walls, maximum 60, objection.  I don't |
| 8:53AM | 18 | know this is 95 percent of the drawings, so maybe they'll |
| 8:53AM | 19 | change that one because we see that there are higher walls |
| 8:54AM | 20 | there.  Like ten feet, 12 feet.  So your footing could change |
| 8:54AM | 21 | significantly there. |
| 8:54AM | 22 | Q.  And by change significantly, you mean it'll have to be |
| 8:54AM | 23 | significantly larger? |
| 8:54AM | 24 | A.  Yeah.  Larger, yes. |
| 8:54AM | 25 | Q.  With more excavation required? |

Sazzad Shafique - Direct

| Time | Line | |
|---|---|---|
| 8:54AM | 1 | A.  Yes. |
| 8:54AM | 2 | Q.  Okay.  And then so let's go down to the second row and is |
| 8:54AM | 3 | this the pier and spandrel system on the second row? |
| 8:54AM | 4 | A.  Yes. |
| 8:54AM | 5 | Q.  Okay.  And then what is in the first image? |
| 8:54AM | 6 | A.  That's the existing condition. |
| 8:54AM | 7 | Q.  And then what about the second image? |
| 8:54AM | 8 | A.  The second one, the peer and the spandrel system, it's like |
| 8:54AM | 9 | have some, you know, like uncommon mobility here, but the |
| 8:54AM | 10 | system is very close to like your backyard, you know, like |
| 8:54AM | 11 | fence.  You are just putting two posts and then you connect |
| 8:54AM | 12 | that one at the fence. |
| 8:54AM | 13 | Q.  Okay. |
| 8:54AM | 14 | A.  Similar to that, you can see we are just drilling a hole |
| 8:54AM | 15 | here and then we'll drill another hole maybe eight to ten feet |
| 8:55AM | 16 | from there or six feet from there.  We'll just fill that one |
| 8:55AM | 17 | with reinforced concrete and then basically in between the two |
| 8:55AM | 18 | posts we are going to fill it with concrete wall.  So that's |
| 8:55AM | 19 | the way we can avoid lot of excavation from there and basically |
| 8:55AM | 20 | try to, you know, like interfere with the trees as little as |
| 8:55AM | 21 | possible. |
| 8:55AM | 22 | Q.  And this image we have a tree in the first, second, third |
| 8:55AM | 23 | and fourth image, correct? |
| 8:55AM | 24 | A.  Yes. |
| 8:55AM | 25 | Q.  So the tree would remain? |

Sazzad Shafique - Direct

| | | |
|---|---|---|
| 8:55AM | 1 | A.  Uh-huh. |
| 8:55AM | 2 | Q.  So for the second image regarding excavation, how deep |
| 8:55AM | 3 | would that pier need to be drilled? |
| 8:55AM | 4 | A.  Usually 15 to 20 feet maximum. |
| 8:56AM | 5 | Q.  Okay.  How wide would the pier need to be in diameter? |
| 8:56AM | 6 | A.  That would be one feet to 1.5 feet. |
| 8:56AM | 7 | Q.  Okay.  So we're talking -- |
| 8:56AM | 8 | A.  Depends on the final design but I'm just guessing. |
| 8:56AM | 9 | Q.  So we're talking 12 to 18 inches in diameter and then |
| 8:56AM | 10 | maybe -- |
| 8:56AM | 11 | A.  Maybe eight to ten inch wall. |
| 8:56AM | 12 | Q.  Tight ten inch wall.  Okay. |
| 8:56AM | 13 | And then for the pier and spandrel system, that's a |
| 8:56AM | 14 | master's level education course, correct? |
| 8:56AM | 15 | A.  Yes.  This is little bit advanced. |
| 8:56AM | 16 | Q.  But you studied the cantilever wall design at the |
| 8:56AM | 17 | bachelor's level, right? |
| 8:56AM | 18 | A.  Yes. |
| 8:56AM | 19 | Q.  And then what kind of equipment do you need to drill the |
| 8:56AM | 20 | piers? |
| 8:57AM | 21 | A.  We can use rotary drill machine. |
| 8:57AM | 22 | Q.  And by rotary drill, are you talking like an auger with a |
| 8:57AM | 23 | drill on it? |
| 8:57AM | 24 | A.  Yes.  Yes. |
| 8:57AM | 25 | Q.  And then there's such things as even hand augers that you |

Sazzad Shafique - Direct

| 8:57AM | 1 | can use? |
|---|---|---|
| 8:57AM | 2 | A.  Sometimes. |
| 8:57AM | 3 | Q.  Yeah. |
| 8:57AM | 4 | A.  I would prefer to use hand augers so that the existing wall |
| 8:57AM | 5 | doesn't, you know, like get any pressure from the drilling. |
| 8:57AM | 6 | Q.  And then if you use a drill with an auger, if you were to |
| 8:57AM | 7 | use the, you know, mechanical version, how heavy is that |
| 8:57AM | 8 | equipment? |
| 8:57AM | 9 | A.  Oh, there's actually -- there are a lot of different |
| 8:57AM | 10 | versions now.  You can get like three, four tons just you know |
| 8:57AM | 11 | like at the back of the truck, they'll that one and then, you |
| 8:57AM | 12 | know, they'll move that one with the backhoe and you can use |
| 8:57AM | 13 | that one there. |
| 8:57AM | 14 | Q.  So we're talking three or four ton piece of equipment if |
| 8:58AM | 15 | you were to use the equipment -- |
| 8:58AM | 16 | A.  Yeah, a small because we are not going to drill like |
| 8:58AM | 17 | hundred, 200 feet.  It's just like 15, 20 feet. |
| 8:58AM | 18 | Q.  And there's even some that are like long reach so you, you |
| 8:58AM | 19 | know, could be offset and drill from a distance away? |
| 8:58AM | 20 | A.  Yeah.  I have seen something like that too. |
| 8:58AM | 21 | Q.  Okay.  So the equipment doesn't weigh 75,000 to a hundred |
| 8:58AM | 22 | thousand pounds? |
| 8:58AM | 23 | A.  Oh, there are some, they are big but that's not for this |
| 8:58AM | 24 | small job.  These are usually for, you know, oil people who try |
| 8:58AM | 25 | to drill that 1,000 feet or more. |

Sazzad Shafique - Direct

| | | |
|---|---|---|
| 8:58AM | 1 | Q.  And you can stabilize the area in order to support any kind |
| 8:58AM | 2 | of heavy piece of equipment, correct? |
| 8:58AM | 3 | A.  I hope so. |
| 8:58AM | 4 | Q.  All right.  So we'll go back to this. |
| 8:58AM | 5 | THE COURT:  Mr. McCraw, I was making a note about |
| 8:58AM | 6 | something on that last question. |
| 8:58AM | 7 | MR. McCRAW:  Yes. |
| 8:59AM | 8 | THE COURT:  And the answer was, I hope so.  What was |
| 8:59AM | 9 | the question?  I hope -- |
| 8:59AM | 10 | BY MR. McCRAW: |
| 8:59AM | 11 | Q.  So you can signize the area if you're using a heavy piece |
| 8:59AM | 12 | of equipment, correct? |
| 8:59AM | 13 | A.  Yes. |
| 8:59AM | 14 | THE COURT:  Okay.  Well, what did you mean by "I hope |
| 8:59AM | 15 | so"? |
| 8:59AM | 16 | THE WITNESS:  That depends on, you know, like if you |
| 8:59AM | 17 | just put proper design, then basically it will definitely hold |
| 8:59AM | 18 | like three, four tons because you might have to, you know, like |
| 8:59AM | 19 | support the wall system. |
| 8:59AM | 20 | THE COURT:  All right.  Well, I hope to wake up |
| 8:59AM | 21 | tomorrow, but -- Okay.  Before you move on, let me ask another |
| 8:59AM | 22 | question. |
| 8:59AM | 23 | On the bottom pier spandrel retaining wall, the image to |
| 8:59AM | 24 | the right, those three white perpendicular lines are the piers, |
| 8:59AM | 25 | correct? |

| | | |
|---|---|---|
| 8:59AM | 1 | THE WITNESS:  Yes. |
| 8:59AM | 2 | THE COURT:  All right.  And so in between the yellow |
| 8:59AM | 3 | rectangular line with the two borders, is that the existing |
| 9:00AM | 4 | wall. |
| 9:00AM | 5 | THE WITNESS:  No,. |
| 9:00AM | 6 | THE COURT:  Okay.  So what -- |
| 9:00AM | 7 | THE WITNESS:  That was the complete wall, which has to |
| 9:00AM | 8 | be -- |
| 9:00AM | 9 | THE COURT:  Okay.  So in addition to the piers, there |
| 9:00AM | 10 | would be additional concrete material put up against the |
| 9:00AM | 11 | existing wall. |
| 9:00AM | 12 | THE WITNESS:  Yes. |
| 9:00AM | 13 | THE COURT:  Okay.  All right.  Go ahead. |
| 9:00AM | 14 | BY MR. McCRAW: |
| 9:00AM | 15 | Q.  All right.  So we'll go back to Exhibit 18 and we're going |
| 9:00AM | 16 | to turn to COSA, what's labels COSA 0604. |
| 9:00AM | 17 | A.  Yes. |
| 9:00AM | 18 | Q.  Do my best with this.  All right. |
| 9:00AM | 19 | And can you describe for us what is displayed on this page |
| 9:00AM | 20 | of the City's engineering plans? |
| 9:00AM | 21 | A.  Excuse me, sir.  Can I use this one? |
| 9:01AM | 22 | THE COURT:  Sure. |
| 9:01AM | 23 | BY MR. McCRAW: |
| 9:01AM | 24 | Q.  Does it shout the elevations for this area? |
| 9:01AM | 25 | A.  Yes. |

Sazzad Shafique - Direct

| | | |
|---|---|---|
| 9:01AM | 1 | Q.  Okay.  And so based on the elevations that are displayed |
| 9:01AM | 2 | here, you can calculate the wall heights at various points in |
| 9:01AM | 3 | the project area? |
| 9:01AM | 4 | A.  Uh-huh. |
| 9:01AM | 5 | Q.  Okay.  Now, I want to look at one particular point where it |
| 9:01AM | 6 | says the upper pump house.  I'm going to zoom in.  Is there a |
| 9:01AM | 7 | way to get this to focus better, Ms. Herndon?  Okay.  There we |
| 9:01AM | 8 | go.  Slowly focus.  Okay.  There we go. |
| 9:01AM | 9 | All right.  So we're going to focus here in just right here |
| 9:01AM | 10 | at the upper pump house, which I've got displayed on the |
| 9:02AM | 11 | screen. |
| 9:02AM | 12 | Now, in this area, how tall is the wall right here by the |
| 9:02AM | 13 | upper pump house? |
| 9:02AM | 14 | A.  That corner, it's almost 15 feet. |
| 9:02AM | 15 | Q.  Okay.  And so going back to the cantilever design, how big |
| 9:02AM | 16 | would the footer need to be for a wall that's nearly 15 feet |
| 9:02AM | 17 | here? |
| 9:02AM | 18 | A.  70 percent of that, approximately, so maybe like ten feet. |
| 9:02AM | 19 | Q.  And then so how many feet of dirt would need to be |
| 9:02AM | 20 | excavated from this area in order to put in that footer? |
| 9:02AM | 21 | A.  It's huge, huge.  You have to go at least -- at least eight |
| 9:02AM | 22 | to nine neat, you know, from the back of the wall and then if |
| 9:02AM | 23 | you have to dig that one, 15 feet, that's actually a lot of |
| 9:02AM | 24 | soil. |
| 9:02AM | 25 | Q.  And so within this eight to ten feet that's being removed |

Sazzad Shafique - Direct

| | | |
|---|---|---|
| 9:03AM | 1 | of soil behind this wall, is that going to require the removal |
| 9:03AM | 2 | of any trees within there, that area? |
| 9:03AM | 3 | A.  Yes. |
| 9:03AM | 4 | Q.  Okay.  And then I want to move to another section of the |
| 9:03AM | 5 | wall, so we'll go to the most western section of the wall, to |
| 9:03AM | 6 | be north side of the river. |
| 9:03AM | 7 | THE COURT:  While you're doing that and getting ready, |
| 9:03AM | 8 | can the necessary soil be brought in from some other source as |
| 9:03AM | 9 | opposed to having to excavate right there. |
| 9:03AM | 10 | THE WITNESS:  You can bring bring, you know, like to |
| 9:03AM | 11 | fill that wall? |
| 9:03AM | 12 | THE COURT:  Uh-huh. |
| 9:03AM | 13 | THE WITNESS:  Yeah, definitely. |
| 9:03AM | 14 | THE COURT:  So if that were done, it wouldn't require |
| 9:03AM | 15 | the tree removal. |
| 9:03AM | 16 | THE WITNESS:  No.  The tree removal needs to make the |
| 9:03AM | 17 | foundation of the retaining wall. |
| 9:04AM | 18 | THE COURT:  Okay.  All right.  Go ahead. |
| 9:04AM | 19 | BY MR. McCRAW: |
| 9:04AM | 20 | Q.  So I guess to kind of clear this up, so we're talking about |
| 9:04AM | 21 | we have to excavate behind the wall eight to ten feet and |
| 9:04AM | 22 | remove all dirt from that area because you're going to put a |
| 9:04AM | 23 | footer down at the bottom, correct? |
| 9:04AM | 24 | A.  Yes. |
| 9:04AM | 25 | Q.  So then you're going to have to clear out all dirt within |

Sazzad Shafique - Direct

| | | |
|---|---|---|
| 9:04AM | 1 | that area in order to be able to install that footer down at |
| 9:04AM | 2 | the bottom. |
| 9:04AM | 3 | THE COURT:  All right. |
| 9:04AM | 4 | BY MR. McCRAW: |
| 9:04AM | 5 | Q.  All right.  So going to the further west on the most kind |
| 9:04AM | 6 | of western side there on the north side of the river, right |
| 9:04AM | 7 | here where I've kind of circled here, how tall are the walls in |
| 9:04AM | 8 | that area? |
| 9:04AM | 9 | A.  Actually, it's a little bit difficult to say from this |
| 9:04AM | 10 | drawing because all the information is not given.  But as far |
| 9:04AM | 11 | as I recall, I went there twice.  So this wall is almost like |
| 9:05AM | 12 | six to eight feet all the.  That I see above the water.  Maybe |
| 9:05AM | 13 | below the water there might be another couple of feet. |
| 9:05AM | 14 | Q.  What do your notes show, Dr. Shafique.  Are they around ten |
| 9:05AM | 15 | feet in your notes? |
| 9:05AM | 16 | A.  Yeah, should be.  Could be roughly, yeah. |
| 9:05AM | 17 | Q.  Okay.  So going back to the cantilever design, about how |
| 9:05AM | 18 | big would the footer need to be here in this section of the |
| 9:05AM | 19 | wall? |
| 9:05AM | 20 | A.  Almost seven feet. |
| 9:05AM | 21 | Q.  Okay.  And then so how many feet of dirt behind the wall |
| 9:05AM | 22 | will then need to be excavated in this area? |
| 9:05AM | 23 | A.  So you have to excavate like at least seven feet from the |
| 9:05AM | 24 | back of the wall to a depth of 11 feet, one feet more than the |
| 9:05AM | 25 | height of the existing wall. |

Sazzad Shafique - Direct

| | | |
|---|---|---|
| 9:05AM | 1 | Q.  So 11 feet down, around seven feet back.  Okay.  And so |
| 9:06AM | 2 | that will require? |
| 9:06AM | 3 | A.  And anything between that scene feet, you have to -- you |
| 9:06AM | 4 | have to pad it off, any trees or anything there. |
| 9:06AM | 5 | Q.  And so under the City's plan, you have to remove a block |
| 9:06AM | 6 | basically a block of dirt that's 11 feet deep and then at least |
| 9:06AM | 7 | seven feet back behind the wall? |
| 9:06AM | 8 | A.  Yes. |
| 9:06AM | 9 | Q.  Okay.  And then so any trees within that area would have to |
| 9:06AM | 10 | go? |
| 9:06AM | 11 | A.  Yes. |
| 9:06AM | 12 | Q.  So under the City's plan all trees within that block have |
| 9:06AM | 13 | to go? |
| 9:06AM | 14 | A.  Yes. |
| 9:06AM | 15 | Q.  And did you prepare a diagram Zoomed in kind of the |
| 9:06AM | 16 | sections of the wall? |
| 9:06AM | 17 | A.  Yes, I did. |
| 9:06AM | 18 | MR. McCRAW:  Your Honor, I can display those diagrams? |
| 9:06AM | 19 | That'd be the second and third page that were provided to you. |
| 9:06AM | 20 | THE COURT:  Yes. |
| 9:06AM | 21 | BY MR. McCRAW: |
| 9:06AM | 22 | Q.  All right.  So we'll take this piece by piece, |
| 9:07AM | 23 | Dr. Shafique.  So what is the picture in the top left corner of |
| 9:07AM | 24 | this diagram? |
| 9:07AM | 25 | A.  That is the north side of the, you know, like beach and you |

Sazzad Shafique - Direct

| | | |
|---|---|---|
| 9:07AM | 1 | can see the corner of the pump house, just -- |
| 9:07AM | 2 | Q.  So this the first section of the wall that we looked at |
| 9:07AM | 3 | over here? |
| 9:07AM | 4 | A.  Yes.  Yes. |
| 9:07AM | 5 | Q.  Okay.  And then what is the image below that? |
| 9:07AM | 6 | A.  That's actually showing all those trees that has to be be |
| 9:07AM | 7 | removed according to City plan. |
| 9:07AM | 8 | Q.  And so under the City's plan, what is a red circle mean? |
| 9:07AM | 9 | A.  Means like the removal of the trees. |
| 9:07AM | 10 | Q.  Okay.  So under the City's plan all trees in this area |
| 9:07AM | 11 | would have to be removed, correct? |
| 9:07AM | 12 | A.  Yes. |
| 9:07AM | 13 | Q.  Okay.  And then to the right of that, we have a diagram -- |
| 9:07AM | 14 | do you have a diagram comparing these two systems? |
| 9:08AM | 15 | A.  Yes. |
| 9:08AM | 16 | Q.  All right.  And so let's look at this line by line.  So on |
| 9:08AM | 17 | the first line where it says state of technical knowledge.  Can |
| 9:08AM | 18 | you tell me what is the comparison between the two? |
| 9:08AM | 19 | A.  Both are well developed.  Both have been used for many, |
| 9:08AM | 20 | many years without any complaint. |
| 9:08AM | 21 | Q.  And then for the second line, "design criteria," could you |
| 9:08AM | 22 | tell me what the comparison is between the City's cantilever |
| 9:08AM | 23 | retaining wall and the then the pier and spandrel retaining |
| 9:08AM | 24 | wall? |
| 9:08AM | 25 | A.  Actually, both of them satisfy all mode of failure.  There |

Sazzad Shafique - Direct

| | | |
|---|---|---|
| 9:08AM | 1 | is three mode of failures.  Maybe a little technical.  But one |
| 9:08AM | 2 | is like overturning.  That one is the wall can shift |
| 9:08AM | 3 | horizontally shift and the third one is failure because of the |
| 9:08AM | 4 | anytration but all sign for these two method actually satisfy |
| 9:08AM | 5 | all three mode of failure. |
| 9:09AM | 6 | Q.  And then for the third line where it says "excavation |
| 9:09AM | 7 | needed" what is the comparison between thetive's chosen |
| 9:09AM | 8 | cantilever retaining wall system and the pier and spandrel |
| 9:09AM | 9 | retaining wall? |
| 9:09AM | 10 | A.  For cantilever retaining wall, you have to actually -- the |
| 9:09AM | 11 | height of the wall, you know, varies from 5 to 15 feet so the |
| 9:09AM | 12 | depth of excavation is 6 to 16 feet because you are now |
| 9:09AM | 13 | foundation of the new retaining wall has to be little bit down |
| 9:09AM | 14 | than the existing wall foundation.  So you have to dig a little |
| 9:09AM | 15 | bit more.  So you have to dig from six to 16 feet and that |
| 9:09AM | 16 | excavation extends about 10 to -- four to 10 feet from the back |
| 9:09AM | 17 | of the wall location.  So anything 4 to ten feet below the back |
| 9:09AM | 18 | has to be, you know, excavated completely. |
| 9:09AM | 19 | Q.  And then what about with regards to the pier and spandrel |
| 9:10AM | 20 | retaining wall regarding excavation? |
| 9:10AM | 21 | A.  There is very minimal excavation required, maybe like one |
| 9:10AM | 22 | feet, you know, just for the wall. |
| 9:10AM | 23 | Q.  And then for the next line, regarding drilling that's |
| 9:10AM | 24 | needed, could you compare the City's cantilever retaining wall |
| 9:10AM | 25 | versus the pier and spandrel retaining wall? |

Sazzad Shafique - Direct

| | | |
|---|---|---|
| 9:10AM | 1 | A.  Sure.  The cantilever retaining wall doesn't require any |
| 9:10AM | 2 | drilling on the other hand for pier and spandrel retaining wall |
| 9:10AM | 3 | we need four to five piers to have drilled but in diameters |
| 9:10AM | 4 | like 1 to 1.5 and depth of the drill is approximately 15 to 18 |
| 9:10AM | 5 | feet but that's subject to change in final design. |
| 9:10AM | 6 | Q.  And then for the next line regarding time of construction, |
| 9:10AM | 7 | what's the difference between the City's cantilever retaining |
| 9:10AM | 8 | wall and a pier and spandrel retaining wall? |
| 9:10AM | 9 | A.  They are pretty same time. |
| 9:10AM | 10 | Q.  So it'd take about the same amount of time to do either |
| 9:10AM | 11 | design? |
| 9:11AM | 12 | A.  Yes.  Yeah. |
| 9:11AM | 13 | THE COURT:  Hold on. |
| 9:11AM | 14 | MR. McCRAW:  And last one in summary -- go ahead. |
| 9:11AM | 15 | THE COURT:   A of time being weeks?  Months?  Years? |
| 9:11AM | 16 | THE WITNESS:  I would say like months. |
| 9:11AM | 17 | THE COURT:  Okay.  Go ahead. |
| 9:11AM | 18 | BY MR. McCRAW: |
| 9:11AM | 19 | Q.  And then regarding kind of the last summary line for the |
| 9:11AM | 20 | impact on trees, can you compare the City's cantilever |
| 9:11AM | 21 | retaining wall system versus a pier and spandrel retaining wall |
| 9:11AM | 22 | system? |
| 9:11AM | 23 | A.  Yeah, the City plan is like taking all the four trees from |
| 9:11AM | 24 | there.  But if you use pier and spandrel retaining wall, you |
| 9:11AM | 25 | have to just remove one tree from there, the one which is -- |

Sazzad Shafique - Direct

| | | |
|---|---|---|
| 9:11AM | 1 | THE COURT: Go ahead. |
| 9:11AM | 2 | THE WITNESS: In between the right corner one which is |
| 9:11AM | 3 | in between the wall itself. |
| 9:11AM | 4 | THE COURT: But either methodology requires tree |
| 9:11AM | 5 | removal of -- at some level. |
| 9:11AM | 6 | THE WITNESS: Yes. |
| 9:11AM | 7 | THE COURT: Okay. |
| 9:12AM | 8 | BY MR. McCRAW: |
| 9:12AM | 9 | Q. But the City's plan would require four as opposed to a pier |
| 9:12AM | 10 | and spandrel would only require one? |
| 9:12AM | 11 | A. Yes. |
| 9:12AM | 12 | Q. Okay. And then so we'll go to the western section of the |
| 9:12AM | 13 | wall and we'll go through same thing, kind of Meece by piece. |
| 9:12AM | 14 | All right. So what is in the -- what is the indigenous the top |
| 9:12AM | 15 | left-hand corner show? |
| 9:12AM | 16 | A. That is the wall in the west side, existing wall. |
| 9:12AM | 17 | Q. And then what about the image below that? |
| 9:12AM | 18 | A. That's showing that how many trees are there and how many |
| 9:12AM | 19 | of them would be removed. I see one, two, three, four, five |
| 9:12AM | 20 | would be removed and one will stay there. |
| 9:12AM | 21 | Q. And that's the tree removals underneath the City's plan, |
| 9:12AM | 22 | correct? |
| 9:12AM | 23 | A. Yes. |
| 9:12AM | 24 | Q. And so the red circle like we mentioned earlier is a tree |
| 9:12AM | 25 | removal, correct? |

Sazzad Shafique - Direct

```
9:12AM    1   A.   Yes.

9:12AM    2   Q.   And so then the green -- the one green circle is --

9:12AM    3   A.   Yes.

9:12AM    4   Q.   All right.  And so we'll go through this -- the diagram on

9:12AM    5   the right once again comparing the two systems.  So we've

9:13AM    6   already kind of done the first one, state of technology.  So

9:13AM    7   we'll kind of and that design criteria so for time's sake we'll

9:13AM    8   just kind of skip on to the third row.

9:13AM    9       So what is theexcavation needed here in this area between

9:13AM   10   comparing the cantilever -- the City's cantilever retaining

9:13AM   11   wall system versus the pier and spandrel retaining wallle is?

9:13AM   12   A.   Well, the height of, you know, like the existing wall is

9:13AM   13   from seven to ten feet.  So the depth ofexcavation would be

9:13AM   14   eight to 11 feet and this one has to extend from the back of

9:13AM   15   the wall at least four to seven feet.  And for the pier and

9:13AM   16   spandrel system actually maximum, you know, like minimum

9:13AM   17   excavation required only like one feet.

9:13AM   18   Q.   And then for the drilling method what's the different

9:13AM   19   between the cantilever retaining wall and the pier and spandrel

9:13AM   20   retaining wall systems?

9:13AM   21   A.   Cantilever reretaining wall doesn't river any drilling.  On

9:13AM   22   the other hand, the pier and spandrel retaining wall needs four

9:14AM   23   to five pier, have to be drilled and the pier diameter is

9:14AM   24   expected to be 1 to 1.5-meter and the depth of drill is

9:14AM   25   approximately 15 to 18 feet.
```

Sazzad Shafique - Direct

9:14AM  1  Q.  And then the time of construction we mentioned on the other
9:14AM  2  slide, same here, correct?
9:14AM  3  A.  Yes.
9:14AM  4  Q.  Okay.  And then the impact on trees, so what is the
9:14AM  5  difference between the City's cantilever retaining wall system
9:14AM  6  and the pier and spandrel retaining wall with respect to what
9:14AM  7  will happen to the trees here?
9:14AM  8  A.  The cantilever retaining wall according to City's proposal,
9:14AM  9  five of the six trees would be removed, but if we use pier and
9:14AM  10  spandrel you know like retaining wall, then two of the six
9:14AM  11  trees have to be removed.  So we can save three trees there.
9:15AM  12  The two -- we are recommending to remove, those are very close
9:15AM  13  to the wall.  On the other hand, the other three are at least
9:15AM  14  three to four feet away from there, from the wall.  But since
9:15AM  15  you is to cut that one for cantilever retaining wall.  So you
9:15AM  16  must have to cut those trees.  But if you use the pier and
9:15AM  17  spandrel system, you may not have those tree which is actually
9:15AM  18  three, four feet away from the wall.
9:15AM  19  Q.  And so I want to go back just to clarify something
9:15AM  20  regarding the third to bottom row, drilling needed.  So for the
9:15AM  21  pier and spandrel system, you're talking about a diameter of
9:15AM  22  one-to-one and a half feet, correct?
9:15AM  23  A.  Yes.
9:15AM  24  Q.  Not meters.  It's not meters, correct?
9:15AM  25  A.  Yeah.  It's feet.  Sorry.

Sazzad Shafique - Direct

9:15AM  1  Q.  All right.  So so just to kind of summarize everything, the

9:16AM  2  City's got -- under the City's diagrams, there are 83 trees

9:16AM  3  within the Lambert Beach area of the park, correct?  Correct?

9:16AM  4  A.  Yes.

9:16AM  5  Q.  Okay.  And then under the City's cantilever wall design,

9:16AM  6  they're requiring the removal of 69 of those 83 trees, correct?

9:16AM  7  A.  Yes.

9:16AM  8  Q.  And in your expert opinion how many trees would need to be

9:16AM  9  removed under the pier and spandrel system?

9:16AM  10  A.  Almost ten, like these are big trees.

9:16AM  11  Q.  So under your -- under the pier and spandrel system in your

9:16AM  12  expert opinion, only ten need to be removed?

9:16AM  13  A.  Yes.

9:16AM  14  Q.  Okay.  And then so using in your expert opinion if the city

9:16AM  15  were to use the pier and spandrel system, they could preserve

9:16AM  16  59 more trees?

9:16AM  17  A.  Yes.

9:16AM  18  Q.  Okay.  All right.  Thank you, Dr. --

9:17AM  19        THE COURT:  Just a moment.  Before we leave that.  Of

9:17AM  20  the ten trees that you believe would have to be removed, I

9:17AM  21  think you used the word "big."  I mean, those are the so-called

9:17AM  22  heritage trees, but they would have to be removed under either

9:17AM  23  methodology blue.

9:17AM  24  Q.  Dr. Shafique do you know the difference between a heritage

9:17AM  25  and a significant tree?

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:17AM | 1 | A.  No. |
| 9:17AM | 2 | Q.  Okay.  So wouldn't be able to see whether they are heritage |
| 9:17AM | 3 | trees, correct? |
| 9:17AM | 4 | A.  No. |
| 9:17AM | 5 | THE COURT:  Okay.  But there still would be ten large |
| 9:17AM | 6 | trees under the pier spandrel retaining wall system that would |
| 9:17AM | 7 | so be removed. |
| 9:17AM | 8 | THE WITNESS:  Yes. |
| 9:17AM | 9 | THE COURT:  So either way if the project goes forward |
| 9:17AM | 10 | trees are going to be removed, it's just a matter of how many. |
| 9:17AM | 11 | Okay.  Go ahead. |
| 9:17AM | 12 | (Discussion off the record) |
| 9:18AM | 13 | MR. McCRAW:  Your Honor, would we be able to mark the |
| 9:18AM | 14 | diagrams that we displayed as Plaintiff's Exhibit 53. |
| 9:18AM | 15 | THE COURT:  Sure. |
| 9:18AM | 16 | MR. McCRAW:  And be admitted?  Your Honor, that's -- I |
| 9:18AM | 17 | just reserve in order to call Dr. Shafique back on redirect. |
| 9:18AM | 18 | THE COURT:  All right.  Mr. Jones.  Or I'm sorry. |
| 9:18AM | 19 | MR. McLIN:  I will handle the cross-examination of |
| 9:18AM | 20 | this witness. |
| 9:18AM | 21 | CROSS-EXAMINATION |
| 9:18AM | 22 | BY MR. McLIN: |
| 9:18AM | 23 | Q.  Good morning, Doctor. |
| 9:18AM | 24 | A.  Good morning. |
| 9:18AM | 25 | Q.  My name is Ian McLin.  I represent the city of San Antonio. |

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:18AM | 1 | I hope I don't have too many questions for you today.  But I'm |
| 9:18AM | 2 | going to start with, in reading your CV and understanding your |
| 9:18AM | 3 | testimony today, you are not an arborist, are you? |
| 9:18AM | 4 | A.  No. |
| 9:18AM | 5 | Q.  You have no education in I think it's been called |
| 9:18AM | 6 | aboriculture science? |
| 9:18AM | 7 | A.  No. |
| 9:18AM | 8 | Q.  And you have no science in arboriculture sciences? |
| 9:18AM | 9 | A.  No. |
| 9:19AM | 10 | Q.  This particular project, would you agree with me, requires |
| 9:19AM | 11 | a unique set or has a unique set of problems because it |
| 9:19AM | 12 | involves historical structures, does it not? |
| 9:19AM | 13 | A.  Yes. |
| 9:19AM | 14 | Q.  And there are additional local, state and federal |
| 9:19AM | 15 | regulations that apply to the preservation of these walls and |
| 9:19AM | 16 | the reconstruction of these walls, aren't there? |
| 9:19AM | 17 | A.  Yes. |
| 9:19AM | 18 | Q.  Do you have any practical or work experience in working on |
| 9:19AM | 19 | historical structures? |
| 9:19AM | 20 | A.  No. |
| 9:19AM | 21 | Q.  Were you here yesterday for Mr. Perez's testimony? |
| 9:19AM | 22 | A.  Yes. |
| 9:19AM | 23 | Q.  And I'm sorry yesterday.  I meant Monday? |
| 9:19AM | 24 | A.  Yes. |
| 9:19AM | 25 | Q.  Okay.  Would you agree with the plaintiff that safety is |

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:19AM | 1 | paramount? |
| 9:19AM | 2 | A.  Yes. |
| 9:19AM | 3 | Q.  Okay.  Both to the citizens of San Antonio and the |
| 9:19AM | 4 | individuals who are performing work on that project, isn't it? |
| 9:20AM | 5 | A.  Yes. |
| 9:20AM | 6 | Q.  Would you also agree that these walls must be repaired? |
| 9:20AM | 7 | A.  Not in the south side. |
| 9:20AM | 8 | Q.  Okay.  On along the north side they need to be repaired? |
| 9:20AM | 9 | A.  Yes. |
| 9:20AM | 10 | Q.  And you're aware the City of San Antonio also plans to |
| 9:20AM | 11 | undertake far to northern edge of the south beach, some repairs |
| 9:20AM | 12 | in that area as well? |
| 9:20AM | 13 | A.  Yeah.  That's nice. |
| 9:20AM | 14 | Q.  Are you aware of those proposed repairs? |
| 9:20AM | 15 | A.  Yes. |
| 9:20AM | 16 | Q.  Okay.  And you agree that those repairs are necessary? |
| 9:20AM | 17 | A.  On the south side? |
| 9:20AM | 18 | Q.  Yes, sir? |
| 9:20AM | 19 | A.  I would say that from the functional perspective, no.  If |
| 9:20AM | 20 | you want to go for beautifyication, yes. |
| 9:20AM | 21 | Q.  Now, when you are talking about making repairs, whether it |
| 9:20AM | 22 | be to the north side or the south side, there are additional |
| 9:20AM | 23 | risks than just the walls themselves, are there not? |
| 9:20AM | 24 | A.  From civil engineering perspective or -- |
| 9:21AM | 25 | Q.  Well, let me -- I'll break it down, okay.  That's fair. |

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:21AM | 1 | You can have or there is a danger from wall collapse as |
| 9:21AM | 2 | construction is being performed? |
| 9:21AM | 3 | A.  Yes. |
| 9:21AM | 4 | Q.  Okay.  And there is a danger from utilization of |
| 9:21AM | 5 | construction machinery during reconstruction repairs? |
| 9:21AM | 6 | A.  Yeah, accident. |
| 9:21AM | 7 | Q.  And then in some instances and I believe an arborist |
| 9:21AM | 8 | testified that you can actually have trees which will or can |
| 9:21AM | 9 | fall during the reconstruction process.  Did you hear that |
| 9:21AM | 10 | testimony? |
| 9:21AM | 11 | A.  I can't recall. |
| 9:21AM | 12 | Q.  You are aware and you did hear the testimony that there is |
| 9:21AM | 13 | actually a branch on the south side hanging from a tree as we |
| 9:21AM | 14 | sit here today? |
| 9:21AM | 15 | A.  Yes. |
| 9:21AM | 16 | Q.  So you would agree with me that aside from the walls |
| 9:21AM | 17 | themselves, there are other dangers within the southern zone |
| 9:21AM | 18 | that pose a risk to human health and safety? |
| 9:21AM | 19 | A.  No. |
| 9:21AM | 20 | Q.  So you don't believe that the potential for a falling tree |
| 9:22AM | 21 | is a risk for safety? |
| 9:22AM | 22 | A.  Yes.  Not from the civil engineering perspective. |
| 9:22AM | 23 | Q.  Aside from the civil engineering perspective, as a |
| 9:22AM | 24 | practical perspective? |
| 9:22AM | 25 | A.  Moansly, I went there.  I didn't take a look at the top. |

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:22AM | 1 | Q.  Now, in this particular case you were not part of the |
| 9:22AM | 2 | design team utilized by the city of San Antonio, were you? |
| 9:22AM | 3 | A.  No, I'm not. |
| 9:22AM | 4 | Q.  Okay.  You weren't present at their meetings? |
| 9:22AM | 5 | A.  No. |
| 9:22AM | 6 | Q.  And you were not present for the public input sessions that |
| 9:22AM | 7 | were held by the City of San Antonio across the City? |
| 9:22AM | 8 | A.  No. |
| 9:22AM | 9 | Q.  I want to go back to the legal and regulatory restrictions |
| 9:22AM | 10 | regarding repairs at Brackenridge Park.  Are you familiar with |
| 9:22AM | 11 | the secretary of supervisor standards for the repair of |
| 9:22AM | 12 | historical landmarks? |
| 9:22AM | 13 | A.  Yes. |
| 9:22AM | 14 | Q.  Okay.  And that they do apply to this particular project, |
| 9:22AM | 15 | do they not? |
| 9:22AM | 16 | A.  Yes. |
| 9:22AM | 17 | Q.  Are you aware of the regulations and restrictions |
| 9:22AM | 18 | promulgated by the Texas Historical Commission? |
| 9:23AM | 19 | A.  Yes. |
| 9:23AM | 20 | Q.  And they do apply to this particular project, do they not? |
| 9:23AM | 21 | A.  Yes. |
| 9:23AM | 22 | Q.  There's also the San Antonio historic commission, isn't |
| 9:23AM | 23 | there? |
| 9:23AM | 24 | A.  Yes. |
| 9:23AM | 25 | Q.  And those regulations apply to this particular project in |

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:23AM | 1 | Brackenridge Park? |
| 9:23AM | 2 | A.   Yes. |
| 9:23AM | 3 | Q.   Do you know what the HDRC is? |
| 9:23AM | 4 | A.   The historic commission. |
| 9:23AM | 5 | Q.   Okay.  Do the rules and operations of the historical design |
| 9:23AM | 6 | review commission apply to this particular project? |
| 9:23AM | 7 | A.   Should be. |
| 9:23AM | 8 | Q.   And then, of course, there's always your former employer, |
| 9:23AM | 9 | the United States Army corps of engineers, isn't there? |
| 9:23AM | 10 | A.   Okay. |
| 9:23AM | 11 | Q.   Do they apply or do they have any authority over this |
| 9:23AM | 12 | particular project? |
| 9:23AM | 13 | A.   Yeah. |
| 9:23AM | 14 | Q.   Now, you prepared a report dated September 12th, 2023, did |
| 9:23AM | 15 | you not your report, sir? |
| 9:24AM | 16 | A.   Yes. |
| 9:24AM | 17 | Q.   Okay.  Do you have a copy of it in front of you? |
| 9:24AM | 18 | A.   Yes. |
| 9:24AM | 19 | Q.   Okay. |
| 9:24AM | 20 |      MR. McLIN:  Your Honor, do you have a copy? |
| 9:24AM | 21 |      THE COURT:  Oh, if it's in the book or not? |
| 9:24AM | 22 |      MR. McLIN:  I don't know whether it is or not, Your |
| 9:24AM | 23 | Honor.  If I may, I'll just bring a physical copy. |
| 9:24AM | 24 |      THE COURT:  Okay.  That's final.  Ms. Herndon will |
| 9:24AM | 25 | take it. |

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:24AM | 1 | MR. McLIN:  Thank you, ma'am. |
| 9:24AM | 2 | THE COURT:  Thank you. |
| 9:24AM | 3 | THE CLERK:  Yes, sir. |
| 9:24AM | 4 | BY MR. McLIN: |
| 9:24AM | 5 | Q.  I want to go straight to your opinions in this case and |
| 9:24AM | 6 | talking about the report, does this report contain all of your |
| 9:24AM | 7 | opinions as applicable that particular case and project? |
| 9:24AM | 8 | Doctor, were you able to hear me? |
| 9:24AM | 9 | A.  Yeah. |
| 9:24AM | 10 | Q.  Does this contain all of your opinions in this case? |
| 9:24AM | 11 | A.  Yeah.  Mostly.  It's a summary. |
| 9:25AM | 12 | Q.  Okay.  Fair enough. |
| 9:25AM | 13 | You said you had two opportunities to inspect the physical |
| 9:25AM | 14 | site? |
| 9:25AM | 15 | A.  Yes. |
| 9:25AM | 16 | Q.  When did you conduct those inspections? |
| 9:25AM | 17 | A.  One before this one and I had little bit confusion so I |
| 9:25AM | 18 | went there last week. |
| 9:25AM | 19 | Q.  Did you enter the construction site? |
| 9:25AM | 20 | A.  Second time, no. |
| 9:25AM | 21 | Q.  Okay.  So you made one physical visit to the actual |
| 9:25AM | 22 | construction site where these repairs will take place? |
| 9:25AM | 23 | A.  Yes. |
| 9:25AM | 24 | Q.  How long did you spend there? |
| 9:25AM | 25 | A.  More than an hour. |

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:25AM | 1 | Q. Did you take any physical measurements? |
| 9:25AM | 2 | A. No. |
| 9:25AM | 3 | Q. Did you take any photographs? |
| 9:25AM | 4 | A. I did, some. |
| 9:25AM | 5 | Q. Did you do any destructive testing? |
| 9:25AM | 6 | A. No. |
| 9:25AM | 7 | Q. Did you take any notes? |
| 9:25AM | 8 | A. Yes. |
| 9:25AM | 9 | Q. And have you provided those notes to counsel in this |
| 9:25AM | 10 | particular case? |
| 9:25AM | 11 | A. No.  That's with me. |
| 9:25AM | 12 | Q. In your report you talk about reviewing construction |
| 9:25AM | 13 | documents.  I believe at paragraphs 3.1 and 3.13.  Did I get |
| 9:26AM | 14 | that right? |
| 9:26AM | 15 | A. Uh-huh. |
| 9:26AM | 16 | Q. I'm sorry.  3.12 and 3.13? |
| 9:26AM | 17 | A. Yes. |
| 9:26AM | 18 | Q. Okay.  Did you review any additional documents in preparing |
| 9:26AM | 19 | for either your testimony today or in preparing this report? |
| 9:26AM | 20 | A. I also read the testimony from Mr. Franke, the designer.  I |
| 9:26AM | 21 | don't know the name is correct.  Mr. Franke or Frank. |
| 9:26AM | 22 | Q. I say Franke, but I won't attest that is a correct |
| 9:26AM | 23 | pronunciation. |
| 9:26AM | 24 | Okay.  Going back to topic number 1 at paragraph 2.3, do |
| 9:26AM | 25 | you know what years in which these walls were constructed, sir? |

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:26AM | 1 | A.  No. |
| 9:27AM | 2 | Q.  You have mentioned the method of construction in your |
| 9:27AM | 3 | report essentially being I think it was piled rocks with some |
| 9:27AM | 4 | mortar.  Is that a fair description? |
| 9:27AM | 5 | A.  Yes. |
| 9:27AM | 6 | Q.  There is no rebar in these walls? |
| 9:27AM | 7 | A.  Uh-huh. |
| 9:27AM | 8 | Q.  And I'm not picking on you for the benefit of the court |
| 9:27AM | 9 | reporter and the Court, is that a yes? |
| 9:27AM | 10 | A.  Okay.  Yes. |
| 9:27AM | 11 | Q.  Okay.  Thank you, sir? |
| 9:27AM | 12 | THE COURT:  Okay.  Yes, there is no rebar. |
| 9:27AM | 13 | MR. McLIN:  I could rephrase it so it makes more |
| 9:27AM | 14 | sense. |
| 9:27AM | 15 | THE COURT:  Yes, we have no bananas today. |
| 9:27AM | 16 | MR. McLIN:  And it sounds -- it sounds perfectly Lucid |
| 9:27AM | 17 | coming from here, Your Honor, but when you sound it back it |
| 9:27AM | 18 | does sound terrible. |
| 9:27AM | 19 | THE COURT:  I'm a jury of one so I have to understand. |
| 9:27AM | 20 | BY MR. McLIN: |
| 9:27AM | 21 | Q.  Doctor, is there any rebar in the construction of these |
| 9:27AM | 22 | walls? |
| 9:27AM | 23 | A.  No. |
| 9:27AM | 24 | Q.  Okay.  They are simple gravity type walls, are they not? |
| 9:27AM | 25 | A.  Yes. |

Sazzad Shafique – Cross

| | | |
|---|---|---|
| 9:27AM | 1 | Q. You've testified that they were underengineered for this |
| 9:27AM | 2 | particular application? |
| 9:27AM | 3 | A. Yes. |
| 9:27AM | 4 | Q. What was the engineering standard of care back when these |
| 9:28AM | 5 | were built, if you know? |
| 9:28AM | 6 | A. Which year you are talking about? |
| 9:28AM | 7 | Q. My understanding is they were built during the works |
| 9:28AM | 8 | project administration years? |
| 9:28AM | 9 | MR. JONES: 1915. |
| 9:28AM | 10 | BY MR. McLIN: |
| 9:28AM | 11 | Q. 1915. |
| 9:28AM | 12 | THE COURT: Well, that was before the depression. So |
| 9:28AM | 13 | work project was in the '30s ply correct. I understand between |
| 9:28AM | 14 | 1935 and the 1930s. Mr. Jones is telling me 1915. |
| 9:28AM | 15 | BY MR. McLIN: |
| 9:28AM | 16 | Q. Do you know what year they were built? |
| 9:28AM | 17 | A. No. |
| 9:28AM | 18 | Q. Okay. Do you know the standard that should have been |
| 9:28AM | 19 | utilized to build these walls if any? |
| 9:28AM | 20 | A. Not at that time, no. I don't know. |
| 9:28AM | 21 | Q. They don't have any supporting foundations, do they? |
| 9:28AM | 22 | A. Most walls do now. And the walls did not. |
| 9:28AM | 23 | Q. And the walls on the northern edge are no longer plumb in |
| 9:28AM | 24 | many places, are they? |
| 9:28AM | 25 | A. Can you repeat that question? |

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:28AM | 1 | Q. When I refer to the plumbness, I'm talking about the |
| 9:28AM | 2 | vertical straightens. Does that make sense? |
| 9:29AM | 3 | A. Yes. |
| 9:29AM | 4 | Q. And you're the engineer and I'm the interloper here, so I |
| 9:29AM | 5 | want to make sure I'm using the correct terms are the walls |
| 9:29AM | 6 | northern the northern edge of the project, are they still |
| 9:29AM | 7 | plumb? |
| 9:29AM | 8 | A. No. Some of them are tilted. |
| 9:29AM | 9 | Q. Does that increase the risk for their failure? |
| 9:29AM | 10 | A. Yes. |
| 9:29AM | 11 | Q. And some walls actually have failed and have fallen, have |
| 9:29AM | 12 | they not? |
| 9:29AM | 13 | A. Yes. |
| 9:29AM | 14 | Q. Would it be your professional recommendation that when |
| 9:29AM | 15 | these walls are reconstructed that a footer or foundation is |
| 9:29AM | 16 | put under those walls? |
| 9:29AM | 17 | A. Yes. |
| 9:29AM | 18 | Q. And the two applications or two engineering solutions that |
| 9:29AM | 19 | we're talking about here today, they both do that, don't they? |
| 9:29AM | 20 | A. It's not putting anything below the foundation. It's just |
| 9:29AM | 21 | trying to that anchor that one from the side. |
| 9:29AM | 22 | Q. And you're talking about putting shadow wall up behind the |
| 9:29AM | 23 | existing walls? |
| 9:29AM | 24 | A. Yes. |
| 9:29AM | 25 | Q. Do those walls need to be fastened together? |

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:29AM | 1 | A.  Yes. |
| 9:29AM | 2 | Q.  They need to be pinned together, don't they? |
| 9:30AM | 3 | A.  Yes. |
| 9:30AM | 4 | Q.  Okay.  If I may, I believe it's Plaintiff's Exhibit 53. |
| 9:30AM | 5 | And claim going to do is I'm going to put it on the ELMO |
| 9:30AM | 6 | because I don't know if he has it loaded yet. |
| 9:30AM | 7 | THE COURT:  While we're doing that, doctor, do you |
| 9:30AM | 8 | know whether the historical regulations of these different |
| 9:30AM | 9 | commissions and agencies apply any differently to any of these |
| 9:30AM | 10 | methods. |
| 9:30AM | 11 | THE WITNESS:  No. |
| 9:30AM | 12 | THE COURT:  Okay.  Go ahead. |
| 9:30AM | 13 | BY MR. McLIN: |
| 9:30AM | 14 | Q.  Okay.  If I may use the ELMO.  Let's see.  Okay.  Do you |
| 9:30AM | 15 | recall this demonstrative, sir, now exhibit? |
| 9:31AM | 16 | A.  Uh-huh. |
| 9:31AM | 17 | Q.  Okay.  And the top row is the cantilever wall, is it not? |
| 9:31AM | 18 | A.  Yes. |
| 9:31AM | 19 | Q.  Okay.  And this particular exhibit you did not include in |
| 9:31AM | 20 | your demonstrative the root ball or roots of any of the trees, |
| 9:31AM | 21 | did you? |
| 9:31AM | 22 | A.  No. |
| 9:31AM | 23 | Q.  Does -- and if you know, do you know how large the |
| 9:31AM | 24 | potential root ball for the tree in your figure or any of the |
| 9:31AM | 25 | trees at the project would be? |

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:31AM | 1 | A.  That would be very big. |
| 9:31AM | 2 | Q.  In either case, would it get up close to the existing wall? |
| 9:31AM | 3 | A.  The big. |
| 9:31AM | 4 | The root ball for the tree that's depicted in your |
| 9:31AM | 5 | demonstrative, would that root ball be within 12 inches of the |
| 9:31AM | 6 | existing wall? |
| 9:31AM | 7 | A.  I will try to avoid that -- |
| 9:31AM | 8 | Q.  And I'm sorry.  I didn't hear your response, sir? |
| 9:31AM | 9 | A.  I'm saying that if you see that, you know, like a root ball |
| 9:32AM | 10 | is within like one feet of the -- of the existing wall, I |
| 9:32AM | 11 | would -- I would recommend to take that tree off. |
| 9:32AM | 12 | Q.  And in this particular case from your demonstrative and |
| 9:32AM | 13 | from your inspection, we don't know where the root ball would |
| 9:32AM | 14 | be located in relation to the project wall or original wall |
| 9:32AM | 15 | that you've indicated in this demonstrative? |
| 9:32AM | 16 | A.  Yeah.  True.  Because I didn't go in-depth, you know, like |
| 9:32AM | 17 | I didn't, you know, do any intrusive, you know, like experiment |
| 9:32AM | 18 | there.  I was just trying to see from outside. |
| 9:32AM | 19 | Q.  And we would also have to deal with root systems for that |
| 9:32AM | 20 | particular tree, would we not? |
| 9:32AM | 21 | A.  Could be. |
| 9:32AM | 22 | Q.  And are the root systems generally contained within the |
| 9:32AM | 23 | footprint of the canopy or do they expand outside of the |
| 9:32AM | 24 | canopy? |
| 9:32AM | 25 | A.  I can't speak about that. |

Sazzad Shafique - Cross

9:32AM 1  Q.  Okay.  When we're doing the cantilever retaining wall, do
9:32AM 2  you know whether the -- do you know what OSHA is?
9:33AM 3  A.  Yes.
9:33AM 4  Q.  Okay.  Would OSHA require that excavation to be shored up
9:33AM 5  to protect the individuals working in that excavation?
9:33AM 6  A.  Uh-huh.
9:33AM 7  Q.  And I'm not picking on you, sir.  I'm sorry.  But is that a
9:33AM 8  yes?
9:33AM 9  A.  Yes.
9:33AM 10 Q.  Thank you.
9:33AM 11    Now, when we go to the bottom, the pier and spandrel wall
9:33AM 12 section, the third one over has what appears to be a white
9:33AM 13 hatch wall there.  Is that the pier and spandrel wall?
9:33AM 14 A.  Yes.  That's the pier, the spandrel wall would be in
9:33AM 15 between two peers.
9:33AM 16 Q.  Is that particular wall reinforced with rebar?
9:33AM 17 A.  The pier?
9:33AM 18 Q.  The spandrel wall, sir.
9:33AM 19 A.  Could be more.
9:33AM 20 Q.  And I'm --
9:33AM 21 A.  Reenforcement.
9:33AM 22 Q.  Let me reask the question because I want to make sure I
9:33AM 23 understand the answer.  The spandrel wall that sits atop the
9:34AM 24 Pearce, is that reinforced with rebar?
9:34AM 25 A.  Yes.

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:34AM | 1 | Q.  And if you are installing the rebar into this system, how |
| 9:34AM | 2 | do you get someone into that excavation to install the rebar? |
| 9:34AM | 3 | A.  You can -- you get that one and then slide that one there |
| 9:34AM | 4 | and then put the concrete to seal at the corner. |
| 9:34AM | 5 | Q.  And then -- |
| 9:34AM | 6 | A.  That might be one option.  The other option could be just |
| 9:34AM | 7 | make vertical wall.  You don't have to go there.  You just make |
| 9:34AM | 8 | a like form passed that one there and your concrete. |
| 9:34AM | 9 | Q.  And thin sir how do you attach the spandrel wall to the |
| 9:34AM | 10 | existing historical wall? |
| 9:34AM | 11 | A.  If there is no wall there, then you can do it from the |
| 9:34AM | 12 | back, the same way the City's talking about, and if you -- if |
| 9:34AM | 13 | there is like existing soil there, then physically you might |
| 9:34AM | 14 | have to do that one from the front side and conceal the anchor |
| 9:35AM | 15 | so that the people can't see. |
| 9:35AM | 16 | Q.  Under current secretary of supervisor standards, do they |
| 9:35AM | 17 | prohibit the pinning of the historical wall to a shadow wall |
| 9:35AM | 18 | from the front side? |
| 9:35AM | 19 | A.  I'm not aware of that. |
| 9:35AM | 20 | Q.  If that is the secretary of supervisor standard and you |
| 9:35AM | 21 | hear testimony about that later, would that affect your opinion |
| 9:35AM | 22 | regarding the ability to pin that wall from the front side? |
| 9:35AM | 23 | A.  Then it will try to the that one from the back side.  Have |
| 9:35AM | 24 | to put like a step Okay.  Not like the whole area.  But you can |
| 9:35AM | 25 | just cut like maybe two to three feet, little bit and then you |

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:35AM | 1 | can go and. |
| 9:35AM | 2 | Q.  Now, when you're pinning, let's say you're pinning from the |
| 9:35AM | 3 | rear, how far apart from those pins spaced? |
| 9:35AM | 4 | A.  Your drawing shows like two feet. |
| 9:35AM | 5 | Q.  Every two feet, horizontally and vertically? |
| 9:35AM | 6 | A.  Horizontally.  Vertically, a little bit less. |
| 9:36AM | 7 | Q.  There are still pins for the entirety of the vertical wall |
| 9:36AM | 8 | structure? |
| 9:36AM | 9 | A.  Maybe.  But you can change that one. |
| 9:36AM | 10 | Q.  Now, in order to get those pins put into place, would it be |
| 9:36AM | 11 | necessary to increase the excavation size to be able to drive |
| 9:36AM | 12 | those pins? |
| 9:36AM | 13 | A.  Yes.  If you are not allowed to the that one from the front |
| 9:36AM | 14 | side, then maybe. |
| 9:36AM | 15 | Q.  Okay.  And how far would you have to excavate in order to |
| 9:36AM | 16 | be able to drive the pins from the rear? |
| 9:36AM | 17 | A.  Maybe two, three feet. |
| 9:36AM | 18 | Q.  Okay.  And those have to be driven by a human? |
| 9:36AM | 19 | A.  Yes. |
| 9:36AM | 20 | Q.  Okay.  And how thick is your spandrel wall in this |
| 9:36AM | 21 | situation? |
| 9:36AM | 22 | A.  Eight inch. |
| 9:36AM | 23 | Q.  I'm sorry. |
| 9:36AM | 24 | A.  Eight inches. |
| 9:36AM | 25 | Q.  And -- |

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:36AM | 1 | A.  Approximately. |
| 9:36AM | 2 | Q.  How deep is the spandrel -- I'm sorry -- the historical |
| 9:36AM | 3 | wall? |
| 9:36AM | 4 | A.  That depends on some places it's three feet.  Some places |
| 9:36AM | 5 | it's 15 feet. |
| 9:36AM | 6 | Q.  And how long is the pin? |
| 9:37AM | 7 | A.  That's more than eight feet actually. |
| 9:37AM | 8 | Q.  How long?  I'm sorry? |
| 9:37AM | 9 | A.  More than eight feet. |
| 9:37AM | 10 | THE COURT:  One foot. |
| 9:37AM | 11 | THE WITNESS:  One foot. |
| 9:37AM | 12 | THE COURT:  Okay. |
| 9:37AM | 13 | BY MR. McLIN: |
| 9:37AM | 14 | Q.  And then there's a machine that you have to use that drive |
| 9:37AM | 15 | those pens is there not? |
| 9:37AM | 16 | A.  Yes. |
| 9:37AM | 17 | Q.  And how big is that machine? |
| 9:37AM | 18 | A.  12-inch. |
| 9:37AM | 19 | Q.  So my very rude meantary math has us up to at least 36 |
| 9:37AM | 20 | inches to be able to drive the pins into the rear of the |
| 9:37AM | 21 | retaining wall? |
| 9:37AM | 22 | A.  Yeah, could be. |
| 9:37AM | 23 | Q.  Okay.  So that's an additional three feet in addition to |
| 9:37AM | 24 | the excavation for the pier and spandrel wall system? |
| 9:37AM | 25 | A.  Yeah.  But you don't have to do that one.  You can just go |

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:37AM | 1 | like the spacing, you know, like like City One is recommending |
| 9:37AM | 2 | like that anchor has to be two feet horizontally.  You can make |
| 9:37AM | 3 | that one with bigger or stronger made but maybe like three feet |
| 9:38AM | 4 | of spacing.  So you have to make that path only like three |
| 9:38AM | 5 | feet.  Not the whole area. |
| 9:38AM | 6 | Q.  It has to be at least deep enough to get a human into it, |
| 9:38AM | 7 | right? |
| 9:38AM | 8 | A.  Yes. |
| 9:38AM | 9 | Q.  At least wide enough to get a human into it, correct? |
| 9:38AM | 10 | A.  Yes. |
| 9:38AM | 11 | Q.  And then be of sufficient size to comply with OSHA |
| 9:38AM | 12 | regulations, doesn't it? |
| 9:38AM | 13 | A.  Yes. |
| 9:38AM | 14 | Q.  Okay. |
| 9:38AM | 15 | THE COURT:  Well, once you get some worker down in |
| 9:38AM | 16 | there or you do the excavation, does OSHA require I would think |
| 9:38AM | 17 | some kind of support so that the soil doesn't collapse on the |
| 9:38AM | 18 | worker. |
| 9:38AM | 19 | THE WITNESS:  Yeah.  They have to make, you know, like |
| 9:38AM | 20 | that -- there. |
| 9:38AM | 21 | THE COURT:  Right.  Yeah.  Okay.  Go ahead. |
| 9:38AM | 22 | BY MR. McLIN: |
| 9:38AM | 23 | Q.  And we generally call that shoring, right? |
| 9:38AM | 24 | A.  Shoring. |
| 9:38AM | 25 | Q.  You're shoring the rear wall of the excavation; is that |

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:38AM | 1 | right? |
| 9:38AM | 2 | A.  Yes. |
| 9:38AM | 3 | Q.  And then you also got to shore the existing wall or peer |
| 9:39AM | 4 | and spandrel structure to make sure that neither collapses in |
| 9:39AM | 5 | on the worker? |
| 9:39AM | 6 | A.  Uh-huh. |
| 9:39AM | 7 | Q.  And doctor, I'm sorry.  I'm not picking on you but just a |
| 9:39AM | 8 | verbal response if you can? |
| 9:39AM | 9 | A.  Oh, sorry. |
| 9:39AM | 10 | Q.  It's okay.  So that would be a yes? |
| 9:39AM | 11 | A.  Yes.  Yes. |
| 9:39AM | 12 | Q.  Okay.  Thank you. |
| 9:39AM | 13 | I want to go to topic number 2, 2.4 in your report, sir. |
| 9:39AM | 14 | You've obviously concluded that tree roots from never by trees |
| 9:39AM | 15 | diminish the structural integrity of certain retaining walls, |
| 9:39AM | 16 | did I read that correctly? |
| 9:39AM | 17 | A.  Yes. |
| 9:39AM | 18 | Q.  And you would agree with me that even after repairs, that |
| 9:39AM | 19 | trees in close proximity to these walls would continue to dim |
| 9:39AM | 20 | tissue structural integrity of walls and/or the repairs made? |
| 9:39AM | 21 | A.  Yes. |
| 9:39AM | 22 | Q.  And in the ideal instance, other than taking humans out of |
| 9:39AM | 23 | the equation that built the walls from the first place, the |
| 9:39AM | 24 | ideal slights would be to keep the trees as far as away as |
| 9:40AM | 25 | possible as either the current walls or the walls as repaired? |

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:40AM | 1 | A.  That depends on how far this one is. |
| 9:40AM | 2 | Q.  All right.  Under topic 3, which is paragraph 2.5, you've |
| 9:40AM | 3 | concluded that there you prefer the pier and spandrel system |
| 9:40AM | 4 | essentially? |
| 9:40AM | 5 | A.  Yes. |
| 9:40AM | 6 | Q.  But cantilever wall system is a perfectly acceptable |
| 9:40AM | 7 | solution, is it not? |
| 9:40AM | 8 | A.  Yes. |
| 9:40AM | 9 | Q.  If you -- if you don't present that trees. |
| 9:40AM | 10 | Q.  When we start talking about comparing the systems, in your |
| 9:40AM | 11 | report you didn't talk about a cantilever wall system is more |
| 9:40AM | 12 | economic Al, is it not? |
| 9:41AM | 13 | A.  Most of the cases. |
| 9:41AM | 14 | Q.  Okay.  And what is the approximate cost difference between |
| 9:41AM | 15 | a cantilever wall system and pier and spandrel system? |
| 9:41AM | 16 | A.  I can't tell right now because I have to wait until the |
| 9:41AM | 17 | full design thing and take a look. |
| 9:41AM | 18 | Q.  Regardless of the solution that is used in these repairs |
| 9:41AM | 19 | are temporary in terms of the construction phase.  In other |
| 9:41AM | 20 | words, the park would be closed temporarily to conduct this |
| 9:41AM | 21 | construction, right? |
| 9:41AM | 22 | A.  Yes. |
| 9:41AM | 23 | Q.  Okay.  And it's anticipated that it would reopen at the |
| 9:41AM | 24 | conclusion of construction? |
| 9:41AM | 25 | A.  Yes. |

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:41AM | 1 | Q. And how long would construction of the pier and spandrel |
| 9:41AM | 2 | system take? |
| 9:41AM | 3 | A. Months. I think very similar to the cantilever system. |
| 9:42AM | 4 | Q. We talk about the crux methodologies that would be utilized |
| 9:42AM | 5 | to repair these walls in terms of the equipment? |
| 9:42AM | 6 | A. Yes. |
| 9:42AM | 7 | Q. The two types of construction used different equipment if I |
| 9:42AM | 8 | understand correctly; is that right? |
| 9:42AM | 9 | A. Yes. |
| 9:42AM | 10 | Q. We have to utilize a drill to insert or make a place for |
| 9:42AM | 11 | the piers to go; is that right? |
| 9:42AM | 12 | A. Yes. |
| 9:42AM | 13 | Q. Okay. That is not construction that is necessary with the |
| 9:42AM | 14 | cantilever wall system, is it? |
| 9:42AM | 15 | A. No. |
| 9:42AM | 16 | Q. Is there a danger to any of the historical portions of the |
| 9:42AM | 17 | park IE the walls from utilization of the drilling units? |
| 9:42AM | 18 | A. I believe that like if you want to use just the backhoe for |
| 9:42AM | 19 | cantilever retaining wall, you have to bring a back low and |
| 9:42AM | 20 | that's also a heavy equipment. So in that situation actually |
| 9:42AM | 21 | you have to shore the wall before you do anything down there. |
| 9:43AM | 22 | So you have to take similar measure like if you going to bring |
| 9:43AM | 23 | a rig there. |
| 9:43AM | 24 | Q. So both require shoring? |
| 9:43AM | 25 | A. Yes. |

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:43AM | 1 | Q.  In terms of the excavation? |
| 9:43AM | 2 | A.  Yes. |
| 9:43AM | 3 | Q.  The cantilever wall design does not require that a drill |
| 9:43AM | 4 | unit be brought in to place piles or piers, does it? |
| 9:43AM | 5 | A.  Yes. |
| 9:43AM | 6 | Q.  At this point in time the only thing we can see is this |
| 9:43AM | 7 | topsides of those trees; is that right? |
| 9:43AM | 8 | A.  Yes. |
| 9:43AM | 9 | Q.  Okay.  And we won't know the impact of the tree ball or the |
| 9:43AM | 10 | tree roots with any type of certainty unless and until we dig |
| 9:43AM | 11 | the excavations to place those walls; is that right? |
| 9:43AM | 12 | A.  Yes. |
| 9:44AM | 13 | Q.  Those excavations very well could disturb both tree roots |
| 9:44AM | 14 | and tree balls, root balls regardless of the methodology that |
| 9:44AM | 15 | is used? |
| 9:44AM | 16 | A.  Yes.  But the -- but the cantilever retaining wall will |
| 9:44AM | 17 | destroy much more compared to the other one. |
| 9:44AM | 18 | Q.  Well, and that's just if we use the single excavation for |
| 9:44AM | 19 | the placement of the wall, right? |
| 9:44AM | 20 | A.  That's what is suggested in the drawing. |
| 9:44AM | 21 | Q.  Okay.  And that does not account for the need to pin the |
| 9:44AM | 22 | shadow Dahl for spandrel wall to the existing retaining wall, |
| 9:44AM | 23 | does it? |
| 9:44AM | 24 | A.  Yeah.  Yes.  It meets. |
| 9:44AM | 25 | Q.  Regardless of methodology that is used, if there are trees |

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:44AM | 1 | left in close proximity to the wall, they pose a danger in the |
| 9:44AM | 2 | future to that wall, do they not? |
| 9:45AM | 3 | A.  Yeah, depends on how many years you are talking about, what |
| 9:45AM | 4 | is the life of your structure, if you say it's hundred years, |
| 9:45AM | 5 | maybe if you said 60 years life, then may not be. |
| 9:45AM | 6 | Q.  Either way, trees in proximity or close proximity to those |
| 9:45AM | 7 | walls can affect the structural integrity of those walls over |
| 9:45AM | 8 | time, can they not? |
| 9:45AM | 9 | A.  It can.  That's why I also recommended to take some of the |
| 9:45AM | 10 | trees for removal. |
| 9:45AM | 11 | Q.  Now, the trees that you've talked about, the trees you've |
| 9:45AM | 12 | talked about in Plaintiff's Exhibit Number 53, are those human |
| 9:45AM | 13 | plantings or volunteer trees? |
| 9:45AM | 14 | A.  I don't know. |
| 9:45AM | 15 | Q.  Is there any way to know? |
| 9:45AM | 16 | A.  I don't know. |
| 9:46AM | 17 | Q.  The diagram that -- or the picture that is being presented |
| 9:46AM | 18 | in Plaintiffs' Exhibit Number 53 on Page 2 reflects four tree |
| 9:46AM | 19 | struck hours that are growing out of the ground.  Do you see |
| 9:46AM | 20 | that? |
| 9:46AM | 21 | A.  Yes. |
| 9:46AM | 22 | Q.  Okay.  The one on the far right appears to be over the |
| 9:46AM | 23 | retaining walls, does it not? |
| 9:46AM | 24 | A.  Yes. |
| 9:46AM | 25 | Q.  Okay.  Is that a tree that has to come out regardless of |

Sazzad Shafique - Cross

| | | |
|---|---|---|
| 9:46AM | 1 | the system that's used? |
| 9:46AM | 2 | A.  Yes. |
| 9:46AM | 3 | Q.  Going to the far left, we have a call that has collapsed, |
| 9:46AM | 4 | do we not? |
| 9:46AM | 5 | A.  Yes. |
| 9:46AM | 6 | Q.  And do you know how far that tree root or root ball is from |
| 9:46AM | 7 | where the existing retaining wall was located before failure? |
| 9:46AM | 8 | A.  No.  But I could see that like the root system there |
| 9:46AM | 9 | because there is not much you know like soil there.  But this |
| 9:46AM | 10 | tree is actually four feet area from the -- from the wall |
| 9:47AM | 11 | location. |
| 9:47AM | 12 | Q.  Are you talking about the lower wall or the wall standing |
| 9:47AM | 13 | when it failed? |
| 9:47AM | 14 | A.  Lower one which one has failed. |
| 9:47AM | 15 | Q.  Okay.  Do you see the wall here to the left, right here and |
| 9:47AM | 16 | then? |
| 9:47AM | 17 | A.  Yes. |
| 9:47AM | 18 | Q.  You see this area with dirt and rubble on the ground? |
| 9:47AM | 19 | A.  Yes. |
| 9:47AM | 20 | Q.  Okay.  That does appear to be wall failure, does it not? |
| 9:47AM | 21 | A.  Yes. |
| 9:47AM | 22 | Q.  And is that tree sufficiently far enough away that if you |
| 9:47AM | 23 | dug a pier and spandrel shadow wall, that that tree would be |
| 9:47AM | 24 | saved? |
| 9:47AM | 25 | A.  Yes. |

Sazzad Shafique - Cross

| 9:47AM | 1 | Q.  Okay.  So how far is it from where the wall will be |
| 9:47AM | 2 | standing? |
| 9:47AM | 3 | A.  Approximately four feet. |
| 9:47AM | 4 | Q.  So it's your testimony that that wall that has fallen was |
| 9:47AM | 5 | standing four feet away from that tree? |
| 9:47AM | 6 | A.  Yeah.  That's the spandrel system would be much compared to |
| 9:47AM | 7 | the existing wall. |
| 9:47AM | 8 | Q.  And the root ball or roots in this particular case appear |
| 9:48AM | 9 | to be right up against where that wall was standing, are they |
| 9:48AM | 10 | not? |
| 9:48AM | 11 | A.  Yeah.  But it's a little bit away from the wall. |
| 9:48AM | 12 | Q.  How far? |
| 9:48AM | 13 | A.  I didn't see the root ball, but the statement is actually |
| 9:48AM | 14 | like four feet from there. |
| 9:48AM | 15 | Q.  And so it's your opinion that tree would be saved? |
| 9:48AM | 16 | A.  Yes. |
| 9:48AM | 17 | Q.  Are your measurements for the distance of that tree from |
| 9:48AM | 18 | where the wall was standing, are those contained in your notes? |
| 9:48AM | 19 | A.  Yeah.  Maybe. |
| 9:48AM | 20 | Q.  Now, this particular exhibit, under "drilling needed" and |
| 9:48AM | 21 | "excavation needed" that does not take into account the width |
| 9:48AM | 22 | necessary to shore that wall and insert the pins to connect the |
| 9:48AM | 23 | pier and spandrel wall or the cantilever wall to the existing |
| 9:49AM | 24 | historical wall? |
| 9:49AM | 25 | A.  Yeah.  In that case the existing wall is already fall so, |

Sazzad Shafique – Redirect

| | | |
|---|---|---|
| 9:49AM | 1 | you know, like you can do either method. |
| 9:49AM | 2 | Q.  Doctor, I want to thank you. |
| 9:49AM | 3 | MR. McLIN:  Your Honor, I will pass the witness. |
| 9:49AM | 4 | THE COURT:  All right.  Before we have redirect, |
| 9:49AM | 5 | doctor, do you know when the picture of these trees was taken |
| 9:49AM | 6 | in connection with your explanation there to the right. |
| 9:49AM | 7 | THE WITNESS:  No.  I just collected that one from |
| 9:49AM | 8 | their. |
| 9:49AM | 9 | THE COURT:  Okay.  All right.  And do you know those |
| 9:49AM | 10 | that we just talked about, the type of trees those are, the |
| 9:50AM | 11 | species. |
| 9:50AM | 12 | THE WITNESS:  Yeah.  I know some of them.  But I |
| 9:50AM | 13 | didn't notice very carefully that which trees are they. |
| 9:50AM | 14 | THE COURT:  Okay.  All right.  Redirect. |
| 9:50AM | 15 | REDIRECT EXAMINATION |
| 9:50AM | 16 | BY MR. McCRAW: |
| 9:50AM | 17 | Q.  All right.  Dr. Shafique, I just want to clean up a few |
| 9:50AM | 18 | things that were said.  So you had mentioned that it appears |
| 9:50AM | 19 | from the City's plan that the preservation of trees was never a |
| 9:50AM | 20 | priority, correct? |
| 9:50AM | 21 | A.  That's what I thought. |
| 9:50AM | 22 | Q.  Yeah. |
| 9:50AM | 23 | And so if they had preserved, if they had prioritized the |
| 9:50AM | 24 | preservation of trees, would have gone with a different plan? |
| 9:50AM | 25 | A.  I would say, yes. |

Sazzad Shafique - Redirect

| | | |
|---|---|---|
| 9:50AM | 1 | Q.  And then how much of the south side of the walls is |
| 9:51AM | 2 | actually being repaired?  Do you remember? |
| 9:51AM | 3 | A.  No. |
| 9:51AM | 4 | Q.  Okay.  Now, is it your understanding that the plaintiffs |
| 9:51AM | 5 | need access to the south side of the river? |
| 9:51AM | 6 | A.  Yes. |
| 9:51AM | 7 | Q.  Because that's where they conduct their ceremony? |
| 9:51AM | 8 | A.  Yes. |
| 9:51AM | 9 | Q.  And, in fact, if we flip through all of these plans, will |
| 9:51AM | 10 | we notice that it appears that there's no construction diagrams |
| 9:51AM | 11 | for the south side of the river? |
| 9:51AM | 12 | A.  Yeah.  I didn't see anything there. |
| 9:51AM | 13 | Q.  And if we look even to the -- if we look at these |
| 9:52AM | 14 | documents, we go to COSA 0601, Exhibit 18, we read where it |
| 9:52AM | 15 | says "phase," what phase of documents are these? |
| 9:52AM | 16 | A.  That's 95 percent construction documents. |
| 9:52AM | 17 | Q.  So these are 95 percent complete? |
| 9:52AM | 18 | A.  Yes. |
| 9:52AM | 19 | Q.  And it doesn't show any construction on the south side? |
| 9:52AM | 20 | A.  No,. |
| 9:52AM | 21 | Q.  So overwhelmingly the repairs are being done on the north |
| 9:53AM | 22 | side of the river? |
| 9:53AM | 23 | A.  That's what I think. |
| 9:53AM | 24 | Q.  Now, do you know if the secretary of supervisor's |
| 9:53AM | 25 | regulations actually apply to this project? |

Sazzad Shafique - Redirect

| | | |
|---|---|---|
| 9:53AM | 1 | A.  I don't know. |
| 9:53AM | 2 | Q.  Yeah.  And, in fact, if they didn't, it wouldn't change |
| 9:53AM | 3 | your opinion? |
| 9:53AM | 4 | A.  No,. |
| 9:53AM | 5 | Q.  Okay.  And all of the failing walls that we've seen |
| 9:53AM | 6 | pictures of and that we discussed are on the north side of the |
| 9:53AM | 7 | river? |
| 9:53AM | 8 | A.  Yes. |
| 9:53AM | 9 | Q.  Okay.  So let's go ahead and go back to your diagram and |
| 9:53AM | 10 | we'll look at one of those sections.  Okay.  So here, on the |
| 9:53AM | 11 | north side of the river, we have in that top left corner an |
| 9:54AM | 12 | area that we've discussed where the wall has already failed, |
| 9:54AM | 13 | correct? |
| 9:54AM | 14 | A.  Yes. |
| 9:54AM | 15 | Q.  And so let's talk about how the cantilever system would be |
| 9:54AM | 16 | built in that area.  Okay?  Let's discuss that first. |
| 9:54AM | 17 | So for the cantilever, you would still have to excavate |
| 9:54AM | 18 | behind it some ratio according to the height of the wall? |
| 9:54AM | 19 | A.  Yes. |
| 9:54AM | 20 | Q.  And so you're going to have to remove all of those trees as |
| 9:54AM | 21 | we discussed earlier, under the City's plan? |
| 9:54AM | 22 | A.  Yes. |
| 9:54AM | 23 | Q.  But the fact that there's no wall there changes how you can |
| 9:54AM | 24 | approach the pier and spandrel system, correct? |
| 9:54AM | 25 | A.  Yes. |

Sazzad Shafique - Redirect

| | | |
|---|---|---|
| 9:54AM | 1 | Q.  And so without a wall there, you're having to replace the |
| 9:54AM | 2 | existing wall, right? |
| 9:54AM | 3 | A.  Yes. |
| 9:54AM | 4 | Q.  So you can build -- you can drill your piers, build your |
| 9:54AM | 5 | span, then attach the wall, correct? |
| 9:54AM | 6 | A.  Yes. |
| 9:54AM | 7 | Q.  So you don't have to excavate behind? |
| 9:54AM | 8 | A.  No. |
| 9:54AM | 9 | Q.  You don't have to put a plan behind? |
| 9:54AM | 10 | A.  No. |
| 9:54AM | 11 | Q.  OSHA regulations wouldn't even apply regarding a trench? |
| 9:54AM | 12 | A.  Yes. |
| 9:54AM | 13 | Q.  So you can see the roots there and you can just slap a wall |
| 9:55AM | 14 | kind of on the front of it, right? |
| 9:55AM | 15 | A.  Yes. |
| 9:55AM | 16 | Q.  Okay.  And so you wouldn't necessarily have to impact the |
| 9:55AM | 17 | roots in that area, right? |
| 9:55AM | 18 | A.  No. |
| 9:55AM | 19 | Q.  Okay.  And even when you're under the pier and spandrel |
| 9:55AM | 20 | system, how do you decide whether you're going to place the |
| 9:55AM | 21 | piers? |
| 9:55AM | 22 | A.  That depends on your choice, like you have to go there, you |
| 9:55AM | 23 | have to take a look, what is your -- there is no necessity that |
| 9:55AM | 24 | this spacing has to be, you know, like evenly form.  You can |
| 9:55AM | 25 | put like six feet and then the other one is eight feet, |

Sazzad Shafique – Redirect

| | | |
|---|---|---|
| 9:55AM | 1 | authority one is ten feet. |
| 9:55AM | 2 | So you will just try to get there so that if you need to |
| 9:55AM | 3 | cut little bit to attach your pin, then maybe you can just move |
| 9:55AM | 4 | little bit from the tree so that you don't have to cut near the |
| 9:55AM | 5 | tree.  You can just go a little bit away from there and then |
| 9:55AM | 6 | cut that tree.  That this is very similar to like your fence |
| 9:56AM | 7 | system.  So usually we keep that post like eight feet away from |
| 9:56AM | 8 | each other, but if you need sometimes you can keep that post |
| 9:56AM | 9 | like four feet, right?  So that's the same thing here.  If you |
| 9:56AM | 10 | just take a look like there is a tree there, you can just move |
| 9:56AM | 11 | little bit away from there and then you can post there.  You |
| 9:56AM | 12 | can insert your piers there.  Okay? |
| 9:56AM | 13 | Q.  So you can based on the root system and the placement of a |
| 9:56AM | 14 | tree, you get to choose where your piers are going to go? |
| 9:56AM | 15 | A.  Yes. |
| 9:56AM | 16 | Q.  And you can avoid the root system? |
| 9:56AM | 17 | A.  Yes. |
| 9:56AM | 18 | Q.  Okay.  Now, before you went to this area, did you have to |
| 9:56AM | 19 | sign a waiver that the City required you to sign? |
| 9:56AM | 20 | A.  I think so. |
| 9:56AM | 21 | Q.  Yeah.  And that waiver they prohibited any kind of testing |
| 9:56AM | 22 | being done? |
| 9:56AM | 23 | A.  Yeah.  So you couldn't do destructive test, impact testing, |
| 9:57AM | 24 | couldn't do basically any kind of measuredments at all,. |
| 9:57AM | 25 | A.  Yeah.  All of the measurements I was trying to estimate by |

Sazzad Shafique - Redirect

| | | |
|---|---|---|
| 9:57AM | 1 | my height, the wall's height. |
| 9:57AM | 2 | Q.  Yeah? |
| 9:57AM | 3 | A.  I tried to see that one whether this one is my height or |
| 9:57AM | 4 | this much, something like that.  I didn't take any other |
| 9:57AM | 5 | things. |
| 9:57AM | 6 | Q.  Yeah.  But that's because the City prohibited from doing |
| 9:57AM | 7 | that? |
| 9:57AM | 8 | A.  Yes. |
| 9:57AM | 9 | Q.  And down if OSHA regulations apply to this project? |
| 9:57AM | 10 | A.  Not that much. |
| 9:57AM | 11 | Q.  All right.  And so we spoke a little bit on that economic |
| 9:57AM | 12 | Al aspects of the cantilever versus the pier and spandrel |
| 9:57AM | 13 | system, correct? |
| 9:57AM | 14 | A.  Yes. |
| 9:57AM | 15 | Q.  And we had -- so switching back to Exhibit 18, which and |
| 9:58AM | 16 | we're going to look COSA 0614.  So let's -- so let's look at |
| 9:59AM | 17 | tree 101.  Do you remember this large oak tree whenever -- |
| 9:59AM | 18 | A.  Yes. |
| 9:59AM | 19 | Q.  The area.  And that is a tree that City's going to move |
| 9:59AM | 20 | back about 15 feet, right? |
| 9:59AM | 21 | A.  Yes.  Yet. |
| 9:59AM | 22 | Q.  And then -- and then under the pier and spandrel system, |
| 9:59AM | 23 | does this tree need to be moved? |
| 9:59AM | 24 | A.  No. |
| 9:59AM | 25 | Q.  Okay.  And so the City when we're talking about cost, |

Sazzad Shafique - Redirect

| | | |
|---|---|---|
| 9:59AM | 1 | because it costs $400,000 to remove this tree, the City would |
| 9:59AM | 2 | save $400,000 under your plan, under the pier and spandrel |
| 9:59AM | 3 | system? |
| 9:59AM | 4 | A.  I don't think so. |
| 9:59AM | 5 | Q.  So under the pier and spandrel system, because the City |
| 9:59AM | 6 | would not have to move this tree, they would save $400,000? |
| 9:59AM | 7 | A.  Yes.  Yes. |
| 10:00AM | 8 | Q.  Okay.  All right.  And the cantilever system also requires |
| 10:00AM | 9 | heavy equipment, correct? |
| 10:00AM | 10 | A.  Yes. |
| 10:00AM | 11 | Q.  It requires at least a backhoe, you know, and that would be |
| 10:00AM | 12 | the same kind of -- if you had to dig any kind of trench for |
| 10:00AM | 13 | the pier and spandrel system, it would be the same backhoe that |
| 10:00AM | 14 | you would use for the pier and spandrel as the cantilever |
| 10:00AM | 15 | system? |
| 10:00AM | 16 | A.  Yes. |
| 10:00AM | 17 | Q.  So it's similar equipment, really not that different in |
| 10:00AM | 18 | size an weight that we're talking about, correct? |
| 10:00AM | 19 | A.  Yes. |
| 10:00AM | 20 | Q.  And while you're there, did you see any large equipment |
| 10:00AM | 21 | that was actually sitting there on the north side, you know, a |
| 10:00AM | 22 | large cherrypicker over there? |
| 10:00AM | 23 | A.  I can't remember. |
| 10:00AM | 24 | Q.  A blue and white cherrypicker sitting over there? |
| 10:00AM | 25 | A.  Could be.  I didn't -- |

Sazzad Shafique - Redirect

| | | |
|---|---|---|
| 10:00AM | 1 | Q.  Okay. |
| 10:00AM | 2 | A.  I can't recall. |
| 10:00AM | 3 | THE COURT:  Are you trying to give him a hint? |
| 10:00AM | 4 | MR. McCRAW:  Very strongly hinting, you know. |
| 10:00AM | 5 | THE COURT:  Okay. |
| 10:00AM | 6 | MR. McCRAW:  Yeah.  All right. |
| 10:01AM | 7 | BY MR. McCRAW: |
| 10:01AM | 8 | Q.  Now, regarding the pier and spandrel system versus the |
| 10:01AM | 9 | cantilever wall system, pier and spandrel system, it's a more |
| 10:01AM | 10 | robust system, correct? |
| 10:01AM | 11 | A.  Usually people call that one, but I'll say that that |
| 10:01AM | 12 | depends on how you are designing.  Okay?  Because our design |
| 10:01AM | 13 | system either way like the cantilever, these are based on |
| 10:01AM | 14 | factor of safety, which is kind of like the resisting moment |
| 10:01AM | 15 | divided by the driving moment.  So if you want to make your |
| 10:01AM | 16 | factor upset high enough, means like this is more robust. |
| 10:01AM | 17 | Okay?  So if you're -- if you make your piers big enough and |
| 10:01AM | 18 | the wall big enough, this means like it's more robust.  But |
| 10:01AM | 19 | that depends on the actually how do you design that one?  But |
| 10:02AM | 20 | some people say that actually this method is robust, you know, |
| 10:02AM | 21 | like but I don't know.  It's not my opinion. |
| 10:02AM | 22 | MR. McCRAW:  That's all I have, Your Honor. |
| 10:02AM | 23 | THE COURT:  All right.  Recross? |
| 10:02AM | 24 | MR. McLIN:  Please, Your Honor. |
| | 25 | |

Sazzad Shafique - Recross

| | | |
|---|---|---|
| 10:02AM | 1 | RECROSS-EXAMINATION |
| 10:02AM | 2 | BY MR. McLIN: |
| 10:02AM | 3 | Q.  Doctor, as you testified to earlier, you are not present at |
| 10:02AM | 4 | any of the City design team meetings, right? |
| 10:02AM | 5 | A.  Me? |
| 10:02AM | 6 | Q.  Yes, sir. |
| 10:02AM | 7 | A.  No. |
| 10:02AM | 8 | Q.  Okay.  You don't know what they prioritized in this case, |
| 10:02AM | 9 | do you? |
| 10:02AM | 10 | A.  No. |
| 10:02AM | 11 | Q.  And any testimony regarding what the City prioritized and |
| 10:02AM | 12 | how it prioritized it is pure speculation on your part, is it |
| 10:02AM | 13 | not? |
| 10:02AM | 14 | A.  I get a little bit from Mr. Franke's, you know, like |
| 10:03AM | 15 | deposition. |
| 10:03AM | 16 | Q.  Were you instructed that you were not allowed to take any |
| 10:03AM | 17 | measurements at the scene? |
| 10:03AM | 18 | A.  Where? |
| 10:03AM | 19 | Q.  At the project site, were you instructed by anyone that you |
| 10:03AM | 20 | were not allowed to take measurements? |
| 10:03AM | 21 | A.  That's what I told by chance that we are not supposed to |
| 10:03AM | 22 | take anything.  I didn't take the permit by myself. |
| 10:03AM | 23 | Q.  Are you aware that that was not the agreement?  You could |
| 10:03AM | 24 | have taken measurements? |
| 10:03AM | 25 | A.  Could be.  Very normal, usually go there with some. |

Sazzad Shafique - Recross

| | | |
|---|---|---|
| 10:03AM | 1 | Q.  Just a regular tape measure? |
| 10:03AM | 2 | A.  Yeah. |
| 10:03AM | 3 | Q.  Did you -- |
| 10:03AM | 4 | A.  I had a tried to see the strength of the soil. |
| 10:03AM | 5 | Q.  Did you utilize that equipment? |
| 10:03AM | 6 | A.  No.  No. |
| 10:03AM | 7 | Q.  You're aware that this is an approximately $7.5 million |
| 10:03AM | 8 | project, correct? |
| 10:04AM | 9 | A.  No.  I didn't know that. |
| 10:04AM | 10 | Q.  Okay.  Do you know what the impact is on having -- the |
| 10:04AM | 11 | economic impact on using a pier and spandrel system versus a |
| 10:04AM | 12 | cantilever system for this project? |
| 10:04AM | 13 | A.  No.  I didn't do the estimation.  You need to do a little |
| 10:04AM | 14 | bit more design to get like some more numbers.  I don't know |
| 10:04AM | 15 | whether the city did that one, but I didn't do it. |
| 10:04AM | 16 | Q.  So you're not able to testify that saving the cost of |
| 10:04AM | 17 | relocating one tree would have any effect on the overall |
| 10:04AM | 18 | project budgets, you are? |
| 10:04AM | 19 | A.  I'm not talking about the overall project.  I'm talking |
| 10:04AM | 20 | about just item by item, like just the wall. |
| 10:04AM | 21 | Q.  And -- there? |
| 10:04AM | 22 | A.  Are a lot of other items there, I'm sure.  I didn't see |
| 10:04AM | 23 | that -- you know, like the, you know, schedule.  But I'm sure |
| 10:04AM | 24 | that there are a lot of items there other than just you know |
| 10:05AM | 25 | like that wall thing. |

Sazzad Shafique - Recross

| | | |
|---|---|---|
| 10:05AM | 1 | Q. All right. There are other items which affect the overall |
| 10:05AM | 2 | budget and cost of there project that you did not evaluate? |
| 10:05AM | 3 | A. Yes. I'm not going there but -- |
| 10:05AM | 4 | MR. McLIN: Your Honor thank you very much for your |
| 10:05AM | 5 | indulgence. I pass the witness. |
| 10:05AM | 6 | THE COURT: All right. Thank you. |
| 10:05AM | 7 | All right. Doctor, Court has several questions. |
| 10:05AM | 8 | THE WITNESS: Okay. |
| 10:05AM | 9 | THE COURT: Do you agree or disagree, just looking at |
| 10:05AM | 10 | the pictures from a lay standpoint, that something needs to be |
| 10:05AM | 11 | done out there. |
| 10:05AM | 12 | THE WITNESS: Definitely. |
| 10:05AM | 13 | THE COURT: Okay. All right. And that would involve |
| 10:05AM | 14 | a construction site for a period of months, correct. |
| 10:05AM | 15 | THE WITNESS: Yes. |
| 10:05AM | 16 | THE COURT: All right. And you opined that most of it |
| 10:05AM | 17 | needs to be on the north side of the river, but there is some |
| 10:05AM | 18 | on the south side. But either way, this one and a half acre |
| 10:05AM | 19 | site, during the time of construction, would be foreclosed to |
| 10:06AM | 20 | the general public, yes or no. |
| 10:06AM | 21 | THE WITNESS: I think that the -- for like the work on |
| 10:06AM | 22 | the south side is much more like lighter compared to the north |
| 10:06AM | 23 | side. So they can do that one very quickly and open that south |
| 10:06AM | 24 | side. But, yeah. It needs a little bit closure, Your Honor. |
| 10:06AM | 25 | THE COURT: Okay. Would it -- is it feasible, |

Sazzad Shafique - Recross

| | | |
|---|---|---|
| 10:06AM | 1 | practical, possible to -- I mean, construction sites are fenced |
| 10:06AM | 2 | off for obvious reasons.  Okay?  And so the access to the south |
| 10:06AM | 3 | side, is it feasible to put the construction fencing from the |
| 10:06AM | 4 | north side of the south wall and do it around that way. |
| 10:07AM | 5 | THE WITNESS:  Yes. |
| 10:07AM | 6 | THE COURT:  As opposed to fencing the whole |
| 10:07AM | 7 | construction area. |
| 10:07AM | 8 | THE WITNESS:  No.  Definitely it can be done like |
| 10:07AM | 9 | separate, north side from the south side. |
| 10:07AM | 10 | THE COURT:  Where would you put the construction fence |
| 10:07AM | 11 | to do that?  In the river. |
| 10:07AM | 12 | THE WITNESS:  Each side is like the beach and the |
| 10:07AM | 13 | other side is the beach. |
| 10:07AM | 14 | THE COURT:  Yeah. |
| 10:07AM | 15 | THE WITNESS:  Right?  So in between that two beaches |
| 10:07AM | 16 | actually have your south side here.  So you can just enclose |
| 10:07AM | 17 | the north side from there. |
| 10:07AM | 18 | THE COURT:  Okay. |
| 10:07AM | 19 | THE WITNESS:  The beach could be the boundary. |
| 10:07AM | 20 | THE COURT:  Would it -- normally you would do all of |
| 10:07AM | 21 | the construction at once, including the relatively small amount |
| 10:07AM | 22 | on the south side also. |
| 10:07AM | 23 | THE WITNESS:  Sometimes.  But not all times. |
| 10:07AM | 24 | THE COURT:  Okay.  All right.  If two competing |
| 10:08AM | 25 | engineering companies came up with these plans and we're |

Sazzad Shafique - Recross

| | | |
|---|---|---|
| 10:08AM | 1 | presenting it to the owner of a property and there are arguably |
| 10:08AM | 2 | pluses and minuses either method, who gets to make that |
| 10:08AM | 3 | decision. |
| 10:08AM | 4 | THE WITNESS:  Usually the owner. |
| 10:08AM | 5 | THE COURT:  The owner.  All right.  In this case it |
| 10:08AM | 6 | appears, at least part of it, that one side is asking the Court |
| 10:08AM | 7 | to tell the owner which methodology to use, which is neither |
| 10:08AM | 8 | here nor there as far as your testimony, but it's an issue. |
| 10:08AM | 9 | Now, you have been coming in and out of the courthouse over |
| 10:08AM | 10 | these last few days.  I will tell you that up until oh, let's |
| 10:09AM | 11 | see two and a half years ago, this was a construction site and |
| 10:09AM | 12 | the landscape was barren.  There were no trees.  There were no |
| 10:09AM | 13 | trees to be save, but certainly -- but now we have all of these |
| 10:09AM | 14 | lovely trees on the border of huego trees.  Separate and apart |
| 10:09AM | 15 | from the religious issues in this case, whatever -- and, |
| 10:09AM | 16 | frankly, I don't know when those pictures were taken, but |
| 10:09AM | 17 | they -- they're not near as pretty trees as what we have out |
| 10:09AM | 18 | here.  So trees, large, mature trees can be brought in, can |
| 10:09AM | 19 | they not?  Well, I'll just tell you that's how those trees got |
| 10:10AM | 20 | there.  They weren't grown from saplings. |
| 10:10AM | 21 | Okay.  All right.  I think that's all I had.  May he be |
| 10:10AM | 22 | excuse, counsel? |
| 10:10AM | 23 | MR. McCRAW:  Your Honor, could I clarify one thing? |
| 10:10AM | 24 | THE COURT:  Sure. |
| 10:10AM | 25 | MR. McCRAW:  All right. |

Sazzad Shafique - Further Redirect

| | | |
|---|---|---|
| 10:10AM | 1 | FURTHER REDIRECT EXAMINATION |
| 10:10AM | 2 | BY MR. McCRAW: |
| 10:11AM | 3 | Q.  So this is taken from the April 19th, 2023, HDRC packet and |
| 10:11AM | 4 | you looked at this and you have a -- you had a copy with it |
| 10:11AM | 5 | that you took note on, if you recollect? |
| 10:11AM | 6 | A.  Yes. |
| 10:11AM | 7 | Q.  Whenever we walked the area. |
| 10:11AM | 8 | And so does this show the rehabilitation strategy there at |
| 10:11AM | 9 | Lambert Beach? |
| 10:11AM | 10 | A.  Yes. |
| 10:11AM | 11 | Q.  And then so if we look at this south side, just want to |
| 10:11AM | 12 | focus on the south side, where is the only area that any |
| 10:11AM | 13 | construction is being done? |
| 10:11AM | 14 | A.  Yes.  The right side. |
| 10:11AM | 15 | Q.  Yeah.  So only this area has any walls construction being |
| 10:11AM | 16 | done at all, correct? |
| 10:11AM | 17 | A.  Yes. |
| 10:11AM | 18 | Q.  In fact, there's a big box and what does that big box say |
| 10:11AM | 19 | right there? |
| 10:11AM | 20 | A.  No, construction to occur in this area. |
| 10:11AM | 21 | Q.  Right.  Okay.  And so and is it in your understanding that |
| 10:12AM | 22 | that's where plaintiffs need to stand? |
| 10:12AM | 23 | A.  Yes. |
| 10:12AM | 24 | Q.  Okay.  And so it's right there on the second staircase from |
| 10:12AM | 25 | the left that they need to stand and it has a big box right |

Sazzad Shafique - Further Redirect

| | | |
|---|---|---|
| 10:12AM | 1 | next to it that says no construction to occur in this area, |
| 10:12AM | 2 | correct? |
| 10:12AM | 3 | A.  Yes. |
| 10:12AM | 4 | MR. McLIN:  Your Honor, I have to object because I'm |
| 10:12AM | 5 | not sure there's a question in will. |
| 10:12AM | 6 | THE COURT:  I'm sorry. |
| 10:12AM | 7 | MR. McLIN:  I have to object, Your Honor, because I'm |
| 10:12AM | 8 | not sure there was a quiet in there. |
| 10:12AM | 9 | THE COURT:  Sustained.  Sustained. |
| 10:12AM | 10 | Go ahead. |
| 10:12AM | 11 | BY MR. McCRAW: |
| 10:12AM | 12 | Q.  And so is there a big box right next to where plaintiffs |
| 10:12AM | 13 | need to stand? |
| 10:12AM | 14 | A.  Yes. |
| 10:12AM | 15 | Q.  On this diagram?  And what does that say? |
| 10:12AM | 16 | A.  No construction to occur in this area. |
| 10:12AM | 17 | Q.  So is it your understanding that no construction will occur |
| 10:12AM | 18 | in the area where plaintiffs need to stand? |
| 10:12AM | 19 | A.  Yeah.  That's what it's saying. |
| 10:12AM | 20 | Q.  Okay.  And then -- so across the north, there's a decent |
| 10:12AM | 21 | amount of construction, correct? |
| 10:12AM | 22 | A.  Yes. |
| 10:12AM | 23 | Q.  Okay.  All right.  And then yeah, we'll mark this |
| 10:13AM | 24 | plaintiffs' 54, Your Honor, if that's all right? |
| 10:13AM | 25 | THE COURT:  Any objection? |

Sazzad Shafique - Further Recross

| | | |
|---|---|---|
| 10:13AM | 1 | MR. McLIN:  I don't have any objection to that, Your |
| 10:13AM | 2 | Honor, but I would like to ask him about some of that |
| 10:13AM | 3 | testimony. |
| 10:13AM | 4 | THE COURT:  Okay.  Let's do the questions first and |
| 10:13AM | 5 | then -- and Mr. McCraw, where did that come from for |
| 10:13AM | 6 | identification purposes. |
| 10:13AM | 7 | MR. McCRAW:  It's in the 19 April 2023 HDRC packet. |
| 10:13AM | 8 | It might be in our -- I just couldn't find it real quick.  It |
| 10:13AM | 9 | might be Exhibit 42. |
| 10:13AM | 10 | THE COURT:  Let's see if it's already admitted. |
| 10:13AM | 11 | All right.  Go ahead. |
| 10:13AM | 12 | RECROSS-EXAMINATION |
| 10:13AM | 13 | BY MR. McLIN: |
| 10:13AM | 14 | Q.  Doctor, if we're doing construction on the south side in a |
| 10:13AM | 15 | particular area, we have to get to that site, don't we? |
| 10:13AM | 16 | A.  Yes. |
| 10:13AM | 17 | Q.  And that would involve moving construction equipment |
| 10:13AM | 18 | through other areas that are not under construction; is that |
| 10:13AM | 19 | right? |
| 10:13AM | 20 | A.  Yeah.  Yes. |
| 10:13AM | 21 | Q.  The second item is, even if we're not moving trees on the |
| 10:13AM | 22 | south side, if the trees on the north side fall, they can fall |
| 10:14AM | 23 | and impact the southern side of the worksite, can they not? |
| 10:14AM | 24 | A.  Yeah.  That depends on the height of the -- you know, like |
| 10:14AM | 25 | trees. |

Sazzad Shafique - Further Recross

| | | |
|---|---|---|
| 10:14AM | 1 | Q.  So it's not just work in that particular area they peaks |
| 10:14AM | 2 | the safety of that area, is it? |
| 10:14AM | 3 | A.  Yes. |
| 10:14AM | 4 | Q.  Construction budgets affect the ultimate project, do they |
| 10:14AM | 5 | not? |
| 10:14AM | 6 | A.  Yes. |
| 10:14AM | 7 | Q.  Okay.  You're aware that this courthouse was supposed to |
| 10:14AM | 8 | have four floors at one time, aren't you? |
| 10:14AM | 9 | A.  Repeat that question. |
| 10:14AM | 10 | THE COURT:  Probably not.  That's not a fair question. |
| 10:14AM | 11 | BY MR. McLIN: |
| 10:14AM | 12 | Q.  I will revert back to his prior answer then, Your Honor, |
| 10:14AM | 13 | and I will pass the witness.  Thank you, sir? |
| 10:14AM | 14 | THE COURT:  All right.  Mr. McCraw, anything else. |
| 10:14AM | 15 | MR. McCRAW:  Nothing else, Your Honor. |
| 10:14AM | 16 | THE COURT:  All right.  Doctor, you're excused.  Or |
| 10:14AM | 17 | you may stay and observe if you like.  Next witness. |
| 10:15AM | 18 | (Discussion off the record) |
| 10:15AM | 19 | MR. JONES:  Your Honor, they asked to -- for me to |
| 10:15AM | 20 | bring Jamaal Moreno here and he's on his way.  He'll probably |
| 10:15AM | 21 | be here in five minutes.  So I don't know -- |
| 10:15AM | 22 | THE COURT:  Okay.  All right.  Well, we'll recess here |
| 10:15AM | 23 | briefly, but in the meantime, I don't know if you all know, but |
| 10:15AM | 24 | I have 200 cases like you alls and I have 200 cases of people |
| 10:15AM | 25 | mostly in handcuffs.  Okay?  So I'm doing a handcuff case at |

Jamaal Moreno - Direct

12:26PM   1  labeled "arborist recommendation."  Do you see that?
12:26PM   2  A.  Yes.
12:26PM   3  Q.  And that column refers to trees that were originally
12:26PM   4  proposed to be preserved in place but the City's tree
12:26PM   5  assessment committee recommended they be remove, right?
12:26PM   6  A.  Yes.  That's correct.
12:26PM   7  Q.  So the City sent the tree assessment committee out into the
12:27PM   8  field to see if other trees could be savored but they came back
12:27PM   9  and told you that actually more trees needed to be removed,
12:27PM  10  didn't they?
12:27PM  11  A.  They did both.  There were some again, they -- when they
12:27PM  12  went out there, they assessed more than just the project area
12:27PM  13  we're talking about.  But there were some trees that they
12:27PM  14  recommended for removal and then there were other trees that
12:27PM  15  they -- that were slated for removal that they recommended to
12:27PM  16  preserve.
12:27PM  17  Q.  But, again, these that are indicated here, these were trees
12:27PM  18  that your team had originally proposed to preserve in place but
12:27PM  19  then the tree assessment committee recommended actually they be
12:27PM  20  removed, right?
12:27PM  21  A.  Correct.
12:27PM  22  Q.  Okay.  Since this chart was presented to the HDRC the City
12:27PM  23  has changed its plans for about three to five trees, right?
12:28PM  24  A.  Which chart are you talking about?
12:28PM  25  Q.  The one right in front of you?

Jamaal Moreno - Direct

| | | |
|---|---|---|
| 12:28PM | 1 | A.  Was this chart presented to the HDRC?  I don't recall that. |
| 12:28PM | 2 | Q.  Okay.  Since this chart was -- since 2023, when this chart |
| 12:28PM | 3 | reflected the City's plans to remove or relocate trees in the |
| 12:28PM | 4 | bond project area? |
| 12:28PM | 5 | A.  Okay. |
| 12:28PM | 6 | Q.  -- the City has changed its plans regarding what will it do |
| 12:28PM | 7 | with three to five trees, right? |
| 12:28PM | 8 | A.  I'm sorry.  Can you -- can you repeat that question, |
| 12:28PM | 9 | please. |
| 12:28PM | 10 | Q.  Sure. |
| 12:28PM | 11 | We established before that this chart reflects the City's |
| 12:28PM | 12 | plans to remove or relocate trees at least as of early 2023, |
| 12:28PM | 13 | right? |
| 12:28PM | 14 | A.  Yes.  It reflects the removal and relocation at that |
| 12:28PM | 15 | particular time. |
| 12:28PM | 16 | Q.  Okay. |
| 12:28PM | 17 | A.  Yes. |
| 12:28PM | 18 | Q.  From then until the present, the City has made some |
| 12:28PM | 19 | adjustments to its plans that change what will happen to three |
| 12:28PM | 20 | to five trees; isn't that right? |
| 12:29PM | 21 | A.  That -- I think three to five is a fair assessment, yes. |
| 12:29PM | 22 | Q.  Okay. |
| 12:29PM | 23 | A.  I don't recall the exact amount, but, yes. |
| 12:29PM | 24 | Q.  Okay.  But none of those changes were made to accommodate |
| 12:29PM | 25 | plaintiffs' religious exercise, were they? |

Jamaal Moreno - Direct

| | | |
|---|---|---|
| 12:32PM | 1 | plans for the bond project, had it? |
| 12:32PM | 2 | A.  No, the plans had not been finalized to that point. |
| 12:32PM | 3 | Q.  But you were still seeking to cut down the trees, weren't |
| 12:32PM | 4 | you? |
| 12:32PM | 5 | A.  Yes.  Correct. |
| 12:32PM | 6 | Q.  Is it your understanding that of the migratory bird treaty |
| 12:32PM | 7 | act if certain migratory birds nest the tree, the City can't |
| 12:32PM | 8 | cut down that tree? |
| 12:32PM | 9 | A.  I believe that to be true, yes. |
| 12:32PM | 10 | Q.  Is that your understanding? |
| 12:32PM | 11 | A.  That's my understanding that, if they're -- if they're |
| 12:32PM | 12 | nesting, if there's nests, if there's eggs or if there's young, |
| 12:32PM | 13 | that they can't be disturbed. |
| 12:32PM | 14 | Q.  Okay.  And you -- and you asked for permission to cut down |
| 12:32PM | 15 | those trees so the City could prevent migratory birds from |
| 12:32PM | 16 | nesting in the trees in Lambert Beach area, right? |
| 12:33PM | 17 | A.  Our purpose was to start construction on the project in |
| 12:33PM | 18 | June of that year, and without being able to remove those |
| 12:33PM | 19 | trees, if there were birds that decided to nest in those trees, |
| 12:33PM | 20 | we wouldn't have been able to start construction. |
| 12:33PM | 21 | Q.  Okay. |
| 12:33PM | 22 | A.  Yeah. |
| 12:33PM | 23 | Q.  So put more simply, have to cut down the trees to stop the |
| 12:33PM | 24 | birds from getting -- to nesting in the trees so that we can |
| 12:33PM | 25 | begin work that summer? |

Jamaal Moreno - Direct

| | | |
|---|---|---|
| 12:33PM | 1 | A.  It was a timing issue, yes, sir. |
| 12:33PM | 2 | Q.  And so you needed to cut down the trees to stop birds from |
| 12:33PM | 3 | nesting there, right? |
| 12:33PM | 4 | A.  Well, the trees primarily needed to be removed for the |
| 12:33PM | 5 | construction project.  And, you know, the construction project, |
| 12:33PM | 6 | the scope of work and even the construction documents were at |
| 12:33PM | 7 | some semblance of completion.  They just weren't totally |
| 12:33PM | 8 | complete.  And our schedule, we project schedules for our |
| 12:33PM | 9 | project and our projected schedule was to start construction in |
| 12:34PM | 10 | summer.  So yes, if there had been birds roosting or nesting in |
| 12:34PM | 11 | those trees, we would not have been able to keep with our |
| 12:34PM | 12 | schedule. |
| 12:34PM | 13 | Q.  And so prevent that so that you could stick with your |
| 12:34PM | 14 | schedule, you had to cut down the trees? |
| 12:34PM | 15 | A.  Yes. |
| 12:34PM | 16 | Q.  At least that was your view? |
| 12:34PM | 17 | A.  Well, remove the trees that -- yes, correct.  We didn't |
| 12:34PM | 18 | necessarily have to remove them all, but it didn't make sense |
| 12:34PM | 19 | to come back and do it again multiple times so we decided let's |
| 12:34PM | 20 | put in a variance request to do -- to remove all of the trees. |
| 12:34PM | 21 | So yes, that's what we asked for. |
| 12:34PM | 22 | Q.  Okay.  So you testified earlier that you are the project |
| 12:34PM | 23 | manager for the bond project, right? |
| 12:34PM | 24 | A.  Yes. |
| 12:34PM | 25 | Q.  And so you understand the bond project design pretty well, |

1:03PM   1  public input?

1:03PM   2  A.  Yes.

1:03PM   3  Q.  If you can go to the second page, sir.  I think we've

1:03PM   4  looked at this exhibit.  This is Defendant's Exhibit 2.

1:03PM   5  A.  Okay.

1:03PM   6  Q.  And if you could, blow up the part that says "public

1:04PM   7  participation" at the top.

1:04PM   8      Does this document, Defendant's Exhibit 2, fairly and

1:04PM   9  accurately depict the City's process for receiving public input

1:04PM  10  on the project?

1:04PM  11          MR. GUYNN:  Objection, hearsay.

1:04PM  12          THE COURT:  Overruled.

1:04PM  13          THE WITNESS:  Yes.  Yes, it does.

1:04PM  14  BY MR. McLIN:

1:04PM  15  Q.  Did the City actually conduct input meetings from March

1:04PM  16  '22, to August 2022?

1:04PM  17  A.  Yes, we did.

1:04PM  18  Q.  Were these meetings conducted in English?

1:04PM  19  A.  Yes.

1:04PM  20  Q.  Were any of these meetings conducted in Spanish?

1:04PM  21  A.  We had Spanish interpreters present at all meetings for

1:04PM  22  that necessity.

1:05PM  23  Q.  Do you recall receiving any input during these meetings

1:05PM  24  from either of the plaintiffs?

1:05PM  25  A.  Yes.  Yes, I did.

Jamaal Moreno - Cross

| | | |
|---|---|---|
| 1:05PM | 1 | Q.  And the City took that input? |
| 1:05PM | 2 | A.  We did. |
| 1:05PM | 3 | Q.  And did the City give it consideration in the |
| 1:05PM | 4 | implementation of the design and construction plan? |
| 1:05PM | 5 | A.  Yes, we did. |
| 1:05PM | 6 | Q.  Were any of the plans modified based on any of the public |
| 1:05PM | 7 | feedback? |
| 1:05PM | 8 | A.  They were. |
| 1:05PM | 9 | Q.  What was modified? |
| 1:05PM | 10 | A.  The amount of trees to be destroyed was modified.  There's |
| 1:05PM | 11 | a lot of detail in there.  But, yes. |
| 1:05PM | 12 | Q.  You can take that off, Steven.  Thank you. |
| 1:05PM | 13 |     The phase 1 project that we're here about today, what does |
| 1:05PM | 14 | that involve or encompass? |
| 1:06PM | 15 | A.  Generally speaking, it encompasses the repair, rebuild and |
| 1:06PM | 16 | rehabilitation of cultural resources within the Lambert Beach |
| 1:06PM | 17 | area of Brackenridge Park.  That includes Lambert Beach |
| 1:06PM | 18 | retaining walls.  It includes Lambert Beach river walls.  It |
| 1:06PM | 19 | also includes the structural stabilization of all of those |
| 1:06PM | 20 | walls as well as repair.  It includes structural stabilization |
| 1:06PM | 21 | of the grand stair case and walls surrounding that area and |
| 1:06PM | 22 | then it also includes the foundation underpinning of the |
| 1:06PM | 23 | Brackenridge Park pump house. |
| 1:06PM | 24 | Q.  Are these efforts being made in the name of safety? |
| 1:06PM | 25 | A.  Yes.  Absolutely. |

Jamaal Moreno – Cross

| | | |
|---|---|---|
| 1:14PM | 1 | A.  The blue outline represents the boundary of all of |
| 1:14PM | 2 | Brackenridge Park. |
| 1:14PM | 3 | Q.  And what does the red outline significant for? |
| 1:14PM | 4 | A.  The red outline represents the outline of the total 2017 |
| 1:14PM | 5 | Brackenridge Park project area, which includes both phase 1 and |
| 1:14PM | 6 | phase 2. |
| 1:15PM | 7 | Q.  If you can, Steven, Exhibit 1, Page 6.  My apologies.  Page |
| 1:15PM | 8 | 7.  And then Page 8.  Okay.  You can take that down, Steven. |
| 1:15PM | 9 | Mr. Moreno, did the City of San Antonio evaluate more than |
| 1:15PM | 10 | one engineering solution to repair or remediate the wall? |
| 1:15PM | 11 | A.  Yes, we did. |
| 1:15PM | 12 | Q.  And did the City of San Antonio evaluate a pier and |
| 1:15PM | 13 | spandrel repair? |
| 1:15PM | 14 | A.  Yes, we did. |
| 1:15PM | 15 | Q.  Did the City of San Antonio evaluate a cantilever wall |
| 1:15PM | 16 | system? |
| 1:15PM | 17 | A.  Yes, we did. |
| 1:15PM | 18 | Q.  Were there any others that the City evaluated? |
| 1:16PM | 19 | A.  Yes.  We evaluated the idea of moving the walls further |
| 1:16PM | 20 | into the river to get further away from the trees. |
| 1:16PM | 21 | Q.  Was that design or solution rejected or accepted? |
| 1:16PM | 22 | A.  It was rejected. |
| 1:16PM | 23 | Q.  Why? |
| 1:16PM | 24 | A.  Because we were in the floodplain, moving the walls closer |
| 1:16PM | 25 | into the river puts fill into the floodplain and it would have |

Jamaal Moreno - Cross

1:16PM  1   negatively affected the FEMA 100-year floodplain.  We would

1:16PM  2   have had to do mitigation and mitigation project to address

1:16PM  3   that effect.

1:16PM  4   Q.  One of the questions earlier related to the strength of an

1:16PM  5   engineering solution.  Is strength the only factor that the

1:17PM  6   City evaluates in determining which engineering solution to

1:17PM  7   use?

1:17PM  8   A.  No.

1:17PM  9   Q.  Which solution did the City choose?

1:17PM  10  A.  We chose the cantilever wall solution.

1:17PM  11  Q.  Why?

1:17PM  12  A.  Because that was the solution that was the least impactful

1:17PM  13  to the site as a whole.  It is -- it is a solution that doesn't

1:17PM  14  require as much heavy equipment and heavy construction.  It

1:17PM  15  will -- the majority of that solution will be done by man labor

1:17PM  16  or by hand.  There will be some small equipment there, but it

1:17PM  17  doesn't require a bunch of large heavy equipment which we're

1:17PM  18  concerned bringing that amount of large, heavy equipment into

1:17PM  19  the area might negatively impact the walls that are in

1:17PM  20  disrepair but still standing.  That's one reason.

1:18PM  21  Q.  Is one option more expensive than the other?

1:18PM  22  A.  Yes.

1:18PM  23  Q.  Which?

1:18PM  24  A.  The pier and spandrel option is significantly more

1:18PM  25  expensive than the option we chose.

Jamaal Moreno - Cross

| | | |
|---|---|---|
| 1:20PM | 1 | Q.  Will there be construction activities? |
| 1:20PM | 2 | A.  Yes. |
| 1:20PM | 3 | Q.  Will there be trees either being removed or having the |
| 1:20PM | 4 | adjacent dirt pulled away from them? |
| 1:20PM | 5 | A.  Yes. |
| 1:20PM | 6 | Q.  Does the City believe that it has a responsibility to keep |
| 1:20PM | 7 | the public safe generally? |
| 1:20PM | 8 | A.  Yes.  In everything we do, yes.  Of course. |
| 1:21PM | 9 | Q.  Was any consideration given to the construction access for |
| 1:21PM | 10 | the pier and spandrel system? |
| 1:21PM | 11 | A.  Yes. |
| 1:21PM | 12 | Q.  Was any consideration given by the city to the excavations |
| 1:21PM | 13 | that would be required to effectuate the peer and spandrel |
| 1:21PM | 14 | solution? |
| 1:21PM | 15 | A.  Yes. |
| 1:21PM | 16 | Q.  Did the City have any concerns? |
| 1:21PM | 17 | A.  A few concerns.  Yes, sir. |
| 1:21PM | 18 | Q.  Can you tell me about those? |
| 1:21PM | 19 | A.  Sure.  So the first concern would be and I alluded to it |
| 1:21PM | 20 | earlier, would be the heavier equipment that would be required |
| 1:21PM | 21 | to drill the piers.  The structural engineer would have to do |
| 1:21PM | 22 | the math to figure out exactly how deep they go.  But |
| 1:21PM | 23 | preliminary design suggested that the piers would have to go |
| 1:21PM | 24 | between 25 to 30 feet deep and that requires a large drill rig |
| 1:21PM | 25 | to do that. |

Jamaal Moreno - Cross

| | | |
|---|---|---|
| 1:22PM | 1 | Also, the excavation required for the pier and spandrel is |
| 1:22PM | 2 | may not be exact, but is pretty much the same amount of |
| 1:22PM | 3 | excavation required for the cantilever design that we're doing. |
| 1:22PM | 4 | And there's specific reasons for that that I can go into, |
| 1:22PM | 5 | but -- |
| 1:22PM | 6 | Q.  Please, tell me why. |
| 1:22PM | 7 | A.  Well, so because these retaining walls are historically |
| 1:22PM | 8 | significant structures, they're cultural resources, they're |
| 1:22PM | 9 | contributing elements to the National Register that |
| 1:22PM | 10 | Brackenridge Park has or the National Register designation that |
| 1:22PM | 11 | the park has, we have to -- or we're required to by the THC |
| 1:22PM | 12 | follow the Secretary of Interior's standards for treatment of |
| 1:22PM | 13 | historic resources and historic properties. |
| 1:22PM | 14 | And so it gets kind of into -- into more detail and |
| 1:22PM | 15 | minutia, but basically we would have to work on those retaining |
| 1:22PM | 16 | walls from the rear and not from the front.  And so in order to |
| 1:23PM | 17 | do that safely, you would need more excavation. |
| 1:23PM | 18 | Q.  When you say to do it safely, what needs to be done?  Why |
| 1:23PM | 19 | does it -- what is required to do it safely? |
| 1:23PM | 20 | A.  Well, so the pier and spandrel, whether you're doing a |
| 1:23PM | 21 | cantilever wall for the pier and spandrel wall, you have a |
| 1:23PM | 22 | concrete wall that is essentially a shadow wall behind the |
| 1:23PM | 23 | masonry wall or the stone wall.  And you have to tie that |
| 1:23PM | 24 | concrete wall to the stonewall. |
| 1:23PM | 25 | Because we can't effect the front of that wall, we have to |

Jamaal Moreno - Cross

| | | |
|---|---|---|
| 1:23PM | 1 | do it from the rear.  And so in either case we have to trench |
| 1:23PM | 2 | behind that wall to get a man down into the trench to do the |
| 1:23PM | 3 | work that he needs to do that, he's required to do to tie the |
| 1:23PM | 4 | new concrete wall to the old stonewall. |
| 1:23PM | 5 | Q.  Does it matter which system you use? |
| 1:23PM | 6 | MR. GUYNN:  Objection, lack of foundation, calls for |
| 1:23PM | 7 | expert opinion. |
| 1:23PM | 8 | THE COURT:  Overruled. |
| 1:24PM | 9 | THE WITNESS:  No.  In my estimation it doesn't matter |
| 1:24PM | 10 | because the trench that you're cutting for the -- for the wall |
| 1:24PM | 11 | that we chose, for the cantilever wall, we're not cutting that |
| 1:24PM | 12 | trench specifically for the space of a cantilever.  We're also |
| 1:24PM | 13 | cutting it in order to get workers down there to be able to tie |
| 1:24PM | 14 | the old wall to the new wall. |
| 1:24PM | 15 | So whether you do the cantilever or whether you just do the |
| 1:24PM | 16 | spandrel wall, you still need roughly the same amount of |
| 1:24PM | 17 | excavation to do the work. |
| 1:24PM | 18 | Q.  You mentioned Secretary of Interior just a minute ago.  Are |
| 1:24PM | 19 | you a secretary of supervisor rules expert? |
| 1:24PM | 20 | A.  No, I'm not. |
| 1:24PM | 21 | Q.  Okay.  Did you rely on someone else to provide that |
| 1:24PM | 22 | information? |
| 1:24PM | 23 | A.  I did. |
| 1:24PM | 24 | Q.  Who? |
| 1:24PM | 25 | A.  The Office of Historic Preservation and the Texas |

Jamaal Moreno - Redirect

| | | |
|---|---|---|
| 1:29PM | 1 | THE WITNESS:  I was still working through the words of |
| 1:29PM | 2 | the question.  Sorry, Judge. |
| 1:29PM | 3 | THE COURT:  That's all right.  I'm sure you would, |
| 1:29PM | 4 | Mr. Moreno, because that door over there. |
| 1:29PM | 5 | THE WITNESS:  Yes, sir. |
| 1:29PM | 6 | THE COURT:  You don't want to go through that. |
| 1:29PM | 7 | THE WITNESS:  No.  That's a bad door.  Okay. |
| 1:29PM | 8 | THE COURT:  Yeah.  That's a bad door.  Now, I might |
| 1:29PM | 9 | get reversed, but until I got reverse, you don't want to go |
| 1:29PM | 10 | through that door. |
| 1:30PM | 11 | MR. GUYNN:  -- reversed, Your Honor. |
| 1:30PM | 12 | BY MR. GUYNN: |
| 1:30PM | 13 | Q.  You testified just now that it's the City's position that |
| 1:30PM | 14 | no more trees can be saved under the current plan, right? |
| 1:30PM | 15 | A.  Yes.  But not exclusively, yes. |
| 1:30PM | 16 | Q.  Okay.  But did you testify that under the current |
| 1:30PM | 17 | engineering design plan, it's the City's position that it |
| 1:30PM | 18 | cannot save any additional trees in the project area? |
| 1:30PM | 19 | A.  Yes. |
| 1:30PM | 20 | Q.  But perhaps trees can be saved if the City chose an |
| 1:30PM | 21 | alternate design plan, right? |
| 1:30PM | 22 | A.  Not more than what we're saving, no.  I don't believe so. |
| 1:30PM | 23 | Q.  So we looked -- you looked at Defendant's Exhibit 10. |
| 1:30PM | 24 | Would you please open that up, please. |
| 1:30PM | 25 | A.  Is it in the same book as -- |

Bill Pennell - Direct

1:57PM   1   Q.   And Mr. Pennell, you're not aware -- well, you were

1:57PM   2   involved in the design of the 2017 bond project, correct?

1:57PM   3   A.   Yes, sir.

1:57PM   4   Q.   And you are aware of the communications that went on to

1:57PM   5   arrive at the current plan?

1:57PM   6   A.   Up until around September of last year.

1:57PM   7   Q.   And you're not aware of the City considering any alternate

1:57PM   8   design to the plan to account for the plaintiffs' religious

1:57PM   9   exercise, correct?  Very specifically?

1:57PM   10  A.   No.

1:57PM   11  Q.   Now, the City submitted public comments in designing the

1:58PM   12  plan, correct?

1:58PM   13  A.   The City submitted --

1:58PM   14  Q.   Solicited.  I'm sorry.   Public comments?

1:58PM   15  A.   Correct.

1:58PM   16  Q.   And it received comments from the public, correct?

1:58PM   17  A.   Yes.

1:58PM   18  Q.   And it opted to incorporate certain of those comments into

1:58PM   19  the plan, correct?

1:58PM   20  A.   What we can accommodate, yes, we consider all and try to

1:58PM   21  accommodate as with all the other factors that go into

1:58PM   22  determining the project, yes.

1:58PM   23  Q.   And it's correct that the City accommo -- the City

1:58PM   24  incorporated public comments based on majority, correct?

1:58PM   25  A.   We consider all of the comments regardless whether -- I

Bill Pennell - Direct

| | | |
|---|---|---|
| 1:58PM | 1 | mean,. |
| 1:58PM | 2 | Q.  But the City incorporated them based on majority, correct? |
| 1:58PM | 3 | A.  We incorporated them based on what we could do within the |
| 1:58PM | 4 | project. |
| 1:58PM | 5 | Q.  Based on -- |
| 1:58PM | 6 | A.  Not majority, just about we evaluated it and determined |
| 1:58PM | 7 | that there was some proposed changes we could coto accommodate. |
| 1:58PM | 8 | Q.  Mr. Pennell, you had your deposition taken in this matter, |
| 1:59PM | 9 | correct? |
| 1:59PM | 10 | A.  I did. |
| 1:59PM | 11 | Q.  And I took your deposition in this matter, correct? |
| 1:59PM | 12 | A.  Yes. |
| 1:59PM | 13 | Q.  And at the start of that deposition you swore to tell the |
| 1:59PM | 14 | truth, correct? |
| 1:59PM | 15 | A.  Yes. |
| 1:59PM | 16 | Q.  And do you stand by the testimony you gave in that |
| 1:59PM | 17 | deposition? |
| 1:59PM | 18 | A.  I do. |
| 1:59PM | 19 | Q.  Okay.  And I believe you should have a copy of your |
| 1:59PM | 20 | deposition in front of you.  Can you find that, please. |
| 1:59PM | 21 | THE COURT:  -- why don't -- Okay.  That's the folder. |
| 1:59PM | 22 | Go ahead. |
| 1:59PM | 23 | BY MR. VILLARI: |
| 1:59PM | 24 | Q.  Okay.  Mr. Pennell, give you a moment to find that. |
| 1:59PM | 25 | A.  Yes. |

Bill Pennell - Direct

| | | |
|---|---|---|
| 2:04PM | 1 | A.  At the time, yes. |
| 2:04PM | 2 | Q.  So you didn't mention anything about an alternative plan at |
| 2:04PM | 3 | that time, did you? |
| 2:04PM | 4 | A.  You asked that the current -- when we were out there, we |
| 2:04PM | 5 | asked them to evaluate the current plan when we were out there. |
| 2:04PM | 6 | Yes. |
| 2:04PM | 7 | Q.  And your testimony is that some other time the tree |
| 2:04PM | 8 | assessment committee was tasked with evaluating alternate |
| 2:04PM | 9 | plans, yet, there's no documentation produced about that and |
| 2:04PM | 10 | there's no mention of it in your deposition.  That's your |
| 2:04PM | 11 | testimony? |
| 2:04PM | 12 | A.  Yes.  They were asked to come in and evaluate other options |
| 2:04PM | 13 | and they concluded that there were no -- they wouldn't change |
| 2:05PM | 14 | their response, that they would stay as it is. |
| 2:05PM | 15 | Q.  And your testimony, again, absent any documentation on |
| 2:05PM | 16 | this, is that the tree assessment committee was asked to come |
| 2:05PM | 17 | back, evaluate alternate engineering proposals and offer |
| 2:05PM | 18 | opinions on whether those other engineering plans would change |
| 2:05PM | 19 | the City's response? |
| 2:05PM | 20 | MS. WILSON:  Objection, asked and answered. |
| 2:05PM | 21 | THE COURT:  Overruled. |
| 2:05PM | 22 | THE WITNESS:  Can you say that one more time, please? |
| 2:05PM | 23 | BY MR. VILLARI: |
| 2:05PM | 24 | Q.  So your testimony is that absent any documentation showing |
| 2:05PM | 25 | this, that at some future point after their initial report the |

Bill Pennell - Direct

| | | |
|---|---|---|
| 2:07PM | 1 | correct? |
| 2:07PM | 2 | A.  Can you say that one more time, please? |
| 2:07PM | 3 | Q.  The City planned to remove trees before it finalized the |
| 2:07PM | 4 | construction plan is that birds would not nest in the trees. |
| 2:07PM | 5 | A.  Can you say that one more time, please? |
| 2:07PM | 6 | Q.  The City planned to remove trees before the construction |
| 2:07PM | 7 | plans were finalized so that birds would not nest in the trees, |
| 2:07PM | 8 | correct? |
| 2:07PM | 9 | A.  The City planned to remove trees based on other factors |
| 2:07PM | 10 | before the birds could nest in the trees, correct. |
| 2:07PM | 11 | Q.  I think I understand what you're saying.  I just want to |
| 2:07PM | 12 | make sure.  So the City wanted to remove the trees before birds |
| 2:07PM | 13 | nested in them, correct? |
| 2:07PM | 14 | A.  The City wanted to remove the trees before birds nested in |
| 2:08PM | 15 | them, yes. |
| 2:08PM | 16 | Q.  Okay.  Thank you. |
| 2:08PM | 17 |     Mr. Pennell, I'm going to switch gears to talk about the |
| 2:08PM | 18 | bird deterrence measures that the city is engaging in.  Cattle |
| 2:08PM | 19 | egrets sooner than cormorants, correct? |
| 2:08PM | 20 | A.  Not -- that's not correct. |
| 2:08PM | 21 | Q.  You wouldn't agree that the birds come into the area |
| 2:08PM | 22 | sequentially? |
| 2:08PM | 23 | A.  Yes, birds -- different birds species come into the -- yes. |
| 2:08PM | 24 | Q.  And cattle egrets come prior to cormorants, correct? |
| 2:08PM | 25 | A.  They don't.  They come in around the same time. |

Bill Pennell - Cross

| | | |
|---|---|---|
| 2:32PM | 1 | Q.  You spoke a little bit about the goals of the City's bird |
| 2:33PM | 2 | deterrence program specifically in the project area.  Can you |
| 2:33PM | 3 | explain to the Court why the City's goal for the project area |
| 2:33PM | 4 | in 2023 is zero nesting of migratory birds? |
| 2:33PM | 5 | A.  Yes.  So that way, when the project's permitted and ready |
| 2:33PM | 6 | to go that the project can start right away. |
| 2:33PM | 7 | Q.  And that -- just circle back, it's the migratory bird |
| 2:33PM | 8 | treaty; is that correct would prevent you from doing |
| 2:33PM | 9 | construction if there were migratory birds in the project area; |
| 2:33PM | 10 | is that correct? |
| 2:33PM | 11 | A.  That's correct. |
| 2:33PM | 12 | Q.  Are you aware of any variance that city could obtain from |
| 2:33PM | 13 | the migratory bird treaty act that would allow the city to go |
| 2:33PM | 14 | construction work in the presence of -- if there are active |
| 2:34PM | 15 | nests present before construction starts? |
| 2:34PM | 16 | A.  I am not. |
| 2:34PM | 17 | Q.  Can you tell the Court what an active nest is?  It's a |
| 2:34PM | 18 | little bit of a term of art? |
| 2:34PM | 19 | A.  Right.  And so it's when there is a nest with an active egg |
| 2:34PM | 20 | in it. |
| 2:34PM | 21 | Q.  Okay.  Do you know how long a migratory bird's nest is |
| 2:34PM | 22 | considered active for purposes of the migratory bird treaty |
| 2:34PM | 23 | act? |
| 2:34PM | 24 | A.  For that time period it's going to vary based on the |
| 2:34PM | 25 | species and types, but that goes from the moment that egg is |

Bill Pennell - Cross

| | | |
|---|---|---|
| 2:38PM | 1 | it out and a heron or an egret comes in the spring, they may |
| 2:38PM | 2 | decide they're going to save a little energy, save a little |
| 2:38PM | 3 | time and just move into the cormorant's nest.  Is that -- |
| 2:38PM | 4 | A.  That's correct. |
| 2:38PM | 5 | MR. VILLARI:  Objection, leading. |
| 2:38PM | 6 | BY MS. WILSON: |
| 2:38PM | 7 | Q.  So you talked about -- is so you talked about cleanup, is |
| 2:38PM | 8 | lab at that time modification different than cleanup? |
| 2:38PM | 9 | A.  It is. |
| 2:38PM | 10 | Q.  What activities are included in habitat modification? |
| 2:38PM | 11 | A.  So it's the removal under story.  It's removal of dead |
| 2:38PM | 12 | trees.  Removal of dead limbs.  It's doing some trimming in |
| 2:39PM | 13 | order to reduce some of the canopy to where the birds will want |
| 2:39PM | 14 | to be able to nest. |
| 2:39PM | 15 | Q.  Okay.  Is there any way to do habit modification that would |
| 2:39PM | 16 | deter herons and egrets but would not deter cormorants? |
| 2:39PM | 17 | A.  Not that I'm aware of. |
| 2:39PM | 18 | Q.  And then you told the court about some of the other |
| 2:39PM | 19 | measures you might take.  You talked about the spray that you |
| 2:39PM | 20 | had used in the past.  Are there any scents that deter egrets |
| 2:39PM | 21 | and herons but don't deter cormorants? |
| 2:39PM | 22 | A.  Not that I'm aware of. |
| 2:39PM | 23 | Q.  You talked about using balloons and those are -- what do |
| 2:39PM | 24 | those balloons look like?  Are they birthday balloons?  What |
| 2:39PM | 25 | are you describing for us? |

Bill Pennell - Cross

| | | |
|---|---|---|
| 2:39PM | 1 | A.  So some of them are the silver or mirror typed look and the |
| 2:40PM | 2 | others, they have basically they call it scary eye.  It's |
| 2:40PM | 3 | circles on a -- if that looked like an eyeball. |
| 2:40PM | 4 | Q.  And then you described streamers? |
| 2:40PM | 5 | A.  Yes. |
| 2:40PM | 6 | Q.  Are those crepe paper streamers, what kind of streamers are |
| 2:40PM | 7 | we talking about? |
| 2:40PM | 8 | A.  They're metallic so obviously you want to light reflecting |
| 2:40PM | 9 | off them and you want them to have light and you want them to |
| 2:40PM | 10 | have movement so it's movement and light. |
| 2:40PM | 11 | Q.  Would it be fair to call those visual deterrents? |
| 2:40PM | 12 | A.  Those are visual deterrents. |
| 2:40PM | 13 | Q.  Okay.  In the category of visual deterrence are there any |
| 2:40PM | 14 | visual deterrents that effectively deter egrets and herons but |
| 2:40PM | 15 | do not deter cormorants? |
| 2:40PM | 16 | A.  Not that I know of. |
| 2:40PM | 17 | Q.  Okay.  And you talked about some noises that you can use. |
| 2:40PM | 18 | Clappers, pyrotechnics.  Can you describe in a little bit more |
| 2:41PM | 19 | detail what falls under the category of pyrotechnics? |
| 2:41PM | 20 | A.  There are two types that we use.  One is a screamer. |
| 2:41PM | 21 | Though it does get shot you out of a starter pistol and it's |
| 2:41PM | 22 | just place a screaming pistol kind of whirling up and the other |
| 2:41PM | 23 | is a banger which will go in the air and then at the top it'll |
| 2:41PM | 24 | pop, make a banging sound. |
| 2:41PM | 25 | Q.  Okay.  And then also another noise that you described was |

Bill Pennell - Cross

| | | |
|---|---|---|
| 2:41PM | 1 | using predator calls? |
| 2:41PM | 2 | A.  Correct. |
| 2:41PM | 3 | Q.  What kinds of predators? |
| 2:41PM | 4 | A.  So it would be hawks and other larger birds that would |
| 2:41PM | 5 | scare the smaller birds. |
| 2:41PM | 6 | Q.  And in that category of noises that the City uses as |
| 2:41PM | 7 | deterrents, are there any noises that deter only egrets and |
| 2:42PM | 8 | herons that do not seem to bother or deter the cormorants? |
| 2:42PM | 9 | A.  Not that I'm aware of. |
| 2:42PM | 10 | Q.  Now, when I asked you, I asked you about herons and egrets |
| 2:42PM | 11 | moving into cormorant nests.  Is the reverse also true, when |
| 2:42PM | 12 | the cormorants come in later in the year, will they also go to |
| 2:42PM | 13 | empty heron and egret nests? |
| 2:42PM | 14 | A.  Absolutely. |
| 2:42PM | 15 | Q.  And so if the City has effectively deterred the herons and |
| 2:42PM | 16 | egrets, out of the highly urbanized areas of the park, have you |
| 2:42PM | 17 | observed the cormorants following into those areas where the |
| 2:42PM | 18 | egrets and herons have gone? |
| 2:42PM | 19 | A.  Yes. |
| 2:42PM | 20 | Q.  Okay.  When the city is performing any of these deterrent |
| 2:43PM | 21 | activities, are there any safety risks to the city employees |
| 2:43PM | 22 | involved with those? |
| 2:43PM | 23 | A.  So we do require them to do PPE so they do have a vest on |
| 2:43PM | 24 | and they do have hearing protection because they're standing |
| 2:43PM | 25 | right next to the clappers.  But we have members of the public |

8:34AM  1  year the bird flew north.  So they went north out of the park

8:35AM  2  and in an area just north of the university Incarnate Word.

8:35AM  3  Q.  And is the area that they moved to more appropriate to

8:35AM  4  support a large rookery of migratory birds.  There is some

8:35AM  5  wilderness area.  There's also some citizens in that area too

8:35AM  6  that are going to have some input in that as well.  So

8:35AM  7  that's -- like I said, we take all comments and we look at all

8:35AM  8  different things and they have the opportunity to do deterrence

8:35AM  9  if they think those are appropriate.

8:35AM  10  Q.  Okay.

8:35AM  11       THE COURT:  So it was in the Olmos Basin where north

8:35AM  12  of the school.

8:35AM  13       THE WITNESS:  Just south of the dam, yeah, right just

8:35AM  14  north or south of it.

8:35AM  15       THE COURT:  All right.

8:35AM  16  BY MS. WILSON:

8:35AM  17  Q.  So you said that last year the neotropics were able to come

8:35AM  18  in and nest in the more urbanized area of the park after the

8:35AM  19  egrets and herons were deterred.  But is it possible to time

8:36AM  20  the bird deterrence activities so that only double crested

8:36AM  21  cormorants can nest in the deterrent zone but not allow egrets

8:36AM  22  and herons to nest there?

8:36AM  23  A.  Based on the knowledge of this current area and when the

8:36AM  24  birds come in, the double crested come in around the same time

8:36AM  25  or within the time of the cattle egrets and -- egrets.  So

| | | |
|---|---|---|
| 8:36AM | 1 | there is not a way to -- differentiate at that time. |
| 8:36AM | 2 | Q.  Okay.  Would the City need to commission a separate study |
| 8:36AM | 3 | to determine that it's not possible to utilize deterrent -- |
| 8:36AM | 4 | deterrent methods that are effective only against egrets and |
| 8:36AM | 5 | herons but don't disturb cormorants? |
| 8:36AM | 6 | A.  No. |
| 8:36AM | 7 | Q.  In your experience with the bird deterrence program over |
| 8:37AM | 8 | the last six years, is it possible to allow only a small number |
| 8:37AM | 9 | of the migratory bird species into the deterrence area to nest |
| 8:37AM | 10 | but after a certain quota is met, to deter the rest of the |
| 8:37AM | 11 | birds? |
| 8:37AM | 12 | A.  So the answer is no, because once the nest gets in place, |
| 8:37AM | 13 | then the migratory bird act is enforced, right?  It's in play. |
| 8:37AM | 14 | So I can't disturb those birds.  So that means I've got to |
| 8:37AM | 15 | understand where I need to back off to, not to interfere with |
| 8:37AM | 16 | that nest, to allow it to go through its process. |
| 8:37AM | 17 | So I -- because I would be in violation if I disturbed that |
| 8:37AM | 18 | nest.  So to have a nest in an area would restrict the work we |
| 8:37AM | 19 | can do, which would allow in 2022 there was an area where a |
| 8:37AM | 20 | yellow cormorant herrings got in unbeknownst to us within -- in |
| 8:38AM | 21 | our deterrence area and they had a nest.  So we had to stop the |
| 8:38AM | 22 | work in that area.  We notified our regulatory agencies, let |
| 8:38AM | 23 | them know yes, they got in.  So we're going to back off and |
| 8:38AM | 24 | we're not going to do deterrent activities in that area. |
| 8:38AM | 25 | And so not too long after that, they were joined by |

| | | |
|---|---|---|
| 8:40AM | 1 | Elmendorf.  Bird go in different trees in Elmendorf park than |
| 8:40AM | 2 | they do in Brackenridge.  It doesn't exactly make sense but |
| 8:40AM | 3 | these are things that we've learned and understand and we know |
| 8:40AM | 4 | as we're working through this.  So, you know, like cypress |
| 8:40AM | 5 | trees in Woodlawn and really Elmendorf, they don't rest in the |
| 8:40AM | 6 | trees in Brackenridge.  So, you know, you have to adapt and |
| 8:40AM | 7 | understand each situation and so being out there and, you know, |
| 8:40AM | 8 | watching and understanding, we can relate those. |
| 8:40AM | 9 | Q.  Could, in your experience and opinion, could the noise and |
| 8:40AM | 10 | activity of an active construction site disturb migratory birds |
| 8:41AM | 11 | who are nesting in the vicinity? |
| 8:41AM | 12 | A.  Yes. |
| 8:41AM | 13 | Q.  And you're familiar with the south bend of -- or the south |
| 8:41AM | 14 | bank of this particular bend in the river, in the project area, |
| 8:41AM | 15 | correct? |
| 8:41AM | 16 | A.  Yes. |
| 8:41AM | 17 | Q.  If construction is only taking place on the south bank at |
| 8:41AM | 18 | the far earn edge of the project area, could that disturb a |
| 8:41AM | 19 | nest that is in the center of the bank or on the western end of |
| 8:41AM | 20 | that project zone? |
| 8:41AM | 21 | A.  So our draft on management plan does give some distances |
| 8:41AM | 22 | that you can use to look at that.  But at the same time, we |
| 8:41AM | 23 | field test that.  So we would -- so it's -- I think it says 50 |
| 8:42AM | 24 | yards for using clappers, construction would be a lot worse |
| 8:42AM | 25 | than the clapper.  And then at a hundred yards for |

| | | |
|---|---|---|
| 8:42AM | 1 | pyrotechnics.  And I would say construction work, especially |
| 8:42AM | 2 | tree removal or digging, that would be around the same -- or |
| 8:42AM | 3 | same noise matter going on. |
| 8:42AM | 4 | So we would have to verify how close you could be based on |
| 8:42AM | 5 | actually watching and observing what the birds do.  So and |
| 8:42AM | 6 | that's what we've done in other areas when a bird nest is |
| 8:42AM | 7 | located and known, then we would test out to see where the |
| 8:42AM | 8 | reaction would be for the bird.  So we know what that distance |
| 8:42AM | 9 | is, right?  This is all in coordination with our regulatory |
| 8:42AM | 10 | agencies because our intent is to follow the law. |
| 8:42AM | 11 | Q.  Do you have an understanding of what the term "take" means |
| 8:43AM | 12 | as it applies to wildlife? |
| 8:43AM | 13 | A.  It's lethal means of taking care of a bird or an egg or, |
| 8:43AM | 14 | yeah, bird or an egg. |
| 8:43AM | 15 | Q.  Does the City take any migratory birds in the park? |
| 8:43AM | 16 | A.  We do not. |
| 8:43AM | 17 | Q.  If construction were going on in the project area and it |
| 8:43AM | 18 | impacted a bird and killed a bird, would that be considered a |
| 8:43AM | 19 | take to your knowledge? |
| 8:43AM | 20 | A.  So there's a lot of different factors that go into that. |
| 8:43AM | 21 | But the answer is if you are disturbing the nest is there |
| 8:43AM | 22 | before you and you are disturbing them or cause them to leave |
| 8:43AM | 23 | the nest or cause them harm, then yes, that would be a take. |
| 8:43AM | 24 | Q.  And that's certainly something the City wants to avoid, |
| 8:43AM | 25 | correct? |

| | | |
|---|---|---|
| 8:47AM | 1 | along the river and there's a spacing that goes along with them |
| 8:47AM | 2 | and then you have trees that are set up within the park itself |
| 8:47AM | 3 | that would have aligned walkways and pathways and, once again, |
| 8:47AM | 4 | there's a line and a spacing that goes with those, that go |
| 8:47AM | 5 | based on design principles and how you would set up and lay |
| 8:47AM | 6 | out, you know, your trees. |
| 8:47AM | 7 | Q.  And do you have any idea of how old those cypress trees |
| 8:47AM | 8 | are? |
| 8:47AM | 9 | A.  We did not sample those, but based on their size and |
| 8:47AM | 10 | knowing how they grow well there, we think they're around the |
| 8:47AM | 11 | same age as the trees at mayor Flores, which we know were |
| 8:47AM | 12 | planted about in the 1930s. |
| 8:47AM | 13 | Q.  And are you familiar with the middle staircase on the south |
| 8:48AM | 14 | bank? |
| 8:48AM | 15 | A.  Yes. |
| 8:48AM | 16 | Q.  There are the two cypress trees, one on either side there, |
| 8:48AM | 17 | correct?  Under the City's current plan for the bond project |
| 8:48AM | 18 | construction, are those cypress trees being removed, relocated |
| 8:48AM | 19 | or preserved in place? |
| 8:48AM | 20 | A.  They're being preserved in place. |
| 8:48AM | 21 | Q.  Mr. Pennell, in the course of your employment with the |
| 8:48AM | 22 | city, have you ever had an opportunity to work on a wall repair |
| 8:48AM | 23 | project that used a pier and spandrel system? |
| 8:48AM | 24 | A.  Yes. |
| 8:48AM | 25 | Q.  Where is that project? |

| | | |
|---|---|---|
| 8:48AM | 1 | A.  So the -- one of the current projects I have to going on is |
| 8:48AM | 2 | just north of this, on the Whitte Museum property of |
| 8:48AM | 3 | Brackenridge Park.  And it has a pier and spandrel design.  We |
| 8:48AM | 4 | do have it permitted.  We do have the treatment plant in |
| 8:48AM | 5 | because it's same criteria as we have in the park and so |
| 8:49AM | 6 | they're going to -- and it requires removal of trees as well. |
| 8:49AM | 7 | Q.  And it -- was the removal of trees required to facilitate |
| 8:49AM | 8 | the of the? |
| 8:49AM | 9 | MR. VILLARI:  Objection, Your Honor.  He doesn't have |
| 8:49AM | 10 | any knowledge of this.  He's not a structural engineer.  He's |
| 8:49AM | 11 | not an arborist. |
| 8:49AM | 12 | THE COURT:  If he knows. |
| 8:49AM | 13 | You may answer. |
| 8:49AM | 14 | THE WITNESS:  Yes. |
| 8:49AM | 15 | BY MS. WILSON: |
| 8:49AM | 16 | Q.  What is -- what is your role in connection with this |
| 8:49AM | 17 | construction project at the Whitte? |
| 8:49AM | 18 | A.  I'm the project manager.  So working with the Whitte to |
| 8:49AM | 19 | restore the walls in the channel. |
| 8:49AM | 20 | Q.  Now, the City received a variety of comments from the |
| 8:49AM | 21 | public requesting that the City consider ways to preserve more |
| 8:50AM | 22 | trees in the project area, correct? |
| 8:50AM | 23 | A.  That's correct. |
| 8:50AM | 24 | Q.  And some were based on religion and some were not? |
| 8:50AM | 25 | A.  That's correct. |

| | | |
|---|---|---|
| 8:50AM | 1 | Q.  Does the basis of the request to save more trees or |
| 8:50AM | 2 | preserve in place more trees change the science of the project? |
| 8:50AM | 3 | A.  It does not. |
| 8:50AM | 4 | Q.  The City received a number of requests to halt or modify |
| 8:50AM | 5 | bird deterrence efforts in the project area, correct? |
| 8:50AM | 6 | A.  Yes. |
| 8:50AM | 7 | Q.  Some were based on religion and some were not? |
| 8:50AM | 8 | A.  Yes. |
| 8:50AM | 9 | Q.  Does the basis of the request change the science of how |
| 8:50AM | 10 | bird deterrence work and how birds behave? |
| 8:50AM | 11 | A.  It does not. |
| 8:50AM | 12 | Q.  And we talked a lot about bird deterrence and when we talk |
| 8:51AM | 13 | about deterring the birds, what activity specifically are you |
| 8:51AM | 14 | deterring? |
| 8:51AM | 15 | A.  The nesting of the target species is our -- that is our |
| 8:51AM | 16 | target and our goal. |
| 8:51AM | 17 | Q.  And I asked you a little bit about possible exemptions or |
| 8:51AM | 18 | variances that may or may not have been pursued and I think |
| 8:51AM | 19 | plaintiffs' counsel did as well.  Are you the best person to |
| 8:51AM | 20 | ask about permitting exemptions and variances? |
| 8:51AM | 21 | A.  Texas Parks and Wildlife would probably be more qualified |
| 8:51AM | 22 | than me. |
| 8:51AM | 23 | Q.  Okay. |
| 8:51AM | 24 | A.  You know, as part of my job is to know the rules and |
| 8:51AM | 25 | regulations, so that's why I reach out to Texas Parks and |

Shanon Miller - Direct

10:48AM   1   Q.  So the City has denies it even needs to study whether it

10:48AM   2   can achieve its governmental purposes while accommodating

10:48AM   3   plaintiffs' religious exercise, right?

10:48AM   4   A.  Well, but to be clear, the City received feedback from many

10:48AM   5   stakeholders and considered all of it.  It wasn't just one

10:48AM   6   particular interest or stakeholder interest that was examined.

10:48AM   7   It was many.  And changed the project as a result.

10:48AM   8      So I think that's an important part of what the city did do

10:48AM   9   to look at viable alternatives.

10:48AM   10  Q.  Thank you.

10:48AM   11     But one of the things that it did was it did not study

10:48AM   12  whether it could achieve its governmental purposes while

10:49AM   13  accommodating plaintiffs' religious exercise, right?

10:49AM   14  A.  Right.

10:49AM   15  Q.  Okay.  No further questions.

10:49AM   16        THE COURT:  All right.  Cross.  Have you ever

10:49AM   17  testified before?

10:49AM   18        THE WITNESS:  One time.

10:49AM   19        THE COURT:  How do you like it?

10:49AM   20        THE WITNESS:  It's not my favorite thing to do.

10:49AM   21        THE COURT:  I testified once, and it's a whole

10:49AM   22  different experience sitting there.

10:49AM   23        MR. JONES:  Right.

          24

          25

Shanon Miller - Cross

| | | |
|---|---|---|
| 1:11PM | 1 | contribute to Brackenridge Park overall. |
| 1:11PM | 2 | Q.  Have I missed any -- oh, we have not talked about the Corps |
| 1:11PM | 3 | of Engineers has jurisdiction over anything that affects the |
| 1:11PM | 4 | water level at -- in the San Antonio River in Brackenridge |
| 1:11PM | 5 | Park.  Is that your understanding? |
| 1:11PM | 6 | A.  Yes, it is. |
| 1:11PM | 7 | Q.  Any other agencies that I haven't gone through, agencies or |
| 1:11PM | 8 | departments? |
| 1:11PM | 9 | A.  The San Antonio River Authority has also been involved and |
| 1:11PM | 10 | I think -- I think you listed -- no other agencies come to |
| 1:11PM | 11 | mind. |
| 1:11PM | 12 | Q.  All right.  And San Antonio River authority has been |
| 1:11PM | 13 | involved in the issue of the water quality at that location? |
| 1:11PM | 14 | A.  Yes. |
| 1:11PM | 15 | Q.  And also part of the support team that's looking at |
| 1:12PM | 16 | different alternatives.  Was one alternative to the design |
| 1:12PM | 17 | method, that the City chose, was one method that was suggested |
| 1:12PM | 18 | was let's just move the river walls out away from the trees and |
| 1:12PM | 19 | just take those walls and move them out so that the trees could |
| 1:12PM | 20 | remain? |
| 1:12PM | 21 | A.  Yes. |
| 1:12PM | 22 | Q.  Okay.  And was that investigated? |
| 1:12PM | 23 | A.  Yes.  That's my understanding.  Yes. |
| 1:12PM | 24 | Q.  All right.  And because of that, that would change the |
| 1:12PM | 25 | course of the -- of the river at that location.  Is that why |

Shanon Miller - Cross

| | | |
|---|---|---|
| 1:12PM | 1 | the San Antonio River Authority would possibly be involved? |
| 1:12PM | 2 | A.  Yes. |
| 1:12PM | 3 | MR. GUYNN:  Objection, lack of foundation. |
| 1:12PM | 4 | THE COURT:  Overruled. |
| 1:12PM | 5 | BY MR. JONES: |
| 1:12PM | 6 | Q.  So under this project that the city is planning, the course |
| 1:12PM | 7 | of the river is not going to change, right? |
| 1:12PM | 8 | A.  Correct. |
| 1:12PM | 9 | Q.  And pretty much everybody concedes that some trees are |
| 1:13PM | 10 | going to have to be removed; is that right? |
| 1:13PM | 11 | A.  Yes. |
| 1:13PM | 12 | Q.  As a result of the public debate and public meetings, have |
| 1:13PM | 13 | there been decisions to change the original design so as to |
| 1:13PM | 14 | preserve or relocate more trees? |
| 1:13PM | 15 | A.  Yes.  The original design would have removed 70 trees in |
| 1:13PM | 16 | this project area.  And that has been reduced to 48 as a result |
| 1:13PM | 17 | of the public input process. |
| 1:13PM | 18 | Q.  And of those that are going to be removed, how many are |
| 1:13PM | 19 | going to be relocated? |
| 1:13PM | 20 | A.  I believe it's 21 that are being relocated. |
| 1:13PM | 21 | Q.  Okay.  I have -- I have a document -- |
| 1:13PM | 22 | A.  Yeah.  There's a chart.  I think it's 21. |
| 1:13PM | 23 | Q.  All right.  So we've established that the course of the |
| 1:14PM | 24 | river is going to -- is going to remain the same.  The trees |
| 1:14PM | 25 | that are being preserved in place, those will all be preserved |

Shanon Miller - Cross

| | | |
|---|---|---|
| 1:33PM | 1 | MR. GUYNN:  Objection, lack of foundation. |
| 1:33PM | 2 | THE COURT:  Overruled. |
| 1:34PM | 3 | THE WITNESS:  Yes. |
| 1:34PM | 4 | BY MR. JONES: |
| 1:34PM | 5 | Q.  Is it an option for the city to just not do anything with |
| 1:34PM | 6 | regard to these walls that have failed? |
| 1:34PM | 7 | A.  No.  They are failing and it's important that we do |
| 1:34PM | 8 | something to stabilize them and make them safe so that the |
| 1:34PM | 9 | public can access. |
| 1:34PM | 10 | Q.  And would that be consistent with the City's obligations |
| 1:34PM | 11 | under its local rules under the state rules and under the |
| 1:34PM | 12 | Secretary of Interior standards? |
| 1:34PM | 13 | A.  Yes. |
| 1:34PM | 14 | Q.  It would -- it would be consistent to -- |
| 1:35PM | 15 | A.  To -- |
| 1:35PM | 16 | Q.  To do what? |
| 1:35PM | 17 | A.  To not do nothing, to do something to stabilize the walls |
| 1:35PM | 18 | that are failing. |
| 1:35PM | 19 | Q.  The meeting that was discussed that occurred with some of |
| 1:35PM | 20 | the arborists and with the City parks arborists and the |
| 1:35PM | 21 | engineer, tell us a little bit about how that meeting came |
| 1:35PM | 22 | about. |
| 1:35PM | 23 | A.  The one earlier this year that -- |
| 1:35PM | 24 | Q.  March I believe? |
| 1:35PM | 25 | A.  Yes.  So when the project was going through the Texas |

Shanon Miller - Cross

1:36PM 1  Historical Commission process and getting ready -- you know,

1:36PM 2  anticipating going to the HDRC process, City staff, including

1:36PM 3  Homer Garcia and me in particular, were asked to really look at

1:36PM 4  the alternatives and to figure out whether or not what was

1:36PM 5  being proposed was the best solution moving forward, that we

1:36PM 6  were saving as many trees as possible.

1:36PM 7      And so we convened a meeting.  I believe it was March the

1:36PM 8  1st.  And it was -- I was there and Jamaal Moreno, Bill

1:36PM 9  Pennell, Ross Hosea and then three of the independent arborists

1:36PM 10 that were involved in that report that has been referenced,

1:36PM 11 that tree assessment report.  And then the engineer, Shawn

1:36PM 12 Franke was there, and then there's a volunteer engineer that

1:37PM 13 had been working with the river road neighborhood association

1:37PM 14 to look at alternatives named Moses Cruz and he was also there.

1:37PM 15     And so what we did is we talk about what Mr. Cruz was

1:37PM 16 recommending in terms of pier and spandrel and how that

1:37PM 17 would -- how that works, like how that would be installed and

1:37PM 18 what the differences are, and it was -- you know, he was

1:37PM 19 trying -- was under the -- had the opinion that if we used the

1:37PM 20 pier and spandrel method, that additional trees could be saved

1:37PM 21 and so we talked through that with the arborists and with our

1:37PM 22 design engineer that afternoon.

1:37PM 23     And then following that, there was also a site visit that I

1:37PM 24 did not attend, but City staff also accompanied Mr. Cruz to the

1:37PM 25 site to talk specifically about specific trees.

Shanon Miller - Cross

| | | |
|---|---|---|
| 1:37PM | 1 | Q.  All right.  And what was the conclusion after that meeting |
| 1:37PM | 2 | or during that meeting? |
| 1:38PM | 3 | A.  The consensus in the meeting with the -- with the arborists |
| 1:38PM | 4 | was that no additional trees would be saved because they would |
| 1:38PM | 5 | still be impacted by the construction regardless of the |
| 1:38PM | 6 | methodology. |
| 1:38PM | 7 | Q.  And do you know whether a written document was prepared and |
| 1:38PM | 8 | Mr. Guynn has asked about whether a written document exists to |
| 1:38PM | 9 | record what was said or done about that.  Do you know of any? |
| 1:38PM | 10 | A.  I do not know that for sure. |
| 1:38PM | 11 | Q.  Okay.  And we could get into the crux methods and question, |
| 1:38PM | 12 | but would that if better left for Shawn Franke, the engineer, |
| 1:38PM | 13 | or can you also talk about standards that require the |
| 1:38PM | 14 | construction to be done a certain way with -- |
| 1:38PM | 15 | THE COURT:  No,. |
| 1:38PM | 16 | MR. JONES:  These historic stones? |
| 1:38PM | 17 | THE COURT:  No. |
| 1:38PM | 18 | MR. JONES:  Okay.  No.  You think the -- |
| 1:38PM | 19 | BY MR. JONES: |
| 1:38PM | 20 | Q.  Well, let me ask it this way.  Would you rather me ask |
| 1:39PM | 21 | Mr. Franke about those kinds of questions? |
| 1:39PM | 22 | MR. GUYNN:  Objection relevancy. |
| 1:39PM | 23 | THE WITNESS:  If your questions are about the |
| 1:39PM | 24 | engineering like the design and the methodology, then yep, you |
| 1:39PM | 25 | should ask the engineer.  But if your question is related to |

Jessica Alderson - Direct

| | | |
|---|---|---|
| 12:12PM | 1 | last to come in. |
| 12:12PM | 2 | Q.  All right.  So when do the first egrets and herons start |
| 12:12PM | 3 | coming into San Antonio in the calendar year? |
| 12:12PM | 4 | A.  Typically the yellow crowned herons and the great egrets |
| 12:12PM | 5 | have been documented in San Antonio area as early as February. |
| 12:12PM | 6 | So February, March time frame. |
| 12:12PM | 7 | Q.  And then the last birds that you mentioned to come in the |
| 12:12PM | 8 | cattle egrets, when do they start coming into San Antonio |
| 12:12PM | 9 | typically? |
| 12:12PM | 10 | A.  Typically April, May time frame for the cattle egrets. |
| 12:13PM | 11 | Q.  Okay.  What about double crested cormorants, when do |
| 12:13PM | 12 | telecom into San Antonio? |
| 12:13PM | 13 | A.  They can come in around that same time or oftentimes later |
| 12:13PM | 14 | into the season. |
| 12:13PM | 15 | Q.  So at around the same time as the cattle egrets? |
| 12:13PM | 16 | A.  Sometimes, yes. |
| 12:13PM | 17 | Q.  All right.  And then there is another species of |
| 12:13PM | 18 | cormorants, neotropics, correct? |
| 12:13PM | 19 | A.  Correct. |
| 12:13PM | 20 | Q.  And when do they come into San Antonio? |
| 12:13PM | 21 | A.  Around the same time. |
| 12:13PM | 22 | Q.  The same time as the cattle egrets? |
| 12:13PM | 23 | A.  Yes. |
| 12:13PM | 24 | Q.  Okay.  In your experience as an urban wildlife biologist |
| 12:13PM | 25 | and your experience with the urban rookeries, is there a way to |

Jessica Alderson - Direct

12:13PM  1  time bird deterrence efforts to deter egrets and herons from

12:13PM  2  nesting in a site but not deter double crested cormorants?

12:13PM  3  A.  No.

12:13PM  4  Q.  You used the phrase colonial nesting birds.  Can you

12:13PM  5  describe for the Court what a colonial nesting bird is?

12:14PM  6  A.  A colonial nesting bird is a bird that nests in large

12:14PM  7  colonies or with large numbers of birds in a given area and

12:14PM  8  they do this as a way of protecting -- protecting their young

12:14PM  9  and protecting their resource.

12:14PM  10  Q.  In San Antonio, what are the size of these rookeries that

12:14PM  11  you or your department has observed or managed?

12:14PM  12  A.  Rookery sizes vary from site to site.  It could be as small

12:14PM  13  as a couple hundred birds to several thousands of birds.

12:14PM  14  Q.  Are you familiar with the types of deterrent activities

12:14PM  15  that the City uses at Brackenridge Park to deter the target

12:14PM  16  species from the highly urbanized area of the park?

12:14PM  17  A.  Yes.

12:14PM  18  Q.  Can you describe for the Court what some of those are?

12:14PM  19  A.  In our general recommendations we have made recommendations

12:14PM  20  for visual and noise deterrence, some visual deterrence could

12:15PM  21  be a scare eye bird balloons are they either purchase them

12:15PM  22  online or make them themselves, as well as Mylar streamers,

12:15PM  23  some of the noise deterrence could be various types of

12:15PM  24  pyrotechnics, could be simply clapping wooden boards together.

12:15PM  25  It's any type of noise that's intended on deterring birds from

Jessica Alderson - Direct

| | | |
|---|---|---|
| 12:15PM | 1 | an undesired location. |
| 12:15PM | 2 | Q.  And based on your experience, you are aware of any visual |
| 12:15PM | 3 | deterrence that deter egrets and herons but do not deter |
| 12:15PM | 4 | cormorants? |
| 12:15PM | 5 | A.  No. |
| 12:15PM | 6 | Q.  Are you aware of any noise deterrents that would deter |
| 12:15PM | 7 | egrets and herons but not cormorants? |
| 12:15PM | 8 | A.  No. |
| 12:15PM | 9 | Q.  Are you aware of any kind of deterrent measure that we |
| 12:15PM | 10 | haven't discussed yet that would work on egrets and herons but |
| 12:15PM | 11 | not disturb cormorants? |
| 12:15PM | 12 | A.  No. |
| 12:15PM | 13 | Q.  And in the course of your work with the state as an urban |
| 12:16PM | 14 | and wildlife biologist, you are familiar with the requirements |
| 12:16PM | 15 | of the migratory bird treaty act? |
| 12:16PM | 16 | A.  Yes. |
| 12:16PM | 17 | Q.  Can you describe in general terms what the -- how the |
| 12:16PM | 18 | migratory bird treaty act influences or interacts with the |
| 12:16PM | 19 | urban rookery management plan? |
| 12:16PM | 20 | A.  The management recommendations within the management plan |
| 12:16PM | 21 | make sure that when the deterrent efforts are being made, it's |
| 12:16PM | 22 | within the constraints of the regulations and the law, both |
| 12:16PM | 23 | federal and state. |
| 12:16PM | 24 | Q.  Does your office enforce the migratory bird treaty act? |
| 12:16PM | 25 | A.  Our Texas Parks and Wildlife game wardens enforce our code |

Realtime Unedited Transcript Only

Jessica Alderson - Direct

12:19PM   1        Can you describe for the Court in general terms what this
12:19PM   2   field agreement hopes to -- or accomplishes?
12:19PM   3   A.  I haven't seen this particular document.
12:19PM   4   Q.  Oh, okay.  All right.  You can take that down.
12:19PM   5        Is there another agreement that you're aware of between the
12:19PM   6   USDA and the City?
12:19PM   7   A.  I know of just the verbal agreement between my -- when we
12:19PM   8   talked about the management plan and that their plan was to
12:19PM   9   talk with USDA and wildlife services and get an agreement with
12:19PM  10   them.
12:19PM  11   Q.  Okay.  Ms. Alderson, based on your experience, if the city
12:20PM  12   were not doing bird deterrence in the project area, would there
12:20PM  13   be a 6 to 8-month window of time where migratory birds would
12:20PM  14   not be present in the area for construction to take place?
12:20PM  15   A.  Could you repeat that question?
12:20PM  16   Q.  Yeah.  I'm going to come back to that because I think I
12:20PM  17   need to help you -- I think I'm about three steps ahead.
12:20PM  18        You're aware of the 2017 bond project, correct?
12:20PM  19   A.  I'm aware, yes.
12:20PM  20   Q.  And the activities construction activities that will take
12:20PM  21   place in the Lambert Beach area, correct?
12:20PM  22   A.  Yes.
12:20PM  23   Q.  Could those construction activities disturb migratory birds
12:20PM  24   who are nesting in the area?
12:20PM  25   A.  Yes.  It could.

Jessica Alderson - Direct

| 12:20PM | 1 | Q.  Could those activities disturb nests containing viable |
| 12:20PM | 2 | eggs? |
| 12:21PM | 3 | A.  Yes, ma'am, it could. |
| 12:21PM | 4 | Q.  From your perspective would that be a problem, that be a |
| 12:21PM | 5 | legal problem for the City? |
| 12:21PM | 6 | A.  It would become a legal problem if they chose to ignore |
| 12:21PM | 7 | that there were nesting birds and continued to move forward |
| 12:21PM | 8 | with the project. |
| 12:21PM | 9 | THE COURT:  And the penalties would be what? |
| 12:21PM | 10 | THE WITNESS:  It depends on which agency takes that |
| 12:21PM | 11 | over and so it could be anywhere from fine to whatever they |
| 12:21PM | 12 | thought the necessary penalty was. |
| 12:21PM | 13 | THE COURT:  Okay.  But the range of punishment for |
| 12:21PM | 14 | that is monetary only? |
| 12:21PM | 15 | THE WITNESS:  I believe so. |
| 12:21PM | 16 | THE COURT:  Okay.  All right.  Go ahead. |
| 12:21PM | 17 | BY MS. WILSON: |
| 12:21PM | 18 | Q.  So we established that the construction could disrupt the |
| 12:21PM | 19 | migratory birds or their eggs.  If the city is not deterring |
| 12:21PM | 20 | birds, migratory birds, from the project area, will there be a |
| 12:21PM | 21 | 6 to 8-month span of time where there would not be migratory |
| 12:22PM | 22 | birds is in the area so the City could do construction without |
| 12:22PM | 23 | disturbing then? |
| 12:22PM | 24 | A.  If a rookery were to establish, then it would halt the |
| 12:22PM | 25 | entire project. |

Jessica Alderson - Direct

| | | |
|---|---|---|
| 12:22PM | 1 | Q.  And there was not any 6 to 8-month window of time where in |
| 12:22PM | 2 | your knowledge and experience San Antonio is free of migratory |
| 12:22PM | 3 | birds? |
| 12:22PM | 4 | A.  Correct. |
| 12:22PM | 5 | Q.  Okay.  Ms. Alderson, you testified that you relied on |
| 12:22PM | 6 | Dr. Reed's letter to alleve your safety concerns about the |
| 12:22PM | 7 | large you ban rookeries at Brackenridge Park.  Can you tell the |
| 12:22PM | 8 | Court what those concerns were and we can look back at |
| 12:22PM | 9 | Defendant's Exhibit 3. |
| 12:22PM | 10 | A.  I would rely on Dr. Hunter Reed's letter to provide that |
| 12:23PM | 11 | background information.  My background and knowledge is in |
| 12:23PM | 12 | wildlife and natural resource management.  Dr. Hunter Reed, |
| 12:23PM | 13 | he's a state veterinarian and he's also a health specialist and |
| 12:23PM | 14 | he's got specific training for that.  So I can't speak in |
| 12:23PM | 15 | detail about those concerns.  But they're outlined here in the |
| 12:23PM | 16 | letter that he wrote. |
| 12:23PM | 17 | Q.  Can we look at the second paragraph. |
| 12:23PM | 18 | Is this -- we're looking now at the second paragraph of |
| 12:23PM | 19 | Defendant's Exhibit 3.  Are those the health concerns that |
| 12:23PM | 20 | Dr. Reed outlines that you relied upon? |
| 12:23PM | 21 | A.  Yes, ma'am. |
| 12:23PM | 22 | Q.  Okay. |
| 12:23PM | 23 | MS. WILSON:  Pass the witness. |
| 12:23PM | 24 | THE COURT:  All right.  Cross.  Was your high school |
| 12:23PM | 25 | in the Northside District? |

Jessica Alderson - Redirect

| | | |
|---|---|---|
| 12:38PM | 1 | Q.  It's not there. |
| 12:38PM | 2 | So you don't mention public safety in this letter, do you? |
| 12:38PM | 3 | A.  Okay.  I guess not if you searched for it and it's not |
| 12:38PM | 4 | there.  I can take a minute and read the whole letter to make |
| 12:38PM | 5 | for sure. |
| 12:38PM | 6 | Q.  You don't mention public health, do you? |
| 12:38PM | 7 | A.  No. |
| 12:38PM | 8 | Q.  So you weren't mentioning anything regarding public safety |
| 12:38PM | 9 | or public health in that letter.  Correct?  You weren't |
| 12:38PM | 10 | mentioning anything about public safety or public health in |
| 12:38PM | 11 | that left, correct? |
| 12:38PM | 12 | A.  No. |
| 12:38PM | 13 | MR. McCRAW:  Okay.  That's all I have, Your Honor. |
| 12:38PM | 14 | Pass the witness. |
| 12:38PM | 15 | THE COURT:  Ms. Wilson, anything else. |
| 12:39PM | 16 | MS. WILSON:  Very briefly. |
| 12:39PM | 17 | THE COURT:  Okay. |
| 12:39PM | 18 | REDIRECT EXAMINATION |
| 12:39PM | 19 | BY MS. WILSON: |
| 12:39PM | 20 | Q.  Ms. Alderson, Mr. McCraw asked you about the goal of the |
| 12:39PM | 21 | rookery management plan being the deterrence of egrets and |
| 12:39PM | 22 | herons.  Do you recall that? |
| 12:39PM | 23 | A.  Yes. |
| 12:39PM | 24 | Q.  If the City had come you and said, Ms. Alderson, is there a |
| 12:39PM | 25 | way that you know of that we can deter egrets and herons but |

Jessica Alderson - Recross

| | | |
|---|---|---|
| 12:39PM | 1 | let double crested cormorants into the project area, what would |
| 12:39PM | 2 | your answer be? |
| 12:39PM | 3 | A.  There isn't a way. |
| 12:39PM | 4 | MS. WILSON:  Thank you, Your Honor.  No further |
| 12:39PM | 5 | questions. |
| 12:39PM | 6 | THE COURT:  All right.  Mr. McCraw, anything based on |
| 12:39PM | 7 | that last question? |
| 12:39PM | 8 | MR. McCRAW:  Just a couple questions Your Honor. |
| 12:39PM | 9 | RECROSS-EXAMINATION |
| 12:39PM | 10 | BY MR. McCRAW: |
| 12:40PM | 11 | Q.  It's almost not worth it just for like, you know, a couple |
| 12:40PM | 12 | questions.  But now, Ms. Alderson, regarding the last question, |
| 12:40PM | 13 | regarding the fact that the City has never asked you whether |
| 12:40PM | 14 | they could target cormorants, I mean, whether they could target |
| 12:40PM | 15 | herons and egrets versus cormorants, would you consult with |
| 12:40PM | 16 | anybody else regarding that issue? |
| 12:40PM | 17 | A.  I would, but I believe this answer would be the same, that |
| 12:40PM | 18 | you can't -- the deterrent techniques are going to impact other |
| 12:40PM | 19 | species than the ones that you're specifically targeting. |
| 12:40PM | 20 | Q.  But you would like to consult with other people? |
| 12:40PM | 21 | A.  Of course. |
| 12:40PM | 22 | Q.  You've just never been asked that question? |
| 12:40PM | 23 | A.  I have never been asked that question, no. |
| 12:40PM | 24 | MR. McCRAW:  Okay.  That's all I have, Your Honor. |
| 12:40PM | 25 | THE COURT:  All right.  Thank you, ma'am.  You may be |

Shawn Franke - Direct

| | | |
|---|---|---|
| 2:01PM | 1 | myself and the City's arborist, I forgot his name.  I'm sorry. |
| 2:01PM | 2 | Q.  That's okay, sir? |
| 2:01PM | 3 | THE COURT:  Ross Hosea. |
| 2:01PM | 4 | THE WITNESS:  Yes, sir. |
| 2:01PM | 5 | THE COURT:  Okay.  Ross. |
| 2:01PM | 6 | BY MR. McLIN: |
| 2:01PM | 7 | Q.  Why was Mr. Cruz there? |
| 2:01PM | 8 | A.  I was actually brought to the meeting to listen to |
| 2:01PM | 9 | Mr. Cruz's ideas. |
| 2:01PM | 10 | Q.  And what -- just generally speaking, *Reader's Digest* |
| 2:01PM | 11 | version, what were his ideas? |
| 2:01PM | 12 | A.  His idea was he was presenting the concept of the pier and |
| 2:01PM | 13 | spandrel, which he actually was performing on another small |
| 2:01PM | 14 | portion of the San Antonio River. |
| 2:01PM | 15 | Q.  And was that type of solution considered either by yourself |
| 2:01PM | 16 | or the City of San Antonio? |
| 2:01PM | 17 | A.  Yes, it was. |
| 2:01PM | 18 | Q.  Okay.  Was it considered by you? |
| 2:01PM | 19 | A.  Yes, sir. |
| 2:01PM | 20 | Q.  Okay.  Is there a reason that you did not go with |
| 2:02PM | 21 | Mr. Cruz's design? |
| 2:02PM | 22 | A.  Yes, sir. |
| 2:02PM | 23 | Q.  What is that? |
| 2:02PM | 24 | A.  Multiple.  We actually during that meeting pointed out to |
| 2:02PM | 25 | Mr. Cruz that his design actually was not in accordance with |

Shawn Franke - Direct

| | | |
|---|---|---|
| 2:02PM | 1 | Secretary of Interior's requirements.  His design was presented |
| 2:02PM | 2 | as drilling through the front face of the stones, which is not |
| 2:02PM | 3 | allowed. |
| 2:02PM | 4 | Q.  So let's talk about the walls that you're trying to support |
| 2:02PM | 5 | a little bit.  I've heard the term gravity wall system.  What |
| 2:02PM | 6 | is a gravity wall system? |
| 2:02PM | 7 | A.  A gravity wall is -- it's basically using the weight of |
| 2:02PM | 8 | itself to resist the horizontal pressures that are behind the |
| 2:02PM | 9 | wall. |
| 2:02PM | 10 | Q.  Do these walls have a foundation? |
| 2:02PM | 11 | A.  Typically not.  They're typically keyed into the soil, just |
| 2:02PM | 12 | a little bit more.  They dug down into natural a little bit and |
| 2:03PM | 13 | then sat on top of there and started building from there. |
| 2:03PM | 14 | Q.  Did these walls as they exist now have any reinforcement in |
| 2:03PM | 15 | them? |
| 2:03PM | 16 | A.  No, sir. |
| 2:03PM | 17 | Q.  Are these walls still what I've heard called as plumb, |
| 2:03PM | 18 | straight up and down? |
| 2:03PM | 19 | A.  Not -- I don't think any of them are, but there might be |
| 2:03PM | 20 | one. |
| 2:03PM | 21 | Q.  Have any of these walls failed? |
| 2:03PM | 22 | A.  Yes, sir. |
| 2:03PM | 23 | Q.  And why have they failed, if you know? |
| 2:03PM | 24 | A.  They have probably failed for a multiple of reasons.  The |
| 2:03PM | 25 | first is is that they're inadequately designed.  The second is |

Shawn Franke - Direct

| | | |
|---|---|---|
| 2:11PM | 1 | A.  Because we just as I said, how water can change the lateral |
| 2:12PM | 2 | pressure on the wall, if you put a large piece of equipment on |
| 2:12PM | 3 | top of the wall, that will generate horizontal pressure on the |
| 2:12PM | 4 | face of the wall. |
| 2:12PM | 5 | Q.  So if we're talking about the -- let's talk about the two |
| 2:12PM | 6 | primary systems that we're arguing about a pier and spandrel |
| 2:12PM | 7 | system versus a cantilever system.  Does the equipment vary |
| 2:12PM | 8 | between those two options? |
| 2:12PM | 9 | A.  Yes, sir. |
| 2:12PM | 10 | Q.  How? |
| 2:12PM | 11 | A.  Pier and spandrel is going to require a little bit larger |
| 2:12PM | 12 | piece of equipment because you're going to have to get in there |
| 2:12PM | 13 | and drill up against the face of that wall.  I heard some |
| 2:12PM | 14 | testimony if I can reference it, of 12 to 18-inch diameter |
| 2:12PM | 15 | footings.  I think they could be much larger than that.  You're |
| 2:12PM | 16 | talking about a piece of equipment that could be somewheres -- |
| 2:12PM | 17 | I verified it versus something else, then it's probably in the |
| 2:13PM | 18 | 50, 60,000-pound range that would have to be setting up against |
| 2:13PM | 19 | the wall. |
| 2:13PM | 20 | Q.  Is that for the pier and spandrel? |
| 2:13PM | 21 | A.  That's for the pier and spandrel.  Now, for the |
| 2:13PM | 22 | cantilever's retaining, since we're basically just removing the |
| 2:13PM | 23 | soil, we could be using in some cases it may be hand dug or |
| 2:13PM | 24 | others, it could be as small as one of the little any |
| 2:13PM | 25 | mini-excavators that you see riding on the back of somebody's |

Shawn Franke - Direct

2:13PM    1    trailer.

2:13PM    2    Q.  Does the pier and spandrel option require any additional

2:13PM    3    work to the work site in order to utilize it?

2:13PM    4    A.  If we are, yes, I think we will.  I think to get the drill

2:13PM    5    rigs that we're talking about to get into there, we would

2:13PM    6    probably have to level or do grading, level it so that you can

2:13PM    7    drive the drill rig on to the site.

2:13PM    8        You will -- because we're going to be applying -- you would

2:14PM    9    be applying such a horizontal pressure on the wall, we would

2:14PM    10   have to have a much more intent shoring system for the historic

2:14PM    11   wall.

2:14PM    12       And it's just the angle -- well, okay.  And then in

2:14PM    13   addition, we would probably have to do more tree trimming

2:14PM    14   because when you stand that rig up, it has to clear tree

2:14PM    15   branches.

2:14PM    16   Q.  Are both systems safe?

2:14PM    17   A.  Yes, sir.

2:14PM    18   Q.  Is one system safer than the other?

2:14PM    19   A.  No, sir.

2:14PM    20   Q.  When we're talking about cost, is there a financial impact

2:14PM    21   on the methodology chosen?

2:14PM    22   A.  Typically you'll see that the cantilever's retaining wall

2:14PM    23   system is less expensive.

2:14PM    24   Q.  By how much?

2:14PM    25   A.  It depends on circumstances.  It can be from 20 percent to

Shawn Franke - Direct

| | | |
|---|---|---|
| 2:16PM | 1 | Q.  Let me reask it a different way? |
| 2:16PM | 2 | A.  Yeah. |
| 2:16PM | 3 | Q.  Is the excavation narrower for the pier and spandrel |
| 2:16PM | 4 | retaining wall than the cantilever retaining wall? |
| 2:16PM | 5 | A.  As it is shown here, yes. |
| 2:16PM | 6 | Q.  In practical matters, what has to be done to build the |
| 2:16PM | 7 | wall, is that excavation going to be narrower? |
| 2:16PM | 8 | A.  No. |
| 2:16PM | 9 | Q.  Why? |
| 2:16PM | 10 | A.  Because you have to get into this area with a -- with a |
| 2:16PM | 11 | human being, a construction worker, you have to get into there |
| 2:16PM | 12 | to insert these pins that we're going to be putting into the |
| 2:16PM | 13 | back of the wall. |
| 2:16PM | 14 | These pens are going to be -- other they're called out at a |
| 2:16PM | 15 | very nicely spaced pattern on our construction documents, they |
| 2:17PM | 16 | will not be.  We've already exposed some other areas in the |
| 2:17PM | 17 | park of the walls, and we're going to have to be picking and |
| 2:17PM | 18 | choosing the rocks that we drill into.  We're going to have to |
| 2:17PM | 19 | be looking for the larger rocks. |
| 2:17PM | 20 | So the concept of just making a section of this wider does |
| 2:17PM | 21 | not happen.  We're going to have to widen.  We have to expose |
| 2:17PM | 22 | the entire back face of the wall so that we can see and so that |
| 2:17PM | 23 | we can then properly attach that wall to our new wall. |
| 2:17PM | 24 | Q.  Does the pier and spandrel retaining wall, is that a |
| 2:17PM | 25 | reinforced wall? |

Shawn Franke - Direct

| | | |
|---|---|---|
| 2:17PM | 1 | A.  Yes, it is. |
| 2:17PM | 2 | Q.  And when I use reinforcement, I'm talking about rebar.  Do |
| 2:17PM | 3 | you understand that? |
| 2:17PM | 4 | A.  Yes, sir. |
| 2:17PM | 5 | Q.  Okay.  Can you get the rebar into a 12 to 18-inch |
| 2:17PM | 6 | excavation? |
| 2:17PM | 7 | A.  You could.  However, this is a very nicely drawn sketch. |
| 2:17PM | 8 | That blue line that you see there is not going to be a straight |
| 2:18PM | 9 | wall.  This is the back of the gravity wall.  It may be |
| 2:18PM | 10 | typically the way somebody would build a gravity wall is it's |
| 2:18PM | 11 | wider at the bottom and narrower at the top. |
| 2:18PM | 12 | So it's going to be a much larger area than that.  You have |
| 2:18PM | 13 | to -- I think I went offtrack.  I probably need your question |
| 2:18PM | 14 | again.  I'm sorry. |
| 2:18PM | 15 | Q.  It's okay, sir. |
| 2:18PM | 16 | It originally started out as a question about how you get |
| 2:18PM | 17 | the rebar -- |
| 2:18PM | 18 | A.  Okay.  I'm sorry.  The first thing, even if you were able |
| 2:18PM | 19 | to get the pins into this, the pins then would stick into the |
| 2:18PM | 20 | wall so the concept of just dropping a prefabricated capable |
| 2:18PM | 21 | into this nice, neat slot is kind of doesn't work because |
| 2:18PM | 22 | you're not going to be able to drop something straight down |
| 2:18PM | 23 | because if the pens are sticking out of the wall, you cannot |
| 2:19PM | 24 | drop a nice prefabricated cage straight down into there. |
| 2:19PM | 25 | Q.  If you wanted to use a prefabricated cage would you have to |

Realtime Unedited Transcript Only

2:19PM 1  wider excavation than what is depicted in Plaintiffs' Exhibit

2:19PM 2  53?

2:19PM 3  A.  Yes, sir, you would so that you could then, you know, place

2:19PM 4  it behind and then slide it forward to engage the pins.

2:19PM 5  Q.  What if you wanted to build the reinforcement structure in

2:19PM 6  place?

2:19PM 7  A.  You would -- you can't put a -- I'm not going to let a man

2:19PM 8  go down into a hole like that.

2:19PM 9  Q.  Why?

2:19PM 10  A.  Life safety, OSHA requirements.

2:19PM 11  Q.  So on a crux like this, who would be responsible for the

2:19PM 12  individuals going down into that hole?

2:19PM 13  A.  The contractor.

2:19PM 14  Q.  Is the design professional, do you have any risk?

2:19PM 15  A.  I have a moral responsibility.  I do not -- per our

2:19PM 16  contracts, we typically are not responsible for contractor

2:20PM 17  safety.  But I will point something out to somebody if I see

2:20PM 18  it.

2:20PM 19  Q.  Okay.  So let's talk about if you are going to drop a

2:20PM 20  prefabricated cage into that excavation.  Does that excavation

2:20PM 21  have to be wired than the wall?

2:20PM 22  A.  Yes, sir.

2:20PM 23  Q.  If you are going to build it in place, does that excavation

2:20PM 24  have to be wider than the wall that is depicted here?

2:20PM 25  A.  Much wider.

Ross Hosea - Direct

| | | |
|---|---|---|
| 10:15AM | 1 | relevant area. |
| 10:15AM | 2 | THE COURT:  All right.  Overruled.  But let's move |
| 10:15AM | 3 | along. |
| 10:15AM | 4 | MR. JONES:  Go to the next slide, please.  I just |
| 10:15AM | 5 | wanted to show where that tree fell.  Go to the next slide. |
| 10:15AM | 6 | THE COURT:  That's a set Darylm. |
| 10:15AM | 7 | THE WITNESS:  Yes, sir. |
| 10:15AM | 8 | THE COURT:  Okay. |
| 10:15AM | 9 | BY MR. JONES: |
| 10:15AM | 10 | Q.  Is that the same species of tree that fell in the |
| 10:15AM | 11 | San Antonio Zoo recently? |
| 10:15AM | 12 | A.  Yes, sir, it is. |
| 10:15AM | 13 | Q.  And does Defendant's Exhibit D15D show the location of that |
| 10:15AM | 14 | tree in relation to the project area? |
| 10:15AM | 15 | A.  That is correct, yes, sir. |
| 10:15AM | 16 | Q.  And over there above the softball field, you see a very |
| 10:15AM | 17 | large oak tree with a sidewalk going up to it? |
| 10:15AM | 18 | A.  Yes, sir.  I know that tree well. |
| 10:15AM | 19 | Q.  All right.  Have I identified that tree? |
| 10:16AM | 20 | A.  You have.  Yes, sir. |
| 10:16AM | 21 | Q.  What did I say about that tree? |
| 10:16AM | 22 | A.  It's your favorite tree, your grrk and I've your favorite |
| 10:16AM | 23 | tree from the entire park. |
| 10:16AM | 24 | Q.  All right.  Did the -- did you have a chance to talk again |
| 10:16AM | 25 | to the arborist committee ^ as well as Shanon Miller and some |

Ross Hosea - Direct

| | | |
|---|---|---|
| 10:16AM | 1 | other city folks in March of this year to have them reassess |
| 10:16AM | 2 | based upon another design proposed by another engineer named |
| 10:16AM | 3 | Mr. Cruz? |
| 10:16AM | 4 | A.  Yes, sir.  There was -- there was talk of a *pro bono* |
| 10:16AM | 5 | engineer that had some alternative plans.  And so the City made |
| 10:16AM | 6 | arrangements for us to meet with him.  We met with him in |
| 10:16AM | 7 | March, early to mid March.  We met him at a parks facility, |
| 10:16AM | 8 | laid out all the papers, went through it and discussed it.  I |
| 10:17AM | 9 | believe three of the four committee members were present.  One |
| 10:17AM | 10 | of them was traveling that day, was not available, mark close |
| 10:17AM | 11 | was not there ^ but we went through that.  He explained his |
| 10:17AM | 12 | side of it.  There was no drawings presented to us.  It was |
| 10:17AM | 13 | just all verbal at the time of what was shown to -- or what was |
| 10:17AM | 14 | described to us.  And at the conclusion of that, I specifically |
| 10:17AM | 15 | asked the group, Okay.  Based on what you've heard here this |
| 10:17AM | 16 | engineer, do these change any of your assessments or any of |
| 10:17AM | 17 | your report?  And they said, no our report stands as it is. |
| 10:17AM | 18 | Q.  Okay.  And I could go back through and show you this |
| 10:17AM | 19 | Exhibit D 59.  But has the -- the current list of trees that |
| 10:17AM | 20 | are scheduled to be removed or relocated, is that necessary to |
| 10:17AM | 21 | accomplish the bond project? |
| 10:17AM | 22 | A.  The tree -- yes.  The trees as we've outlined them. |
| 10:17AM | 23 | Q.  All right.  And did the City make an effort to go back to |
| 10:18AM | 24 | the list of trees to be preserved in place or removed or |
| 10:18AM | 25 | relocated and change it as a result of public comment to |

Ross Hosea - Direct

| | | |
|---|---|---|
| 10:18AM | 1 | preserve more trees in place and relocate trees? |
| 10:18AM | 2 | A.   There was -- that is correct.  If you go back to that one |
| 10:18AM | 3 | thing that had all the colors on it, there's actually a lower |
| 10:18AM | 4 | page 2 that shows in a more current.  So it can see the |
| 10:18AM | 5 | difference.  That's part of the reason that was put together. |
| 10:18AM | 6 | So this would have been in 2022 of January.  You notice -- so |
| 10:18AM | 7 | that's -- you notice the orange is the remove and the green is |
| 10:18AM | 8 | the place.  You see a lot of on the other hand ornthat.  When |
| 10:18AM | 9 | you go down to the photo -- or the image below this one. |
| 10:18AM | 10 | Q.   Go to the next page, please. |
| 10:18AM | 11 | A.   You're going to see the orange decrease. |
| 10:18AM | 12 | Q.   And this is Defendant's Exhibit 59; is that right? |
| 10:19AM | 13 | A.   There's supposed to be two pages to this, yes, sir. |
| 10:19AM | 14 | Q.   Okay.  It's two pages D59 with COSA 2023 and 2024.  There |
| 10:19AM | 15 | you go.  Can you see those numbers now? |
| 10:19AM | 16 | A.   I can see the numbers, yes, sir.  I don't see the second |
| 10:19AM | 17 | page.  I was looking for the 2023 image.  There we go. |
| 10:19AM | 18 | THE COURT:  There it is.  April 17 there. |
| 10:19AM | 19 | THE WITNESS:  We go.  Yes, sir.  So the difference in |
| 10:19AM | 20 | these two, Your Honor, is that this one this one took a lot of |
| 10:19AM | 21 | recommendations and a lot of public input into consideration, |
| 10:19AM | 22 | all the blue trees have now instead of becoming orange, were |
| 10:19AM | 23 | all turned into relocates.  And so you see a reduction in the |
| 10:19AM | 24 | number of straight-up removals and more trees were being |
| 10:19AM | 25 | reserved on the site either in place or through relocation. |

Realtime Unedited Transcript Only

Ross Hosea - Direct

| | | |
|---|---|---|
| 10:19AM | 1 | Q. And the big tree, 101, describe that for the Court. |
| 10:20AM | 2 | A. That is the largest tree in that particular area. It's a |
| 10:20AM | 3 | .44 inch live oak tree. Again, we tried to age it. We were |
| 10:20AM | 4 | unsuccessful. It's very difficult getting broke the core ton |
| 10:20AM | 5 | and were not able to gotten extract. But we still believe |
| 10:20AM | 6 | based on evidence and everything around there, we still believe |
| 10:20AM | 7 | it's still to be under a hundred years old. |
| 10:20AM | 8 | Q. And what's going to happen to it? |
| 10:20AM | 9 | A. It's going to get relocated. That's the one that. Will |
| 10:20AM | 10 | Garcia mentioned earlier. It's going to get slid back |
| 10:20AM | 11 | approximately 10 -- tennish feet. |
| 10:20AM | 12 | Q. How do you do that? |
| 10:20AM | 13 | A. With a lot of equipment and some very specialized -- a very |
| 10:20AM | 14 | special lied company. We're working with a company called |
| 10:20AM | 15 | environmental design out of the Houston area. They the |
| 10:20AM | 16 | worldwide leader in moving large trees. That's their month to. |
| 10:20AM | 17 | We move large trees. And they are the world's beeches at it. |
| 10:21AM | 18 | THE COURT: And what's the percentage of survival? |
| 10:21AM | 19 | THE WITNESS: So we've asked them that question. And |
| 10:21AM | 20 | their answer to us is we are not going to take -- we're not in |
| 10:21AM | 21 | the business to have trees die. We're not going to take on the |
| 10:21AM | 22 | tree if we're not almost a hundred percent sure that we get it |
| 10:21AM | 23 | to live. There's a lot that goes into that moving that tree |
| 10:21AM | 24 | than just sliding it over. There's a lot of prework, pruning |
| 10:21AM | 25 | work and then post work is this is a five year project. Once |

Shawn Franke - Redirect

| | | |
|---|---|---|
| 2:57PM | 1 | THE COURT:  All right.  Thank you, sir.  You may step |
| 2:57PM | 2 | down. |
| 2:57PM | 3 | And, Mr. Jones, we're going to recess.  But what's the plan |
| 2:57PM | 4 | for tomorrow morning? |
| 2:58PM | 5 | MR. JONES:  Your Honor, tomorrow morning we plan to |
| 2:58PM | 6 | call Homer Garcia, the parks director, and Ross Hosea, and then |
| 2:58PM | 7 | we'll rest. |
| 2:58PM | 8 | THE COURT:  And that's it. |
| 2:58PM | 9 | MR. JONES:  Yes. |
| 2:58PM | 10 | THE COURT:  Okay.  Mr. Rasmussen, do you anticipate |
| 2:58PM | 11 | any rebuttal? |
| 2:58PM | 12 | MR. RASMUSSEN:  So far, none, Your Honor.  I did have |
| 2:58PM | 13 | a question about closings and if Your Honor has any guidance |
| 2:58PM | 14 | for us on that. |
| 2:58PM | 15 | THE COURT:  Okay.  I think we're getting to that |
| 2:58PM | 16 | point.  Mr. Rasmussen, you all have the burden, what are you |
| 2:58PM | 17 | asking for time-wise. |
| 2:58PM | 18 | MR. RASMUSSEN:  We'd like an hour to close. |
| 2:58PM | 19 | THE COURT:  Okay.  Open and close or you're going to |
| 2:58PM | 20 | use all -- it doesn't matter if you use the whole hour. |
| 2:58PM | 21 | MR. RASMUSSEN:  Going to take an hour and five |
| 2:58PM | 22 | minutes.  Like to have a little bit of time for rebuttal, I'll |
| 2:58PM | 23 | go first and then they'll close and then a little bit of |
| 2:58PM | 24 | rebuttal. |
| 2:58PM | 25 | THE COURT:  Mr. Jones, how long. |