No. 23-50746

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

GARY PEREZ; MATILDE TORRES,

*Plaintiffs-Appellants/Cross-Appellees,*

v.

CITY OF SAN ANTONIO,

*Defendant-Appellee/Cross-Appellant.*

On Appeal from the United States District Court
for the Western District of Texas (Biery, J.)

## BRIEF OF APPELLANTS GARY PEREZ AND MATILDE TORRES

Mark W. Rasmussen
Margaret I. Lyle
Jonathan D. Guynn
J. Benjamin Aguiñaga
Chance McCraw
Timothy M. Villari
JONES DAY
2727 North Harwood Street
Dallas, TX 75201.1515
Telephone: +1.214.220.3939
E-mail: mrasmussen@jonesday.com
E-mail: milyle@jonesday.com
E-mail: jguynn@jonesday.com
E-mail: jbaguinaga@jonesday.com
E-mail: cmccraw@jonesday.com
E-mail: tvillari@jonesday.com

ATTORNEYS FOR PLAINTIFFS

John Greil
Steven T. Collis
Law & Religion Clinic
University of Texas School of Law
727 East Dean Keeton St.
Austin, TX 78705
Telephone: +1.512.471.5151
E-mail: john.greil@law.utexas.edu
E-mail: steve.collis@law.utexas.edu

ATTORNEYS FOR PLAINTIFFS-
APPELLANTS

# CERTIFICATE OF INTERESTED PERSONS

*Perez, et al. v. City of San Antonio*, No. 23-50746

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Plaintiffs-Appellants Gary Perez and Matilde Torres

   Mark W. Rasmussen
   JONES DAY
   2727 N. Harwood St.
   Dallas, TX  75201

   Margaret I. Lyle
   JONES DAY
   2727 N. Harwood St.
   Dallas, TX  75201

   Jonathan D. Guynn
   JONES DAY
   2727 N. Harwood St.
   Dallas, TX  75201

   J. Benjamin Aguiñaga
   JONES DAY
   2727 N. Harwood St.
   Dallas, TX  75201

   Chance McCraw
   JONES DAY
   2727 N. Harwood St.
   Dallas, TX  75201

   Timothy M. Villari
   JONES DAY

2727 N. Harwood St.
Dallas, TX  75201

John Greil
Law and Religion Clinic
University of Texas School of Law
727 East Dean Keeton St.
Austin, TX 78705

Steven T. Collis
Law and Religion Clinic
University of Texas School of Law
727 East Dean Keeton St.
Austin, TX 78705

2.  Defendant-Appellee City of San Antonio

Fred R. Jones
Langley & Banack, Incorporated
745 East Mulberry Avenue
Suite 700
San Antonio, TX 78212
Tel: (210) 736-6600
Fax: (210) 735-6889
Email: fjones@langleybanack.com

Ian M. McLin
Langley & Banack, Incorporated
745 East Mulberry Avenue
Suite 700
San Antonio, TX 78212
Tel: (210) 736-6600
Fax: (210) 735-6889
Email: imclin@langleybanack.com

Lee Brinson Warren
Langley & Banack, Incorporated
745 East Mulberry Avenue
Suite 700
San Antonio, TX 78212
Tel: (210) 736-6600

Fax: (210) 735-6889
Email: warren@goodelaw.com

Natalie Friend Wilson
Langley & Banack, Incorporated
745 East Mulberry Avenue
Suite 700
San Antonio, TX 78212
Tel: (210) 736-6600
Fax: (210) 735-6889
Email: nwilson@langleybanack.com

Sara Murray
Langley & Banack, Incorporated
745 East Mulberry Avenue Suite 700
San Antonio, TX 78212
Tel: (210) 736-6600
Fax: (210) 735-6889
Email: smurray@langleybanack.com

City of San Antonio
Deborah Klein
Deputy City Attorney
International Center
203 South St. Mary's Street, Second Floor
San Antonio, TX 78205
Telephone: (210) 207-8949
Facsimile: (210) 207-4004
Deborah.Klein@sanantonio.gov

*/s/ Chance B. McCraw*
Chance B. McCraw

## STATEMENT REGARDING ORAL ARGUMENT

The Court has scheduled this case for oral argument on December 7, 2023.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS .................................................. ii

STATEMENT REGARDING ORAL ARGUMENT ...................................... v

INTRODUCTION .............................................................................. 1

STATEMENT OF JURISDICTION ....................................................... 5

STATEMENT OF THE ISSUE PRESENTED ........................................ 5

STATEMENT OF THE CASE ............................................................. 6

    A.    Factual Background ............................................................. 6

        1.    Plaintiffs' Religious Beliefs and the Sacred Area. ............... 6

        2.    The City's Current and Intended Actions Within the Sacred Area. .................................................................... 10

                a.    The City erects fencing that bars Plaintiffs from worshipping in the Sacred Area. .......................... 12

                b.    The City intends to destroy virtually all trees in the Project Area. .......................................................... 13

                c.    The City drives cormorants out of the Project Area. ........ 17

    B.    Procedural History ........................................................... 20

        1.    The District Court's October 2 Order ............................. 21

        2.    The District Court's October 11 Order ........................... 22

        3.    The District Court's October 26 Order ........................... 23

SUMMARY OF ARGUMENT ............................................................. 24

STANDARD OF REVIEW ................................................................ 30

ARGUMENT ................................................................................. 30

I.    Plaintiffs Are Likely To Succeed On The Merits Of Their Religious-Liberty Claims. ................................................................................ 31

    A.    The City's Actions Violate TRFRA. .................................... 32

        1.    The fencing that bars Plaintiffs from worshipping and praying in the Sacred Area lacks any compelling governmental interest and is not narrowly tailored. .................. 33

# TABLE OF CONTENTS
(continued)

**Page**

2.  The City's tree-removal plan lacks any compelling governmental interest and is not narrowly tailored. ......................38

3.  The City's anti-nesting plan lacks any compelling governmental interest and is not narrowly tailored. ......................41

B.  The City's Actions Violate Article I, Section 6 of the Texas Constitution. ................................................................44

C.  The City's Actions Violate the Federal Free Exercise Clause.................45

D.  The City's Actions Violate Article I, Section 6-a of the Texas Constitution. ................................................................47

II.  The Remaining Preliminary-Injunction Factors Strongly Favor Plaintiffs........52

CONCLUSION ..................................................................................54

CERTIFICATE OF SERVICE................................................................56

CERTIFICATE OF COMPLIANCE.........................................................57

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Barr v. City of Sinton*,
  295 S.W.3d 287 (Tex. 2009) .......................................................................*passim*

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984) ....................................................................................30

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014) ....................................................................................40

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ........................................................................42, 45, 47

*Employment Division, Department of Human Resources of Oregon v. Smith*,
  494 U.S. 872 (1990) ...............................................................................45, 50

*Ex parte Herrera*,
  2014 WL 4207153 (Tex. App.—Dallas Aug. 26, 2014, no pet.) ...............44

*Fowler v. State of R.I.*,
  345 U.S. 67 (1953) ......................................................................................51

*Fraternal Order of Police v. City of Newark*,
  170 F.3d 359 (3d Cir. 1999) .......................................................................47

*Fulton v. City of Philadelphia*,
  141 S. Ct. 1868 (2021) ...............................................................................*passim*

*Hague v. Comm. For Indus. Org.*,
  307 U.S. 496 (1939) ....................................................................................51

*HEB Ministries, Inc. v. Tex. Higher Educ. Coordinating Bd.*,
  235 S.W.3d 627 (Tex. 2007) ......................................................................50

*Landor v. Louisiana Dep't of Corr. & Pub. Safety*,
  82 F.4th 337 (5th Cir. 2023) ......................................................................51

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
  485 U.S. 439 (1988) ........................................................................49, 50, 51

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*McDonald v. Longley*,
  4 F.4th 229 (5th Cir. 2021) ............................................................54

*Merced v. Kasson*,
  577 F.3d 578 (5th Cir. 2009) ........................................ 30, 32, 40, 53

*Midrash Sephardi, Inc. v. Town of Surfside*,
  366 F. 3d 1214 (11th Cir. 2004) ....................................................47

*Moore v. Brown*,
  868 F.3d 398 (5th Cir. 2017) .................................................. 30, 31

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................53

*Opulent Life Church v. City of Holly Springs*,
  697 F.3d 279 (5th Cir. 2012) .................................................. 52, 54

*Ramirez v. Collier*,
  595 U.S. 411 (2022) ........................................... 32, 36, 39, 43

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020) ........................................................................52

*Tandon v. Newsom*,
  141 S. Ct. 1294 (2021) ............................................................ 45, 46

*Tanzin v. Tanvir*,
  141 S. Ct. 486 (2020) ......................................................................51

*Texas Dep't of State Health Servs. v. Crown Distrib. LLC*,
  647 S.W.3d 648 (Tex. 2022) .................................................... 44, 50

*Thomas v. Review Bd. of Indiana Emp. Sec. Div.*,
  450 U.S. 707 (1981) ........................................................................35

*United States v. Friday*,
  525 F.3d 938 (10th Cir. 2008) ................................................ 30, 53

*Watson v. City of Memphis*,
  373 U.S. 526 (1963) ................................................................ 41, 54

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**CONSTITUTIONAL AND STATUTORY AUTHORITIES**

Tex. Const. Article I, § 6 ...............................................................................*passim*

28 U.S.C. § 1292 ...............................................................................................5

28 U.S.C. § 1331 ...............................................................................................5

28 U.S.C. § 1343 ...............................................................................................5

28 U.S.C. § 1367 ...............................................................................................5

42 U.S.C. § 1983 ...............................................................................................5

**OTHER AUTHORITIES**

Jimmy Blacklock, *The Constitution After Covid*,
    2023 Harv. J.L. & Pub. Pol'y Per Curiam 8 (2023) .................................... 48

San Antonio Unified Dev. Code § 35-A101 .......................................................16

**INTRODUCTION**

When the government proposes a course of action that will substantially burden the free exercise of religion, the rule is simple: "so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021). If the government fails to do so, then Texas and federal law bar the government from implementing its policy. That is the case here. In fact, the government has admitted that it did not even try.

Plaintiffs are members of the Lipan-Apache Native American Church. For centuries, they and their ancestors have gathered for prayer, meditation, and worship at a bend in the San Antonio River located in San Antonio's public Brackenridge Park (the "Sacred Area"). The Sacred Area comprises a 20-foot by 30-foot portion of the riverbank. The riverbend is sacred because its shape tracks the constellation Eridanus, which is central to Plaintiffs' religion. So too are the trees surrounding the riverbend, where double-crested cormorants—birds likewise central to Plaintiffs' religion—nest. Together, the Eridanus constellation, the trees, the cormorants, and the river itself form a spiritual ecology that exists nowhere else in the world. And it is in that holy place that Plaintiffs worship.

The City of San Antonio, however, intends to refurbish the Park in a way that will destroy the Sacred Area. In a two-acre tract of land that includes the Sacred Area (the "Project Area"), the City plans to repair retaining walls and, in the process, drive away all cormorants and leave only 14 of 83 trees standing. The City has doggedly

pursued that plan without considering—and indeed, expressly refusing to consider—Plaintiffs' religious exercise. It also erected a fence that bars Plaintiffs from accessing the Sacred Area, even though no construction is planned at that site. By destroying these features and denying Plaintiffs access, the City prevents Plaintiffs from religious exercise as their religion commands, including necessary ceremonies and individual worship and prayer. Put otherwise, in a park dedicated to public use, the City effectively plans to destroy Plaintiffs'—and only Plaintiffs'—religion.

Plaintiffs sued the City under the Texas Religious Freedom Restoration Act ("TRFRA"), the Texas Constitution, and the First Amendment, seeking a preliminary injunction against these measures. In the two orders now appealed to this Court, the district court found that Plaintiffs sincerely hold their religious beliefs and that the City's current and intended measures substantially burden Plaintiffs' religious exercise. It nonetheless denied Plaintiffs complete relief. In particular, the district court cited King Solomon but then actually tried to split the baby. It ordered the City to give Plaintiffs access to the Sacred Area for ceremonies on specific "astronomical dates," finding that Plaintiffs "met their burden to prove the four elements for injunctive relief." But the district court denied access for "individual worship," deeming the issue waived (even though Plaintiffs expressly requested such access) and stating that Plaintiffs could simply pray and meditate in a Roman Catholic church or elsewhere in the Park. It also declined to enjoin the City's tree-removal and anti-nesting measures, even though those actions would destroy the Sacred Area forever and the City has never actually attempted

to accommodate Plaintiffs' religious exercise. The district court was wrong, and Plaintiffs are entitled to a preliminary injunction.

*First*, Plaintiffs are likely to succeed on the merits of their claims. That is so with respect to the TRFRA claim (and attendant state and federal constitutional claims) because the City cannot satisfy strict scrutiny: The City all but admits that it has no justification—let alone a compelling governmental interest—for the fence barring Plaintiffs from worship in the Sacred Area, and in any event, the fence is not narrowly tailored since the City could easily relocate it to only encompass construction activities. As for the tree-removal and anti-nesting measures, the City has not identified any compelling governmental interest that could sustain those measures. Perhaps most fatal, there also are numerous less-restrictive alternatives, such as different repair designs and strategically timed anti-nesting measures, the City could have investigated and pursued; it chose not to do so. Indeed, the most striking fact in this litigation is that the City has flatly refused to consider Plaintiffs' religious exercise. That "would take time and money," the City complains, and "[w]e would like to proceed with the project." But that intolerant view is forbidden under the Supreme Court's command that, if government can accommodate religious exercise, it must. *Fulton*, 141 S. Ct. at 1881.

Plaintiffs also are likely to succeed on the merits of their Article I, Section 6-a claim under the Texas Constitution. That relatively new provision bars any government action that "prohibits or limits religious services." That is precisely what the City is doing and seeks to do: Its fencing *prohibits* Plaintiffs from praying and worshipping in

the Sacred Area.  And its tree-removal and anti-nesting measures, if carried out, would prohibit *and* limit Plaintiffs' religious services by destroying the spiritual ecology that allows Plaintiffs to worship.  Under the plain text of the Texas Constitution, therefore, Plaintiffs are likely to succeed on this additional claim, too.

*Second*, Plaintiffs' likelihood of success on the merits all but resolves the remaining preliminary-injunction factors in their favor.  Plaintiffs plainly suffer irreparable harm every day that they are barred from worshipping in the Sacred Area, and they will suffer still more irreparable harm if the City succeeds in irreversibly despoiling the Sacred Area.  In addition, the equities and public interest factors merge in this case because the government is the defendant—and it is well-settled that injunctions preventing First Amendment harms are always in the public interest.

To be clear, Plaintiffs do not seek to prevent any legitimate construction projects. Their only claim is that the City must satisfy strict scrutiny to justify the substantial burdens on Plaintiffs' religious exercise—and the City never tried to accommodate Plaintiffs.  That ends this case.  *See Fulton*, 141 S. Ct. at 1881.  Plaintiffs thus respectfully request that the Court reverse and enjoin the City (1) from barring Plaintiffs' entry into the Sacred Area for individual and group worship and prayer; (2) from implementing Phase I of the construction project as currently designed with respect to tree removal in the Project Area; and (3) from utilizing anti-nesting procedures to prevent cormorants from nesting in the Project Area.

## STATEMENT OF JURISDICTION

The district court has jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 1983, and Plaintiffs' state-law claims under 28 U.S.C. § 1367. The district court entered orders granting in part and denying in part Plaintiffs' request for a preliminary injunction on October 2 and October 11, 2023. ROA.736–739, ROA.984–1046. Plaintiffs filed a timely notice of appeal from both orders on October 16, 2023. ROA.1047. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE PRESENTED

Whether the district court erred in refusing to fully grant Plaintiffs' motion for a preliminary injunction where (a) Plaintiffs are likely to succeed on the merits of their TRFRA and related state and federal claims not least because the City has never attempted to accommodate their religious exercise, (b) they currently suffer irreparable harm because the City bars them from worship in the Sacred Area and they will suffer additional irreparable harm if the City irreversibly destroys the surrounding trees and drives out cormorants, and (c) the equities cut in Plaintiffs' favor, particularly because an injunction protecting the free exercise of religion is always in the public interest.

## STATEMENT OF THE CASE

### A.     Factual Background

### 1.     Plaintiffs' Religious Beliefs and the Sacred Area.

Plaintiffs Gary Perez and Matilde Torres are indigenous Texans and practicing members of the Lipan-Apache Native American Church.  Tr. 41:15–42:11, 121:4–9.[1] Plaintiffs adhere to the teachings and religious practices of both Native American and Christian faith traditions.  Tr. 42:12–19.

A central part of Plaintiffs' religion involves prayer, meditation, and worship at a specific spot along the San Antonio River ("*Yanaguana*," meaning Spirit Waters) in Brackenridge Park, *i.e.*, the Sacred Area.  The San Antonio River winds through the Park in the shape of the Eridanus constellation, which is key in Plaintiffs' religion, Tr. 94:21–95:2, 126:18–23, 769:7–11.  The Sacred Area lies at the northernmost point on the southern bank of a unique bend in the River:

---

[1] References to "Tr." are to the rough transcripts of the preliminary-injunction hearing, which the parties have agreed to utilize for transcript citations in light of the absence of a final transcript.  The parties jointly outlined this issue and their agreement in a November 3, 2023 notice to this Court.  Dkt. 96.  The rough transcripts are filed with the district court as Exhibits A–H of the McCraw Declaration, Dist. Ct. Dkts. 100-1 to 100-9 (not yet part of the electronic record on appeal).



ROA.19; Tr. 48:1-49:18 (identifying location of the Sacred Area).  The Sacred Area itself

is approximately 20 feet by 30 feet; it surrounds a set of stairs between two large cypress

trees on the southern riverbank of the San Antonio River:



COSA 02021

ROA.2209; Tr. 294:1–5, 448:13–17, 596:20–23.

The Sacred Area is a fundamental part of Plaintiffs' religious exercise in many respects. For example, Plaintiffs believe that the dozens of trees surrounding the Sacred Area are descendants of trees that previously stood in the Sacred Area, just as Plaintiffs' religious traditions have passed "from generation to generation." Tr. 77:21–78:3,

100:15–19. The trees also provide nesting locations for double-crested cormorants. The cormorant is special for its role in the Yanaguana creation story, which teaches that life in the San Antonio River Valley began when a spirit in the form of a blue panther chased a spirit in the form of a cormorant from the Blue Hole—a spring located just north of Brackenridge Park—and droplets falling from the cormorant's tailfeathers fell on the earth and gave rise to life in the area. Tr. 43:24–44:4. In this Sacred Area, water, trees, cormorants, and the Eridanus constellation come together to reflect the sacred linkage between the lower, middle, and upper worlds. Tr. 110:12–15, 112:7–15. Indeed, each of these features is a component of Plaintiffs' religious ceremonies and worship.

One ceremony well illustrates this sacred connection: During this ceremony, Plaintiffs view a reflection of a cormorant in the river (the underworld), while standing both in the presence of nesting cormorants (the middle world) and beneath the Eridanus constellation (the upper world). Tr. 58:14–21, 66:2–13. In that holy moment, Plaintiffs' prayers transcend time and space, and as the cormorants ascend into the sky, they "take[] our prayers ... to the heavens." Tr. 127:23–25; *see also* Tr. 139:5–8.

For decades, Plaintiffs, like their ancestors, have worshipped in the Sacred Area, both individually and collectively. Tr. 89:12–20, 140:11–14, Tr. 43:17–18; ROA.989–90, ¶¶ 4, 6. They have assisted Native American pilgrims by "bring[ing] them to that very point along the river." Tr. 63:13–17. And, as ceremonial leaders, they have conducted Church ceremonies in the Sacred Area. Tr. 53:13–23. Plaintiffs view their service as "absolutely critical." Tr. 57:15–25, 63:18–64:1, 107:18–20, 121:10–16. And

they view their worship in the Sacred Area in particular as "critical": "it's where the birds are," "[i]t's because of that bend in the river," "it's connected to [the Eridanus constellation]." Tr. 769:7–11. Their worship in the Sacred Area is a personal and spiritual obligation. Tr. 96:11–22. They cannot worship elsewhere because "[i]t's not religiously effective … I'm not standing where I need to stand to make my petitions to God almighty." Tr. 62:20–63:8. They cannot perform their ceremonies unless cormorants "continue to nest in that area," because the birds "tell that story" of creation through their nesting and presence. Tr. 147:7–149:9; Tr. 121:1–11. And if the trees are destroyed, it is like a Christian unable to "see that cross or … see that dove": Plaintiffs' ability to perform their ceremonies would "be gone forever." Tr. 139:17–24. In short, the Sacred Area is truly sacred to Plaintiffs, and the district court had no trouble concluding that "Plaintiffs have a sincere religious belief." ROA.737.

### 2.    The City's Current and Intended Actions Within the Sacred Area.

The City, however, has barred Plaintiffs from accessing the Sacred Area and plans to destroy the very aspects of the Sacred Area that make it sacred to Plaintiffs and enable them to perform their most important services. In 2017, San Antonio voters approved a bond package for renovations to Brackenridge Park. ROA.1017, ¶¶ 38–40. Years later, the City arrived at a plan to repair retaining walls along the San Antonio River, originally constructed along a racially segregated beach, including near (but not in) the Sacred Area. Tr. 306:7–10, 611:24–612:5. The Project Area is a two-acre tract

of land north and south of the San Antonio River. In the figure below, a red line roughly depicts the boundaries of the Project Area, and the stairs where the Sacred Area is located appear just to the left of the rectangle box stating "No Construction To Occur In This Area":



ROA.1733; Tr. 289:17–19, 291:17–294:5 (testimony indicating location of the Sacred Area on this exhibit). It is undisputed that the retaining walls in the Sacred Area need no repair and pose no safety risk. Tr. 224:7–23, 225:18–25, 248:6–20, 306:25–307:3, 376:17–19. And in fact, no construction will occur along the southern riverbank surrounding the Sacred Area, except for minor "cosmetic" work on the far east end

away from the Sacred Area.   Tr. 284:3–285:19, 623:15–19, 640:7–15; ROA.2197;

ROA.1515.

The City has undertaken, and intends to undertake, three distinct actions at issue

in this case: it fenced off the Project Area, it intends to destroy nearly all of the trees in

the Project Area, and it intends to implement anti-nesting measures that will drive

cormorants out of the Project Area.

### a.   The City erects fencing that bars Plaintiffs from worshipping in the Sacred Area.

To begin, in February 2023 the City erected fencing around the Project Area,

thereby barring Plaintiffs from worshipping in the Sacred Area.  Tr. 61:5–14, 359:21–

360:10.  The City repeatedly denied Plaintiffs' requests to worship in the Sacred Area.

Tr. 64:2–14.  At the same time, however, the City allowed other individuals inside the

fence for secular reasons: a city councilwoman, a city arborist, and other city employees.

Tr. 482:4–483:2, 523:4–524:19, 525:1–5, 755:9–20.

But the City has no justification for the fence.  It was originally erected to

facilitate bird deterrence.  Tr. 408:8–11.  When Plaintiffs asked for access to perform

religious services, however, the City claimed that a single hanging branch posed a public

safety risk.  The district court ordered the City to remove the branch, and the City has

now complied, thereby eliminating this rationale for the fence.  Tr. 819:9–18; ROA.740.

The City also now concedes that the Sacred Area does not "need to be fenced off for

any bird reason."  Tr. 408:4–11.  Accordingly, the City has no remaining justification

for the fence. And notably, the City did not dispute this fact in its opposition to Plaintiffs' motion for an injunction pending appeal in this Court.

### b.    The City intends to destroy virtually all trees in the Project Area.

Turning to the construction project, Phase I of the City's plan includes the removal of some 69 of 83 trees in the Project Area that cormorants use for nesting. Tr. 245:5–7. In particular, the City intends to use a "cantilever" system to repair the retaining walls along the riverbank on the north side of the Project Area, which purportedly requires the removal of the trees. Tr. 369:9–10, 332:19–21 ("We are not removing trees for any other reason than [they] must be removed in order to complete the bond project scope of work."). The cantilever design calls for an L-shaped wall with the long leg affixed to the backside of an existing retaining wall (*i.e.*, the side facing away from the San Antonio River), and the short leg buried underground and pointing away from the San Antonio River. Tr. 228:21–230:1; ROA.2158. In the cantilever design, the short leg or "footer" must be at least 70% of the long leg's height; thus, for example, as to one section of the retaining wall that is 15 feet tall, the footer must be approximately 10 feet long and buried underground at the base of the retaining wall. Tr. 228:21-230:1; ROA.2159; Tr. 235:15–237:2. That cantilever design requires a significant amount of excavation behind the retaining walls, and thus the removal or relocation of 69 trees. Tr. 245:1–7.

The City has pursued the cantilever design notwithstanding at least two alternatives that undisputedly would save more trees. *First*, the City could simply "reconstruct the walls in place [to] … potentially save trees." Tr. 648:12–18. *Second*, the City could employ a pier-and-spandrel design, which is structurally stronger than the cantilever design. Tr. 340:22–24; ROA.2184. The pier-and-spandrel system requires piers to be drilled approximately 15 to 20 feet into the ground directly behind an existing retaining wall. Tr. 230:8–21, 231:2–6. An eight-inch-thick concrete wall— reinforced with rebar—is then attached to the piers and anchored to the existing retaining wall. Tr. 260:1–24. The drawing below offered by Plaintiff's expert (the only expert at the preliminary-injunction hearing and the only engineer with advanced degrees in civil engineering) illustrates the difference between the cantilever and pier-and-spandrel designs:



ROA.2158.

The City did not calculate the potential cost of a pier-and-spandrel system, but the City's engineer testified that it could cost as little as 20% more than the cantilever design. Tr. 630:20–631:3. In addition, the pier-and-spandrel system would eliminate the need for a $400,000 tree-relocation project, which would dramatically offset any increased cost. Tr. 276:15–277:7. The pier-and-spandrel system likewise would "take about the same" length of time to construct and is "at least as safe" as the cantilever system. Tr. 241:6–16; *see also* Tr. 342:2–10, 630:16–19. And finally, the markedly reduced amount of excavation required for the pier-and-spandrel system would require the removal of only *10* trees, preserving an additional *59* trees that would otherwise be destroyed under the City's cantilever plan. Tr. 245:8–17, 627:18–24 (City's expert

conceding that the pier-and-spandrel system would "save more trees" than the cantilever approach).

Despite the tree-saving benefits of both alternatives, the City rejected them based on its belief that U.S. Department of the Interior guidelines bar alterations to the front face of the existing walls. *See* Tr. 621:20–622:3; *see also* Tr. 627:14–24. The City has never identified what provisions of municipal, state, or federal law reflect this mandate. In any event, the municipal code makes clear that Interior's guidelines for the treatment of historic properties "are neither technical nor prescriptive." *See* San Antonio Unified Dev. Code § 35-A101. There also is no dispute that those guidelines are irrelevant as to retaining walls that have already collapsed and thus been "deconstructed." Tr. 648:12–649:10. And perhaps most fundamentally, the City admitted that it could seek an exemption from any relevant guidelines, but the City chose not to do so. Tr. 394:21–395:11. In fact, the City actually pursued, and received, a variance from a zoning ordinance that would have required the City to "preserve 80 percent of significant trees and 100 percent of heritage trees"—thereby allowing the City to destroy more trees. Tr. 396:3–8.

At bottom, Plaintiffs' religious exercise never played a role in the City's decision to go with a cantilever design that will do maximum destruction to the trees in the Project Area. Asked directly whether he "tr[ied] to design a project that prioritizes saving trees," the City's landscape architect admitted: "No. I never asked that." Tr. 382:20–25, 343:23–25 (the cantilever design "was chosen without any consideration of

the plaintiffs' free exercise request"). Instead, even after the City was aware of the problem, the City charged forward because it had "a completed project of completed design with regulatory approval." Tr. 383:5–6. Even then, did the City "look to accommodate [Plaintiffs]?" Tr. 383:9. "I have not," he said. Tr. 383:11. Did the City "want to" do so? Tr. 344:9. "It would take time and money. That's – but no. We would like to proceed with the project." Tr. 344:10–11; *see also* ROA.369, ¶ 59 (the City disclaiming any obligation to study whether it could accommodate Plaintiffs' religion).

### c. The City drives cormorants out of the Project Area.

Lastly, the City is deploying anti-nesting measures designed to keep migratory birds from nesting in the Project Area. Tr. 412:17–413:2. The City has emphasized that the federal Migratory Bird Treaty Act would prevent construction and tree removal in the Project Area if migratory birds are present. *E.g.*, Tr. 338:14–20, 420:7–11, 338:14–20. Accordingly, "the City's goal for the project area … is zero nesting of migratory birds" "[s]o that way, when the project's permitted and ready to go[,] [] the project can start right away." Tr. 420:3–6. To that end, the City seeks to engage in a series of anti-nesting measures, such as lasers, pyrotechnics with a "screamer noise" and a "banger noise," rubber snakes, balloons, streamers, clapper boards, and sound machines playing "predator noises." Tr. 415:12–416:6.

The City's concern with migratory birds is principally aimed at egrets and herons, not cormorants. *See* Tr. 546:9–10 (Texas Parks and Wildlife employee, Jessica Alderson, testifying that "I provided technical guidance to the City related to the egret and heron

[that] were located at Brackenridge Park"). Indeed, "cormorants are not the target species for the bird deterrence." Tr. 559:12–13. And the City "never asked [Ms. Alderson] if it could target the herons and egrets but not the cormorants." Tr. 559:15–17.

That distinction matters because the various migratory birds have different migration patterns. Herons and great egrets "tend to come in first" in the "February, March time frame." Tr. 548:23–549:6. Cattle egrets come in the "April, May time frame." Tr. 549:10. And then cormorants "come in around that same time or oftentimes later into the season." Tr. 549:13–14; *see also* Tr. 405:5–24 (City project manager, Bill Pennell, testifying that some "cormorants will come in *after*" April and May (emphasis added)). None of the migratory birds' nesting sites are "active by mid to late October." Tr. 564:20–21.

Given these migration patterns, there is a natural "gap" between "[m]id to late October" and February—approximately four months—when no migratory birds are present in Brackenridge Park and it is unquestionably "okay to do construction." Tr. 565:4–11. In addition, because cormorants are the last (or among the last) migratory birds to arrive each season in April, May, or later, Tr. 549:13–14, there is a window of at least six months each year—between mid- to late-October through at least April or May—during which cormorants are not present in Brackenridge Park. In fact, in 2022, the City stopped anti-nesting procedures in June, which still allowed "the late existing cormorants to nest." Tr. 406:13–19.

In developing the City's anti-nesting plan, the witnesses responsible for the City's plan admitted that they did not ask several key questions and did not attempt to accommodate Plaintiffs' religious exercise vis-à-vis the cormorants. For example, Ms. Alderson assumed that there was no way to deter egrets and herons without also deterring cormorants, but she had "never been asked that question." Tr. 567:23. Similarly, Mr. Pennell testified that "the City hasn't specifically tried to accommodate plaintiffs' religious exercise in crafting the bird deterrence." Tr. 407:2–5. He testified that he never "talked with anybody about accommodating plaintiffs' religious ceremonies within the bird deterrence program." Tr. 465:19–22. Finally, he testified that "the City never actually investigated whether it could alter the timing of its bird deterrence specifically to accommodate plaintiffs' religious exercise." Tr. 464:23–465:2.

\*     \*     \*

Since early 2022, the City has been aware that its current and proposed actions would run roughshod over Plaintiffs' religious exercise. Plaintiffs testified at public meetings throughout 2022. Tr. 137:3–8, 361:15–25. In June 2022, Ms. Torres also emailed the City letters from multiple Native American tribes opposing the measures. ROA.1490–1494; Tr. at 135:15–136:24. But the City has refused to change its plans, and it has never attempted to accommodate Plaintiffs' religious exercise. It simply thinks it has no such obligation. *See* ROA.369 at ¶ 59 (the City disclaiming any obligation to study whether it could accommodate Plaintiffs' religion).

**B.    Procedural History**

Plaintiffs sued the City on August 9, 2023, asserting federal and state-law causes of action and seeking a temporary restraining order and preliminary injunction against the City's actions detailed above.   Specifically, Plaintiffs asserted claims under the federal Free Exercise Clause (Count I), the federal Religious Land Use and Institutionalized Persons Act ("RLUIPA") (Count II), Article I, Section 6 of the Texas Constitution (Count III), Article I, Section 6-a of the Texas Constitution (Count IV), and TRFRA (Count V).  ROA.45–73.[2]  Plaintiffs sought three forms of injunctive relief: (a) access for religious worship in the Sacred Area; (b) preservation of the spiritual ecology of the Sacred Area by minimizing tree removal; and (c) preservation of the spiritual ecology of the Sacred Area by allowing cormorants to nest.  ROA.984.  To that end, "Plaintiffs ask[ed] the Court to 'order the City to grant access to the plaintiffs to the Sacred Area and reevaluate the Bond Project to develop alternative plans that will accommodate [their] religious beliefs.'"  ROA.985.

The district court held a four-day hearing on Plaintiffs' motion for a preliminary injunction, during which the court heard the testimony above as well as Plaintiffs' unequivocal testimony that the City's plans—without any effort to accommodate their religious exercise—would devastate the spiritual ecology of the Sacred Area and their

---

[2] Plaintiffs have not pursued their RLUIPA claim in their preliminary-injunction papers.

ability to practice their religion. Tr. 71:14–72:11. The district court then issued three subsequent orders relevant here.

### 1.    The District Court's October 2 Order.

First, on October 2, 2023, the district court issued a partial order addressing Plaintiffs' time-sensitive request for access to the Sacred Area for ceremonies on November 17 and December 21, 2023. The district court recognized that Plaintiffs seek "to resume their historic access to a sacred site in Brackenridge Park which is presently fenced off." ROA.736. The court held that "Plaintiffs have a sincere religious belief and are entitled to be present at the site" on the requested dates. ROA.737. The court also ordered the City to remove a broken tree limb (referenced above) and install a gate in the fence to facilitate Plaintiffs' access. ROA.737.

At the same time, however, the Court acquiesced in the City's "immediate desire … to resume bird deterrent operations"—"except for the dates on which Plaintiffs['] religious ceremonies occur." *Id.* The Court thought that "a serious health risk [from bird excrement] exists which surpasses Plaintiffs' desire to have the double-crested cormorant present for their dropped feathers which no doubt Plaintiffs already have or can be found in other locations." *Id.* (The district court misunderstood the record: Plaintiffs' religious practice requires the presence and nesting of cormorants in the area, not the gathering of feathers. *See, e.g.*, Tr. 59:13–21, 129:9–15.) Finally, the district court invoked King Solomon in stating that its order "[f]ollow[ed] the example

of another individual who had to make difficult decisions." ROA.738 (citing 1 *Kings* 3:16–28).

### 2.     The District Court's October 11 Order.

Nine days later, the district court issued a second order on October 11 granting Plaintiffs' motion for a preliminary injunction in part and denying it in part. *First*, as to access for worship in the Sacred Area, the court found that "Plaintiffs have a sincere religious belief and have met their burden to prove the four elements for injunctive relief." ROA.985. The court thus granted Plaintiffs' request for access with respect to group religious services "on specified astronomical dates coinciding with Plaintiffs' spiritual beliefs." *Id.* But the court denied any "access for individual worship," deeming that request "waived" because "it was not in Plaintiffs' Closing Argument request" and holding that "individual access at any time Plaintiffs desire is impractical." ROA.986. The court also "note[d] that both Plaintiffs also practice Roman Catholicism whose places of worship provide numerous locations for individual meditation and worship"—and they "still have access to over 300 acres of Brackenridge Park for meditation in nature." *Id.*

*Second*, as to tree removal and anti-nesting, the court found that "the City has met its burden of proving a compelling government interest for public health and safety, and the equities favor the City on those two items." ROA.988. It summarily adopted the City's own findings of fact and conclusions of law as the court's own. *Id.* It also briefly suggested that hindering the City's tree removal would "exponentially extend

Plaintiffs' and the public's presently fettered ability to enjoy the area," and hindering the anti-nesting efforts would put the City's project on hold indefinitely "given the different species' migration patterns and the Migratory Bird Treaty Act." ROA.987-88.

Plaintiffs filed a notice of appeal from both the October 2 Order and the October 11 Order, ROA.1047–1049, and moved the district court for an injunction pending appeal, ROA.1050–1064, because the commencement of construction in the Project Area was imminent.

### 3.    The District Court's October 26 Order.

When the district court had not ruled on Plaintiffs' motion for an injunction pending appeal by the requested date, Plaintiffs filed a similar motion in this Court, Dkt. 6, which the City opposed, Dkt. 48.  After the City filed its opposition brief in this Court, the district court entered its own order on October 26, denying Plaintiffs' motion for an injunction pending appeal.  ROA.1155–1162.  The order suggested that Plaintiffs want "the Court [] to tell the property owner City how to engineer the project." ROA.1156.  The order also urged Plaintiffs to "compromise." ROA.1157.  Finally, the order stated that Plaintiffs have no viable claims because "First Amendment law provides the government with the right to limit conduct on its own property, even if such limitation may impose limits on the exercise of religion." ROA.1157–61 (citing *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988)).

*      *      *

23

On October 27, a motions panel of this Court entered an administrative stay and expedited this appeal.  Dkt. 74.  On October 30, the City cross-appealed.  ROA.1164–1167.

## SUMMARY OF ARGUMENT

The Court should reverse and enter an order granting Plaintiffs' motion for a preliminary injunction because they are likely to succeed on the merits of their claims and the remaining preliminary-injunction factors easily cut in their favor.

**I.**  Plaintiffs have raised four claims for relief, and they are likely to succeed on each one.

**A.**  That is principally so with respect to Plaintiffs' TRFRA claim.  The City rightly does not dispute that the current fencing, the tree-removal plan, and the anti-nesting measures all substantially burden Plaintiffs' religious exercise.  Accordingly, the only question is whether the City can establish that its actions are the least restrictive means of furthering a compelling governmental interest.  It cannot.

**1.**  Start with the fencing, which bars Plaintiffs from worshipping and praying in the Sacred Area.  The City literally has no interest in the fence, let alone a compelling one.  Indeed, the City admits that its original rationales for the fence no longer apply.  And in any event, the fence is not narrowly tailored because it could be easily relocated to cover actual construction zones unlike the Sacred Area.

The district court agreed with Plaintiffs by ordering access for group worship on specific astronomical dates, but it denied Plaintiffs access for individual worship and prayer on the ground that Plaintiffs never asked for such access.  The district court was wrong.  As an initial matter, the district court's split-the-baby distinction between group and individual access makes no sense: The City's inability to prove a compelling governmental interest and least restrictive means is virtually identical in both cases.  Further, the district court misapprehended the record because the Plaintiffs expressly—and repeatedly—urged the district court to grant them access for individual worship and prayer.

The district court's and the City's remaining arguments are equally unavailing.  The district court suggested that Plaintiffs (who also practice Roman Catholicism) can just go pray in a Roman Catholic church or at another place in Brackenridge Park.  But Plaintiffs' unequivocal testimony is that their religion requires their worship in the Sacred Area whose sacred attributes exist nowhere else in the world.  The district court and the City also claim that granting Plaintiffs access would be "impractical" or "unworkable."  But that is not how strict scrutiny works.  Where, as here, the government has zero evidence regarding a compelling governmental interest and narrow tailoring, the government cannot substantially burden religious exercise.

**2.**  The City's tree-removal plan likewise fails strict scrutiny.  The City's only attempt to establish a compelling governmental interest is its vague claim that the plan will enhance public safety.  But that is exactly the kind of generalized statement

that the Texas Supreme Court has held insufficient to establish a compelling governmental interest.

In any event, the City still has an insurmountable narrow-tailoring problem: Its witnesses candidly testified that the City selected the cantilever plan requiring tree removal "without any consideration" of Plaintiffs' religious exercise. Indeed, to this day, the City has refused to consider Plaintiffs' religious exercise because "it would take time and money" and "[w]e would like to proceed with the project." In fact, the City has disclaimed any obligation to consider Plaintiffs' religious exercise. All that is fatal on strict-scrutiny review because "so long as the government can achieve its interests in a manner that does not burden religion, *it must do so*." *Fulton*, 141 S. Ct. at 1881 (emphasis added). Here, the City never even tried.

That fatal error is even more striking because the undisputed record evidence shows there are viable, less-restrictive alternatives that would save more trees but that the City has refused to pursue. The City could simply repair the retaining walls in place, or, as another option, the City could use a pier-and-spandrel system that would save 59 additional trees. The City dismissed these alternatives, claiming that they would run afoul of unspecified Department of Interior guidelines and similar standards. But the City admits it could seek an exemption from any such guideline; it admits it never tried to do so; and it admits that it sought, and received, an exemption to *destroy* more trees than would otherwise be legally permissible. Here too, the City's refusal to even try to accommodate Plaintiffs' religious exercise is fatal.

Finally, the City purportedly dismissed the pier-and-spandrel system because of its increased cost. But the City's own engineer testified that any increased cost could be as low as 20% of the cantilever system's cost (he had not run the numbers), and the pier-and-spandrel system would actually eliminate the need for a $400,000 tree-relocation project. And in all events, it is well-settled, of course, that constitutional rights cannot depend on any theory that it is less expensive to deny them than to afford them. For all these reasons, the City's tree-removal plan comes nowhere close to satisfying strict scrutiny.

**3.** All the same with the City's anti-nesting measures. What is the City's compelling governmental interest? The City has been clear that the whole purpose of preventing migratory birds from nesting is to prevent any pauses in construction. But that vague assertion—unsupported by any evidence that any pause is somehow intolerable—is no different than any human's complaint that she has an interest in avoiding traffic delays or flight delays. There is nothing compelling about the City's claimed interest.

In any event, the City runs into a similar narrow-tailoring problem. The City has specifically admitted that it has not "tried to accommodate plaintiffs' religious exercise in crafting the bird deterrence." That is fatal under *Fulton*. Not only that, but there also are any number of less-restrictive means that the City easily could have considered. For example, the City could have considered beginning construction during the four-month period when migratory birds are absent, pausing it while migratory birds nest, and then

resuming it when the birds leave. It did not. The City also could have considered completing the anti-nesting measures and construction during the six-month period when cormorants are not present. Again, it did not. Strict scrutiny thus dooms the City's anti-nesting plan.

**B.**  All of the same arguments establish Plaintiffs' likelihood of success on the merits of their claim under Article I, Section 6 of the Texas Constitution—Texas's freedom to worship provision. Accordingly, Plaintiffs incorporate by reference their arguments on the TRFRA, Free Exercise Clause, and Article I, Section 6-a claims.

**C.**  Plaintiffs also are likely to succeed on the merits of their Free Exercise Clause claim. Below, the City attempted to sidestep strict scrutiny by invoking the Supreme Court's rational-basis test for laws that are neutral and generally applicable. But there is nothing neutral or generally applicable about the City's actions in this case. The City has openly admitted that it has not considered—and it refuses to consider—Plaintiffs' religious exercise. That is not neutral because it is "intolerant of religious beliefs." *Fulton*, 141 S. Ct. at 1877. The City also has riddled its actions with exemptions, such as by giving Project Area access to various City employees but refusing Plaintiffs access for worship. This quintessential "system of individualized exemptions" is not generally applicable. *Id.* Accordingly, the City's invocation of this line of cases to avoid strict scrutiny under the Free Exercise Clause goes nowhere.

**D.**  Finally, Plaintiffs are likely to succeed on the merits of their claim under Article I, Section 6-a of the Texas Constitution, which categorically prohibits a city from

issuing any decision or rule "that prohibits or limits religious services."  That precisely describes the City's current and intended actions here: The City has prohibited Plaintiffs from worshipping in the Sacred Area, and it seeks to further prohibit and limit that religious exercise by irreparably destroying the very aspects of the Sacred Area that making it a living place of worship.

At the motion stage, the City tried to sidestep this issue by invoking the Supreme Court's line of cases generally interpreting the term "prohibit" in the Free Exercise Clause not to cover construction projects on government land that affect Native American religious exercise.  But those are not Texas-law cases, and no Texas court has ever imported them into Texas law.   Moreover, Texas's own religious-exercise provisions in the Constitution—Sections 6 and 6-a of Article I—sweep far more broadly than the key word "prohibit" in the Free Exercise Clause that drove the U.S. Supreme Court's reasoning.   And in any event, even the Supreme Court itself has emphasized the importance of accommodating religious exercise—which has never happened in this case.

**II.**   Plaintiffs' likelihood of success on the merits effectively resolves the remaining preliminary-injunction factors in Plaintiffs' favor.  Specifically, they currently suffer irreparable harm because the City bars them from worshipping and praying in the Sacred Area.  And they will suffer still more irreparable harm if the City is permitted to proceed with its tree-removal and anti-nesting procedures, which will irreversibly destroy the Sacred Area and Plaintiffs' ability to practice their religion.  In a similar vein,

the equities and the public interest are squarely in Plaintiffs' favor because an injunction forestalling First Amendment harms is always equitable and in the public interest.

## STANDARD OF REVIEW

This Court "review[s] a district court's denial of a preliminary injunction for an abuse of discretion." *Moore v. Brown*, 868 F.3d 398, 402 (5th Cir. 2017). "Factual findings are reviewed for clear error, while legal conclusions are reviewed de novo." *Id.* at 403. Insofar as the district court found "constitutional facts," however, such facts are "subject to [this Court's] 'independent examination.'" *United States v. Friday*, 525 F.3d 938, 949–50 (10th Cir. 2008) (citing *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984)). This "rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact." *Bose Corp.*, 466 U.S. at 501. In addition, with respect to Plaintiffs' TRFRA claim, "the ultimate answers determine the legal rights protected by the Act and are thus matters of law." *Merced v. Kasson*, 577 F.3d 578, 587 (5th Cir. 2009) (quoting *Barr v. City of Sinton*, 295 S.W.3d 287, 299 (Tex. 2009)); *see also Friday*, 525 F.3d at 949 (noting that the same is true of the strict-scrutiny analysis in First Amendment and federal RFRA cases).

## ARGUMENT

Under the familiar preliminary-injunction factors, Plaintiffs must demonstrate: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of

an injunction is in the public interest." *Moore*, 868 F.3d at 402–03.  These factors are easily satisfied on the undisputed facts in this case.  Plaintiffs are likely to succeed on the merits of their free-exercise claims because the City has barred them from worshipping in the Sacred Area, seeks to permanently prevent Plaintiffs from performing religious services by destroying its spiritual ecology, and literally has never attempted to accommodate Plaintiffs' religious exercise.  The City's current (*e.g.*, the bar on worshipping in the Sacred Area) and proposed (*e.g.*, the tree-removal and anti-nesting measures) actions are textbook examples of irreparable harm.  And equity and the public interest always favor injunctions protecting the free exercise of religion.

For these reasons, Plaintiffs respectfully request that the Court reverse and preliminarily enjoin the City (1) from preventing Plaintiffs from accessing the Sacred Area for personal and group worship and related religious activities; (2) from implementing Phase I of the construction project as currently designed with respect to tree removal in the Project Area; and (3) from engaging in anti-nesting measures to prevent cormorants from nesting in the Project Area.

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR RELIGIOUS-LIBERTY CLAIMS.

As the City's refusal to engage with the irreparable harm, equities, and public interest factors at the motion stage suggests, *see* Dkt. 48, the only way the City can avoid a preliminary injunction is if Plaintiffs are unlikely to succeed on the merits.  But they are likely to succeed on their TRFRA claim and, by extension, their corresponding

claims under Article I, Section 6 of the Texas Constitution and the federal Free Exercise Clause. Each demands that the City survive strict scrutiny, which it cannot do. Plaintiffs are also likely to succeed on their claim under Article I, Section 6-a of the Texas Constitution, which does not even allow the City to try to satisfy strict scrutiny; it is a categorical bar on what the City seeks to do.

## A.   The City's Actions Violate TRFRA.

Start with Plaintiffs' TRFRA claim. TRFRA deems unlawful a government regulation that substantially burdens a plaintiff's free exercise of religion unless the government can show the regulation furthers a compelling governmental interest and is the least restrictive means of furthering that interest. *Merced*, 577 F.3d at 587–88. Here, there is no serious dispute that the City's current and intended actions substantially burden Plaintiffs' religious exercise. The City literally bars them from worshipping in the Sacred Area and proposes to destroy it altogether. *See id.* at 591 ("Merced cannot perform the ceremonies dictated by his religion. This is a burden, and it is substantial."). That explains why the City has expressly "waiv[ed]" (except for trial) any argument that its actions do not substantially burden Plaintiffs' religious exercise. Dkt. 48 at 11. Because Plaintiffs have established a substantial burden on their religious exercise, the burden shifts to the City, which must show that its actions are "the least restrictive means of furthering [a] compelling governmental interest." *Ramirez v. Collier*, 595 U.S. 411, 432 (2022) (citation omitted). The only outstanding question, therefore,

is whether the City can satisfy strict scrutiny as to any of its current and intended actions. It cannot.

### 1.    The fencing that bars Plaintiffs from worshipping and praying in the Sacred Area lacks any compelling governmental interest and is not narrowly tailored.

That is plainly true with respect to the City's fencing that currently bars Plaintiffs from entering the Sacred Area for worship and prayer. The City not only has no compelling governmental interest—*it has no interest at all.* There is no ongoing, or even planned, construction in the Sacred Area. And the original rationales for the fence— that a tree limb posed a safety risk and that the fencing would aid bird deterrence—no longer apply, as the City admits. Tr. 408:4–11, 819:9–18; ROA.740. That alone dooms the City's bar on Plaintiffs worshipping in the Sacred Area because the City has no argument that it "further[s] a compelling governmental interest." *Barr*, 295 S.W.3d at 296 (quoting Tex. Civ. Prac. & Rem. Code § 110.003(b)(1)). And even if the City could identify a compelling governmental interest, the City's fencing is not narrowly tailored to achieve that interest. For example, the record evidence shows that the City could easily install the fencing elsewhere to protect construction areas while leaving access to the Sacred Area where "no construction" is even planned. *See* Tr. 306:7–14, 640:1–11. Therefore, with no compelling interest and other locations available closer to the construction zone, the City's fencing fails strict scrutiny.

The district court's October 11 Order appears to partially recognize as much because it permits Plaintiffs to enter the Sacred Area for group worship on significant

astronomical dates.  ROA.985.  But the district court—in keeping with its split-the-baby approach—declined to permit Plaintiffs to *individually* worship in the Sacred Area, reasoning that Plaintiffs had not requested access for individual worship and prayer.  ROA.986.  The district court was wrong.

*First*, the district court's distinction makes no sense as a matter of law.  If the City's fencing is not the least restrictive means of furthering a compelling governmental interest *as to group worship*, it also is not the least restrictive means of furthering a compelling governmental interest *as to individual worship.*  There is no principled way to distinguish the two.  Indeed, it is difficult to imagine a court ever upholding a rule prohibiting Christians from individually praying at their church while excepting group worship on Christmas Eve and Easter.  Just so here.

*Second*, the district court misapprehended the record in thinking that Plaintiffs waived a request for access to individually worship and pray in the Sacred Area.  Plaintiffs' briefing expressly asked the Court to "enjoin[] the City from [] denying Plaintiffs general access to the Sacred Area, not just for scheduled religious ceremonies in November and December but also for ceremonies beyond December *and* for daily prayer and worship now and in the future."  ROA.749 (emphasis in original).  They emphasized that they seek to "perform scheduled and unscheduled ceremonies, *such as personal prayer.*"  ROA.751 (emphasis added).  And they relied on the fact that Mr. Perez was "prevented [] from accessing the Sacred Area to pray following the tragic loss of his aunt and niece"—*i.e.*, a time when he needed a personal moment of prayer and

meditation at the Sacred Area. ROA.752. The evidence and argument at the preliminary injunction hearing likewise repeatedly presented this request. Tr. 92:2–6, 777:19–21, 780:7–8, 781:19–82:6, 787:5–15, 824:19–22. The district court was thus simply mistaken in thinking Plaintiffs waived this issue. Notably, although the City briefly recited the district court's mistaken view at the motion stage in this Court, Dkt. 48 at 12, the City did not address—let alone refute—the clear record evidence showing that Plaintiffs preserved their request.

Setting the law aside, the district court also suggested that it would be "impractical" to allow Plaintiffs individual access at any time. ROA.986. As just explained, however, no construction is happening or planned at the Sacred Area with which Plaintiffs' access would interfere. To the extent the court was worried about unspecified safety concerns, therefore, that worry is unfounded.

The district court added that Plaintiffs "also practice Roman Catholicism" and could pray and meditate in a church or one of the other "over 300 acres of Brackenridge Park." *Id.* But Plaintiffs specifically testified that they must worship in the Sacred Area because of its unique attributes, none of which are present or replicable in Roman Catholic churches or other areas of Brackenridge Park. *See, e.g.,* Tr. 111:3–17. And "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. of Indiana Emp. Sec. Div.,* 450 U.S. 707, 714 (1981).

Finally, for its part, the City complained at the motion stage that granting Plaintiffs access would be "unworkable." Dkt. 48 at 12–13. But that is not how strict scrutiny works. The government cannot satisfy the compelling governmental interest and narrow tailoring requirements by summarily claiming that accommodating Plaintiffs' religious exercise would be inconvenient—with no evidence, no articulation of any compelling interest, and no attempt to show that completely barring Plaintiffs' individual worship and prayer is the least restrictive means of furthering any interest. *See, e.g.*, *Ramirez*, 595 U.S. at 429 (courts do not "simply defer to [the government's] determination" of compelling interests); *Fulton*, 141 S. Ct. at 1881 ("[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so.").

The City also claimed that Plaintiffs seek "unfettered access to *the Project Area*." Dkt. 48 at 12 (emphasis added). That is false. Plaintiffs have requested access only to *the Sacred Area*—*i.e.*, the 20-foot by 30-foot area between two cypress trees on the southern riverbank, mere steps away from the fencing and Brackenridge Drive, where no construction will ever occur:



COSA 02021

In short, there is simply no good reason why Plaintiffs may not individually worship and pray in the Sacred Area. At a minimum, therefore, Plaintiffs are entitled to an injunction that prevents the City from barring Plaintiffs from the Sacred Area.

## 2.  The City's tree-removal plan lacks any compelling governmental interest and is not narrowly tailored.

The same goes for the City's plan to remove dozens of trees from the Project Area.  Begin with the City's lack of a compelling governmental interest.  The City claims it has a general interest in public safety (although the undisputed evidence is that the retaining walls in the Sacred Area do not need repair).  Tr. 114:1–2, 134:16–19.  But TRFRA requires the government to provide "evidence to support [its] assertion with respect to 'the particular practice at issue.'"  *Barr*, 295 S.W.3d at 307.  That means evidence that *this* tree removal design is necessary in the context of *these Plaintiffs'* religious practice.  A government's claim that its policies "'are reasonably necessary to preserve the public safety' … is the kind of 'broadly formulated interest[]' that does not satisfy the scrutiny mandated by TRFRA."  *Id.* at 306.  And that is exactly the City's problem here: At the motion stage, the City breezily claimed that "the City[] [has a] compelling government interest of making the Project Area safe for visitors in the Park."  ECF No. 48 at 18.  That cursory assertion, however, is virtually identical to the kinds of statements that the Texas Supreme Court has held insufficient to establish a compelling governmental interest.  That ends the strict-scrutiny analysis.

Nonetheless, assuming for the sake of argument that the City had identified a compelling governmental interest, the City still runs straight into a classic narrow-tailoring problem.  In particular, that problem is that the City pursued a single plan— its cantilever idea—without ever attempting to accommodate Plaintiffs' religious

exercise. This is not Plaintiffs' litigating position; it is the City's own admission. The City chose the cantilever design "without any consideration of the plaintiffs' free exercise request." Tr. 343:23–25. The City did not "look to accommodate" Plaintiffs. Tr. 383:9–11. And even now, the City does not "want to" do so. Tr. 344:9–11 ("It would take time and money. That's – but no. We would like to proceed with the project."); *see also* ROA.369, ¶ 59 (the City disclaiming any obligation to study whether it could accommodate Plaintiffs' religion). The City's refusal to formulate a plan that accounts for Plaintiffs' religious exercise is fatal on strict-scrutiny review because "so long as the government can achieve its interests in a manner that does not burden religion, *it must do so.*" *Fulton*, 141 S. Ct. at 1881 (emphasis added).

This fatal defect is all the more pronounced because it is clear that the City *could* have accommodated Plaintiffs if it had tried. The City's briefing so far nit-picks the alternatives Plaintiffs and their experts have already identified. In fact, in closing argument at the hearing, the City complained that Plaintiffs "don't have a plan, they just don't like mine." Tr. 803:3. But the Supreme Court has expressly rejected identical attempts to shift *the government's* burden (to show that its policy is the least restrictive means of furthering a compelling governmental interest) to *the plaintiff*: "That gets things backward." *Ramirez*, 595 U.S. at 433. So too here.

In any event, there were other viable alternatives that (by the City's own admission) would "save more trees" than the cantilever design. Tr. 627:14–20. At least one option was to repair the retaining walls in place, and another was the pier-and-

spandrel system discussed at length in the record—an option that would preserve an additional 59 trees and is "at least as safe." Tr. 245:5–17, 341:2–4.

The City rejected all these alternatives, claiming that its "hands are basically tied by a series of legal issue[s]—or regulatory restrictions." Tr. 627:23–24. At the motion stage in this Court, the City reiterated its vague view that Department of the Interior guidelines and similar standards were obstacles to other alternatives. Dkt. 48 at 20–21. The City has never identified any specific provisions that bar these alternative designs. And the City has never confronted the elephant in the room: The City *admits* that it could seek an exemption from any such guideline; it *admits* it has never tried to do so; and it *admits* that it sought (and *received*) an exemption to destroy more trees than would otherwise be legally permissible. Tr. 394:3–395:4, 646:4–16. Again, the City's refusal to try to accommodate Plaintiffs' religious exercise is fatal. *Fulton*, 141 S.Ct. at 1881; *cf. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 729 (2014) (rejecting government's contention that "RFRA cannot be used to require creation of entirely new programs").[3]

As to the pier-and-spandrel system, the City also has claimed that it would exceed the cost of the cantilever design. ECF No. 48 at 20. But the City's engineer testified

---

[3] It bears noting, moreover, that even if some unspecified municipal code provision *did* create a substantial burden on Plaintiffs' religion by barring a religion-protective design alternative, TRFRA would prevent its enforcement. *See Merced*, 577 F.3d at 595 (TRFRA prevented city from enforcing ordinance); *Barr*, 295 S.W.3d at 296 (same). Indeed, TRFRA was enacted precisely *because* Texans sought to bar bureaucratic red tape from burdening religious exercise.

that the City did not run the figures, though he thought that the increased cost could be as little as 20%. Tr. 630:20–631:4. Plus, the pier-and-spandrel system would eliminate $400,000 in tree-relocation costs, Tr. 277:5–7, offsetting any theoretical increase. In any event, this complaint—just like the City's complaint that accommodating Plaintiffs' religious exercise would "take time and money"—is constitutionally irrelevant: "[C]onstitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." *Watson v. City of Memphis*, 373 U.S. 526, 537 (1963).

At bottom, the City's tree-removal plan in pursuit of its cantilever design is not the product of any attempt to employ the least restrictive means to further a compelling governmental interest.

### 3. The City's anti-nesting plan lacks any compelling governmental interest and is not narrowly tailored.

So too for the City's attempts to prevent cormorants from nesting in the Project Area. Begin again with the City's failure to identify a compelling governmental interest. As the City reiterated at the motion stage in this Court, the entire purpose of the proposed anti-nesting measures is to prevent any pauses in construction. Dkt. 48 at 22.[4] Yet again, this is "the kind of 'broadly formulated interest[]' that does not satisfy

---

[4] The district court's passing references to potential harm from feces are a red herring: The City's anti-nesting measures are about eliminating migratory birds that might otherwise stall construction. Tr. 413:22–23. And the City admits that cormorants in

the scrutiny mandated by TRFRA." *Barr*, 295 S.W.3d at 306. Every human has an interest in avoiding delays in life—traffic delays, flight delays, shipping delays, and so on. The government cannot just pluck a random type of delay out of thin air—a pause in construction—and say that avoiding it suddenly constitutes a compelling governmental interest, at least absent specific "evidence" establishing what makes this interest truly extraordinary. *See id.* at 307 (finding no compelling governmental interest where the city "cite[d] no studies or experiences … to support its professed concerns"). Indeed, the City's newfound urgency to complete construction is belied by the fact that six years have now passed since voters approved the bond referendum. *Cf. Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 547 (1993) (government undermines purported interest "when it leaves appreciable damage to that supposedly vital interest unprohibited") (citation omitted).

And in any event, it is clear that the City comes nowhere close to establishing that its anti-nesting measures are narrowly tailored to further any compelling governmental interest. Again, this is not Plaintiffs' litigating position; this is the City's own admission: "the City hasn't specifically tried to accommodate plaintiffs' religious exercise in crafting the bird deterrence." Tr. 407:2–5; *see also* Tr. 464:23–465:2, 465:19–22. Thus, yet again, the City's refusal to do so is fatal in capital letters. *See Fulton*, 141

---

Project Area "do not present a health risk," Tr. 414:8–9, and it offered no expert evidence suggesting otherwise.

S.Ct. at 1881 ("[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so.").

Although Plaintiffs do not bear the burden to show narrowly tailored alternatives, *see Ramirez*, 595 U.S. at 433, it bears noting that there are no fewer than five obvious alternatives the City could have investigated:

1.    Whether the City could employ anti-nesting measures that target egrets and herons—the true targets of the measures—not cormorants. (Ms. Adelson testified that she had "never been asked that question." Tr. 567:23.)

2.    Whether construction could be completed within the approximately four-month period between mid- to late-October and February when no migratory birds are present. Tr. 565:4–11 (There is no testimony addressing this possibility.)

3.    Whether construction could (a) begin during the approximately four-month period between mid- to late-October and February when no migratory birds are present, (b) pause while migratory birds nest, and (c) resume when the migratory birds leave. (There is no testimony addressing this possibility.)

4.    Whether any anti-nesting measures and the construction could be completed within the approximately six-month period between mid- to late-October and March or April, when the cormorants begin to arrive. Tr. 405:5–24 (Mr. Pennell testified that "the City never actually investigated whether it could alter the timing of its bird deterrence specifically to accommodate plaintiffs' religious exercise." Tr. 464:23–465:2.)

5.    Whether, at a minimum, any anti-nesting measures and the construction could be completed within the approximately eight-month period between mid- to late-October and June, when cormorants may still arrive and nest as happened in 2022. Tr. 406:13–19. (There is no testimony addressing this possibility.)

The City, however, refused to consider any of these alternatives or any others that plainly would be more narrowly tailored than the City's current plan. In its words, "the City hasn't specifically tried to accommodate plaintiffs' religious exercise in crafting the bird deterrence." Tr. 407:2–5. That dooms the City's anti-nesting measures on strict-scrutiny review. *See Fulton*, 141 S.Ct. at 1881.

## B.    The City's Actions Violate Article I, Section 6 of the Texas Constitution.

Plaintiffs' likelihood of success on the merits of their TRFRA claim establishes a likelihood of success on the merits of their Article I, Section 6 claim as well. *See* Tex. Const. art. I, § 6 ("No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion[.]"); *see also Ex parte Herrera*, 2014 WL 4207153, at *4 (Tex. App.—Dallas Aug. 26, 2014, no pet.) ("The Texas Constitution provides greater protections for the free exercise of one's religion than does the federal constitution."); *see also Texas Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648, 677 (Tex. 2022) (Young, J., concurring) (noting that the freedom of worship guarantee in the Texas Constitution is "provided with much greater detail than [its] federal analogue[]"). To that end, Plaintiffs incorporate by reference their arguments above, *see supra* Section I.A, as well as their arguments below—including that the Supreme Court's gloss on the federal Free Exercise Clause does not apply to Texas law and, in any event, is unavailing for the City, *see infra* Sections I.C, I.D.

### C.     The City's Actions Violate the Federal Free Exercise Clause.

So too with Plaintiffs' federal Free Exercise Clause claim because Plaintiffs are likely to succeed on the merits under the same strict-scrutiny analysis. *See supra* Section I.A.  In the district court, the City attempted to short-circuit the route to strict-scrutiny review by invoking *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), and its holding that neutral and generally applicable laws require only rational-basis review.  ROA.603–5, ¶¶ 19-20.  But cases like *Fulton* and *Lukumi* easily dispose of the City's reliance on *Smith*.  In *Fulton*, the Supreme Court reemphasized its long-time rule that "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." 141 S. Ct. at 1877.  As for general applicability, "[a] law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Id.* (internal quotation marks omitted).  A law also is not generally applicable if it grants even one secular exemption that undermines the government's claimed interest to the same or greater degree as the religious exercise at issue in the case. *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021); *Lukumi,* 508 U.S. at 543.

This is a case where the City fails both the "neutrality standard" and "the rubric of general applicability." *Id.*  On neutrality, and as explained at length above, *see supra* Section I.A, the City has openly admitted that it has proceeded (and seeks to proceed) without considering Plaintiffs' religious exercise, let alone attempting to accommodate

it.  Indeed, in one striking portion of the preliminary-injunction hearing, a City witness testified that he would not cut down a tree if a migratory bird were present, but he would otherwise cut it down notwithstanding its religious significance to Plaintiffs.  Tr. 384:2–10.  In other words, the City has failed to act neutrally because it seeks to proceed "in a manner intolerant of religious beliefs." *Fulton*, 141 S. Ct. at 1877.  That demands strict scrutiny.

On general applicability, the City's actions in the Project Area are a case study in impermissible "individualized exemptions." *Id.*  For example,  the City has permitted a city councilwoman, a city arborist, and other city employees inside the fence surrounding the Project Area, but the City has rejected access for Plaintiffs who wish to worship and pray.  Tr. 482:4–483:2, 523:4–524:19, 525:1–5, 755:9–20.  Allowing the City's preferred secular entrants while forbidding its disfavored religious worshippers impermissibly treats "comparable secular activity more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296.  And the process Plaintiffs attempted to engage—requesting access from the Director of Parks and Recreation who retained sole discretion to allow or forbid access—is a quintessential "system of individualized exemptions." *Fulton*, 141 S. Ct. at 1877; Tr. 676:8–18.

The same goes for the tree-removal plan: The City pursued, and received, an exemption from a law protecting the trees in the Project Area (and thus Plaintiffs' religious exercise)—so that the City could cut down more trees—but has refused to accommodate Plaintiffs' religious exercise.  The tree removal plan is thus not a generally

applicable law, but rather part of a "system of individualized exemptions." *Fulton*, 141 S. Ct. at 1877. For example, the City could have, but did not, seek an exemption for a repair design that would save the trees in the Project Area by merely anchoring through the front of the retaining wall, rather than the back. Tr. 396:3–21. Similarly, throughout the Park, the City has left untouched materially identical trees and bird-nesting while targeting it only in the Project Area. Tr. 171:10–16, 409:20–410:4. Again, by leaving so many secular exemptions that undermine its claimed interests, the City's policies are not generally applicable and demand strict scrutiny.

In short, at every turn the City has favored its own secular interests over Plaintiffs' religious exercise. It claims scrupulous adherence to historical regulations, while disclaiming *any* obligation to study whether it can accommodate Plaintiffs' religious exercise at a site their people have held sacred for thousands of years. ROA.369, ¶ 59; Tr. 123:23–124:20. Such value judgments squarely violate the neutrality and general-applicability principles reaffirmed in *Fulton*. *See Lukumi*, 508 U.S. at 537; *see also Midrash Sephardi, Inc. v. Town of Surfside*, 366 F. 3d 1214, 1235 (11th Cir. 2004); *Fraternal Order of Police v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999). And that violation triggers strict scrutiny, which, as explained, the City cannot survive.

### D. The City's Actions Violate Article I, Section 6-a of the Texas Constitution.

Finally, Plaintiffs are likely to succeed on the merits of their claim under Article I, Section 6-a of the Texas Constitution. Section 6-a prohibits a city from issuing a

decision or rule "that prohibits or limits religious services." Tex. Const. art. I, § 6-a. This recent constitutional amendment—which Texans adopted after governmental restrictions during the COVID pandemic demonstrated a need for additional religious liberty protections—lacks any case law expounding on its meaning and effects. But its structural, pro-religion mandate is unmistakably clear. As Justice Jimmy Blacklock explained, "the People of Texas decided to dictate to their government, rather than the other way around. They chose not to leave it up to scientists or judges to decide whether they can worship as they choose[.]" Jimmy Blacklock, *The Constitution After Covid*, 2023 Harv. J.L. & Pub. Pol'y Per Curiam 8, 4 (2023).

Its plain text covers precisely what the City has done and proposes to do. The City has prohibited Plaintiffs from entering the Sacred Area for religious services and similar activities. And the City proposes to further prohibit and limit Plaintiffs' future religious services by irreparably destroying the very aspects of the Sacred Area that make it a living place of worship for Plaintiffs. As Plaintiffs emphasized at the motion stage, no one would say that a city that padlocked the doors to a local Baptist church would survive Article I, Section 6-a scrutiny. Much less would a city that ransacked a local Catholic church's chalices and thuribles, burned the church down, and then assured the congregation that it is free to celebrate Mass. All the same here.

At the motion stage, the City resisted Plaintiffs' Section 6-a claim on the ground that "there is no constitutional right to use public property as a place of worship." Dkt. 48 at 14. The City further insisted that "the government has the right to limit conduct

on its own property, even if such limitation might also impose limits on the exercise of religion." *Id.* at 15.  But the cases the City cited in support are not Article I, Section 6-a cases, or even cases addressing Texas law.  They are cases involving claims under the *federal* Free Exercise Clause.  *See id.* at 14–17.  They are thus irrelevant to whether the City's proposed measures violate Article I, Section 6-a of the Texas Constitution.

There also are good reasons why the Texas Supreme Court—if confronted with the question—would likely reject the City's attempt to import these cases into Article I, Section 6-a.  Those cases trace back to *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988), in which the United States Supreme Court held that building a road and harvesting timber in areas sacred to Native Americans did not violate the Free Exercise Clause.  The Supreme Court held as much because "[t]he crucial word in the [Clause] is 'prohibit.'"  *Id.* at 451.  The Court reasoned that the government's construction projects did not threaten to "prohibit" the free exercise of the Native Americans' religion—but it also noted that "a law prohibiting [Native Americans] from visiting [their sacred area] would raise a different set of constitutional questions."  *Id.* at 453.

Here, of course, prohibiting Plaintiffs from visiting their sacred area is precisely what the City has done.  But more broadly, the "crucial" word "prohibit" that drove the decision in *Lyng* is not present in the Texas Constitution's promise of the free exercise of religion:  "No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion[.]"  Tex. Const. art. I, § 6.

And even in Section 6-a, Texans added the word "limit" in foreclosing governmental entities from impinging in any way on religious services. *Id.* § 6-a. Further, no Texas court has ever invoked the "*Lyng* rule" in a case under the Texas Constitution. Thus, although the Texas Supreme Court has often assumed without deciding that the federal and state free-exercise provisions are coextensive, *e.g.*, *HEB Ministries, Inc. v. Tex. Higher Educ. Coordinating Bd.*, 235 S.W.3d 627, 649–50 & n.87 (Tex. 2007), Plaintiffs have a powerful argument that Texas's provisions on religious exercise are far broader in the respect that *Lyng* found dispositive, *see Crown Distrib. LLC*, 647 S.W.3d, at 677 (Young, J., concurring); *cf. Barr*, 295 S.W.3d at 296 n.37 (noting that the Texas Supreme Court has never adopted *Employment Division v. Smith* for purposes of the Texas Constitution).

Finally, even if *Lyng* were instructive, it would support Plaintiffs. There, the Supreme Court went out of its way to emphasize "that the Government has taken numerous steps in this very case to minimize the impact that construction … will have on the Indians' religious activities." 485 U.S. at 454. Those steps included a 423-page report assessing the impact "on the cultural and religious value of the Chimney Rock area"; ensuring that "[n]o sites where specific rituals take place were to be disturbed"; and moving the new road as far as possible from spiritual sites. *Id.* As the Supreme Court put it, "[e]xcept for abandoning its project entirely, … it is difficult to see how the Government could have been more solicitous." *Id.*

The exact opposite is true here: the City is able to *both* safely repair the retaining walls *and* preserve Plaintiffs' ability to worship. But, as explained above, not only has

the City never attempted to accommodate Plaintiffs' religious exercise, the City also has disavowed any intent to do so in future: "It would take time and money. That's – but no. We would like to proceed with the project." Tr. 344:10–11; *see also* ROA.369, ¶ 59 (the City disclaiming any obligation to study whether it could accommodate Plaintiffs' religion). And that is so notwithstanding Plaintiffs' specific testimony that they do not object to construction if the design does not destroy their ability to practice their religion. Tr. 113:23–114:2, 134:16–19. This is nothing remotely close to *Lyng.*

Make no mistake: The City's position in this case is extreme. It believes it can "impose limits on the exercise of religion" simply because it owns the land. Dkt. 48 at 15; *see* ROA.1161-1162 (district court adopting similar view). But this narrow view is incompatible with more recent cases. *Cf. Landor v. Louisiana Dep't of Corr. & Pub. Safety*, 82 F.4th 337, 340 (5th Cir. 2023); *see Tanzin v. Tanvir*, 141 S. Ct. 486, 492 (2020) (collecting cases). And it is exactly backwards: "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of *the public*," not the government. *Hague v. Comm. For Indus. Org.*, 307 U.S. 496, 515 (1939) (emphasis added). Unlike *Lyng,* this is not a case where the government is trying, at least in part, to use its own land for *its own purposes.* This is a public park dedicated to the public, except that the City seeks to redesign it in a manner that destroys Plaintiffs' religion. Just as a city cannot extinguish free speech rights simply because it owns a public park, it cannot violate religious rights either. *See Fowler v. State of R.I.*, 345 U.S. 67, 69 (1953).

\*    \*    \*

Plaintiffs are not required to show a likelihood of success on the merits of each of their claims—but this case is striking because Plaintiffs are, in fact, likely to succeed from top to bottom on their state and federal claims. Plaintiffs have carried their preliminary-injunction burden.

## II. THE REMAINING PRELIMINARY-INJUNCTION FACTORS STRONGLY FAVOR PLAINTIFFS.

The foregoing analysis all but resolves three remaining injunction factors in Plaintiffs' favor. Indeed, the City's silence on these factors at the motion stage in this Court, *see* Dkt. 48, illustrates that this case effectively rises and falls on Plaintiffs' likelihood of success on the merits.

***Irreparable Harm.*** This Court has long made clear that "[t]he loss of First Amendment freedoms … unquestionably constitutes irreparable injury." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012). Such losses are irreparable even if they are "limited" or "temporary." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020). Two forms of textbook irreparable harm are at issue here.

*First*, undisputed evidence establishes that the City has prohibited Plaintiffs from worshipping and praying in the Sacred Area since the City erected the fence in February 2023. Tr. 54:4–11, 61:18–24, 62:4–11. Notwithstanding that no construction is ongoing, the City apparently intends to maintain its fencing—and its bar on Plaintiffs' presence in the Sacred Area—indefinitely. And that loss of First Amendment freedoms

is textbook irreparable harm.  To be sure, as noted above, the district court permitted Plaintiffs to enter the Sacred Area for scheduled ceremonies—but again, that partial (and welcome) relief does not change the fact that Plaintiffs are otherwise barred from worshipping in the Sacred Area.  *See Merced*, 577 F.3d at 591 ("Merced's ability to perform some ceremonies does not mean the city's ordinances do not burden other Santeria practices.").

*Second*, the City's intended destruction of the Sacred Area by removing dozens of trees quite literally will be irreparable.  Indeed, coupled with anti-nesting measures, this destruction will irreversibly transform the Sacred Area.  As Plaintiffs testified, the Sacred Area is sacred *because of* the spiritual ecology comprising the riverbend, the trees, and the cormorants.  *E.g.*, Tr. 87:15–88:7, 409:20–24, 412:17–23.  If the City proceeds, it will forever dissolve what Plaintiffs sincerely believe represents thousands of years of continuity.  Tr. 83:11–23, 139:13–24 ("[I]t'd be gone forever. You can't replace that.").  The district court was wrong to suggest that this is simply a "temporary" hardship until the Sacred Area reopens.  ROA.988.  If and when the Sacred Area reopens, the Sacred Area will have been desecrated.  *Cf. Friday*, 525 F.3d at 944 (feather from repository could not be substituted for personally harvested feather where plaintiff believed they were not religiously equivalent).  That is irreparable harm in spades.

**Equities and Public Interest.**  The remaining "factors merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  "[I]njunctions protecting First Amendment freedoms are always in the public interest."

*Opulent Life Church*, 697 F.3d at 293 (citation omitted).  And the City's inability to impinge on Plaintiffs' religious exercise "is really no harm at all."  *McDonald v. Longley*, 4 F.4th 229, 255 (5th Cir. 2021).  Neither does the City move the needle by complaining that "[i]t would take time and money" to not violate Plaintiff's religious-exercise rights. Tr. 344:10.  The "vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." *Watson*, 373 U.S. at 537.  The equities and the public interest cut in Plaintiffs' favor.

## CONCLUSION

For these reasons, the Court should reverse the district court's orders denying Plaintiffs' motion for a preliminary injunction and enjoin the City (1) from preventing Plaintiffs from accessing the Sacred Area for personal and group worship and related religious activities; (2) from implementing the bond project as currently designed with respect to tree removal; and (3) from engaging in anti-nesting measures that results in displacing cormorants from the Sacred Area.

November 8, 2023

Respectfully submitted,

*/s/ Chance B. McCraw*
Mark W. Rasmussen
Margaret I. Lyle
Jonathan D. Guynn
J. Benjamin Aguiñaga
Chance McCraw
Timothy M. Villari
JONES DAY
2727 N. Harwood St.
Dallas, Texas 75201
214-220-3939
mrasmussen@jonesday.com
milyle@jonesday.com
jguynn@jonesday.com
jbaguinaga@jonesday.com
cmccraw@jonesday.com
tvillari@jonesday.com

*Counsel for Plaintiffs*

*/s/ John Greil*
John Greil
Steven T. Collis
LAW AND RELIGION CLINIC
UNIVERSITY OF TEXAS SCHOOL OF LAW
727 East Dean Keeton St.
Austin, Texas 78705
(512)-471-5151
john.greil@law.utexas.edu
Steve.collis@law.utexas.edu

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on November 8, 2023, the foregoing Brief of Appellants was electronically filed with the United States Court of Appeals for the Fifth Circuit using the CM/ECF system, and that all parties required to be served have been served. Counsel further certifies that:  (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

/s/ Chance B. McCraw
Chance B. McCraw
*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

This Brief of Appellants complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,924 words, excluding parts exempted by Rule 32(f); and (2) the typeface and type style requirements of Rule 32(a)(5), (6), because it has been prepared in a proportionally spaced typeface (14-point Garamond) using Microsoft Word (the program used for the word count).

Dated: November 8, 2023

*/s/ Chance B. McCraw*
Chance B. McCraw
*Counsel for Plaintiffs*