No. 23-50746

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

GARY PEREZ AND MATILDE TORRES,

*Plaintiffs-Appellants,*

v.

CITY OF SAN ANTONIO,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Western District of Texas (Biery, J.)

## RECORD EXCERPTS OF APPELLANTS GARY PEREZ AND MATILDE TORRES

Mark W. Rasmussen
Margaret I. Lyle
Jonathan D. Guynn
J. Benjamin Aguiñaga
Chance McCraw
Timothy M. Villari
JONES DAY
2727 North Harwood Street
Dallas, TX 75201.1515
Telephone: +1.214.220.3939
E-mail: mrasmussen@jonesday.com
E-mail: milyle@jonesday.com
E-mail: jguynn@jonesday.com
E-mail: jbaguinaga@jonesday.com
E-mail: cmccraw@jonesday.com
E-mail: tvillari@jonesday.com

John Greil
Steven T. Collis
Law & Religion Clinic
University of Texas School of Law
727 East Dean Keeton St.
Austin, TX 78705
Telephone: +1.512.471.5151
E-mail: john.greil@law.utexas.edu
E-mail: steve.collis@law.utexas.edu

COUNSEL FOR APPELLANTS

# TABLE OF CONTENTS

**Tab #**                                                                                          **ROA**

1.    Docket Sheet ....................................................................................ROA.1

2.    Plaintiffs' Notice of Appeal....................................................................ROA.1047

3.    Partial Order Concerning Preliminary Injunction Issues.......................ROA.736

4.    Opinion and Order Granting in Part and Denying in Part Plaintiffs'
      Request for Preliminary Injunction .........................................................ROA.984

5.    Certificate of Service

# Tab 1

APPEAL,RBF

# U.S. District Court [LIVE]
## Western District of Texas (San Antonio)
## CIVIL DOCKET FOR CASE #: 5:23-cv-00977-FB

Perez et al v. San Antonio
Assigned to: Judge Fred Biery
 Case in other court:  5CCA, 23-50746 (Doc. 53)
                       5CCA, 23-50781 (Doc. 61)
Cause: 28:2201 Declaratory Judgment

Date Filed: 08/09/2023
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Gary Perez**                          represented by   **Chance B. McCraw**
                                                         Jones Day
                                                         2727 N. Harwood Street
                                                         Ste 600
                                                         Dallas, TX 75201
                                                         214-969-4563
                                                         Email: cmccraw@jonesday.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Mark W. Rasmussen**
                                                         Jones Day
                                                         2727 N. Harwood St.
                                                         Ste 600
                                                         Dallas, TX 75201
                                                         214-969-4892
                                                         Fax: 214-969-5100
                                                         Email: mrasmussen@jonesday.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Steven Timothy Collis**
                                                         University of Texas at Austin
                                                         School of Law
                                                         727 E. Dean Keeton St.
                                                         Austin, TX 78705
                                                         512-475-9090
                                                         Email: steven.collis@law.utexas.edu
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **John Greil**
                                                         University of Texas at Austin School of Law
                                                         727 E. Dean Keeton St.
                                                         Austin, TX 78705
                                                         651-767-2574
                                                         Email: john.d.greil@gmail.com
                                                         *ATTORNEY TO BE NOTICED*

**Timothy Michael Villari**
Jones Day
2727 N. Harwood Street
Dallas, TX 75201
214-969-5104
Email: tvillari@jonesday.com
*ATTORNEY TO BE NOTICED*

**Jonathan David Guynn**
Jones Day
2727 N. Harwood Street
Ste 600
Dallas, TX 75201
214-969-3793
Email: jguynn@jonesday.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Matilde Torres**                    represented by   **Chance B. McCraw**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark W. Rasmussen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Timothy Collis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Greil**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Timothy Michael Villari**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jonathan David Guynn**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**City of San Antonio**                represented by   **Fred Riley Jones**
Langley & Banack, Incorporated
745 East Mulberry Ave

Suite 700
San Antonio, TX 78212
210-736-6600
Email: fjones@langleybanack.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ian M. McLin**
Langley & Banack
745 E. Mulberry, Suite 700
San Antonio, TX 78212
(210) 253-7177
Fax: (210) 735-6889
Email: imclin@langleybanack.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lee Brinson Warren**
Goode Casseb Jones Riklin Choate &
Watson P.C.
2122 N. Main Avenue
San Antonio, TX 78212
210-733-6030
Fax: 210/733-0330
Email: warren@goodelaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Natalie Friend Wilson**
Langley & Banack, Inc
745 E. Mulberry - Ste 700
San Antonio, TX 78212-3166
(210) 736-6600
Fax: 210/735-6889
Email: nwilson@langleybanack.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/09/2023 | 1 (p.13) | COMPLAINT ( Filing fee $ 402 receipt number ATXWDC-17750696), filed by Matilde Torres, Gary Perez. (Attachments: # 1 (p.13) Civil Cover Sheet)(Guynn, Jonathan) (Entered: 08/09/2023) |
| 08/09/2023 | 2 (p.43) | REQUEST FOR ISSUANCE OF SUMMONS by Gary Perez, Matilde Torres. (Guynn, Jonathan) (Entered: 08/09/2023) |
| 08/09/2023 | | Case assigned to Judge Fred Biery. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (wg) (Entered: 08/09/2023) |
| 08/09/2023 | | If ordered by the court, all referrals will be assigned to Magistrate Judge Farrer (wg) (Entered: 08/09/2023) |

| | | |
|---|---|---|
| 08/10/2023 | 3 (p.45) | Plaintiff's Amended Complaint by Gary Perez, Matilde Torres (Guynn, Jonathan) Modified text on 8/10/2023 (wg). (Entered: 08/10/2023) |
| 08/10/2023 | 4 (p.74) | Summons Issued as to City of San Antonio. (Amended Complaint) (wg) (Entered: 08/10/2023) |
| 08/10/2023 | 5 (p.76) | MOTION for Temporary Restraining Order *and Preliminary Injunction* by Gary Perez, Matilde Torres. (Attachments: # 1 (p.13) Memo in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, # 2 (p.43) Affidavit Declaration of Gary Perez in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, # 3 (p.45) Exhibit A to Declaration of Gary Perez, # 4 (p.74) Exhibit B to Declaration of Gary Perez, # 5 (p.76) Exhibit C to Declaration of Gary Perez, # 6 (p.308) Exhibit D to Declaration of Gary Perez, # 7 (p.311) Exhibit E to Declaration of Gary Perez, # 8 (p.335) Exhibit F to Declaration of Gary Perez, # 9 (p.340) Affidavit Declaration of Jonathan Guynn in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, # 10 (p.343) Exhibit A to Declaration of Jonathan Guynn, # 11 (p.345) Exhibit A-1 to Declaration of Jonathan Guynn, # 12 (p.346) Exhibit A-2 to Declaration of Jonathan Guynn, # 13 (p.348) Exhibit A-3 to Declaration of Jonathan Guynn, # 14 (p.349) Exhibit A-4 to Declaration of Jonathan Guynn, # 15 Exhibit A-5 to Declaration of Jonathan Guynn, # 16 (p.350) Exhibit B to Declaration of Jonathan Guynn, # 17 (p.356) Exhibit C to Declaration of Jonathan Guynn, # 18 (p.1242) Exhibit C-1 to Declaration of Jonathan Guynn, # 19 (p.359) Exhibit C-2 to Declaration of Jonathan Guynn, # 20 (p.383) Exhibit D to Declaration of Jonathan Guynn, # 21 (p.464) Exhibit D-1 to Declaration of Jonathan Guynn, # 22 (p.481) Exhibit E to Declaration of Jonathan Guynn, # 23 (p.489) Exhibit F to Declaration of Jonathan Guynn, # 24 (p.504) Exhibit G to Declaration of Jonathan Guynn)(Guynn, Jonathan) (Entered: 08/10/2023) |
| 08/11/2023 | 6 (p.308) | Pro Hac Vice Letter to Attorneys John Greil, Chance McCraw and Steven T. Collis regarding Attorney Admission to the Western District of Texas . (mgr) (Main Document 6 replaced on 8/11/2023) (mgr). (Entered: 08/11/2023) |
| 08/11/2023 | 7 (p.311) | RESPONSE to Motion, filed by City of San Antonio, re 5 (p.76) MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Plaintiff Matilde Torres, Plaintiff Gary Perez (Attachments: # 1 (p.13) Affidavit Homer Garcia Declaration, # 2 (p.43) Affidavit Ross Hosea Declaration)(Jones, Fred) (Entered: 08/11/2023) |
| 08/11/2023 | 8 (p.335) | REPLY to Response to Motion, filed by Gary Perez, Matilde Torres, re 5 (p.76) MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Plaintiff Matilde Torres, Plaintiff Gary Perez (Guynn, Jonathan) (Entered: 08/11/2023) |
| 08/11/2023 | 9 (p.340) | ORDER DENYING 5 (p.76) Motion for TRO Signed by Judge Fred Biery. (mgr) (Entered: 08/11/2023) |
| 08/17/2023 | 10 (p.343) | SUMMONS Returned Executed by Matilde Torres, Gary Perez. City of San Antonio served on 8/11/2023, answer due 9/1/2023. (Guynn, Jonathan) (Entered: 08/17/2023) |
| 08/17/2023 | 11 (p.345) | ORDER SETTING PRELIMINARY INJUNCTION HEARING re 5 (p.76) MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Matilde Torres, Gary Perez, ( Motion Hearing set for 8/24/2023 10:30 AM before Judge Fred Biery,). Signed by Judge Fred Biery. (wg) (Entered: 08/17/2023) |
| 08/17/2023 | | |

| | | |
|---|---|---|
| | 12 (p.346) | COURT ADVISORY CONCERNING DISCOVERY AND OTHER MATTERS. Signed by Judge Fred Biery. (wg) (Entered: 08/17/2023) |
| 08/17/2023 | 13 (p.348) | AMENDED ORDER SETTING PRELIMINARY INJUNCTION HEARING re 5 (p.76) MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Matilde Torres, Gary Perez, ( Motion Hearing set for 8/24/2023 01:30 PM before Judge Fred Biery,). Signed by Judge Fred Biery. (wg) (Entered: 08/18/2023) |
| 08/21/2023 | 14 (p.349) | ORDER SETTING STATUS CONFERENCE, ( Status Conference set for 8/21/2023 11:30 AM before Judge Fred Biery,). Signed by Judge Fred Biery. (wg) (Entered: 08/21/2023) |
| 08/21/2023 | 15 | Minute Entry for proceedings held before Judge Fred Biery: Status Conference held on 8/21/2023 (Minute entry documents are not available electronically.). (Court Reporter Angela Hailey.)(wg) (Entered: 08/21/2023) |
| 08/22/2023 | 16 (p.350) | Joint MOTION for Discovery *re Agreed Scheduling Order* by Gary Perez, Matilde Torres. (Attachments: # 1 (p.13) Proposed Order)(Guynn, Jonathan) (Entered: 08/22/2023) |
| 08/25/2023 | 17 (p.356) | ORDER GRANTING JOINT MOTION REGARDING AGREED SCHEDULING ORDER AND ENTRY OF SCHEDULING ORDER IN ADVANCE OF PRELIMINARY INJUNCTION HEARING re 16 (p.350) Joint MOTION for Discovery *re Agreed Scheduling Order* filed by Matilde Torres, Gary Perez, ( Discovery due by 9/18/2023,)(Preliminary Injunction Hearing set for 09/25/2023, @ 8:30 AM. Signed by Judge Fred Biery. (wg) (Entered: 08/25/2023) |
| 08/25/2023 | | Set Hearings: Preliminary Injunction Hearing set for 9/25/2023 08:30 AM before Judge Fred Biery, (wg) (Entered: 08/25/2023) |
| 08/28/2023 | 18 (p.1242) | Transcript filed of Proceedings held on 8/21/23, Proceedings Transcribed: Status Conference. Court Reporter/Transcriber: Angela Hailey, Telephone number: 210.244.5048. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 9/18/2023, Redacted Transcript Deadline set for 9/28/2023, Release of Transcript Restriction set for 11/27/2023, (Hailey, Angela) (Entered: 08/28/2023) |
| 09/01/2023 | 19 (p.359) | ANSWER to 1 (p.13) Complaint *and 3 (p.45) Amended Complaint* by City of San Antonio.(Jones, Fred) (Entered: 09/01/2023) |
| 09/08/2023 | 20 (p.383) | MOTION to Compel *Production of Documents from Defendant and Supporting Brief* by Gary Perez, Matilde Torres. (Attachments: # 1 (p.13) Exhibit A to Plaintiffs' Motion to Compel Production of Documents from Defendant and Supporting Brief, # 2 (p.43) Exhibit B to Plaintiffs' Motion to Compel Production of Documents from Defendant and Supporting Brief, # 3 (p.45) Exhibit C to Plaintiffs' Motion to Compel Production of Documents from Defendant and Supporting Brief, # 4 (p.74) Exhibit D to Plaintiffs' Motion to Compel Production of Documents from Defendant and Supporting Brief, # 5 (p.76) Exhibit E to Plaintiffs' Motion to Compel Production of Documents from Defendant and Supporting Brief, # 6 (p.308) Exhibit F to Plaintiffs' Motion to Compel Production of Documents from Defendant and Supporting Brief, # 7 (p.311) Exhibit G to Plaintiffs' Motion to Compel Production |

| | | |
|---|---|---|
| | | of Documents from Defendant and Supporting Brief, # 8 (p.335) Proposed Order Granting Plaintiffs' Motion to Compel Production of Documents from Defendant and Supporting Brief)(Guynn, Jonathan) (Entered: 09/08/2023) |
| 09/11/2023 | 21 (p.464) | DEFENDANT'S RESPONSE to Motion, filed by City of San Antonio, re 20 (p.383) MOTION to Compel *Production of Documents from Defendant and Supporting Brief* filed by Plaintiff Matilde Torres, Plaintiff Gary Perez (Attachments: # 1 (p.13) Exhibit Exhibit 1, # 2 (p.43) Exhibit Exhibit 2)(Jones, Fred) . (Entered: 09/11/2023) |
| 09/12/2023 | 22 (p.481) | REPLY to Response to Motion, filed by Gary Perez, Matilde Torres, re 20 (p.383) MOTION to Compel *Production of Documents from Defendant and Supporting Brief* filed by Plaintiff Matilde Torres, Plaintiff Gary Perez (Guynn, Jonathan) (Entered: 09/12/2023) |
| 09/13/2023 | 23 (p.489) | Response in Opposition to Motion, filed by City of San Antonio, re 20 (p.383) MOTION to Compel *Production of Documents from Defendant and Supporting Brief* filed by Plaintiff Matilde Torres, Plaintiff Gary Perez (Attachments: # 1 (p.13) Exhibit)(Wilson, Natalie) (Entered: 09/13/2023) |
| 09/13/2023 | 24 (p.504) | REPLY to Response to Motion, filed by Gary Perez, Matilde Torres, re 20 (p.383) MOTION to Compel *Production of Documents from Defendant and Supporting Brief* filed by Plaintiff Matilde Torres, Plaintiff Gary Perez (Guynn, Jonathan) (Entered: 09/13/2023) |
| 09/13/2023 | 25 (p.507) | ORDER DENYING 20 (p.383) Motion to Compel Production of Documents. Signed by Judge Fred Biery. (wg) (Entered: 09/13/2023) |
| 09/18/2023 | 26 (p.509) | ADVISORY TO COUNSEL AND THE PARTIES CONCERNING PRELIMINARY INJUNCTION HEARING ORDER, re: Preliminary Injunction Hearing set for 9/25/2023 @ 8:30 AM Set/Reset Hearings. Signed by Judge Fred Biery. (wg) (Entered: 09/18/2023) |
| 09/22/2023 | 27 (p.510) | Exhibit List by City of San Antonio.. (Jones, Fred) (Entered: 09/22/2023) |
| 09/22/2023 | 28 (p.518) | Exhibit List by Gary Perez, Matilde Torres.. (McCraw, Chance) (Entered: 09/22/2023) |
| 09/22/2023 | 29 (p.523) | Witness List by City of San Antonio. (Jones, Fred) (Entered: 09/22/2023) |
| 09/22/2023 | 30 (p.527) | Witness List by Gary Perez, Matilde Torres. (McCraw, Chance) (Entered: 09/22/2023) |
| 09/22/2023 | 31 (p.530) | Proposed Findings of Fact by Gary Perez, Matilde Torres. (Attachments: # 1 (p.13) Proposed Order for Preliminary Injunction)(McCraw, Chance) (Entered: 09/22/2023) |
| 09/22/2023 | 32 (p.556) | Proposed Findings of Fact by City of San Antonio. (Wilson, Natalie) (Entered: 09/22/2023) |
| 09/22/2023 | 33 (p.594) | NOTICE of Attorney Appearance by Timothy Michael Villari on behalf of Gary Perez, Matilde Torres. Attorney Timothy Michael Villari added to party Gary Perez(pty:pla), Attorney Timothy Michael Villari added to party Matilde Torres(pty:pla) (Villari, Timothy) (Entered: 09/22/2023) |
| 09/22/2023 | | |

| | 34 (p.596) | Response in Opposition to Motion, filed by City of San Antonio, re 5 (p.76) MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Plaintiff Matilde Torres, Plaintiff Gary Perez (Attachments: # 1 (p.13) Exhibit Exhibit 1, # 2 (p.43) Exhibit Exhibit 2, # 3 (p.45) Exhibit Exhibit 3, # 4 (p.74) Exhibit Exhibit 4)(Jones, Fred) (Entered: 09/22/2023) |
|---|---|---|
| 09/22/2023 | 35 (p.687) | Proposed Order *Denying* to 5 (p.76) MOTION for Temporary Restraining Order *and Preliminary Injunction* by City of San Antonio. (Wilson, Natalie) (Entered: 09/22/2023) |
| 09/22/2023 | 36 (p.688) | NOTICE of Attorney Appearance by John Greil on behalf of Gary Perez, Matilde Torres. Attorney John Greil added to party Gary Perez(pty:pla), Attorney John Greil added to party Matilde Torres(pty:pla) (Greil, John) (Entered: 09/22/2023) |
| 09/25/2023 | 37 | Minute Entry for proceedings held before Judge Fred Biery: Preliminary Injunction Hearing held on 9/25/2023 (Minute entry documents are not available electronically.). (Court Reporter Chris Poage.)(nm) (Entered: 09/25/2023) |
| 09/27/2023 | 38 (p.690) | Exhibit List *Amended* by City of San Antonio.. (Jones, Fred) (Entered: 09/27/2023) |
| 09/27/2023 | 39 | Minute Entry for proceedings held before Judge Fred Biery: Hearing Cont. on Thursday 9/28/2023. Motion Hearing held on 9/27/2023 re 5 (p.76) MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Matilde Torres, Gary Perez (Minute entry documents are not available electronically.). (Court Reporter Chris Poage.)(wg) (Entered: 09/27/2023) |
| 09/28/2023 | 40 (p.698) | Exhibit List *Second Amended* by City of San Antonio.. (Jones, Fred) (Entered: 09/28/2023) |
| 09/28/2023 | 41 (p.706) | Exhibit List *Third Amended* by City of San Antonio.. (Jones, Fred) (Entered: 09/28/2023) |
| 09/28/2023 | 42 | Minute Entry for proceedings held before Judge Fred Biery: Motion Hearing held on 9/28/2023 re 5 (p.76) MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Matilde Torres, Gary Perez (Minute entry documents are not available electronically.). (Court Reporter Chris Poage.)(wg) (Entered: 09/28/2023) |
| 09/29/2023 | 43 (p.714) | Defendant's Exhibit List *Fourth Amended* by City of San Antonio.. (Jones, Fred) Modified on 9/29/2023 (wg). (Entered: 09/29/2023) |
| 09/29/2023 | 44 (p.722) | Exhibit List *Fifth Amended* by City of San Antonio.. (Jones, Fred) (Entered: 09/29/2023) |
| 09/29/2023 | 45 | Minute Entry for proceedings held before Judge Fred Biery: Written Order forthcoming.Motion Hearing held on 9/29/2023 re 5 (p.76) MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Matilde Torres, Gary Perez (Minute entry documents are not available electronically.). (Court Reporter Chris Poage.)(wg) (Entered: 09/29/2023) |
| 09/29/2023 | 50 (p.969) | EXHIBIT RECEIPT by City of San Antonio. (wg) (Entered: 10/10/2023) |
| 09/29/2023 | 51 (p.977) | EXHIBIT RECEIPT by Gary Perez, Matilde Torres. (wg) (Entered: 10/10/2023) |
| 10/01/2023 | | |

| | | |
|---|---|---|
| | 46 (p.730) | Exhibit List *Amended* by Gary Perez, Matilde Torres.. (McCraw, Chance) (Entered: 10/01/2023) |
| 10/02/2023 | 47 (p.736) | PARTIAL ORDER CONCERNING PRELIMINARY INJUNCTION ISSUES re 5 (p.76) MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Matilde Torres, Gary Perez. Signed by Judge Fred Biery. (wg) (Entered: 10/02/2023) |
| 10/04/2023 | 48 (p.740) | ADVISORY TO THE COURT by City of San Antonio . (Attachments: # 1 (p.13) Exhibit Photo)(Jones, Fred) (Entered: 10/04/2023) |
| 10/06/2023 | 49 (p.744) | PLAINTIFF'S REPLY to Response to Motion, filed by Gary Perez, Matilde Torres, re 5 (p.76) MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Plaintiff Matilde Torres, Plaintiff Gary Perez (Attachments: # 1 (p.13) Affidavit Declaration of Chance McCraw, # 2 (p.43) Exhibit Attachment A (Transcripts), # 3 (p.45) Exhibit Attachment B (D-59), # 4 (p.74) Exhibit Attachment C (D-60), # 5 (p.76) Exhibit Attachment D (P-10), # 6 (p.308) Exhibit Attachment E (D-3), # 7 (p.311) Exhibit Attachment F (P-49-E), # 8 (p.335) Exhibit Attachment G (D-66), # 9 (p.340) Exhibit Attachment H (P-9), # 10 (p.343) Exhibit Attachment I (P-42-A))(McCraw, Chance) (Entered: 10/06/2023) |
| 10/11/2023 | 52 (p.984) | MEMORANDUM OPINION AND ORDER, IT IS HEREBY ORDERED that Plaintiffs Motion for Preliminary Injunction is GRANTED IN PART and DENIED IN PART as set forth herein. re 5 (p.76) Motion for TRO, filed by Matilde Torres, Gary Perez. Signed by Judge Fred Biery. (wg) (Entered: 10/11/2023) |
| 10/16/2023 | 53 (p.1047) | Appeal of Order entered by District Judge 52 (p.984) , 47 (p.736) by Gary Perez, Matilde Torres. ( Filing fee $ 505 receipt number ATXWDC-17992836) (McCraw, Chance) (Entered: 10/16/2023) |
| 10/16/2023 | 54 (p.1050) | MOTION for Preliminary Injunction *Pending Appeal* by Gary Perez, Matilde Torres. (Attachments: # 1 (p.13) Declaration of Chance McCraw, # 2 (p.43) Exhibit A (Email From Opposing Counsel), # 3 (p.45) Exhibit B (Transcript Excerpts), # 4 (p.74) Exhibit C (P-42-A), # 5 (p.76) Proposed Order)(McCraw, Chance) (Entered: 10/16/2023) |
| 10/16/2023 | | NOTICE OF APPEAL following 53 (p.1047) Notice of Appeal (E-Filed) by Gary Perez, Matilde Torres. Filing fee $ 505. Per 5th Circuit rules, the appellant has 14 days, from the filing of the Notice of Appeal, to order the transcript. To order a transcript, the appellant should fill out a (Transcript Order) and follow the instructions set out on the form. This form is available in the Clerk's Office or by clicking the hyperlink above. (wg) (Entered: 10/18/2023) |
| 10/18/2023 | 55 (p.1130) | ADVISORY TO THE COURT by City of San Antonio . (Jones, Fred) (Entered: 10/18/2023) |
| 10/19/2023 | 56 (p.1133) | Defendant Response in Opposition to Motion, filed by City of San Antonio, re 54 (p.1050) MOTION for Preliminary Injunction *Pending Appeal* filed by Plaintiff Matilde Torres, Plaintiff Gary Perez (Jones, Fred) Modified on 10/20/2023 (wg). (Entered: 10/19/2023) |
| 10/20/2023 | 57 (p.1148) | COPY of Letter of transmittal from USCA to Mr. Steven Timothy Collis and Chance McGraw received for 53 (p.1047) Notice of Appeal, filed by Matilde Torres, Gary Perez.***We have docketed the appeal and ask you to use the case number above in future inquiries.*** (dtg) (Entered: 10/20/2023) |

| | | |
|---|---|---|
| 10/25/2023 | 58 (p.1152) | NOTICE *Regarding Emergency Motion for Injunction Pending Appeal to United States Court of Appeals for the Fifth Circuit* by Gary Perez, Matilde Torres (McCraw, Chance) (Entered: 10/25/2023) |
| 10/25/2023 | 59 (p.1155) | ORDER DENYING 54 (p.1050) Motion for Preliminary Injunction Pending Appeal. Signed by Judge Fred Biery. (wg) (Entered: 10/26/2023) |
| 10/27/2023 | 60 (p.1163) | ORDER of USCA (certified copy). re 53 (p.1047) Notice of Appeal.***Per Curiam: IT IS ORDERED that Appellants opposed motion for an injunction pending appeal is CARRIED WITH THE CASE. IT IS FURTHER ORDERED that Appellants opposed motion to expedite the appeal is GRANTED. IT IS FURTHER ORDERED that a temporary administrative stay is issued until further orders of the court.*** (dtg) (Entered: 10/27/2023) |
| 10/30/2023 | 61 (p.1164) | Cross Appeal of Order entered by District Judge 52 (p.984) by City of San Antonio. ( Filing fee $ 505 receipt number ATXWDC-18041020) (Attachments: # 1 (p.13) Exhibit Exhibit 1, # 2 (p.43) Exhibit Exhibit 2)(Jones, Fred) (Entered: 10/30/2023) |
| 10/30/2023 | 62 (p.1237) | TRANSCRIPT REQUEST by Gary Perez, Matilde Torres for dates of 9/25, 9/27, 9/28, 9/29. Proceedings Transcribed: Preliminary Injunction Hearing. Court Reporter: Chris Poage.. (McCraw, Chance) (Entered: 10/30/2023) |
| 10/30/2023 | | NOTICE OF CROSS-APPEAL following 61 (p.1164) Notice of Appeal (E-Filed) by City of San Antonio. Filing fee $ 505. Per 5th Circuit rules, the appellant has 14 days, from the filing of the Notice of Appeal, to order the transcript. To order a transcript, the appellant should fill out a (Transcript Order) and follow the instructions set out on the form. This form is available in the Clerk's Office or by clicking the hyperlink above. (wg)**Modified TEXT on 11/2/2023 (dtg).** (Entered: 11/02/2023) |
| 11/02/2023 | 63 (p.1238) | COPY of Letter of transmittal from USCA to Mr. Fred R. Jones received for 61 (p.1164) Notice of Cross-Appeal, filed by City of San Antonio.***We have docketed the cross appeal as shown above, and ask you to use the case number above in future inquiries.*** (dtg) (Entered: 11/02/2023) |
| 11/02/2023 | 64 (p.1262) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by Gary Perez, Matilde Torres. (Attachments: # 1 (p.13) P-1, # 2 (p.43) P-2, # 3 (p.45) P-3, # 4 (p.74) P-4)(dtg) (Entered: 11/02/2023) |
| 11/02/2023 | 65 (p.1406) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by Gary Perez, Matilde Torres.***P-5*** (Attachments: # 1 (p.13) P-6, # 2 (p.43) P-7, # 3 (p.45) P-8)(dtg) (Entered: 11/02/2023) |
| 11/02/2023 | 66 (p.1421) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by Gary Perez, Matilde Torres.***P-9***(dtg) (Entered: 11/02/2023) |
| 11/02/2023 | 67 (p.1447) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by Gary Perez, Matilde Torres.***P-10*** (Attachments: # 1 (p.13) P-11, # 2 (p.43) P-12, # 3 (p.45) P-13, # 4 (p.74) P-14)(dtg) (Entered: 11/02/2023) |
| 11/02/2023 | 68 (p.1488) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by Gary Perez, Matilde Torres.***P-15*** (Attachments: # 1 (p.13) P-16, # 2 (p.43) P-17, # 3 (p.45) P-18-A)(dtg) (Entered: 11/02/2023) |
| 11/02/2023 | 69 (p.1514) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by Gary Perez, Matilde Torres.***P-18-B*** (dtg) (Entered: 11/02/2023) |

| | | |
|---|---|---|
| 11/02/2023 | 70 (p.1518) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by Gary Perez, Matilde Torres.***P-18-C*** (dtg) (Entered: 11/02/2023) |
| 11/02/2023 | 71 (p.1527) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by Gary Perez, Matilde Torres.***P-18-D*** (dtg) (Entered: 11/02/2023) |
| 11/02/2023 | 72 (p.1539) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by Gary Perez, Matilde Torres.***P-19***(Attachments: # 1 (p.13) P-20, # 2 (p.43) P-21, # 3 (p.45) P-22, # 4 (p.74) P-23, # 5 (p.76) P-24, # 6 (p.308) P-25)(dtg) (Entered: 11/02/2023) |
| 11/02/2023 | 73 (p.1630) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by Gary Perez, Matilde Torres.***P-26*** (Attachments: # 1 (p.13) P-27, # 2 (p.43) P-28, # 3 (p.45) P-29, # 4 (p.74) P-30, # 5 (p.76) P-31, # 6 (p.308) P-32, # 7 (p.311) P-33, # 8 (p.335) P-34, # 9 (p.340) P-35)(dtg) (Entered: 11/02/2023) |
| 11/02/2023 | 74 (p.1672) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by Gary Perez, Matilde Torres.***P-36*** (Attachments: # 1 (p.13) P-37, # 2 (p.43) P-38, # 3 (p.45) P-39, # 4 (p.74) P-40, # 5 (p.76) P-41, # 6 (p.308) P-42-A)(dtg) (Entered: 11/02/2023) |
| 11/02/2023 | 75 (p.1755) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by Gary Perez, Matilde Torres.***P-42-B*** (dtg) (Entered: 11/02/2023) |
| 11/02/2023 | 76 (p.1832) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by Gary Perez, Matilde Torres.***P-43*** (Attachments: # 1 (p.13) P-44, # 2 (p.43) P-45, # 3 (p.45) P-46, # 4 (p.74) P-47, # 5 (p.76) P-48)(dtg) (Entered: 11/02/2023) |
| 11/02/2023 | 77 (p.2131) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by Gary Perez, Matilde Torres.***P-51*** (Attachments: # 1 (p.13) P-52, # 2 (p.43) P-53, # 3 (p.45) P-54, # 4 (p.74) P-55, # 5 (p.76) P-56, # 6 (p.308) P-57, # 7 (p.311) P-58)(dtg) (Entered: 11/02/2023) |
| 11/03/2023 | 78 (p.2210) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio. (Attachments: # 1 (p.13) D-1, # 2 (p.43) D-2, # 3 (p.45) D-3, # 4 (p.74) D-4, # 5 (p.76) D-4-A, # 6 (p.308) D-4-B, # 7 (p.311) D-4-C)(dtg) (Entered: 11/03/2023) |
| 11/03/2023 | 79 (p.2272) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio.***D-4-D*** (Attachments: # 1 (p.13) D-4-E, # 2 (p.43) D-4-F, # 3 (p.45) D-4-G, # 4 (p.74) D-4-H, # 5 (p.76) D-4-I, # 6 (p.308) D-4-J, # 7 (p.311) D-4-K)(dtg) (Entered: 11/03/2023) |
| 11/03/2023 | 80 (p.2280) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio.***D-4-L*** (Attachments: # 1 (p.13) D-4-M, # 2 (p.43) D-5, # 3 (p.45) D-6, # 4 (p.74) D-7, # 5 (p.76) D-8, # 6 (p.308) D-9, # 7 (p.311) D-10)(dtg) (Entered: 11/03/2023) |
| 11/03/2023 | 81 (p.2333) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio.***D-11*** (Attachments: # 1 (p.13) D-12, # 2 (p.43) D-13, # 3 (p.45) D-14, # 4 (p.74) D-15, # 5 (p.76) D-15-A, # 6 (p.308) D-15-B, # 7 (p.311) D-15-C)(dtg) (Entered: 11/03/2023) |
| 11/03/2023 | 82 (p.2362) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio.***D-15-D*** (Attachments: # 1 (p.13) D-15-E, # 2 (p.43) D-15-F, # 3 (p.45) D-15-G, # 4 (p.74) D-15-H, # 5 (p.76) D-15-I, # 6 (p.308) D-15-J, # 7 |

| | | |
|---|---|---|
| | | (p.311) D-15-K)(dtg) (Entered: 11/03/2023) |
| 11/03/2023 | 83 (p.2370) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio.***D-15-L*** (Attachments: # 1 (p.13) D-15-M, # 2 (p.43) D-15-N, # 3 (p.45) D-15-O, # 4 (p.74) D-15-P, # 5 (p.76) D-15-Q)(dtg) (Entered: 11/03/2023) |
| 11/03/2023 | 84 (p.2376) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio.***D-15-R*** (Attachments: # 1 (p.13) D-15-S, # 2 (p.43) D-15-T, # 3 (p.45) D-16, # 4 (p.74) D-17, # 5 (p.76) D-18, # 6 (p.308) D-18-A)(dtg) (Entered: 11/03/2023) |
| 11/03/2023 | 85 (p.2386) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio.***D-18-A-1*** (Attachments: # 1 (p.13) D-18-A-2, # 2 (p.43) D-18-A-3, # 3 (p.45) D-18-B, # 4 (p.74) D-18-B-1, # 5 (p.76) D-18-B-2, # 6 (p.308) D-18-B-3, # 7 (p.311) D-18-C)(dtg) (Entered: 11/03/2023) |
| 11/03/2023 | 86 (p.2394) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio.***D-18-C-1*** (Attachments: # 1 (p.13) D-18-C-2, # 2 (p.43) D-18-C-3, # 3 (p.45) D-18-D, # 4 (p.74) D-18-D-1, # 5 (p.76) D-18-D-2, # 6 (p.308) D-18-D-3)(dtg) (Entered: 11/03/2023) |
| 11/03/2023 | 87 (p.2401) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio.***D-18-D-4*** (Attachments: # 1 (p.13) D-18-D-5, # 2 (p.43) D-18-D-6, # 3 (p.45) D-18-E, # 4 (p.74) D-18-E-1, # 5 (p.76) D-18-G, # 6 (p.308) D-18-G-1)(dtg) (Entered: 11/03/2023) |
| 11/03/2023 | 88 (p.2408) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio.***D-18-G-2*** (Attachments: # 1 (p.13) D-18-G-3, # 2 (p.43) D-18-G-4, # 3 (p.45) D-18-G-5, # 4 (p.74) D-18-G-6, # 5 (p.76) D-18-G-7, # 6 (p.308) D-18-G-8, # 7 (p.311) D-18-G-9)(dtg) (Entered: 11/03/2023) |
| 11/03/2023 | 89 (p.2416) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio.***D-18-G-10*** (Attachments: # 1 (p.13) D-18-G-11, # 2 (p.43) D-18-G-12, # 3 (p.45) D-18-H, # 4 (p.74) D-18-H-1, # 5 (p.76) D-18-I, # 6 (p.308) D-18-I-1, # 7 (p.311) D-18-I-2, # 8 (p.335) D-18-I-3)(dtg) (Entered: 11/03/2023) |
| 11/03/2023 | 90 (p.2425) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio.***D-19*** (Attachments: # 1 (p.13) D-20, # 2 (p.43) D-21, # 3 (p.45) D-22)(dtg) (Entered: 11/03/2023) |
| 11/03/2023 | 91 (p.2479) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio.***D-23*** (dtg) (Entered: 11/03/2023) |
| 11/03/2023 | 92 (p.2535) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio.***D-24*** (Attachments: # 1 (p.13) D-25)(dtg) (Entered: 11/03/2023) |
| 11/03/2023 | 93 (p.2583) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio.***D-26*** (Attachments: # 1 (p.13) D-27, # 2 (p.43) D-28, # 3 (p.45) D-29, # 4 (p.74) D-30, # 5 (p.76) D-31, # 6 (p.308) D-32)(dtg) (Entered: 11/03/2023) |
| 11/03/2023 | 94 (p.2662) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio.***D-33*** (Attachments: # 1 (p.13) D-34, # 2 (p.43) D-35, # 3 (p.45) D-36, # 4 (p.74) D-37, # 5 (p.76) D-38, # 6 (p.308) D-39, # 7 (p.311) D-40, # 8 (p.335) D-41, # 9 (p.340) D-42, # 10 (p.343) D-43)(dtg) (Entered: 11/03/2023) |

| 11/03/2023 | 95 (p.2701) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio.***D-44*** (Attachments: # 1 (p.13) D-45, # 2 (p.43) D-46, # 3 (p.45) D-47, # 4 (p.74) D-48, # 5 (p.76) D-49, # 6 (p.308) D-50, # 7 (p.311) D-51, # 8 (p.335) D-52, # 9 (p.340) D-53, # 10 (p.343) D-54)(dtg) (Entered: 11/03/2023) |
| 11/03/2023 | 96 (p.2942) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio.***D-55***(dtg) (Entered: 11/03/2023) |
| 11/03/2023 | 97 (p.3085) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio.***D-56*** (Attachments: # 1 (p.13) D-57, # 2 (p.43) D-58, # 3 (p.45) D-59, # 4 (p.74) D-60, # 5 (p.76) D-61, # 6 (p.308) D-62)(dtg) (Entered: 11/03/2023) |
| 11/03/2023 | 98 (p.3102) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by City of San Antonio.***D-63*** (Attachments: # 1 (p.13) D-64, # 2 (p.43) D-64, # 3 (p.45) D-65, # 4 (p.74) D-66, # 5 (p.76) D-67)(dtg) (Entered: 11/03/2023) |
| 11/03/2023 | 99 (p.3120) | EXHIBITS TO PLAINTIFFS PRELIMINARY INJUNCTION HEARING by Gary Perez, Matilde Torres. (Attachments: # 1 (p.13) P-53)(dtg) (Entered: 11/03/2023) |

23-50746.12

# Tab 2

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

Gary Perez and Matilde Torres,

          *Plaintiffs*,

      v.

City of San Antonio,

          *Defendant*.

Case No. 23-cv-00977-FB

## PLAINTIFFS' NOTICE OF APPEAL

Plaintiffs Gary Perez and Matilde Torres appeal to the United States Court of Appeals for the Fifth Circuit from the Partial Order Concerning Preliminary Injunction Issues, entered on October 2, 2023, (Dkt. 47) and Opinion and Order Granting in Part and Denying in Part Plaintiffs' Request For Preliminary Injunction, entered on October 11, 2023 (Dkt. 52).

Dated: October 16, 2023

Respectfully submitted,


  /s/ *Jonathan D. Guynn*

Mark W. Rasmussen
Texas State Bar No. 24086291
Jonathan D. Guynn
Texas State Bar No. 24120232
Chance McCraw
Texas State Bar No. 24125807
Timothy M. Villari
Texas State Bar No. 24125870
JONES DAY
2727 North Harwood Street
Dallas, TX 75201.1515
Telephone: +1.214.220.3939
E-mail: mrasmussen@jonesday.com
E-mail: jguynn@jonesday.com
E-mail: cmccraw@jonesday.com
E-mail: tvillari@jonesday.com

John Greil
Texas State Bar No. 24110856
Steven T. Collis
Texas State Bar No. 24122632
Law & Religion Clinic
University of Texas School of Law
727 East Dean Keeton St.
Austin, TX 78705
Telephone: +1.512.471.5151
E-mail: john.greil@law.utexas.edu
E-mail: steve.collis@law.utexas.edu


ATTORNEYS FOR PLAINTIFFS

2

23-50746.1048

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on October 16, 2023, I electronically filed the foregoing Plaintiffs' Notice of Appeal with the Clerk of the United States District Court for the Western District of Texas using the CM/ECF system, which will send notification of such filing to counsel of record.

*/s/ Chance B. McCraw*

Attorney for Plaintiff

23-50746.1049

# Tab 3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **GARY PEREZ and MATILDE TORRES,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. SA-23-CV-977-FB** |
| | § | |
| **CITY OF SAN ANTONIO,** | § | |
| | § | |
| **Defendant.** | § | |

<u>**PARTIAL ORDER CONCERNING PRELIMINARY INJUNCTION ISSUES**</u>

After a four-day preliminary injunction hearing, the Court finds two issues which need to be addressed now due to time constraints.  There will follow a more thorough and detailed analysis, opinion and order.

This case involves competing interests of constitutionally protected religious exercise and compelling government responsibilities to protect public health and safety.

Plaintiffs want to resume their historic access to a sacred site in Brackenridge Park which is presently fenced off in anticipation of restorative construction to begin as soon as all permits are obtained.  The site is depicted in Plaintiffs' Exhibit 58 attached hereto and comprises an approximate 20-foot-by-30-foot rectangular plot out of two acres of land located between two bald cypress trees. Defendant City contends that one of the trees, number 129, poses a risk of injury or death because of a large broken limb which the evidence showed can be removed quickly and must be done before the area can be reopened to the general public irrespective of the religious free exercise matter before the Court.

The immediate desire of the City is to resume bird deterrent operations to comply with the Migratory Bird Treaty Act and to prevent large amounts of foul fowl feces making the area unhealthy for humans, especially the Court notes for toddlers who put anything and everything in their mouths.

Concerning access for Plaintiffs' religious exercise, the Court finds that Plaintiffs have a sincere religious belief and are entitled to be present at the site on the dates of November 17 and December 21, 2023. Plaintiffs, through their counsel, shall keep the City and the Court informed of other proposed dates. The Court will address other issues during construction and as is suggested later in this Order.

To comply with the Court's Order, the City shall:

1. Immediately remove the broken limb on Tree 129.

2. Install a gate in the fence depicted in Plaintiffs' Exhibit 58. The gate may remain locked except in the designated Plaintiffs' access time and dates.

As the construction time approaches, the City shall explore whether the sacred site can be separately fenced off with fencing from the street on the exterior side of the trunks of the two trees to the riverbank, and if not, why not.

With regard to bird deterrence, the Court finds a serious public health risk exists which surpasses Plaintiffs' desire to have the double-crested cormorant present for their dropped feathers which no doubt Plaintiffs already have or can be found in other locations. Accordingly, the City may resume bird deterrent operations, except for the dates on which Plaintiffs religious ceremonies occur.

Finally, the Court makes this observation: Spiritual reflection and connection contemplate being done in the quiet of a forest or a traditional house of worship. Because of the publicity this matter has engendered, the Court predicts Plaintiffs' time in the sacred area will be disruptively accompanied by television camera crews, other members of the press and the general public who are

23-50746.737

also protected by the First Amendment of our Bill of Rights. Plaintiffs' religious experience may not be as satisfactory as hoped for.

Following the example of another individual who had to make difficult decisions, it is so ORDERED.  1 *Kings* 3:16-28.

SIGNED this 2nd day of October, 2023.

_____
FRED BIERY
UNITED STATES DISTRICT JUDGE

23-50746.738



23-50746.739

# Tab 4

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **GARY PEREZ and MATILDE TORRES,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. SA-23-CV-977-FB** |
| | § | |
| **CITY OF SAN ANTONIO,** | § | |
| | § | |
| **Defendant.** | § | |

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' REQUEST FOR PRELIMINARY INJUNCTION

"When asked by an anthropologist what the Indians called America
before the white men came, an Indian said simply, 'Ours.'"[1]

****************

"You can please some of the people some of the time,
all of the people some of the time, some of the people all of the time,
but you can never please all of the people all of the time."[2]

****************

Plaintiffs seek a preliminary injunction requesting three items of relief:

1.     Restore access for religious services in the Sacred Area, which is the northernmost point on the south bank of the San Antonio River.

2.     Preserve the spiritual ecology of the Sacred Area by minimizing tree removal.

3.     Preserve the spiritual ecology of the Sacred Area by allowing cormorants to nest.

---

[1]  Quotation attributed to Vine Deloria, Jr.; *SEE* VINE DELORIA, JR., CUSTER DIED FOR YOUR SINS: AN INDIAN MANIFESTO  (MacMillan, 1971).

[2]  Quotation often attributed to Abraham Lincoln, though there is no verifiable historical source to support such attribution.

To achieve the request, Plaintiffs ask the Court to "order the City to grant access to the plaintiffs to the Sacred Area and reevaluate the Bond Project to develop alternative plans that will accommodate our clients' religious beliefs."[3]

During and following a four-day preliminary injunction hearing, the Court thoroughly reviewed the testimony, exhibits, legal authorities and arguments of counsel.

Plaintiffs and Defendant have filed Proposed Findings of Fact and Conclusions of Law supporting their respective positions and the legal authorities and bases therefor. (Docket entries 31 and 32.) They are attached hereto and made a part hereof. *See also* Partial Order Concerning Preliminary Injunction Issues at Docket entry 47.

Concerning the historical background facts included in both submissions, the Court finds them to be accurate and adopts them as its own.

With reference to Item 1, "access for religious services in the Sacred Area," the Court finds that Plaintiffs have a sincere religious belief and have met their burden to prove the four elements for injunctive relief. The Court adopts as its own Plaintiffs' Proposed Findings of Fact and Conclusions of Law and the legal authorities cited to support granting access for "religious services" involving 15 to 20 people for no more than an hour on specified astronomical dates coinciding with Plaintiffs' spiritual beliefs. Plaintiffs shall provide those dates in advance to the City during the pre-construction and construction periods so that Plaintiffs may be accommodated for entry to the Sacred Area and appropriate security provided. Plaintiffs' request for access in Item 1 is GRANTED.

The testimony also evidenced that there are other indigenous people who share Plaintiffs' beliefs but reside far away from the Sacred Area. Nevertheless, they exercise the same religious

---

[3] Plaintiffs' Closing Argument, Realtime Unedited Transcript, September 29, 2023, at page 778, lines 4-7.

ceremonies.  Those facts support the City's argument that Plaintiffs can temporarily be accommodated in other parts of Brackenridge Park.  However, out of an abundance of legal caution and respect for Plaintiffs' beliefs, the Court reaffirms its granting of Plaintiffs' requested Item 1.

The Court also heard some testimony concerning all-night ceremonies involving consumption of peyote, which is a legal substance for indigenous people.  The Court will defer ruling on that issue while awaiting further advice from counsel whether that type of event has been allowed or occurred before the fencing was erected, it being the Court's recollection that there is some restriction of the Park's nighttime use.

To the extent there was some mention of access for individual worship during the construction period, it was not in Plaintiffs' Closing Argument request, is deemed waived and the equities support the conclusion that individual access at any time Plaintiffs desire is impractical and is DENIED.  The Court notes that both Plaintiffs also practice Roman Catholicism whose places of worship provide numerous locations for individual meditation and worship.  Moreover, Plaintiffs and the general public still have access to over 300 acres of Brackenridge Park for meditation in nature.

For the safety of Plaintiffs and the security of the City's property during the construction period, the City may, if it chooses, erect additional fencing perpendicular to the existing fencing at the Sacred Area.

Item 2 and Item 3 have to do with the spiritual ecology of the Sacred Area.  Clearly the area does not look the same as it did thousands of years ago in the cave painting exhibit.  Nor does it look the same as 100 years ago when there really was a beach as depicted in various exhibits.  Nor will it look the same 100 years from now.

-3-

Central to Plaintiffs' spiritual ecology is the San Antonio River, also referred to by Plaintiffs as Mother Waters. Many religions see water as the wellspring of life, as indeed it is, and incorporate water into their faith traditions: The Ganges River for Hindus, Roman Catholicism Holy Water, the mikveh bath in Judaism, water as a symbol of Allah paradise in Islam, baptismal immersion and sprinkling in Protestant ceremonies and water as symbols of purity and compassion in Buddhist thought.

The most important part of Plaintiffs' spiritual ecology is the confluence of the shape of the Mother Waters at the bend of the San Antonio River with the shape of the Eridanus constellation of stars.

Given the current extended drought, the lack of water flow from the Blue Hole Springs and other natural sources, there would be no San Antonio River/Mother Waters but for the City artificially assisting the river by pumping recycled waste water, presumably from the sewer reclamation system. It is not particularly holy water nor the purity of the spring water Plaintiffs would like, but better than a dry riverbed. This creates something of a secular/religious symbiotic relationship between Plaintiffs and Defendant until it rains, the springs come to life and until the reformation and resurrection of the Project Area is complete. Amen.

Regarding Plaintiffs' requested Item 3, the Court heard credible testimony of thousands of egrets, herons, and cormorants and their excrement nesting in the Project Area during their migrations at different times of the year. Once nested, the Migratory Bird Treaty Act precludes removal. The Court finds the bird deterrent operation is in the realm of public health and safety. To grant Plaintiffs' relief regarding Item 3 would effectively put the Project on hold ad infinitum, given the different species' migration patterns and the Migratory Bird Treaty Act. There could not be an eight month window of opportunity to accomplish the Project.

-4-

With reference to Item 2 and Item 3 of Plaintiffs' requested relief, the Court finds the City has met its burden of proving a compelling government interest for public health and safety, and the equities favor the City on those two items. The Court adopts as its own the City's Proposed Findings of Fact and Conclusions of Law and the legal authorities cited regarding Plaintiffs' requested Item 2 and Item 3. Accordingly, those requests by Plaintiffs are DENIED.

Moreover, Plaintiffs desire possibly to save trees by ordering the City to "reevaluate the Bond Project to develop alternative plans" would, given the lengthy redesign and re-permitting processes, exponentially extend Plaintiffs' and the public's presently fettered ability to enjoy the area. The temporary closing becomes semi-permanent. Instead of months, access would likely remain limited for years, as is the case of the faithful who find the Notre Dame Cathedral to be their sacred place and who for several years will have to use alternative places of worship. By its Order, it is the Court's intent to make the fettered unfettered as soon as reasonably possible. It will be up to the parties to decide how long they wish to delay the unfettered with continuing litigation.

Accordingly, IT IS HEREBY ORDERED that Plaintiffs' Motion for Preliminary Injunction (docket entry 5) is GRANTED IN PART and DENIED IN PART as set forth herein.

No bond shall be required.

It is so ORDERED.

SIGNED this 11th day of October, 2023.

_____
FRED BIERY
UNITED STATES DISTRICT JUDGE

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I.  **Proposed Findings of Fact**[1]

A.  **The Parties**

1.  Plaintiff Gary Perez ("Perez") is a descendant of the indigenous people of North America, resident of the City, and member of the Lipan-Apache Native American Church ("Native American Church").

2.  Perez serves as the principal chief and cultural preservation officer for the Pakahua/Coahuiltecan Peoples of Mexico and Texas and for the Indigenous Governors' office for the State of Coahuila Mexico.

3.  Perez is a published researcher who deciphered elements of the Native American Church's theology and archaeology.

4.  Perez has worshipped and led religious ceremonies in Brackenridge Park ("Park") for at least 25 years.

---

[1] To the extent any of the following findings of fact constitute conclusions of law, they are adopted and treated as such.

5.      Plaintiff Matilde Torres ("Torres") (together with Perez, "Plaintiffs") is a descendant of the indigenous people of North America, resident of the City, and member of the Native American Church and the Pakahua Peoples of Mexico and Texas.

6.      Torres has worshipped and participated in religious ceremonies in the Park for at least 10 years. She is a respected leader in her religious community, and regularly organizes, leads, and serves as a water bearer for religious services.

7.      Defendant City of San Antonio (the "City") is a municipal government entity in Bexar County, Texas.

8.      The City is responsible for the policies developed and implemented through its officers, employees, agents, and departments, including the Department of Parks and Recreation, Public Works Department, Office of Historical Preservation, Development Services Department, and Historic Design and Review Commission.


**B.      The Park**

9.      The Park exists on land that has been inhabited and utilized by indigenous peoples for thousands of years.

10.      The Park officially was established and began to assume its current form in 1899 when George Brackenridge donated 199 acres of land to the City. The City bought or received bequests of additional acreage over the next two decades, which expanded the Park to its current size of approximately 343 acres.

11.      The San Antonio River flows through the Park.

12.      Approximately 83 trees currently exist in the Lambert Beach Area.

13.      The Park contains manmade structures, including retaining walls along the San Antonio River. The retaining walls along the San Antonio River were constructed to protect trees that existed and grew on the bank of the San Antonio River.

14.     An area within the Park is called Lambert Beach ("Lambert Beach Area"). The Lambert Beach Area is the location in dispute in this litigation. It is a place where Plaintiffs and other members of the Native American Church believe they must gather to worship and perform religious ceremonies. It is also the place where the City wishes to make extensive changes and renovations to the natural environment and manmade structures within the Park.

15.     The Park is listed on the National Register of Historic Places and is a Texas State Antiquities Landmark.

16.     The State of Texas and United States government provide a portion of the funding that is used to repair, enhance, maintain, and operate the Park.

17.     Travel to the Park and commercial activity within the Park affects commerce with foreign nations, among the several states, or with Indian tribes. Peyote pilgrims from around North and Central America visit the Park, as well as the nearby Blue Hole spring, to perform religious ceremonies on their way to the peyote gardens.

### C.     Wildlife Management in the Park

18.     To deter migratory birds from feeding, roosting, nesting, or inhabiting the Lambert Beach Area, the City contracted with the U.S. Department of Agriculture ("USDA") and coordinated with the Texas Parks and Wildlife Department and U.S. Fish and Wildlife Service.

19.     The City and its agents have engaged in "habitat modification" within the Park, which included removing nests, clearing underbrush, and removing dead wood from the tree canopy to discourage nesting in the Lambert Beach Area.

20.     The City uses bird deterrent techniques in the Lambert Beach Area, including pyrotechnics, clappers, spotlights, lasers, distress calls, effigies, balloons, explosives, and drones.

21.     The USDA holds wildlife take permits, which authorize the use of lethal force to deter birds from nesting or inhabiting the Lambert Beach Area.

### D.    The 2017 Bond Project

22.    In late 2016 and early 2017, the City engaged in public outreach regarding its desire to make changes to the Park, including the Lambert Beach Area. To that end, the City hosted several meetings with City residents and other stakeholders where the City tried to gain support to make certain changes in the Park.

23.    As part of its promotional efforts, the City did not identify public health or safety as a reason for making changes in the Park.

24.    On February 21, 2017, the City published the Brackenridge Park Master Plan, which synthesized the promotional messages and public feedback regarding the City's public outreach regarding the City's desire to make changes to the Park. The Brackenridge Park Master Plan does not identify public health or safety as a reason to make changes in the Park. Rather, the City distilled three "approved public strategies" as guideposts for the City's further efforts to secure funding and define a scope of work to achieve the City's desired changes within the Park: (1) restoration of natural park features; (2) restore, preserve, and articulate park cultural and historic features; and (3) increase visibility and pedestrian access to / within the park.

25.    In May 2017, the citizens of San Antonio voted in favor of a $850 million bond package for public improvements.

26.    Proposition 3 of the bond package was dedicated to "improvements to parks, recreation, and open spaces," including $7,750,000 for use at the Park to make "[g]eneral park improvements and rehabilitation which may include historic river walls, restrooms, trails and historic structures."

27.    Consistent with the Brackenridge Park Master Plan that was published earlier in 2017, the City did not promote Proposition 3 to San Antonio voters by identifying public health or safety as a purpose for voting for this portion of the bond package.

28. After voters passed Proposition 3, the City began developing the Brackenridge Park 2017 Bond Project (the "Bond Project").

29. The City requires a permit from the U.S. Army Corps of Engineers ("USACE") before it can begin repairing or reconstructing walls, or removing or relocating trees within the Lambert Beach Area. The City has not submitted a final "Treatment Plan" to USACE, which is needed before the City can obtain a permit from USACE.

30. Once USACE approves the final Treatment Plan, which approval is not anticipated to be given until months after submission, a 30-day comment period will begin to solicit feedback from stakeholders, including local indigenous tribes.

31. The City's plan for the Bond Project includes the repair or rebuilding of certain portions of retaining walls along the San Antonio River, including in the Lambert Beach Area.

32. The City's plan for the Bond Project includes the removal or relocation of 69 trees that currently exist within the Lambert Beach Area.

33. Of the 83 trees that currently exist in the Lambert Beach Area, only 14 trees will be preserved in place.

34. Of the 69 trees that the City currently plans to remove or relocate from the Lambert Beach Area, the City's "primary purpose" for removing 31 of the trees is because the City has concluded that removal is needed to address the requirements for heavy construction related to the City's chosen engineering solution to repair or rebuild retaining walls along the San Antonio River.

35. Of the 69 trees that the City currently plans to remove or relocate from the Lambert Beach Area, the City's "primary purpose" for removing 28 of the trees is because the City has concluded that removal is needed for trees (i) within a few feet of a historically significant structure

that requires rehabilitation, (ii) that are causing or have caused damage to resources, or (iii) that will cause future damage if left in place.

36. Of the 69 trees that the City currently plans to remove or relocate from the Lambert Beach Area, the "primary purpose" for removing 4 of the trees is because the City has concluded that removal is needed because the trees are an invasive species.

37. The City applied for, and received from the Development Services Department, a variance from a City Unified Development Code provision that requires 80% significant tree preservation and 100% heritage tree preservation for projects within the 100-yr floodplain.

38. The Development Services Department granted that variance based on a discretionary, individualized assessment.

39. The City's current plan for the Bond Project includes bird mitigation and wildlife management measures within the Lambert Beach Area intended to deter migratory birds from feeding, roosting, nesting, or inhabiting the Lambert Beach.

40. Pursuant to the Migratory Bird Treaty Act, the removal or relocation of trees planned for the Lambert Beach Area cannot proceed if migratory birds, including cormorants, are nesting in the area.

**E.    Plaintiffs' Sincerely Held Religious Beliefs**

41. Plaintiffs are practitioners of the Native American Church.

42. Members of the Native American Church, including Plaintiffs, believe in the teachings and perform the religious ceremonies of indigenous and Christian faith traditions.

43. Plaintiffs believe that life in the region of San Antonio began at a spring, now called Blue Hole, which is north of the Park and situated on the campus of the University of the Incarnate Word.

44. Plaintiffs believe that a spirit in the form of a blue panther lived in the Blue Hole. Plaintiffs believe, a spirit in the form of a cormorant visited the Blue Hole. Plaintiffs believe that the blue panther scared the bird, and as it fled, water droplets from its tail scattered across the San Antonio River Valley, including the area that now comprises the Park, spurring life in the region.

45. Plaintiffs believe that a riverbend located in the Park, specifically within the Lambert Beach Area, mirrors the celestial constellation Eridanus and is where a unique connection exists between the physical and spiritual worlds.

46. Plaintiffs believe that this riverbend is sacred and that they are required to gather, worship, and conduct religiously important ceremonies there.

47. Plaintiffs believe that certain of the religious ceremonies that they are required to perform can only be accomplished at this riverbend that is located within the Lambert Beach Area.

48. Plaintiffs believe that a physical location's capacity to function as a holy place relies on the presence of trees, birds, and other natural features that are part of a "spiritual ecology" of the location, which enables people to commune with the spiritual world and orient themselves in reality when they are present at the location.

49. Plaintiffs believe that cormorants tell the life-creation story through their presence and nesting in the area of the river bend. Accordingly, Plaintiffs believe that certain religious ceremonies that must be performed according to their religious beliefs cannot be properly administered without the presence of cormorant presence, nesting, and habitat.

50. Plaintiffs believe that the Park is a significant site for "peyote pilgrims" and they regularly act as religious leaders and guides to individuals who have traveled to the Park, often unannounced.

### F.     The City's Bond Project Substantially Burdens Plaintiffs' Religious Exercise

51.     Since at least February 2023, the City has prevented Plaintiffs, Native American Church members, and peyote pilgrims from entering the Lambert Beach Area.

52.     Because Plaintiffs have not been permitted to access the southern bank of the riverbend within the Lambert Beach Area, Plaintiffs have been unable to perform religious ceremonies that they believe are religiously necessary or Plaintiffs have been forced to perform religious ceremonies in a different location, which Plaintiffs believe is not religiously acceptable.

53.     Due to their inability to enter the southern portion of the Lambert Beach Area, Plaintiffs have also been unable to minister fully to peyote pilgrims and members of the Native American Church. Plaintiffs are also often presented with requests from local adherents, such as a birthday blessing, that they are unable to perform at the Lambert Beach Area.

54.     According to Plaintiffs' beliefs, the City's current plan to remove or relocate 69 trees from the Lambert Beach Area will permanently disrupt the "spiritual ecology" of the riverbend within the Lambert Beach Area and render the area spiritually inert, making it impossible for Plaintiffs to perform religious ceremonies that they believe are religiously necessary.

55.     According to Plaintiffs' beliefs, the City's current plan to deter migratory birds, especially cormorants, from feeding, roosting, nesting, or inhabiting the Lambert Beach Area will permanently disrupt the "spiritual ecology" of the riverbend within the Lambert Beach Area and render the area spiritually inert, making it impossible for Plaintiffs to perform religious ceremonies that they believe are religiously necessary.

**G.      The City's Design and Implementation of the Bond Project Are Not Neutral or Generally Applicable**

56.      The City will not remove or relocate trees that have migratory or endangered birds nesting in them, but does not provide similar protection for trees that have cormorants nesting in them or that are otherwise essential to Plaintiffs' religious practice.

57.      The City has fenced off the southern portion of the Lambert Beach Area, where Plaintiffs must perform religious ceremonies, because of purported public safety risks from dead or dying trees or due to forthcoming construction, yet the City has failed to fence off many portions of the Park that contain trees posing as great a public safety risk, or greater public safety risk, as compared to the trees inside the Lambert Beach Area.

58.      Homer Garcia, the City's head of Parks and Recreation, has sole discretion to allow or disallow access to the Lambert Beach Area.  There is no formal criteria that Mr. Garcia utilizes to adjudicate requests to enter the Lambert Beach Area.

59.      An examples of this discretion the City has permitted a San Antonio councilwoman to enter the fenced-in Lambert Beach Area without personal protective equipment for a thirty to sixty minute period during which the councilwoman and arborists walked on the south bank, but has refused to grant Plaintiffs the same access.

60.      The City has also permitted Shanon Miller to enter the fenced-in Lambert Beach Area without personal protective equipment, and she walked the area freely accompanied by an arborist.

61.      In contrast, the Plaintiffs offered to follow the same protocols in their requests to enter the Lambert Beach Area on August 12, 2023 and September 21, 2023. The City denied Plaintiffs's request to access the Lambert Beach Area on the same terms that the City permitted the councilwoman and Shanon Miller to enter the Lambert Beach Area.

62.     Plaintiffs have participated in many private and public meetings with the City's employees and agents related to the Bond Project, including a July 29, 2022 meeting with the Department of Parks and Recreation, an April 19, 2023 Historic Design and Review Commission hearing, and an August 3, 2023 City Council hearing, in which they have explained their religious beliefs and practices and how the Bond Project burdens their religious practice.

63.     On May 23, 2023, Plaintiffs sent the City a letter explaining their religious beliefs and practices and detailing how the current Bond Project proposal would prevent them from practicing their religion, and how the proposal violates their rights under federal and state law.

64.     After learning of Plaintiffs' religious objections to the City's current plan for the Bond Project, the City did not commission a study to determine if the Bond Project could be completed if the priority was ensuring that the cormorants could inhabit the Park after the Bond Project was completed.

65.     After learning of Plaintiffs' religious objections to the City's current plan for the Bond Project, the City did not commission a study to determine if the City could achieve its governmental purposes related to the Bond Project while also accommodating Plaintiffs' religious exercise.

66.     One of the City's departments is the Office of Historic Preservation. The mission of the Office of Historic Preservation "is to safeguard the cultural, economic, and environmental sustainability that preserves San Antonio's unique sense of place, economic competitiveness, and authenticity."

67.     To accomplish that mission, the Office of Historic Preservation investigates claims by San Antonio Residents regarding the historic or cultural significance of buildings or property within City limits. Yet, after learning of Plaintiffs' statements about the historic, cultural, and

religious significance of the Lambert Beach Area, the Office of Historic Preservation did not attempt to investigate or verify Plaintiffs statements.

68.     The alleged risks present in the Lambert Beach area may also be present in other areas of Brackenridge Park that are not fenced off.

69.     Going back to 2017, the City has made revisions to its plans for the Bond Project in response to comments received from the public. But the City has not made any changes to its plans for the Bond Project to accommodate Plaintiffs' religious exercise.

**H.     The City's Design and Implementation of the Bond Project Are Not Justified by a Compelling Governmental Interest**

70.     The City's employees are unable to articulate a non-generalized public safety justification, if any at all, for the City's decision to deny Plaintiffs access to the southern bank of the Lambert Beach Area.

71.     The City is not performing construction on the overwhelming majority of the walls on the southern bank of Lambert Beach Area because they are not a threat to public safety. The limited construction that the City is performing on the southern bank of the Lambert Beach area is planned to occur in a small area on the east side of the southern bank of the Lambert Beach Area.

72.     The City is removing small species trees, such as crepe myrtles, from the southern bank of the river that do not require large equipment to remove and these trees do not pose a threat to public safety.

73.     The City has been aware of a moderately-sized hanging branch from a bald cypress tree on the southern bank of the river since at least August 12, 2023, but has refused to remove the branch. Yet, the City has trimmed other areas of the Lambert Beach Area during this time.

74.     The City has not attempted to request permission from the Historic Design and Review Commission to conduct tree risk mitigation work in the Lambert Beach Area that would eliminate the purported tree risk in the area.

75.     The City erected fencing around the southern portion of the Lambert Beach Area in February 2023 to protect its bird deterrence equipment and staff, not to protect the public from any risk of zoonotic disease from birds or danger from trees or future construction.

76.     The City did not task its Tree Assessment Committee with evaluating individual tree risk based on present conditions.

77.     The City fenced off the southern portion of the Lambert Beach Area without any arborist conducting a risk assessment of any tree.

78.     The City did not task its Tree Assessment Committee with evaluating individual tree risk based on present conditions.

79.     The City has failed to demonstrate a substantial threat of zoonotic disease from cormorants in the Lambert Beach Area. The City did not demonstrate that histoplasmosis, salmonella, or psittacosis pose substantial risk to humans if contracted. The City failed to demonstrate that those any such dangers could not be easily prevented.

80.     The City relies solely on visual assessments to determine risk from bird feces on surfaces.

81.     The City's water quality information does not indicate the source of problematic contributions to bacteria levels. The data does not distinguish avian from non-avian sources, does not distinguish cormorant from other bird sources, and does not identify what amount of contribution wildlife from Brackenridge Park Zoo contributes.

82.    The City's internal documents discuss issues relating to feces with respect to egrets and herons, not cormorants.

83.    The City's urban rookery management plan identifies egrets and herons, and not cormorants, as problematic bird species. The City's public statements have stated that the largest issues are caused by cattle egrets and snowy egrets.

**I.    The City's Design and Implementation of the Bond Project Are Not Adequately Tailored to Achieve a Compelling Governmental Interest**

84.    The City erected fencing around the entirety of the Lambert Beach Area, instead of around locations it deems hazardous. The enclosed project area includes areas that no qualified arborist or engineer has deemed dangerous.

85.    The City was presented with at least three engineering solutions that it could use to repair or reconstruct retaining walls within the Lambert Beach Area.

86.    The City rejected two engineering solutions without performing detailed studies or reviews due to cost considerations and because the City believed that it would be more difficult to obtain approval from regulatory agencies to implement those two engineering solutions.

87.    The City selected a third engineering solution that requires extensive excavation and, according to the City, necessitates significant loss of tree and bird life within the Lambert Beach Area.

88.    One of the engineering solutions that the City rejected involves the construction of concrete piers to support the retaining walls. This solution reduces the amount of excavation required and thus reduces the destruction of trees and the disruption to bird life in the Lambert Beach Area.

89.    Once completed, both of the engineering solutions that the City rejected are equally safe or more safe for the public as compared to the City's chosen engineering solution.

90.     The City's chosen engineering solution causes the most damage to the largest number of trees and birds of the known available alternatives. It is the most damaging proposal to the Lambert Beach Area's spiritual ecology, and Plaintiffs' religious exercise, of all the options that have been proposed to the City.

91.     Alternative engineering solutions could preserve more trees and reduce the damage to birds at Lambert Beach.

92.     The City did not task its Tree Assessment Committee with determining whether alternative plans could preserve more trees.  Instead, it instructed the arborists to take the existing design plan for repairing or reconstructing retaining walls as a given.

93.     The City knows that egrets nest earlier than cormorants, but has not tried to tailor deterrence activities to minimize the presence of egrets while allowing cormorants in the area.

94.     The City acknowledges that a single nest does not present a health risk, but nonetheless has the bird deterrence goal of no nesting.

95.     The City has the ability to deviate from the Secretary of the Interior's guidelines if it needs to in order to accommodate Plaintiffs' religious exercise, but it has chosen not to do so.

96.     The City has been aware that the Bond Project would violate Plaintiffs' religious rights since at least July 29, 2022, when Perez made a presentation to the Department of Parks and Recreation regarding his religious beliefs and practices.

97.     The City has been aware that the Bond Project would prevent the religious exercise of members of the Native American Church since at least June 16, 2022, when City employees circulated a letter sent by the Comanche Nation objecting to Bond Project on religious grounds.

98.     On May 23, 2023, Plaintiffs sent a letter to the City outlining the harm that the current plan for the Bond Project would do to their religious exercise.

99.     The City has refused to accommodate Plaintiffs' religious exercise.

100.    The City made no changes to its bird deterrence measures or the Bond Project in response to the religious objection letter from the Comanche Nation.

101.    The City never requested that any arborist or engineer attempt to accomplish the City's goals with respect to bird deterrence, Bond Project construction, or safety fencing, while accommodating Plaintiffs' religious practice.

102.    The City never informed the United States Department of Agriculture, the Texas Parks and Wildlife department, or the Unites States Fish and Wildlife Service of Plaintiffs' religious beliefs and practices.

103.    The City never asked an employee arborist or independent arborist what safety measures could be taken to allow Plaintiffs' ceremonies on August 12, 2023 or September 21, 2023 to be performed safely.

104.    The City has made no changes to its bird deterrence, fencing, or Bond Project design in response to Plaintiffs' religious practice. .

## II.     Proposed Conclusions of Law[2]

### A.     Legal Standard for Granting A Preliminary Injunction

1.      A party seeking a preliminary injunction must establish four elements:  (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

---

[2] To the extent any of the following conclusions of law constitute findings of fact, they are adopted and treated as such.

2.      Plaintiffs are substantially likely to succeed on the merits.

3.      There is a substantial threat of irreparable injury to the plaintiffs if the injunction is not granted.

4.      The threatened injury to Plaintiffs religious exercise if the injunction is denied outweighs any harm that will result if the injunction is granted.

5.      Granting the injunction in Plaintiffs' favor will prevent the violation of constitutional rights and will serve the public interest.

**B.      Texas Constitution, Tex. Const. art. I, § 6-a & Tex. Civ. Prac. & Rem. Code § 110.0031**

6.      Plaintiffs have sincere religious beliefs and practices that originate and are related to the land on which the Park and Lambert Beach Area now sits. Plaintiffs' performance and compliance with these beliefs is a religious exercise.

7.      The Bond Project prevents, prohibits, and limits Plaintiffs' religious services.

8.      Plaintiffs are members of a religious organization, the Native American Church, that was established to support and serve the propagation of sincerely held religious beliefs.

9.      The southern portion of the Lambert Beach Area is the location on which Plaintiffs have and must gather to worship and conduct religious ceremonies.

10.      The City's fencing off of the southern portion of the Lambert Beach Area has the effect of closing Plaintiffs' place of worship.

**C.      Texas Religious Freedom Restoration Act ("TRFRA"), Tex. Civ. Prac. & Rem. Code § 110.003(a), (b)**

11.      Plaintiffs have sincere religious beliefs and practices that originate and are related to the river bend located in the Lambert Beach Area, and the presence and nesting of cormorants in that area.

12. Plaintiffs perform ceremonies on the southern portion of the Lambert Beach Area that are motivated by sincere religious belief. Some of those ceremonies require the presence and nesting of cormorants for Plaintiffs to sufficiently perform their ceremonies.

13. By fencing off the southern bank of the Lambert Beach Area, the City has substantially burdened Plaintiffs' religious exercise by prohibiting their exercise at risk of criminal and civil punishment for entering the area. By destroying the cormorants' habitat through excessive tree destruction and bird mitigation, the City has burdened Plaintiffs' religious exercise by forcing them to modify their religious ceremonies. Plaintiffs believe that the spiritual ecology of the Lambert Beach Area requires the presence and nesting of cormorants, and that without that presence and nesting, Plaintiffs must change their ceremonies and the meaning of their ceremonies to incorporate that degradation. The Bond Project as currently proposed and bird mitigation to eliminate cormorant presence and nesting would end the ability of Plaintiffs to perform religious ceremonies as they know them.

14. The City has no compelling interest for designing or implementing the Bond Project as it is currently iterated, for conducting bird mitigation that would completely eliminate the presence and nesting of cormorants in the Lambert Beach Area, for preventing Plaintiffs from accessing the southern bank of the Lambert Beach Area, or for failing to accommodate Plaintiffs' religious exercise. The City's has vague and general conception of public safety focused on crumbling riverbank walls and falling trees that is the type of "broadly formulated interest" that is insufficient to satisfy strict scrutiny. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006). So too with the general interest in "public health" the City generally associates with migratory birds.

15.     The proper interest to analyze is "the asserted harm of granting specific exemptions to particular religious claimants." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1881 (2021). Here, as to access, that means determining whether the City has a public safety interest in denying access to the southern bank of the Lambert Beach Area for 15 individuals for 15 minutes under the watch of a certified arborist. As to the bird mitigation, it means whether the City has demonstrated that its public health goals cannot be reached unless a zero-cormorant population is achieved in the Lambert Beach Area. As to the Bond Project, it means whether each tree that serves as a potential nesting location for cormorants poses an independent safety hazard or prevents a real safety hazard from being remedied.

16.     TRFRA "places the burden of proving a compelling state interest on the government." *Barr v. City of Sinton*, 295 S.W.3d 287, 307 (Tex. 2009). But the City must support its asserted interest by providing evidence "with respect to 'the particular practice at issue.'" *Id.* "[S]peculation is insufficient to satisfy strict scrutiny." *Fulton*, 141 S.Ct. at 1882.

17.     The City has not only failed to meet its evidentiary burden; it has affirmatively disclaimed its burden altogether. As to access, City witnesses conceded that there would not be a safety risk of allowing Plaintiffs to perform a 15–20 minute ceremony in the southern bank of the Lambert Beach Area. The City's own public documents identify egrets and herons—and not cormorants—as the potential health concerns (notwithstanding the City's failure to establish that birds pose any significant public health hazard in Brackenridge Park). As for the removal or relocation of trees pursuant to the Bond Project being necessary for public safety, the City did not assert that interest at any public point until this litigation commenced.

18.     The Bond Project is not narrowly tailored to achieve any compelling interest that the City may have for implementing it. Furthermore, the City refused to consider or implement

alternatives that would accomplish the City's stated interest in the Bond Project while also preserving Plaintiffs' religious liberty rights. In fact, the City has never undertaken a study to see whether the Bond Project could proceed in a manner that accommodates Plaintiffs' religious exercise.

> **D.     First Amendment of the U.S. Constitution,** *see* **U.S. Const. amend. I**

19.     Plaintiffs have sincere religious beliefs and practices that originate and are related to the land on which the Park and Lambert Beach Area now sits. Plaintiffs' performance and compliance with these beliefs is a religious exercise.

20.     By fencing off the southern bank of the Lambert Beach Area, the City has substantially burdened Plaintiffs' religious exercise by prohibiting their exercise at risk of criminal and civil punishment for entering the Lambert Beach Area.

21.     By destroying the cormorants' habitat through excessive tree destruction and unnecessary bird mitigation, the City has burdened Plaintiffs' religious exercise by forcing them to modify their religious ceremonies.

22.     Plaintiffs believe that the spiritual ecology of this sacred area requires the presence and nesting of cormorants, and that without that presence and nesting, Plaintiffs must change their ceremonies and the meaning of their ceremonies to incorporate that degradation. The Bond Project as currently proposed and bird mitigation to eliminate cormorant presence and nesting would end the ability of Plaintiffs to perform religious ceremonies as they know them.

23.     The City's design and implementation of the Bond Project is not neutral or generally applicable.

24.     "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1877 (2021) (internal

quotation marks and alterations omitted). The City applied for, and received from the Development Services Department, a variance from a City Unified Development Code provision requiring 80% significant tree preservation and 100% heritage tree preservation for projects within the 100-yr floodplain, in a discretionary, individualized determination. That variance rendered the Bond Project and its implementation not generally applicable.

25.     The City has engaged in preferential treatment for secular values and activities that it has refused to Plaintiffs' religious exercise. Namely, the City permits citizens to enter the Lambert Beach Area for secular reasons but denies Plaintiffs entry into the Lambert Beach Area to engage in their religious exercise. The City seeks to preserve structures, such as retaining walls that it believes have historic and cultural significance, while destroying trees and driving away birds that are historic, culturally significant and sacred to Plaintiffs. The City is apathetic to the burdens it has and continues to inflict on Plaintiffs' religious exercise and has not investigated or treated Plaintiffs' claims of historic and cultural significance in the way that it treats the claims of other City residents. Likewise, the City has undertaken significant plan alterations to other projects to preserve animal presence when those animals were valued under secular statutes such as the Endangered Species Act or Migratory Bird Treaty Act.

26.     The City's implementation of the Bond Project is also not generally applicable because "the burden of the [implementation], in practical terms, falls on [Native American Church] adherents but almost no others." *Lukumi*, 508 U.S. at 536. Specifically, the City has fenced of the southern bank of the Lambert Beach Area, which contains Plaintiffs' sacred location necessary for performing religious ceremonies, despite that area posing little to no safety risk, and despite the City failing to fence off areas that present a similar or greater safety risk.

27.     The City has no compelling interest for designing or implementing the Bond Project as it is currently iterated, for preventing Plaintiffs from accessing the Park, or for failing to accommodate Plaintiffs' religious exercise. When pressed, the City has asserted a vague conception of public safety focused on crumbling riverbank walls and falling trees. But the City's purported interest in promoting public safety is a post hoc rationalization that appears nowhere in the volumes of printed and electronic materials the City used to promote the Bond Project with San Antonio residents or obtain permission for the Bond Project from relevant authorities.

28.     The Bond Project is not narrowly tailored to achieve any compelling interest that the City may have for implementing it. Furthermore, the City refused to consider or implement alternatives that would accomplish the City's stated interest in the Bond Project while also preserving Plaintiffs' religious liberty rights. In fact, the City has never undertaken a study to see whether the Bond Project could proceed in a manner that accommodates Plaintiffs' religious exercise.

### E.     Texas Constitution, *see* Tex. Const. art. I, § 6

29.     Plaintiffs have sincere religious beliefs and practices that originate and are related to the land on which the Park and Lambert Beach Area now sits. Plaintiffs' performance and compliance with these beliefs is a religious exercise.

30.     Through its design and implementation of the Bond Project, the City is and will further substantially burden Plaintiffs' ability to practice their religion. By refusing Plaintiffs access to the Lambert Beach Area, the City makes it impossible for them to practice core aspects of their religion. And by destroying trees and driving away birds from the Lambert Beach Area, the City degrades and risks permanently destroying a sacred place for Plaintiffs, which would make core aspects of their religious practice impossible to perform.

31.     The City has no compelling interest for designing or implementing the Bond Project as it is currently iterated, for preventing Plaintiffs from accessing the Park, or for failing to accommodate Plaintiffs' religious exercise. When pressed, the City has asserted a vague conception of public safety focused on crumbling riverbank walls and falling trees. But the City's purported interest in promoting public safety is a post hoc rationalization that appears nowhere in the volumes of printed and electronic materials the City used to promote the Bond Project with San Antonio residents or obtain permission for the Bond Project from relevant authorities.

32.     The Bond Project is not narrowly tailored to achieve any compelling interest that the City may have for implementing it. Furthermore, the City refused to consider or implement alternatives that would accomplish the City's stated interest in the Bond Project while also preserving Plaintiffs' religious liberty rights. In fact, the City has never undertaken a study to see whether the Bond Project could proceed in a manner that accommodates Plaintiffs' religious exercise.

---

DEFENDANT CITY OF SAN ANTONIO'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

On September 25, 2023, the Court commenced a hearing on the request for preliminary injunction filed by Plaintiffs Gary Perez ("**Perez**") and Matilda Torres ("**Torres**", and together with Perez, "**Plaintiffs**") in the above-captioned case.  For the reasons set forth below in the Findings of Fact and Conclusions of Law, the Court **DENIES** Plaintiffs' Motion for Preliminary Injunction.  The Findings of Fact and Conclusions of Law are related solely to the Motion for Preliminary Injunction and are not determinative of the final outcome of the above-captioned suit.  To the extent any Finding of Fact should be deemed a Conclusion of Law, or vice versa, it shall be treated as such.

### FINDINGS OF FACT

#### I.   THE PARTIES

1.    Plaintiff Gary Perez ("**Perez**") is a resident of Bexar County, Texas.

2.    Plaintiff Matilda Torres ("**Torres**") is a resident of Bexar County, Texas.

3.    Perez and Torres are members of the Lipan-Apache "Hoosh Chetzel" Native American Church (the "**Native American Church**"). The Lipan Apache Tribe (of Texas)

1

recognized by the State of Texas and is admitted to the National Congress of American Indians, but it is not a federally recognized tribe.

4.     Defendant City of San Antonio (the "**City**") is a home-rule municipal government in Bexar County Texas.

## II.     THE HISTORY OF BRACKENRIDGE PARK

5.     Brackenridge Park (which may be referred to as the "**Park**") is a public park in San Antonio, Texas, consisting of approximately 343 acres. It is roughly bounded by Hildebrand Avenue, Broadway, Avenue B, Josephine Street, US Highway 281, River Road, Alpine Drive, and N. St. Mary's Street.

6.     The Park was initially established in 1899 when George Brackenridge donated 199 acres of land to the City.

7.     In the early 20th century, the City acquired additional land through purchases and donations, bringing the Park to its final area of approximately 343 acres.

8.     The San Antonio River flows through the northern portion of Brackenridge Park.

9.     Brackenridge Park contains various attractions including paths, sports fields, the San Antonio Zoo, the Japanese Tea Garden, the Sunken Garden Theater, and the Witte Natural History Museum.

10.     The Park contains other manmade structures, including without limitation, retaining walls in the Lambert Beach area.

11.     The Lambert Beach area of the Park was initially constructed in 1915 as a gravel-lined pool in the San Antonio River.  In 1925, concrete stairs and landings, and a stone bathhouse were added.  The Lambert Beach walls are historic structures that contribute to the Park's designation on the National Register of Historic Places as well as a State Antiquities Landmark

2

23-50746.1012

and a City of San Antonio Historic Landmark. Because of their historic designation, construction on the retaining walls is regulated by, *inter alia,* the Texas Historical Commission and the United States Army Corps of Engineers.

12. The retaining walls were built between the 1920s and the 1940s, and have fallen into disrepair. The original retaining walls are a gravity wall system. In part, the damage to the retaining walls has been caused by the presence of trees and/or their root systems, which are too close to the walls.

13. In their current state, the retaining walls present a safety hazard. Some portions of the walls have failed and others are at risk of failing. When a portion of the wall fails, it could cause the soil and/or trees to shift dangerously. These risks increase when there is substantial precipitation.

14. The Park is also a habitat for various wildlife, including, pertinent to this case, migratory birds such as the heron, egret, and double-crested cormorant.

15. The Park, and certain structures within the Park, are listed on the National Register of Historic Places and are also designated as having significant historical value by the applicable State and local government agencies.

### III.   PLAINTIFFS' ASSERTED RELIGIOUS BELIEFS

16. Perez and Torres are practitioners and leaders in the Native American Church.

17. Plaintiffs profess that according to their beliefs, life "in the region" began at a spring, now called Blue Hole, which is north of the Park, situated on the campus of the University of the Incarnate Word.

18. Plaintiffs profess to believe that a spirit in the form of a blue panther lived in the Blue Hole.

23-50746.1013

19.     According to Plaintiffs' beliefs, a spirit in the form of a double crested cormorant visited the Blue Hole.

20.     Plaintiffs believe that the blue panther scared the bird, and as it fled, water droplets from its tail scattered across the San Antonio River Valley, including the area that now comprises the Park, spurring life "in the region."

21.     As a result, Plaintiffs claim that the Park, or a certain area thereof, is a sacred site and that their religious beliefs require them to conduct religious ceremonies in specific locations within the Park.

22.     Specifically, Plaintiffs claim that a specific area in the Park, in the approximate area known as Lambert Beach, is a particularly sacred area and the location at which they must conduct religious ceremonies.  This area is referred to in this litigation as the "Project Area" and is depicted in blue below.



23.     The northern part of the Project Area is the Lambert Beach swimming area and its attendant structures.  The southern portion of the Project Area is green space.  The Project Area

4

is generally bounded on the east by a vehicular bridge and on the west by a pedestrian bridge, as shown in the image below.



24.     Plaintiffs claim that the Project Area is the location where the spirit in the form of the blue panther scared off the spirit in the form of the anhinga in their creation story.

25.     Plaintiffs claim that when the constellation Eridanus aligns with the bend in the San Antonio River located in the Project Area, they are supposed to conduct a ceremony called "Midnight Waters."

26.     In the Midnight Waters ceremony, the participants dip the feathers of the double crested cormorant into the San Antonio River.

27.     According to Plaintiffs the participant views a reflection of the double-crested cormorant (represented by the feather) in the River, representing the underworld.  The participant is surrounded by the bird on land and in the trees, representing the middle world.  The Eridanus constellation reflects the River and the bird in the upperworld.  The Plaintiffs believe that the

23-50746.1015

simultaneous presence and connection of the three worlds creates a "spiritual ecology" that allows them to locate themselves in the physical world and commune with the spiritual world.

28.     Plaintiffs have not alleged that double-crested cormorants must be actively nesting in the Project Area in order for Plaintiffs to exercise their religious beliefs.

29.     Plaintiffs have not alleged that any particular number of double-crested cormorants must be present in the Project Area in order for Plaintiffs to exercise their religious beliefs.

30.     Plaintiffs have not alleged that any particular tree within the Project Area is necessary to the exercise of Plaintiffs' religious beliefs.

31.     Plaintiffs have not alleged that any particular number of trees within the Project Area is necessary to the exercise of their religious beliefs.

32.     The Plaintiffs have previously modified their religious practices or ceremonies due to temporary, exigent circumstances.  For example, during the COVID-19 pandemic, the Plaintiffs voluntarily limited the number of individuals who participated in a ceremony in person, and encouraged others to participate or worship remotely.

33.     According to Plaintiffs, the use of peyote is part of their religious exercise and the Park is also significant site for "peyote pilgrims."

34.     Plaintiffs claim that peyote pilgrims visit Barton Springs, San Marcos Springs, Comal Springs, and finally, San Antonio Springs, performing religious rites at each stop.  "San Antonio Springs" is not a single designated spot, but rather, a collection of springs in the general vicinity of the University of the Incarnate Word and the Park.  The San Antonio Springs include the Blue Hole.

35.     Peyote pilgrims may visit areas of the Park outside of the Project Area.

23-50746.1016

36.     Peyote pilgrims may or may not contact Plaintiffs during their peyote pilgrimage.

37.     Each peyote pilgrimage is unique to the pilgrim and does not require any particular observance in any particular location within the Park.

### IV.     THE 2017 BOND PROJECT

38.     In May 2016, the citizens of San Antonio voted overwhelmingly in favor of a $850 million bond package for public improvements.

39.     Proposition 3 of the bond package was dedicated to improvements related to Parks, Recreation, and Open Spaces, including $7,750,000 for improvements at the Park.

40.     The improvements and repairs include, pertinently, repairs to retaining walls along the San Antonio River, including in the Project Area.  The improvements planned for the Park that are the subject of this lawsuit are collectively referred to as the "2017 Bond Project."

41.     Within the Project Area, the City proposes to repair and rehabilitate the retaining walls along the River; repair and rehabilitate the historic Pump House; and construct a ramp to make the Lambert Beach area more easily accessible to visitors with physical disabilities or who use mobility aids.

42.     The City anticipates that the 2017 Bond Project improvements in the Project Area will commence in the fourth quarter of 2023 and take approximately eight months to complete.

43.     In connection with the 2017 Bond Project, including the construction with the Project Area, the City must comply with a number of local, state, and federal regulations.  These include, but are not necessarily limited to, the City's own design guidelines, State regulations related to the preservation of historic structures and cultural resources, the Secretary of the Interior's Design Guidelines, U.S. Army Corps of Engineer regulations, the Americans with Disabilities Act, and OSHA regulations, to name a few.

7

44.     The City evaluated and considered multiple different repair methodologies for the original retaining walls.  Land, regulatory, and agency limitations exist for the repair of the original retaining walls.

45.     The City utilized a team of design professionals, including architects, engineers, and historic preservation officials ("Design Team"), to determine the repair methodology to be utilized.

46.     The Design Team retained by COSA recommended utilization of a cantilevered wall system to effectuate repairs of the original retaining walls.

47.     The Design Team considered multiple factors in recommending a cantilevered wall system including, but not limited to:

   a.  Tree density
   b.  Tree location
   c.  Topography
   d.  Existing retaining wall stability
   e.  Existing wall height
   f.  Equipment accessibility
   g.  Construction feasibility
   h.  Legal compliance
   i.  Regulatory compliance

48.     The City held a number of public meetings to receive community input regarding repairs of the original walls.  Plaintiffs participated in some of these meetings and submitted public comments.  Plaintiffs, and other citizens, expressed their concerns that the City's initial proposal involved the removal and relocation of many trees in the Project Area.  The Plaintiffs, and other citizens, expressed their desire that the City consider whether more trees in the Project Area could be preserved in place.

49.     The City took these comments, including Plaintiffs' under consideration and evaluated whether more trees could be preserved in place in the Project Area.  The City revised

8

its plan for the work in the Project Area pursuant to the 2017 Bond Project in response to the public comments, including Plaintiffs' comments. Plaintiffs have not identified any statute, regulation, policy, or other law that would require the City to s evaluate Plaintiffs' comments based on the asserted religious rights separately from other comments that expressed similar concerns regarding bird deterrence and tree removal and relocation based on secular concerns.

50.    After revising the initial proposal for the Bond Project to identify and save as many trees as possible, the City is unable to identify any additional trees that could be saved from removal in order to complete the 2017 Bond Project and prevent future degradation of the surrounding infrastructure in the Project Area.

51.    The City's current proposal for the work in the Project Area pursuant to the 2017 Bond Project was developed to comply with all applicable local, state, and federal regulations, statutes, and laws.

52.    The Plaintiffs do not dispute that the retaining walls and other historic structures in the Project Area need to be repaired or rehabilitated, or that, in and of itself, such construction would infringe on their religious rights. Rather, Plaintiffs complain about the manner in which the City intends to pursue the construction in the Project Area.

53.    Specifically, the Plaintiffs claim that the City's plan to remove or relocate trees in the Project Area infringes on their religious rights.

54.    In particular, the Plaintiffs object to the City's plans to remove or relocate certain trees within the Project Area to facilitate construction and prevent future damage to the re-built walls. The City has determined that the affected trees will interfere with the construction in the Project Area, will be irreparably damaged by the construction in the Project Area, or will damage

the repaired and rehabilitated retaining walls and historical structures in the future, leading to the exact same problem the 2017 Bond Project is intended to fix. .

    55.    Under the City's current proposal for construction in the Project Area:

    a.    46 trees will be removed completely.  Of these trees, 4 are dead or dying.  Of the trees suggested to be removed, 4 are invasive species.  The Plaintiffs do not object to the removal of the dead or dying trees or of the invasive species.

    b.    21 trees will be relocated to other areas of the Park.

    c.    16 trees will be preserved in place.

    d.    At least 22 new trees will be planted in the Project Area, but in locations where they will not threaten the integrity of the retaining walls or other historic structures.  The Plaintiffs do not complain about new trees being planted in the Project Area.

    56.    The removal and relocation of trees in the Project Area does not, on its face, discriminate against religion or religious practice.

    57.    The removal and relocation of trees in the Project Area is not aimed at any religion or religious practice.

    58.    The removal and relocation of trees in the Project Area does not treat religious practice different from secular activities.

    59.    The removal and relocation of trees in the Project Area does not prohibit religious conduct while allowing similar secular conduct.

    60.    There is no mechanism for individualized exemptions from the City's plan to remove and relocate trees in the Project Area.

61.     There is no dispute that failing retaining walls present a significant danger to any member of the public who is visiting the Park, including visitors to Lambert Beach and the Project Area.   Because of the hazardous conditions at the Lambert Beach Area, the City temporarily closed the northern portion of the Project Area in 2022.  Plaintiffs do not allege the temporary closure of the northern portion of the Project Area infringes on their religious rights.

62.     The City determined that dead and dying trees in the Project Area present a significant danger to the public. Accordingly, the City temporarily closed the southern portion of the Project Area in February 2023.

63.     The City's determination that dead and dying trees in the Project Area is underscored by two incidents.  First, On March 15, 2023, the limb from a cedar elm fell on to a sidewalk at the San Antonio Zoo, allegedly injuring 7 individuals.  Four of those individuals have filed a lawsuit claiming damages of $1 million.  Second, on or about September 9, 2023, a 20-30' Cedar Elm trunk in the Project Area failed during thunderstorms and a large portion of the tree fell into the River near the bend in the River where Plaintiffs claim they must conduct religious ceremonies.

64.     There is a known "hanger branch" located in the canopy of a Cypress tree in the Project Area, in the immediate vicinity of the area in which Plaintiffs claim they must conduct religious ceremonies.

65.     If the aforementioned hanger branch fell from the tree and struck a person, it could cause serious physical injury or even death to that person.

66.     The City also determined that it was in the interest of public safety to temporarily close the Project Area so that the bird deterrence program (as described below in Section V) could be safely conducted.  The bird deterrence efforts may present a risk to individuals who are

11

not wearing suitable personal protection equipment.  For example, the bird deterrence efforts include techniques that utilize loud noises to dissuade the birds from actively nesting in the area, which could damage someone's hearing if they were close to the noise and not wearing hearing protection, Additionally, there were instances in which City contractors or employees were harassed by members of the public.  Finally, when the construction commences, it will not be safe for the public to be in the Project Area among the construction equipment or close to the trenches necessary to shore up the retaining walls.

67.    When the 2017 Bond Project improvements are complete and the area is safe, the Project Area will be reopened to all visitors, including Plaintiffs and other members of the Native American Church.

68.    The City cannot accomplish its compelling government interest in making the Project Area safe for visitors, preserving historic structures, and making Park amenities accessible and available to the public by any less restrictive means than the removal and relocation of the designated trees in the Project Area, the bird deterrence program, and the temporary closure of the Project Area.

## V.    BIRD DETERRENCE AT THE PARK

69.    Various migratory bird species populate the Park, including herons and egrets.

70.    Double-crested cormorants are also migratory birds.  They are attracted to the nesting sites of other colonial water birds, including those of egrets and herons.

71.    The large roosting colonies of egrets, in particular, adversely affected wildlife biodiversity, water quality, and park amenity access.

72.    Areas of the Park where egret rookeries exist become unusable for 10 months of the year due to increased bird density.

12

23-50746.1022

73.     Bird feces damage park amenities and equipment, including picnic tables, playground equipment, and sidewalks.

74.     Bird feces adversely affect the quality of the water in the San Antonio River, contributing to elevated levels of E. coli.

75.     Large populations of birds increase respiratory illnesses in humans resulting from avian diseases and uric acid in bird feces.

76.     The chemicals in bird feces may increase the nitrogen in water, killing off aquatic life.

77.     To address the adverse impacts of large rookeries and bird populations, the City contracted with the U.S. Department of Agriculture (**"USDA"**) and coordinated with the Texas Parks and Wildlife Department ("TPWD") and U.S. Fish and Wildlife Service ("**FWS**") to modify the bird habitats and deter the birds from nesting in highly urbanized areas of the  Park, including the Project Area.

78.     Habitat modification includes removing old nests, clearing underbrush, and removing dead wood from the tree canopy to discourage nesting.

79.     The City uses only non-lethal deterrent techniques that may include, pyrotechnics, clappers, spotlights, lasers, distress calls, effigies, balloons, and drones.

80.     The City does not utilize any population control techniques on active nests or viable eggs.

81.     The bird deterrence activities are necessary to protect the health and safety of all members of the public who visit the Park, including visitors to Lambert Beach.

82.     The bird deterrence activities are also necessary so that the 2017 Bond Project improvements can proceed without undue delay.

13

83.     Pursuant to the Migratory Bird Treaty act, the proposed construction and removal/relocation of trees planned for the Project Area cannot proceed if migratory birds, including the double crested cormorant, are nesting in the area.

84.     The bird deterrence activities are aimed at preventing birds from nesting in the highly urbanized areas of the Park, and particularly, in the Project Area.

85.     The bird deterrence activities do not prevent birds, including the double crested cormorant, from entering the Park, including the Project Area.

86.     Since the implementation of the bird deterrence measures, double-crested cormorants are still observed to be present in the Park, including in the Project Area.

87.     The City's bird deterrence program does not, on its face, discriminate against any religion or religious practices.

88.     The City's bird deterrence program is not aimed at any religious practice.

89.     The City's bird deterrence program does not treat religious activities differently from secular activies.

90.     The City's bird deterrence program does not permit secular conduct while prohibiting similar religious conduct.

91.     There is no scheme for individualized exemptions from the City's bird deterrence program.

92.     The City cannot accomplish its compelling interest in public health and safety from the hazards posed by the large populations of egrets and herons by any least restrictive means that the current bird deterrence efforts.

## VI.   THE INSTANT SUIT

93.   Plaintiffs filed the instant suit, alleging that the following plans or activities on behalf of the City place a place a substantial burden on their sincerely held religious beliefs, in violation of the First Amendment of the United States Constitution, Texas Constitution, Religious Land Use and Institutionalized Persons Act ("**RLUIPA**"), and Texas Religious Freedom Restoration Act ("**TRFRA**"): (a) bird deterrence activities, (b) the temporary closure of Project Area, and (c) the proposed removal or relocation of trees in the Project area.

94.   Plaintiffs sought a Temporary Restraining Order to be allowed access to the Project Area on August 12, 2023 to perform the Midnight Water ceremony.

95.   The Court denied the request for Temporary Restraining Order.

96.   Plaintiffs now seek a Preliminary Injunction enjoining the City from:

**a.**   "implementing the [2017] Bond Project or otherwise removing trees from the Park until Plaintiffs and the City agree on a specific plan that preserves the Park's spiritual ecology";

**b.**   "implementing the [2017] Bond Project or otherwise engaging in 'bird deterrence' within the Park in a way that violates Plaintiffs' religious rights"; and

**c.**   "preventing Plaintiffs from accessing and performing religious ceremonies in the Park".

97.   Based on the Court's findings above, and pursuant to the Conclusions of Law stated below, the Court finds that the Plaintiffs have not met their burden of showing they are entitled to preliminary injunctive relief.

23-50746.1025

## CONCLUSIONS OF LAW

### I. PRELIMINARY INJUNCTION STANDARD

98.    To obtain a preliminary injunction,

> First, the movant must establish a substantial likelihood of success on the merits. Second, there must be a substantial threat of irreparable injury if the injunction is not granted. Third, the threatened injury to the plaintiff must outweigh the threatened injury to the defendant. Fourth, the granting of the preliminary injunction must not disserve the public interest.

*Allstars v. City of San Antonio*, TX, No. CIV.A. SA-03-CA-356-, 2003 WL 21204471, at *2 (W.D. Tex. May 19, 2003) (citations omitted). "The third and fourth factors merge when, as here, the government is a party." *Guajardo v. Kerry*, No. CV SA-13-CA-608-FB, 2014 WL 12538142, at *2 (W.D. Tex. May 2, 2014) (citing *Planned Parenthood v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013)). A preliminary injunction is an "extraordinary remedy," that "should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements, and is treated as the exception rather than the rule." *Malone v. CST Brands, Inc.*, No. SA-16-CA-0955-FB, 2016 WL 8258791, at *4 (W.D. Tex. Nov. 10, 2016) (quoting *Planned Parenthood v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005); *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997)) (internal quotation marks omitted); *see also 35 Bar & Grille, LLC v. City of San Antonio,* 943 F. Supp. 2d 706, 711 (W.D. Tex. 2013) (quoting *Canal Auth. v. Callaway,* 489 F.2d 567, 569 (5th Cir.1974) ("In order to prevail, Plaintiffs must carry the burden on all four elements.")). The Plaintiffs have not met their burden.

99. With respect to the first criterion of the preliminary injunction standard,

> When determining the likelihood of success on the merits, courts look to the standards of the substantive law. To prevail on a preliminary injunction, the Plaintiffs likelihood of success must be more than negligible, and the preliminary injunction should not be

16

granted unless the question presented by the litigant is free from
doubts.

*35 Bar & Grille*, 943 F. Supp. 2d at 722 (internal quotation marks and citations omitted).

100.    The second criterion of the preliminary injunction requires the Plaintiffs to show

they have sustained an irreparable injury, defined as an injury that

cannot be remedied by an award of economic damages. It is well
established that the loss of First Amendment freedoms for even
minimal periods of time constitutes irreparable injury justifying the
grant of a preliminary injunction.

*Id*. at 724 (internal quotation marks and citations omitted).  "As a matter of law, however, simply

alleging some possibility of irreparable injury does not support the issuance of a preliminary

injunction."  *Aquifer Guardians in Urban Areas v. Fed. Highway Admin.*, 779 F. Supp. 2d 542,

556 (W.D. Tex. 2011) (citation omitted).

101.    The third part of the preliminary injunction analysis requires the Plaintiffs to show

that the threatened injury to them outweighs the potential injury to the City if the injunction is

not granted.  While the Plaintiffs claim they have been and will be prevented from practicing

their religion, the issuance of the preliminary injunction would prevent the City from proceeding

with measures it has determined are necessary to protect the health and safety of its citizens and

its natural resources.  "The City has an interest in promoting the health, safety, morals and

general welfare of the citizens of the City."  *35 Bar & Grille*, 943 F. Supp. 2d at 725; *Houston

Chronicle Pub. Co. v. City of League City, Tex.*, 488 F.3d 613, 622 (5th Cir. 2007) (city

ordinance restricting the solicitation or distribution of any material to the occupant of a vehicle

stopped at a traffic light served government's compelling interest in public safety).

17

23-50746.1027

## II. PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIM UNDER THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION: FREE EXERCISE CLAUSE (28 U.S.C. § 1983)

### A. The Plaintiffs Lack Standing To Bring Claims On Behalf Of Unknown "Peyote Pilgrims"

102.    To establish Article III standing sufficient "to pursue an alleged violation of the Free Exercise Clause, a plaintiff must allege that his or her own 'particular religious freedoms are infringed.'" *Patterson v. Def. POW/MIA Accounting Agency*, 343 F. Supp. 3d 637, 652 (W.D. Tex. 2018) (quoting *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 292 n.25 (5th Cir. 2001)).

103.    Plaintiffs allegations relating to peyote pilgrims or peyote pilgrimages do not meet this standard.

104.    First, the Plaintiffs have not alleged that their own peyote pilgrimages have been or are being infringed upon by any of the City's actions related to bird deterrence, the 2017 Bond Project, or the temporary closure of the Project Area.  Additionally, the Plaintiffs' presence (in their capacities as leaders of the Native American Church) is not a necessary component of any individual's peyote pilgrimage.

105.    Second, there is no allegation that a peyote pilgrimage requires the presence of a double-crested cormorant.  Thus, Plaintiffs have not asserted any injury to this aspect of their religious practice arising out of the bird deterrence program.

106.    Third, there is no allegation that the removal or relocation of trees will have any impact on the conduct of peyote pilgrimages.  Thus, Plaintiffs have not asserted any injury to this aspect of their religious practice arising out of the removal or relocation of trees in the Project Area.

23-50746.1028

107. Finally, there is no allegation that the peyote pilgrims must access the Project Area as part of their pilgrimage. Thus, Plaintiffs have not asserted any injury to this aspect of their religious practice arising out of the temporary closure of the Project Area.

108. Based on the foregoing, to the extent that Plaintiffs assert claims that the City's actions infringe on the conduct of peyote pilgrimages, the Plaintiffs are not likely to succeed on the merits of those claims because they lack standing to bring them.

### B. The Plaintiffs Have Not Established Municipal Liability For Purposes Of Section 1983

109. To prevail on their federal constitutional claim brough via 28 U.S.C. § 1983, the Plaintiffs must prove "(1) a policymaker, (2) an official policy, and (3) a violation of constitutional rights whose moving force is the policy or custom." *Horvath v. City of Leander*, 946 F.3d 787, 793 (5th Cir. 2020), *as revised* (Jan. 13, 2020); *see also Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 694 (1978).

110. Under *Monell*, as interpreted and applied by the Fifth Circuit, "municipal liability cannot be sustained under a theory of *respondeat superior*." *Rivera v. Houston Indep. Sch. Dist.,* 349 F.3d 244, 247 (5th Cir. 2003). Nevertheless, the Plaintiffs have not alleged—or proven—the three *Monell* factors and, therefore, have not established that the City can be liable for the claimed violations of Plaintiffs' First Amendment Rights under section 1983.

111. Alternatively, and notwithstanding Plaintiffs' failure to satisfy *Monell*, Plaintiffs have not shown that they are likely to succeed on the merits of their claims because none of the City's actions **(a)** addresses Plaintiffs or their religion; or **(b)** violates the First Amendment Free Exercise Clause. *See Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 877 (1990); *see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. ___, ___, 142 S. Ct. 2407, 2421 (2022)(*citing Smith*).

19

### C. The Plaintiffs Have Not Shown A Likelihood Of Success On Their Claim That The City Violated Their Tights Under the Free Exercise Clause

112.    Even if the Plaintiffs could establish municipal liability under section 1983, they have not shown that they are likely to succeed on the merits of their claim under the Free Exercise Clause of the First Amendment.

113.    In *Smith*, the Supreme Court considered whether a law criminalizing the use of peyote interfered with the plaintiff's religious exercise in violation of the First Amendment.  The Court held that "if prohibiting the exercise of religion . . . is not the object of the [conduct] but merely the incidental effect of a generally applicable and otherwise valid provision, ***the First Amendment has not been offended***." *Smith*, 494 U.S. at 878 (emphasis added).

114.    The City's bird deterrence efforts are neutral policies.  The bird deterrence policy does not, on its face, discriminate against any religion or religious practice.  The bird deterrence program is not aimed at any religion or religious practice.  The bird deterrence program does not treat religious activities differently from secular activities.

115.    The City's bird deterrence policy is generally applicable.  The bird deterrence policy does not permit any secular conduct while prohibiting similar religious conduct.  There is no mechanism for individualized exemptions.

116.    The City's plan to remove and relocate trees in connection with the 2017 Bond Project is neutral.  It does not, on its face, discriminate against any religion or religious practice.  The plan to remove and relocate trees is not aimed at any religion or religious practice.  The City's plan to remove and relocate trees in connection with 2017 Bond Project does not treat secular and religious activities differently.

23-50746.1030

117.     The City's plan to remove and relocate trees in connection with the 2017 Bond Project is generally applicable.  The removal or relocation of trees does not permit any secular conduct while prohibiting similar religious conduct.  There is no mechanism for individualized exemptions.

118.     The City's decision to temporarily prohibit public access to the Project Area is neutral.  It does not, on its face, discriminate against any religion or religious practice.  The temporary prohibition of public access to the Project Area is not aimed at any religion or religious practice.  The temporary prohibition of public access to the Project Area does not treat secular and religious activities differently.

119.     The City's decision to temporarily prohibit public access to the Project Area is generally applicable.  The temporary prohibition of public access to the Project Area does not permit any secular conduct while prohibiting similar religious conduct.  There is no mechanism for individualized exemptions.  Indeed, to the extent that any exemption *could* be allowed, it would favor religious exercise over secular considerations.  The City thoroughly considered Plaintiffs' requests to access the Project Area on August 12, 2023 and September 21, 2023, so that Plaintiffs could conduct religious ceremonies in the Project Area.

120.     In this instance, the City's bird deterrence program, the removal and relocation of trees pursuant to the 2017 Bond Project, and the temporary closure of the Project Area are generally applicable laws.  The effect – if any – on Plaintiffs' religious exercise is merely incidental to these generally applicable and otherwise valid governmental decisions and actions.

121.     A different standard would apply if the City's bird deterrence program, the removal and relocation of trees pursuant to the 2017 Bond Project, and the temporary closure of the Project Area were deemed not to be neutral or generally applicable.  As the Supreme Court

21

recently explained. "a plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy*, __ U.S. at __, 142 S. Ct. at 2421–22 (citations omitted). If the policy at issue is not "neutral" or "generally applicable", the "Court will find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* (citation omitted).

     122.     The Court explained further,

> A government policy will not qualify as neutral if it is specifically directed at ... religious practice. A policy can fail this test if it discriminates on its face, or if a religious exercise is otherwise its object. A government policy will fail the general applicability requirement if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way, or if it provides a mechanism for individualized exemptions. Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny.

*Id.* (internal quotation marks, citations, and brackets omitted) (ellipses in original). Disparate treatment between secular and religious activities may indicate that a policy is not neutral. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, __ U.S. __. __ 141 S. Ct. 63, 66-67(2020) (occupancy restrictions related to COVID-19 emergency were not neutral because religious services were more strictly regulated than secular activities).

     123.    Although strict scrutiny should not apply in this case, the City's bird deterrence policy, the removal and relocation of trees in connection with the 2017 Bond Project, and the temporary closure of the Project Area to the public all pass strict scrutiny.

     124.    The City's bird deterrence policy serves its compelling interest in public health and safety. Large populations of migratory birds in highly urbanized areas of the Park contribute

to unsanitary conditions in the Park, which can pose a risk of disease to humans and animals. Large populations of migratory birds in highly urbanized areas of the Park also have an adverse impact on the water quality in the San Antonio River.

125.    The City's bird deterrence policy is narrowly tailored to serve this compelling interest.  The City's bird deterrence policy uses non-lethal methods to encourage the migratory birds to nest in less urbanized areas of the Park, where the birds' presence poses less risk of disease and contamination.  The City's bird deterrence policy does not prohibit migratory birds from visiting, roosting, or foraging in the Project Area.

126.    The City's plan to remove or relocate trees in connection with the 2017 Bond Project serves the City's compelling interest in public health and safety.  Removing dead and dying trees prevents them from failing and injuring visitors to the Park.

127.    Repairing the retaining walls in the Project Area also serves the City's compelling interest in public safety.  Failing retaining walls pose a substantial risk to safety.  The otherwise healthy trees that are scheduled to be removed or relocated from the Project Area would be damaged or compromised by the construction required to repair the retaining walls, rendering those trees a risk of failure in the future.  The City has a compelling interest in removing or relocating trees that would become a risk to public safety because of the likelihood of future failure.

128.    Similarly, the relocation and removal of trees that are too close to the retaining walls serves the City's compelling interest in public safety.  Trees that would compromise the integrity of the retaining walls present a serious risk of harm to the public.

129.    The City's plan to remove or relocate trees in the Project Area is narrowly tailored to serve this compelling interest.  There is no reasonable alternative to removing dead or dying

23

trees. The City has limited the removal or relocation of otherwise healthy trees to preserve in place many of the trees. The City plans to plant at least 22 additional trees in the Project Area, in places where the trees do not pose the same risks to public safety as the currently-existing trees.

130. The City's temporary prohibition on access to the Project Area serves the City's compelling interest in public safety. The City's engineers and arborists, as well as independent engineers and arborists, have determined that unsafe conditions exist in the Project Area, including the potential for failing trees (trunks and limbs) and the potential for failing retaining walls.

131. The City's temporary prohibition on access to the Project Area is narrowly tailored to the City's compelling interest in public safety. The Project Area will be reopened to all members of the public, including Plaintiffs, when the construction is completed and the Project Area is once again safe for visitors. The temporary closure of a small portion of the Park while unsafe conditions persist is narrowly tailored.

132. Whether the Court applies a rational basis or strict scrutiny test, the Plaintiffs have failed to show that they are likely to prevail on their claim that the City has violated the Free Exercise Clause of the U.S. Constitution.

**D.    The Plaintiffs Have Not Shown That They Are Likely To Succeed On The Merits Of Their Claim Under the Religious Land Use and Institutionalized Persons Act ("RLUIPA")**

133. Plaintiffs' alleged claim under the federal Religious Land Use and Institutionalized Persons Act ("RLUIPA"), *see* 42 U.S.C. § 2000cc, *et seq*, fails as a matter of law because RLUIPA applies only to land use regulations. The statute defines "land use regulation" as

> ***a zoning or landmarking law, or the application of such a law***,
> that limits or restricts a claimant's use or development of land
> (including a structure affixed to land), ***if the claimant has an***

24

> *ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest*.

42 U.S.C. § 2000cc-5(5) (emphases added). The City's actions and decisions at issue in this lawsuit are not zoning or landmarking laws.

134. Plaintiffs' claims under RLUIPA also fail as a matter of law because RLUIPA applies to cases in which the plaintiff is complaining about a land use regulation as applied to the plaintiff's property, not a land use regulation as applied to the government's own property. *See*, *e.g.*, *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 447-49 (1988)(rejecting Indian tribes' Free Exercise challenge to the United States Forest Service's approval of plans to construct a logging road in the Chimney Rock area of the Six Rivers National Forest (federal property), and finding that such conduct did not impose a burden "heavy enough" to violate the Free Exercise Clause); *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1063 (9th Cir. 2008)(rejecting the claim of multiple Indian-tribe plaintiffs that use of artificial snow made from reclaimed water in a government-owned park on what the Navajo Nation considered a sacred mountain desecrates the entire mountain, deprecates their religious ceremonies, and injures their religious sensibilities, in violation of several federal statutes); *United States v. Means*, 858 F.2d 404 (8th Cir. 1988)(rejecting, on the basis of government's ownership, the Lakotas' claim that the United States Forest Service's denial of a permit for the use of an area in the Black Hills National Forest (federal property), as a religious, cultural, and educational community violated their free exercise rights); *Wilson v. Block*, 708 F.2d 735, 739-40 (D.C. Cir. 1983)(finding no impermissible burden on religious rights despite Navajo and Hopi plaintiffs' contentions that development of the Snow Bowl on the San Francisco Peaks (federal land) would be inconsistent with their First Amendment right to freely hold and practice their religious beliefs on the Peaks,

23-50746.1035

which they believe to be sacred; that such development would be a profane act and an affront to the deities; and that, as a consequence of such acts, the Peaks would lose their healing power and otherwise cease to benefit the tribes; would seriously impair their ability to pray and conduct ceremonies upon the Peaks, as well as to gather from the Peaks the sacred objects, such as fir boughs and eaglets, which are necessary to their religious practices); *Havasupai Tribe v. United States*, 752 F. Supp. 1471 (D. Ariz. 1990), *aff'd sub nom. Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991)(rejecting, on the basis of government's ownership, a Havasupai free exercise violation claim involving the Forest Service's plan for a uranium mine in an Arizona national forest (federal property)); *Manybeads v. United States*, 730 F. Supp. 1515 (D. Ariz. 1989)(rejecting, on the basis of the government's ownership, a Navajo claim that relocation from the Hopi Reservation under the provisions of the Navajo-Hopi Land Settlement Act violated their free exercise rights).

135. The government's right to limit conduct on its own property is equally applicable to state park land. *See*, *e.g.*, *Crow v. Gullet,* 541 F. Supp. 785, 794 (D. S.D. 1982), *aff'd*, *Crow v. Gullet*, 706 F.2d 856, 858 (8th Cir. 1983)(per curiam)(plaintiffs did not show that defendants' development, construction, and regulatory actions burdened plaintiffs' religious exercises in the Bear Butte area, and plaintiffs "failed to establish any infringement of a constitutionally cognizable first amendment right. To the extent their right of access was temporarily restricted at the ceremonial grounds, plaintiffs' interests were "outweighed by compelling state interests in preserving the environment and the resource from further decay and erosion, in protecting the health, safety, and welfare of park visitors, and in improving public access to this unique geological and historical landmark").

23-50746.1036

136.    Even if RLUIPA could apply to a land use regulation imposed by the government on its own property (which it dies not), it would not apply in this case.  RLUIPA limits the definition of "land use regulation"—and, in the process, also limits who may be a claimant under RLUIPA—as follows:

> The term "land use regulation" means a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), *if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest*.

42 U.S.C. § 2000cc-5(5).

137.    Plaintiffs have not shown any "*ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest*" in any property in the Park, as required by RLUIPA.  Thus, Plaintiffs do not fall within the class of individuals granted cause of action under 42 U.S.C. § 2000cc-5(5).

138.    Additionally, Plaintiffs' claims under RLUIPA fail as a matter of law because they cannot prove the "substantial burden" element of 42 U.S.C. § 2000cc-(a)(1).

139.    The Fifth Circuit has explained that

> a government action or regulation creates a "substantial burden" on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs. And, in line with the foregoing teachings of the Supreme Court, the effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs.

*Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004); *see also Barr v. City of Sinton*, 295 S.W.3d 287, 302 (Tex. 2009)(following *Adkins* in declining to "craft a bright-line rule" or "one that will

apply in every context," and in finding that the inquiry as to whether a person's religious exercise has been **substantially burdened** under the TRFRA "requires a case-by-case, fact-specific inquiry.")

140.    Here, even assuming the City's bird deterrence program, 2017 Bond Project, and temporary closing of the Project Area are "land use regulations" for purposes of RLUIPA, they do not place a "substantial burden" on Plaintiffs' religious practices.

141.    There is no allegation—and thus, no proof—that any of the complained of actions force the Plaintiffs to choose between a benefit that is generally available and adhering to their religious beliefs and practices.

142.    The Plaintiffs also have not shown that the complained of actions force them to act in a way that violates their beliefs.

143.    As set forth above, Plaintiffs' religious beliefs do not require double-crested cormorants to be nesting in the Project Area.  The City's bird deterrence program only aims to eliminate nesting.  It does not prevent the double-crested cormorant from visiting, foraging in, or flying over the Project Area.

144.    Plaintiffs' religious beliefs also do not require any particular tree or any particular number of trees to be present in the Project Area.  The City's planned removal and relocation of trees in the Project Area therefore does not substantially burden the Plaintiffs' religious beliefs or practices.

145.    Finally, the City's temporary closure of the Project Area does not rise to a "substantial burden" on Plaintiffs' religious exercise for purposes of RLUIPA because it prevents them only from "enjoying some benefit that is not otherwise generally available[.]" *Adkins*, 393 F.3d at 570; *see also Patterson*, 398 F. Supp. 3d at 122–23.  Temporarily, access to the Project

23-50746.1038

Area is not "otherwise generally available" due to safety concerns.  The Plaintiffs have refused

accommodations that would have allowed them to access certain areas of the Project Area that

are less hazardous.

### E. Plaintiffs Have Not Shown That They Are Likely To Succeed On The Merits Of Their Claims Under The Texas Constitution

146.  TEX. CONST. art. I, § 6 provides:

> All men have a natural and indefeasible right to worship Almighty
> God according to the dictates of their own consciences. No man
> shall be compelled to attend, erect or support any place of worship,
> or to maintain any ministry against his consent.  No human
> authority ought, in any case whatever, to control or interfere with
> the rights of conscience in matters of religion, and no preference
> shall ever be given by law to any religious society or mode of
> worship.  But it shall be the duty of the Legislature to pass such
> laws as may be necessary to protect equally every religious
> denomination in the peaceable enjoyment of its own mode of
> public worship.

147.  Texas courts treat section 6 as "coextensive with the First Amendment, unless the

plaintiff argues that the application of each is different," which Plaintiffs have not done.  *Tilton*

*v. Marshall,* 925 S.W.2d 672, 677 n. 6 (Tex. 1996).  Thus, for the same reasons that the Plaintiffs

are unlikely to prevail on their claims under the Free Exercise Clause of the U.S. Constitution,

they are unlikely to prevail on the merits of their claims under the Free Exercise Clause of the

Texas Constitution. *See Smithback v. Texas*, No. 3-05-CV-0578-BD, 2007 WL 241376, at *3

(N.D. Tex. Jan. 29, 2007)(Texas courts have repeatedly refused to interpret the Texas Bill of

Rights—including the free exercise clause—more broadly than the First Amendment), *aff'd sub*

*nom Smithback v. Crain*, No. 07-10274, 2009 WL 552227 (5th Cir. 2009)(following *Adkins* and

holding that "governmental regulation does not substantially burden religious exercise "if it

merely prevents the adherent from either enjoying some benefit that it not otherwise generally

available or acting in a way that is not otherwise generally allowed").

148.     Plaintiffs' failure to allege any viable violation of the First Amendment "Free Exercise Clause" means that they have also failed to allege any viable violation of the comparable provision of Tex. Const. art. I, § 6.   Similarly, to the extent that the conduct Plaintiffs advocate would violate the Establishment Clause of the First Amendment, such conduct would also violate the comparable language Tex. Const. art. I, § 6 prohibiting the establishment of religion.

149.     In addition, there is no statutory or common law cause of action for damages resulting from alleged violations of the Texas Constitution.  *Smithback*, 2007 WL 241376, at *3 (citing *Williams v. Kaufman Co.*, No. 3-97-CV-0875-L, 1998 WL 34190569 at *6 (N.D.Tex. Sept.18, 1998)); *see also City of Beaumont v. Bouillion*, 896 S.W.2d 143, 150 (Tex. 1995)).

150.     The Texas Constitution, however, was amended in November 2021 to provide broader protections to the exercise of religion than the U.S. Constitution.  TEX. CONST. art. I, § 6-a provides:

> This state or a political subdivision of this state may not enact, adopt, or issue a statute, order, proclamation, decision, or rule that prohibits or limits religious services, including religious services conducted in churches, congregations, and places of worship, in this state by a religious organization established to support and serve the propagation of a sincerely held religious belief.

151.     The Texas Legislature did not define "places of worship" for purposes of this constitutional provision, nor have the Texas courts defined it.

152.     In the context of the Texas Constitution exemption "places of worship" from taxation, the phrase has been defined to mean

> a place where a number of persons meet together for the purpose of worshiping God. The Century Dictionary gives this definition: A building or part of a building set apart for any purpose—as a place of worship. The worship of God is not prohibited in any place, but we are of the opinion that the spirit of the Constitution would

include any place at which the worship might be indulged in so continuously and in such a manner as to give it the character of a place of worship.

*Kerrville Indep. Sch. Dist. v. Sw. Tex. Encampment Ass'n*, 673 S.W.2d 256, 259 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.) (internal quotation marks omitted) (emphasis omitted).  In that case, the Court of Appeals held that vacant lots that were not "used in any capacity other than to further the atmosphere of the rustic hill country" were not "an actual place of religious worship" exempt from taxation.  *See id.* at 261.

153.    Again in the context of tax exemptions for "places of worship", the Supreme Court held that while a property does not need to be used exclusively for worship in order to qualify for the exemption, it will not qualify if "the greater part" of the property is "used for purposes other than religious worship."  *Davies v. Meyer*, 541 S.W.2d 827, 830 (Tex. 1976) (citation omitted) (facility that was used primarily for religious education was not "an actual place of worship").

154.    The Park itself cannot be a "place of worship" under this definition.  Even if once accepts, for the moment, that Project Area is sometimes used for worship activities, the vast majority of the Park's 343 are not used for worship.   And even the Project Area is most commonly used for activities other than worship.

155.    Moreover, the Project Area does not qualify as a "place of worship" as interpreted by the Texas Courts.  It is not a building or part of a building set apart for the conduct of worship.  It is not so continuously used for religious purpose that it has acquired a "character of a place of worship." The Project Area retains its character as an urban park, even if Plaintiffs occasionally conduct short ceremonies there.

23-50746.1041

156.    The City's bird deterrence program in the Project Area does not "prohibit[] or limit[] religious services" in violation of article I, section 6-a of the Texas Constitution.  The bird deterrence program prevents only active nesting by migratory birds in the Project Area.  It does not prohibit or prevent them from visiting, foraging in, or flying through the Project Area.  There is no evidence that Plaintiffs' religious ceremonies or beliefs require double-crested cormorants to be nesting in the Project Area.

157.    The City's plan to remove or relocate trees in the Project Area does not "prohibit[] or limit[] religious services" in violation of article I, section 6-a of the Texas Constitution.  The Plaintiffs assert that their religious beliefs or ceremonies recognize the trees as an element that connects the "middle world" to the "upper world".  There is no evidence that the City's plan to preserve in place 14 trees and plant at least 22 more trees in the Project Area will prohibit or limit this connection.

158.    The City's temporary closure of the Project Area also does not ""prohibit[] or limit[] religious services" in violation of article I, section 6-a of the Texas Constitution.  The 2021 amendment was passed in response to "restrictions put in place by state and local governments in response to the COVID-19 pandemic …."  Resolution Analysis, Committee Report (Unamended), S.J.R. 27.[1]  The COVD-related restrictions specifically prohibited worship services except by video and teleconference.  *See, e.g.*, City of Frisco, Ordinance No.: 2020-03-13 section 1.e.

159.    Here, the temporary closure of the Project Area is not related to COVID-19 and does not specifically mention any prohibition or limits on religious practice.

---

[1] Available at https://capitol.texas.gov/tlodocs/87R/analysis/html/SJ00027H.htm.

160. For the foregoing reasons, Plaintiffs have not shown that the City's bird deterrence program, the removal and relocation of trees in the Project Area, or the temporary closure of the Project Area place a substantial burden on their religious exercise.

161. Therefore, they have failed to demonstrate that they are likely to succeed on the merits of their claims under the Texas Constitution.

## G. Plaintiffs Have Not Shown That They Are Likely To Succeed On The Merits Of Their Claim Under TRFRA

162. A TRFRA claimant must establish that a government agency *substantially burdened* his free exercise of religion. TEX. CIV. PRAC. & REMEDIES CODE § 110.003(a). Thus, the previous discussion about "substantial burden" applies with equal force in the context of TRFRA, and Plaintiffs' failure to establish a substantial burden in the context of RLUIPA applies with equal force here. As set forth above, Plaintiffs have not shown that the City's bird deterrence program, its decision to remove and relocate trees in the Project Area, or the temporary closure of the Project Area imposes a "substantial burden" on their religious exercise. In any event, subsection (a) does not apply if the government agency can demonstrate that the alleged burden was the "least restrictive means of furthering" a "compelling governmental interest." *Id.* § 110.003(b)(1)-(2). For all the reasons set forth above, the City has shown that its bird deterrence program, the current iteration of the 2017 Bond Project (*i.e.*, reducing the number of trees to be removed or relocated within the Project Area), and the temporary closure of the Project Area were the least restrictive means of furthering the compelling government interests in public safety and the preservation of the Park and its amenities.

23-50746.1043

## III.   THE PLAINTIFFS HAVE NOT SHOWN THE LIKELIHOOD OF AN IRREPARABLE INJURY

163.   While any infringement on a constitutional right, even if it is *de minimis*, can constitute an irreparable injury for purposes of the Motion for Preliminary Injunction, Plaintiffs have not met their burden of showing such an injury.

164.   The City's bird deterrence program in the Project Area does not infringe on Plaintiffs' religious rights, because their beliefs do not require double-crested cormorants to be nesting in the Project Area.

165.   The City's plan to remove and relocate trees in the Project Area does not infringe on the Plaintiffs' religious rights, because their beliefs do not require the presence of any particular tree or a particular number of trees in the Project Area.

166.   The City's temporary closure of the Project Area does not infringe on Plaintiffs' religious rights because the right of free exercise does not relieve individuals like Plaintiffs of their obligations to comply with valid or neutral laws of general applicability on the grounds that the law proscribes, or requires, conduct which is contrary to his or her religious practice.  *Smith*, 494 U.S. at 878.

## IV.   THE THREATENED INJURY TO PLAINTIFFS DOES NOT OUTWEIGH THREATENED INJURY TO THE CITY AND A PRELIMINARY INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST.

167.   The third and fourth criteria for obtaining a preliminary injunction merge in this instance, because the City is a governmental agency.

168.   Even assuming that the Plaintiffs had shown that the City's bird deterrence program in the Project Area, the 2017 Bond Project, and the temporary closure of the Project Area constituted a threatened injury to Plaintiffs, such threatened injury does not outweigh the threatened injury to the City.

23-50746.1044

169.     If the City is enjoined from pursuing the bird deterrence program in the Project Area, the public will continue to be exposed to the numerous health hazards posed by the large population of migratory birds in the Project Area, including, but not limited to: failing tree limbs, contaminated water, zoonotic diseases, regurgitated food, deceased birds, and bird feces. The City will be exposed to legal liability if the City is enjoined from pursuing the bird deterrence program to mitigate these health hazards.

170.     Additionally, if the City is enjoined from pursuing the bird deterrence program in the Project Area, it will likely delay the 2017 Bond Project.  Absent the bird deterrence measures, it is virtually certain that migratory birds will nest in the Project Area.  The City will then be required to monitor those nests.  As long as there are active nests in the Project Area, the City cannot proceed with the construction proposed under the 2017 Bond Project.

171.     If the City is enjoined from completing the 2017 Bond Project then the public will continue to be endangered by the failing and collapsing walls and dead or dying trees within the Project Area. The City will be exposed to legal liability if the City is enjoined from making the necessary repairs in the Project Area or will have to keep the Project Area closed to the public to prevent serious injuries.

172.     If the City is not permitted to remove and relocate the trees as currently proposed in the 2017 Bond Project, visitors to the park may be exposed to unnecessarily hazardous conditions.  Additionally, the City would be required to expend additional funds to re-evaluate the proposed bond project to address the same concerns that have already been addressed following the public comment period, *e.g.*, the public comments **(a)** objecting to the bird deterrence program and **(b)** advocating for the preservation of more trees in the Project Area.  As the City has already evaluated alternative and adjusted its plans in response to those public

23-50746.1045

comments, re-evaluating the same concerns under the gloss of Plaintiffs' religious beliefs would be duplicative and futile.

173.    The injunctive relief that Plaintiffs seek would, paradoxically, enhance the injury that Plaintiffs allege.  Until the 2017 Bond Project is complete, the City must continue deterring migratory birds—including the double-crested cormorant—from nesting in the Project Area, and the Project Area must remain closed to the public due to safety concerns.

174.    Further, if Plaintiffs are permitted to access an area that the City has already deemed presents a safety hazard, the City (and ultimately, the taxpayers) are exposed unnecessarily to significant liability if Plaintiffs (or their co-religionists) were injured by, *e.g.*, falling trees or tree limbs.

175.    Finally, granting a preliminary injunction would disserve the public interest. Granting a preliminary injunction to halt the bird deterrence efforts disserves the public interest in public health and safety as well as environmental quality.  Granting a preliminary injunction to prohibit the City from performing the work pursuant to the 2017 Bond Project disserves the public interest in having safe and accessible public park spaces. Granting a preliminary injunction allowing the Plaintiffs to access the Project Area while unsafe conditions persist disserves the public interest in public safety.

# Tab 5

# CERTIFICATE OF SERVICE

I certify that on November 8, 2023, the foregoing record excerpts were electronically filed with the United States Court of Appeals for the Fifth Circuit using the CM/ECF system, and that all parties required to be served have been served. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.


*/s/ Chance B. McCraw*
Chance B. McCraw
*Counsel for Plaintiffs*