CASE NO. 23-50746

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

GARY PEREZ; MATILDE TORRES,
*Plaintiffs–Appellants / Cross-Appellees*

v.

CITY OF SAN ANTONIO,
*Defendant–Appellee / Cross-Appellant*

_____

**BRIEF OF APPELLEE CITY OF SAN ANTONIO**

_____

| | |
|---|---|
| Fred R. Jones<br>fjones@langleybanack.com<br>Natalie Friend Wilson<br>nwilson@langleybanack.com<br>Ian McLin<br>imclin@langleybanack.com<br>Lee Brinson Warren<br>lwarren@langleybanack.com<br>Sara Murray<br>smurray@langleybanack.com<br>LANGLEY & BANACK, INC.<br>745 East Mulberry, Suite 700<br>San Antonio, TX 78212<br>Telephone: (210) 736-6600 | Jane Webre<br>jwebre@scottdoug.com<br>SCOTT DOUGLASS &<br>    MCCONNICO, LLP<br>303 Colorado Street, Suite 2400<br>Austin, TX 78701<br>Telephone: (512) 495-6300<br><br>City of San Antonio<br>Deborah Klein<br>Deputy City Attorney<br>Deborah.Klein@sanantonio.gov<br>International Center<br>203 South St. Mary's Street<br>Second Floor<br>San Antonio, TX 78205<br>Telephone: (210) 207-8949 |

**COUNSEL FOR THE CITY OF SAN ANTONIO**

CASE NO. 23-50746

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

GARY PEREZ; MATILDE TORRES,
*Plaintiffs–Appellants / Cross-Appellees*

v.

CITY OF SAN ANTONIO,
*Defendant–Appellee / Cross-Appellant*

_____

CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1.    Plaintiffs—Appellants/Cross-Appellees
      Gary Perez ("Perez") and Matilde Torres ("Torres")
      (collectively, "Plaintiffs")

      Trial and Appellate Counsel for Plaintiffs/Appellants/Cross-Appellees:

      Mark W. Rasmussen
      mrasmussen@jonesday.com
      Margaret I. Lyle
      milyle@jonesday.com
      Jonathan D. Guynn
      jguynn@jonesday.com
      J. Benjamin Aguiñaga
      jbaguinaga@jonesday.com

Chance McCraw
cmccraw@jonesday.com
Timothy M. Villari
tvillari@jonesday.com
JONES DAY
2727 N. Harwood Street
Dallas, TX 75201.1515
Telephone: (214) 220-3939

John Greil
john.greil@law.utexas.edu
Steven T. Collis
steve.collis@law.utexas.edu
LAW AND RELIGION CLINIC
UNIVERSITY OF TEXAS SCHOOL OF LAW
727 East Dean Keaton Street
Austin, TX 78705
Telephone: (512) 471-5151

2. Defendant-Appellee/Cross-Appellant City of San Antonio
("City")

Appellate Counsel for the City of San Antonio:

Jane Webre
jwebre@scottdoug.com
SCOTT DOUGLASS & MCCONNICO, LLP
Colorado Tower
303 Colorado Street, Suite 2400
Austin, TX 78701
Telephone: (512) 495-6300
Facsimile: (512) 495-6399

Trial and Appellate Counsel for the City of San Antonio:

Fred R. Jones
fjones@langleybanack.com
Natalie Friend Wilson
nwilson@langleybanack.com

Ian McLin
imclin@langleybanack.com
Lee Brinson Warren
lwarren@langleybanack.com
Sara Murray
smurray@langleybanack.com
LANGLEY & BANACK, INC.
745 East Mulberry, Suite 700
San Antonio, TX 78212
Telephone: (210) 736-6600
Facsimile: (210) 735-6889

City of San Antonio
Deborah Klein
Deputy City Attorney
Deborah.Klein@sanantonio.gov
International Center
203 South St. Mary's Street,
Second Floor
San Antonio, TX 78205
Telephone: (210) 207-8949
Facsimile: (210) 207-4004

November 15, 2023

_____
Jane Webre

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................................ ii

Table of Authorities .......................................................................... viii

Jurisdictional Statement ...................................................................... xi

Statement Regarding Oral Argument .................................................... xi

Statement of Issues ............................................................................ xi

Introduction .......................................................................................... 1

Statement of the Case ......................................................................... 4

    A.    Statement of Facts ............................................................ 4

        1.    Hazards from crumbling walls at Lambert Beach
                in Brackenridge Park ......................................... 5

        2.    Hazards from migratory birds at Lambert Beach ......... 9

        3.    Plaintiffs' beliefs as to the Sacred Area near
                Lambert Beach ................................................... 16

        4.    City project to address hazards at Lambert Beach ..... 26

        5.    Tree removal and relocation necessitated by the
                Project ............................................................... 29

    B.    Procedural History ............................................................ 32

    C.    The record from the temporary injunction hearing ............. 34

Standards of Review ............................................................................. 34

Summary of Argument .......................................................................... 35

Argument .............................................................................................. 36

4875-3925-4416

A.  Plaintiffs' contentions regarding access are moot. ...............36

B.  The removal of trees as part of renovating the north riverbank retaining walls does not violate TRFRA..............37

    1.  The standard for a substantial burden is meaningful where it involves the government's use of its own land.........................................................38

    2.  The removal of trees as part of the riverbank renovation does not substantially burden Plaintiffs' religious beliefs...........................................42

    3.  The planned construction method is the least restrictive means to advance compelling governmental interests. ................................................45

C.  The City's rookery management program does not violate TRFRA. .....................................................................54

    1.  The rookery management program does not substantially burden Plaintiffs' beliefs.......................55

    2.  The rookery management program is the least restrictive means to advance compelling governmental interests. ................................................57

D.  The project does not violate any other free exercise guarantee...............................................................................60

    1.  The federal Free Exercise clause .................................60

    2.  Tex. Const. art. I, § 6....................................................63

    3.  Tex. Const. art. I, § 6-a ...............................................64

Conclusion and Prayer ...........................................................66

Certificate of Compliance .......................................................68

Certificate of Service ...................................................................................69

## TABLE OF AUTHORITIES

**Cases**

*A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*,
    611 F.3d 248 (5th Cir. 2010) ...................................................38, 42

*Adkins v. Kaspar*,
    393 F.3d 559 (5th Cir. 2004) ........................................................38

*Arizona v. United States*,
    567 U.S. 387 (2012) ........................................................................49

*Barr v. City of Sinton*,
    295 S.W.3d 287 (Tex. 2009)...........................................................35

*Employment Div., Dep't of Human Res. of Oregon v. Smith*,
    494 U.S. 872 (1990) ..................................................60, 61, 63, 64

*Fulton v. City of Philadelphia, Pennsylvania*,
    141 S. Ct. 1868 (2021) .......................................................61, 62, 63

*Havasupai Tribe v. Robertson*,
    943 F.2d 32 (9th Cir. 1991) ..........................................................41

*Havasupai Tribe v. United States*,
    503 U.S. 959 (1992) ........................................................................41

*Havasupai Tribe v. United States*,
    752 F. Supp. 1471 (D. Ariz. 1990)...............................................41

*HEB Ministries, Inc. v. Tex. Higher Educ. Coordinating Bd.*,
    235 S.W.3d 627 (Tex. 2007)...........................................................64

*In re Commitment of Fisher*,
    164 S.W.3d 637 (Tex. 2005)...........................................................64

*Kansas v. Garcia*,
    140 S. Ct. 791 (2020) .....................................................................48

4875-3925-4416

*Kennedy v. Bremerton Sch. Dist.*,
    142 S. Ct. 2407 (2022) ................................................................. 60

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
    485 U.S. 439 (1988) ...................................................................... 40

*Merced v. Kasson*,
    577 F.3d 578 (5th Cir. 2009) ...................................................... 35

*Navajo Nation v. U.S. Forest Serv.*,
    535 F.3d 1058 (9th Cir. 2008), *cert. denied*
    556 U.S. 1281 (2009) .............................................................. 39, 40

*Satanic Temple v. City of Belle Plaine*,
    2021 WL 4199369 (D. Minn. Sept. 15, 2021) ............................... 65

*Taylor v. City of Gary*,
    233 F. App'x 561 (7th Cir. 2007) .................................................. 65

*Tex. All. for Retired Ams. v. Scott*,
    28 F.4th 669 (5th Cir. 2022) ........................................................ 34

*U.S. Navy Seals 1-26 v. Biden*,
    27 F.4th 336 (5th Cir. 2022) ........................................................ 38

*United States v. Means*,
    858 F.2d 404 (8th Cir. 1988), *cert. denied* 492 U.S. 910 (1989) ..... 41

*Wilson v. Block*,
    708 F.2d 735 (D.C. Cir. 1983) ...................................................... 41

ix

**Statutes**

28 U.S.C. § 1292(a)(1)..................................................................xi

28 U.S.C. § 1331 ..........................................................................xi

28 U.S.C. § 1343 ..........................................................................xi

28 U.S.C. § 1367 ..........................................................................xi

42 U.S.C. § 1983 ..........................................................................xi

Fed. R. App. P. 10(e)(2)(A)........................................................34

Tex. Civ. Prac. & Rem. Code § 110.003(a) ..............................37

Tex. Civ. Prac. & Rem. Code § 110.003(b) ..............................37

**Other Authorities**

*Texas Proposition 3: A State Constitutional Response to
        Restrictions on Religious Gatherings*, 55 Tex. Tech L. Rev.
        559, 583–84 (2023) .........................................................65

**Constitutional Provisions**

Tex. Const. art. I, § 6................................................................63

Tex. Const. art. I, § 6-a.............................................................64

4875-3925-4416

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 1983; and over Plaintiffs' state claims pursuant to 28 U.S.C. § 1367. This Court has jurisdiction over this interlocutory appeal from the district court's injunction orders pursuant to 28 U.S.C. § 1292(a)(1).

## STATEMENT REGARDING ORAL ARGUMENT

This appeal is set for oral argument on December 7, 2023.

## STATEMENT OF ISSUES

1. Are Plaintiffs' claims regarding access to the Sacred Area moot since the City has reconfigured the construction fencing to allow access to the river for Plaintiffs to conduct their religious services?

2. Did the district court abuse its discretion in denying injunctive relief involving trees and birds where Plaintiffs (i) failed to demonstrate that the City's construction project and rookery management activities will substantially burden their religious beliefs, and (ii) the activities are the least restrictive means to advance compelling governmental interests?

4875-3925-4416

CASE NO. 23-50746

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

GARY PEREZ; MATILDE TORRES,
*Plaintiffs–Appellants / Cross-Appellees*

v.

CITY OF SAN ANTONIO,
*Defendant–Appellee / Cross-Appellant*

_____

**BRIEF OF APPELLEE CITY OF SAN ANTONIO**

_____

## INTRODUCTION

The district court granted in part and denied in part a temporary injunction based on Plaintiffs' claims that the City's proposed infrastructure project to rebuild the crumbling banks of the San Antonio River within Brackenridge Park and mitigate the hazardous effects of roosting migratory birds improperly burdens their sincerely-held religious belief that requires them to worship in a particular spot within the Park. This appeal thus entails the intersection of constitutional inquiry involving free exercise and a municipal public works project in a large urban park.

Over a four-day hearing, the district court heard testimony outlining Plaintiffs' beliefs regarding their Sacred Area (defined below). It also heard evidence regarding the dangerous crumbling 100-year-old riverbank retaining walls, the encroachment of trees whose spreading roots contribute to the crumbling, and the proposed engineering solution that will shore up the retaining walls but require the removal or relocation of some trees from the area, many of which are otherwise destined to fall due to erosion when the walls inevitably fail. It also heard evidence about thousands of migratory birds who have made the dilapidated area a rookery contaminated with tremendous amounts of guano that poses a significant threat to human health. The City's Park rehabilitation project and rookery management program will address those hazards, but Plaintiffs seek to enjoin that work and prevent the plan from going forward.

This appeal asks to what degree courts, in evaluating a free exercise claim, should second-guess a municipality's solutions for complex public health and safety issues attendant to a large-scale public works project. The district court heard extensive testimony and evidence showing that the City's plan to rehabilitate the Park both (i) does not substantially burden Plaintiffs' beliefs, and in any event (ii) is narrowly tailored to

accommodate those beliefs. The district court correctly denied Plaintiffs'
requests to enjoin the plan outright. It also ordered the City to remove a
dangerous hanging tree limb from the area held sacred by Plaintiffs, to
grant Plaintiffs certain limited access thereto, and to "explore whether
the sacred site can be separately fenced off with fencing from the street
on the exterior side of the trunks of the two trees to the riverbank."
ROA.737.

In this fast-moving case, procedure has outpaced facts, which
continue to develop on the ground. Following the district court's orders,
the City removed the dangerous limb that previously made the sacred
site inaccessible for compelling safety reasons. ROA.740. Its removal
allowed the City to reconfigure the construction fencing to grant public
access to the entire area, rendering moot Plaintiffs' claims seeking access
to the river to conduct their religious services. The City has also granted
permission for Plaintiffs to conduct a ceremony at the Sacred Area from
midnight to 4 a.m. on November 18, 2023, when the Park is normally
closed, thus going beyond what the district court ordered.

That leaves Plaintiffs' requests to enjoin (i) the entire construction
project to rehabilitate the historic San Antonio River walls based on the
removal of trees necessitated by the plan's engineering methodology, and

(ii) the City's rookery management program necessitated by both public health and safety interests and the Migratory Bird Treaty Act. Plaintiffs have not met their burden on appeal to show that the district court abused its discretion in concluding that they failed to show a likelihood of success on the merits as to either issue. The record confirms that the court did not err—much less clearly err—in concluding that neither action substantially burdens Plaintiffs' beliefs. ROA.1043. The record further confirms that the court did not err in finding that the City's plan is narrowly tailored in any event. *Id.* This brief focuses on Plaintiffs' inability to meet the "likelihood of success" prong, which is dispositive to this appeal.

This Court should affirm the district court's orders denying Plaintiffs' requests to enjoin the construction project and the rookery management program and deny as moot Plaintiffs' requests for injunctions pending appeal.

## STATEMENT OF THE CASE

### A.    Statement of Facts

In its October 11, 2023, Opinion and Order Granting in Part and Denying in Part Plaintiffs' Request for Preliminary Injunction ("Opinion"), the district court did something unusual. Rather than recite

its own findings of fact and conclusions of law based on the evidence adduced at the hearing, it adopted as its own the historical background facts offered by both the Plaintiffs and the City. R.E.4, ROA.985. In addition, the district court adopted as its own the City's Proposed Findings of Fact and Conclusions of Law regarding the Opinion's rulings on Item 2 (trees) and Item 3 (migratory birds), generally. ROA.988. In connection with Item 1 (access) the court adopted Plaintiffs' Proposed Findings of Fact and Conclusions of Law to the extent they support the limited issue of "granting access for 'religious services' involving 15 to 20 people for no more than an hour on specified astronomical dates coinciding with Plaintiffs' spiritual beliefs." ROA.985.

1. <u>Hazards from crumbling walls at Lambert Beach in Brackenridge Park</u>

Founded in 1899, Brackenridge Park (the "Park") is an urban park spanning 343 acres near the headwaters of the San Antonio River. ROA.557-558; ROA.597-598. An integral part of the City's history and culture, the Park now includes the San Antonio Zoo, Sunken Garden Theater, Japanese Tea Garden, and Witte Natural History Museum. *Id.* The Park also serves as a habitat for various wildlife species, including migratory birds such as herons, egrets, and cormorants. *Id.* The Park

4875-3925-4416

belongs to, and is managed by, the City through its Parks and Recreation Department. ROA.598. Plaintiffs have no ownership interest—or any other sort of property interest—in the Park. Tr.105:7-17; Tr.146:10-17.

In developing the Park during the early 1900s, parks commissioner Ray Lambert oversaw in 1915 the construction of a gravel-lined pool in the natural river channel at a particular bend in the river toward the northern end of the Park:



ROA.3100 (Lambert Beach circa 1920).

The "beach" became known as "Lambert Beach" to honor Lambert's contributions. ROA.2773. In 1925, the "beach" was transformed into a

more formal swimming pool, with concrete stairs and landings and a stone bathhouse added to the north bank of the river:



**Figure 17.** Lambert Beach

ROA.2858.

The retaining walls framing Lambert Beach are historic structures that have contributed to the Park's designation on the National Register of Historic Places, as a State Antiquities Landmark, and as a City of San Antonio Historic Landmark. ROA.557-58. Because of these historic designations, construction on the retaining walls is regulated by the

7

Texas Historical Commission and the United States Army Corps of Engineers. *Id.*

The retaining walls are a gravity wall system, built between the 1920s and the 1940s, and have fallen into disrepair on the north bank. *Id.* In part, the damage to the retaining walls has been caused by the presence of trees and their spreading root systems, which are too close to the walls. *Id.*; Tr.264:13-17 (explaining that "tree roots from [nearby] trees diminish the structural integrity of certain retaining walls"). In their current state, the north-bank retaining walls present a safety hazard. ROA.558; ROA.2268-2281. Some portions of the walls have already failed, and others are at risk of failing. *Id.* By way of example:





ROA.2342; ROA.2269.

When a portion of the walls fails, it can cause the soil and trees to shift dangerously, and these risks increase when there is substantial precipitation. ROA.558. If the walls are not rehabilitated, they will inevitably eventually fail, and many of the trees lining the northern bank (*i.e.*, the "high" side) will fall due to erosion. Tr.738:14-739:4.

2.   <u>Hazards from migratory birds at Lambert Beach</u>

The Park serves as a seasonal home to thousands of migratory birds, which arrive annually beginning in February and nest in or near the Park until mid- to late-October when they migrate farther south.

9

Tr.564:17-565:9. Prominent species include yellow crowned herons, great egrets, cattle egrets, double crested cormorants, and neotropic cormorants. ROA.2379. These birds developed a rookery (a large colony of breeding birds) in the deteriorated area surrounding Lambert Beach. *Id.* The City measured elevated levels of E.coli and other substances harmful to human health in this stretch of the river, which is the product of fecal bacteria from the birds; the birds are also known to spread respiratory diseases. ROA.2381-82. In short, the birds poop a lot, and their poop is very hazardous to humans.

The situation is so severe that amenities in the Lambert Beach area, including the Joske Pavilion, Brackenridge Park Conservancy Office, and playground and picnic areas, "become nearly unusable for 10 months of the year due to the bird density/habitat." ROA.2381. The picnic areas become "covered in bird feces, tables, concrete, also the ground around it as well as the . . . . barbecue pits," and the playground becomes "covered in feces" as well. Tr.429:19-430:14. The record contains many photographs depicting the extent of the rookery and these hazards, for example:





4875-3925-4416





ROA.2387; ROA.2401; ROA.2390; ROA.2393.

According to record testimony, "this is mild. It continues to get worse." Tr.429:25.

The City's findings as to the birds have been corroborated by state wildlife veterinarian Dr. J. Hunter Reed, who has a Master's in Public Health degree in addition to his veterinary education. ROA.2267. In a March 2022 letter, Dr. Reed explained that the Park's rookery presented public health and safety issues because of the significant amount of guano in the immediate vicinity of playgrounds and picnic tables and other Park amenities where children play:

> As it pertains to the rookery in Brackenridge Park, I have significant public health concerns for my fellow San Antonians. When large rookeries are established in the immediate vicinity of playgrounds, infrastructure, and recreational hardscapes, the risk of zoonotic disease transmission from several agents (including histoplasmosis, psittacosis, salmonellosis, among others) increases substantially. The sheer magnitude of fecal contamination, high likelihood of human contact with fecal matter, and limited ability to perform effective environmental decontamination make rookery management action paramount to disease risk mitigation. Additionally, the population most likely to be exposed in this scenario, young children, are also the most likely to develop severe disease if infected. This is an outcome that I believe everyone seeks to avoid.

ROA.2267.

To address the health and safety threat posed by the migratory birds, the City developed a rookery management program with technical guidance from Texas Parks and Wildlife. ROA.2425. To mitigate the hazard, the program seeks "to deter birds from an undesired location and encourage them to go to an area where they would be more desirable."

Tr.546:21-547:2. The program deploys two general methods to that end: (1) habitat modification, which involves trimming trees and brush to reduce available nesting habitat; and (2) deterrent techniques, which involve using pyrotechnics, lasers, spotlights, distress calls, mylar balloons, and drones to disperse birds from the undesired location. ROA.2382. These measures "do not harm the birds or keep them from reproducing." ROA.2426.

The record contains a field agreement dated December 21, 2021, between the City and the Wildlife Services division of the U.S. Department of Agriculture ("USDA") along with several of USDA's local Texas affiliates (collectively known as the Texas Wildlife Services Program), that sets forth the City's rookery management program. ROA.2441. The stated objective of the agreement's work plan is "the mitigation of hazardous wildlife for the protection of human health and safety." ROA.2442. The work plan calls for mitigation efforts to begin on January 1, 2022 and continue for up to five years. *Id.*

Habitat modification and deterrent methods began in 2022 and in large part have successfully deterred migratory birds from nesting in the Lambert Beach area for the past two years. Tr.473:18-20. Notwithstanding the relocation of the rookery, the birds still regularly

visit the Lambert Beach area: "They come in and hang out, you see them in the morning, they come in through the day. They'll come in the trees and then they'll go down in the water and then they'll fly back to their nesting area. So it's foraging and then they'll go back and switch out with their mate." Tr.446:24-447:3.

Among the various species at issue, egrets and herons pose the greatest threat to human health and safety; they are the real target of the program. Tr.559:6-11. But the different species (egrets, herons, and cormorants) are also colonial—"they want to be in the group," and will follow one another to nesting areas irrespective of species. Tr.440:5-14; Tr.550:8 ("[T]hey do this as a way of protecting [] their young."). That behavior includes moving in and out of each other's nests interchangeably. Tr.425:10-14.

Consequently, "there is not a way" to deter the more problematic species like egrets and herons without deterring the less problematic species like cormorants. Tr.441:23-442:1; *see* Tr.423:15-22; 424:13-16; 425:6-19; 550:1-551:12. The record is abundantly clear on this point: "There isn't a way." Tr.567:3. In order to accomplish the goal of mitigating the hazard of bird feces, all species must be deterred. That said, once a critical mass of the early nesters establishes a rookery

15

elsewhere, it is sometimes possible for activities to "slow down and cease" with respect to the "stragglers, who are on the end of the migration train," because these late-arriving birds tend to follow the pack—though there are documented exceptions to that dynamic, including in which the established nesting is disrupted "and then the birds will look to create again." Tr.443:3-18.

In 2022, the City employed that very "slow down and cease" approach. Having persuaded the majority of the colony to establish its rookery elsewhere, the City "stop[ped] bird deterrent activities in June of that year," which through careful monitoring allowed some late-arriving cormorants to "come in and nest" at Lambert Beach, to the exclusion of the problematic species. Tr.406:9-19.

    3.   <u>Plaintiffs' beliefs as to the Sacred Area near Lambert Beach</u>

Because this appeal involves claims regarding whether the City's proposed construction projects in the Park substantially burden Plaintiffs' sincerely-held religious beliefs, it is important to outline precisely what Plaintiffs articulated those beliefs to be.

Plaintiffs are residents of San Antonio and members of the Lipan-Apache "Hoosh Chetzel" Native American Church. ROA.556. The Lipan Apache Tribe (of Texas) is recognized by Texas and admitted to the

National Congress of American Indians, but it is not a federally recognized tribe. ROA.556-57.

Plaintiffs believe in the sacredness of a twenty-foot by thirty-foot area situated at "the northernmost point of the southern bank of the San Antonio River" on a specific riverbend located within the Park near Lambert Beach ("Sacred Area"). Tr.66:18-20; 472:18-20; ROA.2209. Plaintiffs believe that the shape of this particular bend in the river mirrors the Eridanus constellation, "the river in the sky," Tr.39:24, which holds importance in their religion's creation story. Plaintiffs further believe that the Sacred Area possesses a "spiritual ecology" comprising "the Eridanus constellation, the trees, the cormorants, and the river itself." Brief p.1.

According to Plaintiffs, "[t]hey and their ancestors have believed [these things] long before the Park existed," ROA.45, and have worshiped at the Sacred Area "[f]or centuries," Brief p.1. Plaintiffs have variously testified that their belief in the Sacred Area dates back through their ancestors "2000 years," (Tr.39:15), "thousands of years," (Tr.77:23-24; 142:13; 143:17), and "10,000 years, at the very least." (Tr.120:23-24).

The record also shows, however, that the current confluence of stars, trees, birds, and river that Plaintiffs seek to preserve in this appeal

17

does not—and cannot—reflect the "spiritual ecology" that gave rise to that belief thousands of years ago. As the district court noted in its opinion, the area "does not look the same as it did thousands of years ago in the cave painting exhibit";[1] nor "does it look the same as 100 years ago when there really was a beach as depicted in various exhibits"; nor "will it look the same 100 years from now." ROA.986.

Since the advent of Plaintiffs' belief thousands of years ago, the Sacred Area has been altered by prior developments visited upon the indigenous land by non-indigenous peoples. Even before George Brackenridge gave the land underlying the Sacred Area to the City in 1899 to form the Park, Spanish missionaries had diverted the river's headwaters to the Alamo via conduits (acequias) in the 1700s, ROA.2769, and a pump house and water supply system for the City had been constructed on the northern bank directly across from the Sacred Area in the 1800s, ROA.2773. After those alterations and others, "[t]he Park officially was established and began to assume its current form in 1899;" and now "[t]he Park contains manmade structures, including retaining walls along the San Antonio River." ROA.990.

---

[1] ROA.53-55.

This recent photograph shows the Sacred Area viewed from the northern bank (ROA.2209):



As depicted above, the Sacred Area today is made up of two bald cypress trees flanking a concrete slab and a concrete staircase leading down to the river.

Plaintiffs testified that only naturally-reproducing trees, not human-planted trees, are considered sacred. Tr.82:10-16. Record testimony reflects that the two cypress trees flanking the Sacred Area

"very much appear . . . to be planted by humans," because "[t]hey fall under the guidelines of design principles" for "spacing, the distance away from the river," and match the size, spacing, and layout of cypress trees planted nearby in the 1930s as part of documented landscape projects. Tr.447:13-448:6; *see also* ROA.3100 (depicting foliage on southern bank of Lambert Beach circa 1920).

In addition to the failing river walls at issue in this appeal, the Sacred Area is also surrounded by other manmade developments like the Brackenridge Pump House, a building containing public restrooms, the Joske Pavilion, the San Antonio Zoo, a playground, a softball field, and a golf course,[2] not to mention asphalt roads and concrete sidewalks:

---

[2] Brackenridge Park Golf Course, which opened in 1916, is the oldest 18-hole public golf course in Texas.



ROA.2678 (red arrow showing location of Sacred Area).

Indeed, the Sacred Area owes its continued existence to those human developments that have changed its ecology over time. As the district court observed, "[t]here would be no San Antonio/Mother Waters but for the City artificially assisting the river by pumping recycled waste water, presumably from the sewer reclamation system." ROA.987. The river water is chemically treated, Tr.97:24-25 ("you can even smell the chemicals because it's been processed"), and the river channel is periodically drained ("dewatered") for maintenance and cleaning, Tr.624:15-18; 366:3-9 (describing "dewatering in 2020"). The record contains photographs and testimony regarding the "dewatering" process,

of which Plaintiffs do not complain:



ROA.1728.

Why does this matter? These realities—the human-driven evolution and development of this bend in the river—underscore that regardless of this appeal's outcome, the Sacred Area will in fact forever lack the "spiritual ecology" that made it sacred to Plaintiffs' ancestors of time immemorial.

Nevertheless, Plaintiffs assert that their religion requires performing ceremonies at the Sacred Area on certain dates coinciding with astronomical events involving the location of the Eridanus constellation in relation to the horizon. The core feature making the

Sacred Area sacred to Plaintiffs is that it provides "access to the steps on the southern bank," Tr.208:11-14, 214:1-3 ("it's a specific staircase on the southern bank"), which allows Plaintiffs to visit the water's edge and incorporate the riverfront into their ceremonies. Plaintiffs "go to that particular bend in the river," Tr.39:22, which "points us directly north," Tr.52:22, to "stand at that particular spot to pray," Tr.45:11.

Plaintiffs' worship ceremonies require "standing over the river" at that exact spot, Tr.60:24, which "represents the underworld, the middle world, and the upperworld," to see that "all three worlds are intact when we look in the water and see our reflection and . . . the trees and the birds and the sky." Tr.58:11-18; 114:7-15.

To be precise, according to Plaintiffs, the religious effectiveness of the ceremony turns on being able to see one's own reflection in the water, silhouetted against the cypress tree branches and cormorants above. Tr.63:5-6 ("I must see my reflection in the water."); 63:1-2 (describing "the very location we need to stand in order to see our reflection in the water"); 97:6-7 (describing the critical component as going "to the edge of the river so they themselves see themselves in the reflection in the water"); 114:4-5 (describing the sacred moment as "when we look in the water and we see our reflection"). Importantly, no tree canopies that would be visible

behind one's own reflection viewed from the vantage point of the Sacred Area will be removed or relocated by the City's plan. Tr.448:20 ("They're being preserved in place.").

Finally, with respect to the birds, in their creation story Plaintiffs view the cormorant or "water bird" as that being which "gave life." Tr.130:13. Two varieties of cormorants migrate seasonally to the Park: the double-crested cormorant and the neotropic cormorant. Tr.549:11-23. According to Plaintiffs, their ceremonies require a live cormorant "to be physically present" within the Sacred Area during the ceremony—and "either type is necessary." Tr.87:12-88:4. In the ceremonies, Plaintiffs view their reflection and see along with "our reflection the trees [] and the birds and the sky," and "everything is copasetic, [when] we're standing there, looking directly in the water." Tr.58:11-18.

According to Plaintiffs, "generations of people have been coming to Brackenridge Park for hundreds of years now for a ceremony and now to celebrate [E]aster." Tr.89:12-13. Easter happens on the first Sunday after the full moon that occurs on or after the spring equinox; it can fall on any date between March 22 and April 25. Plaintiffs also specify that one of their most important ceremonies is conducted on the winter solstice, December 21, "when right at midnight the terrestrial river and celestial

river meet end to end." Tr.771:20-22. And at all of those ceremonies, according to Plaintiffs, cormorants must be present to be viewed in the cypress trees as a backdrop to Plaintiffs' reflection in the river.

The record shows that during their migration season, cormorants visit and are present in the Sacred Area even when they do not nest within the Sacred Area—which has largely been the case for at least the past two years due to the City's rookery management program. Tr.446:19-447:3; 473:19-20 ("[W]e were able to fend them from the project area the last two years."). The record also shows, however, that the cormorants' annual migration season is bounded. They migrate to San Antonio each year in April or May, "or oftentimes later." Tr.549:1-23 (explaining that the yellow crowned herons and great egrets come in "as early as February," followed later by the cattle egrets and cormorants). All of the migratory birds in the Park, including the cormorants, leave and "migrate further down south" at the "first cold snap," which generally occurs in "[m]id to late October," Tr.565:6-7. Separate and apart from the City's rookery management program, based on the birds' migration patterns, Mother Nature tends to preclude the cormorants from being present for Plaintiffs' Easter ceremony or Plaintiffs' "midnight water" ceremony during the winter solstice.

4.    <u>City project to address hazards at Lambert Beach</u>

In May 2017, San Antonio voters approved an $850-million-dollar bond issue for renovations and repairs to several areas of the City, including aspects of the Park that: have deteriorated or fallen into disrepair; threaten the Park's historical, natural, cultural, and recreational features; and/or pose health and safety risks to the Park's many visitors. ROA.562-67. The City then spent several years planning how to carry out that mandate. *Id.* That process involved expert studies, engineering analysis, public hearings, and multiple levels of approval to reach its current point where work can begin. *Id.*

The project is divided into two phases. This appeal involves "Phase I," which "consists of the structural stabilization of the historic [pump house], rehabilitation and stabilization of historic river walls, retaining walls, and grand staircase in . . . the Lambert Beach area, including landscaping and irrigation improvements." ROA.644; ROA.2249. Plaintiffs do not dispute that these repairs need to be made, but they challenge the way the City is going about them. Specifically, Plaintiffs disagree with the engineering and planning decisions the City has made for the project based on the recommendations of its experts. ROA.564-569. Plaintiffs seek an injunction to stop the repairs entirely.

In preparation for the project, and to facilitate project operations and protect the public's health and safety, the City fenced off a two-acre area ("Project Area") of the Park where the first phase of work is scheduled to occur. ROA.599; ROA.619-42. The Project Area is highlighted in blue in this map:



ROA.2221.

The Sacred Area resides within the Project Area and therefore was included in the original fenced-off area. But as of the filing of this brief, the reconfigured fencing no longer encloses the Sacred Area as shown in the following demonstrative and related photographs:

27









In other words, the Project Area (except for the Sacred Area) remains fenced off to facilitate project operations and protect the public's health and safety during the project, but the Sacred Area is open to the public.

5. <u>Tree removal and relocation necessitated by the project</u>

During the project, the City will rehabilitate the crumbling retaining walls on the north bank of the river, directly across from the

Sacred Area, as well as upstream on the south bank, to serve the public health and safety interests giving rise to the bond issue. To repair the retaining walls, the City must remove certain trees and relocate others that are close to the river.

In addition to the need to remove and relocate trees to repair the wall, the Project Area contains dead and dying trees that pose a significant danger to the public, including—until very recently—within the Sacred Area. The health and safety concerns at issue are underscored by two incidents. ROA.566. First, on March 15, 2023, a limb from a cedar elm fell onto a sidewalk at the San Antonio Zoo, allegedly injuring seven individuals, four of whom have filed a lawsuit, claiming damages of $1 million. *Id* Second, on September 9, 2023, a large portion of a tree fell into the River near the Sacred Area. *Id.* This photo is just one example of many fallen trees in the area:



*See* ROA.2355-69.

The City consulted experts including arborists and engineers; held seven hearings to allow the public to give input about the Park's trees and wildlife; and adjusted its plans so that the number of trees now scheduled for removal has been reduced from 70 to 48, with another 20 trees scheduled for relocation. ROA.3096 (plat detailing the planned treatment of every tree within the Project Area); ROA.3097-99 (legend for plat). Despite Plaintiffs' many representations to the contrary, the City considered Plaintiffs' input regarding the trees, held a meeting of decisionmakers to address it, and revised the plan to accommodate it.

31

Tr.361:23-362:11; 603:2-604:6.

Finally, the construction project implicates the federal Migratory Bird Treaty Act, 16 U.S.C. § 703, which forbids interference with actively nesting migratory birds and their nests. The statutory prohibition against interfering with nesting migratory birds lasts "from the moment that egg is conceived in the nest until the fledgling can get out on its own." Tr.420:24-421:2. "Some are weeks, some are months. It's a long period." Tr.421:5. So the project can proceed only if no migratory birds are nesting within the Project Area.

B.   Procedural History

Plaintiffs filed this lawsuit on August 9, 2023. ROA.13-42. The next day, Plaintiffs sought a temporary restraining order and a preliminary injunction. ROA.79-307. Plaintiffs requested access to the Sacred Area, and asked for the court to enjoin the City from conducting (i) tree-removal activities associated with the project, and (ii) the rookery management program. *Id.* The City responded. ROA.311-34. Plaintiffs replied. ROA.335-39. The court denied Plaintiffs' request for a temporary restraining order, ROA.340-42, and set a preliminary injunction hearing for September 25.

After a four-day hearing, the court entered three orders: (i) an October 2 partial order in which the court ordered the City to remove the dangerous broken limb hanging over the Sacred Area and provide Plaintiffs with access to the river, ROA.736; (ii) the October 11 Opinion discussed above in which the court granted an injunction as to access but denied Plaintiffs' requests as to the trees and birds, ROA.984; and (iii) an October 25 order denying Plaintiffs' request for an injunction pending appeal, ROA.1155.

In the midst of those orders, the City filed on October 4 an advisory confirming its removal of the branch from the Sacred Area. ROA.740. And on October 16, Plaintiffs filed their notice of appeal from the Opinion, ROA.1047, and requested an injunction pending appeal, ROA.1050. Before the district court ruled on Plaintiffs' latter request (which was ultimately denied), they sought the same relief in this Court. ROA.1152.

On October 27, a motions panel of this Court ordered that Plaintiffs' request for an injunction pending appeal be carried with the case, expedited the appeal, and issued a temporary administrative stay pending further orders of this Court. Dkt. No. 74.

C.    The record from the temporary injunction hearing

This appeal is expedited, but as of the filing of this Brief, the Court Reporter's official transcripts of the preliminary injunction hearing have not all been filed. The parties jointly moved for the district court to certify the RealTime (unofficial) transcripts of testimony during the four-day hearing, but the district court denied that motion. The transcripts are thus not included in the ROA, though the exhibits introduced at the hearing are in the ROA. The transcripts are critical to this appeal, however, because they provide the evidentiary record for the district court's injunction order.

The parties have therefore agreed to jointly file a stipulation pursuant to Fed. R. App. P. 10(e)(2)(A) to get the unofficial transcripts of the injunction hearing before this Court for review. Plaintiffs' briefing in this Court cites to those transcripts as Tr.___ using the 1-825 pagination. The City will do the same in this brief.

## STANDARDS OF REVIEW

This Court "review[s] a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law de novo." *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022). Regarding the statutory claims under the Texas Religious

Freedom Restoration Act, or TRFRA, "[w]hile we must accept the trial court's fact findings supported by the evidence, the ultimate answers determine the legal rights protected by the Act and are thus matters of law." *Barr v. City of Sinton*, 295 S.W.3d 287, 299 (Tex. 2009); *Merced v. Kasson*, 577 F.3d 578, 587 (5th Cir. 2009).

## SUMMARY OF ARGUMENT

As noted above, this interlocutory appeal arises at the intersection of constitutional free exercise claims and a significant municipal public-works project that entails public health and safety issues as well as engineering challenges to address the crumbling riverbank retaining walls. The district court heard four days of testimony about the issues, including evidence demonstrating that the City developed both the Park project and the rookery management program with a measured and thoughtful approach. The City assembled a team of arborists to assess the trees in the area. It analyzed the alternative engineering methods to reconstruct the retaining walls before concluding that no alternative method would save more trees than the chosen method. It consulted with state Parks & Wildlife experts regarding migratory birds and appropriate rookery management.  It held seven public hearings and considered input

from many people, including Plaintiffs, on ways to improve the project methodology.

All parties agree that the Park project is important and should be completed. The only dispute is methodology, and the district court approved the City's chosen methodology. The district court considered the evidence adduced at the injunction hearing—some of it disputed—and found that neither the Park project nor the rookery management program substantially burdens Plaintiffs' religious beliefs, and the City's activities are the least restrictive means to advance the compelling governmental interests presented in the Park.

The Court should affirm.

## ARGUMENT

A.  Plaintiffs' contentions regarding access are moot.

The district court granted in part Plaintiffs' request for injunctive relief concerning access. It awarded very narrow relief, "granting access for 'religious services' involving 15 to 20 people for no more than an hour on specified astronomical dates coinciding with Plaintiffs' spiritual beliefs." R.E.4; ROA.985. As noted above, the City has provided access to the Sacred Area for everyone by realigning its construction fencing to create a corridor to the twenty-foot by thirty-foot Sacred Area and the

flanking bald cypress trees. Because the City has granted Plaintiffs access to the Sacred Area, their appeal is moot as to that issue.[3] Thus, only contentions regarding trees and birds remain.

B.    The removal of trees as part of renovating the north riverbank retaining walls does not violate TRFRA.

Under TRFRA, a government agency may not "substantially burden a person's free exercise of religion." Tex. Civ. Prac. & Rem. Code § 110.003(a) . That provision "does not apply," though, "if the government agency demonstrates that the application of the burden to the person" is "in furtherance of a compelling governmental interest"; and is "the least restrictive means of furthering that interest." *Id.* § 110.003(b).

After considering four days of testimony from Plaintiffs as well as engineers, arborists, and City personnel overseeing the Park project, the district court properly denied Plaintiffs' requests for injunctive relief regarding both trees and birds, because the evidence demonstrated that

---

[3] As with any large-scale construction project, it is possible that, at some point during the course of Phase I of the Park project, there may arise an important safety reason to enclose the project area and restrict access to the Sacred Area. For example, if another tree or large tree branch falls or threatens to fall in the Sacred Area, or if project conditions necessitate the use of heavy machinery near the Sacred Area, access would need to be restricted until the danger is cleared. If any such condition arises, the parties can address access issues with the district court based on the specific facts presented at the time they arise.

the project does not substantially burden Plaintiffs' sincerely-held religious beliefs, and the City's approaches use the least-restrictive means to advance compelling governmental interests.

1.  <u>The standard for a substantial burden is meaningful where it involves the government's use of its own land.</u>

When this Court decides whether a burden is substantial under TRFRA, it considers federal precedent in analogous contexts, such as the federal RFRA and First Amendment jurisprudence. *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 264-66 (5th Cir. 2010). This Court recently explained that "a government action or regulation creates a 'substantial burden' on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violates his religious beliefs." *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 350 (5th Cir. 2022) (citing *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004)). When analyzing whether a governmental body's activities *on its own land* impose a substantial burden on a plaintiff's religious beliefs, courts agree that the activity does not impose a substantial burden where it affects only the subjective religious experience of the plaintiff.

One good example of this standard is *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058 (9th Cir. 2008), *cert. denied* 556 U.S. 1281 (2009). In that case, Native Americans sought injunctive relief to "prohibit the federal government from allowing the use of artificial snow for skiing on a portion of a public mountain sacred in their religion. At the heart of their claim is the planned use of recycled wastewater, which contains 0.0001% human waste, to make artificial snow. The Plaintiffs claim the use of such snow on a sacred mountain desecrates the entire mountain, deprecates their religious ceremonies, and injures their religious sensibilities." *Id.* at 1062-63. The court explained that the project did not substantially burden the plaintiffs' religious beliefs because the sole effect was on the plaintiffs' subjective religious experience:

> Plaintiff Indian tribes and their members consider the San Francisco Peaks in Northern Arizona to be sacred in their religion. They contend that the use of recycled wastewater to make artificial snow for skiing on the Snowbowl, a ski area that covers approximately one percent of the San Francisco Peaks, will spiritually contaminate the entire mountain and devalue their religious exercises. . . . The Plaintiffs continue to have virtually unlimited access to the mountain, including the ski area, for religious and cultural purposes. On the mountain, they continue to pray, conduct their religious ceremonies, and collect plants for religious use.

Thus, the sole effect of the artificial snow is on the Plaintiffs' subjective spiritual experience. That is, the presence of the artificial snow on the Peaks is offensive to the Plaintiffs' feelings about their religion and will decrease the spiritual fulfillment Plaintiffs get from practicing their religion on the mountain. *Nevertheless, a government action that decreases the spirituality, the fervor, or the satisfaction with which a believer practices his religion is not what Congress has labeled a "substantial burden"—a term of art chosen by Congress to be defined by reference to Supreme Court precedent—on the free exercise of religion.* Where, as here, there is no showing the government has coerced the Plaintiffs to act contrary to their religious beliefs under the threat of sanctions, or conditioned a governmental benefit upon conduct that would violate the Plaintiffs' religious beliefs, there is no "substantial burden" on the exercise of their religion.

*Id.* at 1063 (emphasis added).

This construct of the "substantial burden" element is not unique to the Ninth Circuit; courts in many jurisdictions analyze governmental use of its own property in the same way and agree that a government's use of its own land does not substantially burden religious beliefs if the conduct is not coercive and impacts the subjective religious experience only. *See, e.g., Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451 (1988) ("Whatever may be the exact line between unconstitutional prohibitions on the free exercise of religion and the legitimate conduct by government of its own affairs, the location of the line cannot depend on

measuring the effects of a governmental action on a religious objector's spiritual development."); *United States v. Means*, 858 F.2d 404, 406-07 (8th Cir. 1988), *cert. denied* 492 U.S. 910 (1989) (holding that United States Forest Service's denial of a permit for the use of an area in the Black Hills National Forest as a religious, cultural, and educational community did not substantially burden Lakotas' religious beliefs); *Wilson v. Block*, 708 F.2d 735, 739-40 (D.C. Cir. 1983) (finding no impermissible burden on religious rights despite Navajo and Hopi plaintiffs' contentions that development of the Snow Bowl on federal San Francisco Peaks would be inconsistent with their First Amendment right to freely hold and practice their religious beliefs on the Peaks, which they believe to be sacred; "the government had not denied the Indians access to the Peaks or impaired their ability to gather sacred objects and conduct ceremonies, and thus had not burdened their beliefs or religious practices"); *Havasupai Tribe v. United States*, 752 F. Supp. 1471, 1484-85 (D. Ariz. 1990), *aff'd sub nom. Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991), *cert. denied sub nom. Havasupai Tribe v. United States*, 503 U.S. 959 (1992) (rejecting Havasupai free exercise claim involving the Forest Service's plan for a uranium mine in an Arizona national forest).

41

Plaintiffs argue that this entire body of law is inapplicable because the cases entailed "claims under the *federal* Free Exercise Clause." Brief p.49 (emphasis in original). But these cases all analyze the substantial burden element, which is part of both TRFRA and the Free Exercise Clause. They are therefore germane to the Court's analysis of the substantial burden element here, as this Court recognized in *A.A. ex rel. Betenbaugh*. 611 F.3d at 265-66 (in analyzing substantial burden element of TRFRA, citing Ninth Circuit RFRA case and Southern District of Texas First Amendment case).

     2.    <u>The removal of trees as part of the riverbank renovation does not substantially burden Plaintiffs' religious beliefs.</u>

Plaintiffs state that "there is no serious dispute that the City's current and intended actions substantially burden Plaintiffs' religious exercise." Brief p.32. Plaintiffs do not even brief the issue of substantial burden and instead focus solely on the secondary question of whether the City's actions are narrowly-tailored to advance a compelling governmental interest. But Plaintiffs' representation that the City "expressly waived" any argument regarding substantial burden is simply

not true.[4] The City absolutely disputes that the project substantially burdens Plaintiffs' free exercise of religion, and that element of the TRFRA claim is not met here.

When analyzing the substantial burden question, it is important to bear in mind Plaintiffs' own articulation of their religious ceremony at the Sacred Area. It involves worshipping at the specific twenty-foot by thirty-foot Sacred Area location on certain specific significant dates, bending over the river to see—all in one moment—the underworld, their own reflection, and the reflection of the cypress trees above them. *See* Section A.3 of the Statement of Facts above. The removal and relocation of trees as part of the project will not substantially burden that exercise.

First, no living cypress trees (which Plaintiffs testified are considered particularly sacred) will be removed or relocated during the reconstruction of the riverbank retaining wall. Only one dead cypress will be removed and it is on the north riverbank, not on the southern bank

---

[4] Plaintiffs contend that the City "expressly waived" any issue regarding substantial burden in its response in opposition to the motion for injunction on appeal. Brief p.32 (citing Dkt.38 p.11). In that document, the City stated that it "does not believe [Plaintiffs] have demonstrated a substantial burden on their religious exercise," but it "believes it can accommodate the district court's requirement to provide [Plaintiffs]" access to the Sacred Area. The pleading goes on to state, expressly: "The City *does not*, however, waive the 'substantial burden' issue for trial." (emphasis added).

where the Sacred Area is located. (Plaintiffs do not object to the removal of dead trees. Tr.136:9-12.) The two cypresses flanking the Sacred Area will remain untouched. Tr.448:13-20. Thus, there will be no alteration of any trees that worshippers can see while peering down into the river to see their own reflection in ceremonies at the Sacred Area. Very few trees farther away on the southern bank will be affected; just removal of some dying crepe myrtles. Trees on the north bank that will be removed or relocated cannot be seen in the river's reflection during ceremonies at the Sacred Area.

Second, Plaintiff Perez testified that trees "are only sacred if they are generated from the existing trees," and "new trees planted by humans are . . . not sacred." Tr.82:10-16. He testified further that, "of the 83 trees in the project area," he could not "tell the court which were planted by humans and which grew there naturally." Tr.82:17-20. But there was evidence that the trees in the Project Area, including the two cypress trees flanking the Sacred Area, were human-planted as part of landscaping projects in the Park. Tr.447:10-448:12 ("[T]hey very much appear to be planted by humans"); *see also* Tr.708:19-25 (opining that trees on the southern bank were planted "given their spacing, given their exact size, they are very, very uniform"); Tr.353:7-354:7 (reflecting that

City undertook a study to determine the age of the trees to be removed or relocated, and the "oldest ones" ranged from "87 to 92 years old. All of the other trees were younger than that").

Thus, relocating or removing those trees does not substantially burden Plaintiffs' religious beliefs because Plaintiffs explained that they believe that only naturally-reproduced trees, not human-planted trees, are sacred and contribute to the spiritual ecology of the area.

3.   The planned construction method is the least restrictive means to advance compelling governmental interests.

Independent of the substantial burden inquiry, the relocation and removal of trees as part of the retaining wall construction satisfies the second inquiry of TRFRA: it is the least-restrictive means to advance a compelling governmental interest.

Plaintiffs dispute that there is any compelling governmental interest at stake, but they misdirect the issue by stating that "the retaining walls in the Sacred Area do not need repair." Brief p.38. But the retaining walls in the Sacred Area have never been the issue. The compelling governmental interest is in repairing the crumbling riverbed retaining walls on the *north* bank of the riverbend, across the river from the Sacred Area, and there is no true dispute that repairing the

crumbling retaining walls is a compelling governmental interest. Indeed, Plaintiffs allege that the Park "deteriorates from neglect." ROA.56.

To address this compelling interest, the City analyzed the engineering options and selected the method to repair the riverbed retaining walls that it determined would save the greatest number of large trees. Stated in the words of the applicable inquiry, the record reflects that the City selected the least restrictive means that would actually serve to advance its compelling governmental interest.

Plaintiffs argue that the construction method the City selected—the cantilever method—is not the least restrictive means, but their arguments all rely on disputed facts that the district court found against them. R.E.4, ROA.988 (Opinion adopts the City's findings of fact and conclusions of law as to the trees issue).

For example, Plaintiffs' expert testified that a pier and spandrel alternative would save a greater number of trees (but not a greater number of larger, mature trees or a greater number of non-human-planted trees). But there was contrary evidence that the pier and spandrel alternative would *not* save more trees because Plaintiffs' expert did not account for the width of the excavation trench required for the safety of the construction workers. In the demonstrative on page 15 of

Plaintiffs' brief, the "Pier Spandrel" images appear to require only a single narrow pier abutting the existing wall. But the required excavation for that pier is in fact much wider—eliminating some or all of the tree savings—because "OSHA requires . . . some kind of support so that the soil doesn't collapse on the worker." Tr.263:15-18; *see* Tr.262:23-264:6 (discussing the need for "shoring" the excavation for the pier "to make sure that neither collapses on the worker"); Tr.374:1-4, 15-17 ("And so in either case we have to trench behind that wall to get a man down into the trench to do the work that he needs to do that, he's required to do to tie the new concrete wall to the old stonewall . . . So whether you do the cantilever or whether you just do the spandrel wall, you still need roughly the same amount of excavation to do the work."); Tr.634:7-8 ("I'm not going to let a man go down into a hole like that."). Thus, there was significant evidence that, from an engineering standpoint, the pier and spandrel method did not entail a "markedly reduced amount of excavation required." Brief p.15.

In addition, the pier and spandrel method requires that pins be drilled from the outside of the existing retaining walls (*i.e.*, from the river) into the piers. But the existing retaining walls "are historically significant structures; they're cultural resources." Tr.373:7-8. The City is

required by the federal Department of the Interior's "Standards for Treatment of Historic Resources and Historic Properties" such that it has to "work on those retaining walls from the rear and not from the front. And so in order to do that safely, you would need more excavation." Tr.373:12-17; ROA.1953 (Department of the Interior Standards). Plaintiffs brush aside the federal regulations and represent that "there is no dispute" they are not applicable to "retaining walls that have already collapsed and thus been 'deconstructed.'" Brief p.16 (citing Tr.648:12-649:10). But the testimony they cite for that representation says no such thing. Instead, in that cited testimony, professional engineer Shawn Franke testified regarding options to save trees "where there's no existing wall." Tr.648:22. The City hotly disputes Plaintiffs' representation that Department of the Interior regulations are irrelevant to the retaining walls.[5]

---

[5] If Plaintiffs believe that application of those facially-neutral federal regulations violate their sincerely-held religious beliefs, then their remedy is to sue the Secretary of the Interior and seek a declaratory judgment regarding the application of the regulations. But the City is not required to either violate the applicable regulations itself or litigate their validity on Plaintiffs' behalf. Such a suit would not get far anyway: If TRFRA requires disregarding federal regulations, then TRFRA must yield. *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) ("If . . . a state law confers rights or imposes restrictions that conflict with the federal law . . . the federal law takes precedence and the state law is preempted."); *see Arizona v. United States*, 567 U.S.

The district court also heard testimony that the City considered "other factors, practical factors that affect the options available to the engineers to make these repairs." Tr.627:25-628:1. Among other things, tree location is a "factor that has to be considered by engineers" because "how are you going to get a drilling rig in here? Because we need it to get a drilling rig in. It will require removing a whole series of canopies." Tr.628:9-13; Tr.630:12-15 ("And then in addition, we would probably have to do more tree trimming because when you stand that rig up, it has to clear tree branches.").

The current condition of the retaining walls is another relevant consideration because "if you put a large piece of equipment on top of the wall, that will generate horizontal pressure on the face of the wall." Tr.629:2-4. The cantilever method that the City selected uses smaller equipment and could be "hand dug or . . . use one of the little mini-excavators you see riding on the back of somebody's trailer." Tr.629:21-25. By comparison, the pier and spandrel method Plaintiffs prefer "is going to require a little bit larger piece of equipment because you're going

---

387, 406 (2012) ("The Court has recognized that a "[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy.").

to have to get in there and drill up against the face of that wall. I heard some testimony if I can reference it, of 12 to 18-inch diameter footings. I think they could be much larger than that. You're talking about a piece of equipment that could be somewhere[] -- I verified it versus something else, then it's probably in the 50, 60,000-pound range that would have to be setting up against the wall." Tr.629:11-19.

Another consideration is that the pier and spandrel method would require "additional work to the work site . . . to get the drill rig on to the site" and "you would be applying such a horizontal pressure on the wall, we would have to have a much more [intense] shoring system for the historic wall." Tr.630:2-11.

The City did not simply decide on the cantilever method and leave it at that. During the course of the project, City personnel overseeing the project, four volunteer arborists involved with the tree study, and two engineers met "to really look at the alternatives and to figure out whether or not what was being proposed was the best solution moving forward, that we were saving as many trees as possible." Tr.603:2-14. The group considered the proposed pier and spandrel method to analyze its potential efficacy to save more trees:

50

And so what we did is we talk about what Mr. Cruz was recommending in terms of pier and spandrel and how that would -- how that works, like how that would be installed and what the differences are, and it was -- you know, he was trying -- was under the -- had the opinion that if we used the pier and spandrel method, that additional trees could be saved and so we talked through that with the arborists and with our design engineer that afternoon.

And then following that, there was also a site visit that I did not attend, but City staff also accompanied Mr. Cruz to the site to talk specifically about specific trees.

Tr.603:15-25.

The group concluded that changing the method of renovating the retaining walls would not save any additional trees: "The consensus in the meeting with the -- with the arborists was that no additional trees would be saved because they would still be impacted by the construction regardless of the methodology." Tr.604:1-6.

The district court also heard testimony directly from the arborists who helped develop the project plan. Ross Hosea testified that he cares deeply about preserving trees, and he strove to save as many trees as possible during the retaining wall construction. Hosea testified, "30 years in the business, I love trees," but despite much analysis and effort, there was no way to save more trees, and if the retaining walls are not repaired, then the walls will eventually fail and all of the trees will be lost:

> I have gone around and round with the project team. I've advocated, I've looked everywhere way to do this and at the end of the day I just don't see any way possible. Those trees and those walls are competing for the same space and, in fact, I'll go further that the trees are benefiting from the wall. If the walls were—if they weren't repaired and if they were to fail in my opinion over time it would not necessarily be immediate, but over time weather is going to erode out floods is going to erode out the soil from under those trees . . . eventually it's just a matter of time before the trees will [fall].

Tr.738:14-739:3.

In addition to those deliberations, the City also considered input from members of the public during seven public meetings, one of which was a tour of the Park, and a virtual town hall. Tr.354:8-16. The City took that "public information into account when making further design modifications to the construction plan." Tr.354:17-20. The City received input from the Plaintiffs during the public meetings and modified its design plans based on Plaintiffs' input:

> Q. Do you recall receiving any input during these meetings from either of the plaintiffs?
>
> A. Yes. Yes, I did.
>
> Q. And the City took that input?
>
> A. We did.
>
> Q. And did the City give it consideration in the implementation of the design and construction plan?

A. Yes, we did.

Q. Were any of the plans modified based on any of the public feedback?

A. They were.

Q. What was modified?

A. The amount of trees to be destroyed was modified. There's a lot of detail in there. But, yes.

Tr.361:23-362:11; ROA.2263; *see* Tr.137:1-6 (indicating that Plaintiff Torres testified at City council hearing and historic design and review commission hearing). So when Plaintiffs allege, again and again in their brief, that the City did not take their beliefs into consideration, that is simply false.

Plaintiffs contend that the only difference between the City's chosen cantilever method and its preferred pier and spandrel method is a cost increase of "as little as 20%." Brief p.41. Yet again, the record demonstrates that is not true. Tr.369:24-370:5 (testifying that Plaintiffs' "pier and spandrel option is significantly more expensive than the option we chose" and "could be anywhere from two to three times more expensive"). There was also significant evidence regarding engineering challenges and safety considerations, and that alternative engineering methods such as the pier and spandrel would not result in saving more

trees. After much analysis the City selected the cantilever method, and the district court found that was the least-restrictive means to advance a compelling governmental interest.

C.    <u>The City's rookery management program does not violate TRFRA.</u>

Numerous migratory bird species populate the Park, including herons and egrets. Cormorants are also migratory birds; they are attracted to the nesting sites of other colonial water birds, including herons and egrets. Cormorants are considered sacred by Plaintiffs, and they figure in the ceremonies at the Sacred Area.

In January 2022, the City began its rookery management program within the two-acre Project Area to prevent migratory birds from nesting there. Nesting was not disturbed elsewhere in the Park, nor were birds deterred from landing in trees within the Project Area or spending time there to forage for food. The program affects only *nesting* in the trees within the Project Area.

The methods used are not lethal to the birds and do not affect reproduction. They include habitat modification such as removing dead limbs and "some of the canopy where birds will want to be able to nest." Tr.423:11-13. They may also include use of visual deterrents like mylar-type balloons or metallic streamers and noise deterrents including

pyrotechnics or predator calls. Tr.423:10-425:5. There are no deterrents that will address the herons and egrets but not deter the cormorants. *Id.*

The purpose of the rookery management program is twofold: (1) to mitigate the health and safety hazards arising from the tremendous amount of guano that the dense bird colonies produce; and (2) to ensure no migratory birds are nesting in trees within the Project Area such that work can begin under the Migratory Bird Treaty Act.

The district court denied Plaintiffs' request to enjoin the rookery management program and adopted the City's findings of fact and conclusions of law on the issue. R.E.4, ROA.988. That was the correct result.

1.   <u>The rookery management program does not substantially burden Plaintiffs' beliefs.</u>

The substantial burden analysis involving the rookery management program turns on the known timing of the birds' migration patterns. The evidence showed that the different species of birds migrate at different times. Yellow crowned herons and great egrets arrive in San Antonio first; they are seen "as early as February," followed later by the cattle egrets and cormorants. Tr.549:1-23. The cormorants arrive each year in April or May, "or oftentimes later." *Id.* All of the migratory birds

in the Park, including the cormorants, leave and "migrate further down south" at the "first cold snap," which generally occurs in "[m]id to late October." Tr.565:6-7.

The record thus demonstrates that—regardless of the rookery management program—no cormorants would be present in the Park between the first cold snap around late October and April (if not May or later). Plaintiffs testified that the cormorants are a necessary part of their ceremonies at the Sacred Area. Plaintiffs testified that some of their most important ceremonies are conducted on the winter solstice, December 21, and on Easter, which can fall on any date between March 22 and April 25 depending on the year. Tr.773:11-12. Because the evidence demonstrates that due to their migration patterns no cormorants would be in the area on December 21, and there might be none on Easter (if Easter falls in March or before the birds arrive in April), the City's rookery management program does not substantially burden Plaintiffs' religious beliefs.

In addition to the timing issue, the City's rookery management program does not substantially burden Plaintiffs' religious beliefs because cormorants can still nest elsewhere in the 343-acre Park or nearby; the deterrent activities are deployed only within the two-acre

Project Area and only to persuade the birds to nest elsewhere. Cormorants can perch in the trees within the Project Area and in fact do so during their season. They just cannot nest there en masse. There is thus no evidence or indication that the rookery management program would make it less likely that a cormorant would perch in the cypress trees within the Sacred Area or fly overhead during ceremonies there.

2.  The rookery management program is the least restrictive means to advance compelling governmental interests.

Even if the rookery management program imposed a substantial burden on Plaintiffs' beliefs, it still would not violate TRFRA because it is the least restrictive means to advance a compelling governmental interest. The program serves two compelling interests: (i) public health and safety; and (ii) compliance with federal law to serve the interests underlying the construction project.

As to public health and safety, the record shows that the rookery management program is the least restrictive means to advance the City's interest in mitigating the hazardous effects of bird guano to make the Lambert Beach area safe for human visitors. The program is the product of extensive consultation and engagement with technical advisors and wildlife management experts. ROA.2425, 2441. The program employs a

"yellow zone" and "red zone" approach in which deterrent efforts are limited to areas of moderate or high public use. ROA.2431 (examples of "red zone" areas include "pavilions, restrooms, playscapes, splashpads, recreational centers, picnic pad sites," and the like).

Again, there is no way to deploy those efforts toward egrets and herons only but not cormorants. Tr.567:3; 423:10-425:5; 551:2-12.  And these methods "do not harm the birds or keep them from reproducing." ROA.2426. They simply resolve the "human-wildlife conflict," ROA.2449, by persuading the birds not to nest in "an undesired location and encourage them to go to an area where they would be more desirable." Tr.546:21-547:2. Even with the limited methods in place, the cormorants still fly to and above the Sacred Area, "hang out" at Lambert Beach, "come in the trees," and "go down in the water" to forage. Tr.446:24-447:3.

Moreover, although the deterrent methods cannot distinguish between cormorants and the more problematic species, the record shows that the city deploys these methods in a measured approach tailored to restrict cormorant nesting in the Project Area to the least extent possible. The City applies deterrence only to the extent required to achieve the goal of relocating the problematic species—and no further. For example, during the 2022 migration season the City successfully relocated the

problematic species and determined that those species had finished their annual migration to San Antonio by June of that year. The city then stopped deterrence methods in the Project Area, which in fact allowed some late-migrating cormorants to nest there. Tr.406:9-19. The City's approach exemplifies narrow tailoring.

As to compliance with federal law, the Migratory Bird Treaty Act forbids construction interference with actively nesting migratory birds and their nests. The first phase of construction—slated to last six to eight months, Tr.452:1-16—cannot proceed under federal law absent a rookery management program to prevent nesting in the Project Area. If that program were foregone, the window of time between the first cold snap around late October and the arrival of the great egrets in February would be the only time that construction activities could proceed in the Project Area. The district court noted that the migration patterns would "effectively put the Project on hold ad infinitum, given the different species' migration patterns and the Migratory Bird Treaty Act. There could not be an eight-month window of opportunity to accomplish the Project." ROA.987. For essentially the reasons why the rookery management program is narrowly tailored to address the guano hazard,

it is also the least restrictive means to comply with federal law to serve the compelling interests underlying the construction project.

D.    The project does not violate any other free exercise guarantee.

The bulk of Plaintiffs' brief focuses on their TRFRA claim. *See* Brief pp.31-44. But they also contend that the Park project violates three additional religious protections. Although in some cases the applicable legal framework demands less than strict scrutiny, these theories ultimately fail for essentially the reasons that Plaintiffs' TRFRA argument fails: Plaintiffs fail to demonstrate that the district court abused its discretion in finding (i) that the City's actions do not substantially burden Plaintiffs' belief, and (ii) that in any event the City has narrowly tailored its actions to advance compelling governmental interests. The district court therefore did not abuse its discretion in denying injunctive relief based on the other, catch-all provisions.

1.    The federal Free Exercise clause

The less demanding "*Oregon v. Smith*" standard applies to a federal Free Exercise claim unless the plaintiff shows that a policy is not "neutral" or "generally applicable." *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421–22, (2022) (quoting *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 879–80 (1990)). Plaintiffs

have not made that showing here. Because the Park project satisfies strict scrutiny, it necessarily also satisfies the less demanding standard set forth in *Oregon v. Smith*.

Plaintiffs cannot show that the project lacks neutrality or general applicability. "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1877 (2021). As an initial matter, the City's project does not target or restrict the practices of Plaintiffs (or anyone) on the basis of their beliefs or their religious nature. It is a largescale public works project resulting from a democratic bond process intended to benefit the public generally—and the realities of construction will likewise affect the public generally. *Cf. Smith*, 494 U.S. at 882 ("Our cases do not at their farthest reach support the proposition that a stance of conscientious opposition relieves an objector from any colliding duty fixed by a democratic government."). And contrary to Plaintiffs' representations that the City "has proceeded (and seeks to proceed) without considering Plaintiffs' religious exercise," Brief p.45, the record confirms that the City considered Plaintiffs' religious exercise, held a meeting of decisionmakers to address it, and revised the plan to accommodate Plaintiffs beliefs to

61

the extent possible. The City's actions in connection with the project are neutral under *Fulton*.

The City's actions are also generally applicable for essentially the same reasons. "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by creating a mechanism for individualized exemptions." *Fulton*, 141 S.Ct. at 1877. The primary basis for Plaintiffs' arguments against general applicability relates to evidence that several City-related officials were allowed behind the construction fence in connection with City business relating to the project, despite Plaintiffs' exclusion from the construction zone along with the rest of the general public. Brief pp.45-46. That argument is now moot in light of the City's reconfiguration of the fencing to allow Plaintiffs to access the Sacred Area.

Plaintiffs' final argument against general applicability comes in their complaint that the City sought "exemptions" from local restrictions regarding the removal of heritage trees necessitated by the project but did not seek exemptions from Secretary of Interior guidelines prohibiting the City from drilling into the face of the historic river wall. Brief pp.46-47. Plaintiffs' clever play on the word "exemption" would stretch *Fulton*'s language beyond its application. The "exemptions" at issue in *Fulton*

focus on the government's discretion to consider "***a person's conduct***" in applying the law. *Fulton*, 141 S.Ct. at 1877 (emphasis added). *Fulton* forbids "creating a mechanism for individualized exemptions" in applying a law. *Id.* The trigger is different treatment of "religious conduct" versus "secular conduct" in individuals. *Id.* That is plainly not the case here.

Under *Oregon v. Smith*, "if prohibiting the exercise of religion (or burdening the activity[]) is not the object of the [action] but merely the incidental effect of a generally applicable and otherwise valid [action], the First Amendment has not been offended." *Smith*, 494 U.S. at 1600. The City's actions would pass muster under that standard even if Plaintiffs' beliefs were burdened (and they are not). But ultimately it does not matter what standard applies. As explained above, Plaintiffs fail to demonstrate that the district court erred in holding that the project satisfies strict scrutiny just the same as they cannot show a violation under *Oregon v. Smith*.

### 2.  Tex. Const. art. I, § 6

Absent a controversy over a material difference between the guarantees in the state and federal Free Exercise Clauses, the Texas Supreme Court treats a claim brought under Section 6 as "coextensive" with a federal Free Exercise claim—this notwithstanding "scholarly

commentary criticizing the United States Supreme Court's recent Free Exercise decisions" in *Oregon v. Smith*. *HEB Ministries, Inc. v. Tex. Higher Educ. Coordinating Bd.*, 235 S.W.3d 627, 649–50 (Tex. 2007); *In re Commitment of Fisher*, 164 S.W.3d 637, 645 (Tex. 2005). Plaintiffs contend that "the Supreme Court's gloss on the federal Free Exercise Clause does not apply to Texas law," and therefore TRFRA's strict scrutiny standard should apply to their state Free Exercise claim. Brief p.44. At the end of the day, it makes no difference whether the TRFRA standard or the federal Free Exercise standard applies, because Plaintiffs cannot satisfy either.

3.     Tex. Const. art. I, § 6-a

Article I, Section 6-a of the Texas Constitution was adopted in 2021 in response to local governmental units closing churches to prevent the spread of COVID. It prohibits such orders:

> RELIGIOUS SERVICE PROTECTIONS. This state or a political subdivision of this state may not enact, adopt, or issue a statute, order, proclamation, decision, or rule that prohibits or limits religious services, including religious services conducted in churches, congregations, and places of worship, in this state by a religious organization established to support and serve the propagation of a sincerely held religious belief.

64

There is no case law interpreting this new provision. From its genesis during COVID, to its title ("Religious Service Protections"), to its text, everything about section 6-a speaks in terms of restricting actual gathering for worship. A very recent law review article considered the text of the statute as well as its legislative history and context and concluded that the amendment prohibits restrictions on "religious gatherings." Tyler Shannon, *Texas Proposition 3: A State Constitutional Response to Restrictions on Religious Gatherings*, 55 Tex. Tech L. Rev. 559, 583–84 (2023); *see also id*. at 577 (explaining that the term "religious service" in section 6-a "would seem to include any meeting for religious worship").

The Sacred Area may or may not qualify as a "place of worship" for purposes of Section 6-a. *See Satanic Temple v. City of Belle Plaine*, 2021 WL 4199369, at *13 (D. Minn. Sept. 15, 2021) (providing that there is no "constitutional right to use public property as a place of worship"); *Taylor v. City of Gary*, 233 F. App'x 561, 562 (7th Cir. 2007) (no constitutional right "to demand that the City provide him with municipally-owned property as a place of worship"). But either way, Section 6-a has no application here, because the City has opened access to the Sacred Area

for Plaintiffs' ceremonies or private worship and is not limiting access to that place for religious gathering. The claim under Section 6-a is moot.

## CONCLUSION AND PRAYER

The access issue is moot, and the birds and trees issues were properly resolved against Plaintiffs because the evidence at the hearing demonstrated that the City's Park project and rookery management program do not substantially burden Plaintiffs' religious beliefs, and its activities are the least restrictive means to advance the compelling government interests presented in improving Brackenridge Park for the benefit of all of San Antonio.

WHEREFORE the City of San Antonio prays that the Court affirm the district court's orders denying Plaintiffs' requests to enjoin the construction project and the rookery management program and deny as moot Plaintiffs' requests for injunctions pending appeal.

4875-3925-4416

Respectfully submitted,

_____

Jane Webre
State Bar No. 21050060
jwebre@scottdoug.com
SCOTT DOUGLASS & MCCONNICO, LLP
Colorado Tower
303 Colorado Street, Suite 2400
Austin, TX 78701
Telephone: (512) 495-6300
Facsimile: (512) 495-6399

- and -

LANGLEY & BANACK, INC.

FRED R. JONES
State Bar No. 10886700
fjones@langleybanack.com
NATALIE F. WILSON
State Bar No. 24076779
nwilson@langleybanack.com
IAN M. MCLIN
State Bar No. 24005071
imclin@langleybanack.com
LEE WARREN
State Bar No. 24099453
lwarren@langleybanack.com
SARA MURRAY
State Bar No. 14729400
smurray@langleybanack.com
745 East Mulberry, Suite 700
San Antonio, TX  78212-3166
Telephone: (210) 736-6600
Facsimile:  210) 736-6889

-and -

CITY OF SAN ANTONIO
DEBORAH KLEIN
Deputy City Attorney
State Bar No. 11556750
Deborah.Klein@sanantonio.gov
International Center
203 S. St. Mary's Street,
2nd Floor
San Antonio, TX  78205
Telephone:  (210) 207-8949
Facsimile: (210) 207-4004

**ATTORNEYS FOR DEFENDANT
CROSS-APPELLANT/APPELLEE
CITY OF SAN ANTONIO**

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limitations,
Typeface Requirements, and Type-Style Requirements

This brief complies with **(1)** the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because it contains 11,767 words, excluding the parts of the Brief exempted by FED. R. APP. P. 32(f); and **(2)** the typeface and type style requirements of FED. R. APP. P. 32(a)(5). I understand that a material misrepresentation in this certificate of compliance may result in striking the brief and in sanctions against the person signing the brief.

November 15, 2023.

_____
Jane Webre

COUNSEL FOR APPELLEE
CITY OF SAN ANTONIO

CERTIFICATE OF SERVICE

I certify that on November 15, 2023, I electronically filed the foregoing brief via the CM/ECF system, which will provide notice to counsel of record for Plaintiffs-Appellants:

Mark W. Rasmussen
mrasmussen@jonesday.com
Margaret I. Lyle
milyle@jonesday.com
Jonathan D. Guynn
jguynn@jonesday.com
J. Benjamin Aguiñaga
jbaguinaga@jonesday.com
Chance McCraw
cmccraw@jonesday.com
Timothy M. Villari
tvillari@jonesday.com
JONES DAY
2727 N. Harwood Street
Dallas, TX  75201

John Greil
john.greil@law.utexas.edu
Steven T. Collis
steve.collis@law.utexas.edu
LAW AND RELIGION CLINIC
UNIVERSITY OF TEXAS SCHOOL OF LAW
727 East Dean Keaton Street
Austin, TX  78705

_____
Jane Webre

COUNSEL FOR APPELLEE
CITY OF SAN ANTONIO