No. 23-50746

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

GARY PEREZ AND MATILDE TORRES,

*Plaintiffs-Appellants,*

v.

CITY OF SAN ANTONIO,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Western District of Texas (Biery, J.)

## REPLY BRIEF OF APPELLANTS GARY PEREZ AND MATILDE TORRES

Mark W. Rasmussen
Margaret I. Lyle
Jonathan D. Guynn
J. Benjamin Aguiñaga
Chance B. McCraw
Timothy M. Villari
JONES DAY
2727 North Harwood Street
Dallas, TX 75201.1515
Telephone: +1.214.220.3939
E-mail: mrasmussen@jonesday.com
E-mail: milyle@jonesday.com
E-mail: jguynn@jonesday.com
E-mail: jbaguinaga@jonesday.com
E-mail: cmccraw@jonesday.com
E-mail: tvillari@jonesday.com

ATTORNEYS FOR PLAINTIFFS

John Greil
Steven T. Collis
Law & Religion Clinic
University of Texas School of Law
727 East Dean Keeton St.
Austin, TX 78705
Telephone: +1.512.471.5151
E-mail: john.greil@law.utexas.edu
E-mail: steve.collis@law.utexas.edu

ATTORNEYS FOR PLAINTIFFS

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 3

I.    PLAINTIFFS' ACCESS CLAIMS ARE NOT MOOT ................................... 3

II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR TRFRA CHALLENGES TO THE TREE-REMOVAL AND ANTI-NESTING MEASURES. ................................................................................................ 6

    A.    The Measures Plainly Impose a Substantial Burden on Plaintiffs' Religious Exercise ................................................................. 6

        1.    The City's attack on Plaintiffs' religious beliefs is legally foreclosed and factually wrong. ........................................ 7

        2.    The City's argument that the government has carte blanche "on its own land" is wrong. ........................................... 10

    B.    The Measures Fail Strict Scrutiny. ........................................... 14

        1.    The tree-removal plan is not the least restrictive means of furthering a compelling governmental interest. ........................... 15

        2.    The anti-nesting plan is not the least restrictive means of furthering a compelling governmental interest. ........................... 17

III.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR REMAINING FREE-EXERCISE CLAIMS. ..................................................... 20

    A.    The City's Actions Violate Article I, Section 6 of the Texas Constitution ........................................................................... 21

    B.    The City's Actions Violate the Federal Free Exercise Clause ................ 21

    C.    The City's Actions Violate Article I, Section 6-a of the Texas Constitution ........................................................................... 24

CONCLUSION ................................................................................................ 25

CERTIFICATE OF SERVICE ........................................................................... 27

CERTIFICATE OF COMPLIANCE ................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.,*
611 F.3d 248 (5th Cir. 2010) .................................................. 8, 12

*Adkins v. Kaspar,*
393 F.3d 559 (5th Cir. 2004) ..................................................... 10

*Barr v. City of Sinton,*
295 S.W.3d 287 (Tex. 2009) ................................................ 10, 19

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) .................................................................. 2, 8

*City of Mesquite v. Aladdin's Castle, Inc.,*
455 U.S. 283 (1982) ...................................................................... 3

*DeMarco v. Davis,*
914 F.3d 383 (5th Cir. 2019) ...................................................... 11

*Franciscan All., Inc. v. Becerra,*
47 F.4th 368 (5th Cir. 2022) ..................................................... 4, 5

*Fulton v. City of Philadelphia,*
141 S. Ct. 1868 (2021) ................................................ 1, 3, 22, 24

*Hague v. Comm. For Indus. Org.,*
307 U.S. 496 (1939) ............................................................... 2, 13

*Lyng v. Northwest Indian Cemetery Protective Association,*
485 U.S. 439 (1988) ................................................ 11, 12, 13, 21

*Masterpiece Cakeshop, Ltd. v. Colorado Civ. Rts. Comm'n,*
138 S.Ct. 1719 (2018) ................................................................ 23

*Mayfield v. Tex. Dep't of Crim. Just.,*
529 F.3d 599 (5th Cir. 2008) ...................................................... 11

*Merced v. Kasson,*
577 F.3d 578 (5th Cir. 2009) ................................... 11, 14, 19, 20

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Navajo Nation v. U.S. Forest Service,*
535 F.3d 1058 (9th Cir. 2008), Opp.Br. 39 ................................................. 11

*Opulent Life Church v. City of Holly Springs, Miss.,*
697 F.3d 279 (5th Cir. 2012) ......................................................................... 6

*Ramirez v. Collier,*
595 U.S. 411 (2022) ............................................................................... 17, 19

*Speech First, Inc. v. Fenves,*
979 F.3d 319 (5th Cir. 2020) .............................................................*passim*

*Tandon v. Newsom,*
141 S. Ct. 1294 (2021) ............................................................................... 24

*Thomas v. Review Bd. of Indiana Emp. Sec. Div.,*
450 U.S. 707 (1981) ............................................................................... 8, 14

*United States v. Olano,*
507 U.S. 725 (1993) ................................................................................... 7

## CONSTITUTIONAL AUTHORITIES

Texas Const Art. I, § 6. .............................................................................. 21

Texas Const Art. I, § 6-a. ...........................................................3, 12, 24, 25

## OTHER AUTHORITIES

*Black's Law Dictionary* ............................................................................ 10

# INTRODUCTION

There is no dispute that, if Plaintiffs are likely to succeed on their religious-exercise claims, they suffer and will continue to suffer irreparable harm absent an injunction against the City's measures—and thus, the equities and the public interest are directly in their favor. Recognizing as much, the City never mentions the remaining preliminary-injunction factors, choosing instead to place all its eggs in the likelihood-of-success-on-the-merits factor.

On the merits, however, the City's brief is a story in obfuscation and misrepresentation. The City does not, and cannot, escape the testimony of its witnesses: the City "would like to proceed with the project" and Plaintiffs' religious exercise is in the way because accommodation "would take time and money." Tr. 344:10–11. The tree-destroying construction plan "was chosen without any consideration of the plaintiffs' free exercise request," Tr. 343:23–25, and the City *never* "tried to accommodate plaintiffs' religious exercise in crafting the bird deterrence" policy, Tr. 407:2–3. The City's actions cannot survive strict scrutiny. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021) ("[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so.").

Unsurprisingly, the City has begun abandoning ship. Rather than face Plaintiffs' claims for access to the Sacred Area, the City now informs the Court that the City removed the fencing that barred Plaintiffs from the Sacred Area. The City says that makes Plaintiffs' access claims moot. No. This is a textbook example of voluntary

cessation, which does not moot Plaintiffs' claims. Moreover, the City's own response brief threatens to resurrect the fencing if the City deems it necessary. Having forfeited any merits argument, the City concedes that Plaintiffs are likely to succeed on their access claims.

On the merits of Plaintiffs' challenges to the tree-removal and anti-nesting measures, the City's primary attack is to "tell the plaintiffs that their beliefs are flawed"—even though the City waived its substantial-burden argument (except for trial) in its response to Plaintiffs' motion for injunction pending appeal. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014). Mr. Perez's and Ms. Torres's sincere beliefs about the necessity of tree canopy? Wrong, says the City. Br. 19–20. Their understanding that the "spiritual ecology" connects to the religion of their ancestors? Mistaken, says the City. Br. 17–18. The services they have conducted at that site for years? Worthless, says the City. Br. 24–25. The Constitution and decades of Supreme Court and Fifth Circuit precedent prohibit this insulting attack on religious beliefs. "[I]t is not for [courts] to say that their religious beliefs are mistaken or insubstantial." *Hobby Lobby*, 573 U.S. at 725. And the fact that the City seeks to destroy Plaintiffs' religious exercise "*on its own land*," Br. 38, does not change that. Public parks "have immemorially been held in trust for the use of the public." *Hague v. Comm. For Indus. Org.*, 307 U.S. 496, 515 (1939). TRFRA and the Constitution protect religious exercise at all of them.

To be clear, Plaintiffs emphatically *do not* "seek an injunction to stop the repairs entirely." Br. 26. Plaintiffs have no issue with the City repairing the walls. But the City

can repair the walls *and* permit Plaintiffs to continue practicing their religion.  And that is the only accommodation they seek—indeed, it is the one Texas and federal law require: that "so long as the government can achieve its interests in a manner that does not burden religion, it must do so."  *Fulton*, 141 S. Ct. at 1881.  Because the City admittedly has not even tried, Plaintiffs are likely to succeed on the merits of their claims and they are entitled to a preliminary injunction.

## ARGUMENT

## I.    PLAINTIFFS' ACCESS CLAIMS ARE NOT MOOT.

At the outset, the City's attempt to moot out Plaintiffs' claims for access goes nowhere.  Recall that the City has completely denied Plaintiffs access to the Sacred Area since February.  Op.Br. 12.  It even cross-appealed the district court's order granting Plaintiffs access for group worship on limited dates.  Dist. Ct. Dkt. No. 61.  But now the City completely ignores—and thus has forfeited any objection to—Plaintiffs' comprehensive arguments that the City's fencing fails strict scrutiny and Article I, Section 6-a scrutiny under the Texas Constitution.  Op.Br. 33–37, 47–48.  Instead, the City announces that it has now removed the unlawful fencing and thus mooted Plaintiffs' access claims.  Br. 36–37.  Not so.

*First*, the City's eleventh-hour actions are a textbook example of voluntary cessation.  "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."  *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982).  To overcome

3

the voluntary-cessation doctrine, "the burden rests with the defendant to demonstrate that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022). Here, however, the City does not even mention the doctrine much less overcome it. Indeed, the City's own words and deeds come nowhere close to making "absolutely clear" that the City will not bar Plaintiffs' access again.

To briefly recount: At the same time the City allowed a councilwoman to tour the site and a city employee to walk it to prepare arguments for this litigation, the City twice denied Plaintiffs access to perform a one-hour ceremony accompanied by a City arborist. Tr. 756:16–18, 37:4–7. After rejecting those reasonable requests, the City criticized Plaintiffs for "think[ing] they know better than the Certified Arborists and other professionals" without "any education, experience, or expertise." ROA.313. It told the court that "falling walls and trees in the area" imperiled public safety. ROA.314. And it argued at the hearing that the Sacred Area was so dangerous that no human— or poodle—could possibly enter. Tr. 33:18–25, 175:5–8, 820:19–22. So the Plaintiffs retained an expert arborist and an expert civil engineer. And after four days of testimony, the only safety risk the City could identify was a single hanger branch that took "20 minutes" to trim. Tr. 211:5. The district court recognized the silliness of the City's position, and the City removed the branch less than 24 hours after the district court so ordered. ROA.740.

Yet, even after the City was forced to eliminate the only plausible danger, the City persisted in its endeavor to bar Plaintiffs from the Sacred Area. Specifically, the City filed a notice of cross-appeal on October 30, 2023, after the district court required the City to give Plaintiffs limited access to the Sacred Area for group worship on certain astronomical dates. Dist. Ct. Dkt. No. 61. But as the City's response brief suggests—and as Plaintiffs subsequently confirmed with the City's counsel—the City has now dropped its cross-appeal, seeking instead to moot out Plaintiffs' access claims altogether.

Finally, even now, the City is inconsistent. On one hand, it confidently claims that, "[b]ecause the City has granted Plaintiffs access to the Sacred Area, their appeal is moot as to that issue." Br. 37. On the other hand, the City guts that statement with a footnote that threatens to resurrect the fence if there "arise[s] an important safety reason to enclose the project area and restrict access to the Sacred Area." *Id.* n.3. Given the City's track record on this issue—and the City's stubborn claim that it can bring back the fence whenever it likes—the City plainly has not made "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Franciscan All., Inc.*, 47 F.4th at 376.

In short, the voluntary-cessation doctrine easily disposes of the City's mootness argument. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020) (challenges not moot where (1) defendant made no "sworn affirmative statement," (2) "changes were first announced only in the [defendant]'s appellate brief" and (3) defendant "still defend[ed] the legality of its original policies").

*Second*, "[t]his case is also not moot for another reason"—Plaintiffs' requested relief. *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 286 (5th Cir. 2012). Plaintiffs "seek[] retrospective as well as prospective relief," in the form of damages and attorneys' fees. *Id.*; ROA.72. That puts this case on all fours with *Opulent Life*, where the plaintiff church appealed the denial of a preliminary injunction, and this Court held that the case was not moot (notwithstanding a repeal of the ordinance at issue) because the church "also seeks actual damages and attorney's fees." *Opulent Life*, 697 F.3d at 286. "This alone is enough to ensure that an actual live controversy exists between the parties, for which a court may grant 'effectual relief.'" *Id.*

For either or both of these reasons, the City's mootness argument is meritless. And because the City has forfeited any merits response to Plaintiffs' access claims, Plaintiffs necessarily prevail on those claims.

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR TRFRA CHALLENGES TO THE TREE-REMOVAL AND ANTI-NESTING MEASURES.

On the merits of Plaintiffs' TRFRA challenges that the City does engage, the City's response brief does nothing to change the fact that the City's measures impose a substantial burden on Plaintiffs' religious exercise and fail strict scrutiny.

### A. The Measures Plainly Impose a Substantial Burden on Plaintiffs' Religious Exercise.

To start, the City's response brief goes on at length about whether the City's measures substantially burden Plaintiffs' religious exercise—indeed, the City accuses

Plaintiffs of "not even brief[ing] the issue of substantial burden." Br. 42. But this is a prime example of the City's shapeshifting positions in this litigation. Plaintiffs did brief the substantial-burden element, but only briefly for two reasons: *first*, the substantial burden is self-evident: "The City literally bars [Plaintiffs] from worshipping in the Sacred Area and proposed to destroy it altogether," Op.Br. 32; and *second*, at the motion stage, "the City [] expressly 'waiv[ed]' (except for trial) any argument that its actions do not substantially burden Plaintiffs' religious exercise," *id.*

The City now tries to walk back its waiver, but it emphasizes the very language in its motion-stage briefing that establishes the waiver: "The City does not, however, waive the 'substantial burden' issue for trial." Br. 43 n.4 (emphasis omitted). In other words, the City *does* waive the issue for *this appeal*. And that is a textbook "intentional relinquishment or abandonment of a known right," which the City is free to assert again *at trial*. *United States v. Olano*, 507 U.S. 725, 733 (1993). For these reasons, the Court should ignore the City's waived substantial-burden argument. But, even on its own terms, the argument plainly fails.

### 1.    The City's attack on Plaintiffs' religious beliefs is legally foreclosed and factually wrong.

The bulk of the City's brief and its substantial-burden argument is filled with theological disputations and claims that Plaintiffs misunderstand their own religion. *See, e.g.*, Br. 16–25, 43–45, 55–57. This line of argument is foreclosed as a matter of law, and it is insulting and wrong.

*First*, the City's assault on Plaintiffs' religious beliefs is squarely foreclosed by Supreme Court and this Court's precedent. "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 714 (1981). Courts thus do not scrutinize "religious beliefs with exacting incredulity, unless there is reason to do so." *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 262 (5th Cir. 2010). Instead, the "narrow function in this context is to determine whether the line drawn reflects an honest conviction[.]" *Hobby Lobby*, 573 U.S. at 725 (internal quotation marks and citation omitted).

Here, the City does not dispute that Plaintiffs' beliefs are sincere, nor that they have worshipped and performed religious services at the Sacred Area for years. *See* ROA.989–90, ¶¶ 4, 6. Accordingly, decades of precedent foreclose the City from going line-by-line in Plaintiffs' religion to determine whether Plaintiffs correctly understand it. The Court need proceed no further to dispense with the City's argument.

*Second*, the City's quibbles with Plaintiffs' religious beliefs are all wrong on their own terms, which renders the City's position all the more inexplicable. Plaintiffs testified that facing north in the Sacred Area is necessary for their worship. Tr. 62:20–63:8, 130:3–19, 769:7–11. They testified that the nesting and presence of cormorants are components of their services because those birds "tell that story" of creation and carry their prayers "to the heavens." Tr. 121:1–11, 127:23–25. And Plaintiffs believe the trees there today are descendants of trees present when their ancestors worshipped

at that location, providing a "continuation" of the birth-death-rebirth cycle of the Sacred Area's spiritual ecology.  Tr. 140:11–41:2.

According to the City, Plaintiffs misunderstand their own religion.  The City declares that "the current confluence of stars, trees, birds, and river that Plaintiffs seek to preserve in this appeal does not—and cannot—reflect the 'spiritual ecology' that gave rise to that belief thousands of years ago."  Br. 17–18.  The Sacred Area, the City intones, "lack[s] the 'spiritual ecology' that made it sacred to Plaintiffs' ancestors."  Br. 22.  In particular, Plaintiffs are purportedly wrong to hold the trees in that area sacred because some equivocal testimony suggests two trees "appear[]" human-planted.  Br. 44–45.

But Mr. Perez testified that (1) the trees there now are the "Axis Mundi" that connects underworld, middle world, and upper world and (2) the current Project proposal would make it impossible to practice necessary religious ceremonies.  Tr. 40:12–21, 112:7–15.  Further, the City ignores Ms. Torres's testimony identifying (in the City's own exhibit) the 4,000-year-old White Shaman mural, and locating "the area of Brackenridge Park," the "San Antonio River," "the cormorant," and "the Blue Hole" in the mural.  Tr. 123:23–125:13; *compare* ROA.2157, *with* ROA.55, ¶42.  And indeed, the City seems unaware that, as in many religions, Plaintiffs perform different types of worship and services for different occasions, Br. 24 (mischaracterizing Tr. 87:12–88:4), while accusing Plaintiffs of improperly performing their own ceremonies, Br. 44 (tree visibility); Br. 56 (bird presence).  *But see* Tr. 80:20–81:4 (trees), 88:13–18.

9

In sum, the City has no evidentiary basis to undermine Plaintiffs' own religious beliefs—and those beliefs are not unique to Plaintiffs. As the Lipan-Apache Tribe of Texas itself informed the City in March 2022, the Tribe opposes the Bond Project design because of the harm it threatens to the "San Antonio River, which is represented celestially," and "the Cormorants and the heritage trees it nests in and migrates to, [which] is of utmost importance due to our ceremonious and sacred connection to them." ROA.1494. The City's disbelief and disfavor of Plaintiffs' religious views should be rejected accordingly.

### 2. The City's argument that the government has carte blanche "on its own land" is wrong.

The City also does not truly dispute that its proposed tree-removal and anti-nesting measures substantially burden Plaintiffs' religious exercise. In *Barr v. City of Sinton*, the Texas Supreme Court applied "ordinary meanings in common parlance" to define what TRFRA means to "substantially burden" religious exercise: "real vs. merely perceived, and significant vs. trivial." 295 S.W.3d 287, 301 (Tex. 2009) (quoting *Webster's Third New International Dictionary*).[1] The court had "no hesitation" in

---

[1] The *Barr* court acknowledged, but chose not to adopt, this Court's interpretation of "substantial burden" as it appears in RLUIPA. *See Barr*, 295 S.W.3d at 301 (discussing *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004)). In *Adkins*, this Court rejected the approach of "[t]urning to *Black's Law Dictionary* and *Merriam-Webster's Collegiate Dictionary*" and turned instead to "RLUIPA's legislative history, [which] although sparse, affords some guidance." *Id.* at 568–69. Thus, although it is true that Texas courts "consider decisions applying the federal statutes germane," they are not equivalent. *Barr*, 295 S.W.2d at 296.

concluding that Sinton "substantially burdened Barr's ministry" because "[a]s a practical matter, the ordinance [at issue] ended Barr's ministry." *Id.* at 302.

So too here. The destruction of the tree canopy cormorants need to nest—and the driving away of the cormorants themselves—will end Plaintiffs' ability to conduct religious services. *E.g.*, Op.Br. 8–10; *see also, e.g.*, *DeMarco v. Davis*, 914 F.3d 383, 389 (5th Cir. 2019) (prison official "confiscat[ing] copies of the Bible and religious books … placed a substantial burden on [prisoner's] practice of reading religious literature"); *Merced v. Kasson*, 577 F.3d 578, 591 (5th Cir. 2009) ("city's ban on keeping livestock" meant that Santeria practitioner "cannot perform the ceremonies dictated by his religion. This is a burden, and it is substantial."); *Mayfield v. Tex. Dep't of Crim. Just.*, 529 F.3d 599, 615–16 (5th Cir. 2008) (prison prohibition on Odinist possessing runestones substantially burdened practice of "regular, personal study of the runestones" as well as "use[] in group ceremonies"). And "[a] burden is at its most substantial when the government renders a religious exercise impossible." Br. of *Amici Curiae* 3.

Rather than dispute any of this (and lacking any Texas or Fifth Circuit precedent on its side), the City invokes *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058 (9th Cir. 2008), Br. 39—a descendant of the U.S. Supreme Court's Free Exercise Clause decision in *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988).[2] In

---

[2] To reiterate the City's waiver of the entire substantial-burden issue, Plaintiffs emphasize that, at the motion for injunction pending appeal stage, the City made this

particular, the City urges the Court to hold that "a governmental body's activities *on its own land* … do not impose a substantial burden where it affects only the subjective religious experience of the plaintiff." Br. 38. The Court should ignore that request for at least four separate reasons.

*First*, as Plaintiffs explained (Br. 49–51), *Lyng* and its progeny are irrelevant here because (a) they are federal Free Exercise Clause cases, (b) no Texas court has ever adopted and applied that line of cases under Texas law, (c) the critical text in the federal Free Exercise Clause that drove *Lyng* is narrower than its Texas counterparts, and (d) even on its own terms, *Lyng* favors Plaintiffs. The City does not even try to respond to these arguments. Accordingly, the Court can and should dismiss out of hand the City's reliance on *Lyng* and its progeny.

*Second*, there is no "on government land" exception to the free exercise of religion. The school in *Betenbaugh* was acting on its own land when it prohibited a Lipan-Apache kindergartener from wearing long hair outside his shirt. *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 265 (5th Cir. 2010) (applying TRFRA). Yet the Court held that policy substantially burdened the student's religious practice. *Id.* at 264–65. So too with the myriad prison cases, all of which arise on government property. As

---

*Lyng* argument only in the context of Plaintiffs' Article I, Section 6-a claim, not their other free-exercise claims. *See* Op.Br. 48–51.

*Amici Curiae* say (at 18), "[t]hose courts could have written much shorter opinions if the rule were simply, 'government land, government rules.'"

If the nature of the government's property is relevant, it is the *function* of that property that is relevant—not the fact that the government owns it in the first place. Here, the property in question is a public park, and "[w]herever the title of streets and parks may rest, they have immemorially been held in trust *for the use of the public*." *Hague v. Comm. For Indus. Org.*, 307 U.S. 496, 515 (1939) (emphasis added). That distinguishes this case from *Lyng*, which applied the "internal affairs" doctrine to hold that allowing timber logging and road completion on remote federal lands did not violate the First Amendment. 485 U.S. at 443. There, the Court expressed concern that granting plaintiffs a right to "privacy" and "undisturbed naturalness" would give them a "religious servitude" that would allow them "to exclude all human activity but their own from sacred areas of the public lands." *Id.* at 452–53. Here, Plaintiffs have never demanded privacy or silence, do not oppose the City performing the needed construction to repair the Lambert Beach walls, and have never sought to exclude any persons from using the park as they wish. In contrast to *Lyng*, Plaintiffs have always claimed that the City can achieve its goals *and* accommodate Plaintiffs' religion. The City has simply refused to do so.

*Third*, asking federal courts to determine what constitutes "the subjective religious experience of the plaintiff" is itself constitutionally impermissible because courts lack judicially manageable standards for evaluating spiritual reality. "Particularly

13

in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner … correctly perceived the commands of their … faith. Courts are not arbiters of scriptural interpretation." *Thomas*, 450 U.S. at 716. To compare Plaintiff's religion to Catholicism, whether communion wine has undergone transubstantiation or a mere change in "the subjective religious experience" of the believer is a question better suited for catechisms than courts. And under any standard, the City's removal of dozens of trees and elimination of cormorant nesting is a change in the "objective" reality of the Project Area.

*Finally*, and in any event, the City's argument for a government-owned-land exception "violates TRFRA's plain language." *Merced*, 577 F.3d at 591. "TRFRA applies to '*any* rule, order, decision, practice, or other exercise of governmental authority.'" *Id.* (quoting Tex. Civ. Prac. & Rem. Code § 110.002(a)). It admits of no exceptions, let alone exceptions for when the government wishes to suppress—and indeed, foreclose altogether—religious exercise on government-owned property.

**B.    The Measures Fail Strict Scrutiny.**

Because the City's measures plainly and substantially burden Plaintiffs' religious exercise, the only outstanding question is whether they satisfy strict scrutiny. They do not, and the City offers no persuasive arguments otherwise.

14

##### 1.   The tree-removal plan is not the least restrictive means of furthering a compelling governmental interest.

Beginning with the City's tree-removal plan, the City summarily claims that "repairing the crumbling retaining walls [across the river from the Sacred Area] is a compelling governmental interest." Br. 45–46. If that were the case, however, then virtually every government construction project points to a compelling governmental interest. That is not the law. Moreover, the City mischaracterizes the rule, which is that "TRFRA requires the government to provide 'evidence to support [its] assertion with respect to the 'particular practice at issue.'" Op.Br. 38 (quoting *Barr*, 295 S.W.3d at 307). "That means evidence that *this* tree removal design is necessary in the context of *these Plaintiffs'* religious practice." *Id.* The City still has not done so. To the contrary, the City's witness testified that it is "not removing trees for any other reason than [they] must be removed in order to complete the bond project scope of work." Tr. 332:19-22.

Even if the City had articulated a compelling governmental interest, however, the tree-removal plan is not narrowly tailored. Here and below, the City claims that unidentified "regulatory restrictions" render the City's hands "basically tied by a series of legal issue[s]" and prevent the City from adopting the superior pier-and-spandrel system. Tr. 627:18–24; Br. 48. *But the City has still never identified what those regulations are.* In the district court, the City invoked (without providing citations) "the City's own design guidelines" and "State regulations related to the preservation of historic

structures and cultural resources." ROA.562, ¶ 43.  On appeal, the City has dropped

those assertions, perhaps because those are either precatory guidelines or subject to

exemption.  Op.Br. 16.  Now, the City's only argument is that it "is required by the

federal Department of Interior's 'Standards for Treatment of Historic Resources and

Historic Properties' such that it has to work on those retaining walls from the rear and

not from the front."  Br. 47–48.

What source of law imposes that requirement?  The City has not said.  It does

not provide a citation to the Code of Federal Regulations.  Instead it cites the testimony

of Jamaal Moreno—who is not a lawyer and did not testify as an expert.  The cited

testimony (which the City misrepresents) is that "we're required to *by the THC* [Texas

Historical Commission] follow the Secretary of Interior's standards."  Tr. 373:11–12

(emphasis added).  But, as just mentioned, the City has dropped (and therefore forfeited)

the argument that THC imposes any such mandate.  And more importantly, the City's

own witnesses testified that the City "can deviate from the Secretary of the Interior's

guidelines" if it wants to.  Tr. 395:2–4.  In other words, any relevant Interior guidelines

do not bind the City at all.

Still searching for a regulation that binds it, the City gestures at Plaintiffs' Exhibit

47, (Br. 48 (citing ROA.1953)); but that exhibit states on its very first page that "*The

Secretary of the Interior's Standards for the Treatment of Historic Properties* are regulatory only

for projects receiving Historic Preservation Fund grant assistance and other federally-

assisted projects." ROA.1954.  And there is no record evidence (nor even an assertion in the City's brief) that this is a federally-assisted project.

To be sure, "[t]he City hotly disputes Plaintiffs' representation that Department of the Interior regulations are irrelevant to the retaining walls." Br. 48.  But *the City* has the burden to establish narrow tailoring, which means the City must identify the obstacle (if any) preventing it from using the pier-and-spandrel system and thereby preserving Plaintiffs' religion.[3]  *See Ramirez v. Collier*, 595 U.S. 411, 432 (2022).  Plaintiffs made this same argument below, noting that "the City has not shown it must comply with the Standards." ROA.756.  Yet the City has never done so—not at the preliminary-injunction, not at the motion-stage briefing in the district court and this Court, and not now.  Its tree-removal plan is not the least restrictive means of furthering a compelling governmental interest.

## 2.    The anti-nesting plan is not the least restrictive means of furthering a compelling governmental interest.

As for its anti-nesting measures, the City is largely silent on how such measures are narrowly tailored to further any compelling governmental interest.  As Plaintiffs and the City's own witnesses emphasized, the City's reason for engaging in anti-nesting

---

[3] All of the City's other issues with the pier-and-spandrel system—the cost, the machinery, the OSHA ditch requirements—are premised on the belief that some unidentified standard prohibits anchoring through the front of the wall.  Thus, they are all beside the point unless, as the City has been unable to show, there is a regulatory obstacle to anchoring through the front.

measures is to prevent any delay in construction that might be caused by the presence of migratory birds. Op.Br. 17, 41 & n.4. But the City offers no response to Plaintiffs' commonsense point that "[t]he government cannot just pluck a random type of delay out of thin air—a pause in construction—and say that avoiding it suddenly constitutes a compelling governmental interest, at least absent specific 'evidence' establishing' what makes this interest truly extraordinary." Op.Br. 42. Instead, it simply recycles its claim that anti-nesting measures are required because "the first phase of construction" is "slated to last six to eight months." Br. 59. That is insufficient to establish a compelling governmental interest. *See* Op.Br. 42 (citing *Barr*).

In any event, the City's inability to show narrow tailoring is independently fatal. Although this is not their burden, Plaintiffs identified at least five less-restrictive means that the City failed to consider because it (in its own words) "hasn't specifically tried to accommodate plaintiffs' religious exercise in crafting the bird deterrence." Op.Br. 43–44 (citing Tr. 407:2–5). Ignoring virtually all of them, the City disputes (at 58) whether it could pursue anti-nesting measures that affect egrets and herons but not cormorants. The City omits that it "never asked" that question of its Texas Parks and Wildlife consultant. Tr. 559:15–17. The City also ignores that, even if "deterrent *methods* [could not] distinguish between cormorants and the more problematic species," Br. 58 (emphasis added), the *timing* of the methods unquestionably can. As Plaintiffs explained at length, the City easily could have employed anti-nesting measures between October and March/April which would (a) give the City the six months it says (Br. 59) it needs

for construction and (b) permit cormorants to nest. Op.Br. 43. Between that option and several others, the City's anti-nesting plan plainly is not narrowly tailored. And that is not surprising: Again, the City admits that it "never actually investigated whether it could alter the timing of its bird deterrence specifically to accommodate plaintiffs' religious exercise." Tr. 464:23–465:2. The City "does nothing to rebut these obvious alternatives," and that is fatal. *Ramirez*, 595 U.S. at 432.

Recognizing as much, the City gestures in one citationless sentence to another supposed compelling governmental interest—that the anti-nesting plan "is the least restrictive means to advance the City's interest in mitigating the hazardous effects of bird guano to make the Lambert Beach area safe for human visitors." Br. 57. This is a red herring. For one thing, the City's witnesses were unequivocal that the anti-nesting plan is intended to thwart construction delays, not supposed bird poop problems. Op.Br. 41 & n.4. For another thing, the City offered no experts or studies supporting any bird-poop fear—which alone is fatal. *See Merced*, 577 F.3d at 593 (city failed to demonstrate compelling interest where it *did* introduce experts because "the government bears the burden at this stage to prove its interests are harmed" and the city did not "cite any studies"); *Barr*, 295 S.W.3d at 307 (faulting city for failing to cite studies "to support its professed concerns"). In fact, a City witness testified that cormorants "do not present a health risk." Tr. 414:8–9. And the undisputed evidence undermines any claim of a public health threat at the Sacred Area. ROA.1595–1636

19

(refuting any public health threat from histoplasmosis, psittacosis, and salmonella because no "laboratory tests have resulted in" proving any public health threat).

The City relegates its only possible evidentiary support—a letter from Dr. Hunter Reed—to the factual background section. Br. 13. But that letter does not satisfy the "to the person" standard of the compelling-interest test, which requires the government to present evidence regarding "the specific issue at hand." *Merced*, 577 F.3d at 592. Here, that issue is the presence of cormorants in the two-acre Project Area. But this one-page (and nearly two-year-old) letter addresses the 343-acre "Brackenridge Park," not the two-acre Project Area, and does not mention cormorants at all. ROA.2267. In all events, if the City wanted to rely on Dr. Reed's alleged insights, it could have put him on the witness stand. It did not, and this red-herring argument should not distract the Court.

*       *       *

Summed up, the City's tree-removal and anti-nesting measures are not the least restrictive means of furthering compelling governmental interests. Accordingly, Plaintiffs are likely to succeed on the merits of their TRFRA claims.

## III.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR REMAINING FREE-EXERCISE CLAIMS.

The foregoing arguments also establish that Plaintiffs are likely to succeed on their remaining claims—and the City offers no serious responses.

### A. The City's Actions Violate Article I, Section 6 of the Texas Constitution.

Starting with Plaintiffs' free-exercise claim under Article I, Section 6 of the Texas Constitution, the City offers no argument unique to this claim, choosing instead to incorporate by reference its other arguments. Br. 63–64. The City does claim that "the Texas Supreme Court treats a claim brought under Section 6 as 'coextensive' with a federal Free Exercise claim." *Id.* at 63 (quoting *HEB Ministries, Inc. v. Tex. Higher Educ. Coordinating Bd.*, 235 S.W.3d 627, 649–50 (Tex. 2007)). But the City omits that, in the same breath, the Texas Supreme Court has reserved that question, especially where "[t]he parties do not argue that there is any difference in the application of these federal and state constitutional provisions to this case." *Id.* at 642 & n.57, 649–50 & n.87. And that is important here not only because of key textual differences, but also because the Texas Supreme Court has never adopted federal Free Exercise Clause cases such as *Employment Division v. Smith* and *Lyng* (on which the City places significant weight here) for purposes of Texas law. Op.Br. 49–59. Accordingly, the City's attempt to water down the Texas Constitution is a nonstarter—and in any event, it fails for the same reasons the City is likely to lose on TRFRA and Free Exercise Clause grounds.

### B. The City's Actions Violate the Federal Free Exercise Clause.

With regard to Plaintiffs' Free Exercise Clause claim, the City invokes "[t]he less demanding '*Oregon v. Smith*' standard"—*i.e.*, rational basis review—that "applies to a federal Free Exercise claim unless the plaintiff shows that a policy is not 'neutral' or

'generally applicable.'" Br. 60. But the City's tortured attempts to paint its actions in this case as neutral or generally applicable betray that the City has no serious *Smith* argument.

*First*, as to neutrality, the Supreme Court recently emphasized that "[g]overnment fails to act neutrally when it proceeds in a manner *intolerant* of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. 1877 (citations omitted and emphasis added). And here, the City has shown intolerance of Plaintiffs' religious beliefs from the beginning. Despite responding to the concerns of other members of the public, Br. 53, it refused to even try to accommodate Plaintiffs' religious beliefs. Tr. 343:23–25, 344:9–11, 383:9–11, 394:3–395:4, 407:2–5, 465:19–22, 464:23–465:2; *see also* ROA.369, ¶ 59 (the City disclaiming any obligation to study whether it could accommodate Plaintiffs' religion). At the preliminary-injunction hearing, the City repeatedly attacked Plaintiff's beliefs as implausible or impossible. *See, e.g.*, Tr. 29:20–25, 33:1–5, 33:18–23, 88:24–89:20, 466:16–25, 806:7–22. Then, its response brief in this Court spends the bulk of its time lecturing Plaintiffs on the impossibility of their religious beliefs. Not only that, the City also misstates the record by claiming (without citation) that it "revised the plan to accommodate Plaintiffs [sic] beliefs to the extent possible." Br. 61–62. Nonsense: The City's own witnesses testified that they never sought to accommodate Plaintiffs' religious exercise and they do not wish to do so, and the City itself disclaimed any legal obligation to do so. Op.Br. 17, 19; Tr. 343:25–344:11. The City is entitled to its own opinions, but not its own revisionist history.

These are the actions of an intolerant government.  And in cases like this, the government does not even get to try to justify its behavior under strict scrutiny.  *See Masterpiece Cakeshop, Ltd. v. Colorado Civ. Rts. Comm'n*, 138 S. Ct. 1719 (2018) (refusing even to allow the state to justify its actions through strict scrutiny after determining it had behaved without neutrality).

*Second*, and independently, the City's measures are not generally applicable.  For starters, the City does not dispute that its denial of access was not generally applicable because it allowed City employees in for secular reasons while keeping Plaintiffs (who wanted access for religious reasons) out.  *Compare* Op. Br. 46, *with* Br. 62.  The City simply tries to sidestep the issue on mootness grounds.  Br. 62.  But, as discussed above, *see supra* Section I, the access issue is not moot—and thus, the City has forfeited any argument that its unlawful bar on access to the Sacred Area was generally applicable.

So too with the City's tree-removal and anti-nesting measures, which are not generally applicable.  The City says nothing about anti-nesting, thereby forfeiting the issue.  *See* Op.Br. 47.  Nor does the City have any legal justification for its pursuit of exemptions to cut down more trees than legally permitted in the Project Area, while refusing to accommodate Plaintiffs' religious exercise.  Op.Br. 46–47.  That is the City treating "comparable secular activity more favorably than religious exercise."  *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021).  And when a government action treats *any* comparable secular activity better than the religious exercise at issue, it is not generally applicable.  *Id.*

The City's only response is that Plaintiffs' argument somehow "stretch[es]" *Fulton*, Br. 62—but this is the heartland of *Fulton*. *Fulton* holds that simply having a "mechanism for individualized exemptions" renders a law not generally applicable. 141 S. Ct. at 1878. Indeed, it is "[t]he creation of a formal mechanism for granting exceptions [that] renders a policy not generally applicable." *Id.* And the City does not (and cannot) contest that its process for seeking and obtaining a variance from City ordinances prohibiting tree cutting—while shutting the door on Plaintiffs' request for an accommodation of their religious exercise—is just such an impermissible mechanism. *Id.*

For lack of either neutrality or general applicability, therefore, the City's measures do not fall under *Smith*, are subject to strict scrutiny, and fail strict scrutiny for the reasons expressed above. *See supra* Section II.

## C.  The City's Actions Violate Article I, Section 6-a of the Texas Constitution.

Finally, the City all but admits that Plaintiffs have a meritorious claim under Article I, Section 6-a of the Texas Constitution. Again, that provision bars any municipality's rule "that prohibits or limits religious services." Tex. Const. art. I, § 6-a. The City acknowledges that Section 6-a covers "religious gatherings," which precisely describes Plaintiffs' longstanding use of the Sacred Area. Br. 65. But the City says that "[t]he claim under Section 6-a is moot" because "the City has opened access to the

Sacred Area for Plaintiffs' ceremonies or private worship and is not limiting access to that place for religious gathering." *Id.* at 65–66.

The City's mootness argument is unavailing in two respects. *First*, as already stated, Plaintiffs' access claims are not moot. *See supra* Section I. And by failing to preserve a merits argument, the City has forfeited the issue. *Second*, the City entirely ignores the remainder of Plaintiffs' Section 6-a claim—that the City's tree-removal and anti-nesting measures independently violate Section 6-a because they would "prohibit and limit Plaintiffs' future religious services by irreparably destroying the very aspects of the Sacred Area that make it a living place of worship for Plaintiffs." Op.Br. 48. That issue unquestionably is not moot, and the City's refusal to respond likewise constitutes forfeiture of the issue. Accordingly, Plaintiffs are plainly likely to succeed on the merits of their Article I, Section 6-a claim.

## CONCLUSION

The Court should reverse the district court's orders and enjoin the City (1) from preventing Plaintiffs from accessing the Sacred Area for personal and group worship and related religious activities; (2) from implementing the bond project as currently designed with respect to tree removal; and (3) from engaging in anti-nesting measures that results in displacing cormorants from the Sacred Area.

November 20, 2023

Respectfully submitted,

/s/ Chance B. McCraw

Mark W. Rasmussen
Margaret I. Lyle
Jonathan D. Guynn
J. Benjamin Aguiñaga
Chance B. McCraw
Timothy M. Villari
JONES DAY
2727 N. Harwood St.
Dallas, Texas 75201
214-220-3939
mrasmussen@jonesday.com
milyle@jonesday.com
jguynn@jonesday.com
jbaguinaga@jonesday.com
cmccraw@jonesday.com
tvillari@jonesday.com

*Counsel for Plaintiffs*

/s/ John Greil

John Greil
Steven T. Collis
LAW AND RELIGION CLINIC
UNIVERSITY OF TEXAS SCHOOL OF LAW
727 East Dean Keeton St.
Austin, Texas 78705
(512)-471-5151
john.greil@law.utexas.edu
Steve.collis@law.utexas.edu

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on November 20, 2023, the foregoing Reply Brief of Appellants was electronically filed with the United States Court of Appeals for the Fifth Circuit using the CM/ECF system, and that all parties required to be served have been served. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.


/s/ Chance B. McCraw
Chance B. McCraw
*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

This Brief of Appellants complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because it contains 6,477 words, excluding parts exempted by Rule 32(f); and (2) the typeface and type style requirements of Rule 32(a)(5), (6), because it has been prepared in a proportionally spaced typeface (14-point Garamond) using Microsoft Word (the program used for the word count).

Dated: November 20, 2023

*/s/ Chance B. McCraw*
Chance B. McCraw
*Counsel for Plaintiffs*