

Jane Webre
Direct Dial: 512.495.6320
jwebre@scottdoug.com

June 18, 2025

Lyle W. Cayce, Clerk
United States Court of Appeals
   for the Fifth Circuit
600 S. Maestri Place, Suite 115
New Orleans, LA 70130

In Re: Case No. 23-50746; *Gary Perez; Matilde Torres v. City of San Antonio*; In the United States Court of Appeals for the Fifth Circuit

Dear Mr. Cayce:

Appellee the City of San Antonio (the "City") submits this letter pursuant to Federal Rule of Appellate Procedure 28(j) to address the recent opinion of the Supreme Court of Texas answering this Court's certified question. The Opinion is attached as App.1.

The Court's original panel opinion affirmed the district court's order denying a preliminary injunction. ECF No.209-1. One issue involved Article I, § 6-a of the Texas Constitution (the "Amendment"). This Court affirmed the order because Plaintiffs "did not adequately brief" the issue involving the Amendment, and Plaintiffs' "other arguments lacked merit." ECF No.231-1 p.1. On rehearing, the panel withdrew its original opinion and certified the following question to the Supreme Court of Texas regarding the Amendment: "Does the 'Religious Service Protections' provision of the Constitution of the State of Texas—as expressed in Article 1, Section 6-a—impose a categorical bar on any limitation of any religious service, regardless of the sort of limitation and the government's interest in that limitation?" ECF No.231-1 p.11.

Scott Douglass & McConnico LLP  |  Attorneys at Law

303 Colorado Street, Suite 2400, Austin, TX 78701  |  p : 512.495.6300  |  f : 512.495.6399  |  www.scottdoug.com

June 18, 2025
Page 2

The Supreme Court of Texas heard argument on the certified question and issued the attached Opinion. The Opinion explains that the Amendment is categorical where it applies, but the scope is limited, and it does not apply to government preservation and management of publicly owned lands, which is the issue here. Critically, the Amendment does not apply to the City's planned improvements to Brackenridge Park: "[A]lthough the Religious Services Clause forbids the government from prohibiting or limiting religious services, nothing in its text purports to address governmental preservation and management of public lands or the tensions between such activities and religious liberties." App.1 p. 35.

The Opinion thus forecloses Plaintiffs' claims against the City based on the Amendment. The City prays that the Court affirm the district court's judgment denying a preliminary injunction.

Very truly yours,

Jane Webre

JMW:mp

Enclosure

cc:     Counsel of Record

4917-3883-2463

APP. 1

# Supreme Court of Texas

No. 24-0714

Gary Perez and Matilde Torres,

*Appellants*,

v.

City of San Antonio,

*Appellee*

On Certified Question from the
United States Court of Appeals for the Fifth Circuit

**Argued December 4, 2024**

JUSTICE BOYD delivered the opinion of the Court, in which Chief Justice Blacklock, Justice Lehrmann, Justice Devine, Justice Busby, Justice Bland, Justice Huddle, and Justice Young joined.

JUSTICE SULLIVAN filed a dissenting opinion.

The people of Texas voted to amend the Texas Constitution in 2021 by adding a new clause that forbids their government from enacting a rule that "prohibits or limits" certain "religious services." TEX. CONST. art. I, § 6-a. The United States Court of Appeals for the Fifth Circuit has asked this Court whether this new clause imposes "a categorical bar on any limitation of any religious service, regardless of

the sort of limitation and the government's interest in that limitation." Addressing the question as containing two parts, we answer: (1) when the clause applies, its force is absolute and categorical, meaning it forbids governmental limitations on religious services regardless of the government's interest in the limitation or how tailored the limitation is to that interest, but (2) the scope of the clause's applicability is not unlimited. Without attempting to precisely or comprehensively define that scope today, we conclude it does not extend to the government's preservation and management of publicly owned lands.

## I.
## Background

Gary Perez and Matilde Torres (collectively, Perez) are members of the Lipan-Apache Native American Church. The Church believes that life on earth began at a spring along the Yanaguana, which is now known as the San Antonio River. A particular bend in the river, which resembles the shape of the constellation Eridanus, serves in the Church's faith as a sacred connection between the physical and spiritual worlds. According to the Church's teaching, the spring created the Blue Hole, in which a spirit in the form of a blue panther resided. Another spirit, taking the form of a cormorant, appeared at the Blue Hole, but the panther spirit startled the bird spirit and caused it to flee, dropping water from its tail that produced life throughout the San Antonio River Valley. Church members believe that at certain times throughout the year they must participate in certain religious services in the "Sacred Area"—a twenty-by-thirty-foot space among cypress trees on the south shore of the river bend—facing north so they can observe the trees and

the cormorants nesting and flying within the "spiritual ecology."[1] Evidence exists that indigenous peoples have conducted similar religious services in and around the Sacred Area for thousands of years. Perez has worshipped and led religious ceremonies there for at least twenty-five years, and Torres has worshipped and participated in religious ceremonies there for at least ten years. No one disputes that they and the Church sincerely hold these religious beliefs.

For over 125 years, the Sacred Area has existed within Brackenridge Park, a popular public park located in and owned by the City of San Antonio. Recognized as a local, state, and national historic landmark, the sprawling park contains numerous amenities including picnic areas, hiking paths, sports facilities, a zoo, a tea garden, a theater, a golf course, and a natural-history museum. More than one hundred years ago, the City constructed a public recreation area at the riverbend called Lambert Beach. Through the years, the City has accommodated the Church's religious gatherings in the Sacred Area while also constructing retaining walls and other improvements to promote public health and safety and to preserve the beach area for public use. Over time, retaining walls have eroded and failed, trees have weakened and died, and bird excrement has greatly increased, creating health and safety issues.

In 2016, City voters approved a bond package that included nearly $8 million for park improvements, and the City contracted with a design team that developed a plan to address issues in the Lambert

---

[1] The Church performs ceremonies at the Sacred Area at particular "holy moments" on specific dates throughout the year.

Beach area. The improvement plan includes repairing retaining walls, removing and replacing most of the trees, and deterring migratory birds—including cormorants—from nesting nearby. Various city, state, and federal government agencies must approve and permit the improvements. The parties dispute the extent to which the proposed measures are necessary for public health and safety and the extent to which the City has attempted to accommodate the Church's religious services as part of the improvement plan.

In 2023, a retaining wall failed, and a large tree branch fell near the Sacred Area. When the City temporarily blocked all access to the area, Perez sued the City in federal court. The district court granted immediate relief requiring the City to remove the tree branch and grant the Church access to the Sacred Area, and the City complied with that order. Perez sought additional relief, however, asserting that the City's improvement plan will destroy the Church's sacred worship space by eliminating trees and deterring cormorants, both of which are "necessary components" of the Church's religious services.

Perez contends that the City's removal of the trees and deterrence of the birds will violate his rights (1) to the "free exercise" of religion under the First Amendment to the United States Constitution, (2) to the "freedom of worship" protected under Article I, Section 6 of the Texas Constitution, (3) to be free from governmental action that "substantially burdens" his "free exercise of religion" under the Texas Religious Freedom Restoration Act (the Texas RFRA), and (4) to be free from governmental action that "prohibits or limits religious services" under the new clause, Article I, Section 6-a of the Texas Constitution. Perez

requests injunctive and declaratory relief to require the City to minimize any tree removal in or near the Sacred Area, to allow the cormorants to nest in and around the Sacred Area, and generally to revise the improvement plan to accommodate the Church's religious-service requirements.

The district court declined Perez's request for a temporary restraining order but later partially granted a preliminary injunction, ordering the City to allow the Church to have access for religious ceremonies involving limited-sized groups on certain dates but declining to enjoin the City's tree-removal and bird-deterrence plans. Perez appealed, and the Fifth Circuit initially affirmed. *Perez v. City of San Antonio*, 98 F.4th 586, 614 (5th Cir. 2024). The court rejected Perez's claims under the First Amendment, the Texas Constitution's Freedom of Worship Clause, and the Texas RFRA, *id.* at 596–611, and concluded that Perez did "not sufficiently brief the question of whether" the new Texas Religious Services Clause provides him with additional protections, *id.* at 612. The court thus concluded that Perez failed "to meet [his] burden to show a likelihood of success on the merits" of that claim. *Id.*

After granting Perez's rehearing motion, the Circuit panel withdrew its opinion and certified to this Court the following question:[2]

---

[2] *See* TEX. CONST. art. V, § 3-c(a) ("The supreme court [has] jurisdiction to answer questions of state law certified from a federal appellate court."); TEX. R. APP. P. 58.1 ("The Supreme Court of Texas may answer questions of law certified to it by any federal appellate court if the certifying court is presented with determinative questions of Texas law having no controlling Supreme Court precedent.").

> Does the "Religious Service Protections" provision of the Constitution of the State of Texas—as expressed in Article 1, Section 6-a—impose a categorical bar on any limitation of any religious service, regardless of the sort of limitation and the government's interest in that limitation?

*Perez v. City of San Antonio*, 115 F.4th 422, 428 (5th Cir. 2024). We accepted the certified question, received briefing from the parties, and held oral arguments in which Perez, the City, and the State of Texas— acting as an amicus and represented by the Attorney General— participated. We also received helpful amicus briefs from (1) the State, (2) First Liberty Institute,[3] (3) the International Council of Thirteen Indigenous Grandmothers and Carol Logan,[4] (4) the Texas Catholic Conference of Bishops,[5] and (5) the Baptist General Convention of Texas.[6]

---

[3] First Liberty Institute describes itself as "a nonprofit, public interest law firm dedicated to defending religious liberty for all Americans through pro bono legal representation of individuals and institutes of diverse faiths."

[4] The International Council describes itself as "a global alliance of indigenous elders who come together in prayer, education, and healing for Mother Earth . . . to protect indigenous ways of life from destruction and to preserve the lands where Indigenous peoples live and upon which their cultures depend." Ms. Logan describes herself as "an elder from the Confederated Tribes of Grande Ronde and a lineal descendant of the Clackamas People."

[5] The Catholic Conference describes itself as "an ecclesiastical unincorporated consultive nonprofit association [that] furthers the religious ministry of Roman Catholic bishops and archbishops in this State, particularly through advocacy for social, moral, and institutional concerns of the Catholic Church."

[6] The Baptist Convention describes itself as a "nonprofit corporation in Texas" that serves and operates "in harmonious cooperation" with "over two

## II.
## The Texas Religious Services Clause

The certified question requests that we interpret and construe the new Religious Services Clause. Ultimately, our "bottom-line task is to identify what" this Clause "would have meant to those who ratified it" in 2021. *Hogan v. S. Methodist Univ.*, 688 S.W.3d 852, 857 (Tex. 2024) (citing *In re Abbott*, 628 S.W.3d 288, 293 (Tex. 2021)). To accomplish this, we must "rely heavily on the literal text," *Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009), presuming that "the framers carefully chose the language," *Degan v. Bd. of Trs. of Dall. Police & Fire Pension Sys.*, 594 S.W.3d 309, 313 (Tex. 2020), and interpreting it to mean what the voters who ratified the amendment would have understood it to mean, *see Abbott*, 628 S.W.3d at 293. We focus on the voters' contemporaneous understanding because—as we have long confirmed—"[t]he meaning which a constitutional provision had when adopted, it has to-day; its intent does not change with time nor with conditions; while it operates upon new subjects and changed conditions, it operates with the same meaning and intent which it had when formulated and adopted." *Travelers' Ins. Co. v. Marshall*, 76 S.W.2d 1007, 1011 (Tex. 1934).

To determine the ratifiers' contemporaneous understanding, we must consider not only the words in the immediate text but also their "historical and linguistic context"—that is, the "full context of the constitutional language and history." *In re Dallas County*, 697 S.W.3d

---

million congregants in more than 5,300 churches" that "participate in worship services through the week."

142, 157–58 (Tex. 2024).[7] When construing the Constitution, we "'resist rulings anchored in hyper-technical readings of isolated words or phrases,' because 'the meaning of words read in isolation is frequently contrary to the meaning of words read contextually in light of what surrounds them.'" *Id.* at 158 (quoting *In re Off. of Att'y Gen. of Tex.*, 456 S.W.3d 153, 155 (Tex. 2015)). That is, we must not "simply open a dictionary" and "ignore the historical traditions and legal foundations upon which [our founding documents] were constructed." *Hogan*, 688 S.W.3d at 857, 859. Instead, we may consider evidence of the contemporaneous explanations and understandings of the legislature that proposed the language and the electorate that voted on its ratification. *Degan*, 594 S.W.3d at 313.[8] This evidence may shed helpful

---

[7] Consideration of the linguistic context involves reading the Constitution "as a whole," focusing on all provisions that relate to the same subject matter, giving meaning and effect to each. *In re Nestle USA, Inc.*, 387 S.W.3d 610, 619–20 (Tex. 2012) (quoting *Collingsworth County v. Allred*, 40 S.W.2d 13, 15 (Tex. 1931)). The historical context includes factors such as "the history of the legislation, the conditions and spirit of the times, the prevailing sentiments of the people, the evils intended to be remedied, and the good to be accomplished." *Harris Cnty. Hosp. Dist.*, 283 S.W.3d at 842 (citations omitted).

[8] *See also Abbott*, 628 S.W.3d at 293 ("The legislature's mid-nineteenth century view that article III, section 10 authorized it to take absent members 'into custody' is therefore particularly compelling evidence of the original understanding of the provision."); *Am. Indem. Co. v. City of Austin*, 246 S.W. 1019, 1023 (Tex. 1922) ("Legislative construction and contemporaneous exposition of a constitutional provision is of substantial value in constitutional interpretation."). When interpreting Article XVI, Section 66 of the Texas Constitution, for example, we noted that "its impetus was a Depression-era decision from this Court." *Degan*, 594 S.W.3d at 313. We concluded that "[l]egislative history . . . confirms that Section 66 was added to the Constitution to overrule our decision." *Id.* And in *Edgewood Independent School District v. Kirby*, we looked to records from the Constitutional Convention of 1875 and "the structure of school finance" at the time of ratification to interpret Article

light on what the text meant to those who ratified the amendment, but it "must ordinarily yield when the text's plain meaning says the opposite." *In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 467 (Tex. 2011).

The text of the Texas Religious Services Clause provides:

> This state or a political subdivision of this state may not enact, adopt, or issue a statute, order, proclamation, decision, or rule that prohibits or limits religious services, including religious services conducted in churches, congregations, and places of worship, in this state by a religious organization established to support and serve the propagation of a sincerely held religious belief.

---

VII, Section 1. 777 S.W.2d 391, 396 (Tex. 1991); *see also Marshall*, 76 S.W.2d at 1024 (analyzing "the history of the adoption of the contract clause in the Federal Constitution, its incorporation in the organic laws of the several states, and the long judicial interpretation thereof by the Supreme Court of the United States, by the Supreme Courts of the several States, and by the Supreme Court of Texas prior to 1876 (the date of the adoption of our present Constitution)").

We certainly adhere to our view that, when interpreting and construing a *statute*, "[*l*]*egislative* history is generally useless to courts—indeed, it can be worse than useless because it is manipulable and relies on what *never* was the law." *Brown v. City of Houston*, 660 S.W.3d 749, 755 (Tex. 2023) (citing *In re Facebook, Inc.*, 625 S.W.3d 80, 88 n.4 (Tex. 2021)). But in the context of *constitutional* interpretation, statements made by the legislature that proposed amendments to the people can be relevant, even though they lack any presumption of binding effect and are no more relevant than many other sources that can address the larger context in which the people considered ratification. Similarly, while the U.S. Supreme Court has turned away from ordinary legislative history in statutory construction, in constitutional interpretation it routinely cites the Records of the Federal Convention (a sort of "legislative history"), *see, e.g.*, *Rucho v. Common Cause*, 588 U.S. 684, 695, 697–98 (2019), as well as the Federalist Papers, *see, e.g.*, *SEC v. Jarkesy*, 603 U.S. 109, 121–22, 127 (2024), and many other sources to help show how the proposed text would have been understood by the ratifying public.

TEX. CONST. art. I, § 6-a. The parties and amici generally treat the certified question as inquiring about both (A) the "force" of the Clause when it applies (that is, whether it imposes "a categorical bar . . . regardless of . . . the government's interest in [the] limitation") and (B) the "scope" of its application (that is, whether it imposes a bar "on any limitation of any religious service, regardless of the sort of limitation"). Perez argues that the Clause's force is "absolute" and categorical, but he concedes that its scope is limited by its own terms and by certain "longstanding interpretive principles of Texas constitutional law." The City, by contrast, argues that the Clause's force is limited in that it does not bar prohibitions or limitations that are narrowly tailored to promote a compelling governmental interest and its scope is limited to laws that subject religious services to "unequal treatment" compared to secular gatherings and activities.

We agree with Perez that the Clause's force is categorical when it applies, and we agree with both parties that its scope is not unlimited. But we reject both parties' proposed descriptions of the Clause's scope. We need not—and, therefore, should not and do not—attempt to exhaustively or precisely define the Clause's scope to answer the certified question in a way that assists the federal courts in deciding this case. We conclude only that its scope does not reach the type of governmental actions about which Perez complains.

## A. The "force" of the Religious Services Clause

Perez argues that, when the Clause applies, it applies with "absolute force" and "categorically bars" a prohibited limitation on religious services regardless of the government's interest in that

limitation. All the amici who address the issue agree. But the City disagrees, arguing that the Clause does not forbid laws that are narrowly tailored to promote a compelling governmental interest. The City, in other words, urges us to import into this new Clause the "strict scrutiny" standard that the U.S. Supreme Court has imported into the First Amendment's Free Exercise Clause[9] and that the Texas

---

[9] Since the early 1960s, the U.S. Supreme Court has held that the Free Exercise Clause prohibits the government from restricting religiously motivated conduct *unless* the restriction promotes a "compelling state interest" and "no alternative forms of regulation would combat such abuses without infringing First Amendment rights." *Sherbert v. Verner*, 374 U.S. 398, 406–07 (1963). The Court has described this "strict scrutiny" standard—permitting governmental restrictions only if they are narrowly tailored to promote a compelling governmental interest—as "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997); *see Cath. Charities Bureau, Inc. v. Wis. Labor & Indus. Rev. Comm'n*, 605 U.S. ___, 2025 WL 1583299, at *9 (2025) (referring to this standard as "the highest level of judicial scrutiny"); *Miller v. Johnson*, 515 U.S. 900, 920 (1995) (describing strict scrutiny as "our most rigorous and exacting standard of constitutional review").

We have also applied strict scrutiny to the Texas Constitution's Freedom of Worship Clause, which is original to the 1876 Texas Constitution and provides in part: "All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences," and "No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion." TEX. CONST. art. I, § 6. For want of arguments to the contrary, we have assumed that the Freedom of Worship Clause provides protection that is "coextensive" with the federal Free Exercise Clause and thus requires a strict-scrutiny analysis. *See HEB Ministries, Inc. v. Tex. Higher Educ. Coordinating Bd.*, 235 S.W.3d 627, 649–50 n.87 (Tex. 2007) (citing *Tilton v. Marshall*, 925 S.W.2d 672, 677 n.6 (Tex. 1996) ("Because Tilton has not argued persuasively for a different application of the provisions of the First Amendment and Article I, Section 6 as they pertain to the free exercise of religion, we assume without deciding that the state and federal free exercise guarantees are coextensive with respect to his particular claims.")); *see generally In re Commitment of Fisher*, 164 S.W.3d 637, 645 (Tex. 2005)

Legislature has expressly included in the Texas RFRA.[10] Based on the Clause's text and context, we agree with Perez.

Turning first to the Clause's text, we agree with Perez and the amici that its plain language imposes a categorical bar. Without identifying or acknowledging any caveats or exceptions, it states that the government "may not" impose a requirement "that prohibits or limits religious services." The phrase "may not" in this context states a direct prohibition, synonymous with "shall not," declaring what the government "is not permitted to do." TEX. GOV'T CODE § 311.016(5); BRYAN A. GARNER, *Garner's Dictionary of Legal Usage* 568, 954 (3d ed. 2011). By contrast, numerous other constitutional and statutory provisions state that the government "may not" or "shall not" do something "unless," "until," or "except" in particular circumstances.[11]

---

("Where, as here, the parties have not argued that differences in state and federal constitutional guarantees are material to the case, and none is apparent, we limit our analysis to the United States Constitution and assume that its concerns are congruent with those of the Texas Constitution.").

[10] The Texas RFRA provides that "a government agency may not substantially burden a person's free exercise of religion" unless "the government agency demonstrates that the application of the burden to the person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that interest." TEX. CIV. PRAC. & REM. CODE § 110.003(a)–(b).

[11] *E.g.*, TEX. CONST. art. III, §§ 48-f ("An ad valorem tax may not be levied . . . until approved by the qualified voters . . . ."), 49(d) ("Except as provided by law under Subsection (f) of this section, the amount of debt stated in the proposition may not be exceeded and may not be renewed after the debt has been created unless the right to exceed or renew is stated in the proposition."); art. VII, § 5(c) ("Except as provided by this section, the legislature may not enact a law appropriating any part of the permanent school fund or available school fund to any other purpose."); art. IX, § 9B ("A district

The Texas RFRA, for example, states that the government "may not substantially burden a person's free exercise of religion" but expressly makes that prohibition "[s]ubject to" the government's ability to demonstrate that the imposition of the burden passes strict scrutiny. Tex. Civ. Prac. & Rem. Code § 110.003(a)–(b). The Religious Services Clause contains no similar qualifying language.

The Clause's linguistic context also supports this construction. As explained, the federal Free Exercise Clause, the Texas Freedom of Worship Clause, and the Texas RFRA all protect religious freedoms, but they each—either expressly or as judicially construed—have been understood to permit laws they would otherwise prohibit if the law satisfies strict scrutiny. The Free Exercise Clause and the Freedom of Worship Clause (as often judicially construed) already forbid laws that target the free exercise of religion (which generally would include religious services) *unless* the law survives strict scrutiny, and the Texas RFRA expressly forbids laws that substantially burden the exercise of religion unless the law survives strict scrutiny. Construing the Religious Services Clause to also permit laws that prohibit or limit religious services *if* the law survives strict scrutiny provides no meaningful protection that the Free Exercise Clause and Freedom of Worship Clause do not already provide. We must construe the Clause so that it

---

may not be created or a tax levied unless the creation and tax are approved by a majority of the registered voters who reside in the district."); art. XVI, §§ 40(b) ("State employees or other individuals may not receive a salary for serving as members of such governing bodies, except that . . . ."), 59(c-1) ("The Legislature may not authorize the issuance of bonds or provide for indebtedness under this subsection . . . unless a proposition is first submitted to the qualified voters of the district and the proposition is adopted.").

produces an independent meaning and operative effect. *Doody v. Ameriquest Mortg. Co.*, 49 S.W.3d 342, 344 (Tex. 2001).

The Clause's historical context also supports this construction. As the parties acknowledge and agree, the Legislature proposed and the people ratified the Religious Services Clause in response to governmental shut-down orders that prohibited and limited religious services when the COVID-19 pandemic struck in 2020. Attempting to "slow the spread," governments around the country, including in Texas,[12] issued "lock-down" orders and "social-distancing" requirements that arguably imposed "the greatest intrusions on civil liberties in the peacetime history of this country." *Arizona v. Mayorkas*, 143 S. Ct. 1312, 1314 (2023) (GORSUCH, J., statement). As many turned to their religious faith amid the growing fear and anxiety, their governments barred them from gathering with fellow believers or worshipping in accordance with their religious beliefs. Some jurisdictions prohibited all religious services anywhere, both indoors and outdoors; some restricted all in-person services and permitted only services by video, teleconference, or other remote proceedings; some barred gatherings beyond individual households; some limited the size of religious gatherings to as few as

---

[12] *See, e.g.*, The Governor of the State of Tex., Exec. Order GA-08 (issued Mar. 19, 2020), 45 Tex. Reg. 2267, 2271 (2020) (restricting social gatherings of ten or more people); Travis Cnty. Judge, Order No. 2020-04 (issued Mar. 21, 2020), https://www.traviscountytx.gov/images/docs/covid-19-order-4.pdf (prohibiting gatherings of ten or more people unless social distancing "can be maintained and controlled"); Tarrant Cnty. Judge, Second Amended Declaration of Local Disaster Due To Public Health Emergency, https://www.tarrantcountytx.gov/content/dam/main/global/Covid-19/Declaration_of_Local_Disaster_2nd_Amendment.pdf (issued Mar. 21, 2020) (requiring essential business to "enforce social separation").

ten; some prohibited particular activities like singing or chanting; and some prohibited religious leaders from ministering to adherents except in individual settings following social-distancing requirements.[13]

Yet many of these same governmental orders permitted other activities or imposed lesser limitations, including for schools, restaurants, bars, liquor stores, dry cleaners, plumbers, real-estate transactions, electricians, exterminators, meat-packing plants, distribution warehouses, marijuana dispensaries, firearm stores, and casinos.[14] Many governmental orders deemed these secular entities and

---

[13] *See Mayorkas*, 143 S. Ct. at 1314–15 (GORSUCH, J., statement); *see also, e.g.*, Mass. Exec. Order No. 13 (Mar. 24, 2020), https://www.mass.gov/doc/march-23-2020-essential-services-and-revised-gatherings-order/download/ (limiting services at "[c]hurches, temples, mosques, and other places of worship" "in any confined indoor or outdoor space" to ten people); *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 716 (2021) (*S. Bay II*) (denying injunctive relief against California's "prohibition on singing and chanting during indoor services"); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 15–16 (2020) (per curiam) (enjoining enforcement of Governor of New York's executive order restricting religious services to ten or twenty-five people); *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 343 (7th Cir. 2020) (citing Executive Order 2020-32 § 2(3) (Apr. 30, 2020), the Governor of Illinois's executive order limiting all "public and private gatherings" to ten people); *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 616 (6th Cir. 2020) (granting injunction to allow "drive-in service" in church parking lot despite Governor's order prohibiting "[a]ll mass gatherings"); *Cross Culture Christian Ctr. v. Newsom*, 445 F. Supp. 3d 758, 764 (E.D. Cal. 2020) (noting that "[f]aith based services that are provided through streaming or other technology" were exempt from Governor's stay-home orders, but not in-person services); Tyler Shannon, *Texas Proposition 3: A State Constitutional Response to Restrictions on Religious Gatherings*, 55 TEX. TECH L. REV. 559, 563–66 (2023) (discussing COVID-19 restrictions on religious gatherings nationwide, including in Texas).

[14] *See, e.g., Mayorkas*, 143 S. Ct. at 1314 (GORSUCH, J., statement); *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2604 (2020)

activities to be "essential" while refusing the same status to religious organizations and practices.[15] In Texas, most of the orders that concerned religious gatherings were issued by local governments like cities and counties. Three days after the federal Department of Homeland Security released its Guidelines, the Texas Governor issued an executive order defining "essential services" as consisting of "everything listed by the U.S. Department of Homeland Security in its Guidance on the Essential Critical Infrastructure Workforce, Version 2.0, *plus religious services conducted in churches, congregations, and houses of worship*." The Governor of the State of Tex., Exec. Order GA-14 (issued Mar. 31, 2020), 45 Tex. Reg. 2361, 2369–70 (2020) (emphasis added).

People of faith filed numerous lawsuits challenging various COVID lock-down orders under both the Free Exercise Clause and the RFRA statutes. None reached this Court, and the results in courts in other jurisdictions were mixed. The U.S. Supreme Court, for example, initially denied two emergency applications to enjoin such orders, concluding that the orders did not target or discriminate against religious beliefs and practices and granted more lenient treatment only

---

(ALITO, J., dissenting from denial of application); *Denver Bible Church v. Azar*, 494 F. Supp. 3d 816, 832 (D. Colo. 2020).

[15] *See* U.S. DEP'T OF HOMELAND SEC., ADVISORY MEMORANDUM ON IDENTIFICATION OF ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS DURING COVID-19 RESPONSE (Mar. 28, 2020), https://www.cisa.gov/sites/default/files/publications/CISA_Guidance_on_the_Essential_Critical_Infrastructure_Workforce_Version_2.0_1.pdf.

to "dissimilar" (secular) activities.[16] Later in 2020, the Court granted an injunction, concluding that the orders at issue *might* violate the Free Exercise Clause because they treated religious entities and activities more strictly than similar secular organizations and activities.[17] The Court again granted limited relief in four cases in 2021.[18]

Early in 2021, while many of these lawsuits were pending, the Texas Legislature responded to these events by proposing in Senate Joint Resolution 27 to amend the Texas Constitution by adding the Religious Services Clause as Article I, Section 6-a.[19] Ultimately, the

---

[16] *Sisolak*, 140 S. Ct. at 2603; *S. Bay United Pentecostal Church v. Newsom* (*S. Bay I*), 140 S. Ct. 1613, 1613 (2020).

[17] *Roman Cath. Diocese of Brooklyn*, 592 U.S. at 21.

[18] *Gateway City Church v. Newsom*, 141 S. Ct. 1460, 1460 (2021); *Harvest Rock Church, Inc. v. Newsom*, 141 S. Ct. 1289, 1290 (2021) (granting relief as to capacity limitation on indoor worship services but denying relief, without prejudice, as to prohibitions against singing and chanting); *Gish v. Newsom*, 141 S. Ct. 1290 (2021) (vacating and remanding in light of *S. Bay II*, 141 S. Ct. at 716 (granting relief as to blanket prohibition on "indoor worship services")); *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam) (holding that "government regulations are not neutral and generally applicable" if "they treat *any* comparable secular activity more favorably than religious exercise," even if they treat "some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue"); *see generally* Josh Blackman, *The "Essential" Free Exercise Clause*, 44 HARV. J.L. & PUB. POL'Y 637, 683–701 (2021).

[19] Texas Senate Joint Resolution 27 was not the Legislature's only action responding to pandemic-related limitations on religious liberties. It also passed, for example, House Bill 525, adding chapter 2401 to the Texas Government Code. *See* TEX. GOV'T CODE §§ 2401.001–.005. Chapter 2401 declares that religious organizations are "an essential business" in this State and that their activities are "essential activities" even during a declared state of disaster, regardless of what any disaster order may say, and provides that governmental entities may not "prohibit a religious organization from

Senate passed the resolution on a vote of 28–2,[20] and the House passed it on a vote of 133–3 (with three present not voting).[21] Over sixty-two percent of Texas voters supported ratification of the Clause, and it became effective near the end of November 2021.[22]

This historical context confirms that those who voted to ratify the Religious Services Clause understood that it would provide *greater* protection for religious services than they understood the Free Exercise Clause or the Texas RFRA provided during the COVID-19 pandemic. As the House Resolution Analysis explains, the Legislature proposed the amendment to address concerns "over restrictions put in place by state and local governments in response to the COVID-19 pandemic that violated the right to the free exercise of religion" and to "do more to protect this right for all Texans and ensure that religious liberty is not abridged in the future."[23]

The historical context also confirms that those who proposed and approved the Clause understood that it would provide greater protection by categorically forbidding certain prohibitions and limitations on

---

engaging in religious and other related activities." *Id.* § 2401.002(a). We are not asked to address this new statutory provision in this case.

[20] S.J. of Tex., 87th Leg., R.S. 409 (2021).

[21] H.J. of Tex., 87th Leg., R.S. 2816 (2021).

[22] *See* TEX. SEC'Y OF STATE, TEXAS ELECTION RESULTS, https://results.texas-election.com/races (Election: 2021 November 2nd Constitutional Amend.); *see generally* Shannon, *supra* note 13, at 574.

[23] House Comm. on State Affs., Resolution Analysis, Tex. S.J. Res. 27, 87th Leg., R.S. (2021), available at https://capitol.texas.gov/tlodocs/87R/analysis/pdf/SJ00027H.pdf.

religious services regardless of the government's interest in those prohibitions and limitations. During the legislative debates, one House member proposed that the resolution be revised to include the "normal language" that permits a regulation that is "narrowly tailored to serve a compelling state interest," but the proposal failed after the resolution's House sponsor replied that "there is a reason we have left that language out."[24] Even legislators who opposed the amendment understood that, if it passed and was ratified, the government "could never restrict capacity in a church service for any reason."[25] And evidence supports that the public understood this as well, including an editorial in the Houston Chronicle that opposed the amendment because, if it were adopted, "no state interests can ever justify limiting religious services."[26]

In support of its argument that the Clause does not forbid laws that pass strict scrutiny, the City argues that *every* constitutional right is and must be subject to *some* limitation.[27] The City contends that, just as the Free Exercise Clause and the Freedom of Worship Clause are

---

[24] Debate on Tex. S.J. Res. 27 on the Floor of the House, 87th Leg., R.S. (May 11, 2021), available at https://house.texas.gov/videos/10097.

[25] Dorothy Isgur, *The 8 Texas constitutional amendments on your 2021 ballot*, KXAN (Oct. 13, 2021), https://tinyurl.com/2hkenm4b (quoting statement of Rep. Turner).

[26] The Ed. Bd., *Vote no on Proposition 3. 'Religious freedom' amendment goes too far.*, HOUS. CHRON. (Oct. 14, 2021), https://tinyurl.com/y8cje5b5.

[27] *See Hudson Cnty. Water Co. v. McCarter*, 209 U.S. 349, 355 (1908) ("All rights tend to declare themselves absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached." (quoted in *Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 147 (Tex. 2010))).

qualified by strict scrutiny even though, textually, they appear to be categorical and absolute, the Religious Services Clause must also be qualified by strict scrutiny. But this argument ignores the Clause's linguistic and historical context. The U.S. Supreme Court has applied the strict-scrutiny test to implement its understanding of the original meaning of the Free Exercise Clause based on that Clause's linguistic and historical context. As we have explained, the linguistic and historical context of the Religious Services Clause is dramatically different.

The City argues that the Clause must be subject to strict scrutiny, else the government will be forced to favor individual religions over others and over the public interest in violation of the federal Establishment Clause. We agree with Perez, however, that this concern relates to the *scope* of the Clause's applicability, not to its *force* when it does apply.[28] Based on the Clause's text and context, we conclude that,

---

[28] The City relies in part on the Supreme Court's recent decision in *Catholic Charities Bureau*, in which the Court reaffirmed that a "law that differentiates between religions along theological lines is textbook denominational discrimination" that violates the First Amendment's Establishment Clause. 605 U.S. ___, 2025 WL 1583299, at *6. As the City sees it, construing the Clause's force to be categorical "risks violating the Establishment Clause by favoring one religious group over all other religious and secular interest." Unlike the laws at issue in *Catholic Charities Bureau* and the decisions it reaffirms, however, the Clause in no way permits a law or governmental decision that "grants a denominational preference by explicitly differentiating between religions based on theological practice." *Id.* at *7. To the extent the Clause permits the City to make park improvements that uniquely affect Perez's religious practices, those effects result from "'secular criteria' that happen to have a 'disparate impact' upon different religious organizations.'" *Id.* (quoting *Larson v. Valente*, 456 U.S. 228, 247 n.23 (1982)).

*when it applies*, it categorically bars a governmental prohibition or limitation on religious services without regard to whether it passes strict scrutiny or any other test that balances the right against the government's interests.

## B. The "scope" of the Religious Services Clause

We turn now to the second part of the certified question: Whether the Religious Services Clause forbids "*any* limitation of *any* religious service, regardless of the sort of limitation." Every party and amici agrees that the answer to this question is "No." The difficulty, however, is in identifying the boundaries of the Clause's scope. As explained, we

---

The City also expresses some resistance to this distinction between the Clause's "force" and "scope," noting Justice Kavanaugh's observation that the question of the extent to which a constitutional provision may permit governmental regulation of a right it otherwise guarantees can be framed as either an "exception" or a "limitation" to the right and "[e]ither way, the analysis is the same—does the constitutional provision, as originally understood, permit the challenged law?" *United States v. Rahimi*, 602 U.S. 680, 717 n.1 (2024) (KAVANAUGH, J., concurring). Noting that Perez himself concedes that the Religious Services Clause does not forbid *every* law that prohibits or limits religious services, the City suggests that the limitations Perez himself accepts are actually limitations to the Clause's force, which must be recognized because of the government's compelling interests that support those limitations under the strict-scrutiny standard. We need not thoroughly engage with the City on this issue to answer the question certified, however. We agree with Perez that the certified question asks about both the Clause's force ("a categorical bar") and its scope ("any limitation . . . regardless of the sort"), and we answer the question accordingly. Based on the arguments presented by both parties and amici, and considering the Clause's text, linguistic context, and historical context, we perceive a meaningful distinction *in this case*, at least, between limitations on the types of governmental orders to which the Clause applies and the power the government retains to deny the right in the future. We identify the limits of the Clause's scope based on the intent of its drafters and ratifiers as exhibited through its text and context, not based on how important the government (including the judiciary) may think a governmental interest becomes in the future.

need not and will not attempt to comprehensively define those boundaries in this case. Notwithstanding the potential benefits of certified questions,[29] we must always remain alert to their risks. A case that comes to us through a certified question does not arise from the normal litigation process in Texas courts, and we often lack the benefit of careful consideration of the issues by our lower courts. Indeed, we lack subject-matter jurisdiction in the usual sense, and we can entertain the certified question *only* because the people of Texas gave us that ability through a constitutional amendment. *See* TEX. CONST. art. V, § 3-c(a). Certified questions thus create the risk that we might answer a question in the abstract, divorced from a factual record to illuminate the legal question by grounding it in a real-world dispute.

As occurred here, the Fifth Circuit routinely "disclaim[s] any intention or desire that the Supreme Court of Texas confine its reply to the precise form or scope of the question certified." *Perez*, 115 F.4th at 428 (quoting *Janvey v. Golf Channel, Inc.*, 792 F.3d 539, 547 (5th Cir. 2015)). It is therefore unsurprising that we have restated a certified

---

[29] Certified questions permit this Court and the federal courts to engage in a "cooperative effort" that is "in the best interests of an orderly development of our own unique jurisprudence, and to the bar, as well as in the best interests of the litigants we concurrently serve." *Amberboy v. Societe de Banque Privee*, 831 S.W.2d 793, 798 n.9 (Tex. 1992). Certification can be "a valuable tool for promoting the interests of cooperative federalism." *Blue Cross & Blue Shield of Ala., Inc. v. Nielsen*, 116 F.3d 1406, 1413 (11th Cir. 1997). By "allow[ing] a federal court faced with a novel state-law question to put the question directly to the State's highest court," certification can "reduc[e] the delay, cut[] the cost, and increas[e] the assurance of gaining an authoritative response." *Arizonans for Off. English v. Arizona*, 520 U.S. 43, 76 (1997). It is especially "imperative that any state constitutional law issues . . . be decided by the state supreme court." *Nielsen*, 116 F.3d at 1413.

question when appropriate. *See Sims v. Carrington Mortg. Servs., L.L.C.*, 440 S.W.3d 10, 15 (Tex. 2014). This certified question asks simply whether the Religious Services Clause forbids "*any* limitation of *any* religious service, regardless of the sort of limitation"—a question to which, as everyone agrees, the answer is "No." But the question inherently asks us to define the Clause's scope in a way that will give "guidance" to the federal courts as they resolve the underlying case. *Janvey v. GMAG, L.L.C.*, 592 S.W.3d 125, 126 (Tex. 2019). Here, we are asked to give guidance regarding the scope of a constitutional provision that Texas adopted just a few years ago and that no Texas appellate court has yet interpreted. The potential ramifications of our answer are unknown but vast. However, we need not endeavor to comprehensively define the Clause's scope to provide a helpful answer here—nor should any court undertake to make such comprehensive pronouncements about the contours of a provision such as the Religious Services Clause beyond those that are necessary to decide the case before it.

For purposes of answering this certified question, we need only explain the boundaries the Clause's text expressly lays out, reject the boundaries the parties and amici propose, and address a single limitation that may be helpful to the Fifth Circuit in resolving this case, leaving further construction and application for future cases.[30]

---

[30] Our dissenting colleague would refuse to answer the certified question, reading it narrowly to ask only whether the Religious Services Clause's scope is unlimited. *Post* at 4 (SULLIVAN, J., dissenting). We agree, of course, that we should only answer the question asked, but doing so requires providing at least a "general" answer that assists the federal court in resolving the case. *Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 59 n.3 (Tex. 2019). Our role—our authority, even—in answering a certified question is not to resolve

Endeavoring to provide a helpful response to the Fifth Circuit while avoiding unforeseen collateral consequences, we answer the question by focusing on the facts presented in the record before us. Under those facts, the question, at a minimum, is whether the Clause's scope reaches governmental actions taken to preserve and maintain public property for the safety and enjoyment of the public. To that question, we answer, "No."

The text itself expressly limits the scope of the Clause's applicability in at least five ways. First, the Clause forbids only actions

---

the underlying case by applying our answer to the facts presented. *Amberboy*, 831 S.W.2d at 798. But to answer the question in a way that helps the federal courts resolve the case, we must consider the facts the Fifth Circuit provides us and answer the question within the context of those facts. *Id.* at 793 (answering whether a promissory note is a negotiable instrument when it requires "interest to be charged at a rate that can be determined only by reference to a bank's published prime rate"). So, for example, when the Fifth Circuit asked "whether a transferee on inquiry notice of fraudulent intent can achieve good faith without investigating its suspicions," we answered that question, not "comprehensively," but more specifically than merely addressing "what constitutes good faith." *Janvey*, 592 S.W.3d at 126. At times, providing a helpful answer necessarily requires us to address whether a party possesses the right it asserts. *See, e.g.*, *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 777 (Tex. 2007) (holding party in underlying case had "no right of reimbursement through subrogation" because insured had no cause of action against third party); *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 357 (Tex. 1990) (holding party's "constitutional attack on section 16.003(b) is not premised upon restriction of a common-law cause of action, and, therefore, necessarily fails the first prong of the open courts test"). But even when that's the case, "how our answer is applied in the case before the Fifth Circuit Court of Appeals is solely the province of that certifying court." *Mid-Continent*, 236 S.W.3d at 777. Here, we provide a helpful—but certainly not comprehensive—explanation of the scope of the Religious Services Clause by holding it generally does not address actions the government takes in the preservation and management of public lands. It remains the role of the federal courts, however, to decide exactly how that answer applies in this case.

by "this state or a political subdivision of the state." TEX. CONST. art. I, § 6-a. Second, it forbids only actions through which the state or a political subdivision may "enact, adopt, or issue a statute, order, proclamation, decision, or rule." *Id.* Third, the Clause protects only "religious services"; it does not, for example, purport to protect the broader concept of the "free exercise of religion." *Id.*[31] Fourth, it protects only religious services "conducted . . . in this state by a religious organization established to support and serve the propagation of a sincerely held religious belief." *Id.* And fifth, it forbids only government actions that "prohibit[] or limit[]" such services. *Id.*

For the most part, these express limitations on the Clause's scope of applicability are not controversial in this case. The parties' debate focuses primarily on the fifth requirement, presenting contrasting views of what it means for a government rule or decision to "prohibit" or "limit" a religious service. Relying in part on these express limitations and, more so, on the Clause's linguistic and historical context, the parties and amici present various proposals to answer this question. We find none of them entirely persuasive.

The City asserts, for example, that the Clause applies only to government actions that subject religious services to "unequal treatment" as compared to secular activities and thus requires that religious services be deemed "essential" and "treated at least as

---

[31] As the parties note, the Clause expressly protects "religious services, *including* religious services conducted in churches, congregations, and places of worship." TEX. CONST. art. I, § 6-a (emphasis added). We agree with the parties that this language provides *non-exclusive* examples of common religious services the Clause protects.

favorably under the law as any secular activity." In support of this construction, the City relies primarily on the Clause's historical context, noting that the Legislature and the ratifiers were particularly concerned that COVID lock-down orders prohibited and limited religious services yet allowed many secular activities that were deemed "essential" to continue relatively unimpeded.[32] While we agree that the Clause forbids such unequal treatment of religious services, we conclude it obviously does more.

The text itself does not contain language that ties its protection to a comparison between religious services and secular activities or that refers to treating religious services as "essential."[33] Although some proponents expressed the desire that religious services be treated equally or as essential,[34] we find no support for the proposition that the ratifiers understood that the Clause would allow the government to restrict religious services so long as it also and equally restricted other

---

[32] The City notes, for example, that the resolution's sponsor in the House explained that the resolution was necessary because "[i]n many instances when liquor stores and casinos have been able to operate at full capacity, churches have been closed down." Debate on Tex. S.J. Res. 27 on the Floor of the House, 87th Leg., R.S. (Mar. 25, 2021) (Statement of Rep. Leach).

[33] By contrast, House Bill 525, which the Legislature also passed in 2021, added chapter 2401 to the Texas Government Code and declared that religious organizations are "essential business[es]" in this State and their activities are "essential activities" even during a declared state of disaster, regardless of what any disaster order may say. TEX. GOV'T CODE § 2401.002. The Religious Services Clause contains no such language.

[34] One witness stated, for example, that one purpose of the Clause was to ensure "that churches and places of worship are essential because faith itself is essential." Debate on Tex. S.J. Res. 27 in the Senate Comm. on State Affs., 87th Leg., R.S. at 2:06:27 (Mar. 8, 2021), available at https://tinyurl.com/bdjcusme.

types of activities. To the contrary, the historical context reveals that the Clause was adopted not only in response to orders that treated religious services less favorably than secular activities but in response to orders like Travis County issued, which prohibited all "public or private Community Gatherings" including "religious services." *See* Travis Cnty. Judge, Order [on COVID-19], at §§ 2–3 (issued Mar. 17, 2020), available at https://www.traviscountytx.gov/images/docs/covid-19-order-2.pdf. We thus reject the City's proposed construction of the Clause's scope.

The State argues that the Clause protects only the right to "gather" for religious services. Noting that the text provides examples of services "conducted in churches, congregations, and places of worship," and that the historical context includes many statements that the Clause was adopted to address "government-mandated closure of churches and other houses of worship,"[35] the State suggests that the Clause forbids shut-down orders, capacity caps, and location restrictions

---

[35] *See*, *e.g.*, Tex. Leg. Council, Analyses of Proposed Constitutional Amendments 14 (Aug. 2021), available at https://tinyurl.com/4hd5vcxy (stating purpose was to forbid "limit[ing] in-person religious gatherings" or "[c]losing houses of worship" and preserve the "ability to meet in person" by "[a]llowing places of worship to remain open during public health emergencies"); H.J. of Tex., 87th Leg., R.S. 2815–16 (2021) (quoting state representative as saying purpose was to make clear that "the state cannot close down or limit our houses of worship" and to protect the right "to congregate with fellow believers, to attend church or mosque or synagogue, [and] to meet with fellow believers in prayer and worship"), 2816 (quoting representative as stating purpose was to ensure government cannot "keep you from going to church"); Debate on Tex. S.J. Res. 27 on the Floor of the House, 87th Leg., R.S. at 8:29:36–40 (May 11, 2021), available at https://tinyurl.com/yc8jvvpj (quoting House sponsor as stating purpose was to prevent government from "shut[ting] down" churches or keeping them from "gather[ing] to pray").

that prohibit or limit religious "gatherings" but does not address restrictions on what adherents can do when they are gathered.[36] Like the parties and other amici, we disagree and conclude that the Clause protects not only the right to gather for religious services but also worship practices that are part of religious services. As the Senate and House sponsors insist in their amicus brief, the historical context demonstrates that the Legislature intended and the ratifiers understood that the Clause would "protect not only the gathering of congregants but their acts of worship which inherently comprise religious services."[37] We thus also reject the State's proposed construction of the Clause's scope.

---

[36] Confusingly, the State asserts in its brief that the Clause would prohibit "government orders that directly limit the nature of a service by, for example, prohibiting 'sing[ing],' 'shar[ing] the [L]ord's supper,' or 'tak[ing] off your shoes, even though your religion dictates that you do [so].'" Debate on Tex. S.J. Res. 27 on the Floor of the House, 87th Leg., R.S. at 8:29:41–53 (Mar. 25, 2021), available at https://tinyurl.com/4tdaw5es. But the State insisted at oral argument that the Clause addresses only "closing church doors" and not "what goes on inside" and that laws prohibiting the taking of communion or singing of hymns are "not within the scope of the amendment." Oral Argument at 59:04–1:00:19; 1:01:50, *Perez v. City of San Antonio*, (Dec. 5, 2024) (No. 24-0714), https://www.youtube.com/watch?v=zUiYQdX_Bp8.

[37] As the Senate sponsor explained when addressing a meeting of pastors and adherents, the Clause was intended to address governmental orders that "tried to prohibit singing in places of worship." *See* Chuck Lindell, *Christians: Change laws to protect religious gatherings in pandemic*, Austin Am.-Statesman (Mar. 8, 2021), https://perma.cc/Y7Q9-2FQ9 (quoting statement of Sen. Hancock). The House sponsor similarly explained that the Clause would protect the freedom to both "assemble" and "worship." Comm. on State Affs., Tex, House of Representatives, 87th Leg., R.S. (Mar. 25, 2021) at 1:42:13, available at https://house.texas.gov/videos/7964 (bill layout of Rep. Leach). And the Clause was proposed in response, at least in part, to the U.S. Supreme Court's refusal to enjoin a shut-down order that included a "prohibition on singing and chanting during indoor service." *S. Bay II*, 141 S. Ct. at 716.

Perez agrees that the Clause's scope is limited, not only by the text's plain language imposing the five limitations described above, but also by what Perez refers to as "longstanding interpretive principles of Texas constitutional law." According to Perez, the Clause addresses more than just "unequal treatment" and religious "gatherings" but "does not protect religious services that long-existing background principles of law would have forbidden." Perez asserts that, just as the constitutionally protected right to work and earn a living does not encompass a right to engage in occupations "long deemed 'inherently vicious and harmful,'" *Tex. Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648, 654–55 (Tex. 2022) (quoting *Murphy v. California*, 225 U.S. 623, 628 (1912)), and the Free Exercise Clause does not permit churches to commit tortious conduct "with impunity," *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 12 (Tex. 2008), the Religious Services Clause does not extend to long-recognized limitations on religious freedom. As examples, Perez asserts that the Clause does not extend to and protect a religious service that prevents the government from responding to a "true emergency" or "exigency,"[38] that violates otherwise applicable private property law,[39] that interferes with the

---

[38] Perez asserts, for example, that the Clause does not forbid the government from interfering with a religious service if truly necessary to respond to an imminent flood or falling tree.

[39] Perez asserts, for example, that the Clause does not forbid the government from interfering with a religious service that violates laws against trespassing or that creates a public or private nuisance.

rights of the government or the public to use public property,[40] or that violates well-established criminal law and procedure.[41]

Although we might agree in some cases that the Clause does not protect such religious services, we cannot accept Perez's amorphous description of the Clause's scope, for several reasons. First, nothing in the text or the context provides support for the limitation as Perez articulates it. Second, defining the scope as being limited by "longstanding interpretive principles" provides no adequate objective standard and instead leaves it in the hands of the government to decide in the future what the Clause protects, instead of honoring the decision the people already made in the past. And third, the standard provides no certainty or predictability on which the government may base its decisions, and on which religious organizations may assert their rights, in the future.

Having concluded that the scope of the Religious Services Clause includes but is not limited to governmental orders that treat religious services unequally, or to orders that prohibit or limit religious gatherings, or by amorphous longstanding interpretive principles, we nevertheless agree with the parties and amici that its scope is not

---

[40] Perez asserts, for example, that the Clause does not forbid the government from interfering with a religious service in a public park if necessary to ensure other members of the public can also use and enjoy the park. He also asserts that the Clause would not require this Court to allow a religious organization to use its courtroom for its religious services.

[41] Perez asserts, for example, that the Clause does not forbid the government from prohibiting human sacrifices or imprisoning a convicted clergy member, even if such sacrifices or the clergy member's presence is essential to a religious organization's religious services.

*un*limited. Because the Clause *supplements* and does not *supplant* the protections already provided by the Free Exercise Clause, the Freedom of Worship Clause, and the Texas RFRA, the linguistic context suggests that the Religious Services Clause does not attempt to independently and comprehensively address all governmental limitations on religious freedoms. And the historical context also confirms that those who drafted and proposed the amendment did not intend that its scope be unlimited.

The House sponsor, for example, stated during the floor debates that "existing local laws and ordinances and rules dealing with the fire code, with health and safety hazards, with zoning restrictions, those with criminal justice and public safety laws, those would still be able to be enforced and this constitutional amendment does nothing to affect those." Debate on Tex. S.J. Res. 27 on the Floor of the House, 87th Leg., R.S. (Mar. 25, 2021) (Statement of Rep. Leach). He went on to say he did not intend the amendment to address "every single instance where a fire code may be violated or where a police officer may need to enter a church to do his or her job." *Id.* As another House member told the committee, "I don't think there's anybody, any court, anywhere that would read this to say that if there's a true health and safety issue, that you cannot enforce that health and safety issue." *Id.* (Statement of Rep. King).

Although we need not address here whether the Clause reaches fire codes, police activity, or "true health and safety issue[s]," we can conclude with assurance, based on the Clause's text and historical context, that it generally forbids governmental enactments that prohibit people from gathering for a religious service (like the COVID lock-down

31

orders), restrict the number or relationships of people who can gather for a religious service (like the COVID orders imposing capacity caps), or regulate the activities in which people may engage when they gather (like the COVID orders prohibiting singing, chanting, or communion). Beyond that, to provide a helpful answer to this certified question, we need only consider and address the facts as the Fifth Circuit presents them to us. The City's decision to remove and replace trees and deter migratory birds in a popular City park does not purport to prohibit the Church from gathering or regulate what the Church may do when it gathers. Instead, at most, it eliminates or reduces natural elements of *the City's* real property that the Church believes are necessary components of its religious services. This type of governmental conduct is indisputably different in character from the type of governmental conduct the people sought to proscribe by adopting the new Religious Services Clause.

Unlike the COVID orders that gave rise to the adoption of the Religious Services Clause, the governmental decisions at issue here involve the preservation and maintenance of public property that is owned and managed by the government, not by the Church or its members. Perez agrees that the Clause does not require the City to *provide* the Church with components that are necessary for its religious services or to prevent limitations on those components caused by *other* sources. And Perez concedes the Clause does not prevent the City from

selling this very property to a private developer[42] or from taking actions that are necessary to ensure that all members of the public can access and enjoy the Lambert Beach area equally with the Church. But in Perez's view, for as long as the City owns the property, the Clause at least forbids the City from taking any action that would deprive the Church of trees and birds that are necessary components of the Church's religious services.

These arguments implicate thorny issues that courts have previously addressed under the Free Exercise Clause and the federal RFRA. On the one hand, as Perez asserts, courts have recognized that governments hold public parks in trust for the benefit and use of the public and must make those spaces available to the public without discriminating against any who desire to use them. *See Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939). But as the City insists, the courts have also recognized that the public's right to use a public park "is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order." *Id.* at 515–16.

Two cases particularly illustrate the tensions that can exist between religious liberties and the use of public lands. In the first, *Lyng v. Northwest Indian Cemetery Protective Ass'n*, the U.S. Supreme Court held that the Free Exercise Clause did not prohibit the government from harvesting timber and constructing a road on publicly owned land even

---

[42] Although Perez asserts that original deed restrictions forbid the City from selling the property to a private developer, he concedes that the Religious Services Clause does not have that effect.

though doing so would cause "irreparable damage" to areas long considered by indigenous peoples to be "sacred" and would "have severe adverse effects on the practice of their religion." 485 U.S. 439, 447 (1988). The Court concluded that the Free Exercise Clause did not forbid the governmental actions because the plaintiffs would not "be coerced by the Government's action into violating their religious beliefs; nor would either governmental action penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Id.* at 449. Observing that the "government simply could not operate if it were required to satisfy every citizen's religious needs and desires," the Court reasoned that accommodating the plaintiffs' religious beliefs under these circumstances "could easily require *de facto* beneficial ownership of some rather spacious tracts of public property." *Id.* at 452–53. "Whatever rights the Indians may have to the use of the area," the Court concluded, "those rights do not divest the Government of its right to use what is, after all, *its* land." *Id.* at 453.

The second case that particularly illustrates the tensions that can arise between religious liberties and the use of public land is *Apache Stronghold v. United States*, 101 F.4th 1036 (9th Cir. 2024) (en banc), *cert. denied*, No. 24-291, 2025 WL 1496472 (U.S. May 27, 2025). In *Apache Stronghold*, the Ninth Circuit relied on *Lyng* to hold that neither the Free Exercise Clause nor the federal RFRA prohibits the government from selling public lands to a mining company even though the sale will result in the destruction of an area indigenous peoples believe is a "'sacred place' that serves as a 'direct corridor' to 'speak to [their] creator,'" and at which they have engaged in "religious practices"

34

for "at least a millennium." *Id.* at 1044. The Ninth Circuit reasoned that the Free Exercise Clause does not prohibit the sale because, as in *Lyng*, the sale will not "coerce" the adherents "into acting contrary to their religious beliefs" or "discriminate" against them or treat them unequally. *Id.* at 1051–52. And the court held that RFRA does not prohibit the sale for the same reasons, because the concept of a "substantial burden" on religious exercise under RFRA "must be understood as subsuming, rather than abrogating, the holding of *Lyng*." *Id.* at 1063.

Perez raises several arguments distinguishing *Lyng* and *Apache Stronghold* and explaining why those decisions do not support the City's position. But we need not address them here. When the Fifth Circuit panel withdrew its original opinion in this case, it elected to "pretermit further consideration" of Perez's claims under the Free Exercise Clause and the Freedom of Worship Clause "pending resolution of" this certified question asking only about the Religious Services Clause. *Perez*, 115 F.4th at 427. Expressing no opinions as to those claims, we observe only that although the Religious Services Clause forbids the government from prohibiting or limiting religious services, nothing in its text purports to address governmental preservation and management of public lands or the tensions between such activities and religious liberties. To whatever extent we could construe the text broadly to encompass Perez's claims, the Clause's linguistic and historical context establishes that it does not encompass "limitations" on religious services that result from the government's preservation and maintenance of the natural features of public lands.

### III.
### Answer

For these reasons, we answer the certified question as follows: When the Texas Religious Services Clause applies, its force is absolute and categorical, meaning it forbids governmental prohibitions and limitations on religious services regardless of the government's interest in that limitation or how tailored the limitation is to that interest, but the scope of the clause's applicability is not unlimited, and it does not extend to governmental actions for the preservation and management of public lands. We express no opinion on whether the Free Exercise Clause or the Texas RFRA protect the religious liberties Perez asserts, and we leave it to the federal courts to apply our answer in the underlying case.

_____
Jeffrey S. Boyd
Justice

**OPINION DELIVERED:** June 13, 2025

# 𝕾𝖚𝖕𝖗𝖊𝖒𝖊 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕿𝖊𝖝𝖆𝖘

No. 24-0714

Gary Perez and Matilde Torres,

*Appellants*,

v.

City of San Antonio,

*Appellee*

On Certified Question from the
United States Court of Appeals for the Fifth Circuit

JUSTICE SULLIVAN, dissenting.

Last summer, the U.S. Court of Appeals for the Fifth Circuit asked us whether Article I, Section 6-a of the Texas Constitution "impose[s] a categorical bar on any limitation of any religious service, regardless of the sort of limitation and the government's interest in that limitation." With deepest respect for my esteemed friends on the Fifth Circuit and on our Court, I would decline this expansive invitation to issue an advisory opinion on a "new provision" of our Bill of Rights that "[n]o Texas court has construed." 711 S.W.3d 204, 204 (Tex. 2024) (statement of Young, J.).

**I**

The Fifth Circuit panel that certified this question initially held that the plaintiffs' "sparse briefing" made the Section 6-a issue "a determination we need not reach in the instant case." 98 F.4th 586, 611–12 (5th Cir.), *reh'g granted and opinion withdrawn*, 115 F.4th 422 (5th Cir. 2024). The plaintiffs' opening brief in that court argued that Section 6-a "does not even allow the City to try to satisfy strict scrutiny; it is a categorical bar on what the City seeks to do." Appellants' Br. at 32, Cause No. 23-50746 (5th Cir. Nov. 8, 2023); *see also id.* at 3–4, 28–29, 47–51. But the plaintiffs devoted the bulk of their briefing to three other claims, and the Fifth Circuit followed their lead. *See* 98 F.4th at 594–611 (rejecting claims under the Texas Religious Freedom Restoration Act, the Free Exercise Clause of the U.S. Constitution, and Article I, Section 6 of the Texas Constitution); *id.* at 614 (Higginson, J., concurring in part and dissenting in part) ("Plaintiffs have demonstrated a likely violation of their rights under the Texas Religious Freedom Restoration Act . . . .").

On rehearing, however, the divided three-judge panel "pretermit[ted] further consideration of those claims." 115 F.4th at 427. The Fifth Circuit did so by certifying the Section 6-a question that, in its own words, the plaintiffs "did not adequately brief." *Id.* at 423. To wit:

> Does the "Religious Service Protections" provision of the Constitution of the State of Texas—as expressed in Article [I], Section 6-a—impose a categorical bar on any limitation of any religious service, regardless of the sort of limitation and the government's interest in that limitation?

*Id.* at 428.

## II

I don't think this Court should answer the Fifth Circuit's question. Neither do my wise colleagues, judging from the majority opinion. Today's opinion is characteristically thoughtful but tellingly nonresponsive. Rather than answer a question we wish had been asked, we should exercise our discretion not to issue the advisory opinion that was actually requested. *See* Tex. R. App. P. 58.1 ("The Supreme Court may decline to answer the questions certified to it.").

To answer a certified question is to give an advisory opinion. *See, e.g., Tex. Dep't of Fam. & Protective Servs. v. Grassroots Leadership, Inc.*, ___ S.W.3d ___, 2025 WL 1642437, at *1, *7, *21 (Tex. May 30, 2025); *Lucas v. United States*, 757 S.W.2d 687, 702 n.1 (Tex. 1988) (Phillips, C.J., dissenting); *cf. United Servs. Life Ins. Co. v. Delaney*, 396 S.W.2d 855, 858–64 (Tex. 1965). The Section 6-a question that has been certified to us here seeks "an advisory opinion [on] an abstract question of law." *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993). To "dispense contingent advice" on so "academic" a question wouldn't be "[p]rudent." *City of Dallas v. Albert*, 354 S.W.3d 368, 384 (Tex. 2011) (Willett, J., dissenting); *see also Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 971 S.W.2d 439, 443 (Tex. 1998) ("Refraining from issuing advisory opinions and waiting for cases' timely factual development is . . . essential to the proper development of the [S]tate's jurisprudence.").

Perhaps recognizing as much, the majority refuses this certified request to take Section 6-a and "really explore the studio space." *Saturday Night Live: More Cowbell* (NBC television broadcast Apr. 8,

2000).  As the majority sensibly explains, "we need not endeavor to comprehensively define [Section 6-a's] scope to provide a helpful answer here." *Ante* at 23.  Instead, it opines that the Section 6-a claim urged by these federal-court plaintiffs is a loser:  "To whatever extent we could construe the text broadly to encompass [the plaintiffs'] claims, [Section 6-a's] linguistic and historical context establishes that it does not encompass 'limitations' on religious services that result from the government's preservation and maintenance of the natural features of public lands." *Id.* at 35.

To my eye, the majority opinion doesn't "confine [its] answer to the question propounded by the certifying court." *Amberboy v. Societe de Banque Privee*, 831 S.W.2d 793, 798 (Tex. 1992).  That's a problem, because we lack jurisdiction to issue an advisory opinion that answers a certified question the Fifth Circuit didn't ask.  "Our jurisdiction in these matters is exclusively to 'answer *questions*.' " *Richards v. State Farm Lloyds*, 597 S.W.3d 492, 497 n.6 (Tex. 2020) (quoting TEX. CONST. art. V, § 3-c(a)).  "To avoid exceeding our jurisdiction, 'we answer only the questions certified and nothing more.' " *Id.* (quoting *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 349 (Tex. 1990)).

The majority responds that it's just trying "to answer the question in a way that helps the federal courts resolve the case." *Ante* at 24 n.30.  Lending a hand is all well and good, provided we have jurisdiction to do so.  But will it really help the Fifth Circuit to know that, in this Court's (perhaps uninvited) opinion, these plaintiffs can't win under Section 6-a?  The plaintiffs already lost that fight, after all, when they forfeited their Section 6-a argument through inadequate briefing before

the three-judge panel. *See* 98 F.4th at 611–12 (condemning the plaintiffs' "sparse briefing"); *see also id.* at 597 ("A party forfeits arguments by inadequately briefing them on appeal."). Even on panel rehearing, the Fifth Circuit seemingly reiterated that the plaintiffs "did not adequately brief that issue," before certifying the Section 6-a question to us anyway. 115 F.4th at 423. Given that our rules insist on answering "*determinative* questions of Texas law," TEX. R. APP. P. 58.1 (emphasis added), we shouldn't go out of our way to torpedo a Section 6-a claim that might sink anyway due to forfeiture when the plaintiffs return to the Fifth Circuit.[1]

Were we at liberty to give an advisory opinion on a state-law question nobody asked us, the plaintiffs might fare better with their claims under the Texas Religious Freedom Restoration Act or Article I, Section 6 of the Texas Constitution. Perhaps we would agree that they "have demonstrated a likely violation of their rights under the Texas Religious Freedom Restoration Act." 98 F.4th at 614 (Higginson, J., concurring in part and dissenting in part); *cf. In re B.L.D.*, 113 S.W.3d

---

[1] On my understanding of federal procedure, the plaintiffs couldn't plug the forfeiture hole by saying more about Section 6-a in their petitions for panel rehearing and rehearing en banc than had been said in their appellants' brief. *See, e.g.*, *Hightower v. Tex. Hosp. Ass'n*, 73 F.3d 43, 44 (5th Cir. 1996) ("In their petition for rehearing, appellees have raised a number of arguments that they did not make to this court in their original appellate briefs. . . . These arguments have been raised too late in the appellate process to be useful to this court, and they are deemed waived and have played no role in our decision."); FED. R. APP. P. 28(a)(8)(A) ("The appellant's brief must contain . . . the argument, which must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies . . . ."). But my understanding doesn't really matter: The forfeiture question can be decided only by the Fifth Circuit's distinguished three-judge panel, or by all seventeen of its active judges sitting en banc.

340, 349 (Tex. 2003) ("As a rule, we only decide constitutional questions when we cannot resolve issues on nonconstitutional grounds.").  Or maybe we'd finally stop assuming that *Employment Division v. Smith*, 494 U.S. 872 (1990), reflects a sound construction of Section 6.  *See Tex. Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648, 677 (Tex. 2022) (Young, J., concurring) (noting that "freedom of worship" under Tex. Const. art. I, § 6 is "provided with much greater detail than [its] federal analogue[ ]").  The majority opinion "[e]xpress[es] no opinions as to those claims," however, because they're not included within a certified question that " 'pretermit[s]' " their consideration. *Ante* at 35 (quoting 115 F.4th at 427).  True enough.  But neither has the Fifth Circuit asked us to pick a winner under Section 6-a.

### III

As then-Justice Cornyn once explained, "[t]he Fifth Circuit . . . has had more extensive experience with certification than any other court, state or federal." *Amberboy*, 831 S.W.2d at 798 n.10.  In 1960, with encouragement from Justice Frankfurter, the Fifth Circuit sent the very first certified question to a state supreme court.  *See Sun Ins. Off., Ltd. v. Clay*, 319 F.2d 505, 508 (5th Cir. 1963); *Clay v. Sun Ins. Off. Ltd.*, 363 U.S. 207, 212 & n.3 (1960).  This Court, by contrast, only started accepting certified questions after the People of Texas gave us "jurisdiction to answer questions of state law certified from a federal appellate court" in 1985.  Tex. Const. art. V, § 3-c(a).

Four decades later, our two courts have established a strong tradition of "cooperative judicial federalism." *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974).  In unfailingly gracious terms, the Fifth Circuit

often certifies questions of Texas law for our consideration.[2]  In turn, this Court works hard to answer them with alacrity and good cheer.[3]

---

[2] *See, e.g., Am. Pearl Grp., L.L.C. v. Nat'l Payment Sys., L.L.C.*, No. 23-10804, 2024 WL 4132409, at *8 (5th Cir. Sept. 10, 2024) (per curiam) ("[T]he Supreme Court of Texas has historically been very prompt in its certification responses."); *Fire Prot. Serv., Inc. v. Survitec Survival Prods., Inc.*, 18 F.4th 802, 805 (5th Cir. 2021) ("The Supreme Court of Texas has graciously accepted and promptly answered our questions time and again."); *McMillan v. Amazon.com, Inc.*, 983 F.3d 194, 203 & n.51 (5th Cir. 2020) ("But by long tradition, the Texas Supreme Court graciously accepts and prioritizes certified questions from this circuit, and we are confident that the Court's impressive streak of timely clearing its docket will remain unbroken.  No pressure."); *cf. Jefferson v. Lead Indus. Ass'n*, 106 F.3d 1245, 1247 (5th Cir. 1997) (per curiam) ("[C]ertification is such an important resource to this court that we will not risk its continued availability by going to that well too often."); *Transcon. Gas Pipeline Corp. v. Transp. Ins. Co.*, 958 F.2d 622, 623 (5th Cir. 1992) (per curiam) ("Certification to State Supreme Courts is a valuable resource of this court, so we dare not abuse it by over use lest we wear out our welcome.").

[3] *See, e.g., Am. Pearl Grp., L.L.C. v. Nat'l Payment Sys., L.L.C.*, ___ S.W.3d ___, 2025 WL 1478179 (Tex. May 23, 2025); *Butler v. Collins*, ___ S.W.3d ___, 2025 WL 1478180 (Tex. May 23, 2025); *Port Arthur Cmty. Action Network v. Tex. Comm'n on Env't Quality*, 707 S.W.3d 102 (Tex. 2025); *Roe v. Patterson*, 707 S.W.3d 94 (Tex. 2025); *Carl v. Hilcorp Energy Co.*, 689 S.W.3d 894 (Tex. 2024); *Hogan v. S. Methodist Univ.*, 688 S.W.3d 852 (Tex. 2024); *Moore v. Wells Fargo Bank, N.A.*, 685 S.W.3d 843 (Tex. 2024); *Rodriguez v. Safeco Ins. Co.*, 684 S.W.3d 789 (Tex. 2024); *Sanders v. Boeing Co.*, 680 S.W.3d 340 (Tex. 2023); *Brown v. City of Houston*, 660 S.W.3d 749 (Tex. 2023); *Tex. Med. Res., LLP v. Molina Healthcare of Tex., Inc.*, 659 S.W.3d 424 (Tex. 2023); *Gabriel Inv. Grp., Inc. v. Tex. Alcoholic Beverage Comm'n*, 646 S.W.3d 790 (Tex. 2022); *Paxton v. Longoria*, 646 S.W.3d 532 (Tex. 2022); *Fire Prot. Serv., Inc. v. Survitec Survival Prods., Inc.*, 649 S.W.3d 197 (Tex. 2022); *Whole Woman's Health v. Jackson*, 642 S.W.3d 569 (Tex. 2022); *Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 642 S.W.3d 551 (Tex. 2022); *Monroe Guar. Ins. Co. v. BITCO Gen. Ins. Corp.*, 640 S.W.3d 195 (Tex. 2022); *Dillon Gage Inc. of Dall. v. Certain Underwriters at Lloyds Subscribing to Pol'y No. EE1701590*, 636 S.W.3d 640 (Tex. 2021); *Amazon.com, Inc. v. McMillan*, 625 S.W.3d 101 (Tex. 2021); *Fed. Home Loan Mortg. Corp. v. Zepeda*, 601 S.W.3d 763 (Tex. 2020); *Richards*, 597 S.W.3d 492; *Degan v. Bd. of Trs. of Dall. Police & Fire Pension Sys.*, 594 S.W.3d 309 (Tex. 2020).

"We find such cooperative effort to be in the best interests of an orderly development of our own unique jurisprudence, and to the bar, as well as in the best interests of the litigants we concurrently serve." *Amberboy*, 831 S.W.2d at 798 n.9.

Our productive partnership with the Fifth Circuit will surely endure, despite my misgivings about one out of many certified questions. Because I would decline to answer this particular question, though, I respectfully dissent.

_____

James P. Sullivan
Justice

**OPINION FILED:** June 13, 2025