# United States Court of Appeals for the Fifth Circuit

―――――――――

No. 23-50746

―――――――――

United States Court of Appeals
Fifth Circuit

**FILED**

December 11, 2025

Lyle W. Cayce
Clerk

GARY PEREZ; MATILDE TORRES,

*Plaintiffs—Appellants,*

*versus*

CITY OF SAN ANTONIO,

*Defendant—Appellee.*

―――――――――――――――――――――

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:23-CV-977

―――――――――――――――――――――

Before STEWART, RICHMAN, and HIGGINSON, *Circuit Judges.*

CARL E. STEWART, *Circuit Judge*:

Treating the petition for rehearing en banc as a petition for panel rehearing (5TH CIR. R. 40 I.O.P.), the petition is GRANTED and *Perez v. City of San Antonio*, 150 F.4th 430 (5th Cir. 2025) is WITHDRAWN. The following opinion is substituted therefor.

This case returns to us after the Supreme Court of Texas accepted our certified question regarding the scope of the religious-service-protections provision of the Texas Constitution. In its opinion answering our question, it concluded that the provision does not extend to the government's

No. 23-50746

preservation and management of publicly owned lands. With the benefit of that guidance, and upon further consideration of the issues in this appeal, we once again AFFIRM the judgment of the district court and DENY Appellants' Emergency Motion for Injunction Pending Appeal.

## I. Factual and Procedural History[1]

Gary Perez and Matilde Torres (together "Appellants") sued the City of San Antonio (the "City") alleging that the City's development plan for Brackenridge Park (the "Park") prevented them from performing ceremonies necessary for their religious practice. Appellants sued the City under the First Amendment Free Exercise Clause, the Texas Religious Freedom Restoration Act ("TRFRA"), and the Texas Constitution and sought declaratory and injunctive relief to require the City to (1) grant them access to the area for religious worship, (2) minimize tree removal, and (3) allow cormorants to nest. Following a preliminary injunction hearing, the district court ordered the City to allow Appellants access to the area for religious ceremonies but declined to enjoin the City's planned tree removal and rookery management measures.

### A. The Lipan-Apache Native American Church

Appellants are members of the Lipan-Apache Native American Church ("Native American Church"). Perez serves as the principal chief and cultural preservation officer for the Pakahua/Coahuiltecan Peoples of Mexico and Texas and for the Indigenous Governors' office for the State of Coahuila, Mexico. Torres is a member of the Pakahua Peoples of Mexico and

---

[1] Although we provided much of the relevant factual and procedural background in our order certifying this question to the Supreme Court of Texas, *see Perez v. City of San Antonio*, 115 F.4th 422 (5th Cir. 2024), we do so again here to the extent necessary for ease of comprehension.

No. 23-50746

Texas. Perez has worshipped and led religious ceremonies in the Park for at least twenty-five years. Torres has worshipped and participated in religious ceremonies in the Park for at least ten years.

The district court determined that their religious beliefs are sincerely held. According to their complaint, Appellants believe that life in the region of San Antonio began at a spring called the Blue Hole. Specifically, a spirit in the form of a blue panther lived in the Blue Hole. And when a spirit in the form of a cormorant visited the Blue Hole, the blue panther scared the bird. As the bird fled, water droplets from its tail scattered across the San Antonio River Valley, including the Park, spurring life in the region. The San Antonio River flows through the northern portion of the Park. Appellants also believe that a riverbend, located within the Lambert Beach area of the Park, mirrors the celestial constellation Eridanus and bridges the physical and spiritual worlds. Appellants require certain religious ceremonies to be performed only at this riverbend located within the Lambert Beach area. Moreover, they proclaim that this space's capacity to function as a holy place relies on the presence of trees, birds, and other natural features, which are all part of its "spiritual ecology." Appellants also proclaim that certain religious ceremonies cannot be properly administered without specific trees present and cormorants nesting.

*B. Brackenridge Park, the Sacred Area and Project Area, and the Bond Project*

The Park is a public park in the City, consisting of approximately 343 acres. The Park contains various features and attractions including paths, sports fields, the San Antonio Zoo, the Japanese Tea Garden, the Sunken Garden Theater, and the Witte Natural History Museum. The Park has also been inhabited and utilized by indigenous peoples for thousands of years. Appellants and other members of the Native American Church believe that a specific area within the Lambert Beach section of the Park is a sacred

location where they must gather to worship and conduct religious ceremonies. This area is also the site of the City's planned reformation efforts, which include repairing retaining walls along the San Antonio River. In this litigation, Appellants refer to this area as the "Sacred Area" and the City refers to it as the "Project Area." Appellants define the Sacred Area as the twenty-foot by thirty-foot area between two cypress trees on the southern riverbank of the Lambert Beach area. Within the Project Area, the City developed plans to repair the retaining walls along the San Antonio River, repair the historic Pump House, and construct a handicap-accessible ramp.

In May 2016, San Antonio citizens voted in favor of a $850 million bond package for public improvements. Proposition 3 of the bond package—dedicated to improvements related to parks, recreation, and open spaces—included $7,750,000 for improvements to the Park. The improvements planned for the Park, which are the subject of this suit, are collectively referred to as the "Bond Project." To design the Bond Project and determine the repair methodology to be utilized, the City commissioned the bond project design team, a team of various professionals, including architects, engineers, and historic preservation officials. The bond project design team recommended utilizing a cantilevered wall system to repair the retaining walls. To arrive at this recommendation, the team considered multiple factors including, but not limited to, tree density and location, topography, existing retaining wall stability and height, equipment accessibility, construction feasibility, legal compliance, and regulatory compliance. The City also determined that certain trees in the Project Area would (1) interfere with the construction, (2) be irreparably damaged by the construction, or (3) damage the repaired retaining walls and historical structures in the future. Thus, the City developed plans to (1) completely remove 46–48 trees, (2) relocate 20–21 trees to other areas of the Park, (3) preserve about 16 trees in place, and (4) plant at least 22 new trees in the Project Area. The City held

No. 23-50746

public meetings to receive community input regarding repairs of the original walls. Appellants, and other citizens, expressed concern with the removal and relocation of trees in the Project Area and a desire for the City to consider alternative plans that would preserve more trees in place.

Additionally, the City's plan for the Bond Project includes bird deterrent techniques[2] intended to dissuade migratory birds from nesting in the Lambert Beach area. Pursuant to the Migratory Bird Treaty Act,[3] the removal or relocation of trees planned for the Project Area cannot proceed if migratory birds, including cormorants, are nesting in the area. The City contracted with the U.S. Department of Agriculture ("USDA") and coordinated with the Texas Parks and Wildlife Department ("TPWD") and the U.S. Fish and Wildlife Service ("UFWS") to modify bird habitats and deter birds from nesting in highly urbanized areas of the Park, including the Project Area.

To complete the Bond Project, the City must comply with local, state, and federal regulations. Locally, with the San Antonio Development Services Department, the City applied for and received a variance from a City Unified Development Code ("UDC") provision that requires 80% significant tree

---

[2] The litigants and the district court use "rookery management," "anti-nesting" measures, and "bird deterrence" activities interchangeably. The rookery management program is the product of extensive consultation and engagement with technical advisors and wildlife management experts. To assist with the City's bird deterrence efforts, the Texas Parks and Wildlife Department ("TPWD") recommended habitat modifications (by removing old nests and dead wood to open the tree canopy) and other deterrent techniques to encourage the birds to relocate from the undesired location or to prevent establishment in the first place. Those techniques include pyrotechnics, clappers, spotlights, lasers, distress calls, effigies, balloons, explosives, and drones. Notably, these measures "do not harm the birds or keep them from reproducing." Moreover, these techniques are legal and in accordance with U.S. Fish and Wildlife Service ("UFWS") guidelines, as well as TPWD Code.

[3] 16 U.S.C. § 703 *et seq.*

preservation and 100% heritage tree preservation for projects within the 100-year floodplain. Moreover, state and federal regulations govern the preservation of the Lambert Beach retaining walls. As historic structures, the retaining walls contribute to the Park's designation as a City Historic Landmark and as a State Antiquities Landmark and its placement on the National Register of Historic Places. Because of this historic designation, construction is regulated by the Texas Historical Commission and the United States Army Corps of Engineers ("USACE"). The City must submit a final treatment plan and obtain a permit from USACE before repairing the retaining walls or removing or relocating trees within the Lambert Beach area. Once USACE approves the final treatment plan, a thirty-day comment period will begin to solicit feedback from stakeholders, including local indigenous tribes. Lastly, the Secretary of the Interior's Design guidelines, the Americans with Disabilities Act, and Occupational Safety and Health Administration regulations are all applicable to the bond project improvements.

From roughly February 2023 to November 2023, the City temporarily prevented Appellants, Native American Church members, and peyote pilgrims from entering the Lambert Beach area. Appellants filed the instant suit on August 9, 2023, alleging that the City's bird deterrence activities, temporary closure of the Project Area, and proposed removal or relocation of trees in the Project Area place a substantial burden on their religious beliefs in violation of the First Amendment of the U.S. Constitution, the Texas Constitution, and TRFRA. They sought a preliminary injunction, which itemized the relief requested as (1) access to the Sacred Area for religious services, (2) preservation of the spiritual ecology of the Sacred Area by minimizing tree removal, and (3) preservation of the spiritual ecology of the Sacred Area by allowing cormorants to nest. As to the preservation of the spiritual ecology, Appellants requested that the district court order the City

No. 23-50746

to "reevaluate the Bond Project to develop alternative plans that will accommodate [their] religious beliefs."

## C. The District Court's Decision

After holding a four-day preliminary injunction hearing, the district court adopted the parties' stipulated facts[4] and found that the City's plans did not burden Appellants' free exercise of religion. The district court concluded that Appellants held a sincere religious belief and had met their burden to prove the four elements for injunctive relief as to "access for religious services in the Sacred Area." It thus granted access for religious services involving fifteen to twenty people for approximately an hour on specified astronomical dates coinciding with Appellants' spiritual beliefs.[5] The district court also ordered the City to immediately remove the broken limb that the City maintained "pose[d] a risk of injury or death" in the Project Area. As to their request for "access for individual worship," the district court held that Appellants had waived this request but also noted that the balance of equities supported the conclusion that unplanned, unsupervised individual access was impractical. Following expert testimony, the district court found that the bird deterrent operation was in the realm of public health and safety. It also determined that the City had met its burden of proving "a compelling government interest for public health and safety, and the [balance of] equities favor the City on" Appellants' requested relief regarding minimizing tree removal and allowing cormorants to nest.

---

[4] To the extent any of the findings of fact constituted conclusions of law, the district court adopted and treated them as such.

[5] Torres testified at the injunction hearing that the average number of congregants participating in religious ceremonies or worship services has been between fifteen and twenty since 2020.

### D. *Appellants' Emergency Motion for Injunction Pending Appeal*

After the district court denied Appellants access for individual worship and declined to enjoin the City's planned tree removal and rookery management measures, Appellants filed with this court an Emergency Motion for Injunction Pending Appeal and to Expediate the Appeal (the "Emergency Motion"). In their Emergency Motion, Appellants contended that they satisfied the "irreparable harm" and "success on the merits" elements of a claim for an injunction because they have sufficiently proven a TRFRA violation and federal and Texas constitutional violations. *See Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018) (citation omitted). Appellants further argued that they satisfied the remaining requirements for obtaining an injunction pending appeal. The City opposed the motion.

We granted Appellants' motion to expedite the appeal and held oral argument in December 2023. We also issued a temporary administrative stay and ordered that Appellants' opposed motion for injunction pending appeal be carried with the case on October 27, 2023. On February 21, 2024 and January 30, 2025, at the City's request, we lifted the temporary administrative stay in part to allow the rookery bird deterrent management activities to proceed for the immediately proceeding months until migratory cormorants arrived. On June 24, 2025, after the Supreme Court of Texas answered our certified question, we granted the City's motion to lift the temporary administrative stay.

## II. Standard of Review

"We review a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law *de novo*." *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022) (citation omitted). To obtain the "extraordinary remedy" of a preliminary injunction,

No. 23-50746

the movant must show he is likely to prevail on the merits and also "demonstrate a substantial threat of irreparable injury if the injunction is not granted; the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and the injunction will not disserve the public interest." *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018) (citation omitted).

## III. Discussion

Appellants have raised four claims for relief—(1) a TRFRA claim, (2) a First Amendment Free Exercise claim, (3) a claim under the freedom-to-worship provision of the Texas Constitution, and (4) a claim under the religious-service-protections provision of the Texas Constitution. Appellants argue that they are likely to succeed on the merits of each claim because the City previously barred them from worshipping in the Sacred Area, seeks to permanently prevent them from performing religious services by destroying the area's spiritual ecology, and has never attempted to accommodate their religious exercise. Notably, Appellants argue that the City cannot show that its tree-removal plan, rookery management measures, and fencing further a compelling governmental interest and are the least restrictive means of furthering that interest.

### A. Access

The City contends that Appellants' request for additional injunctive relief to restore their access to the Sacred Area for routine personal worship is moot. We agree. At the start of this suit, fencing prevented Appellants from physically accessing the Sacred Area for religious exercise. But, immediately following the injunction hearing, the district court held that Appellants were entitled to access the Sacred Area for ceremonies on two specific astronomical

dates, November 17 and December 21, 2023, as prescribed by the hearing.[6] To comply with the court order, the City was also ordered (1) to immediately remove the hazardous broken limb posing risks to visitors of the Sacred Area and (2) to ensure that the fencing was unlocked and accessible for Appellants on the designated dates and any additional proposed dates of religious ceremonies. Even more, as of early November 2023, the City had removed the fencing and broken limb ahead of Appellants' scheduled ceremonies.

Thus, Appellants no longer have any personal interest in challenging the City's once fenced-off closure of the Project Area because the City has since removed any fencing impeding their access. The mootness doctrine requires that "litigants retain a personal interest in a dispute at its inception and throughout the litigation." *Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 204 (5th Cir. 2010) (citation and internal quotation marks omitted). A claim is moot if it becomes "impossible for the court to grant any effectual relief whatever to a prevailing party." *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992) (citation and internal quotation marks omitted); *see Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 365 (5th Cir. 2003). When a claim becomes moot on appeal, as is the case here, the appeal must be dismissed. *Church of Scientology*, 506 U.S. at 12.

Still, Appellants urge this court to apply the voluntary cessation exception to mootness. The Supreme Court has held that a party's voluntary cessation of an unlawful action will not moot an opponent's challenge to that practice. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("[A] defendant cannot automatically moot a case simply by ending its unlawful conduct once

---

[6] Torres testified at the hearing that November 17 and December 21, 2023 were the forthcoming dates for which Appellants would need access for religious ceremonies.

sued. Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." (internal citation omitted)). Regardless, an exception to the mootness doctrine declares that "[v]oluntary cessation of challenged conduct moots a case, however, only if it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (per curiam) (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)). "The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *Concentrated Phosphate Export Ass'n*, 393 U.S. at 203).

While this appeal was pending, the City removed the dangerous limb that previously made the Sacred Area inaccessible. Moreover, the City affirmed that it undertook several additional efforts "going beyond what the district court ordered." The City conceded that removing the limb allowed it to reconfigure the construction fencing and it subsequently granted public access to the entire area. Likewise, the City granted Appellants access to conduct a religious ceremony at the Sacred Area from midnight to 4 a.m. on November 18, 2023, during hours when the Park is normally closed. Furthermore, on November 21, 2023, the City moved to dismiss its cross-appeal in this action, deciding to no longer pursue the issue of access to the Sacred Area. Based on these subsequent developments, "[i]t is therefore clear that [the City officials] harbor no animosity toward [Appellants]." *See Preiser v. Newkirk*, 422 U.S. 395, 402 (1975). Appellants now have "no reasonable expectation that the wrong challenged by [them] would be repeated." *See id*. Thus, the voluntary cessation exception does not apply. Hence, Appellants' access claims are moot.

No. 23-50746

### B. Tree-removal Plan and Rookery Management Measures

#### i. TRFRA

Turning to Appellants' claims pertaining to the City's tree-removal plan and rookery management measures, "we begin by analyzing [their] statutory claim under TRFRA, which, if successful, obviates the need to discuss the constitutional questions." *Merced v. Kasson*, 577 F.3d 578, 586 (5th Cir. 2009); *see, e.g.*, *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) ("It is a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case."). Appellants allege that the City prohibits and limits their religious exercise by irreparably destroying the very aspects of the Sacred Area that make it a living place of worship. For purposes of the Texas Constitution, the Supreme Court of Texas has not adopted *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990) and its declaration that generally applicable and facially neutral laws are not subject to strict scrutiny with regard to free exercise claims. *See Barr v. City of Sinton*, 295 S.W.3d 287, 296 (Tex. 2009) ("*Smith*'s construction of the Free Exercise Clause does not preclude a state from requiring strict scrutiny of infringements on religious freedom, either by statute or under the state constitution, and many states have done just that, Texas among them."). Thus, the challenged government action is subject to strict scrutiny.

To succeed on their TRFRA claim, Appellants must demonstrate that the City's actions burden their free exercise of religion and that the burden is substantial. If they manage that showing, the City can still prevail if it establishes that its actions further a compelling governmental interest and that the actions are the least restrictive means of furthering that interest. *Merced*, 577 F.3d at 588 (citing *Barr*, 295 S.W.3d at 296); *see also* Tex. Civ.

No. 23-50746

Prac. & Rem. Code § 110.003(a)–(b); *Barr*, 295 S.W.3d at 307 ("Although TRFRA places the burden of proving a substantial burden on the claimant, it places the burden of proving a compelling state interest on the government."). Because the district court determined the existence of the Appellants' sincere religious beliefs and the City does not dispute this finding, our TRFRA analysis requires an assessment of whether the City's development plans substantially burden their sincere religious practices.

### a. Substantial Burden

Appellants did not sufficiently establish a substantial burden. Appellants emphasize that if the City were permitted to proceed with its tree removal and rookery management procedures, the measures would irreversibly destroy the Sacred Area and their ability to practice their religion there.[7] To bolster these contentions, they cite caselaw analyzing governmental actions that involve complete bans or prohibition of religious exercise. As is the case here, "[w]hen a restriction is not completely prohibitive, Texas law still considers it substantial if 'alternatives for the religious exercise are severely restricted.'" *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 265 (5th Cir. 2010) (quoting *Barr*, 295 S.W.3d at 305). This court has held that according to *Barr*'s prescriptions, "that means a burden imposing a less-than-complete ban is nonetheless substantial if it curtails religious conduct and impacts religious expression to a 'significant' and 'real' degree." *Needville*, 611 F.3d at 265.

The City contends that "[w]hen analyzing whether a governmental body's activities on its *own land* impose a substantial burden on a plaintiff's

---

[7] Notably, these proffered arguments are Appellants' pleas as to the irreparable harm factor of the preliminary injunction inquiry. Because these assertions are as close to an argument in support of the substantial burden element of the strict scrutiny inquiry for which the briefing offers, we consider them here.

No. 23-50746

religious beliefs, courts agree that the activity does not impose a substantial burden where it affects only the subjective religious experience of the plaintiff." The City argues "that a government's use of its own land does not substantially burden religious beliefs if the conduct is not coercive and impacts the subjective religious experience only." The City is correct to pinpoint that the proposed construction is indeed occurring on its own land. Still, Appellants are not merely alleging subjective religious experiences here. Moreover, because we are analyzing Appellants' claims under TRFRA, not the Religious Freedom Restoration Act ("RFRA"), the correct standard for evaluating substantial burden is not "coercion" but whether the burden is "real" and "significant." *Compare Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1063 (9th Cir. 2008) ("Where, as here, there is no showing the government has coerced the Appellants to act contrary to their religious beliefs under the threat of sanctions, or conditioned a governmental benefit upon conduct that would violate the Appellants' religious beliefs, there is no 'substantial burden' on the exercise of their religion.") and *Lyng v. N.W. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988) ("It is true that this Court has repeatedly held that indirect coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to scrutiny under the First Amendment."), *with Barr*, 295 S.W.3d at 301 ("Thus defined, 'substantial' has two basic components: real vs. merely perceived, and significant vs. trivial.").

In analyzing Appellants' contention that the destruction of the tree canopies, where cormorants nest, and the driving away of the cormorants themselves will burden their religions, we consider whether they have met their burden of establishing a likelihood of success on their argument that the presupposed burden is real and significant. Under TRFRA, a burden is substantial if it is "real vs. merely perceived, and significant vs. trivial"—two limitations that "leave a broad range of things covered." *Barr*, 295 S.W.3d at

14

No. 23-50746

301. The focus of the inquiry is on "the degree to which a person's religious conduct is curtailed and the resulting impact on his religious expression," as "measured . . . from the person's perspective, not from the government's." *Id.* This inquiry is "case-by-case" and "fact-specific" and must consider "individual circumstances." *Merced*, 577 F.3d at 588; *Barr*, 295 S.W.3d at 302, 308. "Federal case law interpreting RFRA and [the Religious Land Use And Institutionalized Persons Act ("RLUIPA")] is relevant." *Merced*, 577 F.3d at 588 (citing *Barr*, 295 S.W.3d at 296).

While Appellants argue that the City's plan would  destroy or alter natural resources of religious importance, they plainly failed to establish a likelihood of success on their position that the burden is real and significant under this circuit's case law. Indeed, Appellants did not even address this issue in their principal brief because they incorrectly assumed that the City would agree that its plans substantially burden their religious exercise.[8] Moreover, the record does not support Appellants' argument that the plan constitutes a substantial burden on their religious exercise. *See Barr*, 295 S.W.3d at 301. Appellants continue to have virtually unlimited access to the Park for religious and cultural purposes. And as the record reflects, regardless of the rookery management program, no cormorants, due to their migration patterns, inhabit the area for extended periods of time each year.[9] Further, cormorants are not specifically targeted nor dissuaded from nesting nearby or elsewhere in the 343-acre Park.

---

[8] Appellants assumed that the City "does not dispute that the current fencing, the tree-removal plan, and the anti-nesting measures all substantially burden [Appellants]' religious exercise." In retort, the City explained that it "absolutely disputes that the project substantially burdens [Appellants]' free exercise of religion."

[9] *See infra* Section III.B.i.c (mentioning the double-crested cormorants' typical migration patterns to the City).

No. 23-50746

Mindful of the preliminary posture of this expedited appeal, we conclude that though the City's development plan may affect the nesting of cormorants within two acres of the 343-acre Park, Appellants did not meet their burden to show that they are likely to succeed on their claim that the plan constitutes a substantial burden of their religious exercise. Even if they did, that would not change the outcome of this appeal because the City's plan advances a compelling interest through the least restrictive means—and thus survives strict scrutiny. *See Merced*, 577 F.3d at 588 (citing *Barr*, 295 S.W.3d at 296).

### b. Compelling Interest

The City argues that it has a compelling governmental interest in repairing the crumbling retaining walls on the northern bank of the riverbend, and that tree removal and relocation is an integral part of that plan. It further contends that the bird deterrence activities are necessary to protect the health and safety of citizens who visit the Park. The City avers that the purpose of the rookery management program is twofold: (1) to mitigate the health and safety hazards arising from the bird guano[10] that dense bird colonies produce and (2) to ensure no migratory birds are nesting in trees within the Project Area such that work can begin under the Migratory Bird Treaty Act and the bond project improvements can proceed without delay.

In response to the City's public safety arguments, Appellants maintain that "the undisputed evidence is that the retaining walls in the Sacred Area [on the southern bank] do not need repair." Further, they aver that the City must prove that its "tree removal design is necessary in the context of these Appellants' religious practice" pursuant to TRFRA. *Barr*, 295 S.W.3d at 307. Likewise, Appellants contend that the City's rookery

_____

[10] Guano is the accumulated excrement of birds.

No. 23-50746

management plan fails strict scrutiny. They argue that preventing a pause in construction is not a compelling governmental interest. They contend that the City's cursory assertions—such as its asserted interest in making the Project Area safe for visitors in the Park—and other "public safety" arguments are "the kinds of statements that the Texas Supreme Court has held insufficient to establish a compelling governmental interest."[11] We disagree.

In *Barr*, the Supreme Court of Texas determined that "the trial court's brief finding—that '[t]he ordinance was in furtherance of a compelling government interest'—[fell] short of the required scrutiny." *Barr*, 295 S.W.3d at 307–08. Dissimilarly, the district court here, after holding a four-day preliminary injunction hearing, published three separate orders evaluating the City's interests—(1) the October 2, 2023 "Partial Order," (2) the October 11, 2023 "Memorandum Opinion and Order," and (3) the October 25, 2023 Order. Moreover, contrary to the instant case, the *Barr* court seemed to also admonish the city council from merely reciting a published section of the challenged ordinance when asserting that the law "serves a compelling interest in advancing safety, preventing nuisance, and protecting children." *Barr*, 295 S.W.3d at 306–07. Specifically, the code there read that the "City Council finds the requirements of this section are reasonably necessary to preserve the public safety, morals, and general welfare." *Id.* at 291. Rather, the *Barr* court directed that "[c]ourts and litigants must focus on real and serious burdens [], and not assume that [] codes inherently serve a compelling interest, or that every incremental gain

---

[11] *See Barr*, 295 S.W.3d at 306 (reasoning that "[the City Council's recitation that the Ordinance's requirements] 'are reasonably necessary to preserve the public safety' . . . is the kind of 'broadly formulated interest[]' that does not satisfy the scrutiny mandated by TRFRA").

No. 23-50746

to city revenue (in commercial zones), or incremental reduction of traffic (in residential zones), is compelling." *Id*. at 306.

Here, the district court complied with *Barr*'s directive. It did not assume that the City's bond project improvements inherently served a compelling interest. Rather, it conducted an injunction hearing over several days in which litigants interrogated the interests served by the Bond Project. In its Memorandum Opinion and Order, the district court determined that "[w]ith reference to [tree removal rookery management measures] of [Appellants]' requested relief, the court finds the City has met its burden of proving a compelling government interest for public health and safety[.]"

The City advanced specific public health and safety considerations, which the district court acknowledged and adopted, including that (1) removing dead and dying trees prevents them from falling and injuring visitors to the Park; (2) removing or relocating some trees is necessary because of the likelihood of their future failure; and (3) failing retaining walls pose a substantial risk to safety. The goal of repairing walls and removing trees, which pose dangers to visitors in a public park, is a compelling interest. As it relates to the bird excrement, the City raised well-founded concerns that large populations of migratory birds in highly urbanized areas of the Park have an adverse impact on the water quality in the San Antonio River and contribute to unsanitary conditions in the Park, which can pose a risk of disease to humans and animals. Moreover, the record provides vivid, descriptive, photographic details pertaining to the quantity of excrement and the dangers associated with human contact with the excrement.

The record indicates that various areas of the Park "become nearly unusable for 10 months of the year due to the bird density/habitat." The resulting feces causes damage to various park amenities, including picnic tables, water fountains, playground equipment, restrooms, and

sidewalks. The record provides a variety of pictures illustrating the volume of excrement affecting these facilities. The record also indicates that the excrement could harm humans and other wildlife. The 2022 Draft Rookery Management Plan noted: "When rookeries establish near playgrounds, infrastructure, or other recreational areas, the risk of zoonotic disease transmission (i.e., histoplasmosis, psittacosis, and salmonellosis) increases substantially." The Draft Rookery Management Plan further observed that "the magnitude of fecal contamination, high likelihood of human contact with fecal matter, and limited ability to perform effective environmental decontamination make rookery management crucial to disease risk mitigation in urban areas."

Moreover, breathing problems can occur from avian diseases linked to the uric acid produced by bird feces. The high concentrations of bird fecal matter also affect the Park's water quality. The City measured elevated levels of Escherichia coli ("E. coli") and other substances harmful to human health due to fecal bacteria from the birds. The San Antonio River Authority conducted bacterial source tracking throughout the Park and determined that the largest contributors to E. coli contamination is "non-avian and avian wildlife." Those two classifications make up around 50-60% of the total E. coli in the water.

The record also includes the expert opinions of Dr. J. Hunter Reed, a state wildlife veterinarian and health specialist, and Jessica Alderson, an urban wildlife biologist. Alderson[12] provided technical guidance to the City related to the egret and heron rookery located at the Park and provided recommendations on how to deter these birds from "an undesired location

---

[12] Alderson is the urban wildlife technical guidance program leader for TPWD. Her background and knowledge are in wildlife and natural resource management.

No. 23-50746

[i.e., areas that are high use to the public, such as playgrounds or picnic tables, or where there's lots of human activity and potential encounters with wildlife and humans] and encourage them to go to an area where they would be more desirable." And, in providing technical guidance to the City about its rookery management efforts, Alderson testified that she also relied on "a letter from [the TPWD] state wildlife biologist, Dr. Hunter Reed" as to the "public health and safety regarding the rookery and the birds being in a highly used area of the Park."

Dr. Reed expressed significant public health concerns for citizens enjoying the Park. He warned that "[w]hen large rookeries are established in the immediate vicinity of playgrounds, infrastructure, and recreational hardscapes, the risk of zoonotic disease transmission . . . increases substantially." He continued that "[t]he sheer magnitude of fecal contamination, high likelihood of human contact with fecal matter, and limited ability to perform effective environmental decontamination make rookery management action paramount to disease risk mitigation." He maintained that "well-coordinated and human response to manage the rookery . . . will support the persistence of nesting birds." Accordingly, mitigating these dangers, posed by amassed bird guano in highly urbanized areas of the Park, is a compelling interest. Likewise, because repairing the retaining walls is a compelling interest—which the litigants agree requires the relocation or removal of even *one*, *single* tree—then it logically follows that complying with the demands of the Migratory Bird Treaty Act—which prohibits interference with or disturbance of nests already present in trees—is equally a compelling interest.

### c. Least Restrictive Means

On appeal, Appellants repeatedly argue that, according to *Fulton v. City of Philadelphia*, the City must accommodate their religious exercise in

No. 23-50746

crafting the bird deterrence measures and tree-removal plans. 593 U.S. 522 (2021). They plainly state that "[the City's] intolerant view is forbidden under the Supreme Court's command that, if [the] government can *accommodate* religious exercise, it must." But recall that the *Fulton* Court did not declare that "if [the] government can *accommodate*, it must"—rather it stated that "so long as the government can *achieve its interests in a manner that does not burden religion*, it must do so." This is simply a rewording of the strict scrutiny standard, not a command to commence all or even any of the proposed measures. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993) (holding that to survive strict scrutiny, a challenged action must be "justified by a compelling governmental interest and . . . narrowly tailored to advance that interest"); *McCullen v. Coakley*, 573 U.S. 464, 493–94 (2014) ("The point is not that [the state] must enact all or even any of the proposed measures discussed[.] The point is instead that the [state] has available to it a variety of approaches that appear capable of serving its interests, without excluding individuals [exercising their First Amendment rights]."). In *Fulton*, the Court's full quote reads as follows: "A government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests . . . Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541. Thus, the *Fulton* Court proclaimed that a government action subject to strict scrutiny must achieve its interests in a narrowly tailored manner that would not burden religion. We continue this analysis here.

At the injunction hearing and on appeal, Appellants rely heavily on the City's answer to their complaint to bolster their argument that "the City never commissioned a study that aims to achieve its governmental purposes while accommodating [our] religious exercise." This contention requires us to unpack Appellants' complaint and the City's answer. In their complaint,

No. 23-50746

Appellants alleged that "the City has refused to commission a design firm tasked with creating a plan that would preserve the walls and the double-crested cormorant's presence and habitat." Using the Appellants' proffered language as articulated in their complaint,[13] the City (1) admitted that it did not commission the studies as characterized by Appellants and (2) denied that any such studies were needed. In its answer, the City declared that:

> The City denies [the Complaint's allegations], including without limitation the following: (a) [Appellants'] characterization or summary of the "study" to determine the impact of the Bond Project on [Appellants'] religious beliefs; (b) that the City was required to "commission a design firm" to "creat[e] a plan to preserve the walls and the double-crested cormorant's presence and habitat"; and (c) that the Bond Project, as proposed, does not sufficiently address tree preservation, wildlife protection, and safe access to the Park.

And, while the City admitted that it did not commission the studies as described by the Appellants, it averred that "the City did, however, study viable alternatives to design the Bond Project to achieve the governmental goals of public health and safety with the least adverse impact." When questioned about the City's answer to the complaint, Shanon Miller[14] testified that "the City did look at viable alternatives." She further clarified that "the City received feedback from many stakeholders, and considered all of it. It wasn't just one particular interest or stakeholder interest that was

---

[13] Paragraph 59 of Appellants' complaint alleges that "the City has never commissioned a study to determine if the Bond Project could be completed if the priority was ensuring the double-crested cormorant could inhabit the Park afterwards." Paragraph 59 continues that "the City has never commissioned a study that aims to achieve its governmental purposes while accommodating [Appellants'] religious exercise."

[14] Miller is the director of the Office of Historic Preservation and the City's historic preservation officer.

examined." According to Miller, considering the many interests and stakeholders prompted the City to "change[] the project as a result."

This is a far cry from an overt admission by the City that "it has not considered—and it refuses to consider—[Appellants'] religious exercise" as Appellants allege. Rather, the City's answer declares that "[t]he City denies that it has not attempted 'to accommodate [Appellants'] constitutional and statutory religious freedom rights' . . . [and] also denies that it 'is willing to adjust its plans under its favored causes . . . but not to protect the rights of its citizens.'" The City's answer continues that "[t]he City admits that [Appellants] requested access to Lambert Beach to perform a religious ceremony on August 12, 2023 . . . [and] the City offered various reasonable accommodations that balanced the [Appellants'] asserted religious interest with the governmental goal of public safety (including the safety of [Appellants] and any other participants in the ceremony), but the [Appellants] declined those accommodations."

The record does not support Appellants' allegations that the City has refused to try to accommodate their religious exercise. Rather, the record illustrates that many entities were involved in approving the bond project improvements, and at various stages in the public comment and meeting process, stakeholder interests were considered and incorporated in the development plan's design. Moreover, Appellants participated in many private and public meetings with the City's employees related to the Bond Project.[15]

---

[15] Namely, Perez spoke and gave a presentation to the Parks and Recreation Department on July 29, 2022. Perez was invited by the Brackenridge Park Conservancy to give a presentation about concerns with the Bond Project at its January 10, 2023 meeting.

No. 23-50746

Relevant here, the City's Public Works Department operates as the project manager for bond projects and facilitates with the Bond Project owner, Homer Garcia III.[16] In 2022, the Public Works Department applied for a certificate of appropriateness, related to tree removal, with the Office of Historic Preservation ("OHP").[17] The Historic and Design Review Commission ("HDRC"), whose volunteer members are appointed by the mayor and each councilmember to represent their district, is the recommending body responsible for design review cases. HDRC officials dedicate a significant amount of time to their volunteer roles as commissioners, including attending public hearings, site visits, and committee meetings. After reviewing applications, HDRC makes recommendations to OHP, and Miller, in his capacity as historic preservation officer and director of OHP, issues the final decision on the certificates of appropriateness. In February 2022, HDRC held its first hearing concerning the Bond Project. However, HDRC tabled its approval of the Public Works Department's application because it required additional information. Hence, the bond project design team circled back to gather additional public input at public meetings from March 2022 through summer 2022. A number of City councilmembers, commissions, and departments were involved in the public meetings, including the Public Works Department, the Parks and Recreation Department, the Development Services Department,[18] the City manager's

_____

[16] Garcia is the City's Parks and Recreation director.

[17] OHP staff members help applicants (i.e., the Public Works Department) assemble application materials to provide to the Historic and Design Review Commission ("HDRC"). OHP staff members also prepare staff recommendations to accompany the applications submitted to HDRC. In the instant case, the application was prepared by the bond project design team and the OHP staff recommendation was prepared by OHP staff member, Cory Edwards.

[18] The Development Services Department reviews applications for permitting and arboreal standards.

office, the City attorney's office, the Planning Commission,[19] OHP, and HDRC. After conducting the 2022 public meetings, the bond project design team returned to its application for a certificate of appropriateness in 2023, specifically taking into account the public input related to the bond project design, which pertains to the Project Area. Miller testified that the additional information "made it easier for the commissioners and the public to understand the tree removal request and the context of the larger design."

To approve the Bond Project, the Planning Commission first approved the variance that the Public Works Department requested from the City UDC. Next, after receiving the updated Bond Project application in 2023, HDRC convened a hearing on April 19, 2023 and unanimously recommended to approve the application with three stipulations.[20] Then, on April 27, 2023, the OHP issued the certificate of appropriateness consistent with the HDRC recommendation to move forward with improvements to the Lambert Beach area in the Park. At each level of the application process—the Planning Commission approval, HDRC recommendation, and the OHP issuance of the certificate—public meetings were held to solicit comments in opposition or in favor of the project. Appellants acknowledge that they testified at the March 3, 2023 Texas Historical Commission meeting, the April 19, 2023 HDRC hearing, and the August 3, 2023 City Council hearing.

---

[19] The Planning Commission, whose volunteer members are appointed by the mayor and each councilmember to represent their district, approved the variance the Public Works Department requested from the City UDC provision that requires 80% significant tree preservation and 100% heritage tree preservation for projects within the 100-year floodplain.

[20] The stipulations were that (1) work would not occur until approvals were complete pursuant to Section 106 of the National Historic Preservation Act, 54 U.S.C. § 300101 *et seq.*, (2) any additional tree removals would return to HDRC for approval, consistent with the UDC, and (3) the City would monitor and maintain the heritage and significant trees during and after construction.

No. 23-50746

The City took these public comments, including Appellants', under consideration, evaluated whether more trees could be preserved in place in the Project Area, and revised its plan for the work in the Project Area. Critically, Miller testified that the City decided to change the original design so as to preserve or relocate more trees as a result of the public debate and meetings. The original design would have removed 70 trees in the Project Area, and that number has been reduced to 48 trees, with 21 of those trees being relocated, as a result of the public input process.

The City contends that it cannot accomplish its compelling governmental interest in making the Project Area safe for visitors, preserving historic structures, and making Park amenities accessible and available to the public by any less restrictive means than the bird deterrence program and the removal and relocation of the designated trees in the Project Area. Foremost, the City maintains that it analyzed engineering options and selected the method to repair the retaining walls that it determined would save the greatest number of large trees. From an engineering standpoint, the City contends that the pier-and-spandrel method,[21] submitted by Appellants, did not entail a "markedly reduced amount of excavation required"—a necessary condition in order to save additional trees. Moreover, the City argues that the bird deterrence activities are limited in scope as they do not harm or prevent birds, including the double-crested cormorants, from entering the Park or the Project Area. Since the implementation of the bird deterrence measures, the City avers that double-crested cormorants have been observed in the Park, including in the Project Area.

---

[21] The pier-and-spandrel method requires piers to be drilled approximately 15 to 20 feet into the ground directly behind an existing retaining wall and pins to be drilled from the outside of the existing retaining walls (i.e., from the river) into the piers.

No. 23-50746

Appellants contend that "the City [] has an insurmountable narrow-tailoring problem: Its witnesses candidly testified that the City selected the cantilever plan requiring tree removal 'without any consideration' of [their] religious exercise." Citing *Fulton*, they maintain that the City must pursue "viable, less-restrictive alternatives [to repair the retaining walls] that would save more trees" because "so long as the government can achieve its interests in a manner that does not burden religion, it must do so." Appellants also argue that "the City runs into a similar narrow-tailoring problem," in regard to the rookery management program, because there are a "number of [alternative] less-restrictive means that the City easily could have considered." They argue that rookery management measures are not narrowly tailored because the City has not tried to accommodate Appellants' religious exercise in crafting the bird deterrence plan. They pinpoint that the City proffered no testimony addressing narrowly tailored alternatives to the planned bird deterrence measures. We disagree.

The City has demonstrated that it "seriously undertook [consideration] to address the problem with less intrusive tools readily available to it" and "that it considered different methods that other jurisdictions have found effective." *See McCullen*, 573 U.S. at 494. The City commissioned a team of various professionals, which ultimately decided on the cantilevered design after considering the proposed pier-and-spandrel method and analyzing its potential efficacy to save more trees. At the injunction hearing, the City articulated that, during the course of the bond project design, City personnel, engineers, and arborists, met to examine "the alternatives and to figure out whether or not what was being proposed was the best solution moving forward, [and] that [it was] saving as many trees as possible."

No. 23-50746

Miller and Bill Pennell[22] both testified that they met with the Tree Assessment Committee[23] in March 2023 in anticipation of the HDRC approval process. Specifically, Miller testified that City personnel, including herself and Garcia, "were asked to really look at the alternatives and to figure out whether or not what was being proposed was the best solution moving forward, that we were saving as many trees as possible." As a result, Jamaal Moreno,[24] Ross Hosea,[25] Shawn Franke,[26] three independent arborists, who were involved in the Tree Assessment Committee, Moises Cruz,[27] Pennell, and Miller examined alternatives. Cruz had recommended the pier-and-spandrel design, and the meetings' attendees discussed the design in great detail—including how it works, how it would be installed, and how it differs from alternative designs. Miller testified that the team discussed "with the arborists and with our design engineer that afternoon" whether using the pier-and-spandrel method would allow for additional trees to be saved. Following the meeting, City personnel accompanied Cruz to the Project Area "to talk specifically about specific trees." Still, according to Miller, "[t]he consensus in the meeting with the arborists was that no additional trees

---

[22] Pennell is the City's assistant capital programs manager, overseeing the project management of trail projects managed by the San Antonio River Authority and the City's Public Works Department.

[23] The Tree Assessment Committee was tasked with evaluating trees scheduled for removal in the Park and prepared a tree assessment report, authored on May 16, 2022, for the City. The committee comprised of certified volunteer arborists, David Vaughan, Michael Nentwich, Mark Kroeze, and Mark Duff.

[24] Moreno is the project manager of the City's bond project design team and a licensed Texas landscape architect.

[25] Hosea is the City's forester in the Parks and Recreation Department.

[26] Franke is the structural engineer who designed and provided engineering support for the bond project design team.

[27] Cruz is a volunteer engineer.

would be saved because they would still be impacted by the construction, regardless of the methodology." The City maintains, and presented evidence at the hearing, that in evaluating the alternative engineering methods it sufficiently balanced engineering challenges and safety considerations.

Although Appellants would prefer that the City consider either repairing the retaining walls in place or using a pier-and-spandrel system, the City's tree removal plan is narrowly tailored to achieve the City's compelling governmental interest of making the Project Area safe for visitors to the Park, including Appellants. Moreno testified that the City's informed position is that it cannot save any additional trees in the Project Area under the current engineering design plan, and alternatively, if the City were to choose an alternate design (i.e., the pier-and-spandrel method) no additional trees would be saved compared to what the City is able to achieve as presently designed. The record shows that the City considered, but ultimately rejected, the pier-and-spandrel system in part because it (1) required drilling through the face of the historic walls, in violation of applicable standards promulgated by the Secretary of the Interior, (2) would not allow for the preservation of significantly more trees, and (3) would cost two to three times as much as the cantilevered wall solution, exceeding the budget for the Bond Project. The record also shows that the City even considered moving the walls further into the River to distance them from the trees, but that solution was rejected because it would have required a floodplain mitigation project.

As it relates to the City's bird deterrence measures, Appellants primarily rely on *Merced* to argue that the City has not pursued the least restrictive means. Notably, the *Merced* panel acknowledged that:

> [The plaintiff] propose[d] no fewer than three less restrictive alternatives to [the City's scheme] . . . [And the City did] not rebut any of [the plaintiff's] alternatives; it [did] not even try. Thus . . . we hold that the [City's] ordinances that burden [the

plaintiff's] religious free exercise are not the least restrictive means of advancing the city's interests.

*Merced*, 577 F.3d at 595. So, too, Appellants here attempt to enumerate a list of *possibly* less restrictive alternatives to the City's current scheme. Appellants outline several alternatives that the City could have pursued or investigated instead of its presently planned bird deterrence measures such as (1) conducting rookery management measures that exclude cormorants; (2) completing construction within the four-month period between mid- to late-October and February when no migratory birds are present; (3) starting construction within that same four-month period, pausing while migratory birds nest, and resuming when the migratory birds leave; (4) completing construction within the six-month period between mid- to late-October and March or April before the cormorants begin to arrive;[28] or (5) conducting rookery management measures and completing the construction within the eight-month period between mid- to late-October and June, when cormorants may still arrive and nest. However, the proposed means must not only be conceivable but must be (1) in the context of the compelling governmental interest and (2) be the least restrictive of the proffered choices to achieve that governmental interest. *See* TEX. CIV. PRAC. & REM. CODE § 110.003(a)–(b).

Here, the City successfully rebuts each of Appellants' proposed alternatives. *See Merced*, 577 F.3d at 595. The record indicates that no other means exists to deploy deterrent efforts aimed only at egrets and herons but not cormorants. As discussed, Alderson provided technical guidance to the City related to the egret and heron rookery located at the Park and offered recommendations on how to deter birds from "an undesired location and

---

[28] Alderson testified that double-crested cormorants typically arrive to San Antonio around April and May "or oftentimes later into the season."

encourage them to go to an area where they would be more desirable." She testified that, in her experience as an urban wildlife biologist and working with urban rookeries, there is no way (1) to sequence deterrence efforts to deter egrets and herons from nesting in a site but not deter double-crested cormorants or (2) to utilize noise deterrents that would deter egrets and herons but not cormorants. Essentially based on her experience and expertise, she testified that she is not aware of any kind of deterrent measure that would work on egrets and herons but not disturb cormorants because "the deterrent techniques are going to impact other species than the ones that you're specifically targeting." She testified that the difficulty lies in these species being colonial nesting birds.[29]

In evaluating the relative restrictiveness of the bird deterrence plans, the record shows that the City's activities are the least restrictive means to advance the compelling governmental interests presented. Limited by the predictability of migration and habitat patterns of colonial nesting birds, start and stoppage periods of construction at four-month, six-month, or eight-month intervals, as suggested by Appellants, would not achieve the compelling goals of adhering to the Migratory Bird Treaty Act. Moreover, they certainly would not achieve the goal of mitigating bird excrement. Alderson maintained that she "bas[ed] [her] technical guidance [related to bird deterrence] on the biology behind everything." Since the deterrent methods are targeted at nesting and not a species, at times birds of any species can—despite the deterrent efforts and unbeknownst to the program managers—enter the deterrence area and nest. Once any species nests, the program administrators must stop work in that area and notify the respective regulatory agencies. Once deterrent efforts have been halted, this invites all

---

[29] A colonial nesting bird is a bird that nests in large colonies or with large numbers of birds in a given area as a way of protecting their young and their resources.

No. 23-50746

different migratory birds to enter and nest in the area. As such, the district court posited, and we agree that the record shows that there could not be an eight-month window of opportunity to accomplish the bond project improvements. Even more, given this credible testimony regarding the different species' migration patterns and coverage of the Migratory Bird Treaty Act, Appellants' arguments that the bond project improvements could have been completed during various periods when migratory birds are not present do not sufficiently refute that the City's bird deterrence satisfies the least restrictive means to advance its compelling governmental interests.

Similarly, Pennell testified that based on his knowledge of the area and the birds' migratory patterns, the double-crested cormorants arrive around the same time, or within the same period, as the cattle egrets and snow egrets. Thus, he too confirmed there is not a way to time the bird deterrence activities so that only double-crested cormorants can nest in the deterrent zone but not allow egrets and herons to nest there. Additionally, Pennell confirmed that no separate or additional study needed to be commissioned to answer the question of whether it is possible to utilize deterrent methods that are effective *only* against egrets and herons but do not disturb cormorants. Furthermore, he confirmed that no additional or separate study needed to be commissioned to understand the migratory and habitat patterns of these birds. These conditions have been uniformly observed and widely accepted.

Likewise, the record shows that the City applies deterrence efforts only to the extent required to achieve the goal of relocating the targeted species—and no further. As the City avers, "[the] bird deterrence policy does not prohibit migratory birds from visiting, roosting, or foraging in the Project Area," and the deterrent activities are deployed only within the two-acre Project Area and only to persuade the birds to nest elsewhere.

No. 23-50746

As it relates to the bird excrement, the record provides information pertaining to the remedial measures the City has previously instituted in the Park to curtail human exposure. The record indicates that the City has implemented various bird deterrent techniques to prevent mass congregation of birds and limit the accumulation of the excrement. At times, the City has closed the playground areas and restricted access to other facilities due to the excrement. Other times, these amenities are simply "removed." Still, Pennell noted that the Park's ability to clean the amenities depends on the material that the excrement is on. For example, fecal matter can absorb into plastic and "eat away" at metal paint. As such, the record shows that the rookery management program is the least restrictive means to advance the City's interest in mitigating the hazardous effects of bird guano to make the Park safe for visitors. Throughout the record, Pennell reiterates the City's stance: bird mitigation is important for the safety of park-goers. In his opinion, the bird deterrence policies have been effective to reduce and more effectively manage the migratory bird rookeries in the Park.

The record establishes that the studies requested by Appellants were not needed to ascertain the least restrictive means. Moreover, the record shows that the City considered viable alternatives and "different methods that other jurisdictions have found effective" before ultimately deciding on the "less intrusive tools readily available to it." *McCullen*, 573 U.S. at 494. Consequently, the City's tree removal and bird deterrence plans—which deter only to the extent required to dissuade the targeted species from nesting and remove minimal trees necessary to excavate—are the least restrictive means.

As the dissent notes, the voluminous record in this case also contains a few statements from City officials asserting that (1) the City could have sought an exemption from federal guidelines as to the retaining walls; (2) the City's engineering design "was chosen without any consideration of

[Appellants'] free exercise request" for financial reasons; and (3) "the City never actually investigated whether it could alter the timing of its bird deterrence specifically to accommodate [Appellants'] religious exercise." But those select statements pale in comparison to the wealth of evidence outlined above demonstrating that the City considered and ultimately pursued the least burdensome method of achieving its development plans. Indeed, each of the statements highlighted in the dissent were considered by the district court in its four-day preliminary injunction hearing. The district court ultimately concluded, as we do here, that the weight of the evidence supports a holding that the City's development plans are the least restrictive means of furthering its compelling government interests. Further, in this preliminary posture, our review of the facts ascertained below is for clear error. *Scott*, 28 F.4th at 671. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) (citation omitted). We cannot say, on the record before us, that the district court clearly erred.

In short, even if the City's tree removal plan and rookery management plans substantially burden Appellants' religion, they appear to be the least restrictive means to advance the City's compelling governmental interests. Thus, Appellants failed to establish a likelihood of success on their argument that the City's plans violate TRFRA.

### ii. First Amendment Free Exercise

The parties' dispute under the Free Exercise Clause centers on which standard of constitutional review applies to the instant case, rational basis or strict scrutiny. Appellants argue that the City's plans for tree removal and rookery management measures are not neutral and generally applicable and, therefore, must be analyzed under the more exacting strict scrutiny standard.

No. 23-50746

The City contends that its planned Park improvements are neutral and generally applicable and that the more deferential rational basis standard of review applies. Assuming strict scrutiny applies, we conclude that the challenged government action in this case withstands Appellants' Free Exercise challenge, as illustrated *infra* in the TRFRA claim analysis.

The Free Exercise Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The Free Exercise Clause has been applied to the States through the Fourteenth Amendment. *Lukumi*, 508 U.S. at 531. Although the freedom to believe is absolute, the freedom to act on one's religious beliefs "remains subject to regulation for the protection of society." *Cantwell v. Connecticut*, 310 U.S. 296, 304 (1940). Under strict scrutiny review, a challenged government action will be deemed invalid unless it is (1) justified by a compelling governmental interest[30] and (2) is narrowly tailored to advance that interest. *Lukumi*, 508 U.S. at 533. "[N]arrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest[.]" *Tandon v. Newsom*, 593 U.S. 61, 63 (2021) (per curiam). The government must also demonstrate that it "seriously

---

[30] In this context, when considering whether the City has stated a compelling interest, we do not assess whether its development plan generally furthers a compelling governmental interest in safety or public health. Instead, the City must show that "the compelling[-]interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt v. Hobbs*, 574 U.S. 352, 363 (2015) (quoting *Burwell v. Hobby Lobby Stores*, Inc., 573 U.S. 682, 726 (2014)). This requires "scrutiniz[ing] the asserted harm of granting specific exemptions to particular religious claimants" and "'look [ing] to the marginal interest in enforcing' the challenged government action in that particular context." *Id.* (quoting *Hobby Lobby*, 573 U.S. at 726–27). Applied in this case, we consider compelling the City's interests in rookery management and tree removal over the specific objections of Appellants.

No. 23-50746

undertook [consideration] to address the problem with less intrusive tools readily available to it" and "that it considered different methods that other jurisdictions have found effective." *McCullen*, 573 U.S. at 494.

As discussed, the City has provided ample support demonstrating that it has compelling interests for its adoption of the tree-removal and bird deterrence plans and that it has pursued the least burdensome method of achieving its goals. Thus, Appellants have failed to establish a likelihood of success on the merits of their Free Exercise claim.

### iii. Texas freedom-to-worship provision

Appellants also argue that the City's plan violates their freedom of worship under the Texas Constitution.[31] But because Appellants incorporate by reference their arguments on the Free Exercise and TRFRA claims, they similarly fail to establish a likelihood of success on the merits of their claims under Article I, § 6 of the Texas Constitution.

### iv. Texas religious-service-protections provision

Appellants initially asserted that the City's development plan violates the religious-service-protections provision of the Texas Constitution. Under that provision the state of Texas:

> may not enact, adopt, or issue a statute, order, proclamation, decision, or rule that prohibits or limits religious services, including religious services conducted in churches, congregations, and places of worship . . . by a religious

---

[31] The Freedom of Worship provision of the Texas Constitution states that "[n]o human authority ought . . . to control or interfere with the rights of conscience in matters of religion, and no preference shall ever be given by law to any religious society or mode of worship." TEX. CONST. art. I, § 6.

No. 23-50746

organization established to support and serve the propagation
of a sincerely held religious belief.

Tex. Const. art. I, § 6-a. We certified a question regarding the scope of
that provision to the Supreme Court of Texas. *Perez*, 115 F.4th at 428,
*certified question accepted* (Sept. 6, 2024), *certified question answered*,
No. 24-0714, 2025 WL 1675639 (Tex. June 13, 2025). The Supreme Court of
Texas accepted and answered that question. *Id.* In doing so, it held that:

> When the Texas Religious Services Clause applies, its force is
> absolute and categorical, meaning it forbids governmental
> prohibitions and limitations on religious services regardless of
> the government's interest in that limitation or how tailored the
> limitation is to that interest, but the scope of the clause's
> applicability is not unlimited, and it does not extend to
> governmental actions for the preservation and management of
> public lands.

*Perez*, No. 24-0714, 2025 WL 1675639 at *13. In other words, the Supreme
Court of Texas made it clear that the religious-service-protections provision
of the Texas Constitution does not preclude the City's actions in this case.
Because they challenge the City's preservation and management of its public
lands, Appellants cannot demonstrate a likeliness of success on the merits of
their claim under the religious-service-protections provision of the Texas
Constitution. *See id.*

\*　　\*　　\*

Accordingly, we conclude that the district court did not abuse its
discretion in determining that Appellants failed to show a likelihood of
success on the merits on any of their four claims—the TRFRA claim, the
First Amendment Free Exercise claim, the claim under the
freedom-to-worship provision of the Texas Constitution, or the claim under
the religious-service-protections provision of the Texas Constitution. *See*

*Scott*, 28 F.4th at 671. Thus, no additional analysis is required. "[F]ailure to show a likelihood of success alone is sufficient to justify a denial." C*AE Integrated, L.L.C. v. Moov Techs., Inc.*, 44 F.4th 257, 264 n.22 (5th Cir. 2022).

### C. Injunction Pending Appeal

To obtain an injunction pending appeal, Appellants must satisfy each of the injunction elements. *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). To determine whether to grant an injunction pending appeal, we consider: (1) the likelihood that the moving party will ultimately prevail on the merits of the appeal; (2) the extent to which the moving party would be irreparably harmed by denial of the injunction; (3) the potential harm to opposing parties if the injunction is issued; and (4) the public interest. *See Fla. Businessmen for Free Enter. v. City of Hollywood*, 648 F.2d 956, 957 (5th Cir. Unit B 1981); *Exxon Corp. v. Berwick Bay Real Estate Partners*, 748 F.2d 937, 939 (5th Cir. 1984) (per curiam). As the parties seeking the injunction, Appellants bear the burden of showing that they satisfy each of these elements. *See Ruiz v. Estelle*, 666 F.2d 854, 856 (5th Cir. 1982).

We begin and end with the first factor: likelihood of success on the merits. Appellants claim that they are likely to succeed on the merits of their appeal, arguing that the City's actions—specifically its tree-removal plan and rookery management plan—fail strict scrutiny because these plans (1) lack any compelling governmental interest and (2) are not narrowly tailored. Specifically, Appellants argue that the City seeks to permanently prevent them from performing religious services by destroying the area's spiritual ecology and has never attempted to accommodate their religious exercise.

We have considered Appellants' arguments based on the parties' filings, the district court's opinion, and the relevant caselaw, and conclude that Appellants have failed to establish a likelihood of success on the merits of their claims that the City violated their rights under the federal Free

No. 23-50746

Exercise Clause, the Texas Constitution, or TRFRA. The record evidence establishes that the City has compelling interests. And, in evaluating the relative restrictiveness of the tree-removal and rookery management plans, the record indicates that the City's activities are the least restrictive means to advance the compelling governmental interests presented. The evidence supports that the City's design of the project was a thorough, comprehensive, and complex process involving experts in many disciplines, including arborists, civil engineers, architects, landscape architects, wildlife biologists, and scientists. The City (1) solicited the opinions of experts and others expressing concerns about the Park's trees and wildlife and (2) adjusted its plans regarding the trees so that the number of trees now scheduled for removal has been reduced from 70 to 48, with another 20 trees scheduled for relocation. The City appointed a committee of highly qualified independent arborists to evaluate which trees in the Project Area needed to be removed because of construction restrictions imposed by the bond project construction plans. Moreover, the City's bird deterrence measures are aimed at nesting, not preventing their presence. The migratory birds are still allowed to forage, feed, and rest in the Project Area. Likewise, Appellants' bird deterrence alternatives are not as effective as the current design. The City and its bond project design team theorize that the project will take eight months. To the contrary, Appellants' suggestions—offering a four-month alternative, a six-month alternative, or the prospect of deterring one type of bird and not another—are not the least restrictive means as to the City's compelling interests.

Based on our review, we conclude that Appellants have not demonstrated that they are likely to prevail on their claim that the district court abused its discretion in only partially granting their motion for a

No. 23-50746

preliminary injunction.[32] Because we have concluded that Appellants' have not made the requisite showing of the likelihood of success on the merits, they are not entitled to an injunction pending appeal. *Janvey*, 647 F.3d at 595. Thus, we do not analyze the other injunction elements here.

## IV. Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment. Correspondingly, the appeal as to Appellants' access to the Project Area within the Park is DISMISSED AS MOOT. Because Appellants have failed to show a likelihood of success on the merits, we DENY their Emergency Motion for Injunction Pending Appeal.

---

[32] Appellants sought injunctive relief to require the City to grant them unfettered access to the fenced Project Area for religious worship, minimize tree removal in the Project Area, and allow cormorants to nest in the Project Area. The district court granted injunctive relief as to scheduled group access to the area for religious ceremonies. The court also ordered the City to repair a large broken limb in the Project Area that the City maintained "pose[d] a risk of injury or death." The district court however declined to enjoin the City's planned tree removal and rookery management measures and denied Appellants access for unscheduled individual worship, while the Project Area fencing was actively erected and any dangerous tree limbs posed safety risks to Park visitors. On November 13, 2023, the City affirmed that it had removed the dangerous limb that had previously made the Project Area inaccessible, as ordered by the district court. The City avowed that removing the limb allowed it to reconfigure the construction fencing to grant public access to the entire area.

No. 23-50746

S<small>TEPHEN</small> A. H<small>IGGINSON</small>, *Circuit Judge*, concurring in part and dissenting in part:

I dissent for the reasons I stated before. *See Perez v. City of San Antonio*, 150 F.4th 430, 456-63 (5th Cir. 2025) (Higginson, J., concurring in part and dissenting in part). I am grateful that the majority has once again[1] collegially agreed to withdraw a decision that I think is mistaken, this time to avoid misapplication of *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248 (5th Cir. 2010). Simple subtraction of legal authority, however, does not alter the substantial burden on these Church members' religious expression. The majority's reduced opinion that this burden is trivial or mere perception now rests on ipse dixit, not analysis rooted in law.

---

[1] *See Perez v. City of San Antonio*, 115 F.4th 422 (5th Cir. 2024).