No. 23-50746

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

GARY PEREZ AND MATILDE TORRES,

*Plaintiffs-Appellants,*

v.

CITY OF SAN ANTONIO,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Western District of Texas (Biery, J.)

## PETITION FOR REHEARING EN BANC OF APPELLANTS GARY PEREZ AND MATILDE TORRES

Mark W. Rasmussen
Margaret I. Lyle
Timothy M. Villari
JONES DAY
2727 North Harwood Street
Dallas, TX 75201.1515
Telephone: +1.214.220.3939
E-mail: mrasmussen@jonesday.com
E-mail: milyle@jonesday.com
E-mail: tvillari@jonesday.com

ATTORNEYS FOR APPELLANTS

John Greil
Steven T. Collis
Law & Religion Clinic
University of Texas School of Law
727 East Dean Keeton St.
Austin, TX 78705
Telephone: +1.512.471.5151
E-mail: john.greil@law.utexas.edu
E-mail: steve.collis@law.utexas.edu

ATTORNEYS FOR APPELLANTS

# CERTIFICATE OF INTERESTED PERSONS

*Perez, et al. v. City of San Antonio*, No. 23-50746

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Plaintiffs-Appellants Gary Perez and Matilde Torres

   Mark W. Rasmussen
   JONES DAY
   2727 N. Harwood St.
   Dallas, TX 75201

   Margaret I. Lyle
   JONES DAY
   2727 N. Harwood St.
   Dallas, TX 75201

   Jonathan D. Guynn
   Withdrew as counsel
   Formerly at JONES DAY
   2727 N. Harwood St.
   Dallas, TX 75201
   Now Deputy Assistant Attorney General, Torts Branch
   United States Department of Justice
   Civil Division
   950 Pennsylvania Avenue, N.W.
   Washington, D.C. 20530-0001

   J. Benjamin Aguiñaga
   Withdrew as counsel
   Formerly at JONES DAY
   2727 N. Harwood St.
   Dallas, TX 75201
   Now Solicitor General

State of Louisiana
1885 N. Third St.
Baton Rouge, LA 70802
(225) 326-6766

Chance McCraw
Withdrew as counsel, unopposed motion to withdraw on file in district court
Formerly at JONES DAY
2727 N. Harwood St.
Dallas, TX 75201

Timothy M. Villari
JONES DAY
2727 N. Harwood St.
Dallas, TX 75201

Logan A. Worrick
Withdrew as counsel, unopposed motion to withdraw on file in district court
Formerly at JONES DAY
2727 N. Harwood St.
Dallas, TX  75201.
Now Judicial Law Clerk
United States Court of Appeals for the Fifth Circuit

John Greil
Law and Religion Clinic
University of Texas School of Law
727 East Dean Keeton St.
Austin, TX 78705

Steven T. Collis
Law and Religion Clinic
University of Texas School of Law
727 East Dean Keeton St.
Austin, TX 78705

2.  Defendant-Appellee City of San Antonio

Fred R. Jones
Langley & Banack, Incorporated
745 East Mulberry Avenue

Suite 700
San Antonio, TX 78212
Tel: (210) 736-6600
Fax: (210) 735-6889
Email: fjones@langleybanack.com

Ian M. McLin
Langley & Banack, Incorporated
745 East Mulberry Avenue
Suite 700
San Antonio, TX 78212
Tel: (210) 736-6600
Fax: (210) 735-6889
Email: imclin@langleybanack.com

Lee Brinson Warren
Langley & Banack, Incorporated
745 East Mulberry Avenue
Suite 700
San Antonio, TX 78212
Tel: (210) 736-6600
Fax: (210) 735-6889
Email: warren@goodelaw.com

Natalie Friend Wilson
Langley & Banack, Incorporated
745 East Mulberry Avenue
Suite 700
San Antonio, TX 78212
Tel: (210) 736-6600
Fax: (210) 735-6889
Email: nwilson@langleybanack.com

Sara Murray
Langley & Banack, Incorporated
745 East Mulberry Avenue Suite 700
San Antonio, TX 78212
Tel: (210) 736-6600
Fax: (210) 735-6889
Email: smurray@langleybanack.com

City of San Antonio
Deborah Klein
Deputy City Attorney
International Center
203 South St. Mary's Street, Second Floor
San Antonio, TX 78205
Telephone: (210) 207-8949
Facsimile: (210) 207-4004
Deborah.Klein@sanantonio.gov

Jane Webre
SCOTT DOUGLASS & MCCONNICO LLP
Colorado Tower
303 Colorado Street, Suite 2400
Austin, Texas 78701
Telephone: (512) 495-6300
Email: jwebre@scottdoug.com

*/s/ Mark W. Rasmussen*
Mark W. Rasmussen

## STATEMENT OF THE EN BANC REASONS

Who decides what a religion demands? Adherents who study, practice, and sacrifice time and wealth to live the faith? Or government officials defending a lawsuit? The Constitution answers this question. Yet it continues to divide federal courts.

Some courts correctly hold that, if the religious belief is sincere, government bureaucrats cannot define orthodoxy or prescribe "correct" religious practice. *See, e.g.,* *Mid Vermont Christian Sch. v. Saunders*, 151 F.4th 86, 94–95 (2d Cir. 2025) (state actor erred by attacking the validity of a religious objection because government "may not impose discipline based on its view that [the religious] objection was wrong"). Other courts, including the panel opinion ("Op.") here, wrongly adopt the government's gloss on adherents' beliefs. That mistake deserves the attention of the full *en banc* court.

Here, the substantial burden holding turns on interpreting Native American Church teaching. If the Court accepts the unrebutted testimony of two religious practitioners, a substantial burden exists. If the Court accepts the City's theological interpretation of their practices (as the panel opinion did), it does not. The panel opinion does not just affect Appellants' rights; it harms all future religious liberty claims in the Fifth Circuit. Advocates will ask this Court and others to resolve theological disputations they have no business resolving, citing the panel opinion in support.

The substituted panel opinion corrected an earlier error by removing a discussion of "incidental" burdens. *Compare Perez v. City of San Antonio*, 150 F.4th 430, 440–442 (5th Cir. 2025), *opinion withdrawn and superseded on reh'g*, No. 23-50746, 2025 WL 3559986 (5th

Cir. Dec. 12, 2025), *with* Op. at 13–16. But significant issues remain that unduly weaken this Court's religious liberty jurisprudence, including:

- Adopting the government's interpretation of Appellants' theology in the substantial burden analysis. *Contra Barr v. City of Sinton*, 295 S.W.3d 287, 301 (Tex. 2009) ("The burden must be measured . . . from the person's perspective, not from the government's."). That violates the long-established constitutional command that "courts are not arbiters of scriptural interpretation." *Thomas v. Review Bd. of Ind. Emp. Security Div.*, 450 U.S. 707, 716 (1981). Appellants believe some religious ceremonies can be "performed only at this riverbend" and "cannot be properly administered without specific trees present and cormorants nesting." Op. at 3. The City plans to destroy the "very aspects of the Sacred Area that make it sacred to Plaintiffs and enable them to perform their most important services." App. Br. at 10; *see also id.* at 1–2, 8–10, 31. The City's "intended actions substantially burden Plaintiffs' religious exercise" because they would "destroy [the Sacred Area] altogether." *Id.* at 32. Citing *Barr* and this Court's decision in *Merced v. Kasson*, 577 F.3d 578 (5th Cir. 2009), Op. at 15, the panel opinion nevertheless contradicted them. Instead, it adopted the City's argument that the burden is not "real and significant" because cormorants can nest "elsewhere in the 343-acre Park" and Appellants "continue to have virtually unlimited access." Op. at 15. The City told Appellants they are wrong about their religious beliefs, and the panel opinion accepted it. That is not, and cannot be, the judicial role.

- Placing this Court on the wrong side of a circuit split about whether preventing a religious service substantially burdens religious exercise. "[O]ne court after another has held that preventing a religious exercise is, necessarily, a 'substantial burden' on that religious exercise." *Apache Stronghold v. United States*, 145 S. Ct. 1480, 1488 (2025) (Gorsuch, J., dissenting from denial of certiorari) (collecting cases). The panel opinion leaves this Court alone with the Ninth Circuit in holding otherwise.

- The panel opinion creates new law under which governments need not even *try* to accommodate religion. The City admitted it never studied whether it could achieve its interests while accommodating religion; doing so would take "time and money" and the City wanted to "proceed with the project." *Perez*, 150 F.4th at 458 (Higginson, J., concurring in part and dissenting in part); *see* Dissent at 41 ("I dissent for the reasons I stated before." (citing *Perez*, 150 F.4th at 456–463)). The panel opinion drastically reduces the government's duty to accommodate from the Supreme Court's strict-scrutiny standard, which commands that "so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021). The panel says government need not even try.

These issues warrant rehearing. No active member of this Court has decided an *en banc* religious exercise claim applying strict scrutiny. Meanwhile, courts throughout the Circuit wrongly defer to government officials' say-so. This case offers an

opportunity to restore essential protections for religious freedom and clarify this critical area of law. Without *en banc* review, a 4,000-year-old sacred site will be unnecessarily destroyed and free-exercise rights of all believers unduly narrowed in this Circuit.

# TABLE OF CONTENTS

STATEMENT OF THE EN BANC REASONS............................................................ v

STATEMENT OF THE ISSUES .......................................................................... 1

STATEMENT OF COURSE OF PROCEEDINGS AND DISPOSITION.............. 1

STATEMENT OF RELEVANT FACTS................................................................ 2

ARGUMENT AND AUTHORITIES .................................................................... 5

I.      The Panel's Substantial Burden Analysis Deserves En Banc Review. ................ 5

        A.      The Opinion's Substantial Burden Analysis Treats Plaintiffs'
                Theology as Invalid. ..................................................................... 5

        B.      The Opinion Joins the Wrong Side of a Circuit Split Regarding
                Whether Preventing a Religious Exercise Is a Substantial Burden
                on that Religious Exercise. ........................................................... 8

II.     By Creating New Doctrine on a Government's Obligation to Consider
        Alternatives, the Opinion Enters the Wrong Side of a Circuit Split. ............... 10

III.    The Opinion's Denial of an Injunction Pending Appeal Warrants
        Review. ................................................................................................. 12

CONCLUSION ............................................................................................... 13

CERTIFICATE OF SERVICE ........................................................................... 15

CERTIFICATE OF COMPLIANCE ................................................................... 16

# TABLE OF AUTHORITIES

Page

CASES

*Apache Stronghold v. United States*,
101 F.4th 1036 (9th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct. 1480
(2025) ............................................................................................................... 8, 9

*Barr v. City of Sinton*,
295 S.W.3d 287 (Tex. 2009) ........................................................................... 5, 9

*Bethel World Outreach Ministries v. Montgomery Cty. Council*,
706 F.3d 548 (4th Cir. 2013) ............................................................................. 8

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ......................................................................................... 12

*DeMarco v. Davis*,
914 F.3d 383 (5th Cir. 2019) ............................................................................. 9

*Haight v. Thompson*,
763 F.3d 554 (6th Cir. 2014) ............................................................................. 8

*In re Young*,
82 F.3d 1407 (8th Cir. 1996), *vacated on other grounds sub nom.*, *Christians
v. Crystal Evangelical Free Church*, 521 U.S. 1114 (1997) ................................ 8

*Knight v. Thompson*,
797 F.3d 934 (11th Cir. 2015) ..................................................................... 10, 11

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*,
157 F.4th 627 (5th Cir. 2025) ............................................................................ 7

*Merced v. Kasson*,
577 F.3d 578 (5th Cir. 2009) ......................................................................... 5, 9

*Morgan v. Plano Indep. Sch. Dist.*,
724 F.3d 579 (5th Cir. 2013) ........................................................................... 11

*Perez v. City of San Antonio*,
  150 F.4th 430 (5th Cir. 2025), *opinion withdrawn and superseded on reh'g*,
  No. 23-50746, 2025 WL 3559986 (5th Cir. Dec. 12, 2025)............................2, 10, 12

*Ruiz v. Estelle*,
  650 F.2d 555 (5th Cir. 1981) ................................................................................. 12

*Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*,
  980 F.3d 821 (11th Cir. 2020) ................................................................................. 8

*Thomas v. Review Bd. of Indiana Employment Sec. Div.*,
  450 U.S. 707 (1981) ................................................................................................ 5

*United States v. Wilgus*,
  638 F.3d 1274 (10th Cir. 2011) ............................................................................. 10

*Ware v. Louisiana Dep't of Corr.*,
  866 F.3d 263 (5th Cir. 2017) ................................................................................. 12

*Warsoldier v. Woodford*,
  418 F.3d 989 (9th Cir. 2005) ................................................................................. 11

*Washington v. Klem*,
  497 F.3d 272 (3d Cir. 2007) ................................................................................... 11

*West v. Radtke*,
  48 F.4th 836 (7th Cir. 2022) ................................................................................... 8

*Yellowbear v. Lampert*,
  741 F.3d 48 (10th Cir. 2014) ................................................................................... 8

## STATUTES

TEX. CIV. PRAC. & REM. CODE § 110.001(a)(1) .......................................................... 5
TEX. CIV. PRAC. & REM. CODE § 110.003(a)-(b) ...................................................... 5, 8
TEX. CIV. PRAC. & REM. CODE § 110.006(c) ............................................................. 11

## OTHER AUTHORITIES

First Amendment, U.S. CONST. amend I ................................................................... 5, 7

Fifth Circuit Rule 40.................................................................................... 12

Webster's Third New International Dictionary.................................................... 9

## STATEMENT OF THE ISSUES

1.      Whether courts may substitute a government defendant's theological attack on the validity of a religious obligation for the believer's testimony about the faith's requirements.

2.      Whether preventing a religious service substantially burdens religious exercise.

3.      Whether a government can demonstrate that it has used the least religiously restrictive means where it had knowledge of the religious burden and chose not to study whether workable religious accommodations existed.

4.      Whether an injunction pending appeal is warranted.

## STATEMENT OF COURSE OF PROCEEDINGS AND DISPOSITION

For thousands of years, indigenous peoples have held sacred a bend in the San Antonio River. Op. at 3–4. Gary Perez has led religious ceremonies there for over 25 years, and Matilde Torres for more than 10. *Id.* at 3. In early 2023, the City finalized a plan to renovate retaining walls at that bend. The City fenced off the south bank of the river and implemented a zero-nesting policy for all migratory birds around the bend.

Appellants sued in August 2023 to enjoin the City from (1) preventing access to a space on the bend where they perform religious ceremonies (the "Sacred Area"); (2) implementing a construction design that removes 69 of 83 trees from a two-acre site surrounding the bend (the "Project Area"); and (3) preventing cormorants (sacred to Appellants) from nesting there. After an evidentiary hearing, the District Court partially granted a preliminary injunction, ordering the City to remove a small hanging branch and allow Appellants access to the Sacred Area, but denying all other relief.

Appellants appealed and moved for an emergency injunction pending appeal. This Court entered a temporary order barring the City from removing trees or preventing cormorants from nesting. On the merits, a divided panel initially held the access issue was moot and affirmed the District Court.

The panel then withdrew its opinion and certified a question to the Supreme Court of Texas, which answered on June 13, 2025. The divided panel again held the access issue moot and denied relief on the tree destruction and cormorant-nesting deterrence.

The panel then treated Appellants' petition for rehearing en banc as a petition for panel rehearing, withdrew the panel opinion, and issued a revised panel opinion that removed a paragraph concerning "indirect" burdens under TRFRA. Op. at 1; *compare Perez v. City of San Antonio*, 150 F.4th 430, 440–442 (5th Cir. 2025), *opinion withdrawn and superseded on reh'g*, No. 23-50746, 2025 WL 3559986 (5th Cir. Dec. 12, 2025), *with* Op. at 13–16.

## STATEMENT OF RELEVANT FACTS

Appellants are indigenous Texans and members of the Lipan-Apache Native American Church. ROA.4071:7–4072:19, ROA.4153:14–19. Their ancestors gathered for prayer and worship at the Sacred Area. ROA.4174:7–13. Appellants consider this riverbend sacred because its shape mirrors the Eridanus constellation. They believe that on holy days, the river and constellation meet at this site, and heaven and earth become one. The trees surrounding the bend connect our world with the spirit worlds above

and below. They also provide nesting for cormorants that are sacred to Appellants for their role in the Yanaguana creation story and their migration cycle. ROA.4074:1–8. Together, the stars, trees, cormorants, and river form a unique spiritual ecology. ROA.4088:23–4089:13.

For Appellants, ceremonies at the bend preserve a tenet of their faith and can be accomplished *nowhere else on earth*, not even nearby in the Park. ROA.4083:25–4085:7. When asked whether the ceremonies could occur if cormorants were permitted to nest nearby (but not in) the Project Area, Mr. Perez answered: "No." ROA.4120:22–4121:2.

In February 2023, the City barred Appellants from worshipping in the Sacred Area. ROA.4091:24–4092:8. The District Court's injunction now allows them access. Dkt. 86; Dkt. 120 at 36–37. But the City still plans to destroy the sacred trees and prevent cormorants from nesting. Both trees and cormorants are components of Appellants' religious services. When asked "[w]hat effect will [the City's plan] have on your ability to practice religious ceremonies that you think are necessary," Mr. Perez testified: "They're gone. It's over." ROA.4070:22–24.

To repair failing retaining walls, the City intends to use a "cantilever" system, which requires removing 69 of 83 trees that cormorants use for nesting. ROA.4289:8–10. Some trees will be moved to other religiously insignificant Park areas.

Appellants' expert, a certified Professor of Civil Engineering, demonstrated that drilling through the *front* of the walls would save significantly more trees. ROA.4273:24–4274:11. The City never considered this *front-anchored* pier-and-spandrel design; it only

3

evaluated a different, *rear-anchored* pier-and-spandrel one. *See* ROA.4420:25–4421:22. The City's engineering witness agreed front-anchoring would "save more trees" but believed his "hands [we]re basically tied by a series of legal issue[s]—or regulatory restrictions." ROA.4687:11–17. Though the City never identified any such restriction, its witnesses stated the City knew it could apply for a regulatory waiver of the unidentified restrictions, but chose not to. ROA.4442:17–4443:23.

City officials averred they did not attempt to accommodate Appellants' religious practices when selecting a project design and implementing the bird-deterrence plan. *See* ROA.369, ¶ 59 (disclaiming any obligation to study whether the City could accommodate Appellants' religion), ROA.4390:20–23 (no attempt to accommodate Appellants concerning trees and project plan), ROA.4430:14–44:31:14 (never asked engineers to prioritize saving trees), ROA.4455:24–4456:2, ROA.4520:17–21, ROA.4521:13–16, ROA.4617:12–14 (no investigation of accommodations regarding bird deterrence).

Asked if the wall design was "chosen without any consideration of the plaintiffs' free exercise request," the City's Project Manager answered, "Yes. It was chosen well before we understood there was an issue." The City then did not attempt to accommodate Appellants because revisiting that choice "would take time and money" and the City wanted "to proceed with the project." ROA.4390:20–4391:8.

## ARGUMENT AND AUTHORITIES

**I.**   **The Panel's Substantial Burden Analysis Deserves En Banc Review.**

**A.**   **The Opinion's Substantial Burden Analysis Treats Plaintiffs' Theology as Invalid.**

TRFRA prohibits governmental actions that "substantially burden" the free exercise of religion, unless the government proves the action furthers a compelling government interest in the least religiously restrictive manner. TEX. CIV. PRAC. & REM. CODE § 110.003(a)–(b). The statute requires religious burdens be measured "from the person's perspective, not from the government's." *Barr v. City of Sinton*, 295 S.W.3d 287, 301 (Tex. 2009). That rule exists because "the judicial process is singularly ill equipped to resolve" theological disputes. *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 715 (1981); *accord Merced*, 577 F.3d at 590 ("The judiciary is ill-suited to opine on theological matters, and should avoid doing so.").

The Religion Clauses of the First Amendment demand this, too. When courts make theological judgments, they burden free exercise (by overruling the believer's account) and "establish" a religion (by making government officials arbiters of religious truth). TRFRA's text thus goes out of its way to remove theological questions from the court's analysis. *See* TEX. CIV. PRAC. & REM. CODE § 110.001(a)(1) ("[I]t is not necessary to determine that the act or refusal to act is motivated by a central part or central requirement of the person's sincere religious belief."); *accord Barr*, 295 S.W.3d at 300 ("Not only is such a determination unnecessary, it is impossible for the judiciary.").

By holding there is no substantial burden on Appellants' religious ceremonies at the river bend because they can still access other parts of the Park, the panel opinion ignores TRFRA's and the First Amendment's command. This error pervades the panel opinion, which consistently credits the government's theological interpretation of Appellants' religious beliefs and ignores Appellants' testimony.

As to nesting cormorants, the panel opinion holds the burden is not substantial because cormorants can still "nest[] nearby or elsewhere in the 343-acre Park." Op. at 15. But the City asked Mr. Perez that very question: "If the cormorants are not permitted to nest in the Project Area but they are nesting nearby, is that presence close enough for the spiritual … ecology that you claim is present and necessary in the Project Area?" He testified: "No, ma'am, it isn't." ROA.4120–21.

As to trees, the panel opinion discounts the burden on Appellants because they have "virtually unlimited access to the Park for religious and cultural purposes." Op. at 15. Again, Appellants testified that other locations are "not religiously effective," ROA.4094, and the planned tree removal would mean Appellants' religious ceremonies would "be gone forever," ROA.4173.

The Second Circuit recently rejected this approach. In *Mid Vermont Christian Sch. v. Saunders*, a private Christian school refused to play another school that had a transgender player. 151 F.4th 86, 94–95 (2d Cir. 2025). The Christian school asserted playing the game would affirm transgender identity in violation of its religious beliefs. A state actor expelled the school from athletic competitions; the school sued; and the

Second Circuit found it likely to succeed on the merits of its Free Exercise claim. The state actor argued that the school's religion did not really require them to forfeit the game: "Brigham Young University athletes do not compromise their Mormon faith— or endorse Catholicism—when they play Notre Dame. … This case has nothing to do with beliefs." *Id.* at 91.

The Second Circuit rejected this theological disputation. The state actor's "statement did not just question Mid Vermont's religious *sincerity*. It also attacked the *validity* of Mid Vermont's objection." *Id.* at 94. So too here. The City argued that its cormorant deterrence "does not substantially burden Plaintiffs' religious beliefs because cormorants can still nest elsewhere in the 343-acre Park or nearby." ECF 120 at 56. That is an attack on "the *validity* of [Plaintiffs] objection," which the Constitution prohibits.

The panel's approach also conflicts with this Court's recent decision in *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 157 F.4th 627, 631, 638 (5th Cir. 2025) (applying the church autonomy doctrine, one aspect of which is "the nonreviewability of questions of faith and religious doctrine." (cleaned up)). The panel opinion runs afoul of that doctrine by entertaining the City's theological gloss on Appellants' beliefs.

En banc review is needed to restore the correct rule: under the First Amendment, the government cannot win by arguing that believers are "wrong" regarding their religion's requirements.

**B.   The Opinion Joins the Wrong Side of a Circuit Split Regarding Whether Preventing a Religious Exercise Is a Substantial Burden on that Religious Exercise.**

As Justice Gorsuch recently explained, "one court after another has held that preventing a religious exercise is, necessarily, a 'substantial burden' on that religious exercise." *Apache Stronghold*, 145 S. Ct. at 1488 (Gorsuch, J., dissenting from denial). Six circuits agree—the Fourth, Sixth, Seventh, Eighth, Tenth, and Eleventh.[1] Until this opinion, only the Ninth Circuit disagreed. *See Apache Stronghold v. United States*, 101 F.4th 1036 (9th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct. 1480 (2025). Now this Circuit does too.

The opinion acknowledged the City's actions would permanently destroy Appellants' religious services. Op. at 3 ("Appellants also proclaim that certain religious ceremonies cannot be properly administered without specific trees present and cormorants nesting."). Yet it still concluded that this burden is not "real and significant." *Id.* at 15.

This result contravenes TRFRA's text. *See* TEX. CIV. PRAC. & REM. CODE § 110.003(a)–(b) ("a government agency may not substantially burden a person's free exercise of religion" unless it satisfies strict scrutiny). "As a matter of ordinary meaning,

---

[1] *Bethel World Outreach Ministries v. Montgomery Cty. Council*, 706 F.3d 548, 555–56 (4th Cir. 2013); *Haight v. Thompson*, 763 F.3d 554, 565 (6th Cir. 2014); *West v. Radtke*, 48 F.4th 836, 845 n.3 (7th Cir. 2022); *In re Young*, 82 F.3d 1407, 1418 (8th Cir. 1996), *vacated on other grounds sub nom.*, *Christians v. Crystal Evangelical Free Church*, 521 U.S. 1114 (1997); *Yellowbear v. Lampert*, 741 F.3d 48, 56 (10th Cir. 2014); *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 980 F.3d 821, 830–31 (11th Cir. 2020).

after all, an action that prevents a religious exercise does not just burden that exercise substantially, it burdens it completely." *Apache Stronghold*, 145 S. Ct. at 1486 (Gorsuch, J., dissenting from denial). And unlike the Ninth Circuit's *Apache Stronghold* approach, the Texas Supreme Court has interpreted substantial burden according to ordinary, dictionary meaning. *See Barr*, 295 S.W.3d at 301 (interpreting "substantial burden" by use of Webster's Third New International Dictionary).

When the government *prevents* a religious exercise, that action substantially *burdens* that exercise. Prevention may be government regulation that ends a particular religious practice. *See id.* at 302 ("As a practical matter, the ordinance ended Barr's ministry, as the City Council surely knew it would. We therefore have no hesitation in concluding [it] substantially burdened Barr's ministry."). Prevention might be banning the possession of necessary components of a religious service. *Merced*, 577 F.3d at 591 ("Merced cannot perform the ceremonies dictated by his religion. This is a burden, and it is substantial."). Or it might entail the government's removal of a religiously-necessary object. *See DeMarco v. Davis*, 914 F.3d 383, 389 (5th Cir. 2019) (under RLUIPA, "confiscat[ing] copies of the Bible … placed a substantial burden on … practice of reading religious literature").

By "propos[ing] to destroy" the Sacred Area "altogether," Dkt. 99-1 at 32, the City prevents those ceremonies and substantially burdens Appellants' religious exercise. The en banc court should reject the Ninth Circuit's outlier position and realign this case with Circuit precedent.

## II.     By Creating New Doctrine on a Government's Obligation to Consider Alternatives, the Opinion Enters the Wrong Side of a Circuit Split.

The panel opinion is the first in this Circuit to uphold government action after testimony that the government (1) did not consider the religious impact of its actions; (2) refused to change its actions to accommodate religion once it learned of the religious impact; and (3) disclaimed any responsibility for investigating workable religious accommodations. That outcome places this Circuit on the wrong side of a circuit split, conflicts with Supreme Court precedent, and significantly reduces the duty to accommodate religious exercise.

The opinion holds that the City satisfied least restrictive means standard where its own witnesses testified it (1) did not accommodate the religious practice and (2) did not attempt to do so. *See Perez*, 150 F.4th at 461–63 (Higginson, J., concurring in part and dissenting in part); *see also* Dissent at 41.

The startling holding creates a new rule in this Circuit that governments have no obligation to investigate possible accommodations when put on notice. Some courts have adopted such a rule. *See, e.g.*, *United States v. Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011) ("[T]he government's burden is two-fold: it must support its choice of regulation, and it must refute the alternative schemes offered by the challenger, but it must do both through the evidence presented in the record."); *see generally Knight v. Thompson*, 797 F.3d 934, 946 (11th Cir. 2015) (identifying circuit split).    The Supreme Court resolved that split in *Ramirez v. Collier* by rejecting the argument "that it is [plaintiff's] burden to

'identify any less restrictive means.'" 595 U.S. 411, 432 (2022). That approach "gets things backward," because "*it is the government* that must show its policy" is the least religiously restrictive means. *Id.* (emphasis added); *contra* Op. at 30 (City satisfied least restrictive means by "successfully rebut[ting] each of Appellants' proposed alternatives").

Without searching for alternatives, the government cannot prove it used the least restrictive means. *Ramirez* thus aligns with the rule that the government must have "actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005); *accord Washington v. Klem*, 497 F.3d 272, 284 (3d Cir. 2007).

The latter approach also aligns with TRFRA, which imposes a pre-suit notice requirement so that governments and believers can reach pre-litigation resolution. *See* TEX. CIV. PRAC. & REM. CODE § 110.006(c); *Morgan v. Plano Indep. Sch. Dist.*, 724 F.3d 579, 588 (5th Cir. 2013). The City should have responded to Appellants' notice by investigating workable alternatives to rebuild the walls *and* preserve religious ceremonies. Instead, the City "admit[ted] that it 'never commissioned a study that aims to achieve its governmental purposes while accommodating Plaintiffs' religious exercise' … and denie[d] that any such study is required." ROA.369, ¶ 59.

The panel opinion nevertheless concluded that the City satisfied least restrictive means because it made *some* changes to the construction plan to suit *other* citizens' secular preferences. But the City never researched or consulted with experts on how to

potentially accommodate *Appellants*. According to City witnesses, the redevelopment plan was "set in stone." *See Perez*, 150 F.4th at 462 (Higginson, J., concurring in part and dissenting in part); *see also* Dissent at 41. Strict scrutiny demands more.

"[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Ware v. Louisiana Dep't of Corr.*, 866 F.3d 263, 269 (5th Cir. 2017) (quoting *Holt v. Hobbs*, 574 U.S. 352, 365 (2015)). That rule presupposes the government must investigate what means are available. Sometimes, it even requires the "creation of entirely new programs." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 729–30 (2014). Here, it simply required a different construction design.

TRFRA requires governments to seek solutions that respect both public interest and religious exercise. The City cannot refuse to look for alternatives and then tell the Court, "we have tried nothing and we are all out of ideas." The opinion's rule defies TRFRA and Supreme Court precedent.

## III. The Opinion's Denial of an Injunction Pending Appeal Warrants Review.

The same legal errors resulted in denial of Appellants' motion for injunction pending appeal. *See* Op. at 38–40 (considering only "likelihood of success on the merits"). That ruling warrants en banc review as well because Appellants satisfied that factor and the others under *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981). *See* Fifth Circuit I.O.P. accompanying Fifth Circuit Rule 40.

## CONCLUSION

Appellants respectfully request that the en banc Court vacate the panel opinion, which conflicts with binding United States Supreme Court, Fifth Circuit, and Texas Supreme Court precedent, and set this case for the next available en banc sitting.

Appellants also request that this Court enter an injunction or administrative stay pending appeal to preserve the Court's jurisdiction and status quo of allowing Appellants to exercise their religion without governmental interference.

December 26, 2025

Respectfully submitted,

/s/ *John Greil*
John Greil
Steven T. Collis
LAW AND RELIGION CLINIC
UNIVERSITY OF TEXAS SCHOOL OF LAW
727 East Dean Keeton St.
Austin, Texas 78705
(512)-471-5151
john.greil@law.utexas.edu
Steve.collis@law.utexas.edu

*Counsel for Appellants*

Mark W. Rasmussen
Margaret I. Lyle
Timothy M. Villari
JONES DAY
2727 N. Harwood St.
Dallas, Texas 75201
214-220-3939
mrasmussen@jonesday.com
milyle@jonesday.com
tvillari@jonesday.com

*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I certify that on December 26, 2025, the foregoing Petition of Appellants was electronically filed with the United States Court of Appeals for the Fifth Circuit using the CM/ECF system, and that all parties required to be served have been served. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/* Timothy M. Villari
Timothy M. Villari
*Counsel for Appellants*

# CERTIFICATE OF COMPLIANCE

This Petition of Appellants complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 40(d)(3) because it contains 3,865 words, excluding parts exempted by Rule 32(f); and (2) the typeface and type style requirements of Rule 32(a)(5), (6), because it has been prepared in a proportionally spaced typeface (14-point Garamond) using Microsoft Word (the program used for the word count).

Dated: December 26, 2025

*/s/ Timothy M. Villari*
Timothy M. Villari
*Counsel for Appellants*

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 12, 2025

Lyle W. Cayce
Clerk

No. 23-50746

———————

Gary Perez; Matilde Torres,

*Plaintiffs—Appellants*,

*versus*

City of San Antonio,

*Defendant—Appellee.*

———————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:23-CV-977

———————————————————

Before Stewart, Richman, and Higginson, *Circuit Judges*.

Carl E. Stewart, *Circuit Judge*:

Treating the petition for rehearing en banc as a petition for panel rehearing (5TH CIR. R. 40 I.O.P.), the petition is GRANTED and *Perez v. City of San Antonio*, 150 F.4th 430 (5th Cir. 2025) is WITHDRAWN. The following opinion is substituted therefor.

This case returns to us after the Supreme Court of Texas accepted our certified question regarding the scope of the religious-service-protections provision of the Texas Constitution. In its opinion answering our question, it concluded that the provision does not extend to the government's

No. 23-50746

preservation and management of publicly owned lands. With the benefit of that guidance, and upon further consideration of the issues in this appeal, we once again AFFIRM the judgment of the district court and DENY Appellants' Emergency Motion for Injunction Pending Appeal.

## I. Factual and Procedural History[1]

Gary Perez and Matilde Torres (together "Appellants") sued the City of San Antonio (the "City") alleging that the City's development plan for Brackenridge Park (the "Park") prevented them from performing ceremonies necessary for their religious practice. Appellants sued the City under the First Amendment Free Exercise Clause, the Texas Religious Freedom Restoration Act ("TRFRA"), and the Texas Constitution and sought declaratory and injunctive relief to require the City to (1) grant them access to the area for religious worship, (2) minimize tree removal, and (3) allow cormorants to nest. Following a preliminary injunction hearing, the district court ordered the City to allow Appellants access to the area for religious ceremonies but declined to enjoin the City's planned tree removal and rookery management measures.

### A. The Lipan-Apache Native American Church

Appellants are members of the Lipan-Apache Native American Church ("Native American Church"). Perez serves as the principal chief and cultural preservation officer for the Pakahua/Coahuiltecan Peoples of Mexico and Texas and for the Indigenous Governors' office for the State of Coahuila, Mexico. Torres is a member of the Pakahua Peoples of Mexico and

---

[1] Although we provided much of the relevant factual and procedural background in our order certifying this question to the Supreme Court of Texas, *see Perez v. City of San Antonio*, 115 F.4th 422 (5th Cir. 2024), we do so again here to the extent necessary for ease of comprehension.

Texas. Perez has worshipped and led religious ceremonies in the Park for at least twenty-five years. Torres has worshipped and participated in religious ceremonies in the Park for at least ten years.

The district court determined that their religious beliefs are sincerely held. According to their complaint, Appellants believe that life in the region of San Antonio began at a spring called the Blue Hole. Specifically, a spirit in the form of a blue panther lived in the Blue Hole. And when a spirit in the form of a cormorant visited the Blue Hole, the blue panther scared the bird. As the bird fled, water droplets from its tail scattered across the San Antonio River Valley, including the Park, spurring life in the region. The San Antonio River flows through the northern portion of the Park. Appellants also believe that a riverbend, located within the Lambert Beach area of the Park, mirrors the celestial constellation Eridanus and bridges the physical and spiritual worlds. Appellants require certain religious ceremonies to be performed only at this riverbend located within the Lambert Beach area. Moreover, they proclaim that this space's capacity to function as a holy place relies on the presence of trees, birds, and other natural features, which are all part of its "spiritual ecology." Appellants also proclaim that certain religious ceremonies cannot be properly administered without specific trees present and cormorants nesting.

### B. Brackenridge Park, the Sacred Area and Project Area, and the Bond Project

The Park is a public park in the City, consisting of approximately 343 acres. The Park contains various features and attractions including paths, sports fields, the San Antonio Zoo, the Japanese Tea Garden, the Sunken Garden Theater, and the Witte Natural History Museum. The Park has also been inhabited and utilized by indigenous peoples for thousands of years. Appellants and other members of the Native American Church believe that a specific area within the Lambert Beach section of the Park is a sacred

location where they must gather to worship and conduct religious ceremonies. This area is also the site of the City's planned reformation efforts, which include repairing retaining walls along the San Antonio River. In this litigation, Appellants refer to this area as the "Sacred Area" and the City refers to it as the "Project Area." Appellants define the Sacred Area as the twenty-foot by thirty-foot area between two cypress trees on the southern riverbank of the Lambert Beach area. Within the Project Area, the City developed plans to repair the retaining walls along the San Antonio River, repair the historic Pump House, and construct a handicap-accessible ramp.

In May 2016, San Antonio citizens voted in favor of a $850 million bond package for public improvements. Proposition 3 of the bond package— dedicated to improvements related to parks, recreation, and open spaces— included $7,750,000 for improvements to the Park. The improvements planned for the Park, which are the subject of this suit, are collectively referred to as the "Bond Project." To design the Bond Project and determine the repair methodology to be utilized, the City commissioned the bond project design team, a team of various professionals, including architects, engineers, and historic preservation officials. The bond project design team recommended utilizing a cantilevered wall system to repair the retaining walls. To arrive at this recommendation, the team considered multiple factors including, but not limited to, tree density and location, topography, existing retaining wall stability and height, equipment accessibility, construction feasibility, legal compliance, and regulatory compliance. The City also determined that certain trees in the Project Area would (1) interfere with the construction, (2) be irreparably damaged by the construction, or (3) damage the repaired retaining walls and historical structures in the future. Thus, the City developed plans to (1) completely remove 46–48 trees, (2) relocate 20–21 trees to other areas of the Park, (3) preserve about 16 trees in place, and (4) plant at least 22 new trees in the Project Area. The City held

No. 23-50746

public meetings to receive community input regarding repairs of the original walls. Appellants, and other citizens, expressed concern with the removal and relocation of trees in the Project Area and a desire for the City to consider alternative plans that would preserve more trees in place.

Additionally, the City's plan for the Bond Project includes bird deterrent techniques[2] intended to dissuade migratory birds from nesting in the Lambert Beach area. Pursuant to the Migratory Bird Treaty Act,[3] the removal or relocation of trees planned for the Project Area cannot proceed if migratory birds, including cormorants, are nesting in the area. The City contracted with the U.S. Department of Agriculture ("USDA") and coordinated with the Texas Parks and Wildlife Department ("TPWD") and the U.S. Fish and Wildlife Service ("UFWS") to modify bird habitats and deter birds from nesting in highly urbanized areas of the Park, including the Project Area.

To complete the Bond Project, the City must comply with local, state, and federal regulations. Locally, with the San Antonio Development Services Department, the City applied for and received a variance from a City Unified Development Code ("UDC") provision that requires 80% significant tree

---

[2] The litigants and the district court use "rookery management," "anti-nesting" measures, and "bird deterrence" activities interchangeably. The rookery management program is the product of extensive consultation and engagement with technical advisors and wildlife management experts. To assist with the City's bird deterrence efforts, the Texas Parks and Wildlife Department ("TPWD") recommended habitat modifications (by removing old nests and dead wood to open the tree canopy) and other deterrent techniques to encourage the birds to relocate from the undesired location or to prevent establishment in the first place. Those techniques include pyrotechnics, clappers, spotlights, lasers, distress calls, effigies, balloons, explosives, and drones. Notably, these measures "do not harm the birds or keep them from reproducing." Moreover, these techniques are legal and in accordance with U.S. Fish and Wildlife Service ("UFWS") guidelines, as well as TPWD Code.

[3] 16 U.S.C. § 703 *et seq.*

preservation and 100% heritage tree preservation for projects within the 100-year floodplain. Moreover, state and federal regulations govern the preservation of the Lambert Beach retaining walls. As historic structures, the retaining walls contribute to the Park's designation as a City Historic Landmark and as a State Antiquities Landmark and its placement on the National Register of Historic Places. Because of this historic designation, construction is regulated by the Texas Historical Commission and the United States Army Corps of Engineers ("USACE"). The City must submit a final treatment plan and obtain a permit from USACE before repairing the retaining walls or removing or relocating trees within the Lambert Beach area. Once USACE approves the final treatment plan, a thirty-day comment period will begin to solicit feedback from stakeholders, including local indigenous tribes. Lastly, the Secretary of the Interior's Design guidelines, the Americans with Disabilities Act, and Occupational Safety and Health Administration regulations are all applicable to the bond project improvements.

From roughly February 2023 to November 2023, the City temporarily prevented Appellants, Native American Church members, and peyote pilgrims from entering the Lambert Beach area. Appellants filed the instant suit on August 9, 2023, alleging that the City's bird deterrence activities, temporary closure of the Project Area, and proposed removal or relocation of trees in the Project Area place a substantial burden on their religious beliefs in violation of the First Amendment of the U.S. Constitution, the Texas Constitution, and TRFRA. They sought a preliminary injunction, which itemized the relief requested as (1) access to the Sacred Area for religious services, (2) preservation of the spiritual ecology of the Sacred Area by minimizing tree removal, and (3) preservation of the spiritual ecology of the Sacred Area by allowing cormorants to nest. As to the preservation of the spiritual ecology, Appellants requested that the district court order the City

to "reevaluate the Bond Project to develop alternative plans that will accommodate [their] religious beliefs."

### C. The District Court's Decision

After holding a four-day preliminary injunction hearing, the district court adopted the parties' stipulated facts[4] and found that the City's plans did not burden Appellants' free exercise of religion. The district court concluded that Appellants held a sincere religious belief and had met their burden to prove the four elements for injunctive relief as to "access for religious services in the Sacred Area." It thus granted access for religious services involving fifteen to twenty people for approximately an hour on specified astronomical dates coinciding with Appellants' spiritual beliefs.[5] The district court also ordered the City to immediately remove the broken limb that the City maintained "pose[d] a risk of injury or death" in the Project Area. As to their request for "access for individual worship," the district court held that Appellants had waived this request but also noted that the balance of equities supported the conclusion that unplanned, unsupervised individual access was impractical. Following expert testimony, the district court found that the bird deterrent operation was in the realm of public health and safety. It also determined that the City had met its burden of proving "a compelling government interest for public health and safety, and the [balance of] equities favor the City on" Appellants' requested relief regarding minimizing tree removal and allowing cormorants to nest.

---

[4] To the extent any of the findings of fact constituted conclusions of law, the district court adopted and treated them as such.

[5] Torres testified at the injunction hearing that the average number of congregants participating in religious ceremonies or worship services has been between fifteen and twenty since 2020.

### D. *Appellants' Emergency Motion for Injunction Pending Appeal*

After the district court denied Appellants access for individual worship and declined to enjoin the City's planned tree removal and rookery management measures, Appellants filed with this court an Emergency Motion for Injunction Pending Appeal and to Expediate the Appeal (the "Emergency Motion"). In their Emergency Motion, Appellants contended that they satisfied the "irreparable harm" and "success on the merits" elements of a claim for an injunction because they have sufficiently proven a TRFRA violation and federal and Texas constitutional violations. *See Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018) (citation omitted). Appellants further argued that they satisfied the remaining requirements for obtaining an injunction pending appeal. The City opposed the motion.

We granted Appellants' motion to expedite the appeal and held oral argument in December 2023. We also issued a temporary administrative stay and ordered that Appellants' opposed motion for injunction pending appeal be carried with the case on October 27, 2023. On February 21, 2024 and January 30, 2025, at the City's request, we lifted the temporary administrative stay in part to allow the rookery bird deterrent management activities to proceed for the immediately proceeding months until migratory cormorants arrived. On June 24, 2025, after the Supreme Court of Texas answered our certified question, we granted the City's motion to lift the temporary administrative stay.

## II. Standard of Review

"We review a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law *de novo*." *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022) (citation omitted). To obtain the "extraordinary remedy" of a preliminary injunction,

the movant must show he is likely to prevail on the merits and also "demonstrate a substantial threat of irreparable injury if the injunction is not granted; the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and the injunction will not disserve the public interest." *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018) (citation omitted).

## III. DISCUSSION

Appellants have raised four claims for relief—(1) a TRFRA claim, (2) a First Amendment Free Exercise claim, (3) a claim under the freedom-to-worship provision of the Texas Constitution, and (4) a claim under the religious-service-protections provision of the Texas Constitution. Appellants argue that they are likely to succeed on the merits of each claim because the City previously barred them from worshipping in the Sacred Area, seeks to permanently prevent them from performing religious services by destroying the area's spiritual ecology, and has never attempted to accommodate their religious exercise. Notably, Appellants argue that the City cannot show that its tree-removal plan, rookery management measures, and fencing further a compelling governmental interest and are the least restrictive means of furthering that interest.

### A. Access

The City contends that Appellants' request for additional injunctive relief to restore their access to the Sacred Area for routine personal worship is moot. We agree. At the start of this suit, fencing prevented Appellants from physically accessing the Sacred Area for religious exercise. But, immediately following the injunction hearing, the district court held that Appellants were entitled to access the Sacred Area for ceremonies on two specific astronomical

dates, November 17 and December 21, 2023, as prescribed by the hearing.[6] To comply with the court order, the City was also ordered (1) to immediately remove the hazardous broken limb posing risks to visitors of the Sacred Area and (2) to ensure that the fencing was unlocked and accessible for Appellants on the designated dates and any additional proposed dates of religious ceremonies. Even more, as of early November 2023, the City had removed the fencing and broken limb ahead of Appellants' scheduled ceremonies.

Thus, Appellants no longer have any personal interest in challenging the City's once fenced-off closure of the Project Area because the City has since removed any fencing impeding their access. The mootness doctrine requires that "litigants retain a personal interest in a dispute at its inception and throughout the litigation." *Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 204 (5th Cir. 2010) (citation and internal quotation marks omitted). A claim is moot if it becomes "impossible for the court to grant any effectual relief whatever to a prevailing party." *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992) (citation and internal quotation marks omitted); *see Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 365 (5th Cir. 2003). When a claim becomes moot on appeal, as is the case here, the appeal must be dismissed. *Church of Scientology*, 506 U.S. at 12.

Still, Appellants urge this court to apply the voluntary cessation exception to mootness. The Supreme Court has held that a party's voluntary cessation of an unlawful action will not moot an opponent's challenge to that practice. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("[A] defendant cannot automatically moot a case simply by ending its unlawful conduct once

---

[6] Torres testified at the hearing that November 17 and December 21, 2023 were the forthcoming dates for which Appellants would need access for religious ceremonies.

sued. Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." (internal citation omitted)). Regardless, an exception to the mootness doctrine declares that "[v]oluntary cessation of challenged conduct moots a case, however, only if it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (per curiam) (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)). "The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *Concentrated Phosphate Export Ass'n*, 393 U.S. at 203).

While this appeal was pending, the City removed the dangerous limb that previously made the Sacred Area inaccessible. Moreover, the City affirmed that it undertook several additional efforts "going beyond what the district court ordered." The City conceded that removing the limb allowed it to reconfigure the construction fencing and it subsequently granted public access to the entire area. Likewise, the City granted Appellants access to conduct a religious ceremony at the Sacred Area from midnight to 4 a.m. on November 18, 2023, during hours when the Park is normally closed. Furthermore, on November 21, 2023, the City moved to dismiss its cross-appeal in this action, deciding to no longer pursue the issue of access to the Sacred Area. Based on these subsequent developments, "[i]t is therefore clear that [the City officials] harbor no animosity toward [Appellants]." *See Preiser v. Newkirk*, 422 U.S. 395, 402 (1975). Appellants now have "no reasonable expectation that the wrong challenged by [them] would be repeated." *See id.* Thus, the voluntary cessation exception does not apply. Hence, Appellants' access claims are moot.

No. 23-50746

### B. Tree-removal Plan and Rookery Management Measures

#### i. TRFRA

Turning to Appellants' claims pertaining to the City's tree-removal plan and rookery management measures, "we begin by analyzing [their] statutory claim under TRFRA, which, if successful, obviates the need to discuss the constitutional questions." *Merced v. Kasson*, 577 F.3d 578, 586 (5th Cir. 2009); *see, e.g.*, *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) ("It is a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case."). Appellants allege that the City prohibits and limits their religious exercise by irreparably destroying the very aspects of the Sacred Area that make it a living place of worship. For purposes of the Texas Constitution, the Supreme Court of Texas has not adopted *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990) and its declaration that generally applicable and facially neutral laws are not subject to strict scrutiny with regard to free exercise claims. *See Barr v. City of Sinton*, 295 S.W.3d 287, 296 (Tex. 2009) ("*Smith*'s construction of the Free Exercise Clause does not preclude a state from requiring strict scrutiny of infringements on religious freedom, either by statute or under the state constitution, and many states have done just that, Texas among them."). Thus, the challenged government action is subject to strict scrutiny.

To succeed on their TRFRA claim, Appellants must demonstrate that the City's actions burden their free exercise of religion and that the burden is substantial. If they manage that showing, the City can still prevail if it establishes that its actions further a compelling governmental interest and that the actions are the least restrictive means of furthering that interest. *Merced*, 577 F.3d at 588 (citing *Barr*, 295 S.W.3d at 296); *see also* Tex. Civ.

No. 23-50746

Prac. & Rem. Code § 110.003(a)–(b); *Barr*, 295 S.W.3d at 307
("Although TRFRA places the burden of proving a substantial burden on the
claimant, it places the burden of proving a compelling state interest on the
government."). Because the district court determined the existence of the
Appellants' sincere religious beliefs and the City does not dispute this
finding, our TRFRA analysis requires an assessment of whether the City's
development plans substantially burden their sincere religious practices.

    *a. Substantial Burden*

    Appellants did not sufficiently establish a substantial burden.
Appellants emphasize that if the City were permitted to proceed with its tree
removal and rookery management procedures, the measures would
irreversibly destroy the Sacred Area and their ability to practice their religion
there.[7] To bolster these contentions, they cite caselaw analyzing
governmental actions that involve complete bans or prohibition of religious
exercise. As is the case here, "[w]hen a restriction is not completely
prohibitive, Texas law still considers it substantial if 'alternatives for the
religious exercise are severely restricted.'" *A.A. ex rel. Betenbaugh v.
Needville Indep. Sch. Dist.*, 611 F.3d 248, 265 (5th Cir. 2010) (quoting *Barr*,
295 S.W.3d at 305). This court has held that according to *Barr*'s
prescriptions, "that means a burden imposing a less-than-complete ban is
nonetheless substantial if it curtails religious conduct and impacts religious
expression to a 'significant' and 'real' degree." *Needville*, 611 F.3d at 265.

    The City contends that "[w]hen analyzing whether a governmental
body's activities on its *own land* impose a substantial burden on a plaintiff's

---

[7] Notably, these proffered arguments are Appellants' pleas as to the irreparable harm factor
of the preliminary injunction inquiry. Because these assertions are as close to an argument
in support of the substantial burden element of the strict scrutiny inquiry for which the
briefing offers, we consider them here.

No. 23-50746

religious beliefs, courts agree that the activity does not impose a substantial burden where it affects only the subjective religious experience of the plaintiff." The City argues "that a government's use of its own land does not substantially burden religious beliefs if the conduct is not coercive and impacts the subjective religious experience only." The City is correct to pinpoint that the proposed construction is indeed occurring on its own land. Still, Appellants are not merely alleging subjective religious experiences here. Moreover, because we are analyzing Appellants' claims under TRFRA, not the Religious Freedom Restoration Act ("RFRA"), the correct standard for evaluating substantial burden is not "coercion" but whether the burden is "real" and "significant." *Compare Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1063 (9th Cir. 2008) ("Where, as here, there is no showing the government has coerced the Appellants to act contrary to their religious beliefs under the threat of sanctions, or conditioned a governmental benefit upon conduct that would violate the Appellants' religious beliefs, there is no 'substantial burden' on the exercise of their religion.") and *Lyng v. N.W. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988) ("It is true that this Court has repeatedly held that indirect coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to scrutiny under the First Amendment."), *with Barr*, 295 S.W.3d at 301 ("Thus defined, 'substantial' has two basic components: real vs. merely perceived, and significant vs. trivial.").

In analyzing Appellants' contention that the destruction of the tree canopies, where cormorants nest, and the driving away of the cormorants themselves will burden their religions, we consider whether they have met their burden of establishing a likelihood of success on their argument that the presupposed burden is real and significant. Under TRFRA, a burden is substantial if it is "real vs. merely perceived, and significant vs. trivial"—two limitations that "leave a broad range of things covered." *Barr*, 295 S.W.3d at

301. The focus of the inquiry is on "the degree to which a person's religious conduct is curtailed and the resulting impact on his religious expression," as "measured . . . from the person's perspective, not from the government's." *Id*. This inquiry is "case-by-case" and "fact-specific" and must consider "individual circumstances." *Merced*, 577 F.3d at 588; *Barr*, 295 S.W.3d at 302, 308. "Federal case law interpreting RFRA and [the Religious Land Use And Institutionalized Persons Act ("RLUIPA")] is relevant." *Merced*, 577 F.3d at 588 (citing *Barr*, 295 S.W.3d at 296).

While Appellants argue that the City's plan would destroy or alter natural resources of religious importance, they plainly failed to establish a likelihood of success on their position that the burden is real and significant under this circuit's case law. Indeed, Appellants did not even address this issue in their principal brief because they incorrectly assumed that the City would agree that its plans substantially burden their religious exercise.[8] Moreover, the record does not support Appellants' argument that the plan constitutes a substantial burden on their religious exercise. *See Barr*, 295 S.W.3d at 301. Appellants continue to have virtually unlimited access to the Park for religious and cultural purposes. And as the record reflects, regardless of the rookery management program, no cormorants, due to their migration patterns, inhabit the area for extended periods of time each year.[9] Further, cormorants are not specifically targeted nor dissuaded from nesting nearby or elsewhere in the 343-acre Park.

---

[8] Appellants assumed that the City "does not dispute that the current fencing, the tree-removal plan, and the anti-nesting measures all substantially burden [Appellants]' religious exercise." In retort, the City explained that it "absolutely disputes that the project substantially burdens [Appellants]' free exercise of religion."

[9] *See infra* Section III.B.i.c (mentioning the double-crested cormorants' typical migration patterns to the City).

No. 23-50746

Mindful of the preliminary posture of this expedited appeal, we conclude that though the City's development plan may affect the nesting of cormorants within two acres of the 343-acre Park, Appellants did not meet their burden to show that they are likely to succeed on their claim that the plan constitutes a substantial burden of their religious exercise. Even if they did, that would not change the outcome of this appeal because the City's plan advances a compelling interest through the least restrictive means—and thus survives strict scrutiny. *See Merced*, 577 F.3d at 588 (citing *Barr*, 295 S.W.3d at 296).

### b. Compelling Interest

The City argues that it has a compelling governmental interest in repairing the crumbling retaining walls on the northern bank of the riverbend, and that tree removal and relocation is an integral part of that plan. It further contends that the bird deterrence activities are necessary to protect the health and safety of citizens who visit the Park. The City avers that the purpose of the rookery management program is twofold: (1) to mitigate the health and safety hazards arising from the bird guano[10] that dense bird colonies produce and (2) to ensure no migratory birds are nesting in trees within the Project Area such that work can begin under the Migratory Bird Treaty Act and the bond project improvements can proceed without delay.

In response to the City's public safety arguments, Appellants maintain that "the undisputed evidence is that the retaining walls in the Sacred Area [on the southern bank] do not need repair." Further, they aver that the City must prove that its "tree removal design is necessary in the context of these Appellants' religious practice" pursuant to TRFRA. *Barr*, 295 S.W.3d at 307. Likewise, Appellants contend that the City's rookery

---

[10] Guano is the accumulated excrement of birds.

management plan fails strict scrutiny. They argue that preventing a pause in construction is not a compelling governmental interest. They contend that the City's cursory assertions—such as its asserted interest in making the Project Area safe for visitors in the Park—and other "public safety" arguments are "the kinds of statements that the Texas Supreme Court has held insufficient to establish a compelling governmental interest."[11] We disagree.

In *Barr*, the Supreme Court of Texas determined that "the trial court's brief finding—that '[t]he ordinance was in furtherance of a compelling government interest'—[fell] short of the required scrutiny." *Barr*, 295 S.W.3d at 307–08. Dissimilarly, the district court here, after holding a four-day preliminary injunction hearing, published three separate orders evaluating the City's interests—(1) the October 2, 2023 "Partial Order," (2) the October 11, 2023 "Memorandum Opinion and Order," and (3) the October 25, 2023 Order. Moreover, contrary to the instant case, the *Barr* court seemed to also admonish the city council from merely reciting a published section of the challenged ordinance when asserting that the law "serves a compelling interest in advancing safety, preventing nuisance, and protecting children." *Barr*, 295 S.W.3d at 306–07. Specifically, the code there read that the "City Council finds the requirements of this section are reasonably necessary to preserve the public safety, morals, and general welfare." *Id*. at 291. Rather, the *Barr* court directed that "[c]ourts and litigants must focus on real and serious burdens [], and not assume that [] codes inherently serve a compelling interest, or that every incremental gain

---

[11] *See Barr*, 295 S.W.3d at 306 (reasoning that "[the City Council's recitation that the Ordinance's requirements] 'are reasonably necessary to preserve the public safety' . . . is the kind of 'broadly formulated interest[]' that does not satisfy the scrutiny mandated by TRFRA").

No. 23-50746

to city revenue (in commercial zones), or incremental reduction of traffic (in residential zones), is compelling." *Id*. at 306.

Here, the district court complied with *Barr*'s directive. It did not assume that the City's bond project improvements inherently served a compelling interest. Rather, it conducted an injunction hearing over several days in which litigants interrogated the interests served by the Bond Project. In its Memorandum Opinion and Order, the district court determined that "[w]ith reference to [tree removal rookery management measures] of [Appellants]' requested relief, the court finds the City has met its burden of proving a compelling government interest for public health and safety[.]"

The City advanced specific public health and safety considerations, which the district court acknowledged and adopted, including that (1) removing dead and dying trees prevents them from falling and injuring visitors to the Park; (2) removing or relocating some trees is necessary because of the likelihood of their future failure; and (3) failing retaining walls pose a substantial risk to safety. The goal of repairing walls and removing trees, which pose dangers to visitors in a public park, is a compelling interest. As it relates to the bird excrement, the City raised well-founded concerns that large populations of migratory birds in highly urbanized areas of the Park have an adverse impact on the water quality in the San Antonio River and contribute to unsanitary conditions in the Park, which can pose a risk of disease to humans and animals. Moreover, the record provides vivid, descriptive, photographic details pertaining to the quantity of excrement and the dangers associated with human contact with the excrement.

The record indicates that various areas of the Park "become nearly unusable for 10 months of the year due to the bird density/habitat." The resulting feces causes damage to various park amenities, including picnic tables, water fountains, playground equipment, restrooms, and

No. 23-50746

sidewalks. The record provides a variety of pictures illustrating the volume of excrement affecting these facilities. The record also indicates that the excrement could harm humans and other wildlife. The 2022 Draft Rookery Management Plan noted: "When rookeries establish near playgrounds, infrastructure, or other recreational areas, the risk of zoonotic disease transmission (i.e., histoplasmosis, psittacosis, and salmonellosis) increases substantially." The Draft Rookery Management Plan further observed that "the magnitude of fecal contamination, high likelihood of human contact with fecal matter, and limited ability to perform effective environmental decontamination make rookery management crucial to disease risk mitigation in urban areas."

Moreover, breathing problems can occur from avian diseases linked to the uric acid produced by bird feces. The high concentrations of bird fecal matter also affect the Park's water quality. The City measured elevated levels of Escherichia coli ("E. coli") and other substances harmful to human health due to fecal bacteria from the birds. The San Antonio River Authority conducted bacterial source tracking throughout the Park and determined that the largest contributors to E. coli contamination is "non-avian and avian wildlife." Those two classifications make up around 50-60% of the total E. coli in the water.

The record also includes the expert opinions of Dr. J. Hunter Reed, a state wildlife veterinarian and health specialist, and Jessica Alderson, an urban wildlife biologist. Alderson[12] provided technical guidance to the City related to the egret and heron rookery located at the Park and provided recommendations on how to deter these birds from "an undesired location

---

[12] Alderson is the urban wildlife technical guidance program leader for TPWD. Her background and knowledge are in wildlife and natural resource management.

No. 23-50746

[i.e., areas that are high use to the public, such as playgrounds or picnic tables, or where there's lots of human activity and potential encounters with wildlife and humans] and encourage them to go to an area where they would be more desirable." And, in providing technical guidance to the City about its rookery management efforts, Alderson testified that she also relied on "a letter from [the TPWD] state wildlife biologist, Dr. Hunter Reed" as to the "public health and safety regarding the rookery and the birds being in a highly used area of the Park."

Dr. Reed expressed significant public health concerns for citizens enjoying the Park. He warned that "[w]hen large rookeries are established in the immediate vicinity of playgrounds, infrastructure, and recreational hardscapes, the risk of zoonotic disease transmission . . . increases substantially." He continued that "[t]he sheer magnitude of fecal contamination, high likelihood of human contact with fecal matter, and limited ability to perform effective environmental decontamination make rookery management action paramount to disease risk mitigation." He maintained that "well-coordinated and human response to manage the rookery . . . will support the persistence of nesting birds." Accordingly, mitigating these dangers, posed by amassed bird guano in highly urbanized areas of the Park, is a compelling interest. Likewise, because repairing the retaining walls is a compelling interest—which the litigants agree requires the relocation or removal of even *one*, *single* tree—then it logically follows that complying with the demands of the Migratory Bird Treaty Act—which prohibits interference with or disturbance of nests already present in trees—is equally a compelling interest.

### c. Least Restrictive Means

On appeal, Appellants repeatedly argue that, according to *Fulton v. City of Philadelphia*, the City must accommodate their religious exercise in

crafting the bird deterrence measures and tree-removal plans. 593 U.S. 522 (2021). They plainly state that "[the City's] intolerant view is forbidden under the Supreme Court's command that, if [the] government can *accommodate* religious exercise, it must." But recall that the *Fulton* Court did not declare that "if [the] government can *accommodate*, it must"—rather it stated that "so long as the government can *achieve its interests in a manner that does not burden religion*, it must do so." This is simply a rewording of the strict scrutiny standard, not a command to commence all or even any of the proposed measures. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993) (holding that to survive strict scrutiny, a challenged action must be "justified by a compelling governmental interest and . . . narrowly tailored to advance that interest"); *McCullen v. Coakley*, 573 U.S. 464, 493–94 (2014) ("The point is not that [the state] must enact all or even any of the proposed measures discussed[.] The point is instead that the [state] has available to it a variety of approaches that appear capable of serving its interests, without excluding individuals [exercising their First Amendment rights]."). In *Fulton*, the Court's full quote reads as follows: "A government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests . . . Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541. Thus, the *Fulton* Court proclaimed that a government action subject to strict scrutiny must achieve its interests in a narrowly tailored manner that would not burden religion. We continue this analysis here.

At the injunction hearing and on appeal, Appellants rely heavily on the City's answer to their complaint to bolster their argument that "the City never commissioned a study that aims to achieve its governmental purposes while accommodating [our] religious exercise." This contention requires us to unpack Appellants' complaint and the City's answer. In their complaint,

No. 23-50746

Appellants alleged that "the City has refused to commission a design firm tasked with creating a plan that would preserve the walls and the double-crested cormorant's presence and habitat." Using the Appellants' proffered language as articulated in their complaint,[13] the City (1) admitted that it did not commission the studies as characterized by Appellants and (2) denied that any such studies were needed. In its answer, the City declared that:

> The City denies [the Complaint's allegations], including without limitation the following: (a) [Appellants'] characterization or summary of the "study" to determine the impact of the Bond Project on [Appellants'] religious beliefs; (b) that the City was required to "commission a design firm" to "creat[e] a plan to preserve the walls and the double-crested cormorant's presence and habitat"; and (c) that the Bond Project, as proposed, does not sufficiently address tree preservation, wildlife protection, and safe access to the Park.

And, while the City admitted that it did not commission the studies as described by the Appellants, it averred that "the City did, however, study viable alternatives to design the Bond Project to achieve the governmental goals of public health and safety with the least adverse impact." When questioned about the City's answer to the complaint, Shanon Miller[14] testified that "the City did look at viable alternatives." She further clarified that "the City received feedback from many stakeholders, and considered all of it. It wasn't just one particular interest or stakeholder interest that was

---

[13] Paragraph 59 of Appellants' complaint alleges that "the City has never commissioned a study to determine if the Bond Project could be completed if the priority was ensuring the double-crested cormorant could inhabit the Park afterwards." Paragraph 59 continues that "the City has never commissioned a study that aims to achieve its governmental purposes while accommodating [Appellants'] religious exercise."

[14] Miller is the director of the Office of Historic Preservation and the City's historic preservation officer.

examined." According to Miller, considering the many interests and stakeholders prompted the City to "change[] the project as a result."

This is a far cry from an overt admission by the City that "it has not considered—and it refuses to consider—[Appellants'] religious exercise" as Appellants allege. Rather, the City's answer declares that "[t]he City denies that it has not attempted 'to accommodate [Appellants'] constitutional and statutory religious freedom rights' . . . [and] also denies that it 'is willing to adjust its plans under its favored causes . . . but not to protect the rights of its citizens.'" The City's answer continues that "[t]he City admits that [Appellants] requested access to Lambert Beach to perform a religious ceremony on August 12, 2023 . . . [and] the City offered various reasonable accommodations that balanced the [Appellants'] asserted religious interest with the governmental goal of public safety (including the safety of [Appellants] and any other participants in the ceremony), but the [Appellants] declined those accommodations."

The record does not support Appellants' allegations that the City has refused to try to accommodate their religious exercise. Rather, the record illustrates that many entities were involved in approving the bond project improvements, and at various stages in the public comment and meeting process, stakeholder interests were considered and incorporated in the development plan's design. Moreover, Appellants participated in many private and public meetings with the City's employees related to the Bond Project.[15]

---

[15] Namely, Perez spoke and gave a presentation to the Parks and Recreation Department on July 29, 2022. Perez was invited by the Brackenridge Park Conservancy to give a presentation about concerns with the Bond Project at its January 10, 2023 meeting.

No. 23-50746

Relevant here, the City's Public Works Department operates as the project manager for bond projects and facilitates with the Bond Project owner, Homer Garcia III.[16] In 2022, the Public Works Department applied for a certificate of appropriateness, related to tree removal, with the Office of Historic Preservation ("OHP").[17] The Historic and Design Review Commission ("HDRC"), whose volunteer members are appointed by the mayor and each councilmember to represent their district, is the recommending body responsible for design review cases. HDRC officials dedicate a significant amount of time to their volunteer roles as commissioners, including attending public hearings, site visits, and committee meetings. After reviewing applications, HDRC makes recommendations to OHP, and Miller, in his capacity as historic preservation officer and director of OHP, issues the final decision on the certificates of appropriateness. In February 2022, HDRC held its first hearing concerning the Bond Project. However, HDRC tabled its approval of the Public Works Department's application because it required additional information. Hence, the bond project design team circled back to gather additional public input at public meetings from March 2022 through summer 2022. A number of City councilmembers, commissions, and departments were involved in the public meetings, including the Public Works Department, the Parks and Recreation Department, the Development Services Department,[18] the City manager's

---

[16] Garcia is the City's Parks and Recreation director.

[17] OHP staff members help applicants (i.e., the Public Works Department) assemble application materials to provide to the Historic and Design Review Commission ("HDRC"). OHP staff members also prepare staff recommendations to accompany the applications submitted to HDRC. In the instant case, the application was prepared by the bond project design team and the OHP staff recommendation was prepared by OHP staff member, Cory Edwards.

[18] The Development Services Department reviews applications for permitting and arboreal standards.

office, the City attorney's office, the Planning Commission,[19] OHP, and HDRC. After conducting the 2022 public meetings, the bond project design team returned to its application for a certificate of appropriateness in 2023, specifically taking into account the public input related to the bond project design, which pertains to the Project Area. Miller testified that the additional information "made it easier for the commissioners and the public to understand the tree removal request and the context of the larger design."

To approve the Bond Project, the Planning Commission first approved the variance that the Public Works Department requested from the City UDC. Next, after receiving the updated Bond Project application in 2023, HDRC convened a hearing on April 19, 2023 and unanimously recommended to approve the application with three stipulations.[20] Then, on April 27, 2023, the OHP issued the certificate of appropriateness consistent with the HDRC recommendation to move forward with improvements to the Lambert Beach area in the Park. At each level of the application process—the Planning Commission approval, HDRC recommendation, and the OHP issuance of the certificate—public meetings were held to solicit comments in opposition or in favor of the project. Appellants acknowledge that they testified at the March 3, 2023 Texas Historical Commission meeting, the April 19, 2023 HDRC hearing, and the August 3, 2023 City Council hearing.

---

[19] The Planning Commission, whose volunteer members are appointed by the mayor and each councilmember to represent their district, approved the variance the Public Works Department requested from the City UDC provision that requires 80% significant tree preservation and 100% heritage tree preservation for projects within the 100-year floodplain.

[20] The stipulations were that (1) work would not occur until approvals were complete pursuant to Section 106 of the National Historic Preservation Act, 54 U.S.C. § 300101 *et seq.*, (2) any additional tree removals would return to HDRC for approval, consistent with the UDC, and (3) the City would monitor and maintain the heritage and significant trees during and after construction.

No. 23-50746

The City took these public comments, including Appellants', under consideration, evaluated whether more trees could be preserved in place in the Project Area, and revised its plan for the work in the Project Area. Critically, Miller testified that the City decided to change the original design so as to preserve or relocate more trees as a result of the public debate and meetings. The original design would have removed 70 trees in the Project Area, and that number has been reduced to 48 trees, with 21 of those trees being relocated, as a result of the public input process.

The City contends that it cannot accomplish its compelling governmental interest in making the Project Area safe for visitors, preserving historic structures, and making Park amenities accessible and available to the public by any less restrictive means than the bird deterrence program and the removal and relocation of the designated trees in the Project Area. Foremost, the City maintains that it analyzed engineering options and selected the method to repair the retaining walls that it determined would save the greatest number of large trees. From an engineering standpoint, the City contends that the pier-and-spandrel method,[21] submitted by Appellants, did not entail a "markedly reduced amount of excavation required"—a necessary condition in order to save additional trees. Moreover, the City argues that the bird deterrence activities are limited in scope as they do not harm or prevent birds, including the double-crested cormorants, from entering the Park or the Project Area. Since the implementation of the bird deterrence measures, the City avers that double-crested cormorants have been observed in the Park, including in the Project Area.

---

[21] The pier-and-spandrel method requires piers to be drilled approximately 15 to 20 feet into the ground directly behind an existing retaining wall and pins to be drilled from the outside of the existing retaining walls (i.e., from the river) into the piers.

No. 23-50746

Appellants contend that "the City [] has an insurmountable narrow-tailoring problem: Its witnesses candidly testified that the City selected the cantilever plan requiring tree removal 'without any consideration' of [their] religious exercise." Citing *Fulton*, they maintain that the City must pursue "viable, less-restrictive alternatives [to repair the retaining walls] that would save more trees" because "so long as the government can achieve its interests in a manner that does not burden religion, it must do so." Appellants also argue that "the City runs into a similar narrow-tailoring problem," in regard to the rookery management program, because there are a "number of [alternative] less-restrictive means that the City easily could have considered." They argue that rookery management measures are not narrowly tailored because the City has not tried to accommodate Appellants' religious exercise in crafting the bird deterrence plan. They pinpoint that the City proffered no testimony addressing narrowly tailored alternatives to the planned bird deterrence measures. We disagree.

The City has demonstrated that it "seriously undertook [consideration] to address the problem with less intrusive tools readily available to it" and "that it considered different methods that other jurisdictions have found effective." *See McCullen*, 573 U.S. at 494. The City commissioned a team of various professionals, which ultimately decided on the cantilevered design after considering the proposed pier-and-spandrel method and analyzing its potential efficacy to save more trees. At the injunction hearing, the City articulated that, during the course of the bond project design, City personnel, engineers, and arborists, met to examine "the alternatives and to figure out whether or not what was being proposed was the best solution moving forward, [and] that [it was] saving as many trees as possible."

Miller and Bill Pennell[22] both testified that they met with the Tree Assessment Committee[23] in March 2023 in anticipation of the HDRC approval process. Specifically, Miller testified that City personnel, including herself and Garcia, "were asked to really look at the alternatives and to figure out whether or not what was being proposed was the best solution moving forward, that we were saving as many trees as possible." As a result, Jamaal Moreno,[24] Ross Hosea,[25] Shawn Franke,[26] three independent arborists, who were involved in the Tree Assessment Committee, Moises Cruz,[27] Pennell, and Miller examined alternatives. Cruz had recommended the pier-and-spandrel design, and the meetings' attendees discussed the design in great detail—including how it works, how it would be installed, and how it differs from alternative designs. Miller testified that the team discussed "with the arborists and with our design engineer that afternoon" whether using the pier-and-spandrel method would allow for additional trees to be saved. Following the meeting, City personnel accompanied Cruz to the Project Area "to talk specifically about specific trees." Still, according to Miller, "[t]he consensus in the meeting with the arborists was that no additional trees

---

[22] Pennell is the City's assistant capital programs manager, overseeing the project management of trail projects managed by the San Antonio River Authority and the City's Public Works Department.

[23] The Tree Assessment Committee was tasked with evaluating trees scheduled for removal in the Park and prepared a tree assessment report, authored on May 16, 2022, for the City. The committee comprised of certified volunteer arborists, David Vaughan, Michael Nentwich, Mark Kroeze, and Mark Duff.

[24] Moreno is the project manager of the City's bond project design team and a licensed Texas landscape architect.

[25] Hosea is the City's forester in the Parks and Recreation Department.

[26] Franke is the structural engineer who designed and provided engineering support for the bond project design team.

[27] Cruz is a volunteer engineer.

would be saved because they would still be impacted by the construction, regardless of the methodology." The City maintains, and presented evidence at the hearing, that in evaluating the alternative engineering methods it sufficiently balanced engineering challenges and safety considerations.

Although Appellants would prefer that the City consider either repairing the retaining walls in place or using a pier-and-spandrel system, the City's tree removal plan is narrowly tailored to achieve the City's compelling governmental interest of making the Project Area safe for visitors to the Park, including Appellants. Moreno testified that the City's informed position is that it cannot save any additional trees in the Project Area under the current engineering design plan, and alternatively, if the City were to choose an alternate design (i.e., the pier-and-spandrel method) no additional trees would be saved compared to what the City is able to achieve as presently designed. The record shows that the City considered, but ultimately rejected, the pier-and-spandrel system in part because it (1) required drilling through the face of the historic walls, in violation of applicable standards promulgated by the Secretary of the Interior, (2) would not allow for the preservation of significantly more trees, and (3) would cost two to three times as much as the cantilevered wall solution, exceeding the budget for the Bond Project. The record also shows that the City even considered moving the walls further into the River to distance them from the trees, but that solution was rejected because it would have required a floodplain mitigation project.

As it relates to the City's bird deterrence measures, Appellants primarily rely on *Merced* to argue that the City has not pursued the least restrictive means. Notably, the *Merced* panel acknowledged that:

> [The plaintiff] propose[d] no fewer than three less restrictive alternatives to [the City's scheme] . . . [And the City did] not rebut any of [the plaintiff's] alternatives; it [did] not even try. Thus . . . we hold that the [City's] ordinances that burden [the

No. 23-50746

plaintiff's] religious free exercise are not the least restrictive means of advancing the city's interests.

*Merced*, 577 F.3d at 595. So, too, Appellants here attempt to enumerate a list of *possibly* less restrictive alternatives to the City's current scheme. Appellants outline several alternatives that the City could have pursued or investigated instead of its presently planned bird deterrence measures such as (1) conducting rookery management measures that exclude cormorants; (2) completing construction within the four-month period between mid- to late-October and February when no migratory birds are present; (3) starting construction within that same four-month period, pausing while migratory birds nest, and resuming when the migratory birds leave; (4) completing construction within the six-month period between mid- to late-October and March or April before the cormorants begin to arrive;[28] or (5) conducting rookery management measures and completing the construction within the eight-month period between mid- to late-October and June, when cormorants may still arrive and nest. However, the proposed means must not only be conceivable but must be (1) in the context of the compelling governmental interest and (2) be the least restrictive of the proffered choices to achieve that governmental interest. *See* Tex. Civ. Prac. & Rem. Code § 110.003(a)–(b).

Here, the City successfully rebuts each of Appellants' proposed alternatives. *See Merced*, 577 F.3d at 595. The record indicates that no other means exists to deploy deterrent efforts aimed only at egrets and herons but not cormorants. As discussed, Alderson provided technical guidance to the City related to the egret and heron rookery located at the Park and offered recommendations on how to deter birds from "an undesired location and

---

[28] Alderson testified that double-crested cormorants typically arrive to San Antonio around April and May "or oftentimes later into the season."

No. 23-50746

encourage them to go to an area where they would be more desirable." She testified that, in her experience as an urban wildlife biologist and working with urban rookeries, there is no way (1) to sequence deterrence efforts to deter egrets and herons from nesting in a site but not deter double-crested cormorants or (2) to utilize noise deterrents that would deter egrets and herons but not cormorants. Essentially based on her experience and expertise, she testified that she is not aware of any kind of deterrent measure that would work on egrets and herons but not disturb cormorants because "the deterrent techniques are going to impact other species than the ones that you're specifically targeting." She testified that the difficulty lies in these species being colonial nesting birds.[29]

In evaluating the relative restrictiveness of the bird deterrence plans, the record shows that the City's activities are the least restrictive means to advance the compelling governmental interests presented. Limited by the predictability of migration and habitat patterns of colonial nesting birds, start and stoppage periods of construction at four-month, six-month, or eight-month intervals, as suggested by Appellants, would not achieve the compelling goals of adhering to the Migratory Bird Treaty Act. Moreover, they certainly would not achieve the goal of mitigating bird excrement. Alderson maintained that she "bas[ed] [her] technical guidance [related to bird deterrence] on the biology behind everything." Since the deterrent methods are targeted at nesting and not a species, at times birds of any species can—despite the deterrent efforts and unbeknownst to the program managers—enter the deterrence area and nest. Once any species nests, the program administrators must stop work in that area and notify the respective regulatory agencies. Once deterrent efforts have been halted, this invites all

---

[29] A colonial nesting bird is a bird that nests in large colonies or with large numbers of birds in a given area as a way of protecting their young and their resources.

No. 23-50746

different migratory birds to enter and nest in the area. As such, the district court posited, and we agree that the record shows that there could not be an eight-month window of opportunity to accomplish the bond project improvements. Even more, given this credible testimony regarding the different species' migration patterns and coverage of the Migratory Bird Treaty Act, Appellants' arguments that the bond project improvements could have been completed during various periods when migratory birds are not present do not sufficiently refute that the City's bird deterrence satisfies the least restrictive means to advance its compelling governmental interests.

Similarly, Pennell testified that based on his knowledge of the area and the birds' migratory patterns, the double-crested cormorants arrive around the same time, or within the same period, as the cattle egrets and snow egrets. Thus, he too confirmed there is not a way to time the bird deterrence activities so that only double-crested cormorants can nest in the deterrent zone but not allow egrets and herons to nest there. Additionally, Pennell confirmed that no separate or additional study needed to be commissioned to answer the question of whether it is possible to utilize deterrent methods that are effective *only* against egrets and herons but do not disturb cormorants. Furthermore, he confirmed that no additional or separate study needed to be commissioned to understand the migratory and habitat patterns of these birds. These conditions have been uniformly observed and widely accepted.

Likewise, the record shows that the City applies deterrence efforts only to the extent required to achieve the goal of relocating the targeted species—and no further. As the City avers, "[the] bird deterrence policy does not prohibit migratory birds from visiting, roosting, or foraging in the Project Area," and the deterrent activities are deployed only within the two-acre Project Area and only to persuade the birds to nest elsewhere.

No. 23-50746

As it relates to the bird excrement, the record provides information pertaining to the remedial measures the City has previously instituted in the Park to curtail human exposure. The record indicates that the City has implemented various bird deterrent techniques to prevent mass congregation of birds and limit the accumulation of the excrement. At times, the City has closed the playground areas and restricted access to other facilities due to the excrement. Other times, these amenities are simply "removed." Still, Pennell noted that the Park's ability to clean the amenities depends on the material that the excrement is on. For example, fecal matter can absorb into plastic and "eat away" at metal paint. As such, the record shows that the rookery management program is the least restrictive means to advance the City's interest in mitigating the hazardous effects of bird guano to make the Park safe for visitors. Throughout the record, Pennell reiterates the City's stance: bird mitigation is important for the safety of park-goers. In his opinion, the bird deterrence policies have been effective to reduce and more effectively manage the migratory bird rookeries in the Park.

The record establishes that the studies requested by Appellants were not needed to ascertain the least restrictive means. Moreover, the record shows that the City considered viable alternatives and "different methods that other jurisdictions have found effective" before ultimately deciding on the "less intrusive tools readily available to it." *McCullen*, 573 U.S. at 494. Consequently, the City's tree removal and bird deterrence plans—which deter only to the extent required to dissuade the targeted species from nesting and remove minimal trees necessary to excavate—are the least restrictive means.

As the dissent notes, the voluminous record in this case also contains a few statements from City officials asserting that (1) the City could have sought an exemption from federal guidelines as to the retaining walls; (2) the City's engineering design "was chosen without any consideration of

No. 23-50746

[Appellants'] free exercise request" for financial reasons; and (3) "the City never actually investigated whether it could alter the timing of its bird deterrence specifically to accommodate [Appellants'] religious exercise." But those select statements pale in comparison to the wealth of evidence outlined above demonstrating that the City considered and ultimately pursued the least burdensome method of achieving its development plans. Indeed, each of the statements highlighted in the dissent were considered by the district court in its four-day preliminary injunction hearing. The district court ultimately concluded, as we do here, that the weight of the evidence supports a holding that the City's development plans are the least restrictive means of furthering its compelling government interests. Further, in this preliminary posture, our review of the facts ascertained below is for clear error. *Scott*, 28 F.4th at 671. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) (citation omitted). We cannot say, on the record before us, that the district court clearly erred.

In short, even if the City's tree removal plan and rookery management plans substantially burden Appellants' religion, they appear to be the least restrictive means to advance the City's compelling governmental interests. Thus, Appellants failed to establish a likelihood of success on their argument that the City's plans violate TRFRA.

### *ii. First Amendment Free Exercise*

The parties' dispute under the Free Exercise Clause centers on which standard of constitutional review applies to the instant case, rational basis or strict scrutiny. Appellants argue that the City's plans for tree removal and rookery management measures are not neutral and generally applicable and, therefore, must be analyzed under the more exacting strict scrutiny standard.

No. 23-50746

The City contends that its planned Park improvements are neutral and generally applicable and that the more deferential rational basis standard of review applies. Assuming strict scrutiny applies, we conclude that the challenged government action in this case withstands Appellants' Free Exercise challenge, as illustrated *infra* in the TRFRA claim analysis.

The Free Exercise Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The Free Exercise Clause has been applied to the States through the Fourteenth Amendment. *Lukumi*, 508 U.S. at 531. Although the freedom to believe is absolute, the freedom to act on one's religious beliefs "remains subject to regulation for the protection of society." *Cantwell v. Connecticut*, 310 U.S. 296, 304 (1940). Under strict scrutiny review, a challenged government action will be deemed invalid unless it is (1) justified by a compelling governmental interest[30] and (2) is narrowly tailored to advance that interest. *Lukumi*, 508 U.S. at 533. "[N]arrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest[.]" *Tandon v. Newsom*, 593 U.S. 61, 63 (2021) (per curiam). The government must also demonstrate that it "seriously

---

[30] In this context, when considering whether the City has stated a compelling interest, we do not assess whether its development plan generally furthers a compelling governmental interest in safety or public health. Instead, the City must show that "the compelling[-]interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt v. Hobbs*, 574 U.S. 352, 363 (2015) (quoting *Burwell v. Hobby Lobby Stores*, Inc., 573 U.S. 682, 726 (2014)). This requires "scrutiniz[ing] the asserted harm of granting specific exemptions to particular religious claimants" and "'look [ing] to the marginal interest in enforcing' the challenged government action in that particular context." *Id.* (quoting *Hobby Lobby*, 573 U.S. at 726–27). Applied in this case, we consider compelling the City's interests in rookery management and tree removal over the specific objections of Appellants.

No. 23-50746

undertook [consideration] to address the problem with less intrusive tools readily available to it" and "that it considered different methods that other jurisdictions have found effective." *McCullen*, 573 U.S. at 494.

As discussed, the City has provided ample support demonstrating that it has compelling interests for its adoption of the tree-removal and bird deterrence plans and that it has pursued the least burdensome method of achieving its goals. Thus, Appellants have failed to establish a likelihood of success on the merits of their Free Exercise claim.

### iii. Texas freedom-to-worship provision

Appellants also argue that the City's plan violates their freedom of worship under the Texas Constitution.[31] But because Appellants incorporate by reference their arguments on the Free Exercise and TRFRA claims, they similarly fail to establish a likelihood of success on the merits of their claims under Article I, § 6 of the Texas Constitution.

### iv. Texas religious-service-protections provision

Appellants initially asserted that the City's development plan violates the religious-service-protections provision of the Texas Constitution. Under that provision the state of Texas:

> may not enact, adopt, or issue a statute, order, proclamation, decision, or rule that prohibits or limits religious services, including religious services conducted in churches, congregations, and places of worship . . . by a religious

---

[31] The Freedom of Worship provision of the Texas Constitution states that "[n]o human authority ought . . . to control or interfere with the rights of conscience in matters of religion, and no preference shall ever be given by law to any religious society or mode of worship." Tex. Const. art. I, § 6.

organization established to support and serve the propagation of a sincerely held religious belief.

Tᴇx. Cᴏɴsᴛ. art. I, § 6-a. We certified a question regarding the scope of that provision to the Supreme Court of Texas. *Perez*, 115 F.4th at 428, *certified question accepted* (Sept. 6, 2024), *certified question answered*, No. 24-0714, 2025 WL 1675639 (Tex. June 13, 2025). The Supreme Court of Texas accepted and answered that question. *Id.* In doing so, it held that:

> When the Texas Religious Services Clause applies, its force is absolute and categorical, meaning it forbids governmental prohibitions and limitations on religious services regardless of the government's interest in that limitation or how tailored the limitation is to that interest, but the scope of the clause's applicability is not unlimited, and it does not extend to governmental actions for the preservation and management of public lands.

*Perez*, No. 24-0714, 2025 WL 1675639 at *13. In other words, the Supreme Court of Texas made it clear that the religious-service-protections provision of the Texas Constitution does not preclude the City's actions in this case. Because they challenge the City's preservation and management of its public lands, Appellants cannot demonstrate a likeliness of success on the merits of their claim under the religious-service-protections provision of the Texas Constitution. *See id.*

\*    \*    \*

Accordingly, we conclude that the district court did not abuse its discretion in determining that Appellants failed to show a likelihood of success on the merits on any of their four claims—the TRFRA claim, the First Amendment Free Exercise claim, the claim under the freedom-to-worship provision of the Texas Constitution, or the claim under the religious-service-protections provision of the Texas Constitution. *See*

No. 23-50746

*Scott*, 28 F.4th at 671. Thus, no additional analysis is required. "[F]ailure to show a likelihood of success alone is sufficient to justify a denial." C*AE Integrated, L.L.C. v. Moov Techs., Inc.*, 44 F.4th 257, 264 n.22 (5th Cir. 2022).

### C. Injunction Pending Appeal

To obtain an injunction pending appeal, Appellants must satisfy each of the injunction elements. *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). To determine whether to grant an injunction pending appeal, we consider: (1) the likelihood that the moving party will ultimately prevail on the merits of the appeal; (2) the extent to which the moving party would be irreparably harmed by denial of the injunction; (3) the potential harm to opposing parties if the injunction is issued; and (4) the public interest. *See Fla. Businessmen for Free Enter. v. City of Hollywood*, 648 F.2d 956, 957 (5th Cir. Unit B 1981); *Exxon Corp. v. Berwick Bay Real Estate Partners*, 748 F.2d 937, 939 (5th Cir. 1984) (per curiam). As the parties seeking the injunction, Appellants bear the burden of showing that they satisfy each of these elements. *See Ruiz v. Estelle*, 666 F.2d 854, 856 (5th Cir. 1982).

We begin and end with the first factor: likelihood of success on the merits. Appellants claim that they are likely to succeed on the merits of their appeal, arguing that the City's actions—specifically its tree-removal plan and rookery management plan—fail strict scrutiny because these plans (1) lack any compelling governmental interest and (2) are not narrowly tailored. Specifically, Appellants argue that the City seeks to permanently prevent them from performing religious services by destroying the area's spiritual ecology and has never attempted to accommodate their religious exercise.

We have considered Appellants' arguments based on the parties' filings, the district court's opinion, and the relevant caselaw, and conclude that Appellants have failed to establish a likelihood of success on the merits of their claims that the City violated their rights under the federal Free

No. 23-50746

Exercise Clause, the Texas Constitution, or TRFRA. The record evidence establishes that the City has compelling interests. And, in evaluating the relative restrictiveness of the tree-removal and rookery management plans, the record indicates that the City's activities are the least restrictive means to advance the compelling governmental interests presented. The evidence supports that the City's design of the project was a thorough, comprehensive, and complex process involving experts in many disciplines, including arborists, civil engineers, architects, landscape architects, wildlife biologists, and scientists. The City (1) solicited the opinions of experts and others expressing concerns about the Park's trees and wildlife and (2) adjusted its plans regarding the trees so that the number of trees now scheduled for removal has been reduced from 70 to 48, with another 20 trees scheduled for relocation. The City appointed a committee of highly qualified independent arborists to evaluate which trees in the Project Area needed to be removed because of construction restrictions imposed by the bond project construction plans. Moreover, the City's bird deterrence measures are aimed at nesting, not preventing their presence. The migratory birds are still allowed to forage, feed, and rest in the Project Area. Likewise, Appellants' bird deterrence alternatives are not as effective as the current design. The City and its bond project design team theorize that the project will take eight months. To the contrary, Appellants' suggestions—offering a four-month alternative, a six-month alternative, or the prospect of deterring one type of bird and not another—are not the least restrictive means as to the City's compelling interests.

Based on our review, we conclude that Appellants have not demonstrated that they are likely to prevail on their claim that the district court abused its discretion in only partially granting their motion for a

No. 23-50746

preliminary injunction.[32] Because we have concluded that Appellants' have not made the requisite showing of the likelihood of success on the merits, they are not entitled to an injunction pending appeal. *Janvey*, 647 F.3d at 595. Thus, we do not analyze the other injunction elements here.

## IV. Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment. Correspondingly, the appeal as to Appellants' access to the Project Area within the Park is DISMISSED AS MOOT. Because Appellants have failed to show a likelihood of success on the merits, we DENY their Emergency Motion for Injunction Pending Appeal.

---

[32] Appellants sought injunctive relief to require the City to grant them unfettered access to the fenced Project Area for religious worship, minimize tree removal in the Project Area, and allow cormorants to nest in the Project Area. The district court granted injunctive relief as to scheduled group access to the area for religious ceremonies. The court also ordered the City to repair a large broken limb in the Project Area that the City maintained "pose[d] a risk of injury or death." The district court however declined to enjoin the City's planned tree removal and rookery management measures and denied Appellants access for unscheduled individual worship, while the Project Area fencing was actively erected and any dangerous tree limbs posed safety risks to Park visitors. On November 13, 2023, the City affirmed that it had removed the dangerous limb that had previously made the Project Area inaccessible, as ordered by the district court. The City avowed that removing the limb allowed it to reconfigure the construction fencing to grant public access to the entire area.

No. 23-50746

STEPHEN A. HIGGINSON, *Circuit Judge*, concurring in part and dissenting in part:

I dissent for the reasons I stated before. *See Perez v. City of San Antonio*, 150 F.4th 430, 456-63 (5th Cir. 2025) (Higginson, J., concurring in part and dissenting in part). I am grateful that the majority has once again[1] collegially agreed to withdraw a decision that I think is mistaken, this time to avoid misapplication of *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248 (5th Cir. 2010). Simple subtraction of legal authority, however, does not alter the substantial burden on these Church members' religious expression. The majority's reduced opinion that this burden is trivial or mere perception now rests on ipse dixit, not analysis rooted in law.

---

[1] *See Perez v. City of San Antonio*, 115 F.4th 422 (5th Cir. 2024).