# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 27, 2026

Lyle W. Cayce
Clerk

———————————

No. 23-50746

———————————

Gary Perez; Matilde Torres,

*Plaintiffs—Appellants,*

*versus*

City of San Antonio,

*Defendant—Appellee.*

———————————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:23-CV-977

———————————————————————

## ON PETITION FOR REHEARING EN BANC

Before Stewart, Richman, and Higginson, *Circuit Judges.*

Per Curiam:

Treating the petition for rehearing en banc as a petition for panel rehearing (5th Cir. R.40 I.O.P.), the petition for panel rehearing is DENIED. The petition for rehearing en banc is DENIED because, at the request of one of its members, the court was polled, and a majority did not vote in favor of rehearing (Fed. R. App. P.40 and 5th Cir. R.40).

In the en banc poll, six judges voted in favor of rehearing, Chief Judge Elrod, and Judges Smith, Higginson, Willett, Ho,

and OLDHAM, and eleven judges voted against rehearing, JUDGES JONES, STEWART, RICHMAN, SOUTHWICK, HAYNES, GRAVES, DUNCAN, ENGELHARDT, WILSON, DOUGLAS, and RAMIREZ.

James C. Ho, *Circuit Judge*, dissenting from the denial of rehearing en banc:

I am in profound agreement with my dissenting colleagues that we must "apply[] the same standard to people of all faiths," *post*, at __—and that among those is the principle that "[o]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Post*, at __ (quoting *McCurry v. Tesch*, 738 F.2d 271, 275 (8th Cir. 1984) (quoting *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 76–77 (1981)). That's why I sought rehearing en banc in *Siders v. City of Brandon*, 130 F.4th 188 (5th Cir. 2025). And it's why I stand with my dissenting colleagues in voting for rehearing en banc here as well.

Andrew S. Oldham, *Circuit Judge*, joined by Elrod, *Chief Judge*, and Smith, Higginson, Willett, and Ho, *Circuit Judges*, dissenting from denial of rehearing en banc:

The City of San Antonio plans to destroy a sacred Native American religious site. The burdens on plaintiffs' religious freedoms are undeniable. But a panel of our court dismissed them. In my view, this easily meets the standard for en banc rehearing. And I respectfully dissent from the majority's contrary view.

I

Gary Perez and Matilde Torres are members of the Lipan-Apache Native American Church. "For centuries, [their] ancestors have gathered at a specific bend along the [San Antonio] River to meditate, worship, and pray." *Perez v. City of San Antonio*, 150 F.4th 430, 456 (5th Cir. 2025) (Higginson, J., concurring in part and dissenting in part), *opinion withdrawn and superseded on reh'g,* 163 F.4th 110 (5th Cir. 2025). Specifically, church members understand "the trees and cormorants that occupy a twenty-foot by thirty-foot area" near the River to be "the 'axis mundi,'" a bridge between this world and the after-life. *Id.* at 457. These elements form a cohesive "spiritual ecology;" the trees' roots "go into the underworld, underneath the earth," before "ris[ing] all the way up into the heavens," while the cormorants signify "a spirit . . . [that] scattered life-giving water across the San Antonio River Valley" in the church's creation story. *Ibid.* As in many faiths, the trees and cormorants' religious significance to the Native American Church turns on a tight relationship between the sign and the thing signified—"ceremonies cannot be properly administered without specific trees present and cormorants nesting." *Id.* at 435.

The City of San Antonio owns the land on which this sacred site rests, called Brackenridge Park. In 2022, the City announced "reformation efforts"

in the Park. Among other things, the City plans to uproot most of the trees in the sacred area and deploy "pyrotechnics, clappers, spotlights, lasers, distress calls, effigies, balloons, explosives, and drones" to keep the cormorants away. *Perez*, 163 F.4th at 116. The City maintains that this campaign "[will] not harm the birds." *Ibid.* But the City concedes that its heavy artillery is intended to and likely will prevent cormorants from nesting in the Sacred Area.

Recognizing a grave threat to their religious practices, Perez and Torres sued under, *inter alia*, the Texas Religious Freedom Restoration Act ("TRFRA"). They sought an injunction preventing the City from moving forward with its destructive campaign. The district court denied the injunction, and plaintiffs appealed.

After a tortured procedural history, including a certified question to the Texas Supreme Court, a panel of this court affirmed. *See Perez*, 163 F.4th at 114. As to TRFRA, the panel held that the City's campaign of tree removal, pyrotechnics, lasers, and explosives would not substantially burden the plaintiffs' religious practice and, even if it did, the City's deforestation and artillery were the least restrictive means of furthering its compelling need to repair the park.

## II

That's wrong on both counts. But the substantial-burden point is the most egregious. First, the City's plan substantially burdens religious conduct under any reading of TRFRA. Second, the panel majority's faulty substantial burden analysis poses a particularly acute risk to minority faiths. Third, the better approach is to apply the same standards to all people.

*First*, the existence of a substantial burden. Under TRFRA, a burden is "substantial if it curtails religious conduct and impacts religious expression to a 'significant' and 'real' degree." *A.A. ex rel. Betenbaugh v. Needville Indep.*

*Sch. Dist.*, 611 F.3d 248, 265 (5th Cir. 2010) (citing *Barr v. City of Sinton*, 295 S.W.3d 287, 305 (Tex. 2009)). And burden is considered from "the person's perspective, not from the government's." *Id.* at 264. This is not a high bar for religious observers. The government can still prevail if it can show that it's using the least-restrictive means to pursue a compelling interest. But the law requires the government to bear that burden; it requires relatively little from would-be worshipers.

Nobody disputes that plaintiffs' religious practice at the Sacred Area "relies on the presence of trees [and] birds," even down to "specific trees." *Perez*, 163 F.4th at 115 (majority opinion). So nobody should dispute that destroying most of the trees, relocating others, and targeting the birds with a campaign of pyrotechnics and explosives objectively burdens plaintiffs' worship. To put it quite simply, plaintiffs will be unable to practice their faith if the City's plans go forward. If that is not a substantial burden, I do not know what is.

*Second*, the panel majority's contrary analysis is wanting. In the few sentences the majority devoted to substantial burden, the panel noted that plaintiffs "continue[] to have virtually unlimited access to the park," that "no cormorants . . . inhabit [the park] for extended periods of time each year," and that "cormorants are not specifically targeted" and may "nest[] nearby or elsewhere in the 343-acre Park." *Perez*, 163 F.4th at 122. Respectfully, these are non sequiturs. "[V]irtually unlimited access to the park" is useless if the park's Sacred Area is destroyed. *See Perez*, 150 F.4th at 460 (Higginson, J., concurring in part and dissenting in part) (calling this logic "mistaken"). That cormorants do not nest in the park for "extended periods" is interesting, but the City intends to *permanently* drive off the birds with pyrotechnics and lasers. And plaintiffs' ability to go "elsewhere in the 343-acre Park" misses the point entirely: their practice relies on the unique spiritual ecology of this riverbend. *Id.* at 135; *see Perez*,

150 F.4th at 461 (HIGGINSON, J., concurring in part and dissenting in part) ("To the extent the majority suggests that Appellants can obtain spiritual fulfilment by exercising their religious beliefs in a manner contrary to their testimony, such reasoning is forbidden."). One searches this analysis in vain for a "granular focus on the specific facts, practices, and interests" at stake. *Paxton v. Annunciation House, Inc.*, 719 S.W.3d 555, 584 (Tex. 2025).

But there's more at play here than just misreading TRFRA. Does anyone imagine, for instance, that a court would deem insubstantial a ban on accessing the Lord's Table because congregants can still sit in the pews? Could the government ban baptisms as long as Christians have "virtually unlimited access" to water? Or could the State ban Lord's Day services because the church is empty six days a week? These are judgment calls we simply do not make. *See Merced v. Kasson*, 577 F.3d 578, 590 (5th Cir. 2009) ("The judiciary is ill-suited to opine on theological matters, and should avoid doing so."). And if the government were to padlock a church on the theory that Christians could worship elsewhere, we would not hesitate to hold it unlawful: "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *McCurry v. Tesch*, 738 F.2d 271, 275 (8th Cir. 1984).

Yet in singling out plaintiffs' beliefs for dismissal, the panel joins an unfortunate line of cases treating "the distinctive qualities of Indigenous religious practices regarding sacred sites" as a reason to deny relief. Stephanie Hall Barclay & Michalyn Steele, *Rethinking Protections for Indigenous Sacred Sites*, 134 HARV. L. REV. 1294, 1298–99 (2021); *see also* Jessica M. Wiles, *Have American Indians Been Written Out of the Religious Freedom Restoration Act*, 71 MONT. L. REV. 471, 474 (2010). The encouragement to simply worship "elsewhere" reflects this unfortunate tendency.

As Justice Gorsuch recently noted in *Apache Stronghold v. United States*, 605 U.S. ____, 145 S. Ct. 1480, 1488 (2025), many American Indians "live far from Washington, D.C., and their history and religious practices may be unfamiliar to many. But that should make no difference." (Gorsuch, J., dissenting from denial of certiorari). Here, treating all religions alike requires recognizing the Sacred Area's value to plaintiffs and the burden posed by the City's destructive plans, just as courts recognize the value of church attendance and the burden imposed by forbidding such attendance. *See, e.g.*, *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717–20 (2021) (statement of Gorsuch, J.) (recognizing a "total ban on religious singing" and church attendance as clearly unconstitutional).

*Third*, respecting sacred sites—and recognizing the substantial burdens that attend their destruction—would not privilege Native American religions. Rather, it treats them equally. The law already recognizes that other believers have the right "to use their sacred sites in a manner consistent with their theological requirements, free from government interference." Barclay & Steele, *supra*, at 1346. An obvious example is *McCurry*, which held barring the doors of a Christian church obviously and substantially burdens religion. *See id.* at 1327–28 (discussing the case). And courts already prohibit objective governmental interference with religious volunteerism in the context of non-Indigenous faiths. *Id.* at 1346. For example, imposing mandatory LGBTQ+ instruction can substantially burden families with contrary religious beliefs. *Mahmoud v. Taylor*, 606 U.S. 522 (2025). The threat of a small criminal fine is a substantial burden on Amish families who do not want to send their kids to public school. *Wisconsin v. Yoder*, 406 U.S. 205 (1972); *see also Mahmoud*, 606 U.S. at 557–59 (reaffirming *Yoder*). And the prohibition on bringing a kirpan to a government workplace substantially burdens a Sikh IRS agent. *Tagore v. United States*, 735 F.3d 324, 330 (5th Cir. 2013).

It is no answer to say the substantial-burden analysis should be different when the government owns the place where individuals worship, as it owns Brackenridge Park. Courts routinely recognize substantial burdens on religious practice in prisons, the military, and zoning decisions—even though the government has plenary power and coercive control over those areas. *See* Barclay & Steele, *supra*, at 1333–43 (collecting cases). The substantial burdens recognized in those areas include denying scented oils and sweat lodges in prisons, *id.* at 1334–35, denying Sikh turbans in the military, *id.* at 1338, and denying zoning approval for church expansions, *id.* at 1338–39.

Why apply a different, less-protective standard to people of Indigenous faiths? And if we're applying the same standard to people of all faiths, can it seriously be said that bulldozing a sacred site and artillery-blasting the cormorants in a church's creation story is somehow less burdensome than the five-dollar fine in *Yoder* or the workplace kirpan ban in *Tagore* or the denial of scented oils in prisons?

I respectfully dissent.